# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

# BECKLEY DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                             CRIMINAL ACTION NO. 5:14-cr-00244

DONALD L. BLANKENSHIP,

        Defendant.

# MEMORANDUM OPINION AND ORDER

The Court has reviewed the *Motion of the Wall Street Journal, the Associated Press, Charleston Gazette, National Public Radio, Inc., and the Friends of West Virginia Public Broadcasting, Inc., to Intervene for the Limited Purpose of Moving the Court to Reconsider and Vacate the November 14, 2014 Gag and Sealing Order* (Document 30), as well as the *Memorandum in Support* (Document 31). The Court has also reviewed the *Defendant's Response to the Motion of the Wall Street Journal, the Associated Press, Charleston Gazette, National Public Radio, Inc., and the Friends of West Virginia Public Broadcasting, Inc., to Intervene for the Limited Purpose of Moving the Court to Reconsider and Vacate the November 14, 2014 Gag and Sealing Order* (Document 41), filed on December 11, 2014. The Wall Street Journal, Associated Press, Charleston Gazette, National Public Radio, Inc., and the Friends of West Virginia Public Broadcasting, Inc., (together, "the Movants") seek to intervene in this criminal matter to challenge the Court's November 14, 2014 *Order* (Document 3). For the reasons explained more fully herein, the Court finds that the motion should be granted in part and denied in part.

## I. FACTUAL AND PROCEDURAL HISTORY

The Defendant was indicted on November 13, 2014, in the United States District Court for the Southern District of West Virginia. He is charged with violating certain laws and regulations of the United States. On November 14, 2014, this Court entered an *Order* (Document 3), whereby,

> neither the parties, their counsel, other representatives or members of their staff, potential witnesses, including actual and alleged victims, investigators, family members of actual and alleged victims as well as of the Defendant, nor any court personnel shall make any statements of any nature, in any form, or release any documents to the media or any other entity regarding the facts or substance of this case.

(Document 3 at 1.) The Court ordered that "any and all motions, stipulations, discovery requests, responses, supplemental requests and responses, and other relevant documents shall be filed directly with the Clerk pursuant to Rule 49.1 of the Local Rules of Criminal Procedure." (*Id.* at 1-2.) The Court further ordered that "access to all documents filed on CM/ECF in the above styled matter be restricted to the case participants and court personnel," but ordered that the Clerk "make the docket entries publicly available." (*Id.* at 2.) As support for the order, the Court noted that "the Defendant and the matters which are referenced in the indictment have been the subject of publicity," and, thus, "in light of the prior publicity, the Court finds it necessary to take precautions to insure that the Government and the Defendant can seat jurors who can be fair and impartial and whose verdict is based only upon the evidence presented during trial." (*Id.* at 1.)

On December 1, 2014, the Movants filed their motion to intervene, and on December 17, 2014, the Court held a hearing on the motion. Counsel, Sean P. McGinley, appeared on behalf of the Movants, and the Court heard argument as to the propriety of intervening in a criminal matter

and on the merits of the motion to vacate or modify the November 14, 2014 order. During the hearing, the Court granted the motion to intervene, for the reasons stated on the record and as further discussed *infra*.

On December 18, 2014, the Court received a *Proposed Brief Amicus Curiae of the American Civil Liberties Union of West Virginia Foundation in Support of Motion of the Wall Street Journal, the Associated Press, Charleston Gazette, National Public Radio, Inc., and the Friends of West Virginia Public Broadcasting, Inc. to Intervene for the Limited Purpose of Moving the Court to Reconsider and Vacate the November 14, 2014 Gag and Sealing Order* (Document 55). The Court **ORDERS** that the Amicus brief be **ACCEPTED** and has reviewed the same before issuing this opinion.

## II. DISCUSSION

The Movants initially argue that they enjoy constitutional standing because "there exist willing speakers whose speech to the [Movants], other press and the public is restricted by the gag and sealing order." (Document 31 at 5-6.) It is axiomatic that a "party invoking federal court jurisdiction must demonstrate that the conduct of which he complains has caused him to suffer an injury in fact that a favorable judgment will address." *Doe v. Public Citizen*, 749 F.3d 246, 262 (4th Cir. 2014) (citations and quotation omitted.) The Fourth Circuit has permitted news organizations to intervene in actions where "they were not otherwise parties to challenge a district court's sealing order." *Id.* (reference omitted.) "Article III standing demands that a litigant demonstrate an invasion of a legally protected interest that is concrete and particularized and actual or imminent." *Id.* at 263.

The Court finds that the Movants possess constitutional standing to challenge the November 14, 2014 order. It is less clear, however, that a motion to intervene in the criminal law context is the appropriate vehicle for airing the Movants' grievances. A review of pertinent case law indicates that news media outlets have used other vehicles to challenge court orders that purportedly limit access, including writs of prohibition or mandamus under the All-Writs Act, 28 U.S.C. § 1651. Furthermore, the Court is mindful that "Mandamus is the preferred method for review of orders restricting press activity related to criminal proceedings." *In re Washington Post Co.*, 807 F.2d 383, 388 (4th Cir. 1986). However, intervention, in criminal matters, has been permitted in other circuits. See, e.g., *United States v. Aldawsari*, 683 F.3d 660, 662 (5th Cir. 2012). As addressed during the hearing held on December 17, 2014, the Court, having found standing and having found that the underlying substantive issues should be decided, exercises its discretion in favor of granting intervention for the limited purpose of entertaining the Movants' substantive argument(s).

The Movants challenge the order as impermissibly suppressing their ability to access the parties—including actual and alleged victims and their family members—and further maintain that this Court improperly sealed court records. They argue that the entire order is overbroad and infringes on common law and First Amendment rights of the press to gather and report the news to the public. (Document 31 at 8.) ("The gag order is a prior restraint on the speech of those identified, and the sealing order has a blanket impact, thereby depriving the press and public of access to all past and future court records in this case.") They argue that the order fails strict constitutional scrutiny because it is overbroad and not narrowly tailored since it does not employ less restrictive alternatives. (*Id.* at 11-14, 16-17.)

4

In support, they state that the Court should have held a hearing and made specific findings consistent with *In re The Charlotte Observer*, 882 F.2d 850 (4th Cir. 1989), before "sealing" the docket. They maintain that the order is ineffective and unnecessary because there is "no evidence here that the gag and sealing order would be effective to protect the Defendant's right to a fair trial," and that certain documents are already publicly available. (*Id.* at 15.)

The Movants argue several alternatives to the order, including implementation of *voir dire* and a change of venue for trial. (*Id.* at 15-16.) They give great weight to the notion that "even with the gag and sealing order in place, the press will continue to follow the investigation and prosecution, but the gag and sealing order will leave only second-hand sources free to talk with the press." (*Id.* at 18.) Furthermore, they argue that the order "not only act[s] as a prior restraint upon the [Movants'] ability to gather and disseminate the news, but also erects a barrier to the public's full understanding of these newsworthy proceedings." (*Id.*) The Court addresses each of the arguments below, but first recognizes the various interests at stake. The Court must consider not only the First Amendment rights of the press, the public, and the parties, but also the Defendant's Sixth Amendment right to a trial in an impartial tribunal. Further, the Court observes the public's right to the prompt administration of justice, trial participants and witnesses' right to privacy throughout the proceedings, the rights of alleged victims, including, of course, the right to attend trial as well as the legal preference that a defendant be tried in the district in which he is indicted. All of these interests underscore the balancing act that courts must engage in when seeking to protect each interest. In deciding the issue at hand, precedent tells us that the First and Sixth Amendment interests are, of course, paramount for our consideration.

*A. Restricting Speech of the Parties and Potential Trial Participants*

"Orders restricting parties, witnesses and attorneys from discussing a pending case with the press are not unusual." *In re the State-Record Co., Inc.*, 917 F.2d 124, 128 (4th Cir. 1990). The Fourth Circuit has noted that permitting witnesses to discuss matters related to their testimony with the press "is not an appealing scenario and did not require more than the reasonable likelihood of prejudice standard." *Id.* (Internal quotations omitted.) The Court finds, under the facts and circumstances presented here, that restricting the parties and potential trial participants' statements to the press at the outset helps preserve the Defendant's right to a fair and just tribunal.1[1]

The Court is mindful of its "dut[ies] to protect [the Defendant] from the inherently prejudicial publicity which [can] saturate[ ] the community and to control disruptive influences in the courtroom." *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966). The Court accepts this duty even in light of the Supreme Court's reasoning in another case that "pretrial publicity even pervasive, adverse publicity does not inevitably lead to an unfair trial." *Nebraska Press Association v. Stuart*, 427 U.S. 539, 554 (1976). While adverse pretrial publicity may not inevitably lead to prejudice in every situation, the type of publicity limited by this Court's order would inevitably lead to prejudice in this case. The Court has the discretion and, more importantly, the duty to take specific, reasonable steps to guard against prejudice at the outset where it has knowledge, given prior publicity, that continued publicity, regarding the facts underlying the indictment, is likely to taint prospective jurors. Courts do not exist or operate in a

---

1  The Movants apparently misunderstand the breadth of the Court's order. Counsel for the Movants argued that a higher standard applies because the order extends beyond trial participants. He used the family members of victims as an example. However, the order applies only to those who may appear during some stage of the proceedings as parties or as witnesses. Even if not direct witnesses to the alleged offenses, victims and their family members may be witnesses at sentencing or potential beneficiaries of restitution, should the case reach that posture. As such, they are "trial participants."

vacuum. In the Southern District of West Virginia, we live in coal country. Many of our families depend on coal mining for their livelihood. Many families and communities within the Southern District of this state were impacted by the deaths of the miners in the Upper Big Branch mine explosion referenced in the indictment. Interest in this case is, understandably, heightened by that loss of life. In short, the environment matters.

In *Nebraska Press Association*, the Supreme Court of the United States reversed a Nebraska state court that had "enjoined the publication of certain kinds of information about the [defendant's] case." 427 U.S. at 561. *Nebraska Press Association* involved the criminal prosecution of Erwin Charles Simants for murdering six members of the Henry Kellie family in their home. *Id.* at 542. "The crime immediately attracted widespread news coverage, by local, regional, and national newspapers, radio and television stations." *Id.* Three days after the murders, both the defendant's attorney and the county attorney moved for a restrictive order preventing dissemination of information through the parties to the press. *Id.* In response, the Nebraska state court entered an order "prohibiting reporting or commentary on judicial proceedings held in public." *Id.* at 570. Reversing the order, the Supreme Court reasoned that the underlying state court judge did not make specific findings as to both the effectiveness of restraining the press from reporting the proceedings, and the efficacy of alternative measures such as (i) *voir dire*, (ii) delaying the trial date until the prejudicial publicity receded, and (iii) potentially changing venue for trial. *Id.* at 563-64, 569. In short, the Nebraska state court had failed to meet the "heavy burden" required to justify restraining the press from publishing information gained even from sources other than public court proceedings. *Id.* at 570. ("We hold that . . . [t]o the extent that [the order] prohibited publication based on information gained

7

from other sources, we conclude that the heavy burden imposed as a condition to securing the prior restraint was not met.")

This Court's order is not directed toward the press. In fact, the Court in *Nebraska Press Association* noted the possibility that "trial courts in appropriate cases [could] limit what the contending lawyers, the police, and witnesses may say to anyone." *Id.* at 564. The Movants also suggest that this Court's order is similar to the order at issue in *CBS v. Young*, 552 F.2d 234 (6th Cir. 1975). The order in *Young* applied to "all parties concerned with this litigation," including "close friends and associates" of the parties, and further, prevented discussion "in any manner whatsoever" about the case. *Young*, 552 F.2d at 236.

In contrast to the orders found in *Nebraska Press Association*, *Young*, and other case law cited by the Movants, here the order does not prohibit the press from publishing news articles about the case. This is a crucial distinction, and one that the Movants fail to acknowledge. The order simply prevents the press from filling publications with quotes and accounts springing from the parties or potential trial participants that would likely influence or taint potential jurors and impede the Court's ability to seat a jury within the district. The order does not prevent the parties from talking to the press. It only limits the subject matter. This distinction further evinces the narrowly tailored nature of the order, in that it only restricts the parties and trial participants from making extra-judicial statements about the facts or substance of the case to the press. The order, as currently constituted, does not prevent the press from relaying events that transpire in the courtroom during hearings or trial. The order is designed, however, to prevent likely prejudice resulting from prospective jurors forming opinions about the "facts and substance of the case" based on statements made by persons who could appear before them during the trial.

8

There are "two evils that threaten the integrity of the judicial system. Those evils are (1) comments that will likely influence the outcome of a trial and (2) statements that will prejudice the jury venire even if an untainted jury panel can eventually be found." *In re Morrissey*, 168 F.3d 134, 140 (4th Cir. 1999). The Court has reviewed many of the news articles printed since this case began, and has reviewed many more that were written following the Upper Big Branch explosion on April 5, 2010. Some of these articles include statements made by family members of the victims. Other articles include statements from investigators tasked with determining the cause of the explosion. Some center on statements made by the Defendant. However, media attention had died down during the time period between the explosion in 2010 and the indictment in November 2014. That lapse of time created a buffer that reduced the risk of a tainted jury pool. *Skilling v. United States*, 561 U.S. 358, 383 (2010). Further, the coverage prior to the indictment necessarily did not include the particulars that are most likely to prejudice a jury, namely, discussion of this defendant's guilt or innocence of the particular crimes alleged. Thus, pre-indictment press coverage was not such that any restrictions now imposed are ineffective.

The press has exercised its right to report extensively on the indictment and proceedings in this case. Since the indictment was returned, many news articles have featured the Defendant, the victims and their families, and/or the underlying investigation. The Court finds, given the environment and the nature of the allegations, that there is a reasonable likelihood that these publications could prejudice the jury selection process and/or influence the outcome of a trial, absent the Court's restrictions on access to certain sources of information. See *In re Russell*, 726 F.2d 1007, 1010 (4th Cir. 1984). The discussion on alternative measures to the order restricting speech is found *infra.*

*B. Limiting Access to Documents*

"It is well settled that the public and press have a qualified right of access to judicial documents and records filed in civil and criminal proceedings." *Doe v. Public Citizen*, 749 F.3d 246, 265 (4th Cir. 2014). The Movants' common law right "does not provide as much access to the press and public as does the First Amendment." *In re the State-Record Company*, 917 F.2d at 127. Indeed, "[u]nder the common law the trial court's denial of access to documents is reviewed for abuse of discretion, but under the First Amendment, such denial is reviewed *de novo* and must be necessitated by a compelling government interest that is narrowly tailored to serve that interest." *Id.* (citing *In re Washington Post Co.*, 807 F.2d at 390.) "The right of access to criminal proceedings is not absolute, but must be balanced against other compelling interests protected by the Constitution, such as the right of the accused to a fair trial." *In re Knight Pub. Co.,* 743 F.2d 231, 234 (4th Cir. 1984). (reference omitted.)

*In re The Charlotte Observer* presented the issue(s) of whether the Magistrate Judge's sealing of pleadings and closing off of the courtroom in relation to a motion to change venue was constitutional. 882 F.2d at 852. It involved a federal criminal case charging two defendants "with multiple counts of mail and wire fraud arising out of their activities with the PTL religious organization." *Id.* at 851. The Fourth Circuit held that the orders were unconstitutional, noting the respective judge must base the decision to close with "specific judicial findings that (1) there is a substantial probability that the defendant's right to a fair trial will be prejudiced by publicity; (2) there is a substantial probability that closure would prevent that prejudice; and (3) reasonable alternatives to closure cannot adequately protect the defendant's fair trial rights." *Id.* at 853. (internal citation omitted.) The judge must also "give interested parties prior notice and an

opportunity to be heard before deciding the issue, and support any decision to close with specific reasons and findings on the record to facilitate de novo review of such closure orders that is mandated by their constitutional implications." *Id.* (citing *In re Washington Post Co.*, 807 F.2d at 391.)

Less than a year later, the Fourth Circuit again visited the issue. *In re the State-Record Co., Inc.* involved a "gag" order that was subsequently expanded to documents filed in connection with certain pleadings. 917 F.2d at 127. ("Although the original motion was to stop extra-judicial statements by the attorneys and the parties, this motion was expanded in open court to cover documents the government filed in response to requests for Brady material and Federal Rule of Evidence 404(b) material.") The primary issue for the Fourth Circuit was whether the district court erred when it used the reasonable likelihood—as opposed to substantial probability standard—in deciding to seal the records.

Although it noted the ever-present "tension between First Amendment right to a free press and Sixth Amendment right to a trial by an impartial jury," the Fourth Circuit concluded that "[i]t was error for the district court to use the "reasonable likelihood" standard rather than the "substantial probability" standard in deciding to seal the court's records." *Id.* at 128. The court also noted that "[t]here are probably many motions and responses thereto that contain no information prejudicial to a defendant, and we cannot understand how the docket entry sheet could be prejudicial." *Id.* at 129. It suggested methods that courts could implement to guard against prejudice to the defendant, noting that "opposing counsel could be contacted to review the document" and "if the attorneys could not agree, the document would be submitted to the trial court," which could then find "after applying the substantial probability standard, that such

11

information would create pretrial prejudice, the document could be redacted by the court for the public, with the original being filed with the Clerk under seal." *Id.*

More recently, in *Public Citizen*, the Fourth Circuit had to determine whether allowing a company to secretly litigate to enjoin the publication of information adverse to one of its products violated the "public's constitutional and common-law rights of access to judicial records and documents." *Public Citizen*, 749 F.3d at 252. There, the district court granted the company's motion to seal the entire civil record and proceed under a pseudonym, finding that the company's "interest in reputational and fiscal health" was compelling, and "outweighed the public's abstract interest in obtaining information about the lawsuit." *Id.* at 255. (internal quotations omitted.) Most of the docket entries in the civil action were entirely sealed, and the district court's memorandum opinion and order in favor of judgment for the company was unsealed several months after the fact, and was largely redacted. *Id.* Relevant to the discussion at bar, the Fourth Circuit Court of Appeals reversed the district court's decisions, finding that (1) there were no extraordinary circumstances that supported the company's request to litigate under a pseudonym, and (2) the company's unsupported fear of financial harm did not outweigh the public's presumptive right of access to the documents and summary judgment determination of the court. *Id.* at 271-275.

One important distinction between the order at issue and the order considered in *Public Citizen* is the sealing of the docket. Contrary to the Movants' suggestion that the November 14, 2014 order sealed the docket, the order instructs the Clerk of the Court to render the docket and docket sheet available for public inspection. The Court does note that while the press and public may not see the actual documents and attachments thereto, in many instances, they are able to see

the docket entry and can determine the nature of the record and follow the progression of the criminal case. "The docket sheet provides onlookers an overview of the court proceedings and allows them to ascertain the parties to the case, the materials that have been filed, and the trial judge's decisions." *Public Citizen*, 749 F.3d at 268. Thus, while the order can be seen as limiting the press and public's right of "access," even in its initial form, it does not commit the fatal flaw of sealing the docket sheet or otherwise obscuring docket entries. "In this respect, docket sheets provide a kind of index to judicial proceedings and documents, and <u>endow the public and press with the capacity to exercise their rights</u> guaranteed by the First Amendment." *Public Citizen*, 749 F.3d at 268. (emphasis added.)

Assuming *arguendo* that the order had the effect of sealing the docket, the respective interests of the Defendant and any potential trial participants are compelling, and these interests heavily outweigh the public and media's presumptive right of access guaranteed under the First Amendment in this instance. It is deep-rooted that a defendant's right to a fair trial is a compelling interest. Indeed, it is the very bedrock of our criminal law jurisprudence. Similarly, protecting the privacy rights of trial participants such as potential witnesses and victims has also been found to be a compelling interest. "The interests that courts have found sufficiently compelling to justify closure under the First Amendment include a defendant's right to a fair trial before an impartial jury . . . [and] protecting the privacy rights of trial participants such as victims or witnesses." *Public Citizen*, 749 F.3d at 269. (citations omitted.) Yet, the Fourth Circuit made clear in *Public Citizen* that:

> When presented with a motion to seal, the law in [the Fourth] Circuit requires a judicial officer to comply with the following procedural requirements: (1) provide public notice of the sealing request and a reasonable opportunity for the public to voice

> objections to the motion; (2) consider less drastic alternatives to closure; and (3) if it determines that full access is not necessary, it must state its reasons—with specific findings—supporting closure and its rejections of less drastic alternatives.

*Public Citizen*, 749 F.3d at 272.

Having given full consideration to the rights of the Movants and to the rights of the Defendant, the Court finds that public (and press) access to certain types of documents will serve to keep the public well-informed without unduly impacting the Defendant's right to a fair trial. Accordingly, the Court will issue an amended order and a separate order specifying certain documents that were restricted by the initial order, that are to be publicly accessible under the terms of the amended order. Documents that have already been publicly released, of course, may remain public on the docket without increasing the risk of prejudice. In addition, any documents that do not contain information or argument related to the facts and substance of the underlying case do not fall within the purview of the November 14th order, and should be publicly accessible. Similarly, absent specific instruction to the contrary, all orders and opinions of the Court should be accessible under the terms of the order. Access to all documents, except those authored by the Court, that contain information or argument as to the facts and substance of the case, however, must continue to be restricted to case participants and court personnel. Permitting the disclosure of such documents, like parties' statements, presents the substantial probability of tainting prospective jurors, by trial in the media, thereby prejudicing the Defendant's right to a fair and impartial trial in a court of law.

### C. Narrowly Tailored and Least Restrictive

After hearing argument, the Court finds that there is a substantial probability that irreparable damage would attach to the Defendant's right to a fair trial if it did not limit the docket,

14

due to prior and ongoing publicity, and the nature of said publicity. The Court finds that alternatives to limiting the docket would not adequately protect the Defendant's right to a fair trial. The proffered alternatives are merely ineffective reactions once prejudice has occurred.

The Court has considered alternatives to its November 14th order (as amended) that would be less restrictive, including *voir dire* and the potential for a change of venue, but finds that they are not "alternatives" in the sense that they were not and are not feasible options at the time. On November 14, 2014, *voir dire* and a change of venue would not help avert probable prejudice to insure the Defendant's right to an impartial tribunal or the witnesses' right to privacy. With appropriate *voir dire*, the court attempts to prevent jurors prejudiced by press coverage from being seated, but that process does not prevent the initial pervasive tainting of the prospective jury pool. Transfer of venue, likewise, takes place after pretrial publicity has tainted the jury pool such that a jury cannot be seated within the district and, as discussed during the hearing and below, implicates further policy considerations regarding the preference to hold trials in the district of indictment.[2] Of course, sequestration assumes that a jury could, in fact, be seated, and is not a viable alternative.

As a result, the Court finds that limiting access to the docket was, and remains the most effective method to protect against prejudice, while still allowing the public to follow the case. In other words, the Court finds that the order, as amended, is appropriate, particularly in light of the fact that restricting speech and limiting access to the docket is the only practical measure that is available to the Court, pretrial. The alternatives espoused by the Movants "fall short of serving

---

2  The Court does note, however, that the initial order did not explicitly specify that the restrictions would last only so long as necessary to protect the Defendant's right to trial by an impartial jury. Accordingly, the amended order will include language clarifying that all restrictions will be lifted upon adjudication of the Defendant's guilt or innocence.

[the Defendant's and witnesses'] compelling interests," *Burson v. Freeman*, 504 U.S. 191, 206 (1992), and thus, are not serious, viable alternatives at this stage of the litigation.

Importantly, allowing the press and/or public access to specific arguments included in the parties' submissions and exhibits in support would likely defeat the restriction placed on the parties to forego speaking about the "facts and substance of the case" to the press. On the other hand, restricting access to the filings, but not restricting statements made by the parties, would work a similar prejudice against the Defendant's right to a fair trial and witnesses' right to privacy. The order is most effective when both portions are in place. Put simply, the objectives of the order would be defeated if either aspect was omitted. Thus, it is not overbroad, but *necessary* to effectively limit probable prejudicial publicity before trial. For similar reasons, the order is not overbroad simply because it "extend[s] to the family members not just of parties, but of victims and alleged victims." (Document 31 at 9.) Allowing a potential trial participant to speak through his or her family member would eviscerate the protective measures, and is further evidence of the need for the inclusive order.

This matter has already been the subject of extensive pre-trial motion practice. Recent filings (see Document 41) and statements made by the Defendant's counsel at the hearing on December 17, 2014, indicate that this will continue. If prospective jurors in the public are constantly inundated with news articles detailing specific allegations and arguments contained in filings related to, for example, a motion to transfer venue, or, on the other hand, a motion to dismiss the indictment as allegedly fatally flawed, then there is a substantial probability of predisposition. This fact is amplified when dealing with the modern digital age and its technological achievements that allow duplication and distribution of data relevant to the litigation

within seconds. The Court finds that there is a substantial probability that the order will help insure the Court's ability to seat an impartial jury.

The Court finds that the order is further supported by policy considerations. For example, Article III, Section 2, Paragraph 3, of the United States Constitution mandates that a "Trial shall be held in the State where the said Crimes shall have been committed," while the Sixth Amendment to the United States Constitution dictates that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law." Rule 18 of the Federal Rules of Criminal Procedure likewise commands that "[u]nless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed. The Court must set the place of trial within the district with due regard for the convenience of the defendant, any victim, and the witnesses, and the prompt administration of justice." F. R. Crim. P. 18. Clearly, the laws of our Nation favor criminal trial in the district where the offense was committed. As the Supreme Court pointedly stated in *Sheppard v. Maxwell*,

> we must remember that reversals are but palliatives; the cure lies in those remedial measures that will prevent the prejudice at its inception. The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences. Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate its function.

*Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966).

The subject order does not apply like a blanket covering all statements and documents that may have anything to do with the facts or substance of this case. It does not shield all filings from

public inspection or debate. It is not vague because it applies to a specific set of individuals who are either already involved in the case or may be in the future. The press will not have to rely on second-hand sources because they are free to attend the hearings and trial, and can report developments firsthand. The order is narrowly tailored to ensure a fair trial, while at the same time protecting the right of the press to report about the case and the public's right of access.

**CONCLUSION**

WHEREFORE, after careful consideration, and based on the findings made herein, the Court **ORDERS** that the *Motion of the Wall Street Journal, the Associated Press, Charleston Gazette, National Public Radio, Inc., and the Friends of West Virginia Public Broadcasting, Inc., to Intervene for the Limited Purpose of Moving the Court to Reconsider and Vacate the November 14, 2014 Gag and Sealing Order* (Document 30) be **GRANTED IN PART AND DENIED IN PART.** The Court **ORDERS** that the Movants be permitted to intervene for the limited purpose of challenging this Court's order entered on November 14, 2014. The motion is **DENIED** to the extent it requests that the Court vacate the order, but **GRANTED** to the extent it seeks modifications to the order.

The Court **DIRECTS** the Clerk to send a copy of this order to Sean P. McGinley, to the Defendant and counsel, to the United States Attorney, to the United States Probation Office, and to the Office of the United States Marshal.

ENTER: January 7, 2015

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA