CASE NO: _____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

## IN RE THE WALL STREET JOURNAL, THE ASSOCIATED PRESS, CHARLESTON GAZETTE, NATIONAL PUBLIC RADIO, INC., AND THE FRIENDS OF WEST VIRGINIA PUBLIC BROADCASTING, INC.,

*Petitioners.*

Petition for Writ of Mandamus to the
United States District Court for the Southern District of West Virginia in
*U.S. v. Blankenship*, No. 5:14-cr-00244-1 (S.D. W.Va.)

## PETITION FOR WRIT OF MANDAMUS ON BEHALF OF THE WALL STREET JOURNAL, THE ASSOCIATED PRESS, CHARLESTON GAZETTE, NATIONAL PUBLIC RADIO, INC., AND FRIENDS OF WEST VIRGINIA PUBLIC BROADCASTING, INC.

Sean P. McGinley, Esq.
DITRAPANO BARRETT DIPIERO
    MCGINLEY & SIMMONS, PLLC
604 Virginia Street East
Charleston, WV 25301
Phone: 304-342-1033
Sean.mcginley@dbdlawfirm.com

David A. Schulz
Katherine M. Bolger
LEVINE SULLIVAN KOCH & SCHULZ LLP
321 West 44th Street, Suite 1000
New York, NY 10014
Phone: 212-850-6100
dschulz@lskslaw.com
kbolger@lskslaw.com

*Counsel for Petitioners The Wall Street Journal, The Associated Press, Charleston Gazette, National Public Radio, Inc., and Friends of West Virginia Public Broadcasting, Inc.*

## STATEMENT REGARDING ORAL ARGUMENT

Due to the significant First Amendment issues raised by the Petition for Writ of Mandamus, Petitioners respectfully request this Court to grant oral argument in this case.

# DISCLOSURE OF CORPORATE AFFILIATIONS

Pursuant to Federal Rule of Appellate Procedure Rule 26.1 and Local Rule 26.1, Petitioners submit the following disclosures:

1. ***The Wall Street Journal*** is published by Dow Jones & Company, a global provider of news and business information. *The Journal* maintains one of the world's largest newsgathering operations, with more than 1,800 journalists in nearly fifty countries publishing news in several different languages. Dow Jones also publishes *Barron's*, *MarketWatch*, *Dow Jones Newswires*, and other titles, and provides information services, including Dow Jones Factiva, Dow Jones Risk & Compliance, and Dow Jones VentureSource. News Corporation, a publicly held company, is the indirect parent corporation of Dow Jones. Ruby Newco, LLC, a subsidiary of News Corporation and a non-publicly held company, is the direct parent of Dow Jones. No publicly held company directly owns 10% or more of the stock of Dow Jones. No corporation or other public entity has a direct financial interest in the outcome of this litigation.

2. The **Associated Press** ("AP") is a news cooperative organized under the Not-for-Profit Corporation Law of New York, and owned by its 1,500 U.S. newspaper members. The AP's members and subscribers include the nation's newspapers, magazines, broadcasters, cable news services and

Internet content providers. The AP operates from 300 locations in more than 100 countries. On any given day, AP's content can reach more than half of the world's population. AP has no parents, subsidiaries or affiliates that have any outstanding securities in the hands of the public. No corporation or other public entity has a direct financial interest in the outcome of this litigation.

3. **The Charleston Gazette** is a newspaper of daily circulation published statewide in the State of West Virginia by Charleston Newspapers. It also operates an on-line website for the dissemination of news to the public. The Charleston Gazette is a long established member of the news media. The Daily Gazette Co. is the parent company of The Charleston Gazette and no publicly held corporation or other publicly held entity owns 10% or more of its stock. No corporation or other public entity has a direct financial interest in the outcome of this litigation.

4. **National Public Radio, Inc.** (NPR) is an award-winning producer and distributor of noncommercial news programming. A privately supported, not-for-profit membership organization, NPR serves a growing audience of more than 26 million listeners each week by providing news programming to 285 members' stations that are independently operated, noncommercial public radio stations. In addition, NPR provides original online content and audio streaming of its news programming. NPR.org provides news and

cultural programming including audio archives of past programming. NPR has no parent company and issues no stock. No corporation or other public entity has a direct financial interest in the outcome of this litigation.

5. **The Friends of West Virginia Public Broadcasting, Inc.**, is a charitable 501(c)(3) organization, and is chartered to support West Virginia Public Broadcasting, including but not limited to helping to get access to newsworthy information. Its interest is in assisting West Virginia Public Broadcasting to get access to news. No corporation or other public entity has a direct financial interest in the outcome of this litigation.

These representations are made in order that judges of this Court may determine the need for recusal.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... vii

PRELIMINARY STATEMENT ............................................................ 1

STATEMENT OF FACTS .................................................................... 1

    A.    Don Blankenship ................................................................ 1

    B.    The Upper Big Branch Mine Disaster and the
           Ensuing Investigations .................................................... 2

    C.    Blankenship's Indictment for Conspiracy and Fraud ........... 3

    D.    The Court's Sealing and Gag Order .................................... 5

    E.    Petitioners Seek to Vacate the Order .................................. 5

    F.    The Court's Ruling on Petitioners' Motion ........................ 6

    G.    The Renewed Sealing and Gag Order ................................ 8

    H.    Victims and Their Families Move to Limit Gag Order ........ 9

STATEMENT OF THE ISSUES PRESENTED ..................................... 10

STATEMENT OF RELIEF SOUGHT .................................................. 11

STATEMENT OF REASONS WHY THE WRIT SHOULD ISSUE ........ 11

I.     MANDAMUS IS THE PROPER
      METHOD OF REVIEW AND FORM OF RELIEF .................... 11

II.    THE SEALING ORDER VIOLATES
      THE RIGHT OF PUBLIC ACCESS ....................................... 12

    A.    The Public's Right of Access Applies
           to the Sealed Records in this Prosecution ......................... 12

    B.    Strict Standards Must Be Met
           to Abridge Public Access Right ....................................... 14

C.     No Proper Basis Exists to
Abridge the Public's Right of Access ...................................................15

        1.     There is no demonstrated probability of prejudice to
Blankenship's fair trial right .....................................................16

        2.     Alternatives exist to protect Blankenship's fair trial
rights...........................................................................................18

        3.     The Sealing Order is not narrowly tailored ..............................19

        4.     The Sealing Order is not effective .............................................19

D.     The Procedures Followed by the
District Court Are Also Unconstitutional ...........................................20

III.     THE GAG ORDER VIOLATES THE FIRST AMENDMENT...................21

A.     The Prior Restraint Imposed by the
Gag Order Seriously Infringes First Amendment Rights ...................21

B.     The Gag Order Is Unconstitutionally Vague and Overbroad .............23

C.     No Proper Basis Exists for the
Extraordinary Gag Order Imposed......................................................25

        1.     The pretrial publicity does not justify the Gag Order...............25

        2.     Other measures can adequately mitigate the effects of
publicity ....................................................................................28

        3.     The Gag Order is ineffective.....................................................29

CONCLUSION ......................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABC v. Stewart*,
  360 F.3d 90 (2d Cir. 2004) .......................................................................17, 18

*In re Appl. and Aff. for a Search Warrant*,
  923 F.2d 324 (4th Cir. 1991) .............................................................14

*In re Baltimore Sun Co.*,
  841 F.2d 74 (4th Cir. 1988) .......................................................18, 29

*Broadrick v. Oklahoma*,
  413 U.S. 601 (1973)......................................................................23

*Caperton v. A.T. Massey Coal Co.*,
  556 U.S. 868 (2009)....................................................................1, 2

*CBS v. Young*,
  552 F.2d 234 (6th Cir. 1975) ....................................................23, 24

*In re Charlotte Observer*,
  882 F.2d 850 (4th Cir. 1989) ..................................................*passim*

*Davis v. E. Baton Rouge Parish Sch. Bd.*,
  78 F.3d 920 (5th Cir. 1996) .............................................................23

*Davis v. Nationwide Mut. Fire Ins. Co.*,
  811 F. Supp. 2d 1240 (E.D. Va. 2011) ..............................................2

*Doe v. Pub. Citizen*,
  749 F.3d 246 (4th Cir. 2014) ..................................................*passim*

*In re First Fed. Sav. & Loan Ass'n of Durham*,
  860 F.2d 135 (4th Cir. 1988) ....................................................11, 12

*Gannett Co. v. DePasquale*,
  443 U.S. 368 (1979)..............................................................13, 19, 20

*Gentile v. State Bar*,
  501 U.S. 1030 (1991)...............................................................23, 27

vii

*In re Knight Publishing Co.*,
743 F.2d 231 (4th Cir.1984) .............................................................20

*Miami Herald Publ'g Co. v. Tornillo*,
418 U.S. 241 (1974).........................................................................22

*Nebraska Press Ass'n v. Stuart*,
427 U.S. 539 (1976)...................................................................*passim*

*Nixon v. Warner Commc'ns, Inc.*,
435 U.S. 589 (1978).........................................................................14

*Press-Enter. Co. v. Super. Ct.*,
464 U.S. 501 (1984).................................................................13, 15

*Press-Enter. Co. v. Super. Ct.*,
478 U.S. 1 (1986).....................................................................*passim*

*Richmond Newspapers v. Virginia*,
448 U.S. 555 (1980)..................................................12, 13, 15, 16

*Rushford v. New Yorker Magazine*,
846 F.2d 249 (4th Cir. 1988) ...........................................14, 15, 20, 21

*In re Russell*,
726 F.2d 1007 (4th Cir. 1984) ..............................................26, 27, 28

*Shelton v. Tucker*,
364 U.S. 479 (1960)........................................................................15

*Skilling v. United States*,
561 U.S. 368 (2010)..................................................16, 17, 25, 26

*In re State-Record Co.*,
917 F.2d 124 (4th Cir. 1990) .............................................12, 15, 24

*Stephens v. Cnty. of Albemarle, Va.*,
524 F.3d 485 (4th Cir. 2008) ...................................................22, 23

*In re Time Inc.*,
182 F.3d 270 (4th Cir. 1999) ................................................11, 12, 19

*Tory v. Cochran*,
   544 U.S. 734 (2005)......................................................................24

*U.S. v. Angiulo*,
   897 F.2d 1169 (1st Cir. 1990).......................................................26

*U.S. v. Blankenship*,
   No. 5:14-cr-00244-1 (S.D. W.Va.) ..................................................2

*U.S. v. Gray*,
   189 F. Supp. 2d 279 (D. Md. 2002)................................................28

*U.S. v. King*,
   192 F.R.D. 527 (E.D. Va. 2000) .....................................................24

*U.S. v. Salameh*,
   992 F.2d 445 (2d Cir. 1993) ...........................................................22

*In re Wash. Post Co.*,
   807 F.2d 383 (4th Cir. 1986) ...........................................11, 14, 15

*Wash. Post v. Robinson*,
   935 F.2d 282 (D.C. Cir. 1991)........................................................17

## OTHER AUTHORITIES

W. Va. R. Prof'l Conduct 3.6(a) ...........................................................27

## PRELIMINARY STATEMENT

This Petition challenges a patently improper and over-reaching order that (a) seals from public view virtually every document filed in a criminal prosecution of great significance to the residents of West Virginia, and (b) enjoins practically everyone with any relevant knowledge from speaking to the press about "the facts or substance of this case," whether they will ever be a witness in the case or not. The order was entered *sua sponte*, without advance notice or an opportunity to be heard and with no sufficient factual basis, and it effectively makes the trial judge an official censor over everything the public can know or say about the prosecution. The order is unprecedented in its scope and plainly unconstitutional. A writ should issue forthwith to vacate the order and direct the district court to unseal the many pending secret motions.

## STATEMENT OF FACTS

### A.  <u>Don Blankenship</u>

Don Blankenship has been a powerful and prominent figure in West Virginia for three decades. From 2000 until 2010, he was Chairman and Chief Executive Officer of Massey Energy Company ("Massey"), a coal mining company. Doc. 1 at 1. His significant donations to justices of the West Virginia Supreme Court have been criticized by both the U.S. Supreme Court, *see Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009), and a West Virginia Supreme Court justice who objected that "Blankenship's bestowal of his personal wealth, political tactics, and

1

'friendship' have created a cancer in the affairs of this Court."   *Id.* at 875 (citation omitted).   Blankenship stands accused of large-scale crimes in the case below, *U.S. v. Blankenship*, No. 5:14-cr-00244-1 (S.D. W.Va.).

**B.**     **The Upper Big Branch Mine Disaster and the Ensuing Investigations**

On April 5, 2010, a "massive" explosion ignited by methane gas and fueled by coal dust ripped through the Upper Big Branch ("UBB") mine owned by a Massey subsidiary.   The explosion killed twenty-nine miners and injured two more, making it the most devastating mine disaster since the 1970s.[1]   After a two-year investigation, the federal Mine Safety and Health Administration ("MSHA") concluded that Massey was to blame for the explosion.   It found the explosion to have resulted from Massey's "unlawful policies and practices," including purposefully deceitful actions that placed production quotas above miner safety. Exec. Summ. at 2.   Many others also probed the UBB mine explosion, including the Governor of West Virginia, the West Virginia Office of Miners' Health, Safety and Training, and the United Mine Workers labor union.[2]

---

[1] *Executive Summary, Fatal Underground Mine Explosion*, Mine Safety and Health Administration, at 1, http://www.msha.gov/Fatals/2010/UBB/ExecutiveSummary. pdf (hereinafter, "Exec. Summ.").   Petitioners request that this Court take judicial notice of agency and government records cited herein.   *Davis v. Nationwide Mut. Fire Ins. Co.*, 811 F. Supp. 2d 1240, 1250 n.9 (E.D. Va. 2011) (taking judicial notice of "information contained in . . . government records").

[2] *Report to the Governor:   Governor's Independent Investigation Panel*, May 2011, http://develop.nttc.edu/programs&projects/minesafety/disasterinvestigations/ upperbigbranch/toc.asp; *Upper Big Branch Investigative Report*, W.Va. Report of

Although state and federal investigators sought testimony from Blankenship, he repeatedly asserted his Fifth Amendment right not to respond, choosing instead to take advantage of other channels to speak about his role and the company's role in the explosion.[3]  Blankenship went so far as to produce his own "documentary" attacking the accuracy of the MSHA report.[4]  He also gave numerous television interviews defending the actions of Massey and describing the coal industry as "under attack."[5]  Blankenship's statements remain readily available on the Internet.

## C.    Blankenship's Indictment for Conspiracy and Fraud

On November 13, 2014, Blankenship was indicted for conspiring and causing violations of mandatory federal mine safety standards and other crimes.   Doc. 1 at 1.   The grand jury charged that "Blankenship knew that UBB was committing hundreds of safety-law violations every year and that he had the ability to prevent most of the violations."   *Id.*   Instead, Blankenship allegedly "perpetuated UBB's

---

Office of Miners' Health, Safety and Training, http://www.wvminesafety.org/ Upper%20Big%20Branch%20Mine%20Accident%20Report.htm; *Industrial Homicide:   Report on the Upper Big Branch Mine Disaster*, United Mine Workers of America, http://www.umwa.org/files/documents/134334-Upper-Big-Branch.pdf.

[3] *See, e.g.*, *Appendix D, Fatal Underground Mine Explosion*, MSHA, http://www.msha.gov/Fatals/2010/UBB/AppendixD.pdf.

[4] *For the Sake of Our Miners*, Don Blankenship, http://www.donblankenship.com/ 2014/05/27/for-the-sake-of-our-miners/; *see also* For the Sake of Our Miners, YouTube, May 31, 2014, http://www.youtube.com/watch?v=tfnELGY07Is#t=276.

[5] *See Don Blankenship on Bloomberg TV discussing Massey stock and the coal industry*, YouTube, Aug. 10, 2010, http://www.youtube.com/watch?v=JM8w-YRACI4&list=PL458260C54074685D.

practice . . . in order to produce more coal, avoid the costs of following safety laws and make more money." *Id.* The indictment charges Blankenship with conspiracy to violate mine regulations, conspiracy to defraud the United States, falsifying government submissions, and securities fraud. *Id.* at 34-42.

Blankenship's indictment was met with great public interest as soon as the U.S. Attorney's Office announced it. Doc. 41 at 1. News articles and commentary reflected the intense public interest in the prosecution. NPR reported that the unions representing the miners from other mines saw the indictment as "one step closer to a measure of justice."[6] *The Wall Street Journal* detailed the charge that Blankenship tended to prioritize "produc[ing] coal rather than install[ing] bolts used to secure the mine roof," and *The Charleston Gazette* described the grand jury's work as an "unprecedented government effort."[7] An AP article quoted a victim's mother: "'It's about time' Blankenship was called to account. . . . 'He knew what

---

[6] Howard Berkes, *Former CEO Indicted For Alleged Role In Deadly Mine Disaster*, NPR, Nov. 13, 2014, http://www.npr.org/blogs/thetwo-way/2014/11/13/363890714/former-ceo-indicted-for-alleged-role-in-deadly-mine-disaster.

[7] Kris Maher, *Ex-CEO of Massey Indicted in Case of 2010 Mine Blast*, The Wall Street Journal, Nov. 13, 2014, http://www.wsj.com/articles/ex-ceo-of-massey-energy-indicted-in-case-of-2010-mine-blast-1415913977; Ken Ward, Jr., *Longtime Massey CEO Don Blankenship Indicted*, The Charleston Gazette, Nov. 13, 2014, http://www.wvgazette.com/article/20141113/GZ01/141119629.

was going on in that mine and continued to let it go.'"[8]

### D.   The Court's Sealing and Gag Order

On November 14, 2014, the day after the indictment was issued and without any advance notice, the district court (Hon. Irene C. Berger) *sua sponte* entered an extraordinarily broad order that sealed the entire record in the prosecution and enjoined practically anyone with any relevant information from speaking about it to the press.   Doc. 3 (attached hereto as Ex. A).   The order, which was itself originally sealed and only later made public, stated that because "the Defendant and the matters which are referenced in the indictment have been the subject of publicity," it was "necessary to take precautions" to insure an impartial jury "whose verdict is based only upon evidence presented at trial."   *Id.* at 1.   The order directed that "any and all motions, stipulations, [and] discovery requests" be sealed in their entirety from the moment of filing, and barred both trial participants and others – including all family members of the victims of Blankenship's alleged crimes – from talking to the press about "the facts or substance of this case."   *Id.* at 1-2.

### E.   Petitioners Seek to Vacate the Order

On December 1, 2014, *The Wall Street Journal*, Associated Press, *The Charleston Gazette*, NPR, and Friends of West Virginia Public Broadcasting, Inc.

---

[8] John Raby & Allen G. Breed, *Ex-CEO of mine that blew up, killing 29, indicted*, Associated Press, Nov. 13, 2014, http://bigstory.ap.org/article/ 2964ba2f734b42788b6a2e987f5bf01a/ex-ceo-mine-blew-killing-29-indicted.

("Petitioners") moved to intervene and to vacate the sealing and gag order.   Doc.

30.   Petitioners emphasized that the orders barred disclosure of information already

widely known to the public involving matters of significant concern.   Although

"the Upper Big Branch tragedy occurred four years ago, over the course of time it

has received much public attention and scrutiny, including no less than four

governmental investigations."   *Id.* ¶ 7.   The gag order, they explained, amounted to

an unconstitutional and factually unsupportable prior restraint on discussion of the

UBB tragedy, while the sealing order violated the public's First Amendment right of

access to court records, because it was not needed, was not narrowly tailored, and

did not effectively advance a compelling government interest.   *Id.* ¶ 14.

Blankenship filed a response to that motion, but his counsel did not serve it on

Petitioners because the court's order prohibited him from doing so.   Doc. 41 at 2,

n.1.

**F.**   **The Court's Ruling on Petitioners' Motion**

On January 7, 2015, after oral argument, the district court issued an opinion

and order modifying the sealing order and refusing to modify the gag order.   Doc.

63 ("Mem.") (attached hereto as Ex. B); Doc. 64 ("Order") (attached hereto as Ex.

C).   As to the sealing order, the district court directed that documents with any

"information or argument as to the facts and substance of the case" would continue

to be sealed on the basis that "[p]ermitting the disclosure of such documents . . .

presents the substantial probability of tainting prospective jurors by trial in the media, thereby prejudicing the Defendant's right to a fair and impartial trial in a court of law." Mem. at 14; *see also* Order at 2. The court did not undertake any review of the many motions filed following the indictment to determine whether each actually required sealing, *see id.* at 16, but expressed some satisfaction that the availability of public docket entries minimized the impact of the total sealing of the records themselves, *id.* at 13. The court also indicated that filings would be unsealed when it deemed appropriate, and said that orders would be publicly filed, "absent specific instruction to the contrary." *Id.* at 14.

The district court refused to modify its broad gag order in any respect, defending it as necessary to avoid prejudicial publicity and disagreeing that it was a prior restraint on speech. *Id.* at 6. On the first point, the court acknowledged that "adverse trial publicity may not inevitably lead to prejudice in every situation," but believed it had a duty to take "reasonable steps to guard against prejudice at the outset." *Id.* The court explained that it does not "operate in a vacuum," and pointed out that "we live in coal country" where "the environment matters." *Id.* at 7. On the second point, the court denied the gag order was a prior restraint because it "is not directed toward the press" and "does not prevent the parties from talking to the press," but merely "limits the subject matter" of their comments by prohibiting statements "about the facts or substance of the case." *Id.* at 8.

In reaching these conclusions, the court said it considered whether the orders were the least restrictive alternatives and narrowly tailored, and concluded that they were. *Id.* at 14-18. The district court first found that extensive *voir dire* or a venue change "were not and are not feasible options at the time." *Id.* at 15. Moreover, because *voir dire* or a transfer of venue would not prevent tainting in the first place, it considered them insufficient on their face. *Id.* The court found that denying access to the parties' filings was the "most effective method to protect against prejudice, while still allowing the public to follow the case" through docket entries. *Id.* The gag order similarly was considered necessary and not overbroad because, without it, the "objectives" of the sealing order "would be defeated" by allowing the parties to discuss the contents of the filings. *Id.* at 16.

## G.    The Renewed Sealing and Gag Order

The same day it issued its memorandum opinion, the court entered a modified sealing order and reissued the gag order. The sealing order directs that:

> any and all motions, stipulations, discovery requests, responses, supplemental requests and responses, and other relevant documents be filed directly with the Clerk . . . [and] access to any documents filed on CM/EFF in this matter, which contain information or argument regarding the facts or substance of this case, be restricted to the case participants and court personnel. However, this order shall not be applicable to documents which have previously been released publicly or orders of the Court, absent specific instruction to the contrary. The Court DIRECTS the Clerk to make the docket entries publicly available.

Order at 2 ("Sealing Order"). The court also reissued the gag order:

> neither the parties, their counsel, other representatives or members of
> their staff, potential witnesses, including actual and alleged victims,
> investigators, family members of actual and alleged victims as well as
> of the Defendant, nor any court personnel shall make any statements of
> any nature, in any form, or release any documents to the media or any
> other entity regarding the facts or substance of this case.

*Id.* at 1-2 ("Gag Order"). The court added that the Order would "be lifted upon adjudication of the Defendant's guilt or innocence." *Id.* at 1.

As a result, all substantive filings in this case remain sealed. They include all filings relating to Blankenship's motions to dismiss the indictment (Docs. 81-88, 90-104), along with all filings relating to motions to transfer (Docs. 78-79), to strike material from the indictment (Docs. 107-08), for access to grand jury instructions (Docs. 109-10), and to enforce *Brady* obligations (Doc. 111). This blanket sealing makes it impossible to know if proper procedures are being followed and whether justice is being done – even a motion to recuse the district court judges is sealed. Docs. 78-79. It remains possible, for example, that the judge could dismiss the indictment at a pretrial motions hearing scheduled for March 3 without the public first seeing the papers. Meanwhile, the Gag Order bars large swaths of the public from discussing the case or the underlying facts with the press or any other entity.

## H.    <u>Victims and Their Families Move to Limit Gag Order</u>

Two weeks after the court refused to lift or limit the Gag Order, multiple victims and family members of the victims of the mine explosion – or, as they described it, "a forever, life-altering event" – filed an emergency motion to limit the

scope of the Gag Order.  Doc. 69.  That order, the victims argued, prohibits them from testifying at proceedings currently underway in the West Virginia Legislature that seek to "radically curtail" victims' rights to recover damages.  *Id.* at 2-3.  The victims assert that the prohibition on government participation "is a breach of the social contract and unconscionable under the First Amendment."  *Id.* at 4. Although filed as an emergency motion on January 22, 2015, as of the date of filing this Petition, neither the district court nor any of the parties had responded to the victims' requests for relief.

## STATEMENT OF THE ISSUES PRESENTED

1.     Whether the Sealing Order, which automatically seals all filings containing any "information or argument regarding the facts or substance" of the Blankenship prosecution, violates the public's First Amendment and common law rights of access to the judicial records filed in a criminal proceeding.

2.     Whether the Gag Order, which fails to define precisely to whom it applies, when it applies, and what speech it prohibits, is unconstitutionally vague and overbroad under the Due Process Clause and the First Amendment.

3.     Whether the Gag Order, which prevents both trial participants and non-participants from making any statements "regarding the facts or substance" of the Blankenship prosecution, violates the First Amendment.

## STATEMENT OF RELIEF SOUGHT

Petitioners seek a writ of mandamus (1) vacating the Sealing and Gag Orders and (2) directing the district court promptly to unseal all sealed materials.

## STATEMENT OF REASONS WHY THE WRIT SHOULD ISSUE

Petitioners recognize a trial court's obligation to afford a criminal defendant a fair trial. But both the Sealing Order and Gag Order violate procedural and substantive standards that must be satisfied before any limitation may be imposed on the public's right of access to criminal trials and before any speech about a criminal prosecution may be enjoined. Therefore, the Orders improperly infringe the public's constitutional and common law rights of access to the records of the prosecution, and their First Amendment freedom to speak without prior approval or restraint.

## I.
## MANDAMUS IS THE PROPER
## METHOD OF REVIEW AND FORM OF RELIEF

This Court has repeatedly held that "mandamus is the preferred method of review for orders restricting press activity related to criminal proceedings." *See In re Wash. Post Co*., 807 F.2d 383, 388 (4th Cir. 1986); *In re Time Inc*., 182 F.3d 270, 271-72 (4th Cir. 1999) (same); *In re Charlotte Observer*, 882 F.2d 850, 852 (4th Cir. 1989) (same). Mandamus is appropriately granted when (1) "the petitioner has shown a clear right to the relief sought"; (2) the respondent has "a clear duty" to

perform the act requested; and (3) "no other adequate remedy is available." *In re First Fed. Sav. & Loan Ass'n of Durham*, 860 F.2d 135, 138 (4th Cir. 1988).

As Petitioners demonstrate below, each element is satisfied and mandamus relief is appropriate here.

## II.
## THE SEALING ORDER VIOLATES THE RIGHT OF PUBLIC ACCESS

### A. The Public's Right of Access Applies to the Sealed Records in this Prosecution

The First Amendment provides an affirmative right of public access to virtually all judicial proceedings involved in a criminal prosecution. *See, e.g.*, *Richmond Newspapers v. Virginia*, 448 U.S. 555, 580-581 (1980) (recognizing a constitutional right of access to criminal trials); *Press-Enter. Co. v. Super. Ct.*, 478 U.S. 1, 13 (1986) ("*Press-Enterprise II*") (recognizing constitutional right of access to pretrial proceedings). This constitutional access right extends to "documents submitted in the course of a trial," *In re Time Inc.*, 182 F.3d at 271, and more generally to records submitted in connection with proceedings that are themselves subject to the access right, *Doe v. Pub. Citizen*, 749 F.3d 246, 267 (4th Cir. 2014).[9]

---

[9] This Court previously has found filings such as those currently under seal here to be subject to the First Amendment access right. *See, e.g.*, *In re Time Inc.*, 182 F.3d at 271 (First Amendment access right applies to pretrial filings such as "motions to dismiss the indictment, to transfer the case, and to compel discovery"); *see also In re State-Record Co.*, 917 F.2d 124, 127 (4th Cir. 1990) ("The more rigorous First Amendment standard applies to documents filed in connection with . . . pretrial proceedings.").

Because the access right is a constitutional right, this Court reviews sealing orders *de novo*. *In re Charlotte Observer*, 882 F.2d at 852.

The right exists because public access is critical to the successful functioning of the justice system. In criminal proceedings, openness "enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." *Press-Enter. Co. v. Super. Ct.*, 464 U.S. 501, 508 (1984) ("*Press-Ent. I*"). This is so because "'[p]ublic confidence cannot long be maintained where important judicial decisions are made behind closed doors and then announced in conclusive terms to the public, with the record supporting the court's decision sealed from public view.'" *Gannett Co. v. DePasquale*, 443 U.S. 368, 429 (1979) (Blackmun, J., dissenting in part) (citation omitted); *see also Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 587 (1976) (Brennan, J., concurring) ("[s]ecrecy of judicial action can only breed ignorance and distrust of courts and suspicion concerning the competence and impartiality of judges").

Indeed, this Court only recently emphasized the importance of access to court records to promote both "the public's interest in monitoring the functioning of the courts" and "the integrity of the judiciary." *Pub. Citizen*, 749 F.3d at 266. The Supreme Court also has stressed that other "crucial prophylactic aspects of the administration of justice cannot function in the dark; no community catharsis can occur if justice is 'done in a corner [or] in any covert manner.'" *Richmond*

*Newspapers*, 448 U.S. at 571 (citation omitted). None of these goals can be achieved without public access to the records submitted to judges for the performance of their Article III functions.

The Constitution thus conveys a public access right, and it is a right of *contemporaneous* access. *See, e.g.*, *Pub. Citizen*, 749 F.3d at 272 (underscoring the right of contemporaneous access); *In re Charlotte Observer*, 882 F.2d at 853 (recognizing a right to immediate access to ongoing proceedings). Even a "'minimal delay'" harms "the value of 'openness' itself, . . . whatever provision is made for later public disclosure." *In re Charlotte Observer*, 882 F.2d at 856. It is a "misapprehension and undervaluation of the core first amendment value at stake" to postpone even briefly public access to judicial records. *Id.* This Court has thus regularly "rejected pleas by litigants" to seal documents until the trial is over. *Pub. Citizen*, 749 F.3d at 272; *see also In re Appl. and Aff. for a Search Warrant*, 923 F.2d 324, 331 (4th Cir. 1991) (rejecting request to seal record until after trial).

**B. <u>Strict Standards Must Be Met To Abridge Public Access Right</u>**

Given the importance of contemporaneous public access, the Supreme Court has mandated a strict standard governing any limitation of the access right. *See In re Wash. Post Co.*, 807 F.2d at 393 n.9.[10] It encompasses four distinct factors:

---

[10] A common law right of access also attaches to the record in a criminal proceeding. *See Nixon v. Warner Commc'ns, Inc*., 435 U.S. 589, 597 (1978). As this Court has made clear, the common law presumption of access can be

1. The party seeking to restrict access must demonstrate a *substantial probability* of prejudice to a compelling interest. *See, e.g.*, *Richmond Newspapers*, 448 U.S. at 580-81; *Press-Enter. I*, 464 U.S. at 510; *Press-Enter. II*, 478 U.S. at 13-14; *In re Wash. Post Co.*, 807 F.2d at 392-93 & n.9.

2. The party seeking to restrict access must demonstrate that there is *no alternative* to adequately protect the threatened interest. *Press-Enter. II*, 478 U.S. at 13-14; *In re Wash. Post Co.*, 807 F.2d at 392.

3. Any restriction on access must be *narrowly tailored*. *See, e.g.*, *Press-Enter. II*, 478 U.S. at 13-14. The Supreme Court has long recognized that even "legitimate and substantial" governmental interests "cannot be pursued by means that broadly stifle fundamental personal liberties, when the end can be more narrowly achieved." *Shelton v. Tucker*, 364 U.S. 479, 488 (1960).

4. Any restriction imposed on access must be *effective* in protecting the threatened interest for which the limitation is imposed – a constitutional right may not be restricted for a futile purpose. *Press-Enter. II*, 478 U.S. at 14; *In re State-Record Co.*, 917 F.2d at 129.

Here, the district court did not – and could not – make the findings necessary to justify the denial of access imposed in the Sealing Order.

## C. No Proper Basis Exists to Abridge the Public's Right of Access

The UBB mine disaster had a devastating effect on the West Virginia coal mining community, and the public interest in the Blankenship prosecution is immense. As the district court noted, many families "were impacted by the deaths

---

rebutted only "if countervailing interests heavily outweigh the public interests in access." *Rushford v. New Yorker Magazine*, 846 F.2d 249, 253 (4th Cir. 1988). Then "[t]he party seeking to overcome the presumption bears the burden of showing some significant interest that outweighs the presumption." *Id*. As discussed below, the Order does not effectively serve any countervailing interest, and, therefore, would fail under the common law standard as well.

of the miners." Mem. at 7. The order sealing all records in the prosecution of a rich and powerful man cannot help but sow suspicion that a known "friend" of the state judiciary is above the law. It undermines confidence in the system, and robs the affected families of the "community catharsis" provided by a prosecution that is perceived as just. *Richmond Newspapers*, 448 U.S. at 571.

### 1. There is no demonstrated probability of prejudice to Blankenship's fair trial right.

There has been no showing that unsealing the records in this case would create a substantial probability of harm to Defendant's right to a fair trial. This Court "has never permitted wholesale sealing of documents based upon unsubstantiated or speculative claims of harm," *Pub. Citizen.* 749 F.3d at 270, and the existence of pretrial publicity, alone, does not justify sealing, *In re Charlotte Observer*, 882 F.2d at 853; *see also Press-Enter. II*, 478 U.S. at 15 (access right "cannot be overcome by the conclusory assertion that publicity might deprive the defendant of that right"). As underscored in *Nebraska Press*, 427 U.S. at 565, pretrial publicity, "even if pervasive and concentrated, cannot be regarded as leading automatically and in every kind of criminal case to an unfair trial."

The correct approach, instead, must recognize that "[p]rominence does not necessarily produce prejudice, and juror *impartiality*, we have reiterated, does not require *ignorance*." *Skilling v. United States*, 561 U.S. 368, 381 (2010) (emphasis in original). It is a premise of our justice system "that jurors will set aside their

preconceptions when they enter the courtroom and decide cases based on the evidenced presented." *Id.* at 399 n.34.

Given this, no proper basis exists to conclude that public access to the records in this prosecution would create a substantial probability of prejudice. Many of the "facts" and much of the "substance" of the case already have been fully aired in the public records of government investigations and press reports on the UBB mine disaster. In fact, Blankenship himself has freely engaged in the discussion for years – even producing and distributing his own video telling his side of the story. *See supra* at 3. In these circumstances, there is no reason for sealing because the facts are already public and it is entirely unclear how "disclosure could pose any extra threat." *Wash. Post v. Robinson*, 935 F.2d 282, 292 (D.C. Cir. 1991). Any purported harm from ongoing discussion of this prosecution is at this point also entirely hypothetical – unconnected to any findings about the impact of specific "facts" and "substance" in the records sealed. *Compare* Mem. at 14 *with Pub. Citizen*, 749 F.3d at 270 (faulting district court for entertaining assertions of harm devoid of facts).

There is simply no proper basis to conclude that a substantial probability of harm requires all records to be sealed *in toto* just because of the past publicity about Blankenship and the intense interest in his prosecution. To the contrary, the intense interest surrounding this case should make it particularly important *not* to restrict

access, otherwise "the very demand for openness would paradoxically defeat its availability." *ABC v. Stewart*, 360 F.3d 90, 102 (2d Cir. 2004).

### 2. Alternatives exist to protect Blankenship's fair trial rights.

There has been no showing that alternatives to sealing will not adequately protect Blankenship's fair trial right. *Voir dire* is the "preferred safeguard against" pretrial publicity, and an adequate alternative to sealing the record. *In re Charlotte Observer*, 882 F.2d at 855. In fact, this court has expressed "confidence that *voir dire* can serve *in almost all cases* as a reliable protection against juror bias however induced." *Id*. at 856 (emphasis added). Careful *voir dire* has been used successfully in "massive[ly]" publicized cases, including the prosecution of defendants involved in Watergate and Abscam, without incident. *Id.* at 855-56.

The district court dismissed the potential of *voir dire* because jury selection has not begun, Mem. at 15, but this misses the point. The alternative to sealing does not have to be *immediately* available, just available when needed to protect the fair trial right.[11] In considering the closure of a preliminary hearing in a high-profile case, the Supreme Court specifically found future *voir dire* to be an adequate

---

[11] The district court applied an equally circular rationale to reject transfer of venue as an alternative, Mem. at 15, and erroneously dismissed sequestration because that "assume[d] that a jury could . . . be seated." *See In re Baltimore Sun Co.*, 841 F.2d 74, 76 (4th Cir. 1988) ("If the district court thinks that the attendant dangers of a highly publicized trial are too great, it may always sequester the jury; and change of venue is always possible as a method of obviating pressure or prejudice.").

alternative to screen out compromised jurors. *Press-Enter. II*, 478 U.S. at 15.

### 3. The Sealing Order is not narrowly tailored.

The Sealing Order is improper for the further reason that it is vastly overbroad, removing from public view all filings that "contain information or argument regarding the facts or substance of this case." Order at 2. And it seals all documents from the moment they are submitted to the Court, without any judicial consideration or review. Such blanket sealing orders run directly afoul of this Court's requirement that a court review each document to be sealed to ensure that only those clearing the constitutional hurdles are kept from public view. *See, e.g.*, *In re Time Inc.*, 182 F.3d at 271-72 (automatic sealing of documents invalid).[12]

### 4. The Sealing Order is not effective.

There is also no finding that the Sealing Order will protect Blankenship's fair trial right against any demonstrated harm that would flow from public access. Where sealing does not effectively prevent the purported harm, "that alone suffices to make it constitutionally impermissible." *In re Charlotte Observer*, 882 F.2d at 855. Indeed, "[w]here significantly prejudicial information already has been made public, there might well be little justification" for sealing filings in a criminal trial.

---

[12] The district court asserted that availability of the public docket sheet made the order "narrowly tailored," citing this Court's statement that the docket "endow[s] the public and press with the capacity to exercise their rights." Mem. at 13 (quoting *Pub. Citizen*, 749 F.3d at 268). But this Court never purported to find the existence of a docket justifies a blanket sealing order, noting only that docket sheets are one "component" of "meaningful access." *Id*.

*Cf. Gannett Co.*, 443 U.S. at 442 (Blackmun, J., concurring in part and dissenting in part) (as to closure); *In re Charlotte Observer*, 882 F.2d at 854 (describing as "highly dubious" court's assertion that republication of public information would prejudice defendant). This prosecution relates to one of the worst mine disasters in the Country's history, marked, in its aftermath, by major government investigations at both the state and federal levels that produced hundreds of pages of public factual findings, a media campaign conducted by Blankenship espousing his innocence, and great interest by both the press and the public. *See supra* at 3. Sealing, therefore, does not effectively limit knowledge or discussion of this case among the West Virginia citizens in the jury pool. Simply put, the "genie [is] out of the bottle," *In re Charlotte Observer*, 882 F.2d at 854, and there is no proper basis to deny public access to pleadings discussing well-known public facts.

**D.    The Procedures Followed by the District Court Are Also Unconstitutional**

The district court did not comply with the constitutionally-mandated procedures, and the Sealing Order should be vacated for this reason as well. A court may not limit the public access right without following the procedures defined in *In re Knight Publishing Co.*, 743 F.2d 231 (4th Cir.1984) to ensure the constitutional right is adequately protected. First, the court must "give the public adequate notice that the sealing of documents may be ordered." *Rushford*, 846 F.2d at 253. Second, the court must "provide interested persons 'an opportunity to

object to the request before'" ordering sealing.   *Id.* at 253-54 (citation omitted).

Third, if a court decides to seal records, "'it must state its reasons on the record,

supported by specific findings.'"   *Id.* at 254 (citation omitted).   Fourth, "'the court

must state its reasons for rejecting alternatives'" to sealing.   *Id.* (citation omitted).

The Sealing Order in this case is procedurally improper because it results in

the *immediate* sealing of nearly all documents "contain[ing] information or

argument regarding the facts or substance of this case."   *Rushford*, 846 F.2d at 254

(order precluding the district court's consideration as to specific files was

procedurally defective).   Because the Order purports to decide the propriety of

sealing in advance, without even considering the content of a record, the Sealing

Order necessarily violates the notice and objection requirements.   *Id.*   For the same

reason, the Order impermissibly avoids making "specific findings" to justify sealing

of specific records and to explain why alternatives to sealing are not sufficient.   *Id.*

There simply have been be no findings sufficient to abridge the public access

right in the Blankenship prosecution.   The Sealing Order should be vacated.

### III.
### THE GAG ORDER VIOLATES THE FIRST AMENDMENT

### A.    The Prior Restraint Imposed by the Gag Order
### Seriously Infringes First Amendment Rights

The Gag Order is an impermissible prior restraint.   It prohibits scores of

people from exercising their First Amendment right to speak about the Blankenship

criminal trial.   Such prior restraints on speech constitute "one of the most

extraordinary remedies known to our jurisprudence" and are universally recognized

to be "the most serious and the least tolerable infringement on First Amendment

rights."   *Nebraska Press*, 427 U.S. at 559, 562.   Indeed, some two hundred years of

unbroken precedent establish a "virtually insurmountable barrier" against prior

restraints against speech concerning matters of public concern.   *Miami Herald

Publ'g Co. v. Tornillo*, 418 U.S. 241, 259 (1974) (White, J., concurring).

Although some latitude exists to restrict comments by parties to a lawsuit,

when it comes to gagging non-participants, this Court will:

> examine the evidence before the trial judge when the order was entered
> to determine (a) the nature and extent of pretrial news coverage; (b)
> whether other measures would be likely to mitigate the effects of
> unrestrained pretrial publicity; and (c) how effectively a restraining
> order would operate to prevent the threatened danger.   The precise
> terms of the restraining order are also important.

*Nebraska Press*, 427 U.S. at 562.   No evidence presented justifies the Gag Order,

and, in the face of all that is public already, there is no evidence that could justify the

broad gag imposed on the parties, counsel, and all of Blankenship's alleged victims

and their families.[13]

---

[13]  The court did not consider the Gag Order a prior restraint because it was not
challenged by the parties gagged.   Mem. at 7-8.   But "an order that prohibits the
utterance or publication of particular information or commentary imposes a 'prior
restraint' on speech" and carries "a heavy presumption against its constitutional
validity," even if it is "intended to protect a defendant's Sixth Amendment right to
trial before an impartial jury."   *U.S. v. Salameh*, 992 F.2d 445, 447 (2d Cir. 1993).

**B.**     **The Gag Order Is Unconstitutionally Vague and Overbroad**

As a threshold matter, the Gag Order should be vacated because it is unconstitutionally vague and overbroad.[14]   We are aware of no order of its generality and scope – broadly gagging discussion of ill-defined topics by trial participants and non-participants alike – that has ever been upheld.

The vague terms used in the order violate due process, which requires fair notice of what the law prohibits so that a person can conform her conduct to it. *Gentile v. State Bar*, 501 U.S. 1030, 1048 (1991).   For example, an order barring speech about a lawsuit other than descriptions of the "general nature" of the defense "without elaboration" was struck down in *Gentile* because it did not provide clear notice about the speech proscribed. *Id.* at 1049; *see Nebraska Press*, 427 U.S. at 568.

The Gag Order here is similarly vague because it fails to make clear *who* it

---

Here, the gag order is now separately being challenged by those directly gagged (the families' motion is still pending below), but regardless of that motion, the order unquestionably violates Petitioners' First Amendment rights that extend fully "'to the communication, to its source and to its recipients both.'"   *Stephens v. Cnty. of Albemarle, Va.*, 524 F.3d 485, 491-92 (4th Cir. 2008) (citation omitted); *see also Davis v. E. Baton Rouge Parish Sch. Bd.*, 78 F.3d 920, 926 (5th Cir. 1996) (listing cases finding press standing to challenge prior restraint not directed toward it); *CBS v. Young*, 552 F.2d 234, 239 (6th Cir. 1975) (even when press is not directly enjoined, its First Amendment rights are impaired when "significant and meaningful sources of information concerning the case are effectively removed").   Regardless of the label and, as discussed below, the level of scrutiny, the Gag Order is unconstitutional.

[14]  In this context, third parties may challenge vagueness and overbreadth of orders that do not apply to them.   *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973).

applies to, *when* it applies, and *what* speech it prohibits.   For example, it purports to enjoin "victims and alleged victims," Order at 1, but this could include just the two surviving miners who were injured, or everyone else who worked in UBB mine.   It could also include anyone who purchased or sold Massey stock, given the charge of securities fraud.   Similarly, the Gag Order expressly applies to "family members," but does not indicate whether this means immediate family or the whole extended family.   These terms are all impermissibly vague.   *Young*, 522 F.2d at ("relatives" impermissibly vague); *cf. U.S. v. King*, 192 F.R.D. 527, 534-36 (E.D. Va. 2000) (requiring those subject to gag order to be served with order).

Further, the Gag Order prohibits statements to "the media or any other entity," but does not define what qualifies as an "other entity," leaving it unclear when the order applies.   Order at 1.   Nor does the Order define the phrase "facts or substance" of the case, leaving it unclear what statements are prohibited.   *Compare id. with Nebraska Press*, 427 U.S. at 545.   The Order is too vague to stand.

The Order is also overbroad.   *Tory v. Cochran*, 544 U.S. 734, 738 (2005) (gag order divorced from "underlying rationale" overbroad); *In re State-Record Co.*, 917 F.2d at 129.   The Sixth Circuit, in addressing a similar order explained:

> A more restrictive ban upon freedom of expression in the trial context would be difficult if not impossible to find.   . . . According to its literal terms no discussions whatever about the case are permitted by the persons upon whom the ban is placed whether prejudicial or innocuous, whether subjective or objective, whether reportorial or interpretive. We find the order to be an extreme example of a prior restraint . . . .

*Young*, 522 F.2d at 239-40.   Indeed, the Order has virtually no limits, arguably prohibiting an ill-defined class of people from lobbying for mine safety by reference to the UBB disaster, Doc. 69, from seeking grief or religious counseling to deal with its aftermath, or even from inquiring of their accountant whether Massey stock was affected by Blankenship's public statements.   It gags a community from talking about the greatest disaster that has befallen it in the last fifty years.   The Constitution does not allow such an indiscriminate and overly broad suppression of speech on a matter of obvious public concern.

## C.   No Proper Basis Exists for the Extraordinary Gag Order Imposed

### 1.   The pretrial publicity does not justify the Gag Order.

The Gag Order contains no analysis of the nature of pretrial publicity in this case that supposedly justifies the silence ordered by the district court, and no explanation of how the gag will promote Defendant's fair trial right.   The Gag Order was imposed on the mere *fact* of prominent prior publicity.   This is improper.

As the Supreme Court held in *Skilling*, juror exposure to news accounts about an alleged crime cannot presumptively deprive defendant of his due process:

> Prominence does not necessarily produce prejudice, and juror impartiality, we have reiterated, does not require ignorance.   Jurors are not required to be totally ignorant of the facts and issues involved; scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.   Every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any

one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits.

561 U.S. at 380-81 (internal marks and citations omitted). If, as in *Skilling*, the former CEO of Enron could be fairly tried and without a gag order where the jury pool included former Enron employees and many people who lost their life savings in the Enron collapse, there is no question that, absent some finding not currently in the record, Blankenship can be fairly tried in Beckley without a gag order.

*Nebraska Press* also dealt with a high-profile, well-publicized crime in a small community, and massive pre-trial publicity did not justify a gag order. *Nebraska Press* instructs a court to consider not only the amount of news coverage but the *tone* of the coverage, and to assess whether "further publicity, unchecked, would so distort the views of potential jurors that 12 could not be found who would, under proper instructions, fulfill their sworn duty to render a just verdict exclusively on the evidence presented in open court." 427 U.S. at 569; *see also U.S. v. Angiulo*, 897 F.2d 1169, 1181 (1st Cir. 1990) (purely factual coverage creates no presumption of prejudice). The district court made no such evaluation, but instead barred all speech about the case by anyone remotely involved.

Nor did the district court apply the proper standard in considering the extent of publicity. Thirty years ago this Court held that a gag order can properly issue against trial participants if the party seeking the order demonstrates a "reasonable

likelihood that the defendants would be denied a fair trial without proscribing certain of petitioners' extrajudicial statements." *In re Russell*, 726 F.2d 1007, 1010 (4th Cir. 1984). The *Russell* standard, however, was effectively overruled by the Supreme Court two years later when *Press-Enterprise II* held that the "reasonable likelihood" test was insufficiently protective of First Amendment freedoms when a defendant's fair trial rights were advanced as grounds to limit the constitutional access right. The Court expressly required a "substantial probability" of harm to be established before the First Amendment right could be limited. 478 U.S. at 14.

*Russell*'s "reasonable likelihood" standard was rejected by the Supreme Court once again in *Gentile.* In assessing a gag order that applied only to attorneys, the Court found a standard requiring a "substantial likelihood of materially prejudicing" a defendant's fair trial right – the same standard applicable to attorneys in West Virginia, *see* W. Va. R. Prof'l Conduct 3.6(a), which the court failed to consider as an alternative to the Gag Order here – to be appropriate, explaining that this conclusion followed because only attorneys were gagged and attorneys are officers of the court. 501 U.S. at 1066-74. A gag order affecting the public then, must be based on something *more* than a substantial likelihood of material prejudice. *Id.* These precedents decided *after Russell*, leave no doubt the reasonable likelihood test may not properly justify the Gag Order here.

But even if a likelihood test were good law, there is no reasonable likelihood

that the Gag Order is needed to secure Blankenship's fair trial rights.   As discussed above, there is already a great deal in the public domain about Blankenship's conduct at issue and there is nothing in the record to show that a gag order will prevent any specific, new, even more prejudicial information from reaching the jury pool.   Moreover, it bears emphasizing that the gag order upheld in *Russell* was far more limited than the one at issue here – it was limited to "potential witnesses" who had been notified of their role by the parties and not to an ill-defined category of "victims" and "alleged victims" of Blankenship's securities fraud and other crimes and their "family members."   726 F.2d at 1009; *see also U.S. v. Gray*, 189 F. Supp. 2d 279, 281 (D. Md. 2002) (rejecting requested gag order on a lawyer not involved in the case).

   **2. Other measures can adequately mitigate the effects of publicity.**

  The district court rejected improperly measures that regularly are used to mitigate the potential effects of prejudicial pretrial publicity in high-profile cases. Mem. at 15.   In particular, the court rejected the careful and searching *voir dire* as an alternative to a restraint on speech.   This Court has recognized, however, that *voir dire* "can serve in almost all cases as a reliable protection against juror bias, however induced."   *In re Charlotte Observer,* 882 F.2d at 856.   Even in cases with "massive pretrial media reportage and commentary," a careful *voir dire* can

adequately protect a defendant's fair trial right.[15]  *Id.* at 855-56.

### 3.    The Gag Order is ineffective.

The Gag Order is also improper because it is ineffective in preventing public discussion of already known facts of the case in advance of trial.  *Nebraska Press*, 427 U.S. at 562 (a prior restraint must "effectively . . . prevent the threatened danger").   The UBB Mine disaster occurred four years ago.   It has been the subject of multiple, comprehensive, and public investigations.  *Supra* at 2.   Memorials, web pages, and countless newspaper articles have discussed and commented on the disaster and Blankenship's role in it.  *Id.* at 3-5.   Blankenship produced and continues to distribute Internet videos of his version of events.  *Id*. at 3.   The court's proceedings remain open, Mem. at 8, and the press can (and has) reported on the limited facts disclosed at those proceedings.   Silencing parties and nonparties alike cannot effectively prevent information relating to the "facts and substance of the case" from reaching the juror pool because it already is public.

Moreover, it bears emphasis that the Gag Order will silence only *public* speech.   The community in West Virginia cares about this case.   Even if people are prohibited from talking about it in public fora (via the media or "to any other entity"), then they will be gossiping quietly amongst themselves.   The order will not

---

[15] The district court improperly concluded that change of venue was not a viable alternative because "policy considerations" against changing venue militate against employing them.   That is not the law.   *In re Baltimore Sun Co.*, 841 F.2d at 76.

realistically suppress speech – it will suppress only *public* speech, meaning that innuendo, hearsay, and unreliable scuttlebutt will prevail. The potential for the covert spread of rumors in this kind of environment is far more likely to result in prejudice among potential jurors than the public dissemination of statements by parties, witnesses, or victims, whose statements will be subject to scrutiny and where any falsity or innuendo can be countered by facts.

For all these reasons, the Gag Order is unconstitutional and should be vacated.

## CONCLUSION

For all of the foregoing reasons, this Court should issue a writ of mandamus directing the district court to vacate the Sealing and Gag Orders, and direct the district court to unseal all documents in the record.

Dated: February 20, 2015         Respectfully submitted,

By: /s/ *Katherine M. Bolger*
     Katherine M. Bolger
     David A. Schulz

Sean P. McGinley, Esq.      LEVINE SULLIVAN KOCH
DITRAPANO BARRETT DIPIERO      & SCHULZ, LLP
  McGINLEY & SIMMONS, PLLC    321 West 44th Street, Suite 1000
604 Virginia Street East      New York, NY 10036
Charleston, WV 25301      (212) 850-6100
Phone: 304-342-1033      kbolger@lskslaw.com
Sean.mcginley@dbdlawfirm.com   dschulz@lskslaw.com

*Counsel for Petitioners*

# Exhibit A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## BECKLEY DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,

v.                               CRIMINAL ACTION NO.   5:14-cr-00244

DONALD L. BLANKENSHIP,

                Defendant.

## ORDER

The Court has reviewed the indictment in the above-styled matter which was returned on November 13, 2014.   The Court observes that the Defendant and the matters which are referenced in the indictment have been the subject of publicity.   After careful consideration and in light of the prior publicity, the Court finds it necessary to take precautions to insure that the Government and the Defendant can seat jurors who can be fair and impartial and whose verdict is based only upon evidence presented during trial.

Wherefore, the Court does hereby **ORDER** that neither the parties, their counsel, other representatives or members of their staff, potential witnesses, including actual and alleged victims, investigators, family members of actual and alleged victims as well as of the Defendant, nor any court personnel shall make any statements of any nature, in any form, or release any documents to the media or any other entity regarding the facts or substance of this case.

The Court further **ORDERS** that any and all motions, stipulations, discovery requests, responses, supplemental requests and responses, and other relevant documents shall be filed

directly with the Clerk pursuant to Rule 49.1 of the Local Rules of Criminal Procedure.   Finally, the Court **ORDERS** that access to all documents filed on CM/ECF in the above styled matter be restricted to the case participants and court personnel.   Lastly, the Court **DIRECTS** the Clerk to make the docket entries publicly available.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, to the United States Attorney, to the United States Probation Office, and to the Office of the United States Marshal.

ENTER:    November 14, 2014

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA

# Exhibit B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BECKLEY DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,

v.                                CRIMINAL ACTION NO. 5:14-cr-00244

DONALD L. BLANKENSHIP,

          Defendant.

### MEMORANDUM OPINION AND ORDER

The Court has reviewed the *Motion of the Wall Street Journal, the Associated Press, Charleston Gazette, National Public Radio, Inc., and the Friends of West Virginia Public Broadcasting, Inc., to Intervene for the Limited Purpose of Moving the Court to Reconsider and Vacate the November 14, 2014 Gag and Sealing Order* (Document 30), as well as the *Memorandum in Support* (Document 31). The Court has also reviewed the *Defendant's Response to the Motion of the Wall Street Journal, the Associated Press, Charleston Gazette, National Public Radio, Inc., and the Friends of West Virginia Public Broadcasting, Inc., to Intervene for the Limited Purpose of Moving the Court to Reconsider and Vacate the November 14, 2014 Gag and Sealing Order* (Document 41), filed on December 11, 2014. The Wall Street Journal, Associated Press, Charleston Gazette, National Public Radio, Inc., and the Friends of West Virginia Public Broadcasting, Inc., (together, "the Movants") seek to intervene in this criminal matter to challenge the Court's November 14, 2014 *Order* (Document 3). For the reasons explained more fully herein, the Court finds that the motion should be granted in part and denied in part.

# I.     FACTUAL AND PROCEDURAL HISTORY

The Defendant was indicted on November 13, 2014, in the United States District Court for the Southern District of West Virginia.   He is charged with violating certain laws and regulations of the United States.   On November 14, 2014, this Court entered an *Order* (Document 3), whereby,

> neither the parties, their counsel, other representatives or members of their staff, potential witnesses, including actual and alleged victims, investigators, family members of actual and alleged victims as well as of the Defendant, nor any court personnel shall make any statements of any nature, in any form, or release any documents to the media or any other entity regarding the facts or substance of this case.

(Document 3 at 1.)   The Court ordered that "any and all motions, stipulations, discovery requests, responses, supplemental requests and responses, and other relevant documents shall be filed directly with the Clerk pursuant to Rule 49.1 of the Local Rules of Criminal Procedure."   (*Id.* at 1-2.)   The Court further ordered that "access to all documents filed on CM/ECF in the above styled matter be restricted to the case participants and court personnel," but ordered that the Clerk "make the docket entries publicly available."   (*Id.* at 2.)   As support for the order, the Court noted that "the Defendant and the matters which are referenced in the indictment have been the subject of publicity," and, thus, "in light of the prior publicity, the Court finds it necessary to take precautions to insure that the Government and the Defendant can seat jurors who can be fair and impartial and whose verdict is based only upon the evidence presented during trial."   (*Id.* at 1.)

On December 1, 2014, the Movants filed their motion to intervene, and on December 17, 2014, the Court held a hearing on the motion.   Counsel, Sean P. McGinley, appeared on behalf of the Movants, and the Court heard argument as to the propriety of intervening in a criminal matter

and on the merits of the motion to vacate or modify the November 14, 2014 order.  During the hearing, the Court granted the motion to intervene, for the reasons stated on the record and as further discussed *infra*.

On December 18, 2014, the Court received a *Proposed Brief Amicus Curiae of the American Civil Liberties Union of West Virginia Foundation in Support of Motion of the Wall Street Journal, the Associated Press, Charleston Gazette, National Public Radio, Inc., and the Friends of West Virginia Public Broadcasting, Inc. to Intervene for the Limited Purpose of Moving the Court to Reconsider and Vacate the November 14, 2014 Gag and Sealing Order* (Document 55).  The Court **ORDERS** that the Amicus brief be **ACCEPTED** and has reviewed the same before issuing this opinion.

## II.    DISCUSSION

The Movants initially argue that they enjoy constitutional standing because "there exist willing speakers whose speech to the [Movants], other press and the public is restricted by the gag and sealing order."  (Document 31 at 5-6.)  It is axiomatic that a "party invoking federal court jurisdiction must demonstrate that the conduct of which he complains has caused him to suffer an injury in fact that a favorable judgment will address."  *Doe v. Public Citizen*, 749 F.3d 246, 262 (4th Cir. 2014) (citations and quotation omitted.)  The Fourth Circuit has permitted news organizations to intervene in actions where "they were not otherwise parties to challenge a district court's sealing order."  *Id.* (reference omitted.)  "Article III standing demands that a litigant demonstrate an invasion of a legally protected interest that is concrete and particularized and actual or imminent."  *Id.* at 263.

The Court finds that the Movants possess constitutional standing to challenge the November 14, 2014 order.   It is less clear, however, that a motion to intervene in the criminal law context is the appropriate vehicle for airing the Movants' grievances.   A review of pertinent case law indicates that news media outlets have used other vehicles to challenge court orders that purportedly limit access, including writs of prohibition or mandamus under the All-Writs Act, 28 U.S.C. § 1651.   Furthermore, the Court is mindful that "Mandamus is the preferred method for review of orders restricting press activity related to criminal proceedings."   *In re Washington Post Co.*, 807 F.2d 383, 388 (4th Cir. 1986).   However, intervention, in criminal matters, has been permitted in other circuits.   See, e.g., *United States v. Aldawsari*, 683 F.3d 660, 662 (5th Cir. 2012).   As addressed during the hearing held on December 17, 2014, the Court, having found standing and having found that the underlying substantive issues should be decided, exercises its discretion in favor of granting intervention for the limited purpose of entertaining the Movants' substantive argument(s).

The Movants challenge the order as impermissibly suppressing their ability to access the parties—including actual and alleged victims and their family members—and further maintain that this Court improperly sealed court records.   They argue that the entire order is overbroad and infringes on common law and First Amendment rights of the press to gather and report the news to the public. (Document 31 at 8.) ("The gag order is a prior restraint on the speech of those identified, and the sealing order has a blanket impact, thereby depriving the press and public of access to all past and future court records in this case.")   They argue that the order fails strict constitutional scrutiny because it is overbroad and not narrowly tailored since it does not employ less restrictive alternatives.   (*Id.* at 11-14, 16-17.)

4

In support, they state that the Court should have held a hearing and made specific findings consistent with *In re The Charlotte Observer*, 882 F.2d 850 (4th Cir. 1989), before "sealing" the docket.   They maintain that the order is ineffective and unnecessary because there is "no evidence here that the gag and sealing order would be effective to protect the Defendant's right to a fair trial," and that certain documents are already publicly available.   (*Id.* at 15.)

The Movants argue several alternatives to the order, including implementation of *voir dire* and a change of venue for trial.   (*Id.* at 15-16.)   They give great weight to the notion that "even with the gag and sealing order in place, the press will continue to follow the investigation and prosecution, but the gag and sealing order will leave only second-hand sources free to talk with the press."   (*Id.* at 18.)   Furthermore, they argue that the order "not only act[s] as a prior restraint upon the [Movants'] ability to gather and disseminate the news, but also erects a barrier to the public's full understanding of these newsworthy proceedings."   (*Id.*)   The Court addresses each of the arguments below, but first recognizes the various interests at stake.   The Court must consider not only the First Amendment rights of the press, the public, and the parties, but also the Defendant's Sixth Amendment right to a trial in an impartial tribunal.   Further, the Court observes the public's right to the prompt administration of justice, trial participants and witnesses' right to privacy throughout the proceedings, the rights of alleged victims, including, of course, the right to attend trial as well as the legal preference that a defendant be tried in the district in which he is indicted.   All of these interests underscore the balancing act that courts must engage in when seeking to protect each interest.   In deciding the issue at hand, precedent tells us that the First and Sixth Amendment interests are, of course, paramount for our consideration.

*A. Restricting Speech of the Parties and Potential Trial Participants*

"Orders restricting parties, witnesses and attorneys from discussing a pending case with the press are not unusual."   *In re the State-Record Co., Inc.*, 917 F.2d 124, 128 (4th Cir. 1990).   The Fourth Circuit has noted that permitting witnesses to discuss matters related to their testimony with the press "is not an appealing scenario and did not require more than the reasonable likelihood of prejudice standard."   *Id.* (Internal quotations omitted.)   The Court finds, under the facts and circumstances presented here, that restricting the parties and potential trial participants' statements to the press at the outset helps preserve the Defendant's right to a fair and just tribunal.1[1]

The Court is mindful of its "dut[ies] to protect [the Defendant] from the inherently prejudicial publicity which [can] saturate[ ] the community and to control disruptive influences in the courtroom."   *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966).   The Court accepts this duty even in light of the Supreme Court's reasoning in another case that "pretrial publicity even pervasive, adverse publicity does not inevitably lead to an unfair trial." *Nebraska Press Association v. Stuart*, 427 U.S. 539, 554 (1976).   While adverse pretrial publicity may not inevitably lead to prejudice in every situation, the type of publicity limited by this Court's order would inevitably lead to prejudice in this case.   The Court has the discretion and, more importantly, the duty to take specific, reasonable steps to guard against prejudice at the outset where it has knowledge, given prior publicity, that continued publicity, regarding the facts underlying the indictment, is likely to taint prospective jurors.   Courts do not exist or operate in a

---

[1]      The Movants apparently misunderstand the breadth of the Court's order.   Counsel for the Movants argued that a higher standard applies because the order extends beyond trial participants.   He used the family members of victims as an example.   However, the order applies only to those who may appear during some stage of the proceedings as parties or as witnesses.   Even if not direct witnesses to the alleged offenses, victims and their family members may be witnesses at sentencing or potential beneficiaries of restitution, should the case reach that posture. As such, they are "trial participants."

vacuum.   In the Southern District of West Virginia, we live in coal country.   Many of our families depend on coal mining for their livelihood.   Many families and communities within the Southern District of this state were impacted by the deaths of the miners in the Upper Big Branch mine explosion referenced in the indictment.   Interest in this case is, understandably, heightened by that loss of life.   In short, the environment matters.

In *Nebraska Press Association*, the Supreme Court of the United States reversed a Nebraska state court that had "enjoined the publication of certain kinds of information about the [defendant's] case."   427 U.S. at 561.   *Nebraska Press Association* involved the criminal prosecution of Erwin Charles Simants for murdering six members of the Henry Kellie family in their home.   *Id.* at 542.   "The crime immediately attracted widespread news coverage, by local, regional, and national newspapers, radio and television stations."   *Id.*   Three days after the murders, both the defendant's attorney and the county attorney moved for a restrictive order preventing dissemination of information through the parties to the press.   *Id.*   In response, the Nebraska state court entered an order "prohibiting reporting or commentary on judicial proceedings held in public."   *Id.* at 570.   Reversing the order, the Supreme Court reasoned that the underlying state court judge did not make specific findings as to both the effectiveness of restraining the press from reporting the proceedings, and the efficacy of alternative measures such as (i) *voir dire*, (ii) delaying the trial date until the prejudicial publicity receded, and (iii) potentially changing venue for trial.   *Id.* at 563-64, 569.   In short, the Nebraska state court had failed to meet the "heavy burden" required to justify restraining the press from publishing information gained even from sources other than public court proceedings.   *Id.* at 570.   ("We hold that . . . [t]o the extent that [the order] prohibited publication based on information gained

from other sources, we conclude that the heavy burden imposed as a condition to securing the prior restraint was not met.")

This Court's order is not directed toward the press.   In fact, the Court in *Nebraska Press Association* noted the possibility that "trial courts in appropriate cases [could] limit what the contending lawyers, the police, and witnesses may say to anyone."   *Id.* at 564.   The Movants also suggest that this Court's order is similar to the order at issue in *CBS v. Young*, 552 F.2d 234 (6th Cir. 1975).   The order in *Young* applied to "all parties concerned with this litigation," including "close friends and associates" of the parties, and further, prevented discussion "in any manner whatsoever" about the case.   *Young*, 552 F.2d at 236.

In contrast to the orders found in *Nebraska Press Association*, *Young*, and other case law cited by the Movants, here the order does not prohibit the press from publishing news articles about the case.   This is a crucial distinction, and one that the Movants fail to acknowledge.   The order simply prevents the press from filling publications with quotes and accounts springing from the parties or potential trial participants that would likely influence or taint potential jurors and impede the Court's ability to seat a jury within the district.   The order does not prevent the parties from talking to the press.   It only limits the subject matter.   This distinction further evinces the narrowly tailored nature of the order, in that it only restricts the parties and trial participants from making extra-judicial statements about the facts or substance of the case to the press.   The order, as currently constituted, does not prevent the press from relaying events that transpire in the courtroom during hearings or trial.   The order is designed, however, to prevent likely prejudice resulting from prospective jurors forming opinions about the "facts and substance of the case" based on statements made by persons who could appear before them during the trial.

There are "two evils that threaten the integrity of the judicial system. Those evils are (1) comments that will likely influence the outcome of a trial and (2) statements that will prejudice the jury venire even if an untainted jury panel can eventually be found." *In re Morrissey*, 168 F.3d 134, 140 (4th Cir. 1999). The Court has reviewed many of the news articles printed since this case began, and has reviewed many more that were written following the Upper Big Branch explosion on April 5, 2010. Some of these articles include statements made by family members of the victims. Other articles include statements from investigators tasked with determining the cause of the explosion. Some center on statements made by the Defendant. However, media attention had died down during the time period between the explosion in 2010 and the indictment in November 2014. That lapse of time created a buffer that reduced the risk of a tainted jury pool. *Skilling v. United States*, 561 U.S. 358, 383 (2010). Further, the coverage prior to the indictment necessarily did not include the particulars that are most likely to prejudice a jury, namely, discussion of this defendant's guilt or innocence of the particular crimes alleged. Thus, pre-indictment press coverage was not such that any restrictions now imposed are ineffective.

The press has exercised its right to report extensively on the indictment and proceedings in this case. Since the indictment was returned, many news articles have featured the Defendant, the victims and their families, and/or the underlying investigation. The Court finds, given the environment and the nature of the allegations, that there is a reasonable likelihood that these publications could prejudice the jury selection process and/or influence the outcome of a trial, absent the Court's restrictions on access to certain sources of information. See *In re Russell*, 726 F.2d 1007, 1010 (4th Cir. 1984). The discussion on alternative measures to the order restricting speech is found *infra.*

9

*B. Limiting Access to Documents*

"It is well settled that the public and press have a qualified right of access to judicial documents and records filed in civil and criminal proceedings."  *Doe v. Public Citizen*, 749 F.3d 246, 265 (4th Cir. 2014).   The Movants' common law right "does not provide as much access to the press and public as does the First Amendment."   *In re the State-Record Company*, 917 F.2d at 127.   Indeed, "[u]nder the common law the trial court's denial of access to documents is reviewed for abuse of discretion, but under the First Amendment, such denial is reviewed *de novo* and must be necessitated by a compelling government interest that is narrowly tailored to serve that interest."   *Id.* (citing *In re Washington Post Co.*, 807 F.2d at 390.)   "The right of access to criminal proceedings is not absolute, but must be balanced against other compelling interests protected by the Constitution, such as the right of the accused to a fair trial."   *In re Knight Pub. Co.,* 743 F.2d 231, 234 (4th Cir. 1984). (reference omitted.)

*In re The Charlotte Observer* presented the issue(s) of whether the Magistrate Judge's sealing of pleadings and closing off of the courtroom in relation to a motion to change venue was constitutional.   882 F.2d at 852.   It involved a federal criminal case charging two defendants "with multiple counts of mail and wire fraud arising out of their activities with the PTL religious organization."   *Id.* at 851.   The Fourth Circuit held that the orders were unconstitutional, noting the respective judge must base the decision to close with "specific judicial findings that (1) there is a substantial probability that the defendant's right to a fair trial will be prejudiced by publicity; (2) there is a substantial probability that closure would prevent that prejudice; and (3) reasonable alternatives to closure cannot adequately protect the defendant's fair trial rights."   *Id.* at 853. (internal citation omitted.)   The judge must also "give interested parties prior notice and an

10

opportunity to be heard before deciding the issue, and support any decision to close with specific reasons and findings on the record to facilitate de novo review of such closure orders that is mandated by their constitutional implications."   *Id.* (citing *In re Washington Post Co.*, 807 F.2d at 391.)

Less than a year later, the Fourth Circuit again visited the issue.   *In re the State-Record Co., Inc.* involved a "gag" order that was subsequently expanded to documents filed in connection with certain pleadings.   917 F.2d at 127. ("Although the original motion was to stop extra-judicial statements by the attorneys and the parties, this motion was expanded in open court to cover documents the government filed in response to requests for Brady material and Federal Rule of Evidence 404(b) material.")   The primary issue for the Fourth Circuit was whether the district court erred when it used the reasonable likelihood—as opposed to substantial probability standard —in deciding to seal the records.

Although it noted the ever-present "tension between First Amendment right to a free press and Sixth Amendment right to a trial by an impartial jury," the Fourth Circuit concluded that "[i]t was error for the district court to use the "reasonable likelihood" standard rather than the "substantial probability" standard in deciding to seal the court's records."   *Id.* at 128.   The court also noted that "[t]here are probably many motions and responses thereto that contain no information prejudicial to a defendant, and we cannot understand how the docket entry sheet could be prejudicial."   *Id.* at 129.   It suggested methods that courts could implement to guard against prejudice to the defendant, noting that "opposing counsel could be contacted to review the document" and "if the attorneys could not agree, the document would be submitted to the trial court," which could then find "after applying the substantial probability standard, that such

11

information would create pretrial prejudice, the document could be redacted by the court for the public, with the original being filed with the Clerk under seal."   *Id.*

More recently, in *Public Citizen*, the Fourth Circuit had to determine whether allowing a company to secretly litigate to enjoin the publication of information adverse to one of its products violated the "public's constitutional and common-law rights of access to judicial records and documents."   *Public Citizen*, 749 F.3d at 252.   There, the district court granted the company's motion to seal the entire civil record and proceed under a pseudonym, finding that the company's "interest in reputational and fiscal health" was compelling, and "outweighed the public's abstract interest in obtaining information about the lawsuit."   *Id.* at 255. (internal quotations omitted.) Most of the docket entries in the civil action were entirely sealed, and the district court's memorandum opinion and order in favor of judgment for the company was unsealed several months after the fact, and was largely redacted.   *Id.*   Relevant to the discussion at bar, the Fourth Circuit Court of Appeals reversed the district court's decisions, finding that (1) there were no extraordinary circumstances that supported the company's request to litigate under a pseudonym, and (2) the company's unsupported fear of financial harm did not outweigh the public's presumptive right of access to the documents and summary judgment determination of the court. *Id.* at 271-275.

One important distinction between the order at issue and the order considered in *Public Citizen* is the sealing of the docket.   Contrary to the Movants' suggestion that the November 14, 2014 order sealed the docket, the order instructs the Clerk of the Court to render the docket and docket sheet available for public inspection.   The Court does note that while the press and public may not see the actual documents and attachments thereto, in many instances, they are able to see

the docket entry and can determine the nature of the record and follow the progression of the criminal case.   "The docket sheet provides onlookers an overview of the court proceedings and allows them to ascertain the parties to the case, the materials that have been filed, and the trial judge's decisions."   *Public Citizen*, 749 F.3d at 268.   Thus, while the order can be seen as limiting the press and public's right of "access," even in its initial form, it does not commit the fatal flaw of sealing the docket sheet or otherwise obscuring docket entries.   "In this respect, docket sheets provide a kind of index to judicial proceedings and documents, and <u>endow the public and press with the capacity to exercise their rights</u> guaranteed by the First Amendment."   *Public Citizen*, 749 F.3d at 268. (emphasis added.)

Assuming *arguendo* that the order had the effect of sealing the docket, the respective interests of the Defendant and any potential trial participants are compelling, and these interests heavily outweigh the public and media's presumptive right of access guaranteed under the First Amendment in this instance.   It is deep-rooted that a defendant's right to a fair trial is a compelling interest.   Indeed, it is the very bedrock of our criminal law jurisprudence.   Similarly, protecting the privacy rights of trial participants such as potential witnesses and victims has also been found to be a compelling interest.   "The interests that courts have found sufficiently compelling to justify closure under the First Amendment include a defendant's right to a fair trial before an impartial jury . . . [and] protecting the privacy rights of trial participants such as victims or witnesses."   *Public Citizen*, 749 F.3d at 269. (citations omitted.)   Yet, the Fourth Circuit made clear in *Public Citizen* that:

> When presented with a motion to seal, the law in [the Fourth] Circuit requires a judicial officer to comply with the following procedural requirements: (1) provide public notice of the sealing request and a reasonable opportunity for the public to voice

> objections to the motion; (2) consider less drastic alternatives to
> closure; and (3) if it determines that full access is not necessary, it
> must state its reasons—with specific findings—supporting closure
> and its rejections of less drastic alternatives.

*Public Citizen*, 749 F.3d at 272.

Having given full consideration to the rights of the Movants and to the rights of the Defendant, the Court finds that public (and press) access to certain types of documents will serve to keep the public well-informed without unduly impacting the Defendant's right to a fair trial. Accordingly, the Court will issue an amended order and a separate order specifying certain documents that were restricted by the initial order, that are to be publicly accessible under the terms of the amended order.   Documents that have already been publicly released, of course, may remain public on the docket without increasing the risk of prejudice.   In addition, any documents that do not contain information or argument related to the facts and substance of the underlying case do not fall within the purview of the November 14th order, and should be publicly accessible. Similarly, absent specific instruction to the contrary, all orders and opinions of the Court should be accessible under the terms of the order.   Access to all documents, except those authored by the Court, that contain information or argument as to the facts and substance of the case, however, must continue to be restricted to case participants and court personnel.   Permitting the disclosure of such documents, like parties' statements, presents the substantial probability of tainting prospective jurors, by trial in the media, thereby prejudicing the Defendant's right to a fair and impartial trial in a court of law.

### C. Narrowly Tailored and Least Restrictive

After hearing argument, the Court finds that there is a substantial probability that irreparable damage would attach to the Defendant's right to a fair trial if it did not limit the docket,

due to prior and ongoing publicity, and the nature of said publicity.  The Court finds that alternatives to limiting the docket would not adequately protect the Defendant's right to a fair trial. The proffered alternatives are merely ineffective reactions once prejudice has occurred.

The Court has considered alternatives to its November 14th order (as amended) that would be less restrictive, including *voir dire* and the potential for a change of venue, but finds that they are not "alternatives" in the sense that they were not and are not feasible options at the time.   On November 14, 2014, *voir dire* and a change of venue would not help avert probable prejudice to insure the Defendant's right to an impartial tribunal or the witnesses' right to privacy. With appropriate *voir dire*, the court attempts to prevent jurors prejudiced by press coverage from being seated, but that process does not prevent the initial pervasive tainting of the prospective jury pool. Transfer of venue, likewise, takes place after pretrial publicity has tainted the jury pool such that a jury cannot be seated within the district and, as discussed during the hearing and below, implicates further policy considerations regarding the preference to hold trials in the district of indictment.[2] Of course, sequestration assumes that a jury could, in fact, be seated, and is not a viable alternative.

As a result, the Court finds that limiting access to the docket was, and remains the most effective method to protect against prejudice, while still allowing the public to follow the case.   In other words, the Court finds that the order, as amended, is appropriate, particularly in light of the fact that restricting speech and limiting access to the docket is the only practical measure that is available to the Court, pretrial.   The alternatives espoused by the Movants "fall short of serving

---

[2]      The Court does note, however, that the initial order did not explicitly specify that the restrictions would last only so long as necessary to protect the Defendant's right to trial by an impartial jury.  Accordingly, the amended order will include language clarifying that all restrictions will be lifted upon adjudication of the Defendant's guilt or innocence.

[the Defendant's and witnesses'] compelling interests," *Burson v. Freeman*, 504 U.S. 191, 206 (1992), and thus, are not serious, viable alternatives at this stage of the litigation.

Importantly, allowing the press and/or public access to specific arguments included in the parties' submissions and exhibits in support would likely defeat the restriction placed on the parties to forego speaking about the "facts and substance of the case" to the press.   On the other hand, restricting access to the filings, but not restricting statements made by the parties, would work a similar prejudice against the Defendant's right to a fair trial and witnesses' right to privacy. The order is most effective when both portions are in place.   Put simply, the objectives of the order would be defeated if either aspect was omitted.   Thus, it is not overbroad, but *necessary* to effectively limit probable prejudicial publicity before trial.   For similar reasons, the order is not overbroad simply because it "extend[s] to the family members not just of parties, but of victims and alleged victims."   (Document 31 at 9.)   Allowing a potential trial participant to speak through his or her family member would eviscerate the protective measures, and is further evidence of the need for the inclusive order.

This matter has already been the subject of extensive pre-trial motion practice.   Recent filings (see Document 41) and statements made by the Defendant's counsel at the hearing on December 17, 2014, indicate that this will continue.   If prospective jurors in the public are constantly inundated with news articles detailing specific allegations and arguments contained in filings related to, for example, a motion to transfer venue, or, on the other hand, a motion to dismiss the indictment as allegedly fatally flawed, then there is a substantial probability of predisposition.   This fact is amplified when dealing with the modern digital age and its technological achievements that allow duplication and distribution of data relevant to the litigation

16

within seconds.   The Court finds that there is a substantial probability that the order will help insure the Court's ability to seat an impartial jury.

The Court finds that the order is further supported by policy considerations.   For example, Article III, Section 2, Paragraph 3, of the United States Constitution mandates that a "Trial shall be held in the State where the said Crimes shall have been committed," while the Sixth Amendment to the United States Constitution dictates that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law." Rule 18 of the Federal Rules of Criminal Procedure likewise commands that "[u]nless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed.   The Court must set the place of trial within the district with due regard for the convenience of the defendant, any victim, and the witnesses, and the prompt administration of justice."   F. R. Crim. P. 18.   Clearly, the laws of our Nation favor criminal trial in the district where the offense was committed.   As the Supreme Court pointedly stated in *Sheppard v. Maxwell*,

> we must remember that reversals are but palliatives; the cure lies in those remedial measures that will prevent the prejudice at its inception. The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences. Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate its function.

*Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966).

The subject order does not apply like a blanket covering all statements and documents that may have anything to do with the facts or substance of this case.   It does not shield all filings from

public inspection or debate. It is not vague because it applies to a specific set of individuals who are either already involved in the case or may be in the future. The press will not have to rely on second-hand sources because they are free to attend the hearings and trial, and can report developments firsthand. The order is narrowly tailored to ensure a fair trial, while at the same time protecting the right of the press to report about the case and the public's right of access.

## CONCLUSION

WHEREFORE, after careful consideration, and based on the findings made herein, the Court **ORDERS** that the *Motion of the Wall Street Journal, the Associated Press, Charleston Gazette, National Public Radio, Inc., and the Friends of West Virginia Public Broadcasting, Inc., to Intervene for the Limited Purpose of Moving the Court to Reconsider and Vacate the November 14, 2014 Gag and Sealing Order* (Document 30) be **GRANTED IN PART AND DENIED IN PART.** The Court **ORDERS** that the Movants be permitted to intervene for the limited purpose of challenging this Court's order entered on November 14, 2014. The motion is **DENIED** to the extent it requests that the Court vacate the order, but **GRANTED** to the extent it seeks modifications to the order.

The Court **DIRECTS** the Clerk to send a copy of this order to Sean P. McGinley, to the Defendant and counsel, to the United States Attorney, to the United States Probation Office, and to the Office of the United States Marshal.

ENTER: January 7, 2015

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA
18

Exhibit C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## BECKLEY DIVISION

UNITED STATES OF AMERICA,

                  Plaintiff,

v.                                 CRIMINAL ACTION NO.   5:14-cr-00244

DONALD L. BLANKENSHIP,

                  Defendant.

## AMENDED ORDER

The Court has reviewed the indictment in the above-styled matter which was returned on November 13, 2014.   The Court observes that the Defendant and the matters which are referenced in the indictment have been the subject of publicity.   After careful consideration, and in light of the prior publicity, the Court finds it necessary to take precautions to insure that the Government and the Defendant can seat jurors who can be fair and impartial and whose verdict is based only upon evidence presented during trial.[1]   The restrictions contained in this order will be lifted upon adjudication of the Defendant's guilt or innocence.

Wherefore, the Court does hereby **ORDER** that neither the parties, their counsel, other representatives or members of their staff, potential witnesses, including actual and alleged victims, investigators, family members of actual and alleged victims as well as of the Defendant, nor any

---

[1]    The Court hereby incorporates by reference those factual findings and conclusions contained in the Court's *Memorandum Opinion and Order* (Document 63) regarding pretrial publicity and the interests of those impacted by this order.

court personnel shall make any statements of any nature, in any form, or release any documents to the media or any other entity regarding the facts or substance of this case.

The Court further **ORDERS** that any and all motions, stipulations, discovery requests, responses, supplemental requests and responses, and other relevant documents be filed directly with the Clerk pursuant to Rule 49.1 of the Local Rules of Criminal Procedure, and that access to any documents filed on CM/ECF in this matter, which contain information or argument regarding the facts or substance of this case, be restricted to the case participants and court personnel. However, this order shall not be applicable to documents which have previously been released publicly or orders of the Court, absent specific instruction to the contrary.   The Court **DIRECTS** the Clerk to make the docket entries publicly available.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, to the United States Attorney, to the United States Probation Office, and to the Office of the United States Marshal.

ENTER:    January 7, 2015

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA

CASE NO: _____

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

**IN RE THE WALL STREET JOURNAL, THE ASSOCIATED PRESS, CHARLESTON GAZETTE, NATIONAL PUBLIC RADIO, INC., AND THE FRIENDS OF WEST VIRGINIA PUBLIC BROADCASTING, INC.**

*Petitioners,*

---

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2015, I caused true and correct copies of the Petition for a Writ of Mandamus and Motion for Expedited Consideration of Petition for a Writ of Mandamus to be served upon counsel for the parties and upon the District Court as follows:

**By Hand Delivery**
Hon. Irene C. Berger
United States District Court
110 North Heber Street
Room 336
Beckley, WV 25801


**By Email and USPS Express Mail**
John H. Tinney, Jr.
The Tinney Law Firm
P.O.Box 3752
Charleston, WV 25337-3752
jacktinney@tinneylawfirm.com


**By Email and USPS Express Mail**
Alexander Macia
James A. Walls
Spilman Thomas & Battle
P.O. Box 273
Charleston, WV 25321-0273
amacia@spilmanlaw.com
jwalls@spilmanlaw.com

**By Email and USPS Express Mail**
Eric R. Delinsky
Blair Gerard Brown
Zuckerman Spaeder
Richard Miles Clark
Steven N. Herman
William W. Taylor, III
1800 M Street, NW
Suite 1000
Washington, DC 20035-5807
edlinsky@zuckerman.com
bbrown@zuckerman.com
mclark@zuckerman.com
sherman@zuckerman.com
wtaylor@zuckerman.com

**By Email and USPS Express Mail**
R. Booth Goodwin, II
Steven R. Ruby
U.S. Attorney's Office
P.O. Box 1713
Charleston, WV 25326-1713
usawvs.ecfusa@usdoj.gov
steven.ruby@usdoj.gov

*/s/ Katherine M. Bolger*
Katherine M. Bolger