# IN THE UNITED STATES DISTRICT COURT FOR THE
# SOUTHERN DISTRICT OF WEST VIRGINIA
# BECKLEY

UNITED STATES OF AMERICA

v.   CRIMINAL NO. 5:14-00244

DONALD L. BLANKENSHIP

## UNITED STATES' RESPONSE TO DEFENDANT'S MOTION
## FOR TRANSFER TO ANOTHER DISTRICT FOR TRIAL

The law on changes of venue weighs heavily against Defendant's request for transfer. The Supreme Court's most recent guidepost in this area is *Skilling v. United States*, 561 U.S. 358 (2010). *Skilling*, in which the named defendant was the former chief executive officer of Houston's collapsed Enron Corporation, held that no change of venue was required despite facts that included the following: a venire in which no fewer than two-thirds of the venire persons "expressed views about Enron or the defendants that suggested a potential predisposition to convict"; thousands of local residents who lost their jobs and savings as a result of Enron's collapse, which spawned the prosecution; and more than 4,000 local newspaper articles and 19,000 local televised news segments, "often caustic in tone," on the case and Skilling. *Id.* at 427, 428-29, 432 (Sotomayor, J., dissenting). Even if Defendant's claims about his survey of the Beckley Division and his collection of news stories are taken at face value, they show less evidence of pretrial prejudice than existed in *Skilling*, where no venue change was required. (Defendant refuses to share his data files of survey results with the United States, a decision from

which the Court may draw its own conclusions about the survey's reliability.) If no venue change was required in *Skilling*, then none is required here. Rather, the Court should follow the near-universal rule that a change of venue is not justified unless and until *voir dire* reveals that an impartial jury cannot be empaneled. *United States v. Bakker*, 925 F.2d 728, 732 (4th Cir. 1991).

Defendant's strongest contention is that the Beckley Division is less populous than Houston, the *Skilling* locale. Defendant is correct that the Supreme Court in *Skilling* gave some weight to the Houston community's size as a factor mitigating prejudicial publicity. On the other hand, state courts routinely try defendants for heinous crimes that are the subject of intense local publicity in jurisdictions far less populous than the Beckley Division. *See, e.g.*, *Patton v. Yount*, 467 U.S. 1025 (1984) (declining to require venue change even though 77% of venire persons, and eight of fourteen of jurors and alternates actually seated, believed defendant guilty of murder before trial began, in county of around 70,000 people). But if the Court is concerned about the Beckley Division's size in light of *Skilling*, it could readily solve that problem by moving the trial to Charleston. The Charleston Division has a population of around 516,000. If that is not enough, the Court could add to the jury pool the counties in the Huntington Division. The Charleston and Huntington Divisions together have a population of around 738,000— about 40% of the population of the state. They are also removed from the heart of coal country and from the area most directly affected by the Upper Big Branch explosion. This course would resolve Defendant's objections while protecting the important public interest in vicinage, that is, trying a case as close as possible to where the charged offenses occurred.

The United States, by counsel, thus opposes Defendant's Motion for Transfer to Another District for Trial (ECF 121). A fair reading of the law suggests that changing venue without first attempting to seat a jury would be inappropriate here. And if the Court does conclude that a move out of Beckley is needed, there is no reason to go to Baltimore or Martinsburg (locations that are convenient only for Washington, D.C.-based defense counsel, not for witnesses, the Court, or the interested public in this district). Charleston and Huntington are better alternatives.

## I. Legal standards and precedents.

### A. Standards for juror impartiality.

Exposure to pretrial publicity by no means disqualifies one as a juror, nor even does forming a pretrial opinion as to the defendant's guilt. On the contrary, the informed citizens who make the best jurors usually will know something about any case of significance in the area where they live. "[E]very case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits." *Reynolds v. United States*, 98 U.S. 145, 155-56 (1878). "[P]rominence does not necessarily produce prejudice, and juror *impartiality*, we have reiterated, does not require *ignorance*." *Skilling v. United States*, 561 U.S. 358, 360 (2010). To satisfy the Sixth Amendment's requirement of an impartial jury, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence in court." *Murphy v. Florida*, 421 U.S. 794, 800 (1975).

### B. Two-step analysis of motions for change of venue.

"Motions for a change of venue call for a two-step analysis." *United States v. Bakker*, 925 F.2d 728, 732 (4th Cir. 1991). "As a first step, a trial court must address whether the publicity is so inherently prejudicial that trial proceedings must be presumed to be tainted." *Id.* "In that case, a motion for a change of venue should be granted before jury selection begins." *Id.* The Fourth Circuit "has cautioned, however, that '[o]nly in extreme circumstances may prejudice be presumed from the existence of pretrial publicity itself.'" *Id.* (citing *Wells v. Murray*, 831 F.2d 468, 472 (4th Cir.1987)). "Instead, a trial court customarily should take the second step of conducting a *voir dire* of prospective jurors to determine if actual prejudice exists." *Id.* (citing *Wansley v. Slayton*, 487 F.2d 90, 92–93 (4th Cir. 1973)). "Only where *voir dire* reveals that an impartial jury cannot be impanelled would a change of venue be justified." *Id.*

### C. Key Supreme Court precedents.

#### 1. *Skilling v. United States.*

The most recent, and perhaps the most comprehensive, Supreme Court decision on changes of venue is *Skilling v. United States*, 561 U.S. 358 (2010). Because it is the Supreme Court's most recent guidepost in this area and because many of its specific points are highly instructive here, it warrants extended discussion.

The defendant in *Skilling* was the former chief executive officer of Houston-based Enron Corporation, once one of the world's largest energy companies. In 2001, Enron collapsed virtually overnight under circumstances that led to the defendant's indictment on more than twenty-five criminal charges, including securities fraud, wire fraud, and false representations to auditors. *Skilling*, 561 U.S. at 368-69. Enron's collapse unleashed

"a barrage of local media coverage" that was "massive in volume and often caustic in tone." *Id.* at 427 (Sotomayor, J., dissenting). Before trial, defendant Skilling sought a change of venue, contending that "hostility toward him in Houston, coupled with extensive pretrial publicity, had poisoned potential jurors." *Id.* at 369-70. "[A]ided by media experts," Skilling "submitted hundreds of news reports detailing Enron's downfall" and "presented affidavits from the experts he engaged portraying community attitudes in Houston in comparison to other potential venues." *Id.*

The district court in *Skilling* denied the defendant's motion to change venue. 561 U.S. at 370. Instead, the district court used alternative approaches to seating an impartial jury, including a highly detailed, seventy-seven-question, fourteen-page questionnaire for prospective jurors, and a 400-person venire. *Id.* at 371-72.

Three weeks before Skilling's trial, one of his codefendants, Enron's former chief accounting officer, pleaded guilty. 561 U.S. at 372. Skilling again moved for a change of venue, arguing that news accounts of his codefendant's guilty plea further tainted the jury pool. *Id.* The district court declined, concluding that Skilling still had not established that pretrial publicity or community prejudice raised a presumption of inherent jury prejudice. *Id.* The district court further observed that its extended jury questionnaire and *voir dire* provided adequate safeguards to ensure an impartial jury. *Id.* at 372-73. The district court also decided to examine venire members individually about pretrial publicity and to give the defense extra peremptory challenges. *Id.* at 373.

Under these conditions, and with appropriate instructions and questioning from the district court regarding the importance of impartiality, the presumption of innocence, and other topics to assess and counteract any influence from pretrial publicity, a jury was

selected in less than a day. 561 U.S. at 374-75, 388 (jury selected in five hours). Skilling was tried, convicted on nineteen counts, and acquitted on nine. *Id.* at 375. He appealed. *Id.*

The Fifth Circuit initially determined that the volume and negative tone of media coverage generated by Enron's collapse created a presumption of juror prejudice, contrary to the district court's conclusion. 561 U.S. at 375-76. The appeals court also noted potential prejudice stemming from the guilty plea, just before trial, of the Skilling codefendant, and from the large number of victims in Houston—thousands of Enron employees who lost their jobs and saw their 401(k) accounts wiped out, as well as Houstonians who suffered spillover economic effects. *Id.* Regarding the emotional impact of press coverage, the Fifth Circuit observed, "Local newspapers ran many personal interest stories in which sympathetic individuals express feelings of anger and betrayal toward Enron." *Id.* at 375 n.8. Even the *Houston Chronicle*'s sports page, the court noted, wrote of Skilling's guilt as a foregone conclusion. "Similarly, the *Chronicle*'s 'Penthouse Pet of the Week' section mentioned that a *pet* had 'enjoyed watching those Enron jerks being led away in handcuffs,'" the appeals court continued. *Id.* (citing *United States v. Skilling*, 554 F.3d 529, 559 (5th Cir. 2009)) "These are but a few examples of the *Chronicle*'s coverage." *Id.*

The Fifth Circuit, however, stated that the presumption of juror prejudice was rebuttable if an effective *voir dire* had succeeded in seating an impartial jury despite pretrial publicity and community opinion. 561 U.S. at 376. After examining the *voir dire* conducted by the district court, the Fifth Circuit concluded that this standard was met and that Skilling's right to an impartial jury was satisfied. *Id.*

6

The Supreme Court agreed to review Skilling's contention that venue should have been changed. 561 U.S. at 376. It affirmed the district and appeals courts, and went even further than the appeals court in its reasoning, concluding that the facts in *Skilling* did not create even a presumption that the jury pool was tainted. Pretrial publicity, the Supreme Court noted, had included nothing like the televised confession from *Rideau v. Louisiana*, 373 U.S. 723 (1963), which is the last Supreme Court case to require a venue change because of pretrial publicity. *Id.* at 382-83. In discussing *Rideau*, the *Skilling* Supreme Court emphasized that a defendant's publicized confession is uniquely prejudicial, quoting language from *United States v. Chagra*, 669 F.2d 241, 251-52 n.11 (5th Cir. 1982): "A jury may have difficulty in disbelieving or forgetting a defendant's opinion of his own guilt but have no difficulty in rejecting the opinions of others because they may not be well-founded." *Id.* at 383.

The Supreme Court also regarded lapse of time as significant: "unlike cases in which trial swiftly followed a widely reported crime, *e.g.*, *Rideau*, over four years elapsed between Enron's bankruptcy and Skilling's trial. Although reporters covered Enron-related news throughout this period, the decibel level of media attention diminished somewhat in the years following Enron's collapse." 561 U.S. at 383 (citations omitted). In reversing the Fifth Circuit's conclusion that prejudice had to be presumed, the Supreme Court wrote that "pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial." 561 U.S. at 384 (quoting *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 554 (1976)).

Three justices dissented. 561 U.S. at 427. The dissent described in more vivid terms the depth of hostility toward Skilling in the media and community. Yet even the

dissenting justices did not conclude that a presumption of juror prejudice was warranted. *Id.* at 445-46. Rather, they believed that the actual process of *voir dire* and jury selection employed by the trial court fell below constitutional standards. *Id.* at 447.

Here are some of the facts that even the dissent found did not create a presumption of prejudice: "The failure of Enron wounded Houston deeply. Virtually overnight, what had been the city's largest, most visible, and most prosperous company, its foremost social and charitable force, and a source of civic pride was reduced to a shattered shell." 561 U.S. at 428 (internal quotation marks and citations omitted). "Thousands of the company's employees lost their jobs and saw their retirement savings vanish." *Id.* "As the effects rippled through the local economy, thousands of additional jobs disappeared, businesses shuttered, and community groups that once benefitted from Enron's largesse felt the loss of millions of dollars in contributions." *Id.*

The dissent continued, "With Enron's demise affecting the lives of so many Houstonians, local media coverage of the story saturated the community. According to a defense media expert, the Houston Chronicle—the area's leading newspaper—assigned as many as 12 reporters to work on the Enron story full time." 561 U.S. at 428. "The paper mentioned Enron in more than 4,000 articles during the 3-year period following the company's December 2001 bankruptcy filing. Hundreds of these articles discussed Skilling by name." *Id.* "Local television news coverage was similarly pervasive and, in terms of editorial theme largely followed the Chronicle's lead. Between May 2002 and October 2004, local stations aired an estimated 19,000 news segments involving Enron, more than 1600 of which mentioned Skilling." *Id.* at 428-29 (internal quotation marks and citations omitted).

The dissent noted media coverage critical of Skilling personally. For example, a *Houston Chronicle* report on Skilling's 2002 testimony before Congress described the reaction of Enron employees who turned "incredulous, angry and then sarcastic by turns, as a man they knew as savvy and detail-oriented pleaded memory failure and ignorance about critical financial transactions at the now-collapsed energy giant." 561 U.S. at 429 (internal quotation marks omitted). "'He is lying; he knew everything,' said an employee, who said she had seen Skilling frequently over her 18 years with the firm, where Skilling was known for his intimate grasp of the inner doings at the company. 'I am getting sicker by the minute.'" *Id.* (internal brackets omitted). "A companion piece quoted a local attorney who called Skilling an 'idiot' who was 'in denial'; he added, 'I'm glad Skilling's not my client." *Id.* (internal brackets omitted). The *Skilling* dissent goes on at length to catalogue further negative publicity concerning Skilling, and bears reading in its entirety to understand the parallels between the defense assertions in *Skilling* and here. *See id.* at 428-36.

The dissent also describes the results of the prospective-juror questionnaire. "The completed questionnaires of the 283 respondents not excused for hardship dramatically illustrated the widespread impact of Enron's collapse on the Houston community and confirmed the intense animosity of Houstonians toward Skilling and his codefendants." 561 U.S. at 431. "More than one-third of the prospective jurors . . . lost money or jobs as a result of the Enron bankruptcy." *Id.* at 431-32. "Two thirds of the jurors . . . expressed views about Enron or the defendants that suggested a potential predisposition to convict." *Id.* at 432. "In many instances, they did not mince words, describing Skilling as 'smug,' 'arrogant,' 'brash,' 'conceited,' 'greedy,' 'deceitful,' 'totally unethical and criminal,' 'a

9

crook,' 'the biggest liar on the face of the earth,' and 'guilty as sin.'" *Id.* The dissent, in footnotes, records dozens of other hostile comments reported on the prospective-juror questionnaires. *Id.* at 432-33 nn. 4 & 6.

Despite all this, the dissent agreed with the majority that prejudice could not be presumed and that the district court acted properly in conducting *voir dire* to determine whether an impartial jury could be seated in Houston. 561 U.S. at 445. The *Skilling* Supreme Court thus was unanimous in its conclusion that there was no presumption of prejudice and that *voir dire* to try to seat a local jury was necessary.

### 2. *Rideau v. Louisiana.*

If *Skilling* is the guidepost for when a change of venue is *not* required, then *Rideau v. Louisiana*, 373 U.S. 723 (1963), illustrates the exceedingly rare situation where the Supreme Court has mandated such a change. *Rideau* arose from Calcasieu Parish in Louisiana, where in February 1961 a man robbed a bank, kidnapped three of the bank's employees, and killed one of them. *Rideau*, 373 U.S. at 723-24. Wilbert Rideau was arrested for these crimes and held in the Calcasieu Parish jail. *Id.* at 724. While in the jail, and without counsel, he was interrogated by the local sheriff. *Id.* The interrogation lasted about twenty minutes. *Id.* at 724. In it, Rideau "personally confess[ed] in detail to" murder, kidnapping, and robbery. *Id.* at 726.

Rideau's confession was filmed. *Id.* at 724. Later the same day, the filmed murder confession was broadcast across the jurisdiction. *Id.* It was broadcast again the day after, and again the day after that. *Id.* Much of the jury pool in Rideau's case thus saw and heard him personally confess to murder.

On these unique facts, the Supreme Court held that the trial court erred when it denied Rideau's motion for change of venue. *Id.* at 727. This ruling, issued 51 years ago, was the last time that the Supreme Court vacated a conviction for want of a venue change.

**D. Vicinage.**

Article III, Section II of the Constitution requires that the trial of crimes "shall be held in the state where the said crimes shall have been committed[.]" U.S. Const. art. III § 2. The Sixth Amendment also ensures that a trial occur "by an impartial jury of the State and district wherein the crime shall have been committed." This vicinage requirement is not only the right of the accused, but serves a distinct purpose in furtherance of the public interest to have a case tried in the community where a crime is committed. In *Williams v. Florida*, 399 U.S. 78 (1970), a case examining the history and propriety of a fixed number of jurors, the Supreme Court recognized that "the essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence." *Id*. at 100. The Second Circuit, in *United States v. Fell*, 571 F.3d 264 (2d Cir. 2009), elaborated on this important responsibility of the community. Though ruling that a jury need not accurately reflect the specific local values of a community, the court recognized that "the vicinage requirement, by defining the community from which a federal jury must be drawn, permits the jury to operate as the conscience of that community in judging criminal cases." *Id*. at 269 (citations omitted).

The value of this "community participation" occurring in the particular community that endured a particular crime is significant and has not been lost on courts considering venue transfers. As the court in *United States v. Flaxman*, 304 F. Supp. 1301 (S.D.N.Y. 1969), explained, "In order that the defendant be tried before the most informed jury, the Sixth Amendment directs that trial be had among those who know the local conditions surrounding the criminal acts and who should thus be able to draw the most accurate inferences from the evidence presented at trial." *Id*. at 1303. *See also United States v. Dubon-Otero*, 76 F. Supp. 2d 161, 165 (D.P.R. 1999) ("[T]he interest of a community in trying those who violate its laws remains a central tenet of our judicial system."); *United States v. Means*, 409 F. Supp. 115, 117 (D.N.D. 1976) ("The interest of a community that those charged with violations of its laws, be tried in that community, is not a matter to be cast aside lightly.").

## II. Defendant has not established a presumption that a Beckley Division trial would be tainted.

In light of the Supreme Court's bookend precedents in this area, the question before the Court is straightforward: is this a case like *Skilling* or is it a case like *Rideau*?

The answer, on any fair reading of the law, is that this case is like *Skilling*. Defendant's argument relies on two main components: a compilation of press coverage and a survey. The adverse press coverage in *Skilling* easily matches or exceeds the coverage that Defendant claims occurred with respect to him. The *Skilling* dissent describes 4,000 articles in a single newspaper, along with 19,000 television news segments. *Skilling*, 561 U.S. at 428 (Sotomayor, J., dissenting). The coverage routinely discussed Skilling by name and focused on the thousands who lost their jobs and savings as a result of his alleged crimes. *Id.* at 429. It featured victims who attacked him

personally. *Id.* Defendant's claims about adverse press coverage are similar in kind, if not as extensive.

Defendant's survey, meanwhile, claims to show that "about half" of respondents in the Beckley Division have formed an opinion that he may be guilty. Defendant refuses to provide the United States his survey results in a format, such as a computer spreadsheet file, that would allow the United States to analyze and confirm them, so it is impossible to say if Defendant's claims about the survey are accurate—or what it is about the results that Defendant does not want to disclose. But even if Defendant's "about half" claim is accepted at face value, it is substantially lower than the two-thirds of prospective jurors with a "potential predisposition to convict" in *Skilling*. 561 U.S. at 431-32 (Sotomayor, J., dissenting). And it is far lower than the 77% of the venire that believed the defendant guilty of murder in *Patton v. Yount*, 467 U.S. 1025, 1029 (1984), where the Supreme Court also found that no change of venue was necessary. Indeed, in *Yount*, eight of the fourteen jurors and alternates who were actually seated for trial believed, before hearing the evidence, that the defendant was guilty of murder, yet no venue change was required. *Id.* at 1029-30. In other words, the phrase that Defendant renders in boldface type in his memorandum—"nearly every potential juror in the Beckley Division has prejudged [Defendant] or else knows and talks to people who have," ECF 122 at 7—was even more true in *Skilling* and *Yount*, and, of course, in thousands and thousands of locally notorious murder trials over the centuries.

In comparing this case to *Skilling*, moreover, it is important to note that the direct impact of the crimes charged in *Skilling* went far beyond the direct impact of the explosion at the Upper Big Branch mine (UBB). Defendant is not charged with causing

13

that explosion, of course, but it is the focus of his motion. The UBB explosion was a terrible tragedy. But the number of people that it directly affected pales by comparison to the tens of thousands of Houstonians who lost their jobs and savings when Enron collapsed.

This case has nothing in common with *Rideau*, in which the defendant's jailhouse confession to kidnapping and murder, obtained without counsel, was repeatedly broadcast on television. Here, Defendant has repeatedly and insistently denied any wrongdoing in connection with anything that happened during his tenure at Massey Energy Company. He attempts, nonetheless, in his memorandum to liken himself to the *Rideau* defendant, claiming that the notes and emails sent by him and discussed in the Indictment are tantamount to a public confession. That assertion is so strained that it is hard to understand what Defendant even could mean by it. Does he seriously contend that he has already confessed to the crimes with which he is charged, like the defendant in *Rideau*, and that the only way to give him a fair trial is to find a location where people are unaware of his confession? That would be obvious nonsense.

In sum, the appropriate Supreme Court guidepost is *Skilling*. The "about half" level of prejudgment that Defendant claims here is less than the two-thirds level in *Skilling* (to say nothing of the 77% in *Yount*). The media coverage that Defendant's experts have compiled appears to be less extensive than the coverage in *Skilling*, although the United States has not had time to count the number of articles mentioned. As in *Skilling*, more than four years have passed since the height of the coverage of which Defendant complains. Although UBB-related publicity has continued, as in *Skilling*, the "decibel level of media attention" has diminished enormously from its peak immediately

after the explosion—Defendant's suggestions to the contrary notwithstanding. *See Skilling*, 561 U.S. at 383. And the number of local people directly affected by the event on which Defendant focuses is far lower than the number directly affected by the Enron debacle. Under *Skilling*, these facts require that the Court attempt to seat an impartial jury through *voir dire* before considering a change of venue.

The only aspect of *Skilling* that might give the Court pause is the size of the community. As Defendant notes, community size was a factor in the *Skilling* decision. The Beckley Division, admittedly, is much smaller than Houston. *Yount*, however, was tried in a rural county with a population of around 70,000, and the Supreme Court found that no change of venue was required there even though 77% of the venire thought the defendant guilty of murder, and even though his previous conviction and confessions were widely reported. *See Patton v. Yount*, 467 U.S. 1025, 1029, 1041 (1984). As the United States has already pointed out, murder trials routinely occur around the country in small jurisdictions where nearly everyone knows of the case and those involved in it, and where nearly everyone has some opinion of the defendant's guilt. Even if, as Defendant claims, "about half" of the Beckley Division has formed some degree of opinion that he may be guilty, there are still many thousands of potential jurors who have formed no such opinion and from whose ranks an impartial jury could be empaneled. And it is not necessary, in any event, that a juror come to a case with no opinions. Rather, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence in court." *Murphy v. Florida*, 421 U.S. 794, 800 (1975).

### III. If the Court decides to move the trial, it should be moved to Charleston or Huntington.

If, however, the Court concludes that, in the interest of caution, the case should be moved from the Beckley Division to a larger jury pool, there is no need to move it to Martinsburg or Baltimore, the locations suggested by defense counsel (which happen to be in defense counsel's back yard). The Court could readily move the trial to the Charleston Division, which has a population of approximately 516,000, according to the same Census Bureau statistics that Defendant uses for the Beckley Division. If the Court believes that an even larger pool is needed, it could add to the jury pool the counties of the Huntington Division, with approximately 222,000 people, for a total of approximately 738,000, and try the case in either Charleston or Huntington.

In addition to being larger, the jury pool in the Charleston-Huntington area is distinct from the Beckley jury pool in other ways. Most of the counties in the Charleston and Huntington divisions are removed from the heart of coal country. In most of those counties, coal production is a minority of the economy, and in many of them, there is no coal production at all. The Charleston-Huntington counties are dominated by industries such as health care, chemicals, manufacturing, education and professional services. Coal is still a presence in these divisions, of course, but not predominant, and there is substantial economic diversity.

The Charleston-Huntington counties also are mainly removed from the center of the UBB explosion's direct impact. The great majority of people in Charleston, Huntington, or Parkersburg are not likely to know anyone whom the explosion affected directly. Contrast this with *Skilling*, in which one-third of the venire persons *themselves* lost jobs or savings because of Enron, and presumably many more knew others who did.

16

There are, of course, parts of the Charleston Division, such as Boone County, that were close to UBB and had extensive Massey operations. But the notion that the Court could not find twelve impartial jurors from Wood County, or Wirt County, or Roane County, would be wildly divorced from the reality of those locales.

To defense counsel who are litigating the case from a great distance and know nothing of this area, the distinction between Wood County and Raleigh or Boone County may well seem trifling. That is precisely why the discretion of the Court, which knows the community, is so important. "When pretrial publicity is at issue, 'primary reliance on the judgment of the trial court makes [especially] good sense' because the trial judge 'sits in the locale where the publicity is said to have its effect' and may base her evaluation on her 'own perception of the depth and extent of news stories that might influence a juror.'" *Skilling v. United States*, 561 U.S. 358, 386 (2010) (quoting *Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991)). To the Court, equipped with insight born of years here, it will be apparent that at least in the Charleston-Huntington counties an impartial jury can be seated without great difficulty, especially through the use of precautions like extended *voir dire*, a detailed questionnaire for prospective jurors, and a larger-than-usual venire.

Defendant may respond that the Charleston-Huntington area has received the same press coverage of which he complains in his motion. Here, again, the Court's local knowledge matters greatly. Press coverage of a coal disaster is received differently in the heart of coal country than it is in the Charleston-Huntington area. Its impact is different. It is notable, moreover, that media attention concerning Defendant has not been uniformly negative; he has been able to generate a great deal of positive press over the years and has frequently taken to the airwaves himself to broadcast his own viewpoint. In

any event, *Skilling*, and even more so *Yount*, teach that even extensive press coverage does not produce a presumption of prejudice in a jury pool the size of the one in Charleston and Huntington, especially when several years have passed since the key event that triggered the coverage. The Charleston-Huntington area is, of course, smaller than Houston, but it is ten times larger than the county of 70,000 in *Yount*. A move to the Charleston-Huntington area would address any concern the Court may have that the Beckley Division's size renders it suspect under *Skilling*.

Such a move would also protect the important interest in having the case tried near where the offenses charged occurred, and with a jury drawn from that area. *See Williams v. Florida*, 399 U.S. 78, 100 (1970) (emphasizing importance of "community participation and shared responsibility that results from [local jury's] determination of guilt or innocence"); *United States v. Fell*, 571 F.3d 264, 269 (2d Cir. 2009) ("[T]he vicinage requirement, by defining the community from which a federal jury must be drawn, permits the jury to operate as the conscience of that community in judging criminal cases." (citations omitted)). Defendant brushes aside this public interest in vicinage, but it is real and significant, and if it can be protected while also seating a jury that is impartial, then that is the course that the Court must follow.

### IV. Conclusion.

Controlling precedent refutes Defendant's contentions. Even if Defendant's claims about his survey and collection of news are accepted at face value, they show less prejudicial coverage and less evidence of prejudicial effect on the jury pool than existed in *Skilling*. And in *Skilling*, the Supreme Court unanimously agreed that there was no presumption of juror prejudice, meaning that the district court was required to attempt to

seat a local jury through *voir dire*. The same result applies here. This is not a case of a televised confession like *Rideau*.

The only reason that the Court might question *Skilling*'s applicability is the difference in size between the Beckley Division and the community involved in *Skilling*. If the Court is inclined to take a cautious approach in that regard, it can preserve the public's vicinage interest by moving the case to Charleston or Huntington and, perhaps, using those divisions as a single jury pool for this case. As the Court's own experience in this district will show, any claim that twelve impartial jurors could not be found in such a pool would be unfounded.

Respectfully submitted,

R. BOOTH GOODWIN II
United States Attorney

/s/ Steven R. Ruby
Steven R. Ruby
Assistant United States Attorney
WV Bar No. 10752
300 Virginia Street, East
Room 4000
Charleston, WV 25301
Telephone: 304-345-2200
Fax: 304-347-5104
Email: steven.ruby@usdoj.gov

**CERTIFICATE OF SERVICE**

It is hereby certified that the foregoing "United States' Response to Defendant's Motion to Transfer to Another District for Trial" has been electronically filed and service has been made on opposing counsel by virtue of such electronic filing this 27th day of February, 2015 to:

William W. Taylor, III
Blair G. Brown
Eric R. Delinsky
R. Miles Clark
Steven N. Herman
Zuckerman Spaeder LLP
1800 M Street, NW, Suite 1000
Washington, DC 20036

James A. Walls
Spilman Thomas & Battle, PLLC
48 Donley Street, Suite 800
P.O. Box 615
Morgantown, WV 26501

Alexander Macia
Spilman Thomas & Battle, PLLC
P.O. Box 273
Charleston, WV 25321

/s/ Steven R. Ruby
Steven R. Ruby
Assistant United States Attorney
WV Bar No. 10752
300 Virginia Street, East
Room 4000
Charleston, WV 25301
Telephone: 304-345-2200
Fax: 304-347-5104
Email: steven.ruby@usdoj.gov