**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON GRAND JURY 2014
MARCH 10, 2015 SESSION**

FILED

MAR 1 0 2015

TERESA L. DEPPNER, CLERK
U.S. District Court
Southern District of West Virginia

**UNITED STATES OF AMERICA**

**v.**

**CRIMINAL NO. 5:14-cr-00244**
**30 U.S.C. § 820(d)**
**18 U.S.C. § 371**
**18 U.S.C. § 1001**
**18 U.S.C. § 2**
**15 U.S.C. § 78ff**
**17 C.F.R. § 240.10b-5**

**DONALD L. BLANKENSHIP**

S U P E R S E D I N G
I N D I C T M E N T

**Summary**

1.   Beginning no later than January 1, 2008 and continuing through April 9, 2010 (the

"Indictment Period"), defendant DONALD L. BLANKENSHIP ("BLANKENSHIP"), the Chief

Executive Officer ("CEO") and Chairman of the Board of Directors of coal producer Massey

Energy Company ("Massey"), conspired to commit and cause routine violations of mandatory

federal mine safety standards at Massey's Upper Big Branch-South mine ("UBB").[*] Throughout

the Indictment Period, BLANKENSHIP himself closely managed UBB, the coal from which was

critical to Massey's financial performance. BLANKENSHIP knew that UBB was committing

hundreds of safety-law violations every year and that he had the ability to prevent most of the

violations that UBB was committing. Yet he fostered and participated in an understanding that

_____

[*] Allegations herein are made with reference to the Indictment Period unless otherwise noted.

perpetuated UBB's practice of routine safety violations, in order to produce more coal, avoid the costs of following safety laws, and make more money.

2.   Throughout the Indictment Period, BLANKENSHIP also conspired to defraud the United States by impeding the federal Mine Safety and Health Administration ("MSHA") in carrying out its duties at UBB.

3.   Following a major, fatal explosion at UBB on April 5, 2010, BLANKENSHIP made, and caused to be made, materially false and misleading statements and representations, and omitted and caused to be omitted statements of material facts, regarding his and Massey's practice of willful violations of safety laws at that mine. These included materially false statements and representations made to the United States Securities and Exchange Commission ("SEC") and materially false statements and representations, and materially misleading omissions, made in connection with the purchase and sale of Massey stock.

## Background

4.   At all relevant times, Massey was a corporation engaged in the business of mining and selling coal, including at numerous mines in the Southern District of West Virginia, where Massey maintained a regional headquarters. UBB was a coal mine that Massey, through various subsidiaries, wholly owned and controlled, and was located in and around Montcoal, Raleigh County, West Virginia, within the Southern District of West Virginia. UBB and all Massey's other mines and mining-related facilities produced products that entered commerce and had operations and products that affected commerce, rendering them subject to Title 30, United States Code, Chapter 22, concerning mine safety and health, and to rules and regulations promulgated thereunder, including mandatory federal mine safety and health standards codified in Title 30, Code of Federal Regulations, Chapter I. UBB was subject to regular federal mine

2

safety inspections conducted by MSHA, an agency of the United States Department of Labor (DOL), which was part of the executive branch of the government of the United States. UBB was also subject to monetary penalties imposed by MSHA for violations of mandatory federal mine safety and health standards that federal mine safety inspectors discovered during inspections of UBB.

5.  At all relevant times, Massey's Class A Common Stock was registered with the SEC and was publicly traded on the New York Stock Exchange. At all relevant times, in order to sell securities to members of the public and maintain public trading of its securities in the United States, Massey was required to comply with provisions of the federal securities laws, including the Securities Exchange Act of 1934, and rules and regulations promulgated thereunder.

6.  At all relevant times, the SEC was an agency of the executive branch of the government of the United States.

7.  At all relevant times, BLANKENSHIP, as CEO of Massey and Chairman of Massey's Board of Directors, was principally and ultimately responsible for the management of Massey's business. At all relevant times, the Restated Bylaws of Massey Energy Company provided that BLANKENSHIP, as CEO, had general supervision, direction, and control of the officers, employees, business, and affairs of Massey, including the UBB mine.

8.  During the Indictment Period, UBB was cited approximately 835 times for violations of mandatory federal mine safety and health standards. This was one of the highest levels of safety-law violations of any Massey mine. Approximately 319 of these violations were in an especially serious category of violations: those that could significantly and substantially contribute to the cause and effect of a safety or health hazard. Approximately 283 of UBB's safety-law violations during the Indictment Period were violations of the laws on mine ventilation, which operate to

3

prevent explosions and fires in coal mines and to minimize deaths and serious injuries in the event an explosion or fire does occur. Approximately 59 of UBB's safety-law violations during the Indictment Period resulted in shutdown orders closing all or part of the mine until the violation was abated, pursuant to Title 30, United States Code, Section 814(d). Violations resulting in such shutdown orders were among the most serious category of violations that can occur in a coal mine. UBB ranked among the worst mines in the United States in such shutdown orders during the Indictment Period.

9.   During the Indictment Period, UBB was important to Massey's financial performance. UBB produced a type of coal called metallurgical coal, which was used for manufacturing steel. During the Indictment Period, metallurgical coal sold for substantially more per ton than Massey's other major product, which was steam coal used to generate electricity. Metallurgical coal from UBB was particularly important to Massey's sales of metallurgical coal, because it was an essential ingredient in a blend of metallurgical coal that also included coal from a group of other Massey mines near UBB. In 2009, this UBB-centered group of mines generated revenues of approximately $331 million, which represented approximately 14% of Massey's approximately $2.3 billion in revenue—more than any of Massey's numerous other mining groups. For 2010, Massey projected UBB-group revenue of approximately $432 million, approximately 16% of Massey's projected revenue of approximately $2.7 billion and more than the projected revenue for any other Massey mining group.

10. Beginning in 2009 and continuing through the rest of the Indictment Period, one operating section of UBB employed a mining technique known as longwall mining. (A coal mining "section" was an area of a mine where coal was being produced. A single mine may have had multiple mining sections. While the longwall section was operating at UBB, UBB had, at

various times, four or five total active mining sections, with the other sections using a mining technique different from the longwall method.) Longwall mining was the most productive method of underground coal mining; it uses equipment and a mining configuration that permit the extraction of large swaths of coal in a short period of time. When operating at full productivity, the UBB longwall mining section could produce more than $600,000 worth of coal every day, more than any of Massey's dozens of other underground mining sections. The equipment needed to run a longwall mining section was expensive, typically costing many tens of millions of dollars.

## Upper Big Branch Safety-Law Violations

### *Mine Ventilation Laws*

11. Routine violations of mine-safety laws at UBB included violations of the laws on mine ventilation. Proper ventilation in a coal mine was essential to preventing explosions. The coal mining process inherently generates airborne coal dust, which was highly explosive. And in many coal mines, including UBB, the mining process also inherently releases methane gas into the mine air. Methane gas was explosive if it reaches certain atmospheric concentrations. A constant supply of clean air was necessary to dilute those airborne explosive substances and carry them away, preventing them from reaching dangerous concentrations.

12. *Minimum airflow requirements and mine ventilation plans.* At all relevant times, airflow in certain key areas of a coal mine was required, by mandatory federal mine safety standards, to be adequate to dilute, render harmless, and carry away explosive substances. At all relevant times, the operator of any coal mine was required to develop and follow a ventilation plan approved by federal mine-safety officials, also pursuant to a mandatory federal mine safety standard. This ventilation plan was required to be designed to control methane and coal dust, and

5

to mandate, in certain key locations, specific quantities of airflow that were adequate to dilute, render harmless, and carry away explosive substances. A violation of a mine's approved ventilation plan was a violation of a mandatory federal mine safety standard.

13. *Construction required for proper mine ventilation.* At all relevant times, coal mines were required to construct structures called ventilation controls and devices to manage the flow of air in a mine, pursuant to mandatory mine safety standards. These ventilation structures included permanent block walls and temporary walls made of heavy cloth or plastic to route mine air to locations where it was needed to carry away explosive substances. Maintaining this mandatory system of ventilation structures required continual construction, because as the mine's workings advanced deeper and deeper, new ventilation structures had to be built to route air through the most recently opened parts of the mine.

14. *Mine safety examinations.* At all relevant times, coal mines were required to conduct regular safety examinations to check for ventilation-related hazards, including the presence of potentially explosive methane gas in the mine air, illegally low levels of airflow, and air flowing in the wrong direction. In these safety examinations, mines were also required to check for the existence of any other hazardous conditions, including accumulations of explosive coal dust. Safety examinations in certain areas of a mine were required to be conducted within three hours before any working shift and at least once during each working shift. Wider ranging safety examinations were required to be conducted weekly. These requirements were established in mandatory mine safety and health standards.

15. The above-described mandatory federal mine safety standards concerning ventilation were basic, well-known principles of coal mining.

*UBB's Routine Violations of Mine-Ventilation Laws*

16. During the Indictment Period, BLANKENSHIP and Massey routinely violated the above-described and other mandatory safety standards on ventilation at UBB.

17. *Violations of airflow requirements and mine ventilation plan.* Examples of these violations included the following: On or around June 4, 2009, a federal mine safety inspector discovered airflow of 147 cubic feet per minute in an area of the mine where 9,000 cubic feet per minute was required. This legal minimum air quantity of 9,000 cubic feet per minute was established to ensure that airflow was sufficient to dilute and carry away explosive substances in the mine atmosphere. The inadequate air quantity violated a mandatory mine safety standard requiring the mine to follow its approved ventilation plan.

18. On or around June 3, 2009, a federal mine safety inspector discovered that UBB's section #1 was operating with less than half the minimum legal air quantity, which again violated the mandatory mine safety standard requiring the mine to follow its approved ventilation plan.

19. On or around October 21, 2009, a federal mine safety inspector discovered that UBB's section #2 was operating with less than the minimum legal air quantity. As a result of the illegally low air quantity, the federal mine-safety inspector observed visible airborne coal dust surrounding miners who were working on section #2. This illegally low air quantity again violated the mandatory federal mine safety standard requiring the mine to follow its approved ventilation plan.

20. On or around March 2, 2010, a federal mine safety inspector discovered that UBB's #1 section was operating with less than half the legal minimum air quantity, again violating the mandatory federal mine safety standard requiring the mine to follow its approved ventilation plan.

21. *Ventilation-plan violations regarding water sprays.* UBB also was cited repeatedly for violating another important component of its ventilation plan: its requirements for water sprays on equipment that cut coal from the coal seam. These water sprays suppressed coal dust and cooled the area where cutting occurred, the latter to diminish the possibility that frictional heat from cutting would ignite explosive substances in the mine air. On or around July 15, 2009, federal mine safety inspectors discovered that a continuous mining machine in UBB's section #2 was missing water sprays required by the mine's ventilation plan. On or around October 27, 2009, federal mine safety inspectors discovered that a continuous mining machine at UBB was running with less than the minimum level of water pressure for its sprays as required by the mine's ventilation plan. On or around March 23, 2010, federal mine safety inspectors discovered that a continuous mining machine at UBB was running with nearly half its required number of sprays in inoperable condition and with a water fitting for its spray system broken. Each of these discoveries represented a violation of the mandatory mine safety standard requiring compliance with the mine's approved ventilation plan, and each resulted in the issuance of a federal citation.

22. After the April 5, 2010 explosion at UBB, a federal investigation determined that at the time of the explosion, the longwall shearer in the mine's longwall section was operating with approximately seven of its required water sprays missing and with other sprays clogged. The missing sprays reduced the water pressure at the remaining sprays significantly below the minimum level required by the mine's approved ventilation plan and prevented the remaining sprays from counteracting frictional heat in the area where coal was being cut. Operating the longwall shearer with missing and clogged sprays and insufficient water pressure violated the mandatory federal mine safety standard requiring compliance with the mine's approved ventilation plan.

23. In total, UBB was cited approximately 61 times for violations of its approved ventilation plan during the Indictment Period. The cited violations occurred throughout the Indictment Period and ranged from in or around March 2008 through on or around April 5, 2010.

24. UBB's routine violation of its ventilation plan was the result of several causes, including the following: providing the mine with an inadequate number of coal miners focused on jobs important to safety-law compliance, including the maintenance of ventilation structures in airways away from the mine's active operating sections; BLANKENSHIP's imposition and aggressive enforcement of coal-production quotas that deprived UBB's coal miners of the time they needed to construct and maintain ventilation control structures, and that forced them to operate even where air quantities were below legal minimums; BLANKENSHIP's direction, addressed below, not to construct certain ventilation controls that would produce more reliable airflow because constructing them diverted time from coal production; and BLANKENSHIP's denial, also addressed below, of a request to construct an airshaft at UBB that would have increased airflow to areas of the mine where it was often below the legal minimum.

25. *Violations: Constructing and maintaining ventilation structures.* UBB also was routinely cited during the Indictment Period for violating mandatory federal mine safety standards on ventilation control structures and devices. For example, on or about November 19, 2009, and on or about December 1, 2009, federal mine safety inspectors discovered that legally mandated ventilation controls were missing in airways that were essential to airflow in at least two of the mine's operating sections, including the longwall mining section. Because of poor engineering, the roof and walls of the area of the mine in which these structures were located were collapsing, causing the structures to be crushed almost as quickly as they could be built. The president of UBB's mining group, whose identity is known to the Grand Jury (the "Known UBB Executive"),

9

along with other UBB officials known and unknown to the grand jury, knew that the ventilation control structures in this area of the mine were routinely being destroyed by the collapse of the area's roof and walls. They nonetheless caused the affected passageways to remain in use as part of the mine's ventilation system, thus willfully violating mandatory federal mine safety standards.

26. In total, UBB was cited for approximately 59 violations during the Indictment Period of mandatory federal mine safety standards regarding ventilation control structures and devices. The cited violations occurred throughout the Indictment Period and ranged from in or around January 2008 through in or around March 2010. Among the causes of these violations were an insufficient number of coal miners in jobs focused on the construction and maintenance of ventilation control structures and devices, and the imposition and aggressive enforcement of coal-production quotas that did not allow time to properly maintain ventilation control structures and devices.

27. *Violations: Mine-safety examinations.* UBB also was routinely cited during the Indictment Period for violating mandatory federal mine safety standards requiring regular safety examinations. For example, on or around March 9, 2009, federal mine safety inspectors discovered that, according to UBB's own records, one of the mine's aircourses that was required to be examined weekly had not been examined for more than a year. In total, UBB was cited for approximately 62 violations during the Indictment Period of mandatory federal mine safety standards requiring regular safety examinations, which were among the standards for ensuring proper mine ventilation. The cited violations occurred throughout the Indictment Period and ranged from in or around January 2008 through on or around April 5, 2010. Among the causes of these violations were the employment of an inadequate number of coal miners, and the

imposition and enforcement of coal-production quotas that did not allow time, to conduct required safety examinations in a mine the size of UBB.

28. *Violations: Support of the mine roof and walls.* During the Indictment Period, UBB also routinely violated mandatory federal mine safety standards concerning support of the mine's roof and ribs (walls). Because underground coal mining extracts a layer of coal that previously supported layers of earth and rock overhead, substitute support must be constructed to prevent the mine's roof and walls from collapsing into the resulting void. These supports included long bolts (as long as sixteen feet) that were installed in the mine roof and affixed to large plates that hold the stratum of rock above the mine in place, as well as timbers that helped bear the weight of overlying rock and earth. Just as with the mine's ventilation system, this construction process was a continual one: as mining advanced deeper and deeper, supports were required to be constructed in the mine's newly opened areas. The requirement to provide sufficient support to protect persons from falls of the mine's roof and walls was a basic, well-known principle of coal mining.

29. On or around September 23, 2009, for example, a federal mine safety examiner at UBB discovered that most of the mine roof had fallen out in an area of the mine more than 100 feet long and approximately twenty feet wide, leaving the remaining roof unstable in an area where miners were required to work and travel on a regular basis. UBB's own records of past safety examinations showed that mine officials had been aware of this danger for almost a month but failed to correct it. This knowing failure violated a mandatory federal mine safety standard that required the roof and walls of areas where persons work or travel to be supported or otherwise controlled to protect persons from hazards related to falls of the roof and walls.

30. In total, UBB was cited approximately 91 times for violations during the Indictment Period of mandatory federal mine safety standards regarding support of the mine's roof and walls. The cited violations occurred throughout the Indictment Period, ranging from in or around January 2008 through on or around April 5, 2010. Among the causes of these violations were the employment of an inadequate number of coal miners to perform work necessary to comply with the safety laws on support for the mine's roof and walls, as well as the imposition and aggressive enforcement of coal-production quotas that did not allow enough time to perform such work.

31. *Violations: Explosive coal dust and combustible loose coal and other materials.* During the Indictment Period, UBB also routinely violated mandatory mine safety standards concerning accumulations of coal dust, loose coal, and other combustible materials. As explained above, coal mining inherently produced large quantities of airborne coal dust. This coal dust eventually settled out of the mine air and collected on surfaces throughout the mine. After settling, however, coal dust still posed a risk of explosion. If an explosion ignited in one part of a mine, the blast of air from that explosion could force settled float coal dust back into the mine air. Once the previously settled dust became airborne again, heat and flame from the initial ignition could cause it to explode. In this way, previously settled coal dust could enlarge a relatively small initial explosion and cause it to propagate throughout a mine. Consequently, a mandatory federal mine safety standard required that float coal dust be cleaned up and not permitted to accumulate. Mandatory federal mine safety standards also required that loose coal, which was flammable, and other combustible materials be cleaned up and not permitted to accumulate; fires were a serious danger in underground coal mines in part because such mines featured tight spaces and limited air supply, and because miners in such mines often worked far away from the safety of the surface. The mandatory federal mine safety standard requiring that explosive coal dust,

12

combustible loose coal, and other combustible materials be cleaned up and not permitted to accumulate was a basic, well-known principle of coal mining.

32. Examples of UBB's violations of these standards include the following: On or around January 28, 2010, a federal mine safety inspector discovered float coal dust accumulated along the entire length of the conveyor belt that carried coal from UBB's section #1. This accumulation violated the mandatory federal mine safety standard requiring that explosive float cost dust be cleaned up and not permitted to accumulate.

33. On or around March 15, 2010, a federal mine safety inspector discovered fine, black coal dust deposited along substantially the entire length of the conveyor belt that carried coal from UBB's longwall section. This accumulation violated the mandatory federal mine safety standard requiring that coal dust be cleaned up and not permitted to accumulate.

34. In total, UBB was cited approximately 81 times for violations during the Indictment Period of the mandatory federal mine safety standard requiring that coal dust, loose coal, and combustible materials be cleaned up and not permitted to accumulate. These violations occurred throughout Indictment Period, from in or around January 2008 through on or around April 5, 2010.

35. UBB's own records of mine safety examinations also revealed near-constant violations of mandatory federal mine safety standards concerning accumulations of coal dust and other combustible materials, as well as the application of rock dust, an incombustible substance that was required, pursuant to mandatory federal mine safety standard that were a basic, well-known principle of coal mining, to be spread throughout a coal mine to stop the spread of any explosion or fire that might occur in the mine. In a span of little more than a month, from March 1, 2010, through April 5, 2010, UBB's records of on-shift examinations reflected approximately 937

hazardous conditions arising from accumulations of coal dust and coal and from inadequate application of rock dust. The same records reflected that the majority of these hazardous conditions were not properly corrected. These records were reviewed daily by UBB officials.

36. Among the causes of UBB's routine violations of the laws on explosive and combustible materials and rock dusting were the employment of an inadequate number of coal miners to perform work necessary to comply with these laws, as well as the imposition and aggressive enforcement of coal-production quotas that did not allow sufficient time to perform such work.

**Advance Warning of Federal Mine Inspection Activities**

37.  During the Indictment Period, a scheme existed at UBB to routinely warn underground workers when federal mine safety inspectors were on their way to inspect underground areas of the mine. At the entrance to the UBB mine property was a guardhouse. When federal mine safety inspectors passed this guardhouse on their way to the mine, it was standard practice for a guard to radio the UBB mine office, which sat just outside the entrance to the mine's underground areas, to warn employees in the mine office that the inspectors were on their way. It was standard practice for an employee in the mine office then to call underground (a telephone system connected the mine office to various areas of the mine's underground workings) to pass along this warning to underground personnel. Underground supervisors then would direct miners to quickly cover up violations of mandatory federal mine safety standards that the mine routinely committed, including missing ventilation control structures and devices, accumulations of float coal dust and loose coal, missing roof support, and failures to properly rock dust the mine. The purpose of this advance-warning scheme was to prevent federal mine safety inspectors from discovering and citing many of the violations of mandatory federal mine safety and health standards that were routinely committed at UBB. Because of the distance from the UBB

14

guardhouse to the mine office and the size of the mine's underground workings, the sections of

the mine farthest from the mine entrance could be given as much as two hours' advance warning

before federal mine safety inspectors arrived.

38. In order to avoid alerting federal mine safety inspectors that these warnings were being

given, UBB employees frequently used code words and phrases when discussing imminent

safety inspections on the mine telephone system.

39. UBB officials, including the Known UBB Executive and others known and unknown to

the Grand Jury, frequently instructed and encouraged mine employees to provide advance

warning whenever federal mine safety inspectors were on their way to inspect the mine's

underground areas.

**BLANKENSHIP was fully aware of UBB's practice of routinely violating mandatory
federal mine safety standards.**

40. BLANKENSHIP was fully aware of UBB's practice of routinely violating mandatory

federal mine safety standards. As early as in or around January 2008, BLANKENSHIP learned

that federal mine safety regulators had designated UBB as a mine with a potential pattern of

violations, a status that applied only to the worst mines in the country as measured by serious

safety-law violations and other indicators of safety. In or around early 2009, BLANKENSHIP

began to request and receive reports detailing the cost of fines that Massey was being assessed

for federal safety-law violations. And in or around April 2009, BLANKENSHIP requested and

began to receive a report every workday detailing Massey's violations of mandatory federal mine

safety standards, including an estimate of the fines that Massey would owe for these violations.

41. Each of these daily safety-violation reports showed BLANKENSHIP a count of Massey's

safety-law violations for the year to date, along with year-to-date violation totals for each of

Massey's mining groups. Each daily safety-violation report also showed BLANKENSHIP more

detailed information on the company's violations of the mine safety laws: how often each of the company's mining groups had violated those laws year-to-date, the specific mandatory federal mine safety standard that each group of mines violated most often, and the areas of mandatory federal mine safety standards that the company's mines violated most as a whole.

42. For example, on or around July 1, 2009, BLANKENSHIP received a safety-violation report for the year through on or around June 30, 2009. This report showed BLANKENSHIP that in the first six months of 2009, the UBB group of mines was cited for approximately 596 violations of mandatory federal mine safety and health standards resulting in an estimated $918,401 in fines—more than any other Massey mining group. The report also showed BLANKENSHIP that the mandatory federal mine safety standard violated most often at the UBB group of mines was the standard requiring that accumulations of explosive float coal dust, combustible loose coal, and other combustible materials be cleaned up and not permitted to accumulate. The report further showed BLANKENSHIP that the area of mandatory federal mine safety standards violated most often at Massey's mines as a whole were the standards concerning mine ventilation, which were intended, among other things, to prevent mine explosions and fires and to minimize the risk to miners of death or serious injury if an explosion or fire occurs. The report showed BLANKENSHIP that Massey's mines violated mandatory federal mine safety standards on ventilation approximately 1002 times in the first half of 2009.

43. On or around August 6, 2009, the daily safety-law violation reports sent to BLANKENSHIP began to include a page showing BLANKENSHIP the number of safety-law violations at individual Massey mines, as distinct from mining groups. On or around August 6, 2009, BLANKENSHIP received a daily safety-violation report that showed him that in the year to date, UBB had been cited for approximately 292 violations of federal mine safety laws, fourth

most of any Massey mine in the year to date. That report also showed BLANKENSHIP that the

mandatory federal mine safety standard violated most often by mines in the UBB group

continued to be the standard requiring that accumulations of explosive coal dust, combustible

loose coal, and other combustible materials be cleaned up and not permitted to accumulate in the

mine. The same report showed BLANKENSHIP that the area of mandatory federal mine safety

standards violated most often at Massey's mines continued to be the standards on mine

ventilation.

44. From approximately April 3, 2009, through April 5, 2010, BLANKENSHIP received

approximately 249 of these daily safety-violation reports. It was BLANKENSHIP's practice to

review each of these reports when he received it. Substantially every one of these 249 reports

showed BLANKENSHIP that the UBB mining group was committing hundreds of safety-law

violations every year.

45. Beginning on or around June 2, 2009, the daily safety-law violation reports that

BLANKENSHIP received showed him which of Massey's mining groups were committing the

most safety-law violations, which mandatory federal mine safety standard each mining group

was violating most often, and which area of the mine safety laws Massey as a whole was

violating most. From on or around June 2, 2009, through on or around April 5, 2010,

BLANKENSHIP received approximately 210 of these daily reports of safety-law violations.

Nearly all of those reports showed him that UBB's mining group was one of Massey's worst

mining groups for safety-law violations and that the worst area of safety-law violations for

Massey mines as a whole was mine ventilation. Approximately 193 of these reports showed

BLANKENSHIP that the mandatory federal mine safety standard that the UBB group violated

17

most often was the standard requiring explosive coal dust, combustible loose coal accumulations, and other combustible materials to be cleaned up and not permitted to accumulate.

46. From approximately August 6, 2009, through April 5, 2010, BLANKENSHIP received approximately 163 daily safety-violation reports that showed him year-to-date safety-violation totals for the UBB mine itself, as distinct from its associated group of mines. Nearly all of these reports showed BLANKENSHIP that UBB was committing hundreds of safety-law violations each year and was among Massey's worst mines for safety-law violations.

47. On or around October 7, 2009, BLANKENSHIP received a Massey-internal "Report Card" detailing mine safety violations for each of Massey's mines in the third quarter (July through September) of 2009. This internal Report Card showed BLANKENSHIP that UBB violated mandatory federal mine safety standards 168 times in that three-month period, compared to a target of fifty-nine safety-law violations that Massey had set for UBB in the third quarter of 2009. The Report Card, which was created internally by Massey personnel who tracked safety-law violations at the company's mines, showed BLANKENSHIP that Massey itself had assigned UBB a grade of "Failed" for its number of safety-law violations in the third quarter of 2009.

48. During the Indictment Period, BLANKENSHIP personally monitored the details of UBB's operations closely. After the longwall section began operation at UBB, BLANKENSHIP insisted on personally receiving a report every thirty minutes detailing the longwall section's coal production and the reasons for any production delays. BLANKENSHIP insisted on receiving this report via fax at his home on evenings and weekends. For the other mining sections at UBB, BLANKENSHIP insisted on personally receiving a report every two hours detailing each section's coal production and the reasons for any production delays.

BLANKENSHIP's practice was to regularly review these production reports from UBB's longwall and other sections. Throughout the Indictment Period, BLANKENSHIP insisted on personally reviewing and approving or denying every proposed hire at UBB, every proposal to give a UBB employee a raise, every capital expenditure at UBB, and every hiring of a contractor to perform work at UBB. Throughout much of the Indictment Period, BLANKENSHIP demanded daily phone calls with UBB management, in addition to the dozens of written production reports he received every day, so that he could further supervise activity at UBB. During the Indictment Period, BLANKENSHIP—the CEO and Chairman of a publicly traded corporation with more than $2 billion in annual revenue—routinely, personally reviewed details such as one of UBB's operating sections starting three hours late because of necessary maintenance, a request to give a small number of truck drivers working for the UBB mining group a raise from approximately $11.59 an hour to approximately $13.50 an hour, and a request to spend $750 to hire a contractor to check the freeze-proofing systems at a UBB-group mine before cold weather arrived.

**BLANKENSHIP could have drastically reduced violations of mandatory federal mine safety standards at UBB by taking reasonable steps to follow the law.**

49. Blankenship could have drastically reduced violations of mandatory federal mine safety standards at UBB by taking reasonable steps to follow the law. A large majority of UBB's safety-law violations were preventable. For example, daily safety-law violation reports routinely showed BLANKENSHIP that the mandatory federal mine safety standard that the UBB mining group violated most often was the standard requiring that explosive coal dust, combustible loose coal, and other combustible materials be cleaned up and not permitted to accumulate in the mine. Following this safety law was a matter of basic housekeeping. BLANKENSHIP could have prevented the majority of these safety-law violations by hiring enough miners at UBB, and

giving them enough non-coal-production time, to clean up the explosive and combustible substances that collected in the mine. Similarly, most mine-ventilation violations—which BLANKENSHIP knew were the most common category of safety-law violations at Massey's mines—and roof-control violations at UBB could have been prevented by providing the mine with enough miners, and giving them enough non-coal-production time, to follow the safety laws. Yet throughout the Indictment Period, UBB regularly was staffed with too few miners and had too little non-coal-production time to reasonably be able to comply with mandatory federal mine safety and health standards on ventilation, combustible materials and rock dusting, and roof support, among other areas.

50. Throughout the Indictment Period, BLANKENSHIP possessed the authority to provide UBB with the resources necessary to prevent the majority of UBB's violations of mandatory federal mine safety standards. BLANKENSHIP was the highest-ranking official in the group of officials who approved each Massey mine's annual budget and production plan, which detailed how many miners each mine could hire in specific areas, including areas focused on safety-law compliance, and also set the amount of coal and profit that each mine was required to generate. BLANKENSHIP also exercised personal decision-making authority over every decision at UBB regarding hiring and the use of non-employee contractors, as well as capital expenditures for safety-compliance purposes. BLANKENSHIP possessed full authority to respond to UBB's hundreds of annual, preventable safety-law violations by providing the mine with more miners, particularly in areas focused on safety-law compliance, and to reduce the mine's requirements for coal production and profit so that miners would have more time to work on following the safety laws. Throughout the Indictment Period, BLANKENSHIP also possessed full authority to

discipline UBB executives for the mine's routine violations of mandatory mine safety and health standards, and to determine those managers' compensation.

51. Throughout the Indictment Period, Massey possessed, and BLANKENSHIP controlled, ample financial resources to provide UBB with the resources and reasonable production requirements that it needed to comply with mandatory federal mine safety standards. During the Indictment Period, Massey possessed cash and cash equivalents ranging from approximately $391 million to approximately $1.1 billion.

52. Throughout the Indictment Period, BLANKENSHIP closely managed the UBB mine and group of mines, routinely directing and making decisions on detailed matters of the mines' everyday operations. This elaborate level of involvement further enabled him to take action to reduce safety-law violations at UBB had he chosen to do so. During much of the Indictment Period, BLANKENSHIP received dozens of UBB coal-production reports every day, and had telephone conversations daily or even more frequently with the Known UBB Executive, in which BLANKENSHIP gave direction on UBB's operation. BLANKENSHIP also regularly managed UBB through handwritten messages to the Known UBB Executive, often written on reports regarding UBB's coal production or cost management with which BLANKENSHIP was dissatisfied. Examples of this practice include the following: on or around April 11, 2008, BLANKENSHIP sent the Known UBB Executive a handwritten note, written on a coal-production report from one shift in one operating section of the UBB mine, pressuring the Known UBB Executive to change the section's engineering plan to leave in place smaller coal pillars. Coal pillars were large blocks of coal left in place as a mine advances in order to help support the mine roof; smaller pillars generally provide less support but produce more coal and

21

thus more profit. The Known UBB Executive responded that the operating section that was the subject of the report would soon begin using smaller coal pillars.

53. Also on or around April 11, 2008, BLANKENSHIP sent the Known UBB Executive a handwritten note, written on a coal-production report from one shift in one operating section of one of the UBB-group mines, criticizing the placement of a specific piece of equipment in that section as it was depicted in a routine diagram on that report, demanding to know the details of the section's airflow configuration and the specific sequence in which the section cut coal from each of its passageways, and concluding, "It's easy to see why your mines don't run."

54. On or around May 15, 2008, the Known UBB Executive sent BLANKENSHIP a memo requesting to raise hourly pay for truckers at the UBB mining group from approximately $11.59 an hour to approximately $13.50 because the group could not find truckers willing to work for the rate of approximately $11.59 an hour. On or around that same day, BLANKENSHIP responded with a series of detailed, handwritten questions about the proposed raise to which he required answers before approving or denying the proposed raise.

55. On or around January 6, 2009, BLANKENSHIP received a regular report called a Lost Footage Report from one of UBB's operating sections. On or around that date, BLANKENSHIP, dissatisfied with the information shown on the report, sent the Known UBB Executive a handwritten note on a copy of the report itself. The note read, "Is this the Head or TailGate? Describe Roof Conditions? Why a late Belt move? I didn't see a report. Why? Did you call me yet [illegible]. TODAY?  What do coreholes in mains say rider will do ahead of you?"

56. On or around March 19, 2009, BLANKENSHIP sent the Known UBB Executive a memorandum chastising him for not producing coal as quickly as BLANKENSHIP demanded at UBB. In this memorandum, BLANKENSHIP said that BLANKENSHIP would need to call

directly a subordinate of the Known UBB Executive so that BLANKENSHIP himself could figure out what to do to increase coal production at UBB.

57. On or around October 7, 2009, BLANKENSHIP sent the Known UBB Executive several handwritten notes written on a request from the Known UBB Executive to spend approximately $750 to have a contractor check and test the freeze-proofing systems at one of the UBB-group mines. Two of these handwritten notes read, "<u>Nonsense</u> Giving Money Away," and "What does this mean? It's yet another example of something I never recall having done by a contractor when I was a Group Pres."

**Blankenship chose to routinely violate and cause routine violations of mandatory federal mine safety standards at UBB.**

58. Despite having the ready ability to drastically reduce violations of mandatory federal mine safety standards at UBB, and even though he knew that UBB's practice of routinely violating such standards was unlawful, BLANKENSHIP purposely elected to continue that practice throughout the Indictment Period. Specifically, he chose to maximize profits by depriving UBB of the coal miners and non-coal-production time that it needed to comply with mandatory federal mine safety standards, concluding that it was less expensive to routinely pay fines for violating such standards than to allocate the necessary funds to following them.

59. During the Indictment Period, BLANKENSHIP instructed and encouraged UBB managers to violate mandatory mine safety standards. For example, on or around February 11, 2008, BLANKENSHIP sent the Known UBB Executive a memorandum that addressed work being done to permit UBB to follow mandatory federal mine safety standards on ventilation. This memorandum gave the following instructions: "You need to get low on UBB [sections] #1 and #2 and run some coal. We'll worry about ventilation or other issues at an appropriate time. Now is not the time." Throughout the Indictment Period, however, UBB was required to comply

23

with mandatory federal mine safety standards regarding ventilation, which were intended primarily to prevent mine explosions and fires and to prevent death and serious injury to miners if an explosion or fire occurs. Throughout the Indictment Period, UBB routinely violated those standards.

60. On or around April 29, 2008, BLANKENSHIP sent the Known UBB Executive a handwritten message chastising him because certain sections at UBB-group mines, including UBB itself, were not producing coal as quickly as BLANKENSHIP wanted. In this message, BLANKENSHIP instructed the Known UBB Executive to tell coal miners under his supervision to "run this sections [sic] like coal mines not like construction jobs." Continual construction, including construction of ventilation control structures and supports for a mine's roof and walls, was required to comply with mandatory federal mine safety standards.

61. On or around February 8, 2008, BLANKENSHIP sent the Known UBB Executive a handwritten message chastising him because certain sections at UBB-group mines, including UBB itself, were not producing coal as quickly as BLANKENSHIP wanted. In this message, BLANKENSHIP told the Known UBB Executive, referring to two mining sections at UBB, "Acting like construction sections. Get as low as possible and run coal."

62. On or around April 29, 2008, BLANKENSHIP sent the Known UBB Executive another handwritten message chastising him for not producing coal as quickly as BLANKENSHP wanted at one of the mines in the UBB mining group. This message instructed the Known UBB Executive, "Run coal. Don't bolt for the year 2525." This message was an instruction to increase coal production by devoting less time to the installation of roof bolts, which were a form of roof support. At all relevant times, mandatory federal mine safety standards and approved roof-support plans at all the UBB-group mines determined the number of roof bolts that each of those

mines were required to install, as well as the manner in which they did so, in order to help prevent falls of the mine roof and walls. At all relevant times, any violation of a mine's approved roof support plan was a violation of a mandatory mine safety standard.

63. On or around March 7, 2008, BLANKENSHIP sent the Known UBB Executive a handwritten message pressuring the Known UBB Executive to produce coal more quickly. The message contained the following instruction: "Do not cut any overcasts." An overcast was a ventilation control structure that helps ensure the reliable flow of air through a coal mine such as UBB. As a result of BLANKENSHIP's instruction in this handwritten message and similar instructions that BLANKENSHIP gave to UBB management at other times during the Indictment Period, overcasts were not constructed during the Indictment Period in numerous locations at UBB where they were needed to ensure reliable airflow. This practice contributed to numerous violations of mandatory mine safety and health standards concerning ventilation during the Indictment Period.

64. In or around August 2009, coal miners at UBB were performing work in preparation for the startup of the mine's longwall section, which was projected to be highly profitable. One of the last tasks remaining before the longwall section could begin producing coal was to cut a drainage path in certain passageways around the longwall section. Massey officials expected that water would enter the area near UBB's longwall mining section after it began producing coal, and the purpose of the planned drainage path was to drain this water from the mine in order to prevent flooding. With the drainage project approximately one to two weeks from completion, a Massey Energy Company executive known to the Grand Jury (the "Known Massey Executive") ordered that it be abandoned so that the longwall section could start producing coal sooner. This decision was made in substantial part as a result of pressure from BLANKENSHIP to begin

25

operating the longwall section as soon as possible. In or around November 2009, when the expected inflow of water entered the area of the longwall section, there was no system in place to drain it, and airways that were necessary to ventilate the mine flooded, at least two of filling with water from floor to roof. On or around December 14, 2009, a federal mine safety inspector issued a shutdown order upon discovering that coal miners at UBB were being required to work and travel in dark and murky water measuring up to four feet in depth with invisible slipping and tripping hazards on the floor of the flooded area—conditions that the inspector found could result in drowning. This condition, which made it impossible to examine several of UBB's aircourses in their entirety, violated a mandatory federal mine safety standard requiring that all aircourses be examined in their entirety at least weekly. It was caused by the decision to abandon the project to drain the area around the longwall section.

65. In or around December 2009, UBB's section #1 was still idled because one of its return aircourses (an aircourse that carries away air potentially contaminated by explosive substances and removes it from the mine) was flooded and could not safely be traveled to conduct required safety examinations, and had not been examined in several weeks. While this return aircourse was still flooded and not capable of being examined for safety, BLANKENSHIP directed the Known UBB Executive to start producing coal again in UBB's section #1, in violation of the mandatory mine safety standard requiring that all aircourses be examined at least weekly. When the Known UBB Executive resisted, BLANKENSHIP chastised him for "letting MSHA run his mines."

66. In or around the summer of 2009, during a period when certain sections at UBB routinely were operating with inadequate airflow, BLANKENSHIP counseled the Known UBB Executive

to ensure that UBB's underground operations were warned ahead of time when federal mine safety inspectors were coming to inspect those operations.

67. During the Indictment Period, UBB management repeatedly requested, in the course of the annual mine budgeting process that BLANKENSHP oversaw, to hire more coal miners to work in jobs critical to safety-law compliance. BLANKENSHIP and other Massey officials carrying out BLANKENSHIP's instructions and policies, whose identities are known and unknown to the Grand Jury, denied these requests, knowing that these denials would cause routine, preventable violations of mandatory federal mine safety standards to continue at UBB.

68. During the Indictment Period, BLANKENSHIP, together with other Massey officials carrying out BLANKENSHIP's instructions and policies, whose identities are known and unknown to the Grand Jury, imposed coal-production requirements on UBB that they knew would, in combination with the inadequate staffing and other resources provided to UBB, cause routine, preventable violations of mandatory federal mine safety and health standards to continue at UBB.

69. During the Indictment Period, BLANKENSHIP consistently pressured UBB management to cut the number of coal miners in jobs critical to safety-law compliance, including conducting safety examinations and cleaning and rock dusting the mine's conveyor belts. (In part, because UBB's conveyor belts carried large quantities of coal at high speeds, they inevitably developed accumulations of explosive float coal dust and combustible loose coal that had to be promptly cleaned up to comply with mandatory federal mine safety standards.) For example, on or around March 10, 2008, BLANKENSHIP sent the Known UBB Executive a handwritten note chastising him for employing too many coal miners in jobs that focused on safety examinations, cleanup of

explosive and combustible substances on conveyor belts, and other safety-compliance work, calling the UBB group's employment of such miners "ridiculous" and "[l]iterally crazy."

70. On or around April 18, 2008, BLANKENSHIP sent the Known UBB Executive another handwritten note chastising him for employing too many coal miners in jobs involving safety examinations and cleanup of explosive and combustible substances along conveyor belts. In this handwritten note, BLANKENSHIP demanded to be sent the name and job description of every coal miner assigned to clean and maintain conveyor belts at the UBB group so that he could personally review them.

71. On or around February 25, 2009, BLANKENSHIP directed UBB and all other Massey mines to reduce their labor cost from $18 per ton of coal mined to $14 per ton of coal mined. BLANKENSHIP knew that the only way to carry out this directive at UBB was to further cut the number of coal miners employed in jobs that focused on safety-law compliance rather than the direct production of coal, including coal miners who conducted safety examinations,  cleaned up and maintained conveyor belts, and maintained compliance with safety laws in the mine's aircourses. BLANKENSHIP further knew that this reduction in the number of UBB coal miners who were focused on these and other safety-law compliance tasks, as distinct from direct production of coal, would cause continued routine violations of mandatory federal mine safety standards at UBB.

72. Throughout the Indictment Period, BLANKENSHIP aggressively pressured UBB management to produce more coal and reduce costs while rarely if ever mentioning the mine's routine safety-law violations unless they threatened to affect coal production. UBB managers knew that BLANKENSHIP was aware of the mine's routine safety-law violations, so his near-exclusive emphasis on coal production and cost-cutting, compared with his near silence on

UBB's hundreds of safety-law violations, further clarified to them that he expected and accepted routine safety-law violations as long as they did not compromise coal production.

73. For example, on or around March 19, 2009, BLANKENSHIP sent the Known UBB Executive a memorandum chastising him for not producing as much coal at UBB as BLANKENSHIP wanted. The memorandum said, "UBB's miner sections are a mitigated [sic] disaster," and threatened to shut down UBB if it did not begin producing more coal. In this memorandum, BLANKENSHIP stated that BLANKENSHIP himself would need to personally intervene with the Known UBB Executive's subordinates at UBB to determine, in detail, how to increase coal production at the mine.

74. On or around March 10, 2009, BLANKENSHIP sent the Known UBB Executive a handwritten note chastising him for using two different forms for reports to BLANKENSHIP on an area of cost-cutting at UBB. In this note, BLANKENSHIP threatened the Known UBB Executive's job for what BLANKENSHIP regarded as insufficient attention to cost-cutting, writing, "You have a kid to feed. Do your job."

75. On or around March 13, 2009, BLANKENSHIP sent the Known UBB Executive a handwritten note chastising the Known UBB Executive for not producing as much coal as BLANKENSHIP wanted at a UBB-group mine. This note said, "Pitiful. You need to get focused. As I said at UBB, Marsh F [Marsh Fork, another UBB-group mine], etc I could Krushchev [sic] you. Do you understand?"

76. On or around August 5, 2008, BLANKENSHIP sent a memorandum to several Massey mining-group presidents, including the Known UBB Executive, with the subject "HIGH COSTS." The memorandum said, in part, "It seems to me that none of you are too concerned about your costs. Please let me know whether you are concerned. If you are and you happen to

be responsible for mines like . . . UBB …, please advise how you can run the kind of cost that you run." The memorandum went on to say, "In my opinion, children could run these mines better than you all do. Look at your cost and figure out what you are going to do to get it down because if we don't have a better August and September than we had July, you can be assured that the stock options are not going to look very attractive." This memorandum made no reference to compliance with federal mine safety laws.

77. On or around February 9, 2009, BLANKENSHIP sent a memorandum to Massey mining-group presidents, including the Known UBB Executive, which said, "Please be reminded that your core job is to make money. To do this, you have to run coal at a low cost, ship your orders and control your quality." The memorandum went on to say, "My suggestion is that you begin looking at your daily P&L's [profit and loss statements] everyday because I'm looking to make an example out of somebody and I don't mean embarrassment." This memorandum made no reference to compliance with federal mine safety laws.

78. Meanwhile, during the Indictment Period, in hundreds of calls with the Known UBB Executive in which BLANKENSHIP managed and supervised operations at UBB, BLANKENSHIP rarely if ever mentioned UBB's practice of routine safety-law violations, of which practice BLANKENSHIP was well aware.

79. During the Indictment Period, BLANKENSHIP and others known and unknown to the Grand Jury used compensation decisions to communicate an expectation and acceptance that UBB would routinely violate mandatory federal mine safety and health standards. During the Indictment Period, BLANKENSHIP personally made decisions on compensation for the presidents of Massey's mining groups. In 2009, for example, UBB was cited for approximately 517 violations of mandatory federal mine safety standards. For 2009, however, BLANKENSHIP

30

made the Known UBB Executive, the president of UBB's mining group, among the highest-paid

mining group presidents at Massey, with total compensation of approximately $450,000. Also

for 2009, a year in which Massey mines were cited, according to Massey's own count in the

daily safety-law violation reports that BLANKENSHIP received, for approximately 8,900

violations of mandatory mine safety and health standards, persons known and unknown to the

Grand Jury voted to award BLANKENSHIP bonuses and other compensation that brought his

total compensation for the year to approximately $17.8 million.

### False and Misleading Statements and Omissions Following an Explosion at UBB

80. On April 5, 2010, an explosion occurred at UBB. The explosion resulted in a substantial

number of fatalities and, as a result, attracted national and international media attention. Some

media outlets reported that Massey had engaged in a practice of routinely violating mandatory

safety standards. By April 7, 2010, Massey's Class A Common Stock price dropped

approximately $9.15 per share, or 16.8%, from its closing pricing on April 5, 2010. This

decrease reduced BLANKENSHIP's net worth by approximately $3 million.

81. On or around April 7, 2010, BLANKENSHIP directed Massey officials known to the

Grand Jury to draft a statement to Massey shareholders (the "UBB Shareholder Statement"). On

or around April 7, 2010, Massey officials known to the Grand Jury prepared a draft of the UBB

Shareholder Statement and provided it to BLANKENSHIP for his review and approval. Among

other things, the draft UBB Shareholder Statement specifically responded to public reports that

Massey had engaged in a practice of routinely violating mandatory mine safety and health

standards.

82. On or around April 8, 2010, BLANKENSHIP reviewed and approved the UBB

Shareholder Statement, and approved its release to the public and its filing with the SEC.

BLANKENSHIP did these acts in or around Julian, Boone County, West Virginia, within the Southern District of West Virginia. The UBB Shareholder Statement that BLANKENSHIP approved included the following statements: "Media reports suggesting that the UBB tragedy was the result of a willful disregard for safety regulations are completely unfounded," and, "We do not condone any violation of MSHA regulations, and we strive to be in compliance with all regulations at all times." On or around April 8, 2010, as a result of BLANKENSHIP's approval, Massey released the UBB Shareholder Statement to the public and filed it with the SEC, using means and instrumentalities of interstate commerce.

83. On or around April 9, 2010, a public relations consultant retained by Massey and known to the Grand Jury sent BLANKENSHIP  a draft press release with a message asking him to review the draft release and advising that the consultant wanted to issue the release that day. The release consisted primarily of a list of five claims marked with bullet points. The second of these items was this claim: "We do not condone any violation of Mine Safety and Health Administration (MSHA) regulations, and we strive to be in compliance with all regulations at all times." On or around April 9, 2010, in or around Julian, Boone County, West Virginia, in the Southern District of West Virginia, BLANKENSHIP responded in writing, approving the issuance of the release. On or around April 9, 2010, the public relations consultant issued the release on Massey's behalf through means and instrumentalities of interstate commerce, including commercial services intended to disseminate press releases to the financial and investing communities.

84. At the time BLANKENSHIP approved the release and filing of the UBB Shareholder Statement, he knew that the statements that "[w]e [Massey] do not condone any violation of MSHA regulations" and "we [Massey] strive to be in compliance with all regulations at all

32

times" were materially false, fraudulent, fictitious, and misleading; that the UBB Shareholder Statement contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; that it employed devices, schemes, and artifices to defraud; and that it would operate as a fraud and deceit upon purchasers and sellers of Massey Class A Common Stock.

85. At the time the BLANKENSHIP approved the issuance of the press release described in Paragraph 83, he knew that the statements that "[w]e [Massey] do not condone any violation of Mine Safety and Health Administration (MSHA) regulations" and "we strive to be in compliance with all regulations at all times" were materially false, fraudulent, fictitious, and misleading; that the press release contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; that it employed devices, schemes, and artifices to defraud; and that it would operate as a fraud and deceit upon purchasers and sellers of Massey Class A Common Stock.

**Count One**
**(Conspiracy)**

86. The Grand Jury re-alleges Paragraphs 1 through 85 as if fully incorporated herein.

87. Throughout the Indictment Period, BLANKENSHIP, together with others known and unknown to the Grand Jury, unlawfully, willfully, and knowingly combined, conspired, confederated, and agreed together with each other:

      a.      for BLANKENSHIP and Massey, as operators of UBB, to willfully violate mandatory federal mine safety and health standards at UBB, in violation of Title 30, United States Code, Section 820(d), and Title 18, United States Code, Section 371; and

      b.      to defraud the United States and an agency thereof, to wit, 1) to hamper, hinder, impair, impede, and obstruct, by trickery, deceit, and dishonest means, the lawful and legitimate functions of DOL and its agency, MSHA, in the administration and enforcement of mine safety and health laws at UBB, and 2) to defraud and deprive, by trickery, deceit, and dishonest means, the United States of money that it otherwise would have received.

88. The purposes of this conspiracy included, among other purposes, unlawfully increasing Massey's profits and unlawfully enriching BLANKENSHIP.

*Objects of the Conspiracy*

89. Among the objects of the conspiracy were to:

      a.      routinely violate mandatory federal mine safety and health standards;

      b.      hamper, hinder, impair, impede, and obstruct, by trickery, deceit, and dishonest means, the lawful and legitimate functions of DOL and its agency, MSHA, in the administration and enforcement of mine safety and health laws at UBB; and

      c.      defraud and deprive, by trickery, deceit, and dishonest means, the United States of money that it otherwise would have received.

34

*Manner and Means*

90. The manner and means of the conspiracy included, but were not limited to, the following:

91. It was a part of the conspiracy that BLANKENSHIP, together with others known and unknown to the Grand Jury, would and did instruct and counsel their subordinates to commit violations of mandatory federal mine safety and health standards, and to take actions that they knew would and did cause violations of those standards, and to engage in omissions to act that they knew would and did cause violations of those standards.

92. It was further a part of the conspiracy that BLANKENSHIP, together with others known and unknown to the Grand Jury, would and did refuse to provide UBB with enough coal miners, time to devote to safety-law compliance, and other resources to be reasonably able to comply with mandatory federal mine safety and health standards, knowing that this refusal would and did cause routine violations of federal mine safety and health standards at UBB.

93. It was further a part of the conspiracy that BLANKENSHIP, together with others known and unknown to the Grand Jury, would and did routinely pressure UBB management to increase coal production and cut costs, and specifically to cut the number of coal miners that UBB employed in jobs focused on safety-law compliance, knowing that these steps would cause UBB to continue routinely violating mandatory federal mine safety standards.

94. It was further a part of the conspiracy that BLANKENSHIP, together with others known and unknown to the Grand Jury, would and did routinely disregard UBB's practice of safety-law violations in communicating with UBB management, which served to inform UBB management that BLANKENSHIP and Massey expected and accepted routine violations of mandatory federal mine safety standards at UBB.

95. It was further a part of the conspiracy that BLANKENSHIP, together with others known and unknown to the Grand Jury, would and did reward with high levels of compensation, and declined to punish or discipline, officials who committed and caused routine violations of mandatory federal mine safety and health standards at UBB. These officials included BLANKENSHIP and the Known UBB Executive.

96. It was further a part of the conspiracy that persons known and unknown to the Grand Jury would and did routinely commit willful, readily preventable violations of mandatory federal mine safety and health standards at UBB.

97. It was a part of the conspiracy that BLANKENSHIP, together with others known and unknown, would and did cause and counsel to be given to persons at UBB advance warning of federal mine safety inspection activities, knowing and intending that the persons receiving this advance warning would conceal and cover up and cause to be concealed and covered up violations of mandatory federal mine safety and health standards that otherwise would result in citations and shutdown orders issued by federal mine safety inspectors, and in monetary penalties due to the United States.

98. It was further a part of the conspiracy that members of the conspiracy known and unknown, upon receiving advance warning of federal mine safety inspection activities at UBB, would and did conceal and cover up and cause to be concealed and covered up violations of mandatory federal mine safety standards that would otherwise result in citations and shutdown orders issued by federal mine safety inspectors, and in monetary penalties due to the United States.

99. It was further a part of the conspiracy that members of the conspiracy known and unknown falsified and caused to be falsified samples of respirable dust that were collected at

UBB pursuant to mandatory federal mine health standards, by falsely representing, and causing to be falsely represented, the locations at which dust sampling devices were placed for the collection of such samples.

*Overt Acts*

100.   Overt acts committed in furtherance of the conspiracy and to effect the illegal objects thereof included, but were not limited to, the following:

a.   The imposition of staffing levels and production requirements, by BLANKENSHIP and others known and unknown to the Grand Jury, that BLANKENSHIP and these others known and unknown to the Grand Jury knew would result in continued routine violations of mandatory federal mine safety and health standards at UBB, as alleged in Paragraphs 67 and 68;

b.   the instructions and counsel to perform acts, and to commit omissions, that would violate and cause violations of mandatory federal mine safety and health standards, alleged in Paragraphs 59 through 65;

c.   the counsel to provide advance warning of federal mine safety inspection activities in UBB's underground works, alleged in Paragraph 66;

d.   providing and causing to be provided advance warning of federal mine safety inspection activities in UBB's underground works, as alleged in Paragraphs 37 through 39;

e.   concealing and covering up, and causing to be concealed and covered up, routine violations of mandatory federal mine safety and health standards at UBB in response to warnings of federal mine safety inspection activities in UBB's underground works, as alleged in Paragraph 37;

f.      falsifying and causing to be falsified, during the Indictment Period, samples of respirable dust collected at UBB pursuant to mandatory federal mine health standards, by falsely representing and causing to be falsely represented the locations at which dust sampling devices were placed for the collection of such samples;

g.      regularly pressuring UBB management to increase coal production and reduce production costs while knowing that UBB was routinely failing to meet mandatory federal mine safety and health standards and that those steps would cause continued and increased violations of those standards at UBB, as alleged in Paragraphs 69 through 77;

h.      awarding high levels of compensation to, and declining to discipline or punish, officials who committed and caused routine and ongoing violations of mandatory federal mine safety and health standards at UBB, as alleged in Paragraph 79;

i.      making and causing to be made false and misleading statements and omissions intended to conceal the existence of, and thereby perpetuate, the conspiracy, as alleged in Paragraphs 80 through 85; and

j.      committing routine violations of mandatory federal mine safety and health standards at UBB, as alleged in Paragraphs 16 through 36.

In violation of Title 30, United States Code, Section 820(d), and Title 18, United States Code, Section 371.

**Count Two**

101.     The Grand Jury re-alleges Paragraphs 1 through 100 as if fully incorporated herein.

102.     On or around April 8, 2010, in the Southern District of West Virginia, BLANKENSHIP, aided and abetted by others known and unknown, knowingly and willfully made and caused to be made materially false, fictitious, and fraudulent statements and representations; and knowingly and willfully made and used, and caused to be made and used, a false writing and document knowing the same to contain materially false, fictitious, and fraudulent statements and entries, in a matter within the jurisdiction of the executive branch of the Government of the United States, to wit, by filing and causing to be filed with the SEC a document containing statements, entries, and representations including the following: "[w]e [Massey] do not condone any violation of MSHA regulations" and "we [Massey] strive to be in compliance with all regulations at all times," which statements BLANKENSHIP then and there well knew were false, fictitious and fraudulent.

In violation of Title 18, United States Code, Section 1001(a)(2) and (3), and Section 2.

39

**Count Three**

103.      The Grand Jury re-alleges Paragraphs 1 through 102 as if fully incorporated herein.

104.      From on or around  April 7, 2010, through on or around April 9, 2010, BLANKENSHIP, aided and abetted by others known and unknown to the Grand Jury, did directly and indirectly, by means and instrumentalities of interstate commerce, and by means of the mails and of the facilities of national securities exchanges, did make and cause to be made untrue statements of material fact, and did omit to state, and cause to be omitted to state, material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, did engage in acts and practices and courses of business which operated and would operate as frauds and deceits upon persons, all in connection with the sale and purchase of securities, to wit, Massey Class A Common Stock, in that BLANKENSHIP, aided and abetted by others known and unknown to the Grand Jury, did directly and indirectly, make and cause to be made the statements, "[w]e [Massey] do not condone any violation of MSHA regulations," and "[w]e [Massey] do not condone any violation of Mine Safety and Health Administration (MSHA) regulations," and "we [Massey] strive to be in compliance with all regulations at all times," in a filing made with the SEC by means of interstate wire transmission, and in a press release distributed by means of interstate wire transmissions and companies engaged in the business of distributing press releases by means of interstate wire transmissions.

In violation of Title 15, United States Code, Section 78ff; Title 17, Code of Federal

Regulations, Section 240.10b-5; and Title 18 United States Code, Section 2.

STEVEN R. RUBY
Assistant United States Attorney