## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF WEST VIRGINIA
## BECKLEY

UNITED STATES OF AMERICA

CRIMINAL NO. 5:14-00244

v.

DONALD L. BLANKENSHIP

### UNITED STATES' MOTION IN LIMINE

If the only question in this case is whether Defendant violated the criminal provisions he

is charged with violating, then the answer is not complicated. He did. Mine safety laws were

violated at the Upper Big Branch mine ("UBB") thousands of times—the same, readily

preventable violations, over and over—with his full knowledge and under his close supervision.

Many of those violations were never caught because of successful efforts to block federal safety

regulators from finding them. Yet after the explosion at UBB, Defendant made (or caused) a

fantastical claim: that his company, which ran this mine that he knew had committed thousands

of chronic safety-law violations, did not condone "*any* violation" of federal mine safety

regulations and strived to be in compliance with "*all* regulations at *all* times."

There is no hiding these straightforward facts. So Defendant has adopted a strategy that is

familiar to him: talk about anything besides the plain requirements of the law. His litany of

excuses is long. He says he disagreed with the law's mandates, possessing his own ideas about

how best to balance safety and profits.[1] He suggests that he followed his own, homegrown safety

program, one that may not have fulfilled the law but that in his mind offset his violations of it. In

---

[1] *United States v. Blankenship*, No. 5:14-cr-00244, Mem. Supp. Def. Mot. No. 6 at 6 [ECF 86] (Feb. 6, 2015) ("Accepting, for purposes of this motion, the factual allegations in the indictment as true, all that they establish is that mine safety violations at UBB were an unfortunate – and incidental – byproduct of Mr. Blankenship's aggressive business strategy."; Don Blankenship, *Upper Big Branch: Never Again*, http://www.ubbneveragain.com/ at 5:39 ("MSHA is dictating changes without adequate knowledge.").

this regard, he holds up examples such as affixing reflective tape to miners' uniforms.[2] He says that in his judgment, his mines were as safe as they needed to be, whatever their record of law-breaking.[3] He says that his mines, including UBB, did follow the safety laws some of the time, and that in any event everyone else was breaking the same laws he was.[4] He says federal regulators, despite citing hundreds of violations at UBB, nonetheless did too little to stop him from breaking the law, apparently on the premise that when it came to law-breaking, he was powerless to help himself.[5] He imagines he is the target of a sprawling, shadowy political conspiracy.[6] He claims his system of hastily hiding chronic violations when inspectors were coming was really just his way of complying with the law.[7] He says his secret recordings of his own telephone calls, made when he chose to press the button on his office recording device, will be introduced to offer objective proof of his innocence.[8] And he proposes to have an expert testify that it was important for him not to "waste" Massey's money, apparently to suggest that

---

[2] Don Blankenship, *We Must Keep the Promise: Laws that Will Help the Miners*, Don Blankenship: American Competitionist, http://www.donblankenship.com/2013/03/20/mine-safety/ ("During my career, dozens of . . . technologies and procedural enhancements were developed at Massey to reduce the likelihood of accidents. Reflective clothing . . . is just another example of a true safety enhancement developed at my insistence so that miners would be more visible to one another—not only underground, but outside as well.").

[3] Kris Maher & Siobahn Hughes, *Hope Fades for Miners; Methane Halts Search for Four Missing Workers; Blast Has Already Claimed 25*, Wall St. J. Online, Apr. 6, 2010 ("'I don't think the citations indicated that it was an unsafe mine,' [Blankenship] said. 'This mine is big so the numbers look big. It's one of the larger mines in West Virginia.'").

[4] Ian Urbina & Michael Cooper, *Deaths at West Virginia Mine Raise Issues About Safety*, NY Times, Apr. 6, 2010 ("'Violations [of the mine safety laws] are unfortunately a normal part of the mining process,' Mr. Blankenship said."); *United States v. Blankenship*, No. 5:14-cr-00244, Mem. Supp. Def. Mot. No. 4 at 4 [ECF 82] (Feb. 6, 2015) (asserting that other mine operators also committed many violations of mine safety laws).

[5] *United States v. Blankenship*, No. 5:14-cr-00244, Mot. to Compel at 5 [ECF 283] (Jul. 8, 2015); *United States v. Blankenship*, No. 5:14-cr-00244, Mot. for Early-Return Doc. Subpoena to MSHA at 5 [ECF 300] (Aug. 13, 2015) (asserting that federal mine safety official "never alerted [Defendant] to possible misconduct").

[6] *United States v. Blankenship*, No. 5:14-cr-00244, Mem. Supp. Mot. to Disqualify at 2 [ECF 79] (Feb. 6, 2015) ("[I]t is apparent that the decision to indict Mr. Blankenship was made to punish him for his exercise of his rights to criticize the government.").

[7] *United States v. Blankenship*, No. 5:14-cr-00244, Mem. Supp. Def. Mot. No. 23 at 4 [ECF 202] (Apr. 7, 2015) ("It cannot be said to 'hamper' or 'impair' MSHA by deceit or dishonesty for a mine operator to correct a hazard and bring itself into compliance, even if the correction occurs with an inspector at the doorstep. Indeed, the very purpose of the prospect of MSHA inspections, as well as the inspections themselves, is to encourage mine operators to address hazards.").

[8] Defense counsel has advised counsel for the United States that Defendant may attempt to introduce recordings that Defendant made of his telephone conversations in 2009 and 2010.

devoting necessary resources to following the mine safety laws was, at least at Defendant's company, viewed simply as a waste.[9]

These claims may be convenient excuses, but they are not legal defenses. They are not relevant to the charges against Defendant, and they are not admissible at trial. In a court of law, what matters is the law and whether it was violated. Extralegal excuse-making stops at the courtroom door. The United States of America, by the undersigned Assistant United States Attorney, therefore moves in limine to exclude evidence and argument in the following categories, each of which will be discussed in turn:

1.   Supposed other good acts or noncriminal acts;

2.   Claims that UBB or other Massey mines were "safe" despite routine violations of federal mine safety standards;

3.   Claims that federal mine safety standards were incorrect or misguided;

4.   The cause of the UBB explosion;

5.   Political considerations concerning the coal industry;

6.   The economic state of the coal industry;

7.   Claims of vindictive or selective prosecution;

8.   Claims that a system to orchestrate advance warnings of inspections in order to conceal safety-law violation is lawful;

9.   Claims of reliance on federal mine safety officials to conclude that conduct was lawful;

10.  Self-serving hearsay statements in telephone conversations recorded by Defendant; and

11.  Expert testimony on the importance of not "wast[ing]" Massey's money, among other matters.

---

[9] Letter from James A. Walls, Esq., to Assistant United States Attorney Steven R. Ruby, Aug. 10, 2015 (attached as Exhibit A).

## I.  GENERAL LEGAL PRINCIPLES

Evidence must be relevant to be admissible at trial.  Fed. R. Evid. 402. Rule 401 of the Federal Rules of Evidence provides that evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Fed. R. Evid. 403. The relevance of a particular piece of evidence must be evaluated in the context of the charged offenses. *See Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 387-88 (2008) ("'Relevancy is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case'") (quoting Fed. R. Evid. 401, 28 U.S.C. App., p. 864).

## II.  CATEGORIES OF EVIDENCE AND ARGUMENT THAT SHOULD BE EXCLUDED

### A.  Purported good acts or noncriminal acts

The United States anticipates that Defendant will offer evidence of purported noncriminal conduct or good acts in an attempt to negate the evidence of his criminal conduct. One form that this evidence may take is evidence of alternative safety measures—that is, measures supposedly taken in place of or separate from the requirements of the safety laws. For example, Defendant claims credit for placing reflective stripes on miners' clothing and using improved hardhats. This "good acts" evidence may also take the form of purported instances of noncriminal conduct. That is, Defendant may offer evidence that there were times when UBB or other Massey mines followed the mine safety laws, or other similar evidence. Neither variety of evidence should be admitted.

### 1.  *Legal standards on other good acts and noncriminal conduct*

Evidence of good acts or noncriminal conduct to negate the inference of criminal conduct is generally irrelevant and inadmissible. A defendant charged in a cocaine distribution conspiracy, for example, may not offer evidence of the many prospective customers that he and his co-conspirators allowed to pass by without attempting to sell them cocaine. This principle has been recognized over many decades in cases charging a wide variety of offenses.

In *United States v. Grimm*, 568 F.2d 1136 (5th Cir. 1978), for example, the defendants were charged with conspiring to transport stolen vehicles across state lines. 568 F.2d at 1137. The government's evidence included 72 instances in which the defendants fraudulently induced car dealers to sell them cars in exchange for bogus bank drafts. 568 F.2d at 1137-38. In response, the defendants sought to offer evidence of 75 other occasions when they made honest purchases from car dealers. 568 F.2d at 1138. The trial court excluded this evidence of the defendants' noncriminal acts, and the Fifth Circuit affirmed, holding, "Evidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant." *Id*.

In *United States v. Winograd*, 656 F.2d 279 (7th Cir. 1981), the defendant was charged with tax-related offenses, including conspiracy to defraud the United States, in connection with foreign-currency futures trades. 656 F.2d at 281. The government's evidence included evidence of numerous fraudulent trades. The defendant sought to introduce evidence of other, legal trades that he engaged in, hoping to counteract the evidence of his involvement in the illegal trades. 656 F.2d at 284. The trial court excluded this evidence of the defendant's other, noncriminal conduct, and the Seventh Circuit affirmed, ruling, "The district judge correctly refused to admit the evidence on this basis because evidence that Siegel engaged in certain legal trades is generally irrelevant to the issue of whether he knew of other illegal trades." 656 F.2d at 284.

5

Closer to home, the Fourth Circuit in 1982 decided *United States v. Molovinsky*, 688 F.2d 243 (4th Cir. 1982). The defendant there was charged with conspiracy to counterfeit United States currency. 688 F.2d at 244. He claimed that he routinely dabbled in a variety of lawful, if far-fetched, money-making schemes, and sought to offer evidence of them to negate the inference that he intended to break the law in the scheme with which he was charged. 688 F.2d at 247. The trial court excluded this evidence of other, noncriminal conduct, and the Fourth Circuit affirmed. *Id.* The Fourth Circuit reasoned that the defendant's other, lawful conduct was not only irrelevant but would confuse the jury: "To have allowed a meandering journey down such collateral paths would have distracted the jury from relevant evidence of the counterfeiting scheme itself, which was illegal." *Id.* The Fourth Circuit went on to cite the Fifth Circuit's decision in *United States v. Grimm*, 568 F.2d 1136, 1138 (5th Cir. 1978), quoting its holding that "[e]vidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant." 688 F.2d at 247.

An Eleventh Circuit example is *United States v. Russell*, 703 F.2d 1243 (11th Cir. 1983). There, the defendants were charged with conspiracy to import marijuana and conspiracy to possess it with intent to distribute. 703 F.2d at 1246. One of the defendants was a county commissioner who was charged with using the authority of his office to advance the conspiracy. *Id.* He sought to introduce evidence of his other good acts as county commissioner to rebut the charge that he abused his office in furtherance of the conspiracy. 703 F.2d at 1249. The trial court excluded that evidence, and the Eleventh Circuit affirmed, quoting *Grimm*: "Evidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant." *Id.*

In *United States v. Walker*, 191 F.3d 326 (2d Cir. 1999), two defendants were charged with conspiring to submit false statements to the Immigration and Naturalization Service and to

commit mail fraud. 191 F.3d at 330. The charge concerned allegedly false applications for asylum prepared by the defendants. *Id.* One of the defendants sought to offer evidence of other, honest asylum applications that he had prepared. 191 F.3d at 336. He proposed to use these instances of noncriminal conduct to disprove his allegedly fraudulent intent. *Id.* The trial court excluded the evidence, and the Second Circuit affirmed: "Whether [the defendant] had prepared other, non-fraudulent applications was simply irrelevant to whether the applications charged as false statements were fraudulent." *Id.*

In *United States v. Dimora*, 750 F.3d 619 (6th Cir. 2014), a county commissioner of Cuyahoga County, Ohio, was charged with various public corruption offenses, including conspiracy. 750 F.3d at 623. To rebut the charge that he intentionally abused his public office, he sought to introduce evidence of instances in which he provided services for constituents without asking for or receiving anything of value in return. 750 F.3d at 630. The trial court excluded this evidence of other noncriminal conduct by the defendant, and the Sixth Circuit affirmed. 750 F.3d at 630. The defendant claimed the evidence was relevant to his intent because it showed he often did favors for constituents without regard to whether they did anything for him, but the Sixth Circuit rejected this claim. 750 F.3d at 630-31.

### 2.  Analysis: Other good acts and noncriminal conduct

As the foregoing discussion of precedent demonstrates, purported other good acts and noncriminal conduct of Defendant or his co-conspirators are not relevant because they do not tend to make any fact of consequence more or less probable. *See* Fed. R. Evid. 401. Evidence and argument concerning such acts thus has no probative value. And such evidence and argument would confuse the issues and mislead the jury. *See* Fed. R. Evid. 403.

Defendant is charged with conspiracy to willfully violate mandatory federal mine safety and health standards and to impede federal mine safety regulators, as well as making false and misleading statements. Notably, the Superseding Indictment does not charge that Defendant or his co-conspirators *always* violated such standards or *invariably* made false statements. Rather, the conspiracy described in the Superseding Indictment, particularly Count One, is one in which law-breaking was managed—not carried out indiscriminately, but rather as a calculated part of Defendant's business strategy. When it made financial sense to follow the safety laws, Defendant and his co-conspirators did so. When it instead made financial sense (at least in the short term) to violate those laws, Defendant and his co-conspirators violated them. The Superseding Indictment does not charge that that UBB never followed the law.

If the charge instead were that the conspirators *never* followed safety laws, then Defendant would have a good argument to be allowed to offer evidence of noncriminal acts. But that is not what is alleged. A trial court in the Northern District of Ohio analyzed this point perceptively in a recent case where the defendant was charged with conspiracy to coerce women to engage in commercial sex acts. *United States v. Mack*, 298 F.R.D. 349 (N.D. Ohio 2014). The defendant sought to introduce evidence of other women who prostituted themselves at his request but did so voluntarily, without any force or coercion; the element of force or coercion was essential to the charge. 298 F.R.D. at 351. The trial court observed that such evidence might be admissible if the defendant were charged with "always" or "unceasingly" using force or coercion to drive women into prostitution. 298 F.R.D. at 352-53. But that was not the allegation. 298 F.R.D. at 352. Rather, the defendant was charged with conspiring to, at times, use tactics of force and coercion as part of his prostitution business, just as the charge here is that Defendant

here is charged with conspiring to violate federal mine safety laws when it suited his own business.

Admitting evidence of other good acts or noncriminal conduct would only serve to mislead and confuse the jury. *See* Fed. R. Evid. 403. Such evidence, or any related argument, would suggest to the jury that if Defendant and his co-conspirators followed the law some of the time, or took some steps that they claimed improved mine safety in a manner different from that required by the law, then Defendant did not commit the charged offense. Such a suggestion would be plainly inaccurate and would badly undermine the integrity of the trial.

**B.      Claims that UBB or other Massey mines were "safe," whether or not they complied with federal mine safety standards**

Defendant has asserted that Massey's mines, including UBB, were safe despite their routine violations of federal mine safety standards. He may seek to offer the subjective opinions of witnesses to that effect, as well as statistics that purportedly show that UBB or other Massey mines were "safe" even though they frequently broke the safety laws.

Evidence of alternative safety measures or assessments that are intended to serve as substitutes for the requirements of the law are inadmissible. "An employer who substitutes his own judgment for the requirement of a standard . . . commits a willful violation." *Valdak Corp. v. Occupational Safety & Health Review Comm'n*, 73 F.3d 1466, 1469 (8th Cir. 1996) (assessing a "good faith" defense in civil penalty OSHA case); *Reich v. Trinity Industries, Inc.*, 16 F.3d 1149, 1153 (11th Cir. 1994) ("[T]he employer's belief that its alternative program meets the objectives of OSHA's regulations" was irrelevant to willful violation.). Defendant's duty to follow federal regulations is not negated or altered by his claimed efforts to promote safety outside of those mandatory health and safety standards. *See Interstate Erectors, Inc. v. Occupational Safety and Health Review Comm'n*, 74 F.3d 223, 227-28 (10th Cir. 1996) (finding

9

unacceptable the implementation of an alternative measure of protection in place of those specified in OSHA regulations); *Western Waterproofing Co. v. Marshall*, 576 F.2d 139, 142 (8th Cir. 1978) (rejecting the employer's defense that although it had failed to comply with a particular OSHA standard, it had nevertheless met the "underlying purpose" of the standard). Such evidence should be excluded as irrelevant under Rule 401 and as confusing and misleading under Rule 403.

### C.      Claims that federal mine safety standards were incorrect or misguided

Defendant has publicly expressed his disagreement with federal mine safety regulations. Any argument or evidence that the mandatory mine health or safety standards were wrong, misguided, or imprudent is inappropriate and should be precluded.

It is well settled that "disagreement with the law, no matter how passionately advocated, is not [a defense]." *United States v. Schiff*, 801 F.2d 108, 113 (2d Cir. 1986); *see also United States v. Mitrano*, 658 F.3d 117, 120 (1st Cir. 2011) (disagreement with law ordering child-support payments is no defense to failure to pay) (citing *Cheek v. United States*, 498 U.S. 192, 200 (1991)); *United States v. Komisaruk*, 885 F.2d 490, 492 (9th Cir. 1989). Defendant's disagreement with the propriety of mandatory health and safety standards should be excluded under Rules 401 and 403.

### D.      The cause of the UBB explosion

In prior pleadings, the parties have agreed that the cause of the UBB explosion is not relevant to the charges against Defendant. *See* ECF 287, 290. Evidence and argument concerning the physical cause of the explosion should be excluded.

### E.      Purported political motivations

In his motion to dismiss the indictment for vindictive and selective prosecution, Defendant asserted that this case is politically motivated, part of the agenda of the "Democratic establishment," and a response to his status as "an enemy of the state's powerful and well-connected unions." Mem. Supp. Def's Mot. to Dismiss, ECF 82 at 21-22 (Feb. 6, 2015); *see also United States v. Blankenship*, No. 15-1533, Def's Pet. for Writ of Mandamus at 2 (4th Cir. May 18, 2015) (referencing Defendant's "controversial documentary film" that criticized federal regulators and the political relationships that he believes precipitated his prosecution); *see also* Mem. Supp. Def's Mot to Disqualify This Court, ECF 79 at 10 (Feb. 6, 2015). Such evidence and argument—including conjecture on the political motives of federal officials—is irrelevant to the charges against the Defendant and should be excluded. This Court has already ruled that this evidence amounts to mere speculation, Mem. Op. and Order, ECF 217 at 17 (Apr. 8, 2015), and it should be excluded under Rules 401 and 403.

Similarly, Defendant's personal opposition to national policies cannot establish a defense for violating the law, nor can it negate any of the elements of the charged offenses. *See United States v. Komisaruk*, 885 F.2d 490, 492 (9th Cir. 1989) (defendant's disagreement with national defense policies "could not be used to establish a legal justification for violating federal law nor as a negative defense to the government's proof of the elements of the charged crime"). Evidence and argument that echo political attacks on supposed federal government policies or actions are highly prejudicial and would serve only to stir bias among the jury. Such evidence would be misleading and would discourage the jury from focusing on the relevant arguments and the critical issue of whether the Defendant willfully violated federal mine safety laws.

### F.   Economic issues

Similarly, the Court should preclude Defendant from presenting argument or evidence of (1) his or Massey's purported effect on job creation and employment in West Virginia, and (2) the economic difficulties facing the coal industry in this state and nationally. Any evidence or argument based on the national or statewide economic impact of Massey or the coal industry in general would be irrelevant and misleading under Rules 401 and 403, and it would be an improper attempt by Defendant to appeal to or create bias among the jury.

### G.   Claims of vindictive or selective prosecution

Defendant may suggest that he is being unfairly prosecuted in retaliation for his opinions and speech. *See* Mem. Supp. Def's Mot to Disqualify This Court, ECF 79 at 10 (Feb. 6, 2015); Mem. Supp. Def's Mot. to Dismiss, ECF 82 (Feb. 6, 2015); *United States v. Blankenship*, No. 15-1533, Def's Pet. for Writ of Mandamus (4th Cir. May 18, 2015). Testimony and evidence relating to this argument includes reference to Senator Manchin's communications to the United States Attorney's Office, other coal mine owners or operators who were not indicted, the fact that Defendant is being charged with felony fraud instead of violations of the Mine Act, and any suggestion that Defendant is being prosecuted in bad faith.

This evidence should be excluded because purportedly discriminatory prosecution is not a jury question. "It is well-settled that [d]efenses and objections based on defects in the institution of the prosecution must be raised prior to trial." *United States v. Schmidt*, 935 F.2d 1440, 1450 (4th Cir. 1991) (affirming district court's refusal of selective prosecution jury instruction) (internal quotation marks omitted) (abrogated on other grounds); *see also United States v. Berrigan*, 482 F.2d 171 (3d Cir. 1973). This Court has already ruled the circumstances of this case and the allegations in the superseding indictment do not establish any inference of

vindictive or selective prosecution. ECF 217 at 12, 13, 16 (finding that Defendant failed to demonstrate vindictiveness and explaining that "[f]acts threaded with speculation will not meet the 'rigorous standard' or overcome the presumption of prosecutorial regularity"). The Court also has rejected Defendant's argument that he should have been charged under the Mine Act, ruling that § 371 has been properly charged. ECF 270 at 8 ("The fact that the conspiracy charge includes the commission of particular offenses contained in the Mine Act does not render Count One improper."). It is irrelevant that Defendant could have been charged with violating other statutes but was not.

Through its rulings, Court has foreclosed the Defendant's presentation of the evidence discussed above. An attempt by Defendant to argue unfairness or retaliation is not a legitimate defense to the charges in the superseding indictment, would be improper, and would only be an attempt to bypass the Court's rulings. Such an attempt should be precluded under Rules 401 and 403.

**H.      Claims that a system to orchestrate advance warnings of inspections in order to conceal safety-law violation is lawful**

The Court should disallow evidence or argument that giving advance warning of inspectors for the purpose of "correcting" violations before inspectors can arrive is not illegal or not encompassed by the charges against him. The Court has rejected this argument, concluding that it "borders on the absurd." ECF 267 at 5. Argument that § 371 cannot apply to the act of correcting violations is legally wrong and should not be presented to the jury. As this Court explained in denying Defendant's Motion to Dismiss Count One of the Superseding Indictment for Charging Non-Criminal Conduct (ECF 201):

> Simply put, mine operators cannot willfully violate mandatory federal mine safety and health standards and obstruct the lawful functions of MSHA as alleged here, and then avoid responsibility simply because providing advance warning allowed

their employees to "correct" said violations with inspectors at the doorstep. Such a reality would strip applicable sections of the United States Code of any force or meaning, and render MSHA impotent.

ECF 267 at 5. The so-called correction of violations to evade detection by MSHA inspectors does not negate the fraud of providing advance notice. Indeed, as made clear in the Court's reasoning above, hurriedly correcting a violation of a mandatory health or safety standard following advance notice of inspectors amounts to the concealing of the violation and is illegal under the charged statute. For the purposes of the charged conduct, there is no legal distinction between "correction" and "concealment." Therefore, the Court should preclude Defendant from presenting this legally incorrect and previously rejected defense at trial, pursuant to Rules 401 and 403.

## I.    Claims of reliance on federal mine safety officials to conclude that conduct was lawful.

Defendant has signaled he will claim that purported actions and inaction by federal mine safety officials led him to conclude that he was not breaking the law. *United States v. Blankenship*, No. 5:14-cr-00244, Mot. for Early-Return Doc. Subpoena to MSHA at 5 [ECF 300] (Aug. 13, 2015) (asserting that federal mine safety official "never alerted [Defendant] to possible misconduct"). One might justifiably doubt the persuasiveness of such a defense given the indisputable fact that officials cited hundreds of illegal mine safety violations at UBB during the Indictment Period. How could such overwhelming evidence of lawlessness possibly lead Defendant to believe he was following the law? Setting aside the question of its efficacy, however, this reliance defense is not admissible in the first place.

There is a legal name for the defense that a defendant relied on government statements or action (or inaction) and concluded that his conduct was lawful: "entrapment by estoppel." *United States v. Aquino-Chacon*, 109 F.3d 936, 938 (4th Cir. 1997). It is an exceedingly narrow

exception to the general principle that ignorance of the law is no defense. 109 F.3d at 938. To avail himself of it, a defendant "must do more than merely show that the government made 'vague or even contradictory' statements" about whether particular conduct was unlawful. 109 F.3d at 939 (quoting *Raley v. Ohio*, 360 U.S. 423, 438 (1959)). "Rather, he must demonstrate that there was 'active misleading' in the sense that the government actually told him that the proscribed conduct was permissible." 109 F.3d at 939 (quoting *Raley v. Ohio*, 360 U.S. 423, 438 (1959)). *See also United States v. Clark*, 986 F.2d 65, 69 (4th Cir. 1993) (making clear that entrapment by estoppel applies "when a government official tells the defendant that certain activity is legal"); *United States v. Howell*, 37 F.3d 1197, 1204 (7th Cir. 1994) (entrapment by estoppel "is a defense that is rarely available" and applies "when, acting with actual or apparent authority, a government official affirmatively assures the defendant that certain conduct is legal").

If a defendant seeks to offer evidence of government statements or actions that supposedly led him to believe his conduct was lawful, the trial court should exclude that evidence unless the evidence shows an affirmative governmental assurance of lawfulness sufficient to establish entrapment by estoppel. In *United States v. Hernandez*, No. 1:07-cr-00310-GBL (Mot. in Lim. by United States, ECF 23) (Sept. 27, 2007 E.D. Va.), the defendant was an immigrant who had been deported from the United States for committing an aggravated felony. *Hernandez*, No. 1:07-cr-00310-GBL (Mot. in Lim. by United States, ECF 23) (Sept. 27, 2007 E.D. Va.) (attached and referred to hereinafter as Exhibit B). After he was deported, the Immigration and Naturalization Service ("INS") issued him an Employment Authorization Document. Ex. B at 7-8. After his deportation, Defendant reentered the United States. *Id.* His presence in the United States after deportation was a criminal offense, and he was charged

15

accordingly. *Id.* The United States, prior to trial, sought to exclude evidence of the Employment Authorization Document. *Id.* The United States argued for exclusion because the evidence did not rise to the level of affirmative assurance of lawfulness, even though the defendant might claim that an official INS document authorizing him to work in the United States reasonably led him to believe that he could reenter the United States. *Id.* The trial court agreed, excluding the evidence in limine. *United States v. Hernandez*, 284 F. App'x 24 (4th Cir. 2008). The Fourth Circuit affirmed. 284 F. App'x 24 (4th Cir. 2008) ("Because Hernandez's evidence failed to establish he was entitled to assert the entrapment by estoppel defense, we find that the district court properly granted the Government's motion in limine."). *Accord United States v. Aguilar-Vensor*, 203 F.3d 836 (10th Cir. 2000) (district court properly granted motion in limine precluding defendant from presenting entrapment-by-estoppel type evidence); *United States v. Thompson*, 25 F.3d 1558, 1560 (11th Cir. 1994) (same); *United States v. Yeley*, 346 F. Supp. 2d 969, 971 (S.D. Ind. 2004) (district court granted motion in limine excluding entrapment-by-estoppel type evidence).

The evidence of purported reliance on government officials that Defendant has mentioned to date is nothing like an affirmative assurance that his violations of safety laws somehow were lawful. If an official INS document authorizing a person to work in the United States does not constitute an affirmative authorization to enter the United States—at least not one sufficient to trigger the entrapment by estoppel defense—then surely the sort of evidence that Defendant has cited falls far further from the mark. *See United States v. Hernandez*, 284 F. App'x 24 (4th Cir. 2008).

**J.      Self-serving hearsay statements in telephone conversations recorded by Defendant**

On January 29, 2015, the United States produced to Defendant in discovery approximately 1600 recordings of phone conversations between Defendant and others. Those conversations were apparently surreptitiously recorded by Defendant while he was CEO of Massey. Many of those recordings contain conversations which tend to incriminate Defendant. The United States intends to introduce several of those recordings at trial. (Defendant's own statements in these recorded calls are, if offered by the United States, statements made by an opposing party and offered against him. Fed. R. Evid. 801(d)(2)(A).)

Defense counsel has also indicated a desire to introduce some of Defendant's recorded phone conversations at trial. Presumably, those recordings contain conversations that Defendant claims are in some way exculpatory. Recordings of those conversations should be excluded as hearsay.

Recordings of conversations between Defendant and others are clearly hearsay, for which there is no exception permitting their introduction at trial by Defendant. Rule 801 defines hearsay as follows:

> **(c) Hearsay**. "Hearsay" means a statement that:
>
> **(1)** the declarant does not make while testifying at the current trial or hearing; and
>
> **(2)** a party offers in evidence to prove the truth of the matter asserted in the statement.

None of the recorded phone conversations involve Defendant's testimony during this litigation. Furthermore, Defendant apparently would seek to prove as true what is contained in his recorded conversations. While admissions of a party opponent are not considered hearsay and are admissible at trial, Defendant's own self-serving statements are not admissible. *See* Fed. R.

Evid. 801(d) (2); *United States v. Wilkerson*, 84 F.3d 692, 696 (4th Cir. 1996) ("The rules do not, however, provide an exception for self-serving, exculpatory statements made by a party which are being sought for admission by that same party.").

The United States anticipates Defendant may argue that introduction of certain conversations is permissible pursuant to the "rule of completeness."  However, the application of that rule is quite limited.

The "rule of completeness" provides:

If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time.

Fed. R. Evid. 106.

Importantly, "the rule is limited to writings and recorded statements and does not apply to conversations." Advisory Committee Notes, Fed. R. Evid. 106.

Even if the court were to deem Defendant's surreptitiously recorded phone conversations to be "statements" within the meaning of the rule, the purpose of the rule is "to prevent a party from misleading the jury by allowing into the record relevant portions of the excluded testimony *which clarify or explain the part already received.*" *United States v. Wilkerson*, 84 F.3d 692, 696 (4th Cir. 1996) (emphasis added).  The court thus need only admit the omitted portions of a statement that are necessary to clarify or explain the portion already admitted. *Id.*

Other circuits have ruled similarly. *See United States v. Branch*, 91 F.3d 699, 729 (5th Cir. 1996) ("Neither the Constitution nor Rule 106 . . . requires the admission of the entire statement once any portion is admitted in a criminal prosecution."); *United States v. Awon*, 135 F.3d 96, 101 (1st Cir. 1998) (the rule of completeness does not require the admission of otherwise inadmissible hearsay "simply because one party has referred to a portion of such

18

evidence"). Rule 106 would only permit Defendant to introduce his own recorded conversations where "admission of the statement in its edited form *distorts* the meaning of the statement or excludes information substantially exculpatory of the declarant." *United States v. Kaminski*, 692 F.2d 505, 522 (8th Cir. 1982) (emphasis added).

Simply stated, "Rule 106 does not . . . render admissible evidence which is otherwise inadmissible under the hearsay rules." *United States v. Lentz*, 524 F.3d 501, 526 (2008) (internal quotes omitted).

### K.   Expert testimony on the importance of not "wast[ing]" Massey's money on following the safety laws, among other matters

Defendant proposes to offer expert testimony from a law professor. The proposed testimony addresses areas that are odd subjects for expert opinion in a trial. Most of them are actually areas of factual testimony about Massey, even though the proposed expert does not appear to have firsthand knowledge of the company. And perhaps most striking, Defendant appears to want this so-called expert testify that it would have been a "waste" of Massey's money to devote resources to following federal mine safety laws.

#### *1. Background: Defendant's expert disclosure and proposed testimony*

On August 10, 2015, the United States received a letter from defense counsel in which Defendant disclosed his intent to offer expert testimony from Professor Douglas M. Branson. *See* Exhibit A. According to the curriculum vitae attached to the letter, Branson is a law professor at the University of Pittsburgh School of Law. The disclosure identifies four main categories of anticipated testimony, which are, to say the least, unusual subjects for proposed expert opinion testimony.

The first category concerns Defendant's financial responsibilities as Chief Executive Officer (CEO) of Massey. According to the disclosure, Branson would testify at trial that chief executives of publicly held companies, including Defendant, have the following duties:

- ". . . to endeavor to make or keep their companies profitable . . .";

- ". . . to strive to increase their profitability...";

- ". . .to protect . . . shareholder investment . . ."; and

- ". . . to endeavor not to waste corporate resources."

Second, Branson would testify "that it is necessary and indeed appropriate for chief executives, including [Defendant], to delegate matters to subordinates."

Third, Defendant's disclosure indicates that Branson would testify that the board of directors of Massey oversaw the company and Defendant and that Massey's board members "were appropriately qualified, informed and involved."

Finally, Branson would offer background testimony regarding Massey's structure and organization, its business, and "the roles and responsibilities of its officers and directors."

Given the nature of Branson's testimony, it should be excluded.

### 2.   *Legal principles*

Federal Rule of Evidence 702 specifically governs the admissibility of expert testimony. Rule 702 permits expert testimony if that testimony "helps[s] the trier of fact to understand the evidence or to determine a fact in issue." The district court serves as a gatekeeper in determining whether to admit such evidence pursuant to the rule. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993); *United States v. Forrest*, 429 F.3d 73, 80 (4th Cir. 2005). The gatekeeping function applies not only to scientific expert testimony, but expert testimony based on technical or other specialized knowledge as described in Rule 702. *Kumho*

*Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). Expert testimony, regardless of its nature, must be both relevant and reliable.  *Id.* at 149; *Daubert*, 509 U.S. at 589.

A district court has broad discretion to admit or exclude expert testimony based upon whether it is helpful to the trier of fact. *United States v. Barsanti*, 943 F.2d 428, 432 (4th Cir. 1991). Expert testimony assists the trier of fact if: (1) the testimony is relevant; (2) the testimony is not within the jurors' common knowledge and experience; and (3) the testimony will not usurp the jurors' role of evaluating a witness's credibility. *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1123 (10th Cir. 2006); *United States v. Lespier*, 725 F.3d 437, 449 (4th Cir. 2013) (expert testimony should be excluded if it is "obviously . . . within the common knowledge of jurors").

Like all evidence, expert testimony must make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence and may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Fed. R. Evid. 401, 403.

The United States Supreme Court has recognized that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it," and therefore, "the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (quoting Jack B. Weinstein, *Rule 702 of the Federal Rules of Evidence Is Sound; It Should Not Be Amended*, 138 F.R.D. 631, 632 (1991)). Therefore, as the Second Circuit commented, "the very breadth of the discretion accorded trial judges in admitting [expert testimony] under . . . 403 should cause them to give the matter more, rather than less, scrutiny." *Nimely v. City of New York*, 414 F.3d 381, 397 (2nd Cir. 2005) (quotations and citations omitted).

Against this legal backdrop, it is apparent that Branson's testimony should be excluded.

### 3.   *Analysis*

**Defendant's Financial Responsibilities**. It is generally understood by laypeople that a CEO of a publicly held corporation has a duty to maintain and, if possible, increase the company's profitability. In so doing, the CEO would strive to protect shareholder investments and endeavor not to waste resources. This testimony would be within the common knowledge of jurors. It thus is not a proper subject for expert opinion testimony and should be excluded.

Furthermore, expert testimony that Defendant's job was to make money for Massey is not relevant to any defense; it would not mitigate in any way Defendant's responsibility to ensure that Massey mines followed mandatory health and safety standards. Similarly,  the fact that Defendant had a duty to protect shareholders (of which he was one) in no way implies a right to file false, fictitious and fraudulent statements with the Securities Exchange Commission as charged in Counts Two and Three; on the contrary, it would negate any such right. And Defendant's duty not to waste Massey resources did not obviate his duty to legally operate Massey mines. These categories of testimony are more than just irrelevant. They would risk confusion, leading the jury to believe that the goals of making more money and not "wasting" corporate resources are somehow legal justifications for law-breaking. *See* Fed. R. Evid. 403.

Branson's so-called expert testimony regarding Defendant's purpose as CEO would amount to nothing more than his opinion that Defendant's job was to make money. By implication, then, Branson would opine that safety was not Defendant's responsibility. In other words, Branson's testimony would provide a legal conclusion after applying the facts to Defendant's charges. The Fourth Circuit has held that "it does not help a jury for an expert to give testimony that 'states a legal standard or draws a legal conclusion by applying law to the

facts.'" *United States v. Offill*, 666 F.3d 168, 175 (4th Cir. 2011) (quoting *United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006)). This is so because the testimony "supplies the jury with no information other than the witness's view of how the verdict should read." *Offill*, 666 F.3d at 175 (quoting Weinstein's Federal Evidence § 704.04[2][a] (2d ed. 2003)). Branson's testimony would provide nothing more for the jury to consider beyond his opinion that they should find Defendant not guilty. The proposed expert opinions on Defendant's money-making role should be excluded.

**Delegation to Subordinates**. For the same reasons that expert testimony regarding Defendant's financial responsibilities should be excluded, expert opinion that supervisors often delegate things to the people who work for them should also be excluded. This is, to put it mildly, a curious subject on which even to propose expert opinion testimony. It is common knowledge that bosses delegate duties to their subordinates. Any juror would be aware of that fact. If this particular Defendant wishes to show that he delegated responsibilities to particular subordinates in some manner that mitigates his culpability for the charged conduct, then he should call fact witnesses to testify to that effect. Calling an expert to testify in an abstract fashion that managers generally delegate tasks to the people who work for them is pointless and irrelevant.

The proposed testimony on delegation would also risk leading jurors to incorrectly believe that an executive can, merely by delegating duties to subordinates, insulate himself from liability for criminal conduct that he knows the subordinates are committing. So-called expert testimony suggesting that delegation accomplishes that sort of legal trick—especially from a law professor—would amount to an incorrect and highly misleading legal conclusion that should be excluded under a Rule 403 balancing test.

**Board of Directors' Oversight**. According to Defendant's disclosure, Branson would testify that the Massey board of directors had oversight over the company and "were appropriately qualified, informed and involved." Again, this is a curious subject on which to offer the opinion of an expert. The extent to which Massey's directors oversaw the company and the degree of information and involvement they had in doing so are questions of fact. The opinion of a so-called expert on those subjects cannot possibly be relevant. This appears to be a classic case of using an "expert" to add undue weight to statements that are purely factual. The testimony should be excluded.

**Massey's Corporate Structure**. The final category outlined in Defendant's disclosure concerns general information about Massey's corporate structure. Again, this is an area in which expert testimony is not required and would not be helpful to the jury. Any testimony describing the corporate structure would constitute factual, rather than expert, testimony and could be supplied by any person knowledgeable of the company. Attaching an unnecessary and misleading label of "expert" to that testimony would be improper. This testimony should also be excluded.

### 4. Daubert *Hearing Unnecessary*

In order to determine whether expert testimony should be included, a court may conduct what is commonly referred to as a *Daubert* hearing. A hearing is neither required nor necessary in this case.

In *United States v. Wilson*, 484 F.3d 267 (4th Cir. 2007), the district court permitted the government to introduce testimony from a nine-year veteran of the Baltimore County Police Department concerning coded language employed during the course of a drug conspiracy. The Fourth Circuit, in approving the admissibility of the evidence, noted that "the test of reliability is

flexible" and "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination. 484 F.3d at 274 (citations omitted). This is because "[e]xperiential expert testimony . . . [as opposed to scientific testimony] does not 'rely on anything like a scientific method.'" 484 F.3d at 274. In Wilson, the court determined the reliability of the expert's testimony based on qualifying questions posed at trial. *Id.*

In the instant case, a hearing to determine whether Branson's proposed testimony should be excluded is not required or necessary given the description contained in Defendant's disclosure. A review of the attached disclosure clearly demonstrates that Branson's proposed testimony does not meet the heightened level of scrutiny for expert testimony.

### III.    CONCLUSION

Defendant has a long history of public attempts to distract attention from his illegal safety violations by pointing to anything other than the law. His pleadings in this case have continued that approach. Judging from this track record, Defendant may seek to use a wide variety of irrelevant and inadmissible evidence and argument to obtain an acquittal on a basis not warranted by law. The Court must vigilantly guard against that possibility. Each of the categories of evidence and argument described above should be excluded at trial.

Respectfully submitted,

R. BOOTH GOODWIN II
UNITED STATES ATTORNEY

s/ Steven R. Ruby
Steven R. Ruby
Assistant United States Attorney
WV Bar No. 10752
300 Virginia Street, East
Room 4000

Charleston, WV 25301
Telephone:  304-345-2200
Fax: 304-347-5104
Email: steven.ruby@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

It is hereby certified that the foregoing "UNITED STATES' MOTION IN LIMINE" has

been electronically filed and service has been made on opposing counsel by virtue of such

electronic filing this 18th day of August, 2015 to:

> Steven Herman
> Miles Clark
> Eric Delinsky
> William Taylor, III
> Blair Brown
> Zuckerman Spaeder LLP
> Suite 1000
> 1800 M Street, NW
> Washington, DC 20036
>
> Alex Macia, Esq.
> Spilman Thomas & Battle PLLC
> P.O. Box 273
> Charleston, WV 25321
>
> James Walls, Esq.
> Spilman Thomas & Battle PLLC
> P.O. Box 615
> Morgantown, WV 26507

> s/ Steven R. Ruby
> Steven R. Ruby
> Assistant United States Attorney
> WV Bar No. 10752
> 300 Virginia Street, East
> Room 4000
> Charleston, WV 25301
> Telephone:  304-345-2200
> Fax: 304-347-5104
> Email: steven.ruby@usdoj.gov

27