# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### BECKLEY DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| **v.** | )      **Criminal No. 5:14-cr-00244** |
| | ) |
| **DONALD L. BLANKENSHIP** | ) |

## OPPOSITION TO GOVERNMENT'S MOTION IN LIMINE

The government's motion in limine leads with unnecessary rhetoric about Mr. Blankenship's supposed guilt, rhetoric that serves no purpose but to garner headlines and further taint the jury pool.[1]  The motion contains little analysis of the actual charges and how evidence may relate to them.  As set forth below, the scope of the charges – and the specific allegations of fact pled in the indictment – make it clear that the evidence the government wishes to exclude is inarguably relevant.

## ARGUMENT

As a threshold matter, much of the government's motion must be denied without prejudice, or held in abeyance until trial, for lack of specificity.  Several sections of the motion seek to exclude broad, vaguely defined categories of evidence, the scope of which is difficult to discern.  For instance, the government seeks to exclude nebulous categories such as "good acts," "noncriminal conduct," undifferentiated "statistics" on safety (there are many), and the entirety

---

[1] *See* Ken Ward, Jr., *Feds: Blankenship lawyers trying to dodge real issues*, Charleston Gazette-Mail (Aug. 19, 2015), *available at* http://sundaygazettemail.com/article/20150819/GZ01/150819436 ("In a new court filing, prosecutors argue that mine safety rules were violated 'thousands of times' at Massey's Upper Big Branch with Blankenship's 'full knowledge and under his close supervision' … 'There is no hiding these straightforward facts,' wrote Assistant U.S. Attorney Steve Ruby. 'So the defendant has adopted a strategy that is familiar to him: Talk about anything besides the plain requirements of the law.'").

of 1,600 telephone recordings without any discussion of the content – or applicable hearsay exceptions – pertaining to a single one.

Moreover, it remains the case that the defense still lacks notice of the contours of the government's case-in-chief.  The government's case-in-chief documents are buried in millions and millions of pages of discovery, and the government has refused to identify them.  And the government's theory of criminality has repeatedly shifted.  *See, e.g.,* ECF No. 299 at 2-3. Indeed, even within the government's motion in limine, it shifts positions on the nature of its case – arguing in one place that mine-safety laws were violated "thousands of times" and that the violations were "chronic," while arguing in another place that Mr. Blankenship is not charged with "always" violating such standards and that the violations were "managed," "calculated," and not "indiscriminate[]."  *Compare* ECF No. 320 at 1 *with id.* at 8.  The indictment repeatedly alleges that the 835 alleged violations were "routine."  ECF No. 169, ¶¶ 1, 89(a), 92, 100(a). Now apparently they were "managed."  ECF No. 320 at 8.  And, of course, the government steadfastly refuses to say which are which.

Accordingly, it is impossible for the defense to respond with precision to many of the government's arguments.  For this reason alone, much of the government's motion should be denied without prejudice and then addressed as necessary at trial.

With that said, the defense addresses each category of the evidence raised in the government's motion below.

**A.  "Good Acts" or "Noncriminal Acts"**

The government seeks to prohibit the introduction of "noncriminal conduct or good acts." *See* ECF No. 320 at 4-9.  The government's description of this category of evidence is entirely vague – specifying only evidence of two purported safety measures, undescribed "times" when

Massey complied with safety regulations, and "other similar evidence" (whatever that may be). *Id.* at 4. Its request should be denied without prejudice or held in abeyance on this ground alone.

On the merits, however, this appears to be nothing more than a request to exclude exculpatory evidence that negates any alleged conspiracy to commit willful violations of the Mine Act. That is the express allegation in the indictment, and it is the charged offense that the government must prove. As set forth below, such evidence is plainly relevant, and the cases the government cites are not remotely on point.

1. Relevance

The government's attempt to exclude evidence of "noncriminal conduct" and "good acts" disregards the actual allegations in the indictment. The government ignores two key features of the conspiracy charge set forth in Count One:

First, the indictment charges a conspiracy to "*routinely*" violate federal safety standards at UBB, resulting in a "*practice* of *routine* safety violations" at the mine. ECF No. 169 ¶ 1 (emphasis added). Under the plain terms of the indictment, the alleged object of the conspiracy was to "routinely" violate safety standards; an alleged means of the conspiracy was to "routinely" commit such violations; and such routine violations allegedly numbered no less than 835. *Id.* ¶¶ 8, 89(a), 96. In its motion in limine, the government goes even further, alleging that the violations were "chronic" and that there were "thousands" of them. ECF No. 320 at 1.[2]

Second, the indictment alleges that the purpose of the conspiracy was to maximize profits and enrich Mr. Blankenship, both by refusing to allocate the resources necessary for safety compliance and by avoiding penalties owed to the United States. *See* ECF No. 169 ¶¶ 1, 58, 79.

---

[2] Later in its motion, the government shifts theories and claims the violations were "managed," "calculated," and not "indiscriminate[]." ECF No. 320 at 8. This not only is inconsistent with the lead paragraph of the very same motion, but also it is flatly inconsistent with the indictment.

The indictment further claims that the company authorized safety violations because paying fines for them was cheaper than complying with the law.  *See id.* ¶ 58.

In light of these allegations, the following evidence is plainly relevant:

- Evidence tending to show that willful violations at UBB did not occur, and that if any did, they were not "routine."  This evidence directly rebuts the government's allegation that an agreement to willfully violate safety regulations even existed – an obvious element of Count One.  *See United States v. Dozie*, 27 F.3d 95, 97 (4th Cir. 1994).

- Evidence tending to show that Massey devoted substantial time, attention, and money to mine safety, including in the form of safety innovations, many of which facilitated compliance with safety regulations.  This evidence directly rebuts the allegation that Mr. Blankenship and his alleged co-conspirators (thus far unnamed) were motivated by a desire to save money at the expense of safety.  *See* ECF No. 169 ¶¶ 1, 58, 79.  It also negates the *mens rea* for Count One, as devoting time, resources and money to safety improvements, including improvements designed to facilitate regulatory compliance, is inconsistent with the contention that Mr. Blankenship and any alleged co-conspirator intended there to be willful violations.

- Evidence tending to show that Mr. Blankenship and alleged co-conspirators made efforts to comply with safety regulations at UBB and to reduce violations.  Once again, this evidence directly rebuts the allegation that Mr. Blankenship or any supposed co-conspirators ever agreed to willfully violate such regulations or that they intended that willful violations be committed – both elements of Count One.  *See Dozie*, 27 F.3d at 97.

- Evidence tending to show that Mr. Blankenship and any alleged co-conspirators worked to correct violations at UBB when they occurred.  This evidence, again, directly rebuts the allegation that Mr. Blankenship agreed to willfully violate safety regulations or intended that willful violations be committed, as alleged in Count One.  *See id.*

- Evidence tending to show that neither Mr. Blankenship nor any alleged co-conspirator possessed the state of mind necessary for Count One, including knowledge of the alleged conspiracy, intent to join that conspiracy, and intent to commit the

4

conspiracy's underlying offenses (here, willful violations and fraud). *See Cheek v. United States*, 498 U.S. 192, 203 (1991) ("[F]orbidding the jury to consider evidence that might negate willfulness would raise a serious question under the Sixth Amendment's jury trial provision."); *United States v. Lankford*, 955 F.2d 1545, 1550 (11th Cir. 1992) ("Where the element of willfulness is critical to the defense, the defendant is entitled to wide latitude in the introduction of evidence tending to show lack of intent."); *United States v. Biaggi*, 909 F.2d 662, 692 (2d Cir. 1990) ("Where evidence of a defendant's state of mind, critical to a fair adjudication of criminal charges, is excluded, we have not hesitated to order a new trial."); *United States v. Sternstein*, 596 F.2d 528, 530-31 (2d Cir. 1979) ("[T]he accused as part of his defense is entitled to wide latitude in the introduction of evidence which tends to show lack of specific intent." (internal quotation marks and citation omitted)).

All of the above evidence, furthermore, is also directly relevant to Counts Two and Three.  The indictment charges that Mr. Blankenship made or caused to be made the allegedly false statements that "[w]e [Massey] do not condone any violation of MSHA regulations" and "we [Massey] strive to be in compliance with all regulations at all times."  *See* ECF No. 169 ¶¶ 102, 104.  The indictment charges that Mr. Blankenship knew these statements were false at the time they were made.  *See id.* ¶ 85.  Evidence showing that violations at UBB were not routine; that Massey devoted substantial time, money, and resources to mine safety, regulatory compliance, and violation reduction; that Mr. Blankenship and others made efforts to comply with federal law and reduce violations; and that Mr. Blankenship and others worked to correct violations when they occurred is all relevant to the alleged falsity of the statements and Mr. Blankenship's belief in their truth.  *See United States v. David*, 83 F.3d 638, 640 (4th Cir. 1996); *United States v. Jones*, No. 3:12-CR-239, 2014 WL 1384485, at *3 (W.D.N.C. Apr. 9, 2014).

In sum, the exculpatory evidence related to Mr. Blankenship's efforts to improve safety and reduce violations is directly tethered to the precise allegations of the indictment and to the particular elements thereof.  It is plainly relevant and admissible in this case.

2.   The Government's Cases

None of the cases cited by the government concern evidence such as that listed above, which directly negates allegations in the indictment and elements of the charged offenses.  The cases are easily distinguished and do not support the action the government seeks.

The allegation here is <u>not</u> that Mr. Blankenship conspired to commit particular willful safety violations on particular days.  Rather, the indictment charges Mr. Blankenship and others with a broad "practice" of "routine" willful violations over an extended period of time, and it alleges that he and they furthered that conspiracy by putting in place policies that "fostered" and "perpetuated" such violations.  ECF No. 169 ¶ 1; *see also, e.g., id.* ¶¶ 24, 26, 27, 30, 36, 67, 68, 72, 92, 93.  The evidence described above directly negates the elements of this charge – including whether the alleged conspiracy even existed in the first place.

This evidence is therefore tethered to specific allegations in the indictment and to specific elements of the charged offenses.  It is not "other acts" evidence, extraneous to the charge, as in the cases cited by the government.  *See United States v. Dimora*, 750 F.3d 619, 630 (6th Cir. 2014) (defendant convicted of 39 particular violations of federal anti-corruption laws could not introduce 404(b) evidence "that on several occasions he helped constituents 'without asking for . . . or receiving anything of value'"); *United States v. Walker*, 191 F.3d 326, 336 (2d Cir. 1999) (defendant convicted of eight false-statement charges could not introduce evidence of "other, non-fraudulent applications" that were "simply irrelevant to whether the applications charged as false statements were fraudulent"); *United States v. Russell*, 703 F.2d 1243, 1249 (11th Cir. 1983) (defendant convicted of drug-dealing conspiracy could not introduce evidence of "unrelated, good acts . . . to prove that 'he was a good county commissioner'"); *United States v. Molovinsky*, 688 F.2d 243, 247 (4th Cir. 1982) (defendant convicted of counterfeiting conspiracy

6

could not introduce evidence of other "improbable and farfetched, if legal, money-making schemes engaged in previously by him"); *United States v. Grimm*, 568 F.2d 1136, 1138 (5th Cir. 1978) (defendant convicted of conspiracy to transport stolen cars that involved 72 fraudulent sight drafts could not introduce evidence of 75 other, non-fraudulent drafts, which was "simply cumulative of [the defendant's] undisputed testimony that he had paid other drafts"); *United States v. Winograd*, 656 F.2d 279, 284 (7th Cir. 1981) (defendant convicted of fraud conspiracy involving monetary futures could not introduce evidence that "he properly entered into many futures contracts . . . in commodities other than monetary futures"); *United States v. Mack*, 298 F.R.D. 349, 351-54 (N.D. Ohio 2014) (defendant convicted of conspiracy to sex-traffic four specific women through coercion could not introduce evidence of "other women who had allegedly prostituted themselves at defendant's request, but did so voluntarily and without force or coercion").  Moreover, none of the cases cited by the government contain companion charges, like those asserted in Counts Two and Three, which provide additional bases of admissibility.

It is well-established that "[w]here the element of willfulness is critical to the defense, the defendant is entitled to wide latitude in the introduction of evidence tending to show lack of intent." *Lankford*, 955 F.2d at 1550 (citation omitted); *see also Cheek*, 498 U.S. at 203 ("[F]orbidding the jury to consider evidence that might negate willfulness would raise a serious question under the Sixth Amendment's jury trial provision."); *Biaggi*, 909 F.2d at 692 ("Where evidence of a defendant's state of mind, critical to a fair adjudication of criminal charges, is excluded, we have not hesitated to order a new trial."); *Sternstein*, 596 F.2d at 530-31 ("[T]he accused as part of his defense is entitled to wide latitude in the introduction of evidence which tends to show lack of specific intent." (internal quotation marks and citation omitted).  This includes circumstantial evidence.  *See United States v. Rosen*, 520 F. Supp. 2d 802, 812 & n.22

(E.D. Va. 2007) (collecting cases explaining that "circumstantial evidence can be probative of the lack of criminal intent").

The evidence outlined above is plainly relevant and admissible to every count charged in the indictment.  It is exculpatory evidence in its purest form – negating particular allegations in the indictment and particular elements of the charged offenses.  There is no basis to exclude it.  Doing so would deny Mr. Blankenship his constitutional right to present a defense.

**B.   The Safety of UBB and Other Massey Mines**

The government next seeks to exclude witness testimony or unspecified statistics that "show that UBB or other Massey mines were 'safe.'"  ECF No. 320 at 9.  The government's position is unclear, as it is impossible to understand precisely what evidence the government hopes to keep from the jury.  Once again, this section of the government's motion should be denied as unduly vague or premature, or at least held in abeyance until trial.

Subject to the above, however, and without knowing what particular testimony or particular statistics the government seeks to exclude, the defense opposes the government's attempt to exclude evidence related safety on the following grounds:

First, evidence of Massey's safety efforts bears on whether the alleged conspiracy even existed and on Mr. Blankenship's state of mind as to any such conspiracy.  If there is evidence to show that Mr. Blankenship and Massey were pushing to improve safety, then that evidence is relevant to whether Mr. Blankenship knowingly joined a conspiracy to willfully violate safety standards.  Evidence that Massey invested resources in improving safety at its mines would also directly undermine the government's specific allegation that Mr. Blankenship schemed to save money – and thereby increase profit – by cutting back on safety expenditures.  *See* ECF No. 169 ¶¶ 1, 58, 79.

Second, if the government opens the door to other safety evidence at trial, the defense may of course introduce it.  The government has indicated at least twice its intention to do so.  It has suggested that it will argue to the jury that federal regulations are intended to keep mines safe and prevent explosions.  *See* ECF No. 290 at 2, 6-10.  It has also notified the defense of its intent to introduce evidence of statistics on non-fatal days lost.  *See* ECF No. 308.  If the government introduces such evidence, or any other evidence on safety at Massey and UBB, then the government obviously would be opening the door to defense evidence on the subject, providing yet an additional ground that makes such evidence relevant and admissible.

### C.  Correctness of Federal Mine Safety Standards

The government seeks to exclude evidence and argument that safety regulations were wrong, misguided or imprudent.  *See* ECF No. 320 at 10.  This issue cannot be addressed pre-trial.  The defense does not intend to argue that "disagreement with the law" is a defense, as the government suggests it may.  *Id.*  However, subject to what the government argues and puts on in its own case, the defense reserves the right to present evidence that certain safety standards were indeed wrong, misguided or imprudent.  Indeed, if the government were to go beyond the elements of the charged offenses and introduce evidence or argument related to the purpose of mine-safety standards or their role in making mines safer, and if the Court were to permit such evidence over defense objection, then the defense most certainly would be permitted to present counter evidence and argument – including, without limitation, to show that many mine safety standards do not correlate directly to safety.  The defense cannot be precluded from introducing such evidence if the government opens the door to it.  As the Fourth Circuit has noted, "[o]ur precedent is clear that otherwise inadmissible evidence may be permitted for the limited purpose

of removing any unfair prejudice injected by an opposing party's 'opening the door' on an issue." *United States v. Halteh*, 224 Fed.Appx. 210, at *4 (4th Cir. 2007).

### D.  The Cause of the UBB Explosion

The government seeks to exclude as irrelevant evidence regarding the cause of the April 5, 2010 explosion at UBB.  *See* ECF No. 320 at 10.  The defense has moved for the same relief. *See* ECF No. 287.  That the government now affirmatively seeks such relief itself makes it even more clear that the government must not be permitted to adduce *indirect* evidence of the cause of explosion or otherwise *insinuate* that Mr. Blankenship may be to blame.  *See* ECF Nos. 287 & 297 (incorporated herein).  The government may not, on the one hand, affirmatively seek the exclusion of evidence on relevance grounds, while, on the other hand, employ indirect means to insinuate such evidence back into the case.

To the extent the government is permitted to introduce indirect evidence of the cause of the explosion of the sort it has outlined previously, *see* ECF No. 290, then the Court must either grant severance of Count One from Counts Two and Three, *see* ECF No. 298, and/or the defense must be permitted to rebut such evidence with evidence on the true cause of the explosion.

### E.  Political Motivations for this Prosecution

The government seeks to exclude evidence or argument related to the political motivations for this prosecution.  *See* ECF No. 320 at 11.  Contrary to the government's suggestion, the defense does not intend to argue that Mr. Blankenship's "personal opposition to national policies" is a defense to any alleged legal violation.  *Id.*

The defense reserves the right, however, to introduce evidence or argument related to Mr. Blankenship's positions insofar as they are relevant on cross-examination to show the bias of government witnesses against him – including, for instance, current or former government

officials and/or union members.  "Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness's testimony."  *United States v. Abel*, 469 U.S. 45, 52 (1984).

### F.  Economic Issues

The government seeks to preclude the defense from presenting argument or evidence on Mr. Blankenship's record of job creation and employment, as well as on the economic conditions facing the coal industry.  *See* ECF No. 320 at 12.  These are broad subjects, and the defense does not know the full range of what the government seeks to preclude through such designations.  As best at it can, the defense responds as follows:

The indictment puts directly at issue the economics of Massey and the challenges it faced during the indictment period.  It specifically alleges that "Massey possessed, and BLANKENSHIP controlled, ample financial resources to provide UBB with the resources and reasonable production requirements it needed to comply with mandatory federal mine safety standards"; that Mr. Blankenship had "full authority" to provide "more miners" and "to reduce the mine's requirements for coal production"; that Mr. Blankenship refrained from doing so because "it was less expensive to routinely pay fines for violating such standards than to allocate the necessary funds to following them"; that Mr. Blankenship "consistently pressured UBB management to cut the number of coal miners"; that he "aggressively pressured UBB management to produce more coal and reduce costs"; and that he did so to "increase[e] Massey's profits" and to "enrich[]" himself.  ECF No. 169 ¶¶ 50, 51, 58, 69, 72, 88.

In light of these allegations, evidence on issues such as the financial challenges faced by Massey, the competing pulls on its resources, the legitimate business concerns motivating

11

various decisions, and the reasons why the company was managed in the fashion that it was is plainly admissible.  This evidence of the business rationale for the company's decisions and policies directly rebuts and contextualizes the indictment's allegations that cost-saving decisions were made simply to enrich Mr. Blankenship or as a result of corporate greed.  It rebuts the allegation that resources were withheld willfully to violate the law, instead demonstrating that they were motivated by appropriate considerations rather than some cost-benefit analysis that it was cheaper to pay fines for safety violations.  Given the indictment's allegations, which by their plain terms make these issues relevant, such evidence cannot possibly be excluded.

> ### G.  Vindictive and Selective Prosecution

The government seeks to exclude evidence and argument that Mr. Blankenship has been targeted for prosecution in retaliation for his political opinions and speech.  *See* ECF No. 320 at 12.  The defense can locate no Court of Appeals precedent in this circuit that precludes a criminal defendant from introducing at trial evidence or argument of vindictive or selective prosecution.  *But see United States v. Gilmore*, No. 1:00CR00104, 2004 WL 285941, at *3 (W.D. Va. Feb. 13, 2004).  Indeed, *United States v. Schmidt*, 935 F.2d 1440 (4th Cir. 1991), which the government claims bars such an argument, actually suggested that "a selective prosecution defense" may be viable and only affirmed the denial of a jury instruction on that defense because the defendants in that case had failed to raise the issue prior to trial and thus had "waive[d] . . . any claim that the prosecution was instituted for discriminatory reasons."  *Id.* at 1449-50.  Mr. Blankenship, by contrast, did raise this issue prior to trial, *see* ECF Nos. 81 & 82, and therefore he may present a vindictive and selective prosecution defense to the jury.  The defense reserves the right to do so.

The integrity of the investigation that leads to a defendant's prosecution is directly relevant to the validity of the charges ultimately filed.  As the Ninth Circuit explained: "To tell the jury that it may assess the product of an investigation, but that it may not analyze the quality of the investigation that produced the product, illogically removes from the jury potentially relevant information," since "[d]etails of the investigatory process potentially affect[] [the investigators'] credibility and, perhaps more importantly, the weight to be given to evidence produced by [the] investigation."  *United States v. Sager*, 227 F.3d 1138, 1145-46 (9th Cir. 2000); *see also Kyles v. Whitley*, 514 U.S. 419, 446 (1995) ("[T]he defense could have examined the police to good effect . . . and so have attacked the reliability of the investigation . . . in tolerating (if not countenancing) serious possibilities that incriminating evidence had been planted."); *United States v. Yagman*, CR 06-227, ECF No. 338 at 15 (C.D. Cal. May 16, 2007) ("Defendant is entitled to inquire about the quality of the investigation so far as it bears on the credibility, validity, or probative weight of specific evidence produced by the witness's investigation.").  Evidence of bias and retaliation in the investigation of Mr. Blankenship is similarly relevant and admissible here.

Separately, even if the Court rules that Mr. Blankenship may not raise a vindictive and selective prosecution defense, the defense has the right to use all relevant evidence to impeach the credibility, and show the bias, of any government witness – including evidence of vindictiveness and selectivity.  There is a well-recognized distinction between running a defense of selective or vindictive prosecution, on the one hand, and using the same evidence for cross-examination for bias, on the other hand.  In *United States v. Safavian*, for example, the district court prohibited the defense from arguing vindictive or selective prosecution, but noted that "some questions in this case that touch on th[o]se matters also may go to the bias, prejudice or

credibility of a particular witness," and therefore permitted the defense to ask such questions on cross-examination.  No. 05-0370, 2008 WL 5255534, at *1 (D.D.C. Dec. 12, 2008); *see also Yagman*, CR 06-227, ECF No. 338 at 3 ("[S]ome evidence that conceivably relates to vindictiveness might also support relevant arguments unrelated to vindictive prosecution.").

Indeed, "[p]roof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness's testimony."  *Abel*, 469 U.S. at 52; *see also United States v. Fieger*, No. 07-CR-20414, 2008 WL 996401, at *3 (E.D. Mich. Apr. 8, 2008) ("To the extent that Defendants wish to show that the government witnesses had a motive or bias which speaks to the 'reliability' of their testimony that questioning shall be allowed."); *Yagman*, CR 06-227, ECF No. 338 at 3 ("[S]ome evidence that conceivably relates to vindictiveness might also support relevant arguments unrelated to vindictive prosecution.").

Accordingly, even if the Court precludes a selective or vindictive prosecution defense, the defense reserves the right to introduce related evidence or argument in order to show bias, motive, or prejudice on the part of government witnesses.

**H.  Lawfulness of "Correcting" Violations on Receipt of Advance Notice**

The government seeks to exclude "evidence or argument that giving advance warning of inspectors for the purpose of 'correcting' violations before inspectors can arrive is not illegal or not encompassed by the charges against [Mr. Blankenship.]"  ECF No. 320 at 13.  The defense opposes the government's attempt to keep this evidence from the jury.

There is no basis to preclude the jury from considering whether, on the facts, a practice of merely correcting violations upon receiving word that an inspection has commenced makes out a fraud on the United States, as charged in Count One.  Federal law requires that "[a] hazardous

condition shall be corrected immediately" and that "[a]ny violation of a mandatory health or safety standard found during a preshift, supplemental, on-shift, or weekly examination shall be corrected."   30 C.F.R. § 75.363(a).   The government's chief witness – the "known UBB Executive" – testified that miners at UBB allegedly received notice of federal inspectors "so that everyone could check their work area and make sure there weren't any, I guess, easily correctible violations of the mine laws."  ECF No. 202, Ex. A (Christopher Blanchard Grand Jury Tr. 63, Nov. 12, 2014).  If miners, upon receiving notice that an inspection had commenced, checked their work areas to address any inadvertent "easily correctible violations," that is not fraud on the United States.  It is compliance with the law.  *See* 30 C.F.R. § 75.363(a).  Accordingly, there is clear basis in law to argue that correcting violations is not fraud on the United States, and the defense is entitled to present evidence and argument on this subject.

Nor is this position remotely inconsistent with the Court's prior ruling rejecting such an argument as grounds to dismiss the indictment as a matter of law.  *See* ECF No. 267.  The Court's previous analysis concerned the sufficiency of the indictment, not the admissibility of any evidence or argument.   Indeed, faced with a charge of fraud, the defense is of course permitted to argue at trial that the facts do not amount to fraud and to present evidence thereon.

Moreover, the Court's prior ruling, even if applicable to evidentiary determinations, was quite limited.  It held only that the correction of "willful" violations may constitute fraud on the government.  ECF No. 267 at 5 (emphasis added).  The defense may still argue at trial that it would not be fraud to correct non-willful violations.  There is no basis in law to preclude such evidence and argument.

## I.  **Reliance on MSHA Officials**

The government seeks to preclude evidence and argument related to assurances from federal mine safety officials that Massey and Mr. Blankenship were in compliance with the law. *See* ECF No. 320 at 14-16.   The government asserts that such evidence constitutes an "entrapment by estoppel" defense, which it claims is unavailable here.  *Id.*   That argument is wrong on two counts.

First, such evidence is relevant and admissible, not merely to show "entrapment by estoppel," but also simply as relevant evidence that tends to undermine the allegations in the indictment.  In *United States v. Dixon*, 173 F.3d 856, at *3-4 (6th Cir. 1999), for example, the Sixth Circuit held that the defendant's reliance on the advice of state officials was admissible to show his good faith and lack of specific intent to violate the law, even though such evidence did not create an entrapment by estoppel defense, since the officials did not work for the federal government.

Here, evidence of what MSHA said to Massey about violation-reduction programs, its praise for the safety efforts at UBB, its attribution of alleged violations to mere negligence, and its knowledge, tolerance, and participation in the provision of advance notice of mine inspections is similarly relevant to show the company's good faith, lack of willfulness, and absence of intent to defraud.  Furthermore, possible testimony from or about MSHA inspectors and officials who were present at – and thus eyewitnesses to – the mine is relevant to show that safety regulators themselves did not observe any willful regulatory violations at UBB.  This evidence tends to show that no conspiracy of the sort alleged in Count One ever existed, and that even if it did exist, that Mr. Blankenship lacked knowledge of or intent to join it.  *See Dozie*, 27 F.3d at 97. Similarly, such evidence shows that the statements charged in Counts Two and Three were not

actually false, and that Mr. Blankenship did not have knowledge of their supposed falsity.  *See David*, 83 F.3d at 640; *Jones*, 2014 WL 1384485, at *3.  This evidence, in short, is relevant and admissible to rebut the allegations in the indictment, entirely aside from any "entrapment by estoppel" defense.

Second, the government's request to preclude the defense from making an "entrapment by estoppel" argument is, at best, premature.  "The defense of entrapment by estoppel is available when a government official tells the defendant that certain activity is legal, the defendant commits the activity in reasonable reliance on that advice, and prosecution for the conduct would be unfair."  *United States v. Clark*, 986 F.2d 65, 69 (4th Cir. 1993).  To assert the defense, the defendant "must demonstrate that there was 'active misleading' in the sense that the government actually told him that the proscribed conduct was permissible."  *United States v. Aquino-Chacon*, 109 F.3d 936, 939 (4th Cir. 1997) (citations omitted).  The evidence in question does precisely that.  MSHA's approval of violation-reduction programs, its praise for safety efforts during the indictment period, its attribution of violations to negligence, and its involvement in the provision of advance notice of mine inspections all actively communicated to Massey that its management of the UBB mine was lawful and not criminal.

Furthermore, the government's comparison of this case to one involving an immigrant charged with illegal reentry is unfounded.  *See* ECF No. 320 at 15-16.  In the context of regulatory offenses such as those at issue here, the Supreme Court has made clear that "the rulings, interpretations, and opinions of the (responsible agency) . . ., while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which . . . litigants may property resort for guidance."  *United States v. Pennsylvania Indus. Chem. Corp.*, 411 U.S. 655, 674 (1973).  In *Pennsylvania Industrial,* the Court held that the

defendant was entitled to present evidence in support of entrapment of estoppel defense based on a longstanding agency construction of the relevant statute implying that defendant's conduct was lawful. *See id.* Here, then, where MSHA's communications and conduct with Massey implied that its administration of UBB neither violated 30 U.S.C. § 820(d) nor amounted to fraud, an entrapment by estoppel defense is equally viable. The Court should deny the government's attempt to preclude this argument, or, alternatively, hold this part of the government's motion in abeyance until it can evaluate what evidence is actually introduced at trial.

### J.  Recorded Telephone Conversations

The government's argument as to recorded telephone conversations is premature and too vague to be evaluated, much less decided. *See* ECF No. 320 at 16-19. As the government notes, there are approximately 1,600 recordings at issue. Yet the government discusses not a single one of them. The admissibility of these recordings – and the application of the Federal Rules of Evidence to them – cannot be decided without resort to the particular statements at issue in each. Accordingly, the government's request must be denied without prejudice or held in abeyance until particular recordings are identified and the issue becomes ripe.

As to Rule of Evidence 106, which partially codifies the rule of completeness, *see United States v. Wilkerson*, 84 F.3d 692, 696 (4th Cir. 1996), the government concedes that the Court must admit the omitted portions of a recorded statement that "clarify or explain the part already received," *see* ECF No. 320 at 18 (quoting *Wilkerson*, 84 F.3d at 696). That analysis cannot be considered without reference to the particular recordings at issue and their content. Yet the government has not identified for the defense the particular recordings it seeks to use. Determining which portions of the recordings must be admitted under Rule 106, therefore, is impossible at this time.

To the extent that the government suggests that Rule 106 does not apply to these telephone recordings, and that it can therefore pick and choose segments of particular recordings to play for the jury while leaving out other parts necessary for clarity or explanation, it is obviously wrong.  First, the exclusion of "conversations" from the Rule's coverage is a reference only to unrecorded "oral statement[s]."  *United States v. Smith*, 43 Fed. Appx. 529, 531 (4th Cir. 2002); *see also* 21A Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice & Procedure § 5074.1 (2d ed. 2005).  Rule 106 <u>does</u> apply to recorded conversations, such as the telephone calls at issue here.  *United States v. Webber*, 255 F.3d 523, 526 (8th Cir. 2001) ("Rule 106 may in some cases require that all or portions of a series of recorded conversations be played to avoid misleading the jury."); *see also United States v. Phillips*, 596 F.3d 414, 417 (7th Cir. 2010); *United States v. Roy*, 375 F.3d 21, 25 (1st Cir. 2004); *United States v. Sutton*, 801 F.2d 1346, 1366-70 (D.C. Cir. 1986).

Second, even if Rule 106 did not apply to the telephone recordings, the defense could still introduce omitted sections of the recordings under "[t]he common-law 'rule of completeness,'" since "when one party has made use of a portion of a document, such that misunderstanding or distortion can be averted only through presentation of another portion, the material required for completeness is *ipso facto* relevant and therefore admissible under Rules 401 and 402."  *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 171-72 (1988).

Finally, the government seeks to preclude the defense from independently admitting <u>any</u> of the recordings itself, arguing that they are inadmissible hearsay if introduced on Mr. Blankenship's behalf.  Yet it identifies none that it seeks to exclude in particular, even though it has possessed every one of the recordings for years.  There is no basis to preclude introduction of these recordings *en masse*.  Depending on the particular recording and the trial evidence, there

may be bases to admit one recording or another.  For example, the recordings contain not only statements *by* Mr. Blankenship, but also statements *to* him.  A statement made by Mr. Blankenship that reflects his state of mind or intention is clearly admissible, *see Mutual Life Ins. Co. of New York v. Hillmon*, 145 U.S. 285, 295-96 (1892), and statements by third parties to Mr. Blankenship are similarly admissible to show his knowledge and state of mind, *see United States v. Rivers*, 468 F.2d 1355, 1356-57 (4th Cir. 1972).

If the government seeks to preclude particular recordings for particular reasons, it should identify them so that the defense may respond.  But any request to exclude these 1,600 recordings *en masse* – without consideration of the content and possible bases for admissibility of each – must be denied.

### K.  Expert Testimony from Professor Douglas M. Branson

Finally, the government seeks to exclude the testimony of Professor Douglas Branson, a recognized expert on corporate governance.  *See* ECF No. 320 at 19-25.  The government does not challenge Professor Branson's qualifications.  Rather, it argues that his testimony would not be helpful to the jury.  The defense addresses each of the government's arguments in turn.

1.  Duty to Maintain or Increase Profits and Protect Shareholder Investment

The government first argues that it is "generally" understood that the CEO of a publicly held corporation has a duty to maintain or increase the company's profitability and to protect shareholder investments.  *Id.* at 22.  The government claims that such opinions are therefore not a proper subject for expert testimony.  Yet the government offers zero authority to support such a claim.  There simply is no basis to just assume that laypersons understand that CEOs answer – and have legal duties – to shareholders, including to protect their investments and not to waste company resources.

20

Indeed, there is significant authority holding that such testimony is both necessary and helpful to juries. *See, e.g., Stradtman v. Republic Servs., Inc.*, No. 1:14CV1289, 2015 WL 1930498, at *3 (E.D. Va. Apr. 28, 2015) (permitting corporate-governance expert to provide testimony on "Plaintiff's role as CEO . . . and any associated fiduciary duties that arise from that position"); *In re Homestore.com, Inc.*, No. CV 01-11115, 2011 WL 291176, at *10 (C.D. Cal. Jan. 25, 2011) (permitting corporate-governance expert to provide "helpful testimony to the jury on the appropriate standard of behavior a CEO owes its company and shareholders"); *United States v. Brooks*, No. 06-CR-550, 2010 WL 291769, at *4 (E.D. N.Y. Jan. 11, 2010) (explaining that "[c]ourts generally permit expert corporate governance testimony . . . such as setting forth . . . the nature of an officer's fiduciary duties to the corporation").

Moreover, even if this knowledge were within the ken of laypersons (which it is not), the government itself has put it at issue in a way that makes Professor Branson's testimony necessary. The indictment specifically charges Mr. Blankenship with imposing undue "pressure [on] UBB management to increase coal production and cut costs." ECF No. 169 ¶ 93. This is a central part of the government's theory of guilt. Thus, Professor Branson's testimony is necessary to explain to the jury that pushing production corresponds to the duty of a CEO and that there is an explanation for the imposition of supposed production quotas, short of conspiracy.

The government also argues that Professor Branson will testify to the legal conclusion that Mr. Blankenship is not guilty, or that an element of the offenses charged has not been met. *See* ECF 320 at 22-23. But Professor Branson's disclosure proffers no such testimony, and the defense has no intention of adducing such testimony at trial.

2.   Delegation to Subordinates

The government also argues that it is "common knowledge" that CEOs delegate duties to their subordinates and that such testimony would therefore not be helpful to the jury.  ECF No. 320 at 23.  But again, the government provides absolutely no authority for the proposition that the inner-workings of enormous, publicly-traded corporations are within the "common knowledge" of an everyday person.  To the contrary, courts have found that expert testimony on this subject is useful to jurors.  *See, e.g., Brooks*, 2010 WL 291769, at *4 (explaining that "[c]ourts generally permit expert corporate governance testimony . . . such as . . . what a CEO does"); *Pereira v. Cogan*, 281 B.R. 194, 200 (S.D. N.Y. 2002) (permitting corporate-governance expert to testify about "what he believes good corporate practices require according to industry and custom").  The suggestion that a layperson understands the full scope of the responsibilities to which the CEO must tend – from investors, to customers, to sales, to production, to compliance, to the Board – and the sheer necessity of delegating responsibilities to subordinates, is baseless.

Furthermore, the government once again ignores the allegations of the indictment, which make this testimony particularly necessary.  The indictment specifically alleges that Mr. Blankenship's "near silence" on safety compliance furthered the conspiracy.  *See* ECF No. 169 ¶ 72; *see also id.* ¶¶ 78, 94.  Mr. Blankenship's delegates, however, certainly were not silent on safety.  At Mr. Blankenship's urging, they quite loudly demanded greater safety compliance and aggressive violation reduction.  Given the indictment's clear suggestion that the violation-reduction mandate should have come from Mr. Blankenship personally and its direct accusation that his "near silence" furthered the conspiracy, the defense must present testimony that it was appropriate for a CEO to delegate.

The government also claims that Professor Branson's testimony on this point would risk leading the jury to believe that an executive can insulate himself from liability through delegation. *See* ECF No. 320 at 23. The defense, however, is not presenting any such testimony from Professor Branson.

### 3. Board of Directors' Oversight

The government makes the same kind of argument as to Professor Branson's testimony on the Board of Directors. *See id.* at 24. This subject, however, is plainly appropriate for expert testimony.

First, Professor Branson will testify on the role of a board of directors in overseeing a company and its chief executive. The duties of the directors of a publicly traded company are not within the ken of a layperson, and courts therefore commonly permit experts to offer testimony on the subject. *See, e.g., Brooks*, 2010 WL 291769, at *4 (explaining that "[c]ourts generally permit expert corporate governance testimony . . . such as setting forth the respective roles of a corporation's directors and officers"); *CDX Liquidating Tr. v. Venrock Assocs.*, 411 B.R. 571, 586-87 (N.D. Ill. 2009) (permitting corporate-governance expert to provide "testimony regarding general standards governing boards of directors . . . how boards operate; the types of alternatives available to the . . . Board at all relevant times; and the factors a board can and should consider when making decisions").

Such testimony is clearly relevant here, as the indictment alleges that Mr. Blankenship, "as CEO of Massey and Chairman of Massey's Board of Directors, was principally and ultimately responsible for the management of Massey's business." ECF No. 169 ¶ 7. It further charges, incorrectly, that Mr. Blankenship possessed "full authority" at Massey and that he "controlled" its resources. *Id.* ¶¶ 50-51. If the government is going to suggest that Mr.

Blankenship was "principally and ultimately responsible" for the company and had "full authority" over its resources, irrespective of the Board of Directors, then the defense is entitled to present to the jury the specialized information necessary to evaluate that claim.

Second, Professor Branson will opine on the structure of the Board and its subcommittees, the frequency with which it met, and whether it was organized appropriately to oversee safety issues. Again, this testimony is directly relevant to the allegations set forth in the indictment. The indictment alleges in Counts Two and Three that it was false for Massey to state that "[w]e do not condone" safety violations and that "we strive to be in compliance" with regulations. *Id.* ¶¶ 101-104. Notably, these statements referred to "we" – a reference to Massey as a whole, not to Mr. Blankenship individually. Thus, whether the board was structured in a manner to appropriately address safety compliance is relevant to the truth or falsity of those statements. Likewise, it is relevant to whether the conspiracy charged in Count One – which the indictment claims included "Massey" as an entity, *see id.* ¶ 87(a) – even existed. This is especially so given that the indictment insinuates that the Board was involved in the conspiracy. *See, e.g., id.* ¶ 79 (alleging that "persons known and unknown to the grand jury" improperly "voted to award BLANKENSHIP bonuses and other compensation").

### 4. Massey's Corporate Structure

Professor Branson's disclosure states that he may offer background testimony regarding Massey's corporate structure "[t]o the extent necessary for the Court and the jury to understand his opinions." Such background testimony, of course, is appropriate for an expert in a specialized field, and the Court will be in a position at trial to determine on whether such background information may or may not be helpful to the jury's understanding. *See* Fed. R. Evid. 703 (expert may testify as to "facts or data" that helped form his opinion to "help[] the jury

evaluate the opinion"); *Cary Oil Co. v. MG Refining & Mktg., Inc.*, No. 99 Civ. 1725, 2003 WL 1878246, at *5 (S.D.N.Y. Apr. 11, 2003) (permitting corporate-governance expert "to explain general corporate governance principles" since "the Court considers such background information crucial if the laymen jury is to understand fully the complex issues in this matter").

Accordingly, there is no basis to exclude any testimony from Professor Branson.

## **CONCLUSION**

For the reasons set forth above, the defense respectfully requests that the government's motion in limine be denied.

Dated: August 25, 2015                    Respectfully submitted,

  /s/ William W. Taylor, III
William W. Taylor, III
Blair G. Brown
Eric R. Delinsky
R. Miles Clark
Steven N. Herman
ZUCKERMAN SPAEDER LLP
1800 M Street, NW, Suite 1000
Washington, DC 20036
202-778-1800 (phone) / 202-822-8106 (fax)
wtaylor@zuckerman.com
bbrown@zuckerman.com
edelinsky@zuckerman.com
mclark@zuckerman.com
sherman@zuckerman.com

  /s/ James A. Walls
James A. Walls (WVSB #5175)
SPILMAN THOMAS & BATTLE, PLLC
48 Donley Street, Suite 800
Morgantown, WV 26501
304-291-7947 (phone) / 304-291-7979 (fax)
jwalls@spilmanlaw.com

*Counsel for Donald L. Blankenship*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that the foregoing has been electronically filed and service has been made

by virtue of such electronic filing this 25th day of August, 2015 on:

    R. Booth Goodwin, II
    Steven R. Ruby
    Gabriele Wohl
    U.S. Attorney's Office
    P.O. Box 1713
    Charleston, WV 25326-1713

    R. Gregory McVey
    U.S. Attorney's Office
    P.O. Box 1239
    Huntington, WV 25714-1239

                          */s/ Eric R. Delinsky*
                          Eric R. Delinsky