IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
BECKLEY DIVISION

_____

UNITED STATES OF AMERICA      )
                              )
       v.                     )      Criminal No. 5:14-cr-00244
                              )
DONALD L. BLANKENSHIP         )
_____ )

## RENEWED MOTION TO TRANSFER TO ANOTHER DISTRICT FOR TRIAL

Defendant Donald L. Blankenship hereby renews his motion for an order transferring this case for trial to the District of Maryland, Northern Division, or, alternatively, to the Northern District of West Virginia, Martinsburg Division.  This renewed motion for transfer is made pursuant to the Due Process Clause of the Fifth Amendment to the United States Constitution and pursuant to Federal Rule of Criminal Procedure 21.  It incorporates by reference all the arguments and exhibits contained in the initial motion for transfer, supporting memorandum, and the reply.  *See* ECF Nos. 121, 122 & Exs. A-M and ECF Nos. 166-2, 166-3, 166-4, & 166-5.  That initial motion argued that transfer was necessary because, among other things, saturation-level prejudicial publicity in this district has created a high degree of prejudgment about Mr. Blankenship's culpability, an erroneous impression that he is on trial for causing the UBB explosion, and a powerful sense of community pressure for a guilty verdict.

The environment has not changed since the filing of the motion to transfer on February 20, 2015.  As demonstrated in this renewed motion and supporting exhibits, the same media sources that saturated the Beckley Division with extensive and prejudicial news coverage have similarly saturated the Charleston and Huntington Divisions.  The venue surveys of the Beckley and Charleston Divisions submitted with the motion to transfer and reply showed nearly identical

levels of knowledge, prejudgment, and bias; there is no reason to believe that prospective jurors from the Huntington Division will be any different.

The defense submits with this motion television and newspaper coverage relevant to this case, starting with the date when exhibits in the motion to transfer stopped through August 31, 2015. We also submit with this motion examples of highly prejudicial social media. Finally, we submit the expert declaration of Scott Armstrong, a journalist who has provided expert opinions about the extent and impact of news coverage in other high-publicity criminal cases, including *United States v. Skilling*. Mr. Armstrong has reviewed the relevant media, including recent news coverage since the filing of the original transfer motion, in this district and in the two alternative districts proposed by the defense. He observes that news coverage in this district is magnitudes more pervasive and hostile toward Mr. Blankenship than in the other two districts, and that local coverage routinely links the charges against Mr. Blankenship to his alleged responsibility for the UBB disaster and the deaths of the 29 despite the fact that he is not charged with causing the explosion. He notes a united community sentiment that those allegedly responsible for the UBB disaster must be punished, including Mr. Blankenship. He also compares the media in this case to that in *United States v. Skilling*, in which he served as a media expert and finds that the coverage in this case is far more pervasive, more negative, and more personal. Mr. Armstrong also concludes:[1]

---

[1] A list of the exhibits submitted with this motion are as follows:
        Exhibit A: Print Media Coverage in the Southern District of West Virginia
        Exhibit B: Print Media Coverage in the Northern District of West Virginia, Martinsburg Division
        Exhibit C: Print Media Coverage in the District of Maryland, Northern Division
        Exhibit D: Television Coverage in the Southern District of West Virginia
        Exhibit E: Television Coverage in the Northern District of West Virginia, Martinsburg Division
        Exhibit F: Television Coverage in the District of Maryland, Northern Division
        Exhibit G: Social Media Coverage in the Southern District of West Virginia
        Exhibit H: UMW Journal Coverage
        Exhibit I: CEDAR Coal Fair Presentation
        Exhibit J: Declaration of Scott Armstrong

> [T]he patterns of pervasive news media coverage about Blankenship and the charges against him in the Southern District of West Virginia viewed collectively, are likely to impair a jury's ability to focus its deliberative process solely on the evidence presented in the courtroom. News coverage taken cumulatively has reported that Blankenship has been indicted for the very actions and failures to act that four investigations found responsible for the UBB mine disaster and for the deaths of 29 men. The news media in the Southern District of West Virginia have documented a united community sentiment that those responsible for the UBB mine disaster must be indicted, prosecuted and convicted, and that Blankenship was responsible.

Community bias against Mr. Blankenship in this district is so extreme that the Court must *presume* juror prejudice. This motion, like the initial motion, therefore respectfully requests that the Court make a finding that the district has been so saturated by prejudicial publicity, prejudgment, and bias that it must "grant a change of venue *prior* to jury selection." *United States v. Higgs*, 353 F.3d 281, 307 (4th Cir. 2003) (emphasis added). As a matter of law, voir dire will not assure Mr. Blankenship a fair trial. The only way to protect his Fifth Amendment right to due process is to transfer the case to another district. In other words, this is an extreme case where there is "such a presumption of prejudice in [the] community that the jurors' claims that they can be impartial should not be believed." *Patton v. Yount*, 467 U.S. 1025, 1031 (1984); *see also Skilling v. United States*, 561 U.S. 358, 377-381 (2010) (describing presumption of prejudice that precludes use of voir dire); *id.* at 438-440 (Sotomayor, J., concurring in part and dissenting in part) (same).

This Court's prior orders (ECF Nos. 232 & 280), which "held in abeyance" the initial transfer motion "pending completion of the voir dire process," were, in effect, summary denials of that motion, because the motion requested a finding that pretrial publicity, prejudgment, and bias in this district had rendered voir dire unreliable as a matter of law. In this renewed motion, which includes additional prejudiced publicity after the Court's prior ruling, we again ask the

Court to adopt a presumption of juror prejudice, and find that voir dire will not guarantee Mr.

Blankenship a fair trial, and ask that this case be transferred to another district prior to voir dire.

## ARGUMENT

**MR. BLANKENSHIP CANNOT RECEIVE A FAIR TRIAL IN ANY DIVISION OF THE SOUTHERN DISTRICT OF WEST VIRGINIA.**

### A.    The Initial Transfer Motion and Reply

The defense demonstrated in its initial transfer motion and reply that Mr. Blankenship

cannot receive a fair trial *anywhere* in the Southern District of West Virginia.  First, the defense

established that at the time of the filing of the motion to transfer and reply that there had been

saturation-level, prejudicial press coverage of this case in the Southern District of West Virginia.

The defense produced as exhibits extensive news coverage by, among other sources, the

dominant newspapers in the Southern District of West Virginia -- the Charleston Gazette-Mail

and the Register-Herald, *see* ECF No. 121, Ex. A, and the dominant television stations in the

Southern District of West Virginia − WCHS, WOWK, WSAZ, and WVVA, *see* ECF No. 121

Ex. D.   At the time the motion to transfer and reply were filed, media coverage of Mr.

Blankenship had been unceasingly and extraordinarily hostile across the Southern District of

West Virginia.  Slightly expanding the jury pool from the 500,000 residents of the Charleston

Division to include the 200,000 residents of the Huntington Division does not change this.  All

the residents of the Southern District of West Virginia have been exposed to the same torrent of

hostile press coverage.  All must be presumed prejudiced.

Second, the defense demonstrated that the size and composition of the Southern District

of West Virginia – what the court acknowledged was "coal country" – would make it especially

difficult to select an unbiased jury.  In *Skilling*, the Supreme Court observed that "[i]n *Rideau* . . .

the murder was committed in a parish of only 150,000 residents.  Houston, in contrast, is the

fourth most populous city in the Nation . . . [with] more than 4.5 million individuals eligible for jury duty"  561 U.S. at 382.  The Court therefore concluded that Houston's large size – the counties within the Houston Division of the Southern District of Texas have a population of over six million residents - made it possible to seat an impartial jury, unlike the small town in *Rideau*. The Charleston and Huntington Divisions, together numbering approximately 700,000 residents, are far closer in size to the parish in *Rideau*, where a fair trial could not be held, than they are to the population of Houston.  Furthermore, as the defense noted in its reply in support of the initial transfer motion, the Charleston and Huntington Divisions sit in the heart of "coal country," with nine of their sixteen counties producing 46% of the coal in West Virginia and employing 48% of the coal employees.  Three of the five largest coal producing counties in West Virginia are in the Charleston Division.  *See* 2012 Coal Production and Employment by County, Office of MHS&T, *available at* http://www.wvminesafety.org/2012%20Annual/2012prodempl.pdf (last visited Sept. 19, 2015); *see also* West Virginia Mining Statistics 1996-2012, Office of MHS&T, *available at* http://www.wvminesafety.org/STATS.HTM (last visited Sept. 19, 2015).  Just like Beckley, then, the size and character of the Charleston and Huntington Divisions makes it impossible to seat an impartial jury in this case.

Finally, surveys demonstrated the high rates of prejudgment and prejudice against Mr. Blankenship.  A survey of Beckley Division residents found that 95% of respondents had knowledge of the UBB explosion and that 57% of those who had such knowledge already believed Mr. Blankenship was guilty of at least one of the charges against him.  *See* ECF No. 122, Exs. L & M.  Similarly, a survey of Charleston Division residents found that 93% of respondents had knowledge of the UBB explosion and that 51% of those with such knowledge already believed Mr. Blankenship was guilty.  *See* ECF Nos. 166-3 and 166-4.  Fifty-one percent

5

of respondents admitting prejudgment is "not just exceptionally high," it is "extraordinarily high."  ECF No. 166-3, at ¶ 11 (Jepsen Aff.).  There is no reason to believe that these levels of prejudice will be significantly affected by adding some of prospective jurors from the Huntington Division.

In sum, we demonstrated that the Southern District of West Virginia − "coal country" − was saturated by negative publicity regarding Mr. Blankenship, with high rates of prejudice and prejudgment concerning him.  The negative publicity was both inflammatory and misleading, describing this case as a prosecution of Mr. Blankenship for causing the UBB explosion and reflecting the hostility of prominent community members against him, including family members of miners killed at UBB, leaders of the United Mine Workers of America, and the state's U.S. Senators.  The surveys exposed extraordinary levels of prejudgment, with practically every resident of the Southern District of West Virginia acknowledging familiarity with the case and more than half admitting a presumptive belief in Mr. Blankenship's guilt.  The surveys also raised serious concerns about community pressure on jurors to convict.  To ensure Mr. Blankenship's right to a fair trial before an impartial jury, then, this case must be transferred out of the Southern District of West Virginia.

> **B.** **Since the First Transfer Motion was Filed, Pretrial Publicity in this District Has Been Brutally Prejudicial, Especially After the Court's Gag Order was Lifted.**

Since Mr. Blankenship filed his initial motion to transfer in February 2015, media coverage of the case in this district has been relentless, omnipresent, and vicious.  *See* Exs. A, D, & G.  By contrast, there has been practically no coverage in the District of Maryland, Northern Division or the Northern District of West Virginia, Martinsburg Division.  *See* Exs. B, C, E, & F.  The prejudicial nature of the local press coverage intensified even further in early March 2015, when the Court lifted its January 7, 2015 gag order, which had restricted the parties and potential

trial participants from speaking to the press and the public from accessing the docket. *See* ECF No. 164. The unceasing and blatantly prejudicial press coverage of this prosecution has saturated the entire Southern District of West Virginia, making this an "extreme case" that requires a presumption of juror prejudice and transfer to another district for trial. *Skilling*, 561 U.S. at 382.

As this Court previously noted, the gag order was necessary to keep these proceedings in the Southern District because, without it, adverse pretrial publicity "would inevitably lead to prejudice in this case." ECF No. 63 at 6. In particular, this Court explained, the gag order "prevent[ed] the press from filling publications with quotes and accounts springing from the parties or potential trial participants that would likely influence or taint potential jurors and impede the Court's ability to seat a jury within the district." *Id.* at 8. This Court observed that "[s]ince the indictment was returned, many news articles have featured the Defendant, the victims and their families, and/or the underlying investigation," and that "given the environment and the nature of the allegations, that there is a reasonable likelihood that these publications could prejudice the jury selection process and/or influence the outcome of a trial, absent the Court's restrictions on access to certain sources of information." *Id.* at 9. This Court also noted that "there is a substantial probability that irreparable damage would attach to the Defendant's right to a fair trial if it did not limit the docket, due to prior and ongoing publicity, and the nature of said publicity." *Id.* at 14-15.

As demonstrated below, the Court's prediction was exactly right. Since the gag order was lifted, television, print, and social media have continuously broadcast vivid, emotional accounts from the family members of those who died in the UBB explosion as well as others who worked in the mine. Commenters on social media have posted malicious, threatening, and

even violent comments to each published article and TV segment, which remain linked together for the entire community to see.  On the fifth anniversary of the UBB disaster, media coverage linked that somber, sensitive occasion to the prosecution of Mr. Blankenship.  The prejudice has become so bad in this district that a local TV station even aired a half-hour special report entitled "Can West Virginia Give Don Blankenship a Fair Trial?"  As the Court will observe, moreover, practically all of this media presumes – incorrectly – that Mr. Blankenship is on trial for causing the UBB explosion and the resulting deaths.  In light of all this, and for the reasons set forth in the initial transfer motion, the Court must presume that inherent jury prejudice in this district will render voir dire ineffective and transfer this case for trial in another district.

    A.   <u>Media Coverage Consistently Links the Charges in this Case to Responsibility for the UBB Explosion.</u>

Across every media source, press coverage of this case has consistently – and inaccurately – linked the charges against Mr. Blankenship with his alleged responsibility for the UBB explosion.  That is not the case, as the government itself has affirmed.  *See* ECF No. 160 at 13-14.  Not only is this impression factually false and likely to mislead jurors, it is so inflammatory and prejudicial that it cannot feasibly be kept from influencing their deliberations.[2]

The press's misrepresentation of the charges faced by Mr. Blankenship ranges from the mundane to the egregious.  As demonstrated in Exhibit J3, newspaper articles routinely describe the charges as directly related to the UBB explosion and the 29 deaths that resulted from the disaster.  Television stations do the same.  *See, e.g.,* Exhibit D, WOWK, Mar. 24, 2015, 5:00 PM; Exhibit D, WOWK, Mar. 24, 2015, 6:00 PM; Exhibit D, WOWK, Mar. 24, 2015, 11:00 PM; Exhibit D, WOWK, Mar. 24, 2015, 11:00 PM; Exhibit D, WOWK, Mar. 25, 2015, 5:00 AM; Exhibit D, WOWK, Mar. 25, 2015, 12:00 PM; Exhibit D, WVNS, Mar. 24, 2015, 6:00 PM;

---

[2] As the defense has already shown, this misimpression pervades the Southern District of West Virginia.  *See* ECF No. 287 at 6-7.

Exhibit D, WVNS, Mar. 24, 2015, 11:00 PM; Exhibit D, WOAY, June 13, 2015, 6:00 PM (stating that Mr. Blankenship was "charged with the deaths of 29 miners"); Exhibit D, WOAY, June 13, 2015, 11:00 PM (same); Exhibit D, WOAY, June 17, 2015, 6:00 PM (same); Exhibit D, WOAY, June 17, 2015, 11:00 PM (same); Exhibit D, WOAY, June 18, 2015, 6:00 AM (same) Given that mention of the explosion and the deaths unfailingly follow nearly every description of the charges, it will be practically impossible for jurors in this district to dissociate the two concepts in their minds when they consider the evidence in this case, even though they have nothing to do with one another.

More extreme examples abound in the material submitted to the Court and highlighted below, including interviews with families of the miners killed at UBB, who routinely condemn Mr. Blankenship and call for his conviction, and commemorations of the anniversary of the explosion that describe this trial as a way to heal the pain caused by the disaster.  To pick just two examples, the Charleston Gazette asked a family member of a UBB miner for his perspective on these proceedings: "I'm anxious to get it going . . . I hope he gets what he deserves. . . . I'm just wanting for it to get to trial . . . and, hopefully, we can get a guilty verdict and he can spend his time in jail, which is a lot better than 29 men who get to spend their time in the ground."  Ken Ward, *Upper Big Branch 5-Year Anniversary: Blankenship's trial is focus of families*, Charleston Gazette (Apr. 5, 2015) (Exhibit A at 138-41).   On the fifth anniversary of the UBB explosion last April, a local television marked the occasion with the following broadcast:

> Blankenship is charged with conspiring to violate safety standards related to the Upper Big Branch mine disaster that killed 29 miners in 2010.  And Sunday does mark the fifth anniversary of that disaster at Massey Energy's Upper Big Branch coal mine that killed 29 miners.  This explosion is known to be the worst coal-mining disaster in 40 years.  Investigators following the accident

> showed a blatant disregard for safety rules and a failure to recognize the condition of the mine that resulted in the explosion. Massey CEO Don Blankenship has been under a microscope for his role in that incident. The Upper Big Branch Mining Memorial Group will be placing wreathes in honor of those lives lost at the Upper Big Branch Miners' Memorial on Saturday April 4th.

Exhibit D, WOAY, Apr. 3, 2015, 5:00 PM; *see also* Exhibit D, WOAY, Apr. 3, 2015, 6:00 PM; Exhibit D, WOAY, Apr. 3, 2015, 11:00 PM. Given the near-constant linkage between this prosecution and Mr. Blankenship's alleged responsibility for the UBB disaster, it is no surprise that some commenters on social media have come to believe that the explosion is "exactly what [Mr. Blankenship] is being tried for." Exhibit G at 58.

As noted below, Mr. Armstrong similarly finds significant the frequent, and inaccurate, linkage of the charges in this case with Mr. Blankenship's alleged responsibility for the UBB explosion. He observes that the media serving the Charleston and Huntington Divisions contains "regular references directly associating the charges against Mr. Blankenship with the deaths of the 29 miners. The formulations suggest to readers that Mr. Blankenship is being tried for his responsibility for the 29 deaths." *See* Exhibit J, ¶ 56; *see also id.*, ¶ 58, 60-65 and Exhibit J3. The linkage of the charges and the UBB disaster is not only linguistic, *see id.*, ¶¶ 60-63, but also visual, as Mr. Armstrong notes that television stories on this case frequently "contain stock footage of one of the memorials to the 29 miners or of first responders at the scene of the explosion . . . The collective effect of such televised news coverage is the regular reminder to television news viewers that Mr. Blankenship is being tried for his role in the death of the 29 miners and that anything other than a conviction would be a miscarriage of justice." *Id.*, ¶ 64. "As a result," Mr. Armstrong explains, "readers of any of the three main newspapers serving the Charleston and Huntington Divisions would come away with the inevitable conclusion that Mr. Blankenship is to be tried for his responsibility for the deaths of 29 members of the tightly knit

mining community." *Id.*, ¶ 58.  By comparison, Mr. Armstrong found almost no such linkages in the press coverage in the District of Maryland or the Northern District of West Virginia.  *See id.*, ¶¶ 59 & 66.

The pervasive association between the charges in this case and Mr. Blankenship's alleged responsibility for the UBB disaster exacerbates the already extreme levels of prejudgment and adds to the powerful sense of community pressure on the jury to return a conviction.  Transfer out of this district is the only way to ensure that Mr. Blankenship receives a fair trial on the charges and evidence that are actually presented against him.

### B.  Personal Testimonies of Family Members and UBB Miners

As demonstrated in the defense's initial transfer motion, even before this Court's gag order was lifted, press coverage of the case in this district featured a stream of personal testimonies from the family members of miners who died at UBB.  *See* ECF No. 122 at 29-31. Since the gag order was lifted, however, that stream has become a flood.  Television stations and local newspapers routinely quote family members of those who died in the UBB disaster, and their statements are, perhaps unsurprisingly, emotional, hostile to Mr. Blankenship, and extremely prejudicial.  These statements have been broadcast again and again across this district. Here is just a small sample of statements from family members published by the local press since the defense filed its initial transfer motion:

- "He [Mr. Blankenship] disregarded any safety.  He's a murderer is what he is. . . . He don't have no remorse.  He don't care nothing about the families.  He cares nothing about the men who lost their lives.  And he cares nothing about those families.  It's all about Don.  It's always been all about Don." Exhibit D, WOAY, Mar. 24, 2015, 6:00 PM; *see also* Exhibit D, WOAY, Mar. 24, 2015, 11:00 PM.

- "He [Mr. Blankenship] has no heart, he has no soul.  He thinks he's done nothing wrong.  And all the people that are around here

know what he's done.  We know.  And its time for him to face it.  Its time to get it over with."  Exhibit D, WCHS, Mar. 24, 2015, 5:00 PM; *see also* Exhibit D, WCHS, Mar. 24, 2015, 11:00 PM; Exhibit D, WVAH, Mar. 24, 2015, 10:00 PM.

- "He [Mr. Blankenship] gets to come out and get in his car and go to his house and go home, when all of us are here, we go to the graveyard to see our family. . . . I just can't stand to look at him, I mean really.  But I gotta come for my son, my brother, my nephew, and the other 26 miners. . . . Just look at him.  He's heartless, he's ruthless, he has no soul."  Exhibit D, WOWK, Mar. 24, 2015, 6:00 PM; *see also* Exhibit D, WOWK, Mar. 24, 2015, 5:30 PM; Exhibit D, WOWK, Mar. 25, 2015, 5:00 AM; Exhibit D, WOWK, Mar. 25, 2015, 6:00 AM; Exhibit D, WOWK, Mar. 25, 2105, 12:00 PM; Exhibit D, WVNS, Mar. 24, 2015, 6:00 PM; Exhibit D, WVNS, Mar. 24, 2015, 11:00 PM.

- "He's [Mr. Blankenship's] coming out the courtrooms and he's getting in his car and he's going home every day, to see his wife, his family whatever.  When me and my sister-in-law and Robert and the Quarles, all of them, we go home, and look at pictures.  Or we go to the graveyard, and look at a stone."  Exhibit D, WQCQ, Mar. 24, 2015, 10:00 PM; *see also* Exhibit D, WOAY, Mar. 24, 2015, 6:00 PM; Exhibit D, WOAY, Mar. 24, 2015, 11:00 PM.

- "The man (Blankenship) is the devil, I'm serious, he's pitiful."  Joel Ebert, *Blankenship pleads not guilty*, Charleston Daily Mail (Mar. 25, 2015) (Exhibit A at 27-28).

- "These are the games that lawyers play . . . I don't have a lot of respect for the shenanigans between lawyers, especially Mr. Blankenship's lawyers. When they finish playing their games, I intend to show up and watch. . . . We want justice, and I want to be a part of it. . . . That's not going to go away . . . When I speak to you on the 10th anniversary and the 15th anniversary and the 20th anniversary, those emotions are not going to go away. The old adage that time heals all wounds isn't true. We have move forward, but it doesn't abate the pain."  Ken Ward, *Upper Big Branch 5-Year Anniversary: Blankenship's trial is focus of families*, Charleston Gazette (Apr. 5, 2015) (Exhibit A at 138-41).

- "That man [Blankenship]" walks free every day . . . He gets to go to his car and he gets to go home.  But all of us, we have to go to graveyards to see our families. . . . [He] is heartless, ruthless and has no soul.  That man is the devil."  Wendy Holdren, *Don

*Blankenship pleads not guilty to superseding indictment*, Register Herald (Mar. 24, 2015) (Exhibit A at 279-80).

- "People often ask her [the sister of a UBB miner killed in the explosion] if she thinks Blankenship should be convicted, or if his conviction would provide closure for her. 'It's not up to me. He will pay, whether it's in this life or the life to come, he'll pay for what he's done.'" Wendy Holdren, *Remembering the 29*, Register-Herald (Apr. 5, 2015) (Exhibit A at 293-97).

Other examples of statements of family members in Exhibit 2 to the Armstrong Declaration and in the original motion to transfer and reply.

Personal testimonies have also been broadcast through this district via social media. Family members and some former Massey miners regularly post Facebook comments to articles and segments posted by local television stations and newspapers, which then appear linked together for all to see. For example:

- "I worked for him for 12 years.. believe me.. he's guilty." Ex. G (SDWV Social Media) at 81.

- "So I guess we are forgetting about the over 900 violations that that mine had then right? The tip offs to the workers that agents were on the mining grounds never happened either, I guess. My father in law was KILLED in that blast and he was on his 3rd day at that site. He reported violations EVERY DAY." *Id.* at 108.

- "My dad worked for him when he took over their union mine and he pretty much told them they were nobodies and he could careless about them! I think his exact words. 'They were dirt under his feet'...he needs to be punished, for all of it..." *Id.* at 114.

- "One day he will have to answer to God for what he has done to our family and the rest of the Ubb miners families...rip 29 ubb." *Id.* at 164.

- "Gary Wayne wasn't just a friend, he was someone's son and someone's father. He has two beautiful children that are growing up and they needed their dad. A young man who loves to be in the woods and is about to graduate high school and

needs his guidance. A smart beautiful athletic daughter who needs his love and attention. Someone to walk her down an aisle one day. Mr. Blankenship has robbed 29 families, their friends of 29 great men. He deserves to stay right here in the place he stole from. These families need closure. Gary and Patty Quarles deserve any closure that this trial may offer them." *Id.* at 191.

- "Bc of him my family spends Memorial day at the cemetery visiting my uncle who died in UBB!!!" *Id.* at 62.

- "I have t[a]lked to the families of just more than the 29 who were killed. My best friend was there and I see their pain. I have seen first hand what he has caused and I really never though[t] of it that way but I agree. I have watched for years as my husband suffered at the direction of this man. I also think that more should be held accountable for their actions as well. I want to see this man ROT in prison and never see the light of day. I sat and watched as they brought the men from Aracoma who will killed. I sat with their families and seen first hand what they went through. His actions can never be justified. But you and I both know that 9 times out of 10 he will walk free cause it is all about Money and politics." *Id.* at 67.

- "He's guilty . . . no doubt about it!!  I was a responding EMS worker to that disaster."  *Id.* at 11.

- "[H]e needs life in prison for killing my cousin!!!! [A]nd the other 29 miners."  *Id.* at 131.

- "Will these families ever get justice??  This man had his hands in 29 deaths!!  Yet he still walks free . . . he gets delay after delay, gets to go watch his son race motor cycles.  My nephew just graduated high school.  His dad would have loved seeing him get his diploma, what a wonderful young man he's became [*sic*], but he couldn't be there . . . 5 yrs ago he was murdered by this evil man!!" *Id.* at 74.

- "I was on site of this explosion!  I can tell you that the arrogance and insensitivity that was displayed by this monster told me all I needed to know.  He put money before safety . . . and 29 men paid the price for it!  I say let him go down into the mine, and let the same exact thing happen to him . . ." *Id.* at 75.

- "[M]y fiance lost her brother and her Mom and Dad that was their only son.  So he deserves to rot in prison and I hope that he does.  You didn't lose a family member in that explosion we did."  *Id.* at 76.

- "I knew quite a few of the ones who passed away because of his negligence they were close friends some I grew up with this needs to be done instead of being pushed aside . . . he deserves to pay for his actions and these families deserve justice!!!"  *Id.* at 77.

- "He personally seen to it [*sic*] that the violations were ignored and some were rigged and that in itself cause a loss of a great friend of mine [*sic*] who left behind two children and two wonderful parents whom of which all miss him dearly [*sic*]."  *Id.* at 136.

- "I have to go to a graveyard to visit my sons grave [*sic*] because of him and he gets to go watch his race . . . This world is so messed up!  Hell is not hot enough for this Man!!"  *Id.* at 138.

- "He gets to see his son . . . My sons father [*sic*] is gone and he doesn't get to see him and my grandson would love to spend just one day with his grandfather.  Just hard to swallow!"  *Id.*

- "What a joke he will never spend a day in jail for killing my brother and 28 other miners you watch and see." *Id.* at 176.

- "This is a shame.  He needs to pay for his actions.  The families deserve better than this.  I myself what [*sic*] more than this.  MY brother was one of the deceased miners.  Blankenship needs to be put in the darkest hole around.  AND BLOWN UP!" *Id.* at 126.

- "My cousin was one of the survivors, has a brain injury, will never ever be the man he was.  Time for Blankenship to pay for all he did." *Id.*

- "I hope he pays for it all . . . but most likely he won't . . . our family changed that day my uncle was one of the 29 miners." *Id.*

- "He killed 29 innocent men two of which were my family members my cousin and my cousin's father died because of his negligence.  That's 29 families forever destroyed due to poor

decision making he made for his employees.  There's blood on his hands & he deserves to be punished.  He deserves to go to prison hopefully for life."  *Id.* at 121.

As this Court anticipated, these vivid, emotional, and highly prejudicial personal accounts have "influence[d] [and] taint[ed] potential jurors," and will "prejudice the jury selection process and/or influence the outcome of a trial."   ECF No. 63 at 8-9.  Statements from UBB miners and from family members of deceased miners exacerbate community prejudgment, add to the erroneous impression that this case concerns the cause of the UBB explosion, and increase the pressure on the jury to convict.

C.   Threats of Violence

Commenters on social media have also repeatedly threatened violence against Mr. Blankenship, his family, and his supporters.  These threats are particularly remarkable given that Facebook does not provide the authors any anonymity – all the violent statements quoted below are publicly available and linked to the commenter's name and personal Facebook account. These comments rise above and beyond the ordinary rough and tumble of the Internet.  They both reflect local bias and exacerbate it, and they make the danger of jury intimidation and community pressure to convict even more dire.

- "I honestly can't believe he is still breathing .... IF he gets off - and I pray that he doesn't - but - IF .... I am believing that a 'stray' bullet will find him."  Ex. G at 90.

- "F***in dick...if you get out of this, you will get hunted by more than your average WV hunter."  *Id.* at 64.

- "FRY that man already! He murdered 29 miners! He is just as guilty as Manson was for his crimes! I swear if he doesn't get life I will know for a fact our system is far beyond repair!  I hope a miners family [*sic*] hunts him down like a dog!"  *Id.* at 31.

16

- "Anyone who supports this piece of trash should be hung too!" *Id.* at 107.

- "RAPING a whole state full of people is definitely criminal, though, and as one of the residents of this raped state, I want to personally strangle him and ALL of his descendants." *Id.* at 31.

- "I think we should just hang him and be done with it!" *Id.* at 23.

- "Someone just take the pos out back with a shotgun." *Id.* at 90.

- "How is this p.o.s still alive? Coal miners are a crazy, fearless bunch and this low life thug has done many a miner dirty as hell. Off with his head prison is too good for King Scab." *Id.*

- "He could get a fair trial anywhere. He may have to be somewhere else to get a crooked one!  He needs to be hung upside-down above ground level and beaten with barbed-wire ball bats! Make him pay consequences with his own bloodshed! NO EXCUSES!" *Id.* at 107.

- "Awe [*sic*] cant get a fair trial ? Poor Blankenship . You murdered those miners. Your [*sic*] lucky the families dont [*sic*] hunt you down." *Id.* at 109.

- "Maybe a loose tire will come off a car and hit him slowly killing him so that he suffers awhile first and pray the driver of the car the tire comes off of is safe!!!" *Id.* at 17.

- "[C]rowdfund a bounty on his head – dead or alive." *Id.* at 60.

- "Well if he gets away with it I would assume one of the fallen miner's [*sic*] family members would take it upon themselves to serve true justice . . . I'm only sayin'…" *Id.* at 53.

These violent threats not only express the deep-seated animosity toward Mr. Blankenship in this community, but also they serve to intimidate potential jurors in the district.  They also indicate – and reinforce – the widespread but erroneous belief in this district that Mr. Blankenship is charged with causing the UBB explosion.  They are just one manifestation of the

overwhelming community pressure that will be brought to bear on jurors to return a guilty verdict in this case, no matter what the evidence at trial shows.

D. Fifth Anniversary of the UBB Explosion

The fifth anniversary of the UBB explosion fell on April 5, 2015.  The media reported on community-wide remembrances of the event, including statements from elected officials, *see, e.g.,* Exhibit D, WCHS, Apr. 5, 2015, 6:00 PM; Exhibit D, WOAY, Apr. 4, 2015 11:00 PM, a public commemoration at the Beckley Courthouse hosted by the Beckley Fire Department, *see, e.g.,* Exhibit D, WVVA, Apr. 5, 2015, 11:00 PM; Exhibit D, WOAY, Apr. 4, 2015, 11:00 PM, and a wreath-laying ceremony at the UBB memorial, *see, e.g.,* Exhibit D, WCHS, Apr. 5, 2015, 6:00 PM; Exhibit D, WOWK, Apr. 4, 2015, 6:00 PM.  The anniversary was also marked by a mass of publicity that (inaccurately) linked the UBB disaster to the prosecution's charges against Mr. Blankenship.  Here again is a sample of the publicity in this district, as well as social media posts, which, in a deeply and indelibly prejudicial combination, entwine tributes to this sensitive occasion with inflammatory descriptions of this case:

- "Now the aftermath of the disaster led to multiple indictments and convictions as well as changes in mine safety laws.  Families of the victims say many questions will be answered on April 20th.  That's when Don Blankenship's trial begins."   Exhibit D, WVNS, 4/3/2015, 5:00 PM; *see also* Exhibit D, WVNS, Apr. 3, 2015, 6:00PM; Exhibit D, WVNS, Apr. 3, 2015, 11:00 PM; Exhibit D, WOWK, Apr. 3, 2015, 7:00 PM; Exhibit D, WOWK, Apr. 3, 2015, 11:00 PM; Exhibit D, WOWK, Apr. 4, 2015, 5:00 PM.

- "Reporter: The lives of 29 coal miners killed at the Upper Big Branch mine are being remembered all across the region today.  It marks the fifth anniversary of their deaths. . . . Investigators fault Massey Energy for failure to properly maintain its ventilation systems and many other safety violations.  Wreathes were hung yesterday at a memorial located along Route 3 in Whitesville in Boone County.  Family members there still in disbelief.

Tommy Davis, Lost Brother, Son, and Nephew: I'll probably never get that chance to hold him, let alone a grandbaby or anything of that sort. I feel like he kind of robbed me a little bit.

Reporter: And the aftermath of this tragedy lead to a number of indictments and convictions, as well as changes in state and federal safety laws." Exhibit D, WSAZ, Apr. 5, 2015, 6:00 PM.

- "Voiceover: Kevin Price, a first responder at Upper Big Branch, hasn't forgotten the look on their faces when the search and rescue teams came out.

  Kevin Price: Going in wasn't bad. But seeing their faces when they came out, I talked with a lot of them, I cried with a lot of them, that was the hard part. You know, knowing that they couldn't do anything for their brothers that they passed, you know, going in and coming out.

  Voiceover: Five years after Upper Big Branch, many still have questions, questions they hope to see answered when Don Blankenship heads to trial.

  Kevin Price: You know, business is in business to make money. If we let our drive for that money get in the way of human lives, then what have we gained?" Exhibit D, WVVA, Apr. 3, 2015, 6:00 PM; *see also* Exhibit D, WVVA, Apr. 3, 2015, 5:00 PM; Exhibit D, WVVA, Apr. 3, 2015, 11:00 PM.

- "This month marks the fifth anniversary of the Upper Big Branch Mine Disaster. The trial of Don Blankenship, former CEO of Massey Energy, was scheduled to start April 20 but has been moved to July - with a long list of pretrial motions still to be resolved. To bring attention to this disaster and its aftermath, we recently published a paperback edition of 'Thunder on the Mountain: Death at Massey and the Dirty Secrets behind Big Coal,' by journalist Peter A. Galuszka . . . With 'Thunder on the Mountain,' Galuszka pieces together the story behind the tragedy at the Upper Big Branch Mine, and in doing so he has created a devastating portrait of an entire industry. This tragedy was the deadliest mine disaster in the United States in 40 years. 'Thunder on the Mountain' alleges the deaths were rooted in the cynical corporate culture of Massey and its notorious CEO, and were part of an endless cycle of poverty, exploitation and environmental abuse that has dominated the Appalachian coalfields since coal was first discovered here." Abby Freeland, *Publisher digs deep to*

*expose mine disasters*, Charleston Gazette (Apr. 19, 2015) (Exhibit A at 154-56).

- "Sunday is the fifth anniversary of a West Virginia tragedy - the 2010 Upper Big Branch mine explosion that killed 29 miners. The United Mine Workers called it 'industrial homicide' - and several government probes supported that conclusion. . . . Reports concluded that the 29 deaths easily could have been prevented, if Massey Energy had obeyed safety laws - but the firm didn't. In other words, the UBB horror was a crime. . . . Massey's controversial CEO, Don Blankenship - a political bankroller who got a $12 million golden parachute just before Massey was sold to Alpha Natural Resources - was indicted, and awaits trial. . . . Thank heaven for U.S. Attorney Booth Goodwin and federal agents who prosecuted, taking seriously the preventable deaths of 29 workers." Editorial, *UBB: 'Industrial Homicide,'* Charleston Gazette (Apr. 4, 2015) (Exhibit A at 136-37).

- "May they rest in peace and their deaths be not in vain. May Don Blankenship burn in Hell if there is one." Ex. G at 71.

- "And ole Don is still out walking around -- he should be in jail as long as the 29 men are in the grave." *Id.* at 72.

- "That mine had numorous saftey [*sic*] violations... It had nothing to do with safety laws and everything with them ignoring safety risks for profit." *Id.*

- "Prayers for the families so uncalled for, all because the big wigs of the company thought more about money than the lives of these men." *Id.*

One of the two dominant newspapers in the Southern District of West Virginia expressed similar sentiments during Workers' Memorial Week, at the end of April:

- "In advance of Workers' Memorial Week, which begins Saturday, a national worker safety group cited the Upper Big Branch Mine disaster in a report to highlight the thousands of lives lost each year due to unsafe working conditions. . . . During a conference call with media on Thursday, Celeste Monforton, a lecturer at George Washington University and member of former Gov. Joe Manchin's Independent Investigation Panel on the Upper Big Branch mining disaster, said, 'Like most work-related fatalities, the deaths of these 29 workers could've been prevented.' Monforton pointed to the

numerous warnings that Blankenship's company had prior to the 2010 mining disaster. 'Yet the company continued to gamble with the workers,' she said. . . . Monforton pointed to U.S. Attorney Booth Goodwin's indictment of Blankenship, which found the Massey CEO violated worker safety rules in order to produce more coal, avoid costs of following safety laws and to make more money, as a sign of possibly seeing some change. 'I wonder whether those words sent chills up the spines of executives and corporate board rooms across the country?' she asked. Monforton said Blankenship's trial will serve as a wake-up call for corporate America. 'If you cut corners, if you operate unsafely and people get hurt as a result, you can be held accountable in a court of law,' she said. 'I'm not sure many companies understood that before. I hope they understand it now.'" Joel Ebert, *Report highlights workplace deaths*, Charleston Daily Mail (Apr. 24, 2015) (Exhibit A at 44-45).

Combining commemorations of the UBB disaster with celebrations of this prosecution is highly inflammatory, and increases the community pressure even further on jurors to honor those who died by convicting Mr. Blankenship. It is also highly misleading, as the government has affirmed that Mr. Blankenship is not charged with causing the explosion. *See* ECF No. 160 at 13-14. Unfortunately, that distinction has been erased for the people of this district, and with it, any hope of providing Mr. Blankenship a fair trial on the actual charges against him.

E.  Special: Can West Virginia Give Don Blankenship a Fair Trial?

The extent of local prejudice against Mr. Blankenship runs so deep that on May 1, 2015, the WOWK news station ran a heavily-promoted, *see, e.g.,* Exhibit D, WOWK, Apr. 30, 2015, 5:00PM; Exhibit D, WOWK, May 1, 2015, 5:00 AM; Exhibit D, WOWK, May 1, 2015, 5:00 PM; Exhibit D, WOWK, May 1, 2015, 6:00 PM; Exhibit D, WOWK, May 1, 2015, 6:00 AM; Exhibit D, WOWK, May 1, 2015, 12:00 PM, thirty-minute news special entitled "Can West Virginia Give Don Blankenship a Fair Trial?" *See* Exhibit D, WOWK, May 1, 2015, 5:30 PM (Special Report). This report, ironically, served only to further exacerbate community bias

21

against Mr. Blankenship, as it recounted the prosecution's charges – including its "profits over people" theme –, featured multiple shots of the UBB memorial, aired interviews with family members of the miners who died at UBB, and invited viewers to share their thoughts on Facebook and Twitter.  At the end of the segment, the hosted noted: "[W]e've been hearing from you throughout our show tonight.  Some of you have questioned whether Don Blankenship even deserves a fair trial."  Exhibit D, WOWK, May 1, 2015, 5:30 PM (Special Report).  Below is a selection of quotes from the special, as well as social media commenters' revealing answers to the question it posed:

- "Voiceover: Wheeling attorney Bob Fitzsimmons understands West Virginia law better than most.  But even he admits the upcoming federal trial of former Massey CEO Don Blankenship may change everything we know about standards in the mine industry.

  Bob Fitzsimmons: And it's more than just money.  That they're actually going to prosecute people criminally now for this, and its going to set that example, and I think its a good example.  And I think corporate officials should be responsible for their acts." Exhibit D, WOWK, May 1, 2015, 5:30 PM (Special Report).

- "Voiceover: The Upper Big Branch mine explosion that killed 29 miners back in 2010 is still a fresh memory to those families who lost a son, brother, or father.

  Jack Bowden: Well I've lost my son-in-law Steve Harrah, he was married to my daughter, had a son, six years old, when this accident happened.

  Voiceover: Bowden says as hard as he tries, he doesn't think the feeling will ever go away.

  Jack Bowden: There's emptiness there but life goes on and we're moving on with our lives, but there's times that we still cry.

  Voiceover: In July, former Massey CEO and the person many believe was responsible for the tragedy, Don Blankenship, will be going to trial in Beckley."  Exhibit D, WOWK, May 1, 2015, 5:30 PM (Special Report).

- "He trial [*sic*] should be as fair as the UBB miners lives and their families have endured!"  Ex. G at 81.

- "[I]f you were related to the miners who died because of his side stepping and shortcuts and bribes, you wouldn't give a damn about him getting a fair trial..."  *Id.*

- "Well that's the downside to being a rich crook, all your dirty wrongdoings are aired to entire public, so it's not WV's fault he's been 'exposed' it's his fault and he can pay the consequences just like any other criminal."  *Id.* at 82.

- "Yes, we will give him a fair trial before we hang him."  *Id.*

- "He doesn't deserve anything but hug [*sic*] on the court house lawn!! He didn't care about all those miners [*sic*] lives why should tax payers care about his!!" *Id.*

- "Doubt it he is the most hated man in WV but all with good reason. . . ." *Id.*

- "Does he even deserve a fair trial.  Did any of the dead miners get a fair chance?  So, who cares if it's fair, he just needs to stand and be held accountable and pay up.....30 to life sounds fair." *Id.* at 83.

- "No, they should put in the electric chair. He is a murderer without a heart." *Id.*

- "I feel the same as others, did the men who died get a fair chance to live? Why do we worry so much about fairness for people who more or less committed murder." *Id.* at 152.

-  "He don't deserve a trail [*sic*] ...he needs to go stright [*sic*] to jail for all those who lost their lives so the families of the deceased will have some type of closure!" *Id.* at 153.

As the special and the comments indicate, the juror pool in this district believes Mr. Blankenship is responsible for the UBB explosion and is committed to convicting him based on preconceived notions of his guilt, not providing him with a fair trial on the evidence.  Transfer is the only way to protect Mr. Blankenship's constitutional right to due process.

F.   <u>Other Indications of Local Prejudice</u>

Aside from the four broad categories of prejudicial local media coverage outlined above, there has also been an assortment of other incidents that demonstrate the extreme degree of prejudgment against Mr. Blankenship in this district.

First, a workers' compensation bill proposed in the West Virginia state Senate was styled the "Don Blankenship Protection Act" by its Democratic opponents, which, predictably, lead to more negative publicity.  One local newspaper commented:

> "Here's the deal: the workers compensation system was designed to provide protection for workers and immunity for employers for those unpredictable accidents that happen even in a responsible workplace. It's no substitute for justice and it wasn't set up to allow irresponsible corporations to knowingly dodge safety rules and standards with impunity.
>
> Think Massey.
>
> All of which may explain why some people have come to call the bill 'the Don Blankenship Protection Act.' . . .
>
> It will be interesting to see how things proceed in the Senate, where the margins are close. Some senators live in districts with family members who lost loved ones at Upper Big Branch. If they vote for the bill as it now stands, it might be difficult to justify their decision to the survivors - or to others who may lose loved ones in future disasters."

Rick Wilson, *House bill could end justice for families of workers killed on job*, Charleston Gazette (Mar. 6, 2015) (Exhibit A at 112-13); *see also* Pamela Pritt, *Senate committee sends deliberate intent bill to the floor*, The Register-Herald (Mar. 6, 2015) (Exhibit A at 268-69) ("'It creates an environment of protectionism,' said Delegate Shawn Fluharty, D-Ohio. 'We should just call this thing the Don Blankenship Protection Act, if you really want to get down to it.'"); Eric Eyre, *House approves bill that limits workplace injury suits*, Charleston Gazette (Feb. 11, 2015) (Exhibit A at 99-100) ("Democratic lawmakers referred to the bill as the 'Don

Blankenship Protection Act,' saying it would give immunity to corporate executives who turn a blind eye to workplace safety hazards.  Blankenship, former Massey Energy CEO, faces a raft of federal charges in connection with the 2010 Upper Big Branch mine disaster."); Whitney Burdette, *Bill creates path for alternative teachers*, Charleston Daily Mail (Feb. 11, 2015) (Exhibit A at 12-14) ("Democrats attacked the legislation, saying it is a regression of safety standards and would have meant Don Blankenship, former CEO of Massey Energy, which owned Upper Big Branch, wouldn't have been held liable for the April 2010 explosion that killed 29 miners.").  Not only did this campaign further exacerbate community prejudice against Mr. Blankenship, but also it reveals that he is so despised in this district that his name alone has become a political weapon.

Second, the United Mine Workers Journal ran a highly prejudicial article on the subject of this prosecution.  *See Massey miners will get day in court*, UMW Journal (Jan.-Feb. 2015) (Exhibit H at 6).  The article quoted UMW President Cecil Roberts, who claimed it was "obvious to many of us in the coal industry that Massey Energy was a company that routinely and knowingly violated the nation's mine safety laws in order to maximize profits.  There can be no doubt that this culture of contempt for miners' health and safety was fostered in the highest office of the company by Don Blankenship.  It is well past time that he be held accountable for his deplorable actions."  *Id.*  Roberts went on to assert, in even more inflammatory language:

> In his time as CEO of Massey Energy, Don Blankenship micro-managed every aspect of the company's activities, including those that resulted in the worst fatality rate of any mine operator in the nation . . . In all, 52 miners were killed at Massey operations under Blankenship's brutal reign. It is inconceivable that this could happen after all the struggles miners have faced over the years to improve health and safety. This indictment is only the first step at achieving justice for these miners, as a conviction is the ultimate goal.

*Id.*  The prejudicial, misleading, and pressuring effect of this article speaks for itself.  And yet it is just the most recent in a long campaign against Mr. Blankenship in the pages of UMW Journal, which previously called his conviction "the only possible outcome" of this case and the only way to satisfy the families of those killed at UBB, *Massey manager guilty, implicates Blankenship*, UMW Journal (Mar.-Apr. 2013) (Exhibit H at 15); *Former Massey official guilty*, UMW Journal (Jan.-Feb. 2013) (Exhibit H at 17), accused him of "creat[ing] the safety-last culture of fear and intimidation at Massey" that led to "industrial homicide [at UBB] . . . constitut[ing] a massive slaughter," *Alpha/Massey merger final*, UMW Journal (May-June 2011) (Exhibit G at 40); *New year, new opportunities*, UMW Journal (Jan.-Feb. 2012) (Exhibit H at 31), and labeled him the "Dark Lord of Coal Country" who "will be long remembered as a throw-back to the age of the coal barons of a century ago, when operators routinely put profits over people, and mine disasters were common place" and "oversaw Massey's emergence as the poster child for arrogance and greed within the coal industry," *A New World in the Coalfields?*, UMW Journal (Jan.-Feb. 2011) (Exhibit H at 50).  This is just a small sample of the vitriol directed against Mr. Blankenship by the Journal, the remainder of which is attached here as Exhibit G.

Finally, the profound depth of local hatred toward Mr. Blankenship was put on display at the Coal Education Development and Resource Coal Fair.  *See* Exhibit I (CEDAR Coal Fair) at 17.[3]  One junior high school student from Boone County, West Virginia, submitted a presentation entitled "The Rise and Fall of Don Blankenship," dedicated to the UBB disaster and this prosecution.  *See id.* at 14.  In a confirmation of how deep local prejudice has penetrated into the West Virginia community, this young student's presentation stated as fact several key

---

[3] The CEDAR Coal Fair is a public event where students present projects on the subject of coal in a competition for cash prizes.  *See* Exhibit I at 17.

contentions of the prosecution's case against Mr. Blankenship: "Don violated mine safety and health standards from January 2008 to April 2010."  *See id.* at 2.  "He allowed mine bosses to cover up safety violations.  *See id.* at 3.  "On April 5, 2010, the Upper Big Branch mines exploded and killed 29 men.  It was caused by high levels of methane." *See id.* at 5.  "The explosion was his fault, because he could've prevented it."  *See id.* at 8.  "We learned that Don Blankenship is a bad guy who violated health standards for two years.  It ended with a huge explosion that killed twenty-nine men."  *See id.* at 16.  This remarkable story demonstrates how completely saturated this district has become by prejudicial media and community bias against Mr. Blankenship.  If even the children of the Southern District of West Virginia have prejudged Mr. Blankenship, then undoubtedly the eligible jurors have as well.

### C.   A Media Expert's Analysis of the News Coverage of this Case in the Southern District of West Virginia Demonstrates that the Coverage Has Been Uniquely Pervasive, Prejudicial, and Misleading, and Far Worse than the Coverage News Considered in *Skilling v. United States*.

Scott Armstrong, a media and journalism expert, has submitted a declaration analyzing the news media coverage of Mr. Blankenship, Massey Energy, and the Upper Big Branch disaster in the Southern District of West Virginia, the Martinsburg Division of the Northern District of West Virginia, and the Northern Division of the District of Maryland, attached here as Exhibit J.  Mr. Armstrong's analysis emphasizes the prejudicial, saturation-level coverage of this case in the Southern District, the local media's misleading linkage of the charges against Mr. Blankenship with the UBB disaster, and the differences between this case and *Skilling v. United States*.  His observations demonstrate even further that potential jurors in the Charleston/Huntington media market have been prejudiced against Mr. Blankenship, misled about the nature of the charges against him, and subject to community pressure to return a conviction.

27

First, Mr. Armstrong observes that media coverage of Mr. Blankenship in the Charleston and Huntington Divisions has been pervasive and prejudicial, in contrast to the relatively sparse and neutral presentations in the Martinsburg and Northern Maryland Divisions. As Mr. Armstrong notes, the "coal country" media in the Southern District of West Virginia pays special attention to the coal industry, safety concerns, labor strife, and mine accidents. *See* Ex. J, ¶¶ 20-23. Mr. Blankenship has long been a subject of media coverage in this region, especially following the disaster at UBB. *See id.*, ¶¶ 25-35. Mr. Armstrong notes that in coal country, Mr. Blankenship is "synonymous with Massey," meaning that "every detail of what Massey had done attached to [him]." *Id.*, ¶ 41.

Comparing news coverage in the Charleston and Huntington Divisions to that of the other two possible venues, Mr. Armstrong opines that "[t]he local news coverage [of Mr. Blankenship, Massey, and UBB] in the Charleston and Huntington Divisions has been dramatically different in the frequency, emphasis, length, and focus." *Id.* ¶ 30. Specifically, he explains:

> Apart from the sheer number of news media items, the length of those items and the prominence and circumstances of the presentation suggest a saturation of news content. The common indices of saturation journalism are present: extended story detail, prominent placement of stories on the front and editorial pages, lengthy interviews, additional graphics and photographs, extended use of opinion commentary in letters to the editor or reader views features, and extended obituaries. In television coverage, the same characteristics occur: the use of special segments and customized graphics, heavily promoted lead-ins and headlines, repeated use of evocative video footage packages and extended images or artist renderings of defendants and witnesses, special editions or sections devoted to such things as anniversary coverage and memorial coverage. . . . The focus of local news coverage has been on fact-specific content related to the causes of the explosion and on the intensity of emotion related to the deaths of the 29 miners, the grief and suffering of the 29 victims' families, and the community consensus that Blankenship needs to be tried, convicted and jailed for his role in the deaths of the 29 miners.

*Id.*, ¶¶ 30, 33.

Highlighting the pervasiveness of the coverage in the Charleston and Huntington Divisions, Mr. Armstrong further observes that "[t]he order of magnitude difference between the frequency of local and national print news regarding Blankenship, Massey, and the Upper Big Branch mine disaster varied from ratios of 10:1 up to 20:1 and higher.  But the order of magnitude difference in length of the stories was far greater, increasing the differences in ratio by another quantum well beyond 20:1." *Id.*, ¶ 38. Recent coverage in these Divisions, moreover, has been especially prejudicial, as an onslaught of negative editorials, hostile comments by UBB victims' family members, and attacks by environmentalists and union leaders have combined such that, according to Mr. Armstrong, "[i]n the Charleston and Huntington Divisions, the news media audience has regularly heard Blankenship pronounced responsible for the deaths of 29 miners.  The open question raised by the community is not whether he is guilty but whether he will escape punishment through his power and influence." *Id.*, ¶ 45; *see also id*,. ¶¶ 36-37, 42-44, 46-56.  By contrast, Mr. Armstrong observes, there has been far less coverage of the subject in the Martinsburg and Northern Maryland Divisions, and what coverage there has been has been far less poignant or memorable.  *See id.*, ¶¶ 23, 26, 40.  Mr. Armstrong concludes that the press coverage in the Southern District of West Virginia "will impair the capacity of prospective jurors to consider only the evidence presented in the courtroom." *Id.*, ¶ 33.

Second, Mr. Armstrong shows how the news media in the Charleston and Huntington Divisions has consistently – and inaccurately – conflated the charges against Mr. Blankenship with his alleged responsibility for the UBB disaster and the deaths of the 29 miners.   He explains:

> The trend line in the tone of print coverage changed since the Blankenship indictment.   The relatively restrained tone of the

> principal print news media serving the Charleston and Huntington Divisions has given way to regular references directly associating the charges against Blankenship with the deaths of the 29 miners. The formulations suggest to readers that Blankenship is being tried for his responsibility for the 29 deaths. . . . Virtually every filing of or ruling on a motion in the case resulted in a repetition of some form of conjunctive connection between Blankenship and the charges for actions "stemming from" or "related to" a mine explosion that killed 29 miners . . . As a result, readers of any of the three main newspapers serving the Charleston and Huntington Divisions would come away with the inevitable conclusion that Blankenship is to be tried for his responsibility for the deaths of 29 members of the tightly knit mining community.

*Id.*, ¶¶ 56, 58.  Mr. Armstrong observes the same in the Charleston and Huntington Divisions' television coverage, concluding that "[t]he collective effect of such . . . coverage is the regular reminder to television news viewers that Blankenship is being tried for his role in the death of the 29 miners and that anything other than a conviction would be a miscarriage of justice."  *Id.*, ¶ 64.  By contrast, he finds very few such linkages in the Martinsburg and Northern Maryland Division media coverage.  *See id.*, ¶¶ 59, 66.

Finally, Mr. Armstrong compares the media coverage of this case with that in *Skilling v. United States* (the prosecution of Jeffrey Skilling for his role in the collapse of Enron), where he also served as a media expert.  Mr. Armstrong observes that while Enron was the subject of a "marginally greater" number of news stories than the UBB disaster, the Charleston-Huntington news market was also "far smaller" than the Houston market.  *Id.*, ¶ 76.  He adds that "the ratio in the frequency of coverage of Skilling/Enron/bankruptcy between the Houston Chronicle and the Atlanta Journal-Constitution, the most prolific of the other national papers, was 3:1, the ratio in the frequency of coverage of Blankenship/Massey/UBB between the Charleston and Huntington Division papers and the most prolific national paper, the Washington Post, has been 13:1."  *Id.*  Furthermore, "the number of references to defendants Skilling and Blankenship was

comparable, particularly considering the fact that the Houston area is nearly nine times as large." *Id.*, ¶ 77.

Mr. Armstrong also identifies several key differences between the Charleston and Huntington Divisions' news coverage of Mr. Blankenship and the Houston coverage of Mr. Skilling.  First, he notes that "[t]he negative tone and conclusory nature of community views about Blankenship's singular responsibility for the deaths of 29 men . . . exceeds the tone and conclusory nature of community views in Houston about Skilling as the singular cause of Enron's downfall."  *Id.*, ¶ 78.  Second, he observes that "[i]n the context of the smaller, more cohesive Coal Country community of the Charleston and Huntington Divisions, the substantial loss of life led to pervasive and detailed local print and television news media coverage of family members of the victims and their explicit expectations that Blankenship must be made to answer for the deaths of 29 citizens," whereas "[t]here is no parallel in Houston," which is also "a much larger and more culturally and economically diverse community than the Charleston and Huntington Divisions."  *Id.*  Third, he opines that "[t]he degree of anger and frustration with the prosecution in the Charleston and Huntington Division community prior to Blankenship's indictment and the sense of 'it is about time' that accompanied his indictment . . . have no parallel in Houston," adding that "[w]hile there were worries about Skilling's ability to escape justice in Houston, there was nothing like the expressed depth of concern in the Charleston and Huntington Division news media that Blankenship's track record for buying his way out of judicial trouble would repeat."  *Id.*, ¶ 79.  Finally, Mr. Armstrong advises that "[t]he degree to which the local news media in the Charleston and Huntington Divisions has reported that a significant segment of the news media audience, particularly the families and those responsible for the investigations, has concluded that Blankenship is responsible for the deaths of the UBB

miners exceeds the reporting of the Houston news media of any similar conclusions there."  *Id.*, ¶ 81.

Mr. Armstrong's ultimate conclusion, based on the three key themes recounted above, is worth quoting in full:

> I have concluded that there has been saturation-level coverage of Blankenship and this case in the Southern District of West Virginia that dwarfs in quantity and intensity the coverage in the alternative proposed venues.  News coverage in this district also regularly links the charges against Blankenship to responsibility for the Upper Big Branch Mine disaster and the deaths of 29 miners, either through outright assertion, linguistic suggestion, or visual association.   It is also my opinion, based on my role as a media expert in the case of *United States v. Skilling* and in this case, that the media coverage in the Blankenship case is more pervasive, more negative, and more personal than it was in the *Skilling* case.  It is further my opinion that the patterns of pervasive news media coverage about Blankenship and the charges against him in the Southern District of West Virginia viewed collectively, are likely to impair a jury's ability to focus its deliberative process solely on the evidence presented in the courtroom. News coverage taken cumulatively has reported that Blankenship has been indicted for the very actions and failures to act that four investigations found responsible for the UBB mine disaster and for the deaths of 29 men.  The news media in the Southern District of West Virginia have documented a united community sentiment that those responsible for the UBB mine disaster must be indicted, prosecuted and convicted, and that Blankenship was responsible.

*Id.*, ¶ 3.  Mr. Armstrong's expert analysis of the local news coverage demonstrates that this case must be transferred out of the Southern District of West Virginia in order to ensure that Mr. Blankenship is tried by an impartial jury, which is his constitutional right.

## CONCLUSION

For the foregoing reasons, the defense respectfully renews its request for the Court to transfer this case to the District of Maryland, Northern Division, or, alternatively, to the Northern District of West Virginia, Martinsburg Division, for trial.

Dated: September 24, 2015

Respectfully submitted,

 /s/ William W. Taylor, III
William W. Taylor, III
Blair G. Brown
Eric R. Delinsky
R. Miles Clark
Steven N. Herman
ZUCKERMAN SPAEDER LLP
1800 M Street, NW, Suite 1000
Washington, DC 20036
202-778-1800 (phone) / 202-822-8106 (fax)
wtaylor@zuckerman.com
bbrown@zuckerman.com
edelinsky@zuckerman.com
mclark@zuckerman.com
sherman@zuckerman.com

 /s/ James A. Walls
James A. Walls (WVSB #5175)
SPILMAN THOMAS & BATTLE, PLLC
48 Donley Street, Suite 800
Morgantown, WV 26501
304-291-7947 (phone) / 304-291-7979 (fax)
jwalls@spilmanlaw.com

 /s/ Alexander Macia
Alexander Macia
SPILMAN THOMAS & BATTLE, PLLC
P.O. Box 273
Charleston, WV 25321-0273
304-340-3800 (phone) / 304-340-3801 (fax)
jwalls@spilmanlaw.com

*Counsel for Donald L. Blankenship*

33

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing has been electronically filed and service has been made

by virtue of such electronic filing this 24th day of September, 2015 on:

R. Booth Goodwin, II
Steven R. Ruby
Gabriele Wohl
U.S. Attorney's Office
P.O. Box 1713
Charleston, WV 25326-1713

R. Gregory McVey
U.S. Attorney's Office
P.O. Box 1239
Huntington, WV 25714-1239


*/s/ Blair G. Brown*
Blair G. Brown