**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
BECKLEY**

UNITED STATES OF AMERICA

v.                                                                                           CRIMINAL NO. 5:14-00244

DONALD L. BLANKENSHIP

**AMENDED AND RESTATED RESPONSE TO DEFENDANT'S ORAL MOTION FOR
RE-CROSS EXAMINATION OF CHRISTOPHER BLANCHARD**

Comes now the United States of America, by counsel, and files its Amended and Restated Response to Defendant's Oral Motion for Re-Cross Examination of Christopher Blanchard ("Blanchard"). Counsel for Defendant, after the end of re-direct examination, sought re-cross examination of Blanchard. Rather than ask to respond to the defense memorandum the Court directed be filed by Monday morning, the United States amends and restates its position on Defendant's request for re-cross examination. For reasons stated below, re-cross examination should be denied.

I.

At the beginning of trial, the Court stated—consistent with Federal Rule of Evidence 611—that it would not allow re-cross examination. Allowing—or not allowing—re-cross examination is entirely within the sound discretion of the Court based in fairness and courtroom efficiency. The Court has only permitted such additional examination after the Court

reconsidered evidence that the Court had previously excluded. With respect to this witness, counsel for the defense objected <u>only once</u> on re-direct that the evidence being elicited was beyond the scope of his cross examination—an objection the Court overruled. The defense has not established any compelling need for re-cross examination of Blanchard. Rather, it appears that the defense merely wants to have the last word with a witness whom it has thoroughly prepared to assist its case. That wish is only natural—in a trial, everyone wants to have the last word—but it is not grounds for re-cross.

After the luncheon recess on Thursday, October 22, 2015, the United States called Blanchard to the stand. The United States completed direct examination of Blanchard mid-afternoon Friday, October 23, 2015, at which time, Defendant began cross examination. Defendant resumed cross examination on Monday, October 26, 2015 and continued cross examination until almost mid-day Thursday, October 29, 2015—a total of almost 4 days with an intervening weekend to continue to prepare for the bulk of such cross examination.

The United States began Blanchard's re-direct examination shortly before lunch on Thursday, October 29, 2015 and concluded near the end of the day on Friday, October 30, 2015.

Defendant has had more than ample opportunity to confront Blanchard. Defendant's cross examination well exceeded the total amount of time the United States examined the witness. As would be readily apparent from a review of the cross examination, Blanchard—someone designated as one of Defendant's co-conspirators—was largely co-opted as a witness for Defendant. Defendant introduced more than 165 exhibits through Blanchard on cross examination.

Indeed, it also became apparent on cross-examination that Blanchard's counsel had considerable contact with defense counsel in preparation for trial. Blanchard admitted to this contact on re-direct examination:

> Q. That wasn't the question I asked. The question that I asked was, did you have the understanding that your lawyers were discussing with you questions that the defense wanted to ask you on cross-examination?
>
> A. I took that the same, but yes, sir.
>
> Q. Your answer to that is yes?
>
> A. Yes, sir.
>
> Q. And did you review documents that you understood the defendant's lawyers wanted to show you on cross-examination?
>
> A. Yes, sir.
>
> Q. And did you discuss the answers that you would give if you were asked to testify about these documents?
>
> A. With my attorneys.
>
> Q. And were those answers conveyed to the attorneys for the defendant?
>
> A. I don't know, sir.
>
> Q. Who paid your, your lawyer fees in this case, by the way, Mr. Blanchard?
>
> \*\*\*
> A. At the beginning, it was my -- my lawyers' fees and costs were covered by Massey Energy Company.
>
> Q. And at that time, who was the CEO of Massey Energy Company?
>
> A. Don Blankenship.

Tr. 3331:15-3332:21.

## II.

"Absent the introduction of any new matter on re-direct examination, the rule is that re-cross-examination is not required. Without something new, a party has the last word with his own witness." *United States v. Fleschner*, 98 F.3d 155 (4th Cir. 1996) (citing Wharton's Criminal Evidence, 14th Ed., 1986, Vol. 2, p. 698). No new matters were explored on re-direct examination beyond those that were explored on direct and cross examination.

A.

The introduction on re-direct examination of additional citations issued at the Upper Big Branch mine were required to fairly meet the extensive number of citations—and general character of the citations—introduced by the defense on cross examination, and do not constitute "new matters." In cross examination Defendant used dozens of citations seeking to make points, which included: citations at UBB drew critical responses from senior Massey officials who purportedly spoke for the Defendant; citations triggered action by Massey officials that was intended to prevent them in the future; citations were for violations that could not have been prevented by the Defendant or other Massey executives and that in many cases were the fault of lazy or incompetent coal miners; citations were issued for improper purposes such as antipathy by MSHA toward UBB officials; and citations were issued for trivial violations. The United States was careful on redirect to use citations only to respond to these points from the defense cross examination and not to go beyond the subjects of cross.

The citations the United States used in re-direct were available for use by the defendant on cross examination. The fact that Defendant "cherry-picked" citations for the above-stated purposes while he ignored the other citations prompts this response from the United States. Defendant's extensive cross examination using only those documents which he apparently believes casts a poor light on MSHA out of a large class of documents available for use in cross

examination does not justify allowing re-cross when the United States on redirect simply "set the record straight." The United States' re-direct about MSHA citations thus warrants no re-cross.

B.

Defense counsel wants "another bite of the apple" concerning Blanchard's testimony regarding advance notice of mine inspectors. The chief complaint of the defense is this exchange with Blanchard on re-direct examination:

> Q. Mr. Blanchard, let me start the question over. Did you know when you were the president at UBB that a Federal Court had confirmed that it was illegal to notify underground sections that an inspector was coming even after the inspector arrived at mine property?
>
> A. No, sir, I did not know that.

The Court has repeatedly instructed the jury that the questions of counsel are not evidence. Blanchard responded "no" to the question. Moreover, such exchange and the questions that followed were directly responsive to the questions posed to Blanchard on cross examination. No re-cross concerning those matters should be permitted.

C.

With regard to the issues respecting discipline, the re-direct examination certainly did not raise any new matters. Blanchard was simply asked probing questions regarding the incidents of discipline raised on cross-examination. Concerning whether discipline was handed out with respect to the citations discussed on re-direct examination, the witness invariably answered that he did not know whether discipline was imposed on others concerning the violations. There is certainly no need for re-cross concerning matters of discipline.

D.

Defense counsel also desires to cross-examine Blanchard regarding testimony on which he was impeached through his prior grand jury testimony. Specifically, Defendant seeks additional cross-examination "on the nature of the questions in the grand jury, the context of the Grand Jury, the confining [of Blanchard] to leading questions and the other circumstances about it." Tr. 3702:1-4. This is not an appropriate basis to allow re-cross. It is worth noting that the questioning of Blanchard using his grand jury testimony was met with no objection by Defendant at the time it occurred.

The parties received an email from the Court's chambers early on the morning of October 31, 2015 to the following effect: "Part of the basis of the Defendant's motion to re-cross Mr. Blanchard is that impeachment questions were based on grand jury testimony which was taken out of context. The Judge asks that the Defense designate the questions and the relevant portions of the transcript, and forward the same to me by e-mail and to counsel for the United States no later than 8:00 Monday morning."

Several of Blanchard's answers on cross examination were inconsistent with answers provided on direct examination and inconsistent with his grand jury testimony. Defendant has been in possession of Blanchard's grand jury transcript since December 4, 2014—well before his cross-examination. Defendant elicited responses from Blanchard which were obviously inconsistent with his grand jury testimony. Defendant could have explored those inconsistencies through further questioning on cross-examination in an effort to explain the inconsistencies. He chose not to. Defendant had more than ample opportunity to explore areas of Blanchard's grand jury testimony in which, according to Defendant, Blanchard was "confined" by leading questions which may have resulted in some misunderstanding. Defendant did not do so because no such confinement occurred. Throughout his testimony, Blanchard availed himself of opportunities to

explain his answers. For example, the following exchange occurred during Blanchard's re-direct examination:

> Q. Mr. Blanchard, after this violation in Defense 158, did the defendant hire the additional coal miners that you had asked for to help keep up with the safety laws?
>
> MR. TAYLOR: Same objection, Your Honor.
>
> THE COURT: All right, Mr. Taylor, I overrule it for the reasons that I stated here at the bench. I think you and I interpret the question differently. Go ahead, please.
>
> THE WITNESS: Sir, can I give more than a "yes" or "no" answer?

Tr. 3402:6-15.

Rather than seek to provide additional contextual explanations when confronted with his grand jury testimony, Blanchard confirmed that his answers therein were true. There is, therefore, no basis for re-cross to explore the context of that testimony.

Blanchard's impeachment through his grand jury testimony was also directly responsive to answers elicited during cross examination. Blanchard was asked several questions on cross examination regarding his and Defendant's participation in the charged conspiracy. For example, the following colloquy occurred during the early portion of Blanchard's cross-examination at Tr. 2529:7-16:

> Q. This indictment alleges that Mr. Blankenship committed a conspiracy to commit willful violations of the mine safety regulations. And the Government has named you as a co-conspirator. Did you conspire with Mr. Blankenship to commit willful violations of the mine safety regulations?
>
> MR. RUBY: Calls for a legal conclusion.
> .
> MR. TAYLOR: No, it doesn't.
>
> THE COURT: The objection is overruled. Go ahead, please.
>
> THE WITNESS: No, sir.

7

Cross-examination continued as follows:

> Q. And did you and Mr. Blankenship ever together commit a willful violation of the mine safety regulations?
>
> A. No, sir.

Tr. 2531:15-17.

> Blanchard was then asked about his participation in a conspiracy to defraud MSHA:
>
> Q. Mr. Blankenship is also charged with a conspiracy to defraud MSHA. And the practice -- I want to ask you. Did you participate or conspire with Mr. Blankenship to defraud MSHA inspectors?
>
> A. No, sir.

Tr. 2531:25-2532:4.

Midway through Defendant's multi-day cross examination of Blanchard, he was asked whether he and Defendant had "an understanding or a wink and a nod that there would be violations of the mine safety regulations." Blanchard responded that they "didn't have an agreement or an understanding." Tr. 2694:9-14.

Defendant then pressed further, asking if there was an unwritten understanding that Defendant instructed Blanchard that he wanted violations at the mine. Blanchard responded "No, sir." Tr. 2694:22-24

The same type of questioning occurred toward the end of Defendant's multi-day cross examination of Blanchard, during which the following exchanges occurred:

> Q. So the record is clear, Mr. Blanchard, there was no agreement between you and Mr. Blankenship to willfully violate the federal mine safety laws?
>
> A. That's correct.
>
> Q. There was no unspoken agreement or understanding between you and Mr. Blankenship to violate the mine safety laws?
>
> A. That's correct.

8

Tr. 3311:21-3312:3.

In response to Defendant's lengthy cross-examination, and specifically in response to Blanchard's testimony that he and Defendant did not conspire to violate health and safety standards or to defraud MSHA, the following colloquies occurred as the United States impeached Blanchard with his grand jury testimony:[1]

> Q. Having reviewed that then, Mr. Blanchard, do you recall being asked in the Federal Grand Jury last November whether there was an understanding at Massey and at UBB that it was often cheaper simply to pay the fines that came along with violations than it was to spend the money that would have been necessary to follow the law?
>
> A. Yes, sir.
>
> Q. And do you recall what your answer was?
>
> A. I answered you, "That was the implicit understanding."

3321:14-22.

> Q. Do you recall, Mr. Blanchard, being asked whether the defendant fostered and participated in that understanding?
>
> A. Yes, sir.
>
> Q. And do you recall what your answer was to that?
>
> A. I – my answer was, "Yes. I mean, he didn't do anything to dissuade that."

3321:25-3322:5.

***

> Q. Do you recall, Mr. Blanchard, being asked in the Federal Grand Jury whether the defendant told you or said words to the effect that he saw it as cheaper to break the safety laws and pay the fines than to spend what would be necessary to

---

[1] A copy of Blanchard's grand jury transcript is provided as Exhibit A. Inasmuch as Defendant has previously filed the transcript publicly (ECF 201, Exhibit E), this response and exhibit are not filed under seal.

follow the safety laws? And I'll direct you, if you need to refresh your recollection, to page 106 of the Grand Jury transcript, at line 17.

A. Yes, sir.

Q. And do you recall what your answer was to that?

A. I said, "That was the implication."

3322:9-19.

*** 

Q. And then do you recall after that being asked whether that was your understanding, that is, the understanding with regard to the previous question as to whether it was cheaper to break the safety laws than to pay the money to follow them, do you recall being asked whether that was your understanding from conversations that you had with the defendant?

A. Yes, sir.

Q. What was your answer?

A. "Yes."

3322:20-3323:4.

***

Q. Do you recall, Mr. Blanchard, being asked in the Federal Grand Jury last November whether the defendant told you that safety violations were the cost of doing business the way he wanted it done, or words to that effect?

A. Yes –

Q. Go ahead, I'm sorry.

A. Yes, sir.

Q. And do you recall what your answer was?

A. I will read it to you if you'll direct me to the proper location.

Q. If you need to refresh your recollection, I'll refer you to page 106 again of the Grand Jury transcript, at line 13.

A. I answered you, "To that effect."

3323:8-21.

***

Q. Do you recall, Mr. Blanchard, being asked in the Federal Grand Jury last November whether there was an understanding at Massey and at UBB that regular safety violations at UBB were part of the cost of doing business? And I'll refer you to Grand Jury page 107, line 25, if you need to refresh your recollection.

A. Yes, sir.

Q. Do you recall what your answer was to that question?

A. I answered you that "I think there was an understanding that a certain level of MSHA and state violations were tolerable."

3323:25-3324:10.

***

Q. Do you recall testifying in the Federal Grand Jury last November -- strike that. Let me ask a slightly different question. Do you recall being asked in the Federal Grand Jury last November, Mr. Blanchard, whether the defendant's policy was to invariably press for more production at his mines? And if you need to refresh your recollection, I'll refer you to page 51, line 19, of the Grand Jury transcript.

A. Yes, sir.

Q. Do you recall your answer?

A. My answer was, "Yes."

3324:19-3325:4.

***

Q. Do you recall after that question in the Federal Grand Jury being asked whether that was the defendant's policy, to invariably press for more production even at mines that he knew were struggling to keep up with the safety laws?

A. Yes, sir.

Q. Do you recall your answer to that question?

11

A. Yes.

Q. What was your answer?

A. "Yes."

3325:7-15.

***

Q. Do you recall, Mr. Blanchard, being asked, again in the Federal Grand Jury last November when you were under oath, if you rarely, if ever, heard from the defendant about the number of safety law violations that your mine was committing. And I'll refer you if you need to refresh your recollection to page 103 of the Grand Jury transcript, line 6.

A. Yes, sir.

Q. And do you recall what your answer was?

A. My answer was, "No, that's correct."

3325:18-3326:3.

***

Q. Do you recall, Mr. Blanchard, in the Federal Grand Jury last November being asked if the defendant continually pressured you on profit and on costs but rarely, if ever, said anything about the hundreds of safety law violations at UBB? And if you need to refresh your recollection, I'll refer you to page 107, line 7.

A. Yes, sir.

Q. Do you recall your answer to that question?

A. My answer to that question was, "That's correct."

3326:11-20.

***

Q. Do you recall being asked in the grand jury whether calling underground to give a warning that mine inspectors were coming was a regular practice at UBB?

A. Yes, sir.

Q. What was your answer?

A. My answer was, "Yes."

Q. And do you recall being asked whether the defendant was aware of that?

A. Yes, sir.

Q. And what was your answer?

A. My answer was, "Yes."

3365:5-15.

***

Q. Let me refer you, Mr. Blanchard, again to your grand jury transcript. I believe it's there on the, on the same page of the transcript. Do you recall being asked in the grand jury whether this practice would allow the mine's underground sections a lot of time to clean up safety violations that otherwise would have been caught?

A. Yes, sir.

Q. And do you recall the answer that you gave in the grand jury?

A. Yes, sir. The answer I gave in the grand jury was, "It would."

3366:10-20.

All of the questions posed by the United States concerning Blanchard's grand jury testimony were directly related to the inconsistent answers provided to similar questions on cross examination. Blanchard's responses to questions posed in the grand jury were confirmed by him during re-direct examination with no further need to explain them. There is no contextual ambiguity to the questions asked in grand jury or to the answers provided to those questions.

E.

Finally, Defendant submits that he should be provided an opportunity for re-cross examination due to a suggestion by the United States that the daily violation reports included detailed information about the citations. Defendant further posits that the United States failed to

13

provide a single violation report to demonstrate the notice actually received by him. Once again, Defendant is incorrect. The United States never indicated that the citations, or the detail of the citations, were included in the daily violation reports. In fact, three violation reports (Exhibits 212 through 214) have been introduced into evidence by the United States through Sandra Davis. Ms. Davis testified that Defendant received those reports. The reports have been shown to the jury, and Exhibits 212 and 214 were used in Blanchard's direct examination. Tr. 2499:13-2504:14; 2519:9-21:23. It is clear from those reports, and from testimony, that Defendant did not receive the citations themselves or the particular details of the citations. Rather, Defendant received notice of the citations. Based on the evidence introduced thus far at trial, through testimony and exhibits, there exists no reason for any confusion about what was contained in the daily violation reports received by Defendant.

III.

Defendant's stated bases for re-cross are unavailing; they all relate to areas of the redirect that did nothing more than test evidence introduced on cross-examination. Defendant has had more than ample opportunity to confront Blanchard. The scope, length and substance of the cross examination went well beyond that which are required by the Confrontation Clause of the Sixth Amendment to the Constitution. With his request for re-cross, Defendant simply wants further opportunity to present elements of his case through the easier vehicle of cross examination of Blanchard. Defendant has already indicated that it intends to put on a defense in this case, and he is certainly able to call Blanchard in his case. Given such an opportunity, and the fact that no new matters were raised on re-direct examination, there is no risk of running afoul of the Confrontation Clause. Defendant's oral motion for re-cross examination should be denied.

Respectfully Submitted,

/s/ R. Booth Goodwin II
R. Booth Goodwin II
United States Attorney
WV Bar No. 7165
300 Virginia Street, East
Room 4000
Charleston, WV 25301
Telephone:  304-345-2200
Fax: 304-347-5104
Email: booth.goodwin@usdoj.gov

CERTIFICATE OF SERVICE

      It is hereby certified that the foregoing **"Amended and Restated Response to Defendant's Oral Motion for Re-Cross Examination of Christopher Blanchard"** has been electronically filed and service has been made on opposing counsel by virtue of such electronic filing this 1st day of November, 2015 to:

>William W. Taylor, III
>Blair G. Brown
>Eric R. Delinsky
>R. Miles Clark
>Steven N. Herman
>Zuckerman Spaeder LLP
>1800 M Street, NW, Suite 1000
>Washington, DC 20036
>
>James A. Walls
>Spilman Thomas & Battle, PLLC
>48 Donley Street, Suite 800
>P.O. Box 615
>Morgantown, WV  26501
>
>Alexander Macia
>Spilman Thomas & Battle, PLLC
>P.O. Box 273
>Charleston, WV  25321

>                    <u>/s/ R. Booth Goodwin II</u>
>                    R. Booth Goodwin II
>                    United States Attorney
>                    WV Bar No. 7165
>                    300 Virginia Street, East
>                    Room 4000
>                    Charleston, WV 25301
>                    Telephone:  304-345-2200
>                    Fax: 304-347-5104
>                    Email: booth.goodwin@usdoj.gov