**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

UNITED STATES OF AMERICA,

      Plaintiff,

v.                               CRIMINAL ACTION NO. 5:14-cr-00244

DONALD L. BLANKENSHIP,

      Defendant.

**MEMORANDUM OPINION AND ORDER**

The Court has reviewed the Defendant's *Rule 29 Motion for Judgment of Acquittal on All Counts* (Document 497-1). Oral argument was held before the Court on November 12, 2015. For the reasons set forth herein, the Court finds that the motion should be denied.

**PROCEDURAL HISTORY**

On March 10, 2015, the Charleston Grand Jury returned a three count *Superseding Indictment* (Document 169) against the Defendant. Count One charged the Defendant, Donald Blankenship, with conspiracy to willfully violate mandatory mine safety and health standards and to defraud the Mine Health and Safety Administration ("MSHA"), an agency of the United States. Count Two charged the Defendant with knowingly and willfully making materially false, fictitious and fraudulent statements and representations to the Securities and Exchange Commission, and Count Three alleged the Defendant made and caused to be made untrue statements of material fact and omitted and caused to be omitted material facts in connection with the sale and purchase of Massey Class A Common Stock. The Defendant was arraigned on the Superseding Indictment on

March 24, 2015.  Trial began on October 1, 2015, and the United States completed the presentation of its evidence on November 12, 2015.  On the same day, the Defendant moved for a judgment of acquittal pursuant to Fed.R.Crim.P. 29(a), arguing that the evidence set forth by the United States was insufficient to sustain a conviction as to the three counts.  The Defendant also moved to strike from the record the testimony of a number of Government witnesses, alleging that the testimonial evidence proffered by these witnesses was not relevant as to each Count.  Because the United States has presented all of its evidence, these motions are ripe for ruling.[1]

## STANDARD OF REVIEW

Federal Rule of Criminal Procedure 29(a) ("Rule 29") states, in relevant part, that "[a]fter the government closes its evidence …, the court on the defendant's motion must enter a judgment of acquittal on any offense for which the evidence is insufficient to sustain a conviction.  The court may on its own consider whether the evidence is insufficient to sustain a conviction." Fed.R.Crim.P. 29.  In its review, the court must " '[v]iew[ ] the evidence in the light most favorable to the Government,'" *United States v. Hickman,* 626 F.3d 756, 763 (4th Cir.2010) (quoting *United States v. Bynum,* 604 F.3d 161, 166 (4th Cir.2010)).  The Court must assume that the Government's evidence is credible, and draw all favorable inferences in the Government's favor.  *United States v. Gadsden*, 616 Fed.Appx. 539, 541 (4th Cir. 2015); *see also United States v. Boddy*, 2014 WL 6961695 (S.D.W.V. December 8, 2014) (slip op.)  However, "leaps of logic" are not permitted. *Evans-Smith v. Taylor*, 19 F.3d 899, 908 n.22 (4th Cir. 1994.)  More precisely, "[a] judgment of acquittal based on the insufficiency of the evidence is a ruling by the court that as a matter of law the government's evidence is insufficient to 'establish factual guilt' on the charges in the

---

[1]  The Court notes that some of the rulings contained herein are moot as a result of the jury's verdict.  However, since the opinion was written after the conclusion of the Government's case and prior to the return of the jury's verdict, the opinion is issued in its entirety.

indictment." *United States v. Alvarez*, 351 F.3d 126, 129 (4th Cir. 2003) (quoting *Smalls v. Pennsylvania*, 476 U.S. 140, 144 (1986). The test for deciding a motion under Rule 29(a) is "whether there is substantial evidence (direct or circumstantial) which, taken in the light most favorable to the prosecution, would warrant a jury finding that the defendant was guilty beyond a reasonable doubt." *United States v. McCloskey*, 682 F.2d 468, 473 (4th Cir. 1982). If a "rational trier of fact" can find that the essential elements of a charged offense are supported by the evidence, the motion must be denied. *United States v. Singh*, 518 F.3d 236, 246 (4th Cir. 2008).

## DISCUSSION

### A. Count One of the Superseding Indictment

Count One of the Superseding Indictment charges a conspiracy in two parts. First, that the Defendant and others, as operators of the Upper Big Branch mine in Montcoal, West Virginia, ("UBB"), "unlawfully, willfully, and knowingly combined, conspired, confederated, and agreed together with each other" to willfully violate "mandatory federal mine safety and health standards" at UBB, in violation of 30 U.S.C. §820(d) and 18 U.S.C. §371. (Superseding Indictment, at ¶87.) Second, that the Defendant conspired to "defraud the United States and an agency thereof" by impeding and obstructing, through "trickery, deceit and dishonest means," the lawful functions of the Department of Labor ("DOL") and MSHA in the administration of mine safety and health laws at UBB, and thereby "defraud and deprive" the United States of revenue. (*Id*.) The asserted purpose of this conspiracy was to unlawfully increase the profits of Massey energy, and thus unlawfully enrich the Defendant. (*Id*.)

18 U.S.C. §371, "Conspiracy to commit offense or to defraud United States," allows the imposition of a fine and/or imprisonment where a jury finds that "two or more persons conspire to commit any offense against the United States, or to defraud the United States, or any agency

thereof in any matter or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy," 18 U.S.C. §371. Thus, to sustain a conviction for a charge of conspiracy under the first prong of 18 U.S.C. §371, "to commit any offense against the United States," the United States must prove the following elements beyond a reasonable doubt: (1) an agreement with at least one other person to "violate the laws of the United States," (2) intent by the Defendant to enter into such an agreement, and (3) at least one overt act committed in furtherance of the conspiracy. *United States v. Ellis*, 121 F.3d 908, 922 (4th Cir. 1997), cert. denied, 522 U.S. 1068 (1998) (citing *United States v. Chorman*, 910 F.2d 102, 109 (4th Cir. 1990)); *see also United States v. Brown*, 784 F.Supp. 322, 324 (E.D.V.A. February 24, 1992). The "offense against the United States" language of 18 U.S.C. §371 requires the United States to allege a conspiracy to violate at least one federal statute or regulation. The Superseding Indictment alleges that the Defendant conspired to violate 30 U.S.C. §820(d), which states, in relevant part, that any "[mine] operator who willfully violates a mandatory health or safety standard … shall, upon conviction, be punished by a fine of not more than $250,000, or by imprisonment for not more than one year, or by both…" 30 U.S.C. §820(d). Thus, to survive the Defendant's motion under Fed.R.Crim.P. 29(a) as to the first part of Count 1, the evidence must be sufficient, when viewed in the light most favorable to the United States, to establish that the Defendant entered into an agreement with his co-conspirators to willfully violate mandatory mine safety and health standards, and at least one overt act occurred to further the conspiracy.

Similarly, the second prong of 18 U.S.C. §371, "to defraud the United States," requires proof of three elements beyond a reasonable doubt: (1) the existence of an agreement, (2) an overt act by a conspirator in furtherance of the agreement, and (3) intent by the conspirators to defraud the United States. *United States v. Fuller*, 298 Fed.Appx. 289 (4th Cir. 2008) (citing *United States*

*v. Gosselin Worldwide Moving, N.V.*, 411 F.3d 502, 516 (4th Cir. 2005). For purposes of criminal liability under 18 U.S.C. §371, "[f]raudelent intent may be inferred from the totality of the circumstances and need not be proven by direct evidence." *Id.*, quoting *United States v. Ham*, 994 F.2d 1247, 1254 (4th Cir. 1993). The Superseding Indictment alleges that the Defendant conspired to defraud the United States and MSHA, an agency of the United States, by, *inter alia*, providing underground miners at UBB with advanced notice of MSHA inspections, and by interfering with the accurate collection of underground dust samples at UBB. (Superseding Indictment, at ¶89-99.) To sustain this charge against a motion for judgment of acquittal, the evidence must also be sufficient, when viewed in the light most favorable to the United States, to establish that the Defendant conspired to defraud the United States under 18 U.S.C. §371, by impeding the ability of MSHA to enforce such mine safety and health standards, thus depriving the United States of monetary penalties which would otherwise result from such enforcement. The Court will address each issue.

*1. Conspiracy to Willfully Violate Mandatory Mine Safety Standards.*

The Defendant first argues that there is insufficient evidence, as a matter of law, to establish his intent to enter into a conspiracy to willfully violate mandatory mine safety and health standards. The Defendant claims that the United States has "concocted a conspiracy" that does not exist in fact, and is not supported by the evidence in this case. (Tr. at 5401:5-11.) To support this argument, the Defendant emphasizes the absence of documents or testimony establishing his desire that Massey willfully violate mandatory mine safety and health standards. (*Id.* at 5401:12-22.) He focuses on the testimony of Chris Blanchard, former President of Massey subsidiary Performance Coal Company ("Blanchard"), who worked for the Defendant and oversaw UBB during the time period covered by the indictment. Calling Blanchard the "key link" in the Government's case, the

Defendant argues that far from tying the Defendant to a conspiracy, Blanchard's testimony established that the Defendant wanted to prevent violations of mine safety and health laws. (*Id*. at 5402:6-5403:3)

The Defendant also directly addressed Blanchard's testimony that a certain level of violations at Massey was considered acceptable, claiming that this is at most indicative of acquiescence to a conspiracy, or in the alternative, evidence that the Defendant was insufficiently attentive to his responsibilities as Chief Executive Officer at Massey. (*Id*. at 5403:14-5404:4.) The Defendant argues that neither fact would allow a jury to find him guilty beyond a reasonable doubt. As to Blanchard's testimony that the Defendant did nothing to dissuade Blanchard from believing that at Massey, it was considered more economical to pay MSHA citations than to follow the law, the Defendant argues that this is also insufficient to establish the "agreement" necessary to sustain a charge of conspiracy. (*Id*. at 5403:14-20.) The Defendant provides a similar rebuttal for evidence that the Defendant instructed Blanchard that he was letting "MSHA run" UBB, arguing that these comments do not constitute an instruction to violate the law. (*Id*. at 5404:5-15.)

The United States, by contrast, argues that the evidence in the record is more than sufficient to allow a jury to find that the Defendant conspired to willfully violate mandatory mine health and safety laws. Indeed, the United States asserts that the evidence in the record establishes a *prima facie* case of conspiracy, by proving an understanding between the Defendant and others to execute an unlawful plan, and at least one overt act in furtherance of the plan. To support the existence of a conspiracy, the United States cites Blanchard's testimony that there was "understanding" at Massey that violations were acceptable, and that it was cheaper to pay the fines for violations than to comply with MSHA regulations, despite the fact that many of the violations were easily preventable. (*Id*. at 5414:9-25.) The United States also emphasizes testimony from former MSHA

inspector and Massey employee Bill Ross, who informed the Defendant about persistent concerns regarding the safety of Massey mine, including UBB, and Massey's poor record of MSHA compliance. (*Id*.) The United States notes that numerous witnesses, including Blanchard, testified that the Defendant was directly involved in minute aspects of operations at UBB, and received daily violations reports from UBB, and despite these reports, continued to emphasize production at UBB. (*Id*. at 5418:6-5419:9.) According to the United States, this evidence proves that the Defendant knew that Massey was violating MSHA regulations, and "plow[ed] straight ahead" in producing coal, rather than correcting the relevant conditions. (Id. at 5416:13-25.) In fact, the United States argues that rather than correcting safety violations, the Defendant encouraged subordinates to ignore safety concerns, and rewarded himself and those subordinates who followed his instructions with "lavish" compensation. (*Id*. at 5419:21-25.)

Addressing evidence that the Defendant wanted to reduce Massey's safety violations, and allocated company resources to improve MSHA compliance, the United States argues that the Defendant only emphasized safety when it was financially beneficial to himself and to Massey. At all other times, the United States argues, the Defendant chose to emphasize production. (*Id*. at 5420:15-22.) The United States also claims that, after receiving notice that UBB was understaffed, and that safety violations were a direct result of insufficient headcount, the Defendant took steps to reduce the number of miners working at UBB. (*Id*. at 5423:2-9.) Regarding the Defendant's statements about the importance of safety, the United States argues that they were plainly insincere, and directly contradicted by the Defendant's emphasis on production at UBB. (*Id*. at 5423:10-17.) Finally, the United States notes that the Hazard Elimination Program, introduced at Massey by the Defendant during the time period of the indictment, did not show the Defendant's commitment to complying with MSHA regulations. Rather, the Hazard Elimination Program was

an insincere gesture or "just words" which did not reduce violations at UBB, and which was unknown to the miners responsible for production at UBB. (*Id*.)

To satisfy the requirement of an "overt act," the United States points to the testimony of numerous miners, mine foremen, and Massey group presidents, who testified about the emphasis on production at Massey, and the consistent disregard of safety and MSHA compliance. The United States argues that because the Defendant received notice of this conduct, and the MSHA violations which resulted, the Defendant's decision to allow such conduct to continue unabated rises to the level of an "overt act" under 18 U.S.C. §361. (*Id*. at 5424:3-13.)

Viewing the evidence in the light most favorable to the United States, and drawing all reasonable inferences in favor of the United States, the Court finds that the Defendant's motion for a judgment of acquittal as to the first part of Count One must fail. There is sufficient evidence in the record for a jury to determine that the Defendant conspired to willfully violate mandatory mine safety regulations, in violation of 18 U.S.C. §361 and 30 U.S.C. §820(d).

As an initial matter, the evidence in the record would clearly allow a jury to find that the Defendant was aware of the conditions at UBB, that these conditions violated MSHA regulations, and that UBB received a significant number of safety-related MSHA citations during the time period of the indictment. Several witnesses, including a Special Agent of the Federal Bureau of Investigation, testified to the Defendant's receipt of daily citation reports for UBB and other Massey mines. William "Bill" Ross, a former MSHA employee hired by Massey in 2008, testified that he personally informed the Defendant about conditions at Massey mines, including UBB, and provided the Defendant with a frank and unflattering portrait of Massey's relationship with MSHA and record of MSHA compliance. In particular, Ross testified that he encouraged the Defendant to increase headcount at Massey mines, including UBB, to allow more time and manpower to

satisfy MSHA requirements, and urged the Defendant to allocate resources sufficient to ensure that Massey safely operated UBB and other mines. (Tr. at 4111:4-4116:17.)  Ross also testified that he met with Stephanie Ojeda, in-house counsel for Massey, and that his conversations, including comments that Massey was seen by MSHA as "defiant," became the subject of a memorandum (the "Ross Memorandum") drafted by Ojeda and submitted to the Defendant, which summarized his findings regarding the poor state of MSHA compliance at UBB and other Massey mines. (Tr. at 3877:19-3891:25.)  Viewing this evidence in the light most favorable to the United States, a reasonable jury could find that Massey mines, including UBB, consistently violated mandatory mine safety and health regulations, and that the Defendant was aware of this conduct.

However, mere notice of wrongful conduct, without more, is insufficient to sustain the charge of conspiracy.   The United States must show that the Defendant, either explicitly or tacitly, agreed to work with others to willfully violate mandatory mine safety and health laws. The evidence in the record, viewed in the light most favorable to the United States, is sufficient to satisfy this burden.  The Court first notes the testimony of Chris Blanchard, who stated that there was an "understanding" between himself, the Defendant, and other executives at Massey that a certain level of violations was acceptable.  (*Id*. at 2245:2246:4.)  Blanchard testified that "there was an understanding that it was cheaper to – or it was less money to pay the fines for the safety violations than the cost of preventing all the violations," and that he thought the Defendant "shared the same opinion."  (*Id*. at 2245-23-2246:5.)   And while Blanchard did testify that he never "conspired" with the Defendant, the Court notes his testimony on redirect examination that he was unaware that, as a matter of law, a conspiracy did not require an explicit agreement.  (*Id*. at 2237:1-7.)  The Court finds that, based on all of the evidence and the fact that the Court should not make credibility determinations at this stage, a jury could infer an agreement between the Defendant and

others, including Blanchard, to willfully violate mandatory mine safety and health standards.

Count One also requires proof of an overt act in furtherance of a conspiracy. As to this element, the Court notes the voluminous testimony that the Defendant continued to emphasize the production of coal at UBB and other mines after receiving notice of Bill Ross' concerns about MSHA compliance and mine safety. The evidence also indicates that despite the high level of safety violations at UBB, during the time period of the indictment, the Defendant and Massey provided Blanchard with high levels of compensation. The Court notes the testimony of numerous former miners and fire bosses at UBB, including Bobbie Pauley, Larry Adams, Michael Smith, and Clifton Stover,[2] that despite receiving significant numbers of MSHA citations, regulations on ventilation, water, and rock dusting were routinely and willfully flouted at UBB, and that the mine foreman at UBB continued to emphasize production, while denying miners the time and manpower necessary to comply with MSHA regulations. Drawing all reasonable inferences from these facts in favor of the United States, the Court finds that a reasonable juror could determine that these acts were done in furtherance of the conspiracy.

### 2. Conspiracy to Defraud the United States

As to the Government's theory that the Defendant conspired to defraud and impede MSHA's enforcement of mandatory mine safety and health standards, the Defendant argues that there is no proof linking him to advanced notice or the falsification of dust samples. (*Id.* at 5405: 5-15.) Regarding advance notice, the Defendant argues that there is only one piece of evidence suggesting his involvement in the practice: a conversation where the Defendant discussed a recent

---

[2]  As part of his motion under Rule 29(a), the Defendant moved to strike the testimony of Government witnesses Bobbie Pauley, Richard Hutchins, Scott Halstead, Clifton Stover, Thomas Gary Young, Charles Justice, Larry Adkins, Michael Ellison, Richard Hodge, Stanley Stewart and Charles Lilly, arguing that the Government failed to establish a basis for admitting the testimony, and that none of the witnesses testified that the Defendant was present for the conduct described on direct examination. (Tr. at 5521:2-13.) The Court finds that the evidence is relevant and was properly admitted at trial, and therefore, declines the opportunity to strike the testimony.

inspection by MSHA with Blanchard, and asked if the miners underground knew the inspectors were coming. (*Id*.) He, therefore, argues the Government's evidence is completely insufficient. Similarly, the Defendant argues that his knowledge of any falsification of dust sampling was insufficient to establish his intent to enter into an agreement to defraud MSHA. (Id. at 5406:2-14.)

In opposing the Defendant's motion, the United States claims there is "no room" to dispute an understanding between the Defendant and others to provide advanced warning to underground miners when MSHA inspectors arrived at UBB. (*Id*. at 5425:14-22.) The United States acknowledges the Defendant's argument that there is only one fact directly relevant to his participation in such an alleged conspiracy – the question asked to Blanchard – but argues that fact is sufficient to allow the jury to infer the Defendant's intent to conceal ongoing violations of mandatory mine safety and health regulations. (*Id*. at 5425:23-5426:18.) The United States also argues that the Defendant was aware of the falsification of dust pump readings at UBB and other mines by virtue of his conversation with Bill Ross and his review of the Ross Memorandum. It claims the Defendant's awareness of the ongoing false readings, the efforts by Massey employees at UBB and elsewhere to falsify such readings, and his refusal to act to prevent similar conduct in the future, is evidence of the existence of a conspiracy. (*Id*. at 5429:6-16.) To ensure that the objective of the conspiracy was achieved, the United States argues that the Defendant sought to reduce employee headcount at UBB and other mines, and made statements, such as his comments about the insignificance of "Black Lung," which conveyed his state of mind as to the relative importance of MSHA regulations concerning dust sampling. (*Id*. at 5429:20-5430:16.)

The Court finds the evidence in the record relevant to this allegations as sufficient, when viewed in the light most favorable to the United States, to survive a motion under Rule 29. As to the issue of advance notice, the Court notes as a preliminary matter the evidence in the record that

advance notice was a common practice at UBB and other mines during the time period of the indictment. Several witnesses, including Bobbie Pauley and Charles Lilly, testified that in their work at UBB, they provided advance notice to underground miners and other UBB employees about the arrival of MSHA inspectors, and that they were instructed to do so by supervisors at UBB. (Tr. at 332:24-333:6; 3784:20-3785:23.) Stanley Stewart also testified that when the crews underground at UBB received advance notice of an inspection from a dispatcher, often by means of code words, such as "it's cloudy out there today," the crews would "[t]ry to clean up anything we could find." (*Id*. at 1827:9-15.) This evidence, viewed in the light most favorable to the United States, satisfies the "overt act" requirement of a charge for conspiracy under 18 U.S.C. §371. The Court also notes Chris Blanchard's testimony that dispatchers would call underground when MSHA inspectors arrived at UBB. (Tr. at 2318:8-9.) More significantly, the Court notes Blanchard's testimony about a telephone conversation with the Defendant in 2009, when Blanchard attempted to reschedule a conference call due to the arrival of MSHA inspectors at UBB. (*Id*. at 2321:14-19.) Blanchard testified he spoke with the Defendant, informed the Defendant about the inspection, and that the Defendant "remarked or asked me, did the, did the crews know [the MSHA inspectors] were coming," and that Blanchard responded "yes." (*Id*. at 2321:25-2322:5) Asked if he understood the Defendant to be "making sure that the underground crews at UBB" were notified about the presence of inspectors prior to the inspection, Blanchard testified "yes." (*Id*. at 2323:20.) Viewing these facts in the light most favorable to the United States, the Court finds them sufficient for a jury to infer that providing advance notice of MSHA inspections was a frequent practice at UBB, that the Defendant knew of the practice, and that the Defendant willfully joined in the conspiracy to continue the practice.

Similarly, the Court also finds that the evidence in the record, when viewed in the light

most favorable to the United States, and drawing all favorable inferences therefrom, is sufficient for a reasonable jury to return a verdict finding that the Defendant conspired, under 18 U.S.C. §371, to defraud MSHA by preventing accurate dust sampling at UBB. The testimony of Bill Ross established that the Defendant was informed, by means of the Ross Memorandum, that miners and section bosses at UBB and other Massey mines were "plainly cheating" in dust sampling during the time period of the indictment, and that according to an MSHA employee, it was "only a matter of time" before MSHA investigated such conduct. (Tr. at 3906:3-3908:22.) The Ross Memorandum also informed the Defendant that several mine foremen, when asked by Ross about the reason for cheating on dust samples, indicated that the foremen were "carrying out what they were told to do." (*Id*. at 3910:12-14.) The Ross Memorandum attributed the conduct ultimately to a "lack of personnel," and a focus on "running big footage," or mining significant amounts of coal. (*Id*. at 3912:5-10.) Ross then testified that Massey "didn't have enough staff … to oversee the proper way to handle the sampling process." (*Id*. at 3912:13-17.) This evidence clearly establishes that the Defendant had notice of the unlawful conduct at UBB and other Massey mines regarding dust sampling.

Several miners also testified about the practice of falsifying dust samples at UBB. In particular, Scott Halstead, a type-90 miner with symptoms of black lung disease, testified that on days where MSHA regulations required him to wear a dust pump at UBB, UBB safety director Berman Cornett would "make [Halstead] stand aside in fresh air" while Cornett performed Halstead's duties. (Id. at 2111:15-25.) Also relevant is the Defendant's recorded statement about the relative insignificance of black lung disease in the mining industry, which a jury could reasonably read as evidence of the Defendant's state of mind regarding the importance of federal dust sampling regulations, and intent to conspire with others to violate the regulations governing

dust sampling. Finally, viewing the evidence in the light most favorable to the United States, the Court finds that a jury could interpret the Defendant's decision to reduce headcount at UBB, after learning of Ross' opinion that more miners were required at UBB to ensure adequate dust sampling, as an overt act in furtherance of the conspiracy.

### B. *Count Two of the Superseding Indictment*

Count Two of the Superseding Indictment alleges that on or about April 8, 2010, the Defendant and others knowingly and willfully made false, fictitious and fraudulent statements of material fact, and "knowingly and willfully made and used, and caused to be made and used," a false writing containing the same false, fictitious and fraudulent statement of material fact. (Superseding Indictment, at ¶102.) The statement at issue was a shareholder statement issued several days after the explosion at UBB on April 5, 2010, which indicated that "we [Massey] do not condone any violation of MSHA regulations" and "we [Massey] strive to be in compliance with all regulations at all times" (the "shareholder statement"). (*Id.*) The indictment alleges that the shareholder statement, by virtue of Massey's status as an issuer of securities, falls within the jurisdiction of the Securities and Exchange Commission, and therefore, violated 18 U.S.C. §1001(a)(2) and (3) and 18 U.S.C. §2.

18 U.S.C. §1001(a) states that "[e]xcept as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully – (2) makes any materially false, fictitious, or fraudulent statement or representation, or (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry" shall be fined or imprisoned. 18 U.S.C. §1001(a)(2)-(3). Meanwhile, 18 U.S.C. §2 provides, in relevant part, that (a) "[w]hoever commits an offense against the United States, or

aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal," and (b) "[w]hoever willfully causes an act to be done which if directly performed" by himself or another person "would be an offense against the United States, is punishable as a principal." 18 U.S.C. §2. For purposes of criminal liability under 18 U.S.C. §1001, a statement is "material" if the statement "has a natural tendency to influence agency action or is capable of influencing agency action." *United States v. Garcia-Ochoa*, 607 F.3d 371, 375 (4th Cir. 2010) (quoting *United States v. Norris*, 749 F.2d 1116, 1122 (4th Cir. 1984)). Thus, the United States was required to prove the following elements as to Count Two: (1) that in issuing the shareholder statement, the Defendant made, or caused to be made, a false, fraudulent, or fictitious statement, representation or writing; (2) that the shareholder statement was within the jurisdiction of an agency of the executive branch of United States – in this case, the Securities and Exchange Commission, and (3) that the shareholder statement was material, and capable of influencing the action of the agency.

In moving for a judgment of acquittal, the Defendant argues that the Shareholder Statement was not material. (Tr. at 5408:11-14.) The Defendant also argues that there is no evidence in the record showing that the language of the statements, which asserted that Massey did not condone MSHA violations and strived to comply with MSHA regulations, was capable of influencing the Securities and Exchange Commission. (*Id*. at 5410:5-16.) The United States opposes the motion, arguing that there is clear evidence that the shareholder statement was material. In support, the United States argues the UBB explosion was a critical event for Massey, which led to intense public scrutiny of knowing violations of safety regulations at the mine. (*Id*. at 5433:10-24.) Thus, investors were obviously focused on Massey's public response to UBB, and any potential indication that Massey had violated safety regulations or faced civil or criminal liability. (*Id*. at 5434:1-16.) The United States also argues that the proximity of the statement to the UBB disaster

15

establishes that the statement was capable of influencing the Securities and Exchange Commission. To support this argument, the United States notes that the SEC requested additional information from Massey about compliance with MSHA regulations after the shareholder statement was issued. (*Id.* at 5434:17-23.)

The Court finds the evidence in the record is sufficient to sustain Count Two against the Defendant's motion for a judgment of acquittal. Regarding the falsity of the shareholder statement, the Court finds, when viewing the evidence in the light most favorable to the United States, there is sufficient evidence for a jury to determine that the statement was false. In particular, the Court notes the abundance of evidence regarding unsafe conditions and potentially unlawful violations at UBB based on evidence from miners who also testified that safety and safety compliance were disregarded in favor of production, and the fact that the Defendant was aware of the high number of citations received by UBB in the two years preceding the explosion on April 5, 2010. This evidence is sufficient for a jury to determine that the relevant statements, "we do not condone any violation of MSHA regulations" and "we strive to be in compliance with all regulations at all times" were false.

However, a false statement, standing alone, is insufficient to sustain the charge under 18 U.S.C. §1001. The United States must also establish that the Defendant made the statement. The Court finds that, viewing the evidence in the light most favorable to the United States, a reasonable jury could reach this determination. In reaching this conclusion, the Court notes the testimony of two Government witnesses, namely, Karen Hanratty and John Poma. Hanratty, who advised Massey on public relations following the UBB explosion, testified that she emailed a copy of the draft shareholder statement to the Defendant for his review. (Tr. at 1005:18-25.) Hanratty also testified that Defendant Blankenship responded to her email, attaching a hand-written note stating

"Karen, okay, Don." (*Id*. at 1007:11-18.) Hanratty testified that the note "indicated [the Defendant's] approval of the statement that we could send it out to reporters." (*Id*. at 1007:20-21.) John Poma, meanwhile, testified that he served as Chief Administrative Officer at Massey at the time of the UBB explosion, and that he was tasked to serve as the "air traffic controller" for the issuance of the shareholder statement. (*Id*. at 4585:23-25; 4588:20-24.) Poma testified that he sent multiple drafts of the shareholder statement to the Defendant, and added a cover note, where he recommended "post[ing]" the statement "on the Massey website and fil[ing] an 8k that refers the public to our website," because "the investor share base is generally the population that reviews the 8k filings." (*Id*. at 4598:2-4599:10.) Poma testified that he was familiar with the Defendant's "management style," and that "something of [the shareholder statement's] importance would not be filed without [the Defendant's] approval." (*Id*. at 4602:6-10.) Finally, Poma testified that on April 8, 2010, he sent an e-mail to Baxter Philips, attaching an edited shareholder statement. Poma testified that the email stated "[t]the attached [shareholder statement] incorporates the edits suggested by [the Defendant] during my meeting with him this afternoon." (*Id*. at 4602:5-12.) Poma then testified that the Defendant made "minor edits" and "more substantive edits" to the shareholder statement. (*Id*. at 4604:10-13.) Poma also confirmed that the final shareholder statement was published on the Massey website. (*Id*. at 4600:18.) The 8K referring shareholders to the shareholder statement on the Massey website was issued on April 8, 2010. (Gov. Ex. 197.) Viewing this evidence in the light most favorable to the United States, the Court concludes that a jury could find that the Defendant, as Chief Executive Officer of Massey, "made" the false statement.

The jurisdiction of the Securities and Exchange Commission, under the Securities Act of 1933, the Securities Exchange Act of 1934, and the relevant regulations thereunder, to investigate

the falsity of public statements by issuers of publicly-traded securities, is not disputed in this case. Nor is it disputed that Massey was such an issuer during the time period of the indictment. However, to survive the Defendant's motion for a judgment of acquittal as to Count Two, the United States was still required to establish that the shareholder statement was material, which for purposes of liability under 18 U.S.C. §1001, requires a showing that the statement was capable of influencing the SEC. Viewing the evidence as to this element in the light most favorable to the Defendant, the Court finds that a reasonable jury could find that the shareholder statement was material. In particular, the Court notes the testimony of Government expert Frank Torchio. Torchio testified that the price of Massey stock dropped significantly on April 6 and 7, 2010, the two days following the UBB explosion. (Tr. at 4727:17-21.) Torchio also testified that after the shareholder statement was issued, Massey's stock price experienced a "fairly large … reaction of approximately four percent." (*Id*. at 4737:1-6.) The Court also notes the SEC comment letter issued on July 2, 2010, which requested additional information about Massey's safety measures and MSHA compliance. (Gov. Ex. 290.) This evidence is sufficient, drawing all reasonable inferences in favor of the United States, for a jury to conclude that the statement was material to investors, and therefore, was capable of influencing the action of the Securities and Exchange Commission.

C. *Count Three of the Superseding Indictment*

Count Three of the Superseding Indictment also focuses on two sentences from the shareholder statement of April 9, 2010: that Massey "… do[es] not condone any violation of MSHA regulations," and "strive[s] to be in compliance with MSHA regulations at all times." (Superseding Indictment, at ¶102.) However, in Count Three, the United States alleges that by issuing the shareholder statement, and filing the shareholder statement with the Securities and

Exchange Commission, the Defendant, from "on or around April 7, 2010" through "on or around April 9, 2010," made "untrue statements of material facts" and "omit[ted] to state, and cause[d] to be omitted to state, material facts necessary in order to make the statements … not misleading." Count Three alleges that this conduct violated 15 U.S.C. §78ff, and 17 C.F.R. §240.10b-5, as well as 18 U.S.C. §2.

15 U.S.C. §78ff states, in relevant part, that "[a]ny person" who willfully violates "… any rule or regulation" implemented pursuant to the Securities Exchange Act of 1934 (the "Exchange Act"), or who "willfully and knowing makes, or causes to be made, any statement in any application, report or document required to be filed" under the Exchange Act or "any rule or regulation thereunder" may be fined "not more than $5,000,000, or imprisoned not more than 20 years, or both …" 17 C.F.R. §240.10b-5 ("Rule 10b-5"), meanwhile, makes it "unlawful" for "any person" to use "any means or instrumentality of interstate commerce," in "connection with the purchase or sale of any security," to "(a) … employ any device, scheme, or artifice to defraud," "(b) … make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading …", or "(c) … engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. §240.10b-5. Count Three, therefore, requires the United States to prove three elements. First, that in connection with the purchase, sale or offering of Massey stock or securities, the Defendant knowingly either made (a) an untrue statement of material fact, or omitted to state a material fact necessary in order to make the statement made, in light of the relevant circumstances, not misleading; or (b) engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon a purchaser or seller. Second, that in connection with this purchase or sale, the Defendant made use

of or caused the use of any means of interstate commerce, or of the mails, or of any facility of any national securities exchange. Third, the Defendant acted willfully, knowingly, and with the intent to defraud. For purposes of criminal liability under 15 U.S.C. §78ff and Rule 10b-5, a statement is material if there is a "substantial likelihood" that disclosure of the omitted facts, or an accurate description of the falsely stated facts, "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 656 (4th Cir. 2004) (quoting *Basic v. Levinson*, 485 U.S. 224, 231-32 (1988).

The Defendant argues that there is no evidence in the record showing that the relevant statement was made with an intent to deceive. (Tr. at 5411:8-12.) The Defendant claims that it is insufficient for the Government to use a witness from the Federal Bureau of Investigation to read into evidence Massey proxy statements showing that the Defendant owned shares in Massey, and argue that the Defendant's shares created a motive to deceive. (*Id*. at 5411: 13-25.) He also argues that it is insufficient, to show the loss in value suffered by Massey shares after the announcement of the UBB accident, and impute to the Defendant a desire to issue a false shareholder statement, in order to avoid a similar loss. (*Id*.) The United States, by contrast, argues that the Defendant's participation in a conspiracy to willfully violate mandatory mine safety and health laws, as alleged in Count One, is *per se* evidence that the shareholder statement was false, and that the statement omitted facts necessary to render the statement, in light of the circumstances in which it was made, not misleading. (*Id*. at 5435:23-5436:11.) The United States argues that the testimony of Frank Torchio establishes that the content of the shareholder statement was clearly material to investors. The United States cites Torchio's testimony for the proposition that Massey investors were concerned in the aftermath of UBB about the company's commitment to regulatory compliance.

(*Id.* at 5437:8-5436:5.)  Finally, the United States argues that the transmission of the draft statement to and from the company's offices in West Virginia to other offices in Virginia, the distribution of the shareholder statement on the Massey website, and Massey's decision to upload the statement to the SEC's EDGAR portal establish the nexus to interstate commerce required for a conviction under 15 U.S.C. §78ff and Rule 10b-5.  (*Id.* at 5438:6-22.)

The Court finds the evidence in the record as to Count Three is sufficient to survive the Defendant's motion.  As an initial matter, the Court finds the evidence, when viewed in the light most favorable to the United States, is sufficient for a jury to find that the Defendant "made" the statement for purposes of Rule 10b-5, and that the statement was false.  *See* Page 16-17, *supra*. Similarly, drawing all reasonable inferences in favor of the United States, the evidence is sufficient to conclude that the shareholder statement omitted information which, in light of the circumstances under which the statement was made, was required to make the shareholder statement not misleading.  In particular, the Court notes the testimony in the record about conditions underground at UBB during the time period of the indictment, the testimony regarding willful safety violations by miners, the testimony that miners were instructed to continue production, rather than remedy potential MSHA violations, and the evidence clearly establishing the Defendant's notice that Massey received a significant number of MSHA violations.  The Court also notes the evidence that the Defendant reduced the number of miners at UBB after the Defendant received notice from the Ross Memorandum, and from Ross himself, that in Ross' opinion, crews at UBB were insufficiently staffed to ensure compliance with MSHA regulations, and that ventilation violations were frequent.

As to the Defendant's intent to defraud, the Court also concludes that the evidence, viewed in the light most favorable to the United States, is sufficient to survive the Defendant's motion.

As an initial matter, the Court notes the Defendant's involvement in issuing the shareholder statement. The Court also notes the evidence of the Defendant's compensation, and the evidence of the Defendant's personal holdings in Massey stock. Taken in connection with the evidence in the record of the Defendant's state of mind regarding his own compensation (Gov. Ex. 110), and the evidence showing the Defendant's state of mind regarding production at UBB and other Massey mines, the Court finds that a reasonable juror could infer from this evidence the Defendant's intent to artificially sustain Massey's stock price by issuing the shareholder statement.

Having satisfied these elements of Count Three, the United States must show that the shareholder statement was material. Drawing all inferences in favor of the United States, the evidence in the record is sufficient to establish that the shareholder statement was material. The Court notes again the testimony of Frank Torchio, who linked the shareholder statement to a change in Massey's stock price, and also demonstrated that Massey's stock price later fell when information was released about government investigations into the UBB explosion on April 30, 2010, and again on May 17, 2010. (*See* Tr. at 4737:1-6; 4746:1-4752:4) Torchio also testified that the UBB explosion was "statistically significant which from an economic perspective means that the information that came out was important to investors." (Id. at 4754:1-4.) This evidence is sufficient, when viewed in the light most favorable to the United States, for a reasonable jury to determine that investors were concerned about events at UBB, and that investors would have considered additional information about UBB, including accurate descriptions of the conditions therein, significant when making decisions about Massey stock.

The Defendant's arguments to the contrary, which emphasize that the citations received by Massey were publicly available, and that any information omitted from the shareholder statement would not have added to the "total mix" of available information, are unpersuasive. The Defendant

seems to suggest that investors had sufficient reason to question the veracity of the shareholder statement based on publicly-available information about the Company's compliance record with MSHA. The Defendant argues that media coverage of Massey's compliance record gave investors reason to question the shareholder statement, and implicitly argues that because media outlets were investigating Massey's compliance record at UBB, and publishing stories to that effect, a statement by the company about its efforts to comply with MSHA regulations, and refusal to condone MSHA violations, would not be taken seriously by investors, and was, therefore, not material. These are arguments for the jury.

## CONCLUSION

Wherefore, following thorough review and careful consideration, the Court **ORDERS** that the *Rule 29 Motion for Judgment of Acquittal on All Counts* (Document 497-1) be **DENIED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, to the United States Attorney, to the United States Probation Office, and to the Office of the United States Marshal.

ENTER:    December 9, 2015

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA