IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
BECKLEY DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                CRIMINAL ACTION NO. 5:14-cr-00244

DONALD L. BLANKENSHIP,

      Defendant.

**MEMORANDUM OPINION AND ORDER**

The Court has reviewed the Defendant's *Renewed Motion to Transfer to Another District for Trial* (Document 384), filed on September 24, 2015, and the *Response of the United States to Defendant's Renewed Motion to Transfer to Another District for Trial* (Document 394). The Court has also reviewed *Defense Motion No. 3: Motion to Transfer to Another District for Trial* (Document 121), the *Memorandum in Support of Defense Motion No. 3: Transfer to Another District for Trial* (Document 122), the *United States' Response to Defendant's Motion for Transfer to Another District for Trial* (Document 160), the *Reply in Support of Defense Motion No. 3: Transfer to Another District for Trial* (Document 166-2), as well as all attached exhibits. Further, the Court has reviewed its June 12, 2015 *Order* (Document 280), its August 20, 2015 *Order* (Document 322), and its October 7, 2015 *Memorandum Opinion and Order* (Document 419). For the reasons stated herein, the Court finds that the Defendant's motion should be denied.

**PROCEDURAL HISTORY**

On February 20, 2015, the Defendant filed his first motion to change venue. Therein, he requested that the Court transfer this case to another federal district court for trial. The Defendant argued that under Federal Rule of Criminal Procedure 21(a) and relevant Supreme Court

precedent, pre-trial publicity and public opinion in the Beckley Division of the Southern District of West Virginia were so adverse to the Defendant as to jeopardize his Sixth Amendment right to a fair trial. (Def. Mem. in Support of Mot. to Change Venue, at 3-5.) Moreover, the Defendant argued that under *United States v. Skilling*, 561 U.S. 358 (2010), the prejudice against the Defendant in the Beckley division, and the demographic and economic characteristics of that division, meant that *voir dire* would be an ineffective procedure for seating an impartial jury. (*Id.*) The United States filed its response on February 27, 2015, arguing that neither the pretrial publicity about this case, nor the demographics of the Beckley division, threatened the Defendant's Sixth Amendment rights. (United States' Resp. in Opp. to Def. Mot. to Change Venue, at 1-2.)

On March 20, 2015, the United States moved for the use of a juror questionnaire (Document 176), and attached as an exhibit proposed questions for distribution to potential jurors. The Defendant responded with his own questions on March 27, 2015 (Document 181). On June 8, 2015, the Court held a telephonic hearing, wherein the Court directed the parties to file any proposed juror questionnaires by June 12, 2015. On that day, the Defendant filed his *Motion for Use of Juror Questionnaire* (Document 277), wherein he attached an amended version of his proposed juror questionnaire, and the United States filed its *Notice of Amended Proposed Juror Questionnaire* (Document 278). On June 12, 2015, this Court entered an *Order*, indicating that jury selection and trial would take place in the Charleston division of the Southern District of West Virginia. (Document 280, at 3.) The *Order* was entered after careful consideration of the location of the events alleged in the indictment, the size of the respective jury pools in the Charleston and Beckley divisions, and the resulting delay if an impartial jury could not be seated. (*Id.*) The *Order* was entered with the consent of both the United States and the Defendant.

On August 20, 2015, this Court entered an *Order* (Document 322) requiring the Clerk of the Court to randomly select three hundred men and women from the qualified jury wheels for the Charleston and Huntington Divisions of the Southern District of West Virginia. (Document 322, at 1.) The Court also ordered the Clerk to issue a summons and questionnaire to each of the randomly selected jurors. On August 21, 2015, the Clerk mailed the summons and final questionnaire to potential jurors. Of the eighty-seven questions on the juror questionnaire, approximately sixty-four questions were either directly drawn from, or incorporated, the substance of the Defendant's proposed questionnaire. Prior to *voir dire*, the jury questionnaire responses were made available to the parties, and the Court individually reviewed one hundred and eighty-seven questionnaires. Of those, approximately seventy indicated some evidence of bias, either for the United States or for the Defendant.

On September 24, 2015, the Defendant filed his renewed motion to transfer to another district for trial. The Defendant rehashed many of his prior arguments about pretrial publicity, including that media coverage in this district had been hostile to him, that the unique economic characteristics of this district made seating an impartial jury "especially difficult," and that surveys conducted reveal "high rates of prejudgment and prejudice." (Def. Renewed Mot. to Transfer to another District for Trial, at 4-6.) He also argued that since the filing of his earlier venue motion on February 20, 2014, media coverage of the case had been so "relentless, omnipresent and vicious" as to "render voir dire ineffective." (*Id*. at 6-8.) Finally, the Defendant claimed that media coverage had created the false impression that he was on trial for causing the explosion at UBB; that media accounts from the families of miners who died at Upper Big Branch made it more likely that a jury would convict him; and that social media postings threatening the Defendant with

3

violence showed "deep-seated animosity" toward him in this district. (*Id.* at 8-17.)

*Voir dire* began on October 1, 2015, and continued for five days. The Court informed the parties of the Court's intent to seat thirty-five (35) potential jurors, to conduct *in camera voir dire* from the bench, and informed the parties that they would be able to submit additional questions for potential jurors. (Transcr. at 13:22-25.) The Court instructed the potential jurors, as indicated in the jury questionnaire, there were "no right or wrong answers" in *voir dire,* and emphasized that the purpose of the *voir dire* process was to "seat a jury that can be fair and impartial to both sides" of the case. (*Id*. at 17:5-8) The Court's clerk then administered the oath to the jury, and further requested that potential jurors swear to the truth and accuracy of their answers to the jury questionnaire. (*Id*. at 8-20.)

Approximately ninety-nine jurors were questioned by the Court during *voir dire.* The Court seated thirty-five (35) jurors and began by questioning four jurors who indicated that they personally knew the Defendant, the Defendant's counsel, or counsel for the United States, before questioning the remaining jurors in numerical order. For each juror, the Court inquired whether, since completing the juror questionnaire, the juror had become aware of additional information about the Defendant, and whether the juror could base a verdict solely on the law provided by the Court and the evidence set forth during trial. The Court also asked about any answers on the jury questionnaire which suggested bias or prejudice, and asked follow-up questions about any inconsistencies between the content of the jury questionnaire and a juror's answers at the bench. These questions also gave the Court the opportunity to assess the credibility and demeanor of each juror, and the Court gave the parties the opportunity to submit additional questions for each juror. Out of the presence of the juror, the parties were given an opportunity to move to strike the juror

4

for cause. In total, the Court excused eighty-seven (87) potential jurors for cause, either on motion or by agreement of the parties.[1] The Court then seated thirty-five (35) members of the panel, from which the parties took preemptory strikes, leaving a jury of twelve (12), plus three (3) alternates. Approximately forty-nine potential jurors were unused.

Trial began on October 7, 2015. Immediately prior to the start of trial, the Defendant again renewed his motion to transfer. That same day, the Court issued a Memorandum Opinion and Order denying the Defendant's motion for change of venue on the basis of presumed prejudice based on pretrial publicity. (Document 419, at 6.) On December 4, 2015, the seated jury returned a verdict finding the Defendant guilty as to Count One of the Superseding Indictment (Document 169), and not guilty as to Counts Two and Three.

## APPLICABLE LAW

"As a general premise, a change of venue is warranted when the court is satisfied that there exists in the district where the prosecution is pending 'so great a prejudice against the defendant' that 'the defendant cannot obtain a fair and impartial trial.'" *United States v. Higgs*, 353 F.3d 281, 307 (4th Cir. 2003) (citing Fed.R.Crim.P. 21(a)). This determination requires a "two-step process" where, first, the "district court must determine 'whether the publicity is so inherently prejudicial that trial proceedings must be presumed to be tainted,'" thus requiring change of venue before jury selection. *Id.* (quoting *United States v. Bakker*, 925 F.2d 728, 732 (4th Cir. 1991)). The Fourth Circuit has cautioned, however, that "only in extreme circumstances may prejudice to a defendant's right to a fair trial be presumed from the existence of pretrial publicity itself." *Id.* (internal brackets omitted) (quoting *Wells v. Murray*, 831 F.2d 468, 472 (4th Cir. 1987)).

---

1  A majority of those excused by agreement of the parties were not subject to *voir dire* or questioned by the Court.

Likewise, presumed prejudice is a "rare case . . . ." *United States v. Jones*, 542 F.2d 186, 193 (4th Cir. 1976).

The second prong of the test for change of venue requires the Court, while conducting *voir dire*, to determine if there is actual prejudice to the Defendant, such that the Defendant cannot receive a fair trial. *Higgs*, 353 F.3d at 308, citing *Bakker*, 925 F.3d at 732. The Court may only find actual prejudice if the Court is unable to seat an impartial jury. *Bakker*, 925 F.2d at 732. When conducting *voir dire*, the Court must determine whether a potential juror has formed a pre-trial opinion of the Defendant's guilt, such that the juror is unable to "lay aside his impression or opinion or render a verdict based on the evidence presented in court." *Higgs*, 353 F.3d at 308, quoting *Irwin v. Dowd*, 366 U.S. 717, 723 (1961). Notably, "mere knowledge of case" by a seated juror "is insufficient to support a finding of actual prejudice." *Id.*, citing *Irwin*, 366 U.S. at 722-23; *Murphy v. Florida*, 421 U.S. 794, 799-800 (1975) ("qualified jurors need not be … totally ignorant of the facts and issued involved.") Rather, the Court must only excuse potential jurors who express or demonstrate "an inability to be fair and impartial." *Id.* at 309. In assessing the adequacy of *voir dire*, no formal requirements govern; rather, the "only issue is whether … *voir dire* was sufficient to impanel an impartial jury." *Bakker*, 925 F.2d at 733; quoting *United States v. LaRouche*, 896 F.2d 815, 830 (4th Cir. 1990).

## DISCUSSION

As an initial matter, the Court notes that the only issue before the Court is the second prong of the venue analysis: whether *voir dire* revealed actual prejudice to the Defendant, such that the Court was unable to seat an impartial jury. The Court finds that the *voir dire* process allowed the

Court to successfully impanel an impartial jury and, thereby, safeguard the Defendant's Sixth Amendment right to a fair trial.

The Court has reviewed and considered Supreme Court and Fourth Circuit precedent in reaching this conclusion. In *United States v. Skilling*, a highly-publicized case involving the trial of the former Chief Executive Officer of Enron, the defendant challenged the *voir dire* process applied by the trial judge, arguing that the process failed to protect his Sixth Amendment rights. *Skilling*, 561 U.S. at 358-59. Writing for the majority, Justice Ginsburg noted that the trial judge issued a questionnaire to the four hundred randomly selected jurors, and that the judge excused a total of 119 jurors based on their answers to the questionnaire. *Id*. at 359. The Supreme Court also noted that the trial judge led *voir dire*, while allowing Counsel for the defendant to submit questions for potential jurors about their exposure to news stories and media reports about the issues in the case, as well as questionnaire answers which suggested bias. *Id*. After noting, as a preliminary matter, that "'[j]ury selection is particularly within the province of the trial judge," the Supreme Court held that the *voir dire* process ensured the selection of an impartial jury, and was, therefore, sufficient to protect the defendant's Sixth Amendment rights. *Id*. at 362-63. Justice Ginsburg identified several facts which allowed the Court to reach this conclusion, in particular, that the jury questionnaire, which included a number of questions proposed by the defendant, effectively identified potential jurors to be excused for cause, that the *voir dire* process secured a jury panel "largely uninterested" in the substantial pretrial publicity about the defendant, and that "whatever community prejudice existed … generally" toward the defendant and the defendant's former employer, the defendant's "jurors were not under its sway." *Id*. at 362. Moreover, the Supreme Court emphasized that the district court did not take the venire members "at their word,"

rather, the Court questioned each juror individually about potential bias. *Id*. at 363. "This face to face opportunity to gauge [the juror's] demeanor and credibility, coupled with information from the questionnaires regarding juror's backgrounds, opinions, and news sources, gave the court a sturdy foundation to assess fitness for jury service." *Id*.

The Fourth Circuit conducted similar analysis in two cases involving significant pretrial publicity, *United States v. Higgs* and *United States v. Bakker*. In *Higgs*, a case involving a highly publicized murder charge, the Fourth Circuit noted that while seven of the jurors seated by the trial court had heard of the case, that fact alone was "insufficient to support" a finding of actual prejudice, as each of these jurors stated that they could decide the case based solely on the evidence presented at trial. *Higgs*, 353 F.3d at 309. Moreover, the Fourth Circuit emphasized that the trial court excused jurors who had "expressed an inability to be fair and impartial." *Id*. Similarly, in *Bakker*, a case involving highly-publicized allegations of criminal conduct by a nationally-known televangelist, the Fourth Circuit found that *voir dire* was sufficient to protect the defendant's constitutional rights, despite the significant pre-trial publicity surrounding the defendant's alleged conduct. *Bakker*, 925 F.2d at 733. The Fourth Circuit emphasized the trial judge's use of *voir dire* to "disclos[e] the impact that both past and future media attention would have upon potential jurors," and noted that the trial court thoroughly questioned potential jurors about exposure to pretrial publicity, vulnerability to the opinions of others, and the influence of media reports upon the juror's ability to remain impartial. *Id*. Finding that it was "well-settled that a trial judge may conduct *voir dire* without allowing counsel to pose questions directly to the potential jurors," the Fourth Circuit also found that the trial judge followed the procedures required by Rule 24(a) of the Federal Rules of Criminal Procedure, by asking Counsel for the defendant if they had additional

8

questions, and "then posing the questions." *Id*. The Fourth Circuit also declined to find that potential jurors must have no knowledge of the defendant, or the defendant's alleged conduct.[2] *Id*. at 734.

Precedent supports the finding that *voir dire* in this case was sufficient to protect the Defendant's Sixth Amendment rights, and to ensure a fair and impartial jury. As in *Skilling* and *Bakker*, the Court distributed a questionnaire to potential jurors, which included a number of questions designed to elicit information about the juror's knowledge of the defendant, opinions related to the case, relationship to Counsel involved in the case, and knowledge of and opinions related to the explosion at the Upper Big Branch mine on April 5, 2010. And, as in *Skilling*, many of the questions included on the Court's questionnaire, including questions about the Defendant, the Upper Big Branch Mine, the Mine Safety and Health Administration, and conduct by corporate executives, were proposed by the Defendant. When *voir dire* began, the Court agreed to excuse twenty-three jurors for cause, based on the mutual agreement of the parties, and then carefully questioned ninety-nine additional jurors on the content of the questionnaire. As in *Skilling* and *Bakker*, the Court conducted *voir dire* from the bench, and focused on the juror's answers to the questionnaire. The Court inquired about each juror's exposure to pretrial publicity since completing the questionnaire, emphasized that there were no "right or wrong answers," and confirmed that each juror had refrained from viewing, reading or commenting on media reports or social media postings about the trial. The Court emphasized that each juror would be obligated

---

2  The Fourth Circuit quoted the Supreme Court's decision in *Irwin v. Dowd*, 366 U.S. 717 (1961), for the proposition that in an era of rapid and widespread communications, trial courts must be vigilant to ensure that jurors are not biased and trials are not compromised by media attention surrounding a case, without requiring "that jurors be totally ignorant of the facts and issues involved," as "it is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Bakker*, F.2d at 734, citing *Irwin v. Dowd*, 366 U.S. 717, 722-23 (1961).

9

to base a verdict solely on the evidence set forth at trial. The Court then examined each juror about any answers on the jury questionnaire which suggested even a hint of prejudice against the Defendant, and further explored any inconsistencies in the juror's response. The Court emphasized the need to seat a jury that was impartial, and ensured that each juror understood the Defendant's constitutional rights. As in *Bakker*, the Court then allowed each party to submit additional questions for the juror to the Court, and the Court posed those questions to the juror. On a number of occasions, the Court permitted the parties to submit an additional round of questions, to ensure that both parties were satisfied as to the juror's response.

Of the thirty-five (35) panel members who were seated, the parties struck sixteen (16) from the first twenty-eight (28) to leave a jury of twelve, and struck four (4) from the remaining seven (7) to leave three alternate jurors. While some of these jurors knew who the Defendant was, knew of his former role as the Chief Executive Officer for Massey Energy, and/or had some familiarity with the Upper Big Branch explosion, these facts do not independently require the Court to find actual prejudice. To the contrary, *Skilling*, *Higgs* and *Bakker* clearly establish that a juror need not be entirely ignorant of the facts in a particular case. Further, the Court determined that these jurors could sit impartially. To that point, none of the seated jurors had more than a passing familiarity with the Defendant, the facts giving rise to the case, or the events at Upper Big Branch. Nor did any of these jurors reveal any signs of potential bias or prejudice. Thus, as in *Skilling*, even if there was community prejudice against the Defendant in the Charleston and Huntington Divisions of the Southern District of West Virginia, these jurors were "not under its sway." Rather, the answers provided by the jurors clearly demonstrated their ability to objectively weigh the evidence presented in the case, and render a decision based solely on that evidence and the

instructions of law provided by the Court. The Court also finds that each juror understood the importance of impartiality, and the serious nature of the proceeding. Thus, the Court finds that the *voir dire* process in this case was more than sufficient to protect the Defendant's Sixth Amendment rights, and further finds that there was no actual prejudice to the Defendant.

## CONCLUSION

Wherefore, following thorough review and careful consideration, the Court **ORDERS** that the *Renewed Motion to Transfer to Another District for Trial* (Document 384) be **DENIED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, to the United States Attorney, to the United States Probation Office, and to the Office of the United States Marshal.

ENTER: December 9, 2015

*[Signature]*
IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA