## IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA BECKLEY

UNITED STATES OF AMERICA

v.                                                            CRIMINAL NO. 5:14-00244

DONALD L. BLANKENSHIP

## UNITED STATES' SENTENCING MEMORANDUM

May 1, 1900, Scofield, Utah:  A coal dust explosion at the Winter Quarters mine kills 200 coal miners.

December 6, 1907, Monongah, Marion County, West Virginia: A coal dust and gas explosion at Fairmont Coal's No. 6 and 8 mines kills 361 coal miners.

December 9, 1911, near Briceville, Tennessee: An explosion likely caused by gas and coal dust at the Cross Mountain mine kills 89 coal miners.

March 2, 1915, Layland, Fayette County, West Virginia: A coal dust explosion at the New River and Pocahontas No. 3 mine kills 112 coal miners.

March 8, 1924, near Castle Gate, Utah: A gas and coal dust explosion at the Utah Fuel Company Castle Gate Mine No. 2 kills 171 coal miners.

April 28, 1924, Wheeling, West Virginia: A gas and coal dust explosion at the Benwood mine kills 119 coal miners.

May 12, 1942, Osage, Monongalia County, West Virginia: A methane and coal dust explosion at the Christopher No. 3 mine kills 56 coal miners.

February 5, 1957, Bishop, on the Virginia-West Virginia line: A gas and coal dust explosion at the Bishop mine kills 37 coal miners.

November 20, 1968, Farmington, West Virginia: An explosion at the Consol No. 9 mine kills 78 coal miners. The ensuing investigation determines that the mine suffered from inadequate ventilation and inadequate control of coal dust.

March 9 and 11, 1976, near Ovenfork, Kentucky: Two gas and coal dust explosions at the Scotia mine kill a total of 26 coal miners.

December 7, 1981, Kite, Kentucky: A coal dust explosion at the Adkins Coal No. 11 mine kills eight coal miners.

September 13, 1989, Sullivan, Kentucky: A methane explosion at the Pyro No. 9 Slope mine kills ten coal miners. The ensuing investigation determines that an inadequate preshift safety examination contributed to the explosion.

December 7, 1992, near Norton, Virginia: A methane and coal dust explosion at the Southmountain Coal No. 3 mine kills eight coal miners. The ensuing investigation determines that inadequate preshift and weekly safety examinations contributed to the explosion.

January 19, 2006, Melville, Logan County, West Virginia: A fire at Massey Energy's Aracoma Alma #1 mine kills two coal miners. The ensuing investigation determines that violations of the laws on mine ventilation and safety examinations contributed to the deaths. Massey's Aracoma subsidiary later pleads guilty to willful violations of mine safety and health standards resulting in death. Defendant, at the time, was Massey's chief executive officer and chairman of the board.

These catastrophes, terrible as they are, represent only a small fraction of the toll exacted by mining deaths. Since 1900, the earliest year that records are readily available, more than 100,000 workers have been killed in America's coal mines. The great majority of this loss of life could have been prevented by following well-known principles of mine safety.

This history matters. It is a stark reminder that the laws on mine safety are not just words on paper. They are the bitter fruit of decades of tragedy. We have known for a very long time what makes coal mines explode. We have known for a very long time how to prevent it. And, sadly, we have known for a very long time that some mine operators will ignore these hard-learned lessons until the law compels them to take notice. The mine safety laws, it is said with good reason, are written in coal miners' blood.

Defendant knew full well the awful risks, dramatized time and again in ghastly fashion over the years, that he was taking by flouting the mine safety laws at Upper Big Branch. There was no mystery about what poor ventilation meant: buildups of methane that would ignite with the slightest spark. Yet UBB's miners were left pleading for air. There was no question what accumulations of coal dust meant if not properly treated: a powder keg 1,000 feet below the surface, primed to blow at any time. Yet black dust pervaded the mine, a calamity in the making. There was nothing the least bit hidden or mysterious about the dangers of how Defendant chose to run UBB. They manifested themselves openly, obviously, to anyone with the most basic knowledge of coal mining, and certainly to Defendant. So let us dispense with the defense's obfuscation and double talk and say plainly what Don Blankenship did: He made a conscious, cold-blooded decision to gamble with the lives of the men and women who worked for him.

How does one take the measure of such a crime? Defendant was the chief executive of one of America's largest coal companies—a multibillion-dollar behemoth with its shares traded on the New York Stock Exchange, a fleet of private aircraft, luxurious board meetings at posh resorts around the country, and vast resources to support its mining operations. He had every opportunity to run UBB safely and legally. Instead, he actively conspired to break the laws that protect coal miners' lives. Although already fabulously wealthy by the time of the criminal

3

conspiracy of which he stands convicted, Defendant's greed was such that he would willfully imperil his workers' survival to further fatten his bank account.

What punishment can suffice for wrongdoing so monstrous? The United States knows of no other case in which a major company's CEO has been convicted of a crime against worker-protection laws, so direct reference points are difficult to come by. But compare this crime to others seen more regularly. Which is worse: a poor, uneducated young man who sells drugs because he sees no other opportunity, or a multimillionaire executive, at the pinnacle of his power, who decides to subject his workers to a daily game of Russian roulette? Which is worse: that young man carrying a gun during a single drug deal—a crime that will earn him a five-year mandatory minimum prison sentence—or a CEO jeopardizing the lives of hundreds, day after day? Which is worse: stealing money or trampling on laws that protect human life? In each case, to ask the question is to answer it. Under any fair assessment, only a sentence of many years in prison could truly reflect the seriousness of Defendant's crime and provide just punishment, which the law requires the court to do. 18 U.S.C. § 3553(a)(2)(A).

Other statutory provisions, of course, make such a sentence impossible here. The law says that willfully violating mine safety and health standards is worth at most a year in prison. 30 U.S.C. § 820(d). One doubts that Congress contemplated a set of facts like these when it imposed that one-year maximum: a CEO whose conspiracy led to near-constant safety violations, thousands of them, certainly, based on the testimony of the miners who worked at UBB. A year is woefully insufficient to comply with the purposes of the statutory section that governs this proceeding. *See* 18 U.S.C. § 3553(a). But under the law on the books, it is the best the court can do.

Given the magnitude of Defendant's crime, a sentence shorter than the maximum could only be interpreted as a declaration that mine safety laws are not to be taken seriously. In that

4

way, it would badly erode respect for these laws. 18 U.S.C. § 3553(a)(2)(A). And it would encourage, not deter, future violations of the same laws that Defendant disregarded for years. *Id.*(a)(2)(B). A year in prison for what Defendant did is paltry enough. Anything less would undermine the basic requirements of sentencing.

### Sentencing guidelines

The sentencing guidelines call for a prison sentence between 15 and 21 months. This recommendation arises from a base offense level of six, with four levels added because Defendant was a leader and organizer of the offense of conviction, two levels for his abuse of a position of trust, and two levels for obstructing the administration of justice. U.S.S.G. §§ 2X5.2, 3B1.1; 3B1.3; 3C1.1.

The first of these enhancements applies because Defendant was the leader and organizer of criminal activity that involved five or more participants and was otherwise extensive. U.S.S.G. § 3B1.1. Defendant objects to this enhancement. His main contention is that he was only a passive participant in the conspiracy of which he was convicted. The record, as anyone who sat through the trial in this case knows, proves the contrary. Defendant was a micromanager—and boastful of that fact—who exerted detailed control over UBB's daily operations. His actions and decisions created the understanding that safety violations would routinely be committed there. The notion that he merely stood by while others broke the law contradicts both the record and the jury's verdict.

The second enhancement addresses Defendant's abuse of his position of trust. U.S.S.G. § 3B1.3. This enhancement applies when a defendant abuses a position of public or private trust in a manner that significantly facilitates the commission or concealment of his offense. A position of private trust includes a post in a private entity whose holder exercises "substantial discretionary judgment that is ordinarily given considerable deference." As CEO of Massey, of

5

course, Defendant enjoyed enormous discretion—in practice, plenary discretion—over what happened at Massey's mines, including UBB. And it was his authority as CEO that allowed him to foster the conspiracy of which he was convicted. The trial record establishes these facts and thus mandates the enhancement.

Defendant objects to the abuse-of-trust enhancement for two reasons. First, he asserts that he promoted safety at UBB. The jury, however, convicted Defendant of conspiring to willfully violate mine safety laws at UBB. His claim that he promoted safety merely expresses his dismay at having been convicted, which is understandable but not relevant here. Second, Defendant contends that the enhancement cannot be applied based on his job title alone. This is true. But Defendant was not convicted merely because of his title. The evidence showed that he grossly abused his power as chief executive officer of Massey to further the conspiracy of which he was convicted. Without that position of trust, he would have been unable to advance the conspiracy in the manner that he did. Indeed, without Defendant's active leadership of the conspiracy as Massey's CEO, no scheme could have existed that approached the scope of the one that he oversaw.

The third enhancement, for obstruction of the administration of justice, applies because of Defendant's involvement in advance warning of mine inspections at Upper Big Branch. Defendant objects to this enhancement and offers lengthy grounds for his objection. The United States' full response appears in its letter to the United States Probation Office (USPO) addressing Defendant's objections. Because of its length, that response will not be repeated here, but the letter is attached as an exhibit.

In brief, the obstruction enhancement applies because trial testimony established that on at least one occasion, Defendant encouraged the giving of advance warning of a mine inspection at UBB. The purpose of that warning was to conceal mine safety violations committed as part of

6

the conspiracy of which Defendant stands convicted. Because Defendant acted to prevent the detection of his offense of conviction, the enhancement applies. It makes no difference that the obstruction occurred before the commencement of the criminal investigation that led to his conviction. U.S.S.G. § 3C1.1, comment. (n.1). Nor is it significant that Defendant's involvement in advance warning also related to a part of the indictment that did not lead to a conviction. *United States v. Watts*, 519 U.S. 148, 149-57 (1997). And the claim that Defendant believed advance notice of inspections were lawful, which he pressed at trial and now raises again at sentencing, lacks any plausibility, given the longstanding criminal prohibition against such warnings and the evidence at trial of efforts to hide the warnings from inspectors. More than that, it is beside the point: even if Defendant believed that advance notice of inspections was lawful in and of itself, a system of advance warnings to conceal a criminal conspiracy is the sort of behavior that without question supports the sentencing guidelines' obstruction enhancement.

With these enhancements, as noted above, Defendant's guidelines range is 15 to 21 months' imprisonment. In other words, even the low end of his guidelines range is longer than the one-year maximum allowed by statute. A sentence less than a year would represent a downward variance for which there is no basis. Even if the enhancement for obstruction—the only enhancement to which Defendant devoted meaningful space in his objections—were omitted, the guidelines range still would be 10 to 16 months, corresponding to an offense level of 12. If the court were to adopt Defendant's argument on the instruction enhancement, in other words, a sentence of a year in prison nonetheless would be not only within his guidelines range, but in the bottom half of it.

### Defendant's other objections to presentence report

Defendant sent the USPO lengthy objections to the presentence report, the majority of which concern the report's exposition of his offense conduct. These so-called objections

represent nothing more than a protracted statement of Defendant's disagreements with the jury's verdict—a repetition of the motion for judgment of acquittal that he made at trial, which the court rejected. The presentence report need not recite Defendant's failed motion for judgment of acquittal or rehash elements of his closing argument that the jury rejected in convicting him. His objections on offense conduct should be rejected.

### Fine

The sentencing guidelines call for a fine between $4,000 and $40,000. U.S.S.G. § 5E1.2(c)(3). In this case, however, a fine in that range would fall grossly short of statutory mandates. The statutory provision that specifically governs fines requires the court to consider, in addition to the factors set forth in § 3553(a), Defendant's income and financial resources. 18 U.S.C. § 3572(a). And, as already noted, the court must impose a sentence—including a fine, where necessary—that reflects the seriousness of the offense, promotes respect for the law, provides just punishment for the offense, and deters criminal conduct. *Id.* § 3553(a)(2). The sentence must also take into account Defendant's particular history and characteristics, which include his financial means. *Id.*(a)(1).

Defendant, in keeping with his demonstrated disdain for the law, refuses to provide up-to-date information about his finances, even though he is required to do so. *See* 18 U.S.C. § 3664(d)(3). The court, however, does possess some information that Defendant provided to the pretrial services officer before his arraignment in November 2014. The United States will not repeat the details of that information in this sentencing memorandum, but it discloses that Defendant is—there is no other way to put it—immensely wealthy. A fine of $40,000 or less probably would strike him, and others, as comical. It would promote mockery of the law, not respect. It would do nothing whatsoever to deter violations of safety laws by mine executives. So it could not satisfy the law's requirements for a criminal fine.

The statutory maximum fine in this case is $250,000. 30 U.S.C. § 820(d); 18 U.S.C. § 371. In reality, a $250,000 fine for this Defendant is not much different from a $40,000 fine. But, to echo a previous point, it is the best the court can do given the laws on the books. With Defendant's fine, as with his sentence of imprisonment, a fair application of the governing statutory provision leaves the court little choice but to impose the maximum.

### Restitution

Defendant's motion to hold a separate restitution hearing is pending, and the United States has agreed that a separate hearing is required under 18 U.S.C. § 3664(d)(4). ECF 566, 567. The amount of compensable losses to Alpha Natural Resources, Inc., has yet to be finally ascertained. Moreover, other claims for restitution have been submitted, and the United States is seeking further information to ascertain the amount of any compensable loss related to them. Accordingly, the United States remains of the view that a hearing and briefing on restitution, separate from the April 6, 2016 sentencing hearing, will be necessary.

### Conclusion

It shocks the conscience that in the 21st century, knowing all that has been learned from decades of grief in our nation's mines, the CEO of a major coal company would willfully conspire against the laws that protect his workers' lives. One struggles for words to describe the inhumanity required for a mogul like Defendant to send working men and women into needless, mortal jeopardy for no purpose other than to pile up more money. The law, as it stands, offers no adequate punishment for his crime. But what the law does allow, the court should impose: a year in prison and the maximum fine. Don Blankenship owes at least that much to the men and women who worked at UBB.

Respectfully submitted,

CAROL A. CASTO
Acting United States Attorney

9

/s/ Steven R. Ruby
Steven R. Ruby, WV Bar No. 10752
Assistant United States Attorney
300 Virginia Street, East, Room 4000
Charleston, WV 25301
Telephone:  304-345-2200
Fax: 304-347-5104
Email:  steven.ruby@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

It is hereby certified that the foregoing "United States' Sentencing Memorandum" has been electronically filed and service has been made on opposing counsel by virtue of such electronic filing this 28th day of March, 2016 to:

Steven Herman, Esq.
Miles Clark, Esq.
Eric Delinsky, Esq.
William Taylor, III, Esq.
Blair Brown, Esq.
Zuckerman Spaeder LLP
Suite 1000
1800 M Street, NW
Washington, DC 20036

Alex Macia, Esq.
Spilman Thomas & Battle PLLC
P.O. Box 273
Charleston, WV 25321

James Walls, Esq.
Spilman Thomas & Battle PLLC
P.O. Box 615
Morgantown, WV 26507

/s/ Steven R. Ruby
Steven R. Ruby, WV Bar No. 10752
Assistant United States Attorney
300 Virginia Street, East, Room 4000
Charleston, WV 25301
Telephone:  304-345-2200
Fax: 304-347-5104
Email:  steven.ruby@usdoj.gov

11