IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
BECKLEY DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| v. ) | Criminal No. 5:14-cr-00244 |
| ) | |
| **DONALD L. BLANKENSHIP** ) | |

### DEFENDANT'S SENTENCING MEMORANDUM

We submit this memorandum as provided by the Court's scheduling order. We recognize that the Court will impose sentence upon our client based upon his conviction of the misdemeanor conspiracy to commit an offense against the United States charged in Count One. We address the factors which we assume the Court will consider in imposing sentence, but respectfully preserve our objections to the verdict, to trial errors, and to the numerous rulings on motions and legal issues already addressed. We intend to appeal.

I.   **Mr. Blankenship's History and Characteristics (§ 3553(a)(1))**

The defense never contested that Don Blankenship could be blunt and a hard taskmaster, but the truth is that he cares deeply about his family, his community, and the people who worked for him. We respectfully direct the Court to the many character letters submitted on Mr. Blankenship's behalf.[1] These letters come from former employees, acquaintances, colleagues, and family and were provided notwithstanding the risk to these persons of being criticized.

These letters address the history and characteristics of Mr. Blankenship more knowledgably and authentically than the words of prosecuting attorneys, defense attorneys, or persons who never interacted with him. Below are some representative excerpts:

---

[1] Defendant's Sentencing Memorandum Exhibit ("Mem. Ex.") 2 is the collection of more than 110 character letters supporting Mr. Blankenship. Addresses and information required to be removed by the Court's rules are redacted. A binder of unredacted letters will be provided to the Court.

**Personal History**
Don's family lived in a trailer, but as his mother's hard work paid off, she was able to operate a small gas station and a market deep in the mountains of West Virginia … With three boys and one daughter with special needs, Aunt Nancy had her hands full. Donnie … took care of his sister, Beulah, helped clean the store, operated the gas pumps and the manual cash register, checked and handled inventory and orders and provided the manual labor necessary to unload deliveries and stack shelves. (Carol McCoy, cousin).

Don dropped out of college at age 19 to work as a coal miner in order to support his young cousins, Janice and Jeff, who had been left to live with Aunt Nancy. (Carol McCoy).

My mother, God rest her soul, was an alcoholic. When Dad could no longer bear the pain of this type of existence, they divorced … The fallout of alcoholism isn't healthy on the children of a home, and Dad knew it. Dad raised John and me on his own after they were divorced. (Jennifer Gibson, Daughter).

**Role in the Community**
I have seen firsthand his compassion for the coalfield areas. Things like donating to the local golf course to help keep it operating or building little league fields for area middle and high schools when their budgets didn't allow the expense. He insisted that the company give back to the community via scholarships, helping with flood clean-ups, or assisting the elderly during long term power outages … (John Neace).

I saw multiple times where Don would see a need and just quietly fill it behind the scene anonymously or remaining very low key. All these huge public improvements didn't come with a big banner flying overhead that said, "Donated by Don Blankenship and/or Massey Energy;" that's not how he has chosen to operate through the years. Many people using these parks, community buildings, like the Delbarton Opry House, don't even know where much of the funding and/or materials came from. (Lisa Crum).

I am a retired Mingo county secondary teacher … When [Mr. Blankenship] learned that our students had to remain in their rooms all day when the weather was bad, he gave our parish a large gymnasium. Later, when the city's exodus reached the Catholics, Mr. Blankenship have us a large sum of money to help keep our parochial school open. (June Mitchell Glover).

Several years ago, I was trying to have fundraisers for new playground equipment at our local elementary school. I was probably $3000 short of my goal. I never asked anyone for help. One day, while picking up my mail, there is a check and a note from Mr. Blankenship … He did not want credit for this donation, he wanted the children to have someplace to play. (Donna Paterino).

Without the kindness of Don Blankenship, one of my sons would not have been able to go to college and become an engineer. We simply could not afford it at

the time … At one time I was told that there were over a 100 children that were able to go on from our communities to become engineers, accountants, and doctors because of Don's generosity… (Dorothy Adkins).

The first Holiday after [my husband's] death I received a gift from Don Blankenship. It was on Easter and it made my day. He didn't realize that that was the first Easter basket that I ever had. Every Holiday since then, I have received a gift. Nothing large, just a little something to let me know that I was thought of … Then I heard that he was actually doing this for many other widowed ladies … I still cry every holiday that my gift arrives. (Dorothy Adkins).

[Speaking of Mr. Blankenship's Massey Christmas event] There were thousands of local children from the area in line before daylight to receive gifts for Christmas. Dolls, remote control cars, bicycles, video games, etc., literally thousands of choices for the children. There were two 18 wheel trailers full of hams and turkeys as well. I remember one year it was cold, snowing and the line was growing longer faster than we could get the children to pock gifts and pass on through the line. Mr. Blankenship showed up and pulled money from his pocket for us to go buy Kerosene potable patio heaters to place along the line to keep everyone warm … (Todd Case).

**Commitment to Safety**
I was involved in a number of Mr. Blankenship's safety initiatives. There were several and Mr. Blankenship was very passionate about their development. I have never worked for anyone that was more involved in improving workplace safety than he … We have had our disagreements, but in my 42 years mining experience I have not worked with a supervisor dedicated more to providing a safe work place for our coal miners. (Jimmy Brock, former Massey).

Don has a challenging management style that is off-putting to many people … That being said, no person with credibility that served under Don on Massey's management team would ever claim that he doesn't care about mine safety. I have worked for many fine people in the coal industry, but Don established the highest standards on mine safety that I have experienced. I know that he cares about his people because I've been there with him at mine sites in the middle of the night when we experienced a fatal accident … Don Blankenship established Massey's first ever Safety Development Group … This was a senior management committee specifically charged with investigating every fatality, serious accident, or near-miss to identify changes in work practices, equipment, personal protective gear, or policies that would prevent (or at least reduce the likelihood of) a recurrence. The SDG initiated a number of new company-wide requirements to improve mine safety … All of the above requirements (and many more over the coming years) were imposed on Massey mining operations by order of Don Blankenship at significant cost to the company. I have no doubt that they saved many coal miners from death or serious injury. (Bennett Hatfield).

I am a Certified Mine Safety Professional and a strong advocate for health, safety and welfare issues for coal miners …. I had the privilege of working for Mr. Blankenship for 14 years both in safety and production as his Corporate Safety Director and would gladly work for him again … I spent years investigating [accidents] for Mr. Blankenship and exploring and correcting the reasons for why they happened …. Mr. Blankenship did not blame them on MSHA or State regulatory agencies, but he wanted to know why they happened and what we could do to prevent recurrences … I constantly went to Mr. Blankenship with ideas regarding safety initiatives and innovations and all he asked was that I justified the expense. He never turned me down… (Frank Foster, former Massey).

I cannot think of a single safety innovation within the mining industry over the past 25 years that did not come from a Massey Energy initiative, as a result of Mr. Blankenship's involvement and focus on safety. (M. Blackburn, former Massey).

I was there in 1993 when a section foreman was killed in a tragic underground accident at my operation because in that dark environment he was not sufficiently visible to an equipment operator. Mr. Blankenship initiated a focused effort to find a safety solution that would never let that happen again: the result was a corporate Reflective Clothing Policy … High visibility reflective clothing has now has become the industry standard … I saw the same effort and commitment displayed years later when another operation had a near miss accident that saw a dozer operator become temporarily buried in a coal stockpile … At Mr. Blankenship's direction … Massey engineers and safety personnel developed special protective measures for all stockpile dozers … (Dennis Hatfield, former Massey).

I can vividly remember a conversation I had with Mr. Blankenship in 1999 during a budget meeting. Mr. Blankenship instructed our group to make sure we had all the safety initiatives layered in the cost/capital budget. I asked Mr. Blankenship why at Massey we have layered in all of the safety costs that [are] not mandated by MSHA doesn't it make us less competitive in the marketplace with our cost structure compared to our competitors. I can remember Mr. Blankenship responding that a safe work place is a productive workplace. Mr. Blankenship also stated that the goal of the company is to provide a safe work environment to make sure everyone goes home at the end of their shift. (John Marcum, former Massey).

When Mr. Blankenship first took responsibility for all of Massey one of his first, if not the first, "calls to order" was the establishment of a new comprehensive safety program. I will always remember Mr. Blankenship explaining that our new safety program would be named "S-1"… Our focus was to be on safety, and "S-1" was to have documented procedures with continuous improvements in outfitting our mines and miners for their safety. (Baxter Phillips, former Massey)

4

[T]here was no doubt in my mind that Mr. Blankenship wanted to be sure that Massey Energy operated safe coal mines … [T]here was one fact that I truly believed when I worked for Mr. Blankenship, that if I made a decision to affect someone's safety that worked for me in any way and he found out about it, I would be fired on the spot. (John Stepp, former Massey).

I believe that I have had as much or more opportunity to observe and work with Don Blankenship as anyone, particularly as it regards safety … [He] demanded top production but was equally demanding when it came to mine safety. He abhorred slogans and gimmicks, and continually pushed for engineered-in safety … I have never known Don Blankenship to turn down a request for funding a safety improvement item … (Stanley Suboleski, former Massey).

He was constantly unwavering in his concern for the miners who worked for him … Without the preparation and ideology that I received from Mr. Blankenship and Massey Energy, I am not sure that I would have been prepared for the position that I know hold [Director of Health and Safety for Rhino Energy LLC]. (Cathy Frazier, former Massey).

I worked with him for 30 years. Not once did he ever tell me to do anything that was unsafe … He always made safety a top priority. (Ricky Simpkins, former Massey).

I communicated with Mr. Blankenship on a regular basis (several times a week) … Mr. Blankenship's commitment to safety was second to none. Contrary to some people's opinions, the members I employed felt our operations were safe and we did everything we could to keep the mines and plants operating in this manner. We were given all the resources and support we needed to do our jobs and operate in a safe and efficient manner. (David Kramer, former Massey).

These excerpts are only samples; additional excerpts are included as Exhibit 1. We respectfully request that the Court review the full text of all letters in Exhibit 2. The people who wrote the letters know Don Blankenship. Not all of them like him, but not one of them, indeed not a single witness at trial, provides any support for the notion that he was ruthlessly committed to money for himself at the expense of the safety of the people who worked for him.

## II. The Nature and Circumstances of the Offense (§ 3553(a)(1))

The Court cannot and should not conclude that the jury accepted the government's broad arguments about the nature of the offense and Mr. Blankenship's role in it. There was an enormous body of mitigating evidence offered or admitted at trial, and there is additional

5

mitigating information regarding the offense that has been presented by the defense in the Addendum to the Presentence Report ("PSR Add.") and in the exhibits to this memorandum. This evidence demonstrates that, while the jury convicted Mr. Blankenship of a conspiracy to willfully violate regulatory standards on the basis of instructions permitting a conviction for agreeing to "allow" such violations to continue and to "recklessly disregard" the causes of such violations, the offense of conviction did not involve the brazen lawlessness described in the government's closing argument. Nor did it involve *any* intent to jeopardize the safety of miners. We direct the court to a sample of this evidence below.

Mr. Blankenship's commitment to safety. We highlight, as examples only, the following evidence of Mr. Blankenship's commitment to safety introduced or offered into evidence at trial:

- Not one witness testified that Mr. Blankenship instructed him to violate safety regulations or otherwise suggested or insinuated that he should violate any of the regulations. Nor did a single witness testify that Mr. Blankenship personally witnessed any safety violation at UBB or that he ever was informed of any willful safety violation at UBB.

- Mr. Blankenship initiated, encouraged, and demanded efforts to comply with safety regulations, reduce citations, and improve safety at Massey. He did so in writing.[2] He did so in his recorded telephone conversations.[3] He did so in meetings.[4] Those that worked for him, including Mr. Blanchard and Mr. Ross, testified that they knew that he wanted safety regulations followed and citations reduced.[5] He forcefully pressed his managers to reduce safety violations. Def. Ex. 404. PSR Add. 79 & Ex. M.

- Mr. Blankenship ordered the creation of the daily violation report to enable the company to "measure, manage, and eliminate" its citations. Def. Ex. 10. *See also* Def. Exs. 403, 404; PSR Add. 79.

- Mr. Blankenship formed a committee of high-level executives for the express purpose of developing a plan to reduce citations. When the committee initially set a 20% citation

---

[2] *See, e.g.*, PSR Add. 77-78 & n.41, 94-96, 101-02; Def. Exs. 5, 6, 8, 9, 10, 11, 12, 13, 15, 18, 20, 25, 52, 117A, 334, 410, 528.

[3] *See, e.g.*, ECF No. 492 (Notice of Intent to Introduce Audio Recordings) (attached as Mem. Ex. 4, without excerpts); PSR Add. 96-98.

[4] *See, e.g.*, PSR Add. 94-95; Gov. Ex. 167.

[5] *See, e.g.*, PSR Add. 77-78 & n.41, 84-85.

6

reduction target, Mr. Blankenship demanded more, raising the goal to 50%. PSR Add. 83; Def. Ex. 5. MSHA "applauded" Massey's actions. Mem. Ex. 3.

- Mr. Blankenship launched the Hazard Elimination Program. Def. Exs. 27, 52, 117A, 410. The executives on the Hazard Elimination Committee convened a meeting of over 500 Massey managers, including mine section foremen. At the meeting, they reiterated Mr. Blankenship's expectation that all of its mines put safety first, comply with the law, and eliminate conditions that lead to citations. PSR Add. 83-84 & n.53, 101-02 & n.70; Def. Exs. 52, 410, 410A; ECF No. 480.

- Mr. Blankenship demanded accountability. *See, e.g.*, Def. Exs. 10, 11, 18. He recommended discipline to make sure people took Massey's compliance message seriously. *See, e.g.*, Def. Exs. 15 ("You won't make a difference until written warnings & placed into peoples files & after a couple of final discharges occur."); Def. Exs. 16, 528; PSR Add. 75 & n.38.

- Although increased staffing does not increase safety or reduce citations, *see infra* at 9, UBB received more miners than what was in the budget and more than Mr. Blanchard requested. PSR Add. 78-79, 100-01.

- Although some miners testified that production was first and safety was second, they were in the minority at Massey. A 2010 anonymous survey showed overwhelmingly that the miners believed in the company's commitment to mining safely and to compliance with the law. *See* Def. Exs. 28A. For example, 77% of the 2,575 underground miners who responded to the survey believed that Massey "considers work safety to be of greater importance than production," and 90% answered that Massey was "committed to safety in the workplace." *Id*. (questions 7 & 8). *See* PSR Add. at 101, 103.

More than two thirds of the miners at UBB shared those views. *See* Mem. Ex. 4. (Performance Coal Survey results). Letters from individuals who worked at UBB, *see* Mem. Ex. 2, confirm those findings:

> During my employment with Massey Energy, I visited the Upper Big Branch Mine Site multiple times. As previously stated, I was an internal Safety Auditor for the company and found Upper Big Branch to be one of the safest mines under Massey's banner. (Lawrence Ferguson).

> While at UBB I was classified as a safety director and worked directly with the underground crews and was never denied anything that was needed to promote safety underground. At no time did Massey or Blankenship give the impression that safety was second to production. (James Walker).

> I was the "Block" Chief Electrician at the UBB Mine, in charge of both the tail gate section and the head gate section … I have two children and would have

taken them in that mine at any time … Massey (UBB) was the safest run mine that I have ever worked in in my lifetime. (Rick Nicolau).

[W]hile I was employed at UBB I served as a Long wall set up crew member, shuttle car operator and a Roof bolter. While I was employed at UBB I was never asked to do anything unsafe or anything that would intentionally put myself or my co-workers in danger … In my opinion UBB was one of the safest mines I was ever employed at. (Mike McKinney).

Many families now talk about the dangers that were at UBB, but I can honestly say that before the tragedy, miners in my community wanted to be employed at UBB because of the new equipment and technology that Massey had. (Rev. Danny Gilfilen, former coal miner).

<u>MSHA Regulatory Violations at UBB and Massey</u>. The government relied at trial on data about the number and nature of MSHA citations and orders at UBB and other Massey mines.[6] It does so again at sentencing. PSR ¶¶ 22-25. The government data is incomplete and highly misleading. The appropriate data and comparisons are described in Mem. Ex. 6, the declaration of Ken Katen, a highly qualified expert in mine safety, and the exhibits accompanying his declaration. Mr. Katen states, among other findings:

- MSHA determined that *none* of the citations and orders issued to UBB during the Indictment Period constituted knowing and willful safety violations. Katen Decl. ¶¶ 10-12.

- Of the mines most comparable to UBB (the 8 Central Appalachian longwall mines), 4 received more citations then UBB, 4 had a higher rate of violations per inspection day, and 6 had more coal dust violations during the Indictment Period. *Id.* ¶¶ 14-20 & Exs. A, B.

- Another comparable mine, Patriot Coal Corporation's Harris No. 1 Mine, which produced coal from the same coal seam as UBB, received 25% *more* MSHA citations and orders than UBB did during the Indictment Period, despite the facts that Harris No. 1 produced less coal and had more man hours. *Id.* ¶¶ 21-22 & Ex. C.

- During the three years following Alpha's acquisition of Massey, the five remaining Markfork mines (of which alleged co-conspirator Chris Blanchard had been president) received 65% *more* MSHA citations and orders than they did under Massey's control. At the same time, those mines employed 49% more miners and produced 22% less coal under Alpha. During the period that Alpha was receiving those increased numbers of citations and orders, the U.S.

---

[6] The data purportedly was not offered for the truth, although the government repeatedly relied on it for that purpose.

8

Attorney's Office concluded that Alpha had complied with its obligation to make expenditures to increase safety compliance. *Id.* ¶¶ 23-25 & Ex.'s D-1–D-6.

- The chart comparing Massey to other mining companies used by the government at trial was "incomplete and misleading." Properly analyzed, the data revealed that Massey had fewer citations per MSHA-regulated facility than several other large coal companies. *Id.* ¶¶ 36-41 & Ex. E. *See also* PSR Add. 73-74.

The fact that other mines received more violations than UBB is not an argument that violations should be excused. However, it rebuts and mitigates the government's version of the offense – that the number of regulatory citations itself proved widespread lawlessness and a conspiracy of great breadth -- and the government's unsubstantiated theories that less production and more miners would have reduced safety violations.

### III. Other Section 3553(a) Factors

<u>The Sentencing Guidelines (§ 3553(a)(3),(4), and (5)).</u> The defense objects to the PSR's application of the Sentencing Guidelines, for the reasons in the PSR Addendum. The enhancements for role in the offense and abuse of position of trust excessively rely on Mr. Blankenship's position as CEO, without consideration of other factors. PSR Add. 66-67. The obstruction of justice enhancement likewise is unsupported by the facts and the law. *Id*. 55-59. There was no criminal investigation to obstruct at the relevant time. Moreover, there was no willful interference with the administration of justice, and the evidence of Mr. Blankenship's connection to arrival notice consisted, at most, of one ambiguous comment. The deficiencies in the evidence led the jury to acquit and likewise should lead the Court to find the proof insufficient, even under the objectionable preponderance of evidence standard. Proper application of the Guidelines would result in a Level 6, for which probation is an appropriate sentence.[7]

---

[7] If the Court nevertheless concludes that the offense level is greater than 8, the section 3553(a) factors and the parsimony principle fully support a downward variance to a probationary sentence.

The Remaining Section 3553(a) Factors. There is no basis to conclude that Mr. Blankenship will reoffend or that he is in need of services. 18 U.S.C. §§ 3553(a)(2)(B), (C), and (D). As for general deterrence, *id.* at (a)(2)(B), the indictment of Mr. Blankenship, the widespread publicity about the case, the resulting conviction, a fine, and the restrictions of probation will provide ample warning and deterrence to others that mine safety violations believed by the government to be willful will be criminally prosecuted and, if a conviction results, punished. As for avoidance of sentencing disparities, *id.* at (a)(6), we note the recent sentences of the individual defendants in the Freedom Industries cases in this district.[8] There is no legal basis to order restitution to anyone, *id.* at (a)(7), for the reasons stated in the PSR by the probation office (¶ 95) and by the defense (¶¶ 112-150) and in the defense memorandum and reply in support of the motion to dismiss Alpha's restitution claims (ECF No.'s 564 & 568).

## CONCLUSION

Section 3553(a) requires a court to "impose a sentence sufficient, but not greater than necessary" to achieve the enumerated purposes of sentencing. There undoubtedly will be strident calls for imposition of the maximum permissible sentence for Mr. Blankenship, but a fair and impartial application of the parsimony principle and the Section 3553(a) factors should result in a sentence no greater than probation and a fine.

---

[8] Michael E. Burdette, Charles E. Herzing, Robert J. Reynolds, and William E. Tis received sentences of probation and fines for misdemeanor environmental crimes. Dennis R. Farrell and Gary L. Southern each were convicted of multiple misdemeanor environmental crimes, had Total Guidelines Offense Levels of 15 and no government 5K1.1 motion. *See U.S. v. Farrell*, No. 2-14-cr-264-1, ECF No. 273; *U.S. v. Southern*, No. 2:14-cr-264-4, ECF No. 275. Each received a sentence of 30 days imprisonment, 6 months of supervised release, and a fine. The sentences of the Massey mine superintendents and director of security are not appropriate comparisons when considering Mr. Blankenship's sentence; they were convicted of felonies.

Dated: March 28, 2016                         Respectfully submitted,

                                         /s/ Blair G. Brown
William W. Taylor, III
Blair G. Brown
Eric R. Delinsky
R. Miles Clark
Steven N. Herman
ZUCKERMAN SPAEDER LLP
1800 M Street, NW, Suite 1000
Washington, DC 20036
202-778-1800 (phone) / 202-822-8106 (fax)
wtaylor@zuckerman.com
bbrown@zuckerman.com
edelinsky@zuckerman.com
mclark@zuckerman.com
sherman@zuckerman.com

       /s/ James A. Walls
James A. Walls (WVSB #5175)
SPILMAN THOMAS & BATTLE, PLLC
48 Donley Street, Suite 800
Morgantown, WV 26501
304-291-7947 (phone) / 304-291-7979 (fax)
jwalls@spilmanlaw.com

       /s/ Alexander Macia
Alexander Macia
SPILMAN THOMAS & BATTLE, PLLC
P.O. Box 273
Charleston, WV 25321-0273
304-340-3800 (phone) / 304-340-3801 (fax)
amacia@spilmanlaw.com

*Counsel for Donald L. Blankenship*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing has been electronically filed and service has been made by virtue of such electronic filing this 28th day of March, 2016 on:

Steven R. Ruby
Gabriele Wohl
U.S. Attorney's Office
P.O. Box 1713
Charleston, WV 25326-1713

R. Gregory McVey
U.S. Attorney's Office
845 Fifth Avenue, Room 209
Huntington, WV 25701

> */s/ Blair G. Brown*
> Blair G. Brown