**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**Beckley Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 5:14-CR-00244** |
| | ) | |
| | ) | |
| **DONALD L. BLANKENSHIP** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MOTION TO VACATE AND SET ASIDE DEFENDANT'S
## CONVICTION AND SENTENCE PURSUANT TO 28 U.S.C. § 2255

Donald L. Blankenship, by and through counsel, respectfully moves this court to vacate

set aside, and correct his sentence and conviction as contrary to the laws and Constitution of the

United States pursuant to 28 U.S.C. § 2255.

## INTRODUCTION

1.      Don Blankenship was charged by indictment on November 13, 2014 with several

felony offenses and one misdemeanor offense related to an explosion at the Upper Big Branch

("UBB") mine owned by his company, Massey Energy.  The charges were vigorously contested

by Mr. Blankenship, and his attorneys served numerous formal and informal demands for

discovery on the prosecution team.  This Court ordered the government to disclose all *Brady*

information and to specify that information to the defense.  On December 3, 2015, after trial and

after lengthy deliberations – punctuated by several *Allen* charges – the jury acquitted Mr.

Blankenship on all felony counts.  The jury convicted, however, on the misdemeanor charge of

conspiracy to violate mine safety regulations.

1

2.      After trial and sentencing, something extraordinary occurred.  Mr. Blankenship and his counsel continued to assert his right to discovery of exculpatory and other information required for his defense.  After the two attorneys who led the prosecution of Mr. Blankenship left the United States Attorney's Office, the government began to produce reports and other information that were responsive to Mr. Blankenship's discovery requests that it had not disclosed pre-trial.  In a series of letters stretching from January 31, 2017 to April 6, 2018, the government provided to Mr. Blankenship sixty-one previously undisclosed memoranda of interview ("MOI"), forty-eight previously undisclosed emails, and nine other previously undisclosed documents.  The sheer quantity of withheld information is staggering, and its quality would have made it essential to Mr. Blankenship's defense.  Included in this never-before-disclosed information are five MOIs *each* for the government's two main witnesses.  The materials also include internal Mine Safety and Health Administration ("MSHA") emails that directly contradict the government's theory of prosecution.  In addition, the materials include documents reflecting sanctions imposed on MSHA officials for their performance of their official duties – evidence which corroborates a central part of Mr. Blankenship's defense.  This mountain of undisclosed information includes exculpatory *Brady* material, impeaching *Giglio* material, and witness Jencks material, among other things.

3.      There is no lawful basis by which these materials could have been withheld.  The Department of Justice, for its own part, has referred these matters to its Office of Professional Responsibility ("OPR") for investigation.  OPR has not yet released its report and findings, but Mr. Blankenship expects that the report will issue in the near future.  Mr. Blankenship anticipates that the findings of the OPR report will add material information to the subject matter of this Motion.

4.      The full scope of the prosecution's conduct in this matter is still coming to light. Mr. Blankenship has received new information from the government as recently as April 8, 2018.  And the findings of OPR will no doubt shed further light on this matter.  Mr. Blankenship brings this Motion to vindicate his constitutional and other rights.  The prosecution if this case deprived Mr. Blankenship of his constitutional right to a fair trial, violated the Jencks Act, violated this Court's discovery orders, and made material misrepresentations to Mr. Blankenship's defense counsel and to the Court.  The conviction of Mr. Blankenship that resulted from this terribly flawed process cannot stand.  The jury that convicted Mr. Blankenship deliberated for nine days and twice told the judge that it could not agree on a verdict.  Ultimately, it convicted Mr. Blankenship on only a single, misdemeanor count.  In short, this was an extremely close call.  The newly disclosed evidence, withheld by the prosecution until after trial, would have tipped the balance in Mr. Blankenship's favor.  As a result, Mr. Blankenship's conviction and sentence was imposed in violation of the Constitution and laws of the United States.  Therefore, this Court should vacate and set aside that conviction and sentence

## PROCEDURAL HISTORY

5.      On November 13, 2014, a grand jury in the Southern District of West Virginia (S.D.W.Va.) indicted Mr. Blankenship.  *United States v. Donald L. Blankenship*, Crim. No. 5:14-cr-00244 (ECF No. 1).[1]  As amended by the superseding indictment on March 10, 2015, prosecutors charged Mr. Blankenship with three counts: (1) conspiracy to both willfully violate federal mine safety and health standards in violation of 18 U.S.C. §371 and 30 U.S.C. § 820(d) and to defraud the United States in violation of 18 U.S.C. § 371; (2) false statements to the Securities and Exchange Commission in violation of 18 U.S.C. §1001; and (3) false statements

---

[1] All ECF numbers cited herein refer to this docket.

in connection with the sale or purchase of securities in violation of 18 U.S.C. §78ff. (ECF No. 169). Mr. Blankenship pled not guilty to all counts.

6. Mr. Blankenship was tried before a jury sitting in the S.D.W.V. He did not testify at trial. On December 3, 2015, the jury convicted Mr. Blankenship on Count 1, but only as to the conspiracy to violate Mine Safety regulations. (ECF No. 529) The jury acquitted Mr. Blankenship on Counts 2 and 3. (*Id.*). The district court entered a judgment of conviction on December 10, 2015. (ECF. No. 553)

7. On April 6, 2016, the district court sentenced Mr. Blankenship to twelve months incarceration followed by one year of supervised release, as well as a $250,000 fine and a $25 special assessment. (ECF No. 589). Prosecutors objected to Mr. Blankenship remaining on bond pending appeal.

8. Mr. Blankenship filed a timely appeal to the Fourth Circuit. (ECF No. 591; Case No. 16-4193). He argued that: (1) the indictment insufficiently alleged a violation of 30 U.S.C. § 820(d); (2) that the district court improperly denied re-cross examination of an alleged co-conspirator, Chris Blanchard; (3) that the district court incorrectly instructed the jury regarding the meaning of "willfully" as used in 30 U.S.C. §820(d); and (4) the district court incorrectly instructed the jury as to the government's burden of proof. The Fourth Circuit affirmed Mr. Blankenship's conviction on January 19, 2017. *United States v. Blankenship*, 846 F.3d 663 (4th Cir. 2017).

9. Mr. Blankenship petitioned the United States Supreme Court for a writ of certiorari. (ECF No. 655; Case No. 16-1413). He raised the following two issues in his petition: that the district court (1) incorrectly instructed the jury regarding the meaning of willfully, and

(2) improperly denied re-cross examination of Mr. Blanchard. The Supreme Court denied certiorari on October 10, 2017. 138 S.Ct. 315 (2017).

10.     Mr. Blankenship has filed no other motions, petitions, or applications concerning the judgment of conviction in any court.

## JURISDICTION

11.     This Court has jurisdiction over this motion as it imposed Mr. Blankenship's sentence. 28 U.S.C. § 2255(a).

12.     Mr. Blankenship is presently in custody within the meaning of Section 2255 as he is serving a term of supervised release under the supervision of Probation and Pretrial Services for the District of Nevada. *See United States v. Swaby*, 855 F.3d 233, 238-39 (4th Cir. 2017); *see also Maleng v. Cook*, 490 U.S. 488, 491-92 (1989). His term of supervised release ends on May 9, 2018.[2]

13.     This motion is timely because it has been filed within one year of the date on which the judgment of conviction became final. 28 U.S.C. §2255(f)(1); *Clay v. United States*, 537 U.S. 522, 527 (2003) (judgment of conviction becomes final when the U.S. Supreme Court denies petition for writ of certiorari).

## STATEMENT OF FACTS

14.     Zuckerman Spaeder ("Zuckerman") represented Mr. Blankenship in the pre-trial, trial, and appellate proceedings. Throughout the proceedings, the Zuckerman defense team raised concerns to the prosecution and the Court about the adequacy of the prosecution's

---

[2] A motion under Section 2255 does not become moot when the custodial sentence terminates if the movant continues to suffer collateral consequences that flow from the conviction. *Carafas v. LaVallee*, 391 U.S. 234, 237-38 (1968); *Swaby*, 855 F.3d at 239 n. 2. The Fourth Circuit has held that payment of a fine or restitution upon conviction – as done by Mr. Blankenship here – qualifies as a collateral consequence sufficient to keep a Section 2255 motion from becoming moot. *Nakell v. Att'y Gen. of North Carolina*, 15 F.3d 319, 322 (4th Cir. 1994).

disclosure of *Brady* material.  In addition to informal requests, the defense filed multiple motions

seeking exculpatory and impeachment material.[3]  The government consistently replied that it had

provided the defense with all documents required by *Brady*, *Giglio*, and Jencks, as well as the

Court's orders regarding discovery.[4]

 15. The government provided its initial discovery on December 4, 2015 and January

29, 2015.  On April 15, 2015, the defense emailed Assistant U.S. Attorney Steve Ruby and asked

him to confirm "that all of the memoranda of interviews that the government conducted as part

of its investigation, as well as the documents used during those interviews . . . have been

provided to the defense."  The defense also requested a complete list of all interviews conducted.

AUSA Ruby responded on April 21, 2015 with a list of interviews.

 16. On June 12, 2015, in response to a defense motion, this Court ordered the

government to "specifically designate any known Brady material as such and disclose the same

---

[3] Zuckerman also sent a number of communications directly to the USAO seeking the same material.  Motions filed with the court that sought exculpatory material include:  Motion to Enforce The Government's *Brady* Obligations (Feb. 6, 2015) (ECF No. 111); Motion to Compel the Government to Identify in its Production *Brady* and Rule 16(a)(1) Material (Apr. 28, 2015) (ECF No. 245); Motion to Compel Production of Witness Interview Notes and Records of Attorney Proffers Containing *Brady* Information (May 6, 2015) (ECF No. 248); Motion to Compel Compliance with *Brady* Order and for Other Appropriate Relief (July 8, 2015) (ECF No. 283); and Motion to Compel Compliance with Subpoena, for Production of *Brady*, Rule 16, and Jencks Material, and for Evidentiary Hearing (Nov. 6, 2015) (ECF No. 481).

[4] *See, e.g.,* United States' Response to Defendant's Motion No. 19, Motion to Enforce the Government's *Brady* Obligations at 2 (Feb. 20, 2015) (ECF No. 133) ("Defendant's belief notwithstanding, all discoverable evidence, including all *Brady* material known to the United States, has been provided to Defendant."); United States' Response to Defendant's Motion to Compel Production of Witness Interview Notes and Records of Attorney Proffers Containing *Brady* Information at 1-2 (May 14, 2015) (ECF No. 251) (claiming that the government was "aware of its ongoing *Brady* obligations" and "is in compliance with its discovery obligations"); United States' Combined Motion for Production of Reciprocal Discovery and Response to Defendant's Motion to Compel Compliance with *Brady* Order at 8 (July 14, 2015) (ECF No. 284) ("[S]ince the United States has complied with the *Brady* Order with respect to the substance of those interviews, there is no reason to revisit that ruling.")

to defense counsel." Mem. Op. & Order at 11 (June 12, 2015) (ECF No. 279). The prosecutors' response flatly denied that any exculpatory evidence existed in the entire investigation:

> As an initial matter, the United States notes that *all the evidence of which it is aware tends to support the conclusions that Defendant and others at Massey Energy Company made a business decision to regularly commit illegal mine-safety violations at the Upper Big Branch mine* ("UBB") and then caused statements and omissions to be made that concealed that decision after the 2010 UBB explosion. In other words, *the United States does not know of any evidence that truly tends to exculpate Defendant.* Defendant may propose that evidence is exculpatory if it shows that there were occasions when he or others at Massey complied with mine safety laws rather than violating them. That view would be mistaken . . . Similarly, Defendant may propose that evidence that he or others at Massey expressed general concern for safety tends to show that he did not conspire to violate mine safety laws. That claim, too, would be erroneous. (Emphases added)

Nonetheless, prosecutors proceeded to identify ten out of the more than 300 MOIs that had actually been disclosed to the defense that "Defendant might claim tend to be exculpatory in some way, even if such a claim would lack merit."[5]

17. After receiving the government's response, Mr. Blankenship sought further relief from this Court, citing a litany of deficiencies in the government's representations. Motion to Compel Compliance with *Brady* Order (July 8, 2015) (ECF No. 283) (ECF No. 283). For example, in some instances, rather than turning over a complete MOI, the government provided cursory statements that purported to summarize potentially exculpatory information provided by a witness. *Id.* at 3. In its opposition to the Motion to Compel, the government assured the Court that "the United States has complied with the *Brady* Order." United States' Combined Motion for Production of Reciprocal Discovery and Response to Defendant's Motion to Compel Compliance with *Brady* Order (July 14, 2015) (ECF No. 284). In light of the government's

---

[5] This response is contained in Exhibit A of Mr. Blankenship's Motion to Compel Compliance with *Brady* Order (July 8, 2015) (ECF No. 283, Att. No. 1).

representations, the Court denied further relief. Mem. Op. & Order (Aug. 10, 2015) (ECF No. 295).

18. Given his concerns about the prosecution's compliance with its discovery obligations, Mr. Blankenship also sought evidence directly from MSHA. On September 9, 2015 this Court issued an order granting Mr. Blankenship's request for a Rule 17(c) subpoena *duces tecum* to be served on MSHA. (ECF No. 358). The subpoena was issued that same day and sought three categories of documents including: "All documents regarding the UBB mine during the Indictment Period located in the files of the MSHA inspectors and officials who were present in the mine during the Indictment Period and their supervisors." (ECF No. 359).

19. On September 17, 2015, Mr. Blankenship filed a motion to compel compliance with the Rule 17(c) subpoena, arguing that MSHA's response could not possibly have been complete. Motion to Compel MSHA to Comply with Subpoena Duces Tecum (Sept. 17, 2015) (ECF No. 377). Prosecutors defended MSHA's response and urged the Court to deny Mr. Blankenship's motion. Response to Motion to Compel MSHA to Comply with Subpoena Duces Tecum (Sept. 24, 2015) (ECF No. 388). Mr. Blankenship renewed the motion on November 6, 2015. Motion to Compel Compliance with Subpoena, for Production of *Brady*, Rule 16, and Jencks Material, and for Evidentiary Hearing (Nov. 6, 2015) (ECF No. 481). Once again, the prosecutors insisted that MSHA had complied with the subpoena. United States' Response to Motion to Compel (Nov. 15, 2015) (ECF No. 496). This Court ultimately denied Mr. Blankenship's motion. Mem. Op. & Order (Dec. 9, 2015) (ECF No. 549).

20. During trial, prosecutors continued to assert the government's compliance during argument before the court. For example, during cross-examination, Chris Blanchard testified about a number of exculpatory topics that he claimed to have previously told the government.

Defense counsel asked to see the MOIs from those interviews: "This witness was interviewed a number of times by the Government and, according to the witness, told them that he did not, did not believe that he was guilty of a crime, that he didn't believe that he participated in a conspiracy with Mr. Blankenship, and a number of other more specific exculpatory statements. We were never provided with any of that, notwithstanding our aggressive [and] persistent efforts." (Trial Tr. Vol. XVII at 3710:23-3711:5). AUSA Ruby told the court point blank that "We have [] turned over 302s from our interviews with this witness . . . to the extent that there is exculpatory information that we had from this witness, that's been turned over to the defense." (*Id.* at 3712:9-18). As of that time, the government had turned over a single 302 (also referred to as a MOI) for Mr. Blanchard.

21.     On January 19, 2017, OPR notified the acting U.S. Attorney[6] that MOIs conducted during the investigation into Mr. Blankenship had not been disclosed to the defense. In response, the U.S. Attorney's Office ("USAO") began a review of the file and, over the course of the following weeks, provided Mr. Blankenship with sixty-one memoranda of interview that had not been disclosed previously. In October 2017, the USAO provided details regarding an undisclosed attorney proffer by Chris Adkins, Mr. Blanchard's immediate supervisor. Then, in November 2017, the USAO turned over several dozen emails from MSHA. Most recently, on April 6, 2018, the USAO learned of still more undisclosed MSHA documents which it then promptly turned over to Mr. Blankenship. All these undisclosed materials, along with the letters of transmittal, are being submitted with this Motion.

### GROUNDS FOR RELIEF

---

[6] Carol Casto – who was not a member of the prosecution team in Mr. Blankenship's case – became the acting U.S. Attorney in January 2016 and served in that role until the appointment of the current U.S. Attorney in January 2018.

22.     Mr. Blankenship hereby incorporates by reference paragraphs 1 through 21 of this motion.

23.     Prosecutors' conduct deprived Mr. Blankenship of his constitutional right to a fair trial.  Each of the following grounds is individually sufficient to warrant the requested relief.

**1.      Suppression of Material Exculpatory and/or Impeaching Evidence in Violation of *Brady v. Maryland* and *Giglio v. United States*.**

24.     Despite their repeated assertions to the court, prosecutors failed to turn over material, exculpatory and/or impeachment evidence in violation of their obligations under *Brady v. Maryland,* 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972).  The prosecutors' failure to comply with their *Brady* and Giglio obligations violated Mr. Blankenship's constitutional right to a fair trial and warrants vacating his conviction and sentence.

### A.  *Memoranda of Interview*

25.     The sixty-one MOI provided to Mr. Blankenship post-trial contain mountains of exculpatory material.  Among them were five MOI for *each* of the government's two main witnesses at trial.  They failed to disclose twenty-three pages of reports from five separate interviews with alleged co-conspirator Chris Blanchard.  Similarly, five interviews comprising twenty-eight pages of reports for Bill Ross – a former MSHA inspector hired by Mr. Blankenship specifically to address safety concerns – also went undisclosed.

26.     These sixty-one MOI contain numerous examples of exculpatory and impeaching evidence.  The full list of *Brady/Giglio* material in the undisclosed MOI is enormous and cannot be detailed in full within the confines of this Motion.  A few key examples, however, are highlighted below.

27.     The undisclosed MOIs from Mr. Blanchard include the following information:

- o Mr. Blanchard told investigators: "Blanchard advised that he never knowingly gave a direct order where he told someone to do something that caused a law to be broken." (MOI-001457).

- o The government argued at trial that Massey's failure to increase staffing levels at UBB proved Mr. Blankenship's intent to violate mine safety regulations. *See, e.g.,* Trial Tr. Vol. XXVIII at 5842:24-5843:24. But as is reflected in the undisclosed materials, Mr. Blanchard told investigations that there was "no amount of money or resources that could take care of all violations at a mine." (MOI-001547).

- o One of the most critical pieces of evidence for the prosecution was Mr. Blankenship's receipt of reports that showed the citations issued to UBB. (*See, e.g.,* Trial Tr. Vol. XXVIII at 5839:9-11, 5953:12-19). But in fact, Mr. Blanchard told the prosecutors that "Blankenship . . . felt violations were going to be written by MSHA. Blankenship felt MSHA made things up." (MOI-001402).

28.     A review of the five undisclosed MOIs for Mr. Ross likewise includes obvious exculpatory and impeaching statements:

- o Like Mr. Blanchard, Bill Ross provided evidence that many of the citations at UBB were outside Massey's control. Mr. Ross told investigators in an undisclosed MOI that "the UBB mine was set up to fail based on the ventilation system MSHA forced the UBB mine to use." (MOI-001532). This was a critical part of Mr. Blankenship's defense – that UBB received citations, at least in part, because MSHA required them to use an ineffective ventilation system that caused violations.

- o Ross also told the government of several statements Blankenship made about *reducing* violations. (MOI-001487; MOI-001476; MOI-001488).

- o What is more, one of the alleged co-conspirators, Chris Adkins (Mr. Blanchard's immediate supervisor), told Ross that "they should comply with all regulations at the mine site." (MOI-001477)

29.     In addition, the government never turned over MOIs for many other witnesses that included exculpatory information that would have benefited Mr. Blankenship's defense. For example, the government never turned over a MOI for Mark Clemens, who oversaw Massey's production, sales and budgeting. Among other exculpatory information in his MOI, Mr. Clemens directly refuted one theory of prosecution when he told the government that "there was

pressure at Massey to run coal, but not enough pressure to overlook safety." (MOI-001506). In addition, the information contained in undisclosed MOIs for Sabrina Duba, Charlie Bearse, Stephanie Ojeda, Steve Sears, Lisa Williams, and Gary Frampton all contained additional exculpatory and impeachment information that would have benefited Mr. Blankenship at trial.

### B. MSHA Documents

30.     In November 2017 and April 2018, the USAO turned over dozens of exculpatory and impeaching documents and emails from the Mine Safety and Health Administration ("MSHA"). We cannot identify every such instance here, but provide the following as particularly egregious examples.

31.     Several of the MSHA emails support Mr. Blankenship's defense theory that many citations did not reflect actual violations. For example, one email from a MSHA attorney discusses several citations issued to UBB. In this email, the attorney observes that one citation could not be sustained and must be vacated. She also points out that more information would be needed from inspectors to sustain two other citations. (USAO0000114). In another email, a MSHA employee points out a "potential violation" at UBB. He receives the following response: "Sounds like a violation is in order. Let Norman know about it and I am sure he will be more than happy to give them one more piece of paper." (USAO0000028).

32.     Other emails demonstrate MSHA's contempt for Mr. Blankenship and Massey Energy. In response to a draft press release regarding complaints about Massey mines, MSHA Mine Administrator Kevin Stricklin replied: "My only comment is to put a dagger into massey [sic]." He was overruled by the head of MSHA, Joe Main, who responded that "This is about presenting the facts to the public in a responsible way." (USAO0000033). But Mr. Stricklin's

remark is tame in comparison with what another MSHA employee wrote: "I hope that him [Blankenship] and Glenn Beck get raped by a rhinoceros. Horn end." (USAO0000109).

33.     Even more astoundingly, the issue of advance notice – the illegal practice of warning miners that inspectors had arrived – came up regularly at trial. It was a major focus of the government's case that Mr. Blankenship defrauded the United States, but was also used to demonstrate his participation in a conspiracy to violate the mine safety regulations. In fact, however, the undisclosed internal MSHA emails reveal that MSHA officials themselves were conflicted as to whether Massey's practices actually violated regulations regarding advance notice. In one especially pointed email, a MSHA investigator explained: "The fact is most [inspectors] did not really think that what was going on was advance notice. The lack of citations says a lot." (USAO0000030).

34.     Finally, the documents provided on April 6, 2018 show that multiple MSHA supervisors were disciplined by the agency for inadequate supervision over UBB. In particular, these documents criticize MSHA officials for failing to consider the interaction between the mine's dust and ventilation plans when they approved them. This evidence supports another of Mr. Blankenship's key defenses at trial – that MSHA required Massey to use a ventilation plan that inherently created violations. These documents also reveal the disparity between the government's treatment of Mr. Blankenship (criminal prosecution) and that of the MSHA officials responsible for the UBB mine's safety (a slap on the wrist).

**2.     Suppression of Evidence in Violation of the Jencks Act and Rule 26.2 of the Federal Rules of Criminal Procedure.**

35.     Many of the MOIs include statements by witnesses who testified at trial and should therefore have been turned over to the defense. *See* Jencks Act, 18 U.S.C. § 3500; Fed. R. Crim. P. 26.2(a). The sanctions for Jencks violations at trial include striking the witnesses'

testimony and/or declaring a mistrial.  Fed. R. Crim. P. 26.2(e). Because the excluded testimony was critical to the government case, Mr. Blankenship's conviction and sentence must be vacated.

36.     Roughly two-thirds of the undisclosed memos were authored by FBI Special Agent James Lafferty, who testified at trial on a number of subjects, including subjects related to those covered in the MOIs.  These MOIs are unequivocally Jencks material that should have been produced.  *See United States v. Hinton,* 719 F.2d 711, 714 n.2, 716, 722 (4th Cir. 1983) (formal MOIs are considered a government agent's statement for Jencks Act purposes but informal notes are not).   Notably, Special Agent Lafferty authored all of the undisclosed Ross MOIs and all but one of the Blanchard MOIs.

37.     Moreover, one of the undisclosed MOIs includes a diagram drawn by Mr. Ross to explain how continuous miners operated in connection with certain ventilation systems.  Mr. Ross testified extensively on the subject matter of ventilation and mining operations.  (*See, e.g.,* Trial Tr. Vol. XIX at 3904:18-3905:25).

38.      If the testimony of Mr. Ross, Mr. Blanchard, and Special Agent Lafferty had been stricken, there clearly would have been insufficient evidence to convict.  In fact, striking the testimony of any one of them would have seriously undermined the government's case.  This fact alone warrants vacating Mr. Blankenship's conviction and sentence.

**3.      Violation of District Court Orders Regarding discovery.**

39.     By failing to disclose these MOIs and MSHA documents, the government violated two orders issued by the Court regarding discovery.  These violations deprived Mr. Blankenship of his constitutional right to a fair trial.

### A. District Court's **Brady** *Order*

40. As described in paragraph 15, this Court ordered the government to "specifically designate any known Brady material as such and disclose the same to defense counsel." The prosecution's response denied that any exculpatory evidence existed in the entire investigation. None of the sixty-one interviews were included on that list, despite the fact that a number had already occurred by that time. And, of course, those interviews conducted later on were never disclosed at all.

41. Moreover, prosecutors repeatedly told the Court and the defense that they had complied with the Court's order. For instance, Mr. Blanchard testified on cross-examination that he had made several exculpatory statements during meetings with prosecutors. Having received only a single MOI from an interview with Mr. Blanchard, the defense requested the MOI from those other interviews. In response, AUSA Ruby asserted that "We have [] turned over 302s from our interviews with this witness . . . to the extent that there is exculpatory information that we had from this witness, that's been turned over to the defense." (Trial Tr. Vol. XVII at 3712:9-18). But, in fact, the government had not turned over 302s – plural – as AUSA Ruby claimed. It had turned over only a single 302 and had withheld *five* others with Mr. Blanchard – totaling twenty-three pages of notes. Included in one of those undisclosed MOIs was a statement corroborating that Mr. Blanchard told the government he had committed no crime: "Blanchard advised that he never knowingly gave a direct order where he told someone to do something that caused a law to be broken." (MOI-001457).

### B. *Rule 17(c) Subpoena*

42. On September 9, 2015, pursuant to this Court's order granting Mr. Blankenship's request for a Rule 17(c) subpoena *duces tecum* to be served on MSHA (ECF No. 358), the

subpoena was issued requesting: "All documents regarding the UBB mine during the Indictment Period located in the files of the MSHA inspectors and officials who were present in the mine during the Indictment Period and their supervisors." (ECF No. 359).

43.     Mr. Blankenship – correctly as we now know – believed that MSHA's responses were inadequate.  When he sought the Court's assistance in compelling better responses, prosecutors vigorously opposed those efforts. *See supra* para. 19.

44.     However, documents turned over to Mr. Blankenship in November 2017 include emails that were responsive to the Rule 17(c) subpoena and should have been produced pursuant to it.

45.     What is more, the defense discovered evidence that MSHA had *destroyed* documents in the aftermath of the UBB explosion.  It raised this issue with the court and requested an evidentiary hearing.  (ECF No. 481).  In opposition to Mr. Blankenship's motion, prosecutors told this Court: "MSHA has complied with the subpoena, and the United States has complied and continues to comply with its discovery obligations." (ECF No. 496).  As a result, the court did not find Mr. Blankenship's evidence of non-compliance to be sufficient: "Absent additional testimony or evidence regarding alleged document destruction by MSHA or any MSHA employee, and any additional link between such acts and this case, the Court sees no legal basis or justification for granting the Defendant's Motion."  (ECF No. 549).

46.     The undisclosed MSHA letters provide that additional evidence.  In December 2011, a MSHA employee William Francart sent an email asking: "How many miners worked their entire career at UBB? We had a shredding party here in Beckley and the charts you printed for everyone were modified so that they can't be read."  (USAO0000032).  This email reinforces the conclusion that MSHA intentionally destroyed its records related to UBB.

### C. *Fraud on the Court*

47.     In addition to its failure to turn over *Brady* material, prosecutors misrepresented the government's compliance with its *Brady* obligations and the court's *Brady* order in both court filings and oral arguments.

48.     For example, in its opposition to Mr. Blankenship's pre-trial motion to Compel Compliance with the Court's Brady Order, prosecutors told the Court that "the United States has complied with the *Brady* Order." (ECF No. 284).  Likewise, in its opposition to a similar motion during trial, prosecutors told this Court: "MSHA has complied with the subpoena, and the United States has complied and continues to comply with its discovery obligations." Response to Defendant's Motion to Compel (Nov. 15, 2015) (ECF No. 496).  Neither of these statements was true.

49.     AUSA Ruby misrepresented the government's compliance during argument before the court.  As described earlier, after Chris Blanchard testified about a number of exculpatory topics that he told the government, Mr. Taylor asked to see the MOIs from those interviews.  AUSA Ruby told the Court that "We have [] turned over 302s from our interviews with this witness . . . to the extent that there is exculpatory information that we had from this witness, that's been turned over to the defense."  (Trial Tr. Vol. XVII at 3712).  This was simply not true.

### 4.     Prosecutorial Misconduct

50.     In order to establish a claim under *Brady*, it is not necessary to show that the prosecutors intentionally suppressed evidence.  *See Brady*, 373 U.S. at 87 (the "good faith or bad faith of the prosecution" is irrelevant if the suppressed evidence "is material either to guilt or to punishment").  Nonetheless, the quantity and quality of the suppressed exculpatory and other

information here leads to the unfortunate conclusion that the misconduct was intentional. The prosecutorial misconduct was of such magnitude as to deny Mr. Blankenship due process and a fair trial, and it therefore violated his Fifth Amendment rights and warrants vacating his conviction and sentence.

51.     Defense counsel frequently raised the issue of nondisclosure with both prosecutors and the court, asking for specific documents or statements. On behalf of the prosecution team, AUSA Ruby repeatedly countered that they had complied with their obligations even though they so obviously had not. AUSA Ruby in particular, *must have known* that these representations were not true. He had personally participated in the vast majority of the undisclosed interviews including all five Blanchard interviews, along with three of those involving Bill Ross.

52.     Moreover, prosecutors denied that any exculpatory evidence even existed. In response to the Court's *Brady* Order, AUSA Ruby denied that any exculpatory evidence existed in the entire investigation. Yet, it is clear from his response that AUSA Ruby understood the precise nature of the information that Mr. Blankenship considered exculpatory. Instead of providing that information, he simply argued that the evidence *did not* actually exculpate Mr. Blankenship.

53.     The Blanchard incident is the most telling display of the willfulness of the misconduct. After defense counsel requested notes from Mr. Blanchard's MOIs, stunningly, AUSA Ruby did not offer to review the file or ask the Court for time to confirm. Instead, he boldly told the Court that all exculpatory information from the witness had been turned over. (*See* Trial Tr. Vol. XVII at 3712:9-18). And yet, twenty-three pages of notes from five interviews *that AUSA Ruby personally attended* had never been disclosed.

54.     Despite the efforts of the new U.S. Attorney to remedy these discovery violations, Mr. Blankenship has reason to believe that additional exculpatory material remains undisclosed. Specifically, handwritten notes of interviews by investigating agents have never been disclosed. In a pre-trial motion, defense counsel requested the handwritten notes of interviews.  The Court ordered that the substance of those notes be produced, a requirement the government claimed had been satisfied by the typewritten memos.  Nonetheless, it is probable that witnesses made exculpatory statements to the government that are not reflected in the typed MOIs that were produced.[7]  Based on the pattern of violations here, it seems likely that material evidence may be contained in the handwritten notes that is not reflected in the typed MOIs.

55.     Additionally, before trial, the defense requested certain information regarding communications between the government and immunized witnesses. Specifically, they requested information on whether immunized "witnesses or their counsel profess innocence or otherwise make factual representations or proffers inconsistent with their or Mr. Blankenship's guilt."  No response to that request has ever been provided.

56.     Finally, even with the most recent batch of MSHA emails provided by the government, there is no indication that the routine day-to-day communications among MSHA inspectors have ever been produced, despite defense counsel's repeated requests.

**CONCLUSION**

WHEREFORE, Donald L. Blankenship moves this Court to vacate and set aside his sentence and judgment of conviction as having been imposed in violation of the Constitution and the laws of the United States, and for such other relief as is necessary and appropriate.  Mr.

---

[7] For example, Mr. Blanchard testified that he (or his attorney) informed the government that he had not engaged in a conspiracy with Mr. Blankenship.  (Trial Tr. Vol. XVI at 3309:17-3310:4). No such statement appears in any of the disclosed MOIs.

Blankenship also moves the Court to hold an evidentiary hearing to consider the full facts, and to

determine whether additional information exists that should have been provided to Mr.

Blankenship pre-trial.


Dated: April 17, 2018                      Respectfully submitted,

/s/ Howard C. Vick
Howard C. Vick
Michael A. Baudinet
MCGUIREWOODS LLP
Gateway Plaza
800 E. Canal Street
Richmond, VA 23219-3916
Tel: (804) 775-1000
Fax: (804) 775-1061
tvick@mcguirewoods.com
mbaudinet@mcguirewoods.com

Benjamin L. Hatch
MGUIREWOODS LLP
World Trade Center
101 West Main Street
Suite 9000
Norfolk, VA 23510-1655
Tel: (757) 640-3700
Fax: (757) 640-3701
bhatch@mcguirewoods.com

/s/ W. Henry Jernigan, Jr.
W. Henry Jernigan, Jr. (WVSB No. 1884)
DINSMORE & SHOHL LLP
707 Virginia Street, East, Suite 1300
P.O. Box 11887
Charleston, West Virginia 25339-1887
Telephone: (304) 357-0900
Facsimile: (304) 357-0919
henry.jernigan@dinsmore.com

*Counsel for Donald L. Blankenship*

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### Beckley Division

|                                  |     |                            |
|----------------------------------|-----|----------------------------|
|                                  | )   |                            |
| **UNITED STATES OF AMERICA**     | )   |                            |
|                                  | )   |                            |
| **Plaintiff,**                   | )   |                            |
|                                  | )   |                            |
| **v.**                           | )   | **Criminal No. 5:14-CR-00244** |
|                                  | )   |                            |
|                                  | )   |                            |
| **DONALD L. BLANKENSHIP**        | )   |                            |
|                                  | )   |                            |
| **Defendant.**                   | )   |                            |

## CERTIFICATE OF SERVICE

I, W. Henry Jernigan, do hereby certify that a foregoing **Motion to Vacate and Set Aside Defendant's Conviction and Sentence Pursuant to 28 U.S.C. § 2255** was served through the Court's electronic filing system on this the 17th day of April, 2018 upon the following counsel of record:

Michael B. Stuart, Esquire
U.S. Attorney for the Southern District of West Virginia
Robert C. Byrd U.S. Courthouse
300 Virginia Street, East, Suite 4000
Charleston, WV 25301

/s/ W. Henry Jernigan, Jr.
W. Henry Jernigan, Jr. (WVSB No. 1884)