**Report of Interview**

**U.S. Department of Labor**
**Office of Inspector General**
**Office of Investigations**



Page  1  of  3

OIG Form 103 (OI – 1/98)

| Investigation on: | 11/10/2011 | At: | Richmond, VA | File: | 31-0862-0001 PC |

By: Special Agent Jeffrey Carter                                    Date Prepared: 11/14/2011

On November 10, 2011, Mark Clemens was interviewed at the United States Attorney's Office located in Richmond, VA by Thomas Hall, DOJ Trial Attorney, Fraud Section and Special Agent Jeffrey Carter, United States Department of Labor, Office of Inspector General, Office of Labor Racketeering and Fraud Investigations. The nature of the contact was explained and Mohr voluntarily provided the following information:

Also present during the interview was Pete White and Nora Lovell, Attorneys from Schulte Roth & Zabel.

Clemens stated that he is no longer with Massey/Alpha Natural Resources and that his last day was June 9, 2011. Clemens had been employed by Massey for 22 years. Prior to the merger with Alpha, Clemens was senior vice president of operations for Massey Coal Services. After the merger he was vice president of optimization.

Clemens started working for Massey June 1989. He was an accounting trainee in a three year training program where he learned all aspects of the coal mining business. After he completed his training Clemens spent two years in the accounting department. Clemens passed is CPA exam and became a staff account. In 1993 Clemens transferred to Massey's Omar Subsidiary as the comptroller and held that position for one year. In 1994 Clemens became the comptroller for Stirrat for approximately 18 months. In the fall of 1995 Clemens became the comptroller for Performance Coal Company. August 1997 Clemens was the corporate comptroller for Massey and held that position for approximately 14 to 15 months. Clemens held the position of vice president for subsidiary accounting until February 2000. Clemens also held positions as president of Independence Coal and the head of budgeting for Massey.

Clemens stated that his role with Massey from 2007 until the acquisition was allocation working with production, sales and budgeting. Clemens matched up production and sales. He also had a big role in budgeting. Clemens stated that his predecessor was Drexel Short. Clemens reported directly to Don Blankenship. Clemens stated that approximately four to five individuals reported to Clemens along with the different work groups. Clemens stated that he also indirectly worked with Sabrina Duba and Stacy Wagner who worked in sales. They reported directly to Baxter Phillips.

Clemens stated that he had contact with all individuals in sales: Steve Sears, Mike Allen, John Parker and Tom Dougherty. Clemens had some contact with the customers. Clemens stated that he got involved with the larger complaints which dealt with deliveries, inventory issues and quality control. Clemens stated that he dealt more with the situation than the customer.

Clemens recalled that he met mainly with Scott Vogel and Bill McCartney from U.S. Steel. Clemens was involved in negotiations. Sears and John Poma attended these meetings also. Sears and Poma focused on contracts, negotiations and customer relations more so than Clemens. If Clemens got involved that meant there was an issue.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Clemens stated that he didn't get involved very often. Clemens cited an example when Herman Maze called because his inventory was low and that he was going to have to shut down. Clemens stated that Maze was given priority for shipping.

Clemens stated that the coal industry was give and take with meeting needs. Clemens explained that for example in 2009 no one wanted coal. A shift in the steel market would create a demand for coal. Clemens recalled the following issues, customers held back on their coal, rail road related issues, geological conditions at the mines, the labor pool was tight and there was a lot of turnover.

Clemens stated that if an issue was elevated to his level that he would have discussed it with Baxter Phillips and Don Blankenship. Clemens couldn't recall any specific occasions. Clemens stated that he saw Blankenship at least once a week or he may see him every day dependent upon what was going on. Clemens saw Phillips less than Blankenship.

Clemens stated that there was a sense that 2010 was going to turnaround for coal. Massey was able to keep its workforce intact and may have added a few sections.

Clemens stated that he recalled an issue with a customer late 2009 or early 2010. He couldn't recall any specifics, but stated it shouldn't have been an issue with getting coal.

Clemens didn't work with overseas customers much. He visited India once with Sears for contract negotiations and may have been to the UK twice. Sears was responsible for Massey's overseas accounts.

Clemens was presented with a schedule from U.S. Steel dated April 27, 2010. Clemens couldn't recall why there was a shortfall with U.S. Steel. Clemens stated that it could have been a rail road problem, but doesn't know for sure. Clemens explained that you try to make up what you can with your customers. Clemens stated the following were remedies for coal shortfall issues. The contract could be extended to make up the tons and the blend could be adjusted and a lower quality coal could be accepted. Clemens stated that companies often would not accept the lower quality coal.

Clemens stated that the following metallurgical coal customers were serviced from Marfork: U.S. Steel, Wheeling Pitt, Great Lakes, Berns Harbor, Corus, ILUA, and Arcelor Mittal.

Clemens stated that there was pressure at Massey to run coal, but not enough pressure to overlook safety. According to Clemens all of management wanted to run coal. Clemens stated that Blanchard wasn't under any more pressure than any other President at Massey.

Clemens stated that he had contact with Chris Blanchard. Clemens spoke with Blanchard Weekly, but very rarely went to see him. Clemens discussed budget and delivery issues with Blanchard. Blanchard had visited Clemens. Clemens stated that conference calls were held monthly for coal sales. Blanchard participated in these calls along with James Sutphin, who was a direct report to Clemens, the sales force and the traffic department. They discussed the production sales summary, sales reporting and tracked contracts. Issues were discussed and production was married up with contracts. Blankenship may have been present for some of these calls.

Mine presidents and the lab managers scheduled trains, managed day to day reporting that was used to track where the company stood compared to its contracts.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

MOI-001506

Clemens stated that he wasn't involved with safety or MSHA. Clemens stated that he received a call from Blankenship and based on that call initiated a non-fatal days lost (NFDL) audit. This was done after MSHA conducted an audit and found accidents that weren't reported. Clemens, Blanchard and Nick Johnson were involved. Clemens stated that Elizabeth Chamberlain worked with mine presidents and safety directors. The audit looked at reportable accidents and reviewed to see if any were lost time accidents. Clemens stated that they missed reporting some accidents.

Clemens stated that during the audit it was found that some miners were performing light duty work. Clemens believed that there may have been a misunderstanding of the rules. Clemens stated that instances were found where accidents were reported to MSHA, but not to the company. Massey started the audit then Ernst and Young was hired to finish the audit.

Clemens stated that he felt UBB was run well and hadn't heard anything negative about the mine. It was the largest deep mine producer with a high quality of coal that Massey had. Clemens did recall that UBB received a large number of violations. Clemens stated that UBB had a resident inspector along with some of the other larger operations. Massey had 50 to 60 PPOV mines. Clemens was aware of this because of the reporting to the SEC in 2009.

Clemens stated that following individuals worked on the SEC filings: Eric Grinnan from corporate, Roger Hendrickson-Investor relations, Eric Tolbert-CFO and Elizabeth Chamberlain was responsible for the NFDL rate.

After the explosion Chis Adkins, Chief Operating Officer for Massey was focused on UBB. Clemens assumed Adkin's duties. Clemens sent force Majeure letters to its customer. Clemens stated that Massey met approximately 48% of customer contracts.

Clemens stated that the delay in getting the longwall up and running at UBB was an issue, but couldn't recall any specific problems it created.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

**Report of Interview**

**U.S. Department of Labor**
**Office of Inspector General**
**Office of Investigations**



Page __1__ of __3__

OIG Form 103 (OI – 1/98)

| Investigation on: | 11/10/2011 | At: | Richmond, VA | File: | 31-0862-0001 PG |
|---|---|---|---|---|---|

By: Special Agent Jeffrey Carter _JRC_                              Date Prepared: 11/14/2011

On November 10, 2011, Steve Sears was interviewed at the United States Attorney's Office located in Richmond, VA by Thomas Hall, DOJ Trial Attorney, Fraud Section and Special Agent Jeffrey Carter, United States Department of Labor, Office of Inspector General, Office of Labor Racketeering and Fraud Investigations. The nature of the contact was explained and Sears voluntarily provided the following information:

Also present during the interview was Pete White and Nora Lovell, Attorneys from Schulte Roth & Zabel.

Sears retired from Massey Energy/Alpha Natural Resources in June or July 2011. Sears retired with 30 years of service. He is currently under a consulting agreement with Alpha.

Sears started his career with Massey in January 1981. Sears worked as a company pilot for approximately three years. Eventually Sears began working in sales for Massey. He held various positions within sales, such as Industrial Sales President, Electric Power Sales President and President of Massey Coal Sales (MCS), overseeing all of sales operation. Sears also held positions within Coal Handling Solutions.

Sears was president of MCS from late 2007 until he retired in June or July 2011. Sears reported directly to Baxter Phillips. Prior to becoming President of MCS, Sears was Vice President for sales and marketing. Sears explained that he has spent six months out of the year overseas for the past two years. MCS was responsible for industrial, utility and metallurgical coal sales and transportation.

The following individuals were involved on the metallurgical coal sales side of Massey; Mike Allen, John Parker, John Dougherty, Gary Temple and Andy Smallneck. There were three administrative personnel assigned to metallurgical sales. The traffic department had another five individuals assigned. Sears explained that some finance positions reported to him. The coal handling groups also reported to Sears.

Mike Allen left Massey in April 2008. Sears believed that Allen started his own business, Allen Energy. Andy Smallneck was moved from industrial sales to metallurgical to work with Sears. In late 2009, Smallneck left the company and went to work for Trafigura. After Smallneck left, Sears and Dougherty assisted the metallurgical sales. David Smith was brought from the field to assist metallurgical sales around the middle of 2010. Smith is currently employed by Alpha.

Sears reported directly to Baxter Phillips and on an informal basis to Don Blankenship. Sears also worked closely with Mark Clemens. Clemens worked with operations and the overseas employees.

Sears stated that the top metallurgical coal customers were US Steel, Steel Authority of India, Algoma, and Corus. Sears stated that sometimes he chased the customer and sometimes they chase him. He

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

worked closely with his customers, but was not able to visit them all. Some overseas customers came to visit Sears and he took them to the mine operations.

Sears explained that some issues were elevated to Phillips or Blankenship, either directly or brought to their attention. Sometimes Blankenship would get involved with negotiations. Sears would back off when Blankenship got involved. Blankenship liked talking with customers and they liked talking with him. Phillips had relationships with Algoma, Corus, Hydra and Posco Steel. Phillips was happy to speak with customers. Sometimes customers wanted to speak with someone in a higher position.

Sears stated that he has known Chris Blanchard for many years. Sears has not had a lot of interaction with him, but stated that his interaction with Blanchard has been more often over the past couple of years. Blanchard is one of our better mine presidents. Blanchard understood mining, customers and finances. Sears stated that Blanchard would meet with customers. Sears has visited Blanchard at the Marfork Mine office. Sears stated that Blanchard was a product of the people that worked for him and that he was a good person.

Sears stated that pressure from customers depended upon the coal market, whether it was high or low. It also depended on the customer's inventory. Sears explained that some customers carry lower inventories than others.

Complaints from customers also depended on the coal market. In 2008 customers were pushing for deliveries and in 2009 when coal prices were high they did not want it.

Some customers were more demanding than others. AK Steel operated with low inventory. Wheeling Pit was skeptical until they got to know Sears because of past experiences.

Sears stated that the biggest issues with deliveries were the rail roads, CSX and Norfolk and Southern. Sears stated that if every rail car was available that was requested there would have been a production problem. Sears stated that they were not running the way they wanted to run, but that they were staying ahead of the rail road. If there was a production issue first step was to talk with the president of the operation, maybe Clemens and eventually Blankenship. Sears stated that most conversation with Blanchard were indirectly through Clemens.

Sears reviewed a document from US Steel dated 4/27/2010. Sears stated that he did not recall a specific problem that US Steel was having with Massey. They worked to accommodate customers. One of the biggest issues was renegotiating contracts when the price of coal was high.

Sears stated that Massey's primary focus was safety. Blankenship started a safety program for individuals and pushed safety more than any other CEO in the industry. People have been fired because of safety. Sears was responsible for safety audits at Coal Handling Solution locations at Westvaco in VA and Eastman Chemical in TN.

Sears stated that there had been a ventilation plan in place at UBB for 15 years and in 2009 MSHA wanted to change the plan and started writing violations.

Sears explained that there were issues with the setup of the longwall at UBB that caused delays and in September of 2009, MSHA shut down the wall because of ventilation which hurt production. Sears stated that the longwall sometimes runs a lot of coal and sometimes it does not run any.

Sears stated that he had a positive opinion about safety at all of Massey's operations.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Non-Fatal Days Lost (NFDL) was a topic of discussion by Elizabeth Chamberlain at every operations meeting.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Report of Interview          **U.S. Department of Labor**
                             **Office of Inspector General**
                             **Office of Investigations**



Page   1   of   2                              OIG Form 103 (OI – 1/98)

| Investigation on: | 1/25/2012 | At: | Charleston, WV | File: | 31-0862-0001 PC |
|---|---|---|---|---|---|

By: Special Agent Jeffrey Carter  *[signature]*                    Date Prepared: 1/25/2012

On January 25, 2012, Andy Coalson was interviewed at the United States Attorney's Office, Charleston, WV by Steve Ruby, Assistant United States Attorney, Special Agents Jeffrey Carter, United States Department of Labor, Office of Inspector General, and Jim Lafferty, Federal Bureau of Investigation. The nature of the contact was explained and Coalson voluntarily provided the following information:

Also present during the interview was John Carr, Attorney.

Coalson stated that he was present in the mine office at UBB with Chris Blanchard when advance notice of inspectors was given. Coalson believed that it was MSHA inspectors that were announced. Blanchard looked at Coalson and asked him if he had notified the section. Coalson explained that he was at the other end of the office with Blanchard when Blanchard looked at him and asked if he had contacted the section.

Coalson recalled that on one other occasion he was outside of the mine when he heard MSHA times two over the radio. Coalson explained that is was unusual for him to hear the announcements because he was an underground guy.

Coalson also recalled times when inspectors were coming up the stairs and he would go into the office and call the section.

Coalson stated that he wasn't taught to give advance notice it was learned by example. It was the way it had always been done.

According to Coalson, Jamie Ferguson was definitely aware that advance notice was taking place. Coalson recalled that Ferguson had contacted the section before.

Hagar was aware that advance notice was taking place at UBB because Coalson had told Hagar that he was trying to notify a section of incoming inspectors.

The only conversations Coalson had with May would have involved where they thought the inspectors may be going. So they could warn the section and also getting miners underground.

Coalson stated that he has never had an inspector tell him not to call underground. It didn't feel like a law because no one ever enforced it. It was only enforced on mine blitzes. Coalson's take was that the law was on the books, but it was never enforced.

Coalson stated that part of your foreman's class was spent covering state and federal laws. Someone from the company covered state and federal law at the beginning of the classes. The classes were contracted out. Coalson attended a foreman class at Marfork paid for by the company. Ed Chaffin taught classes. Class was from one to two weeks every day. Coalson stated it was a good class. It's

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

MOI-001389

how he learned the map, ventilation and mine basics. You were tested the following week after the classes were concluded and received your certification card the same day. The test covered law, but did not discuss advance notice.

Coalson stated that inspectors knew they were calling Coalson thought the law allowed you to contact mine foremen and superintendents as company representative. Calling gave you time to tighten curtains, make sure air was right in the last break, check ventilation, make sure the roof was bolted, reflectors were in place and the area was rock dusted. You are not able to clean an entire section in an hour. Sections were shut down to make sure everything was right when inspectors showed up. It allowed you to not have to clean 40 feet to the face.

Coalson recalled that Jack Martin had been given advanced notice. It was found that Martin did not have enough air on the section. Martin was asked and stated I felt like I had good air, but Martin did not take an air reading. Blanchard wanted to fire Martin, because Martin knew inspectors were coming and he did not take an air reading. Blanchard discussed what happened with Martin to Ferguson. Coalson called Blanchard on Martin's behalf. It is the only time Coalson called Blanchard at home. Blanchard told Coalson they were paying a man to do a job and he wasn't doing it. Coalson was told to suspend Martin for five days.

Shutting the belts off is the quickest way to get someone to come to the phone. Also the sections would call out to see what was going on. Coalson was not aware of codes used for inspectors. He would hear things like fed man on the way. Coalson received calls from dispatch or anyone outside. Coalson can't remember a time not being called on the section when inspectors showed up. Coalson stated that May and Homer Wallace called in advance of inspectors.

Coalson stated that he may have briefed the oncoming section concerning water and may have called out to request more pumps. Coalson did not provide a water report. Coalson recalled that he spoke to Everett Hagar and Ferguson after the shift.

Coalson stated that he was never told to not put something in the log books.

Coalson witnessed Blanchard chewing out May because he had received D orders for not having canopies on the equipment.

Coalson stated that the P and L (profit loss statement) can be manipulated. The clean tons per foot could be manipulated to increase numbers if one mine was not doing good. You could change the numbers with a mine that was doing good to make them even out. You may split costs with another mine operation to make the books look good. Coalson doesn't have any proof this was going on, only that he knew how much coal was being mined.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Report of Interview          **U.S. Department of Labor**
                             **Office of Inspector General**
                             **Office of Investigations**



Page __1__ of __5__                     OIG Form 103 (OI – 1/98)

| Investigation on: | 11/27/2012 | At: | Charleston, WV | File: | 31-0862-0001 PC |

By: Special Agent Jeffrey Carter                     Date Prepared: 11/28/2012

On November 27, 2012, John Ryan Patrick was interviewed at the United States Attorney's Office located in Charleston, WV by Special Agents Jeffrey Carter, U.S. Department of Labor, Office of Inspector General, Office of Labor Racketeering and Fraud Investigations, and James Lafferty, Federal Bureau of Investigation. Also present and participating was Assistant United States Attorney Steven Ruby. Patrick was accompanied by his attorney John Carr. The participating parties were introduced and the nature of the interview was explained. The following is the information provided by Patrick:

Patrick is currently employed by Alpha Natural Resources in the safety department at Brooks Run West located in Logan, WV. Patrick has been at Brooks Run since 2010.

Patrick is 30 years of age and holds an undergraduate degree in engineering from West Virginia Tech. Prior to working for Massey/Alpha, Patrick was an instructor at Southern Community College. He taught electrical engineering technology classes. Patrick has also worked in the field of freelance computer repair.

Patrick met Nathen Brown from the HR department at Massey at a job fair in Logan. Patrick was called for an interview by Gary Duncan. Patrick was hired as an engineer tech assigned to the environmental group at Logan County Mine Services working for Natalie Ferrell and Steve Poe. Patrick entered data into a central database for water quality audits. Patrick worked at Logan Mine Services from August 2008 until February 2009.

Patrick transferred to the Julian office working directly for Chris Adkins. There was a need for someone to handle violation data. Patrick explained that he met with Adkins one day and was brought into Julian to start working the next. Adkins described Patrick's position as tracking and reporting violations. John Segsworth may have been doing some of this because he was a safety analyst. Patrick talked to Keith Hainer about the software. Patrick believed that Adkins mentioned the need to do a better job tracking trends and that safety was lacking. There wasn't any electrical engineering component to the job. Adkins introduced Patrick to Elizabeth Chamberlain and Segsworth. Patrick initially reported to Adkins, but at some point started reporting to Chamberlain. Patrick was temporarily assigned to Massey Coal Services, but continued to be paid by Logan County Mine Services for the first six months.

Chamberlain explained that the first thing that Patrick needed to do was gather information for Adkins because he had a call on Tuesdays with Don Blankenship. Patrick's first full day at Julian he met with Adkins, set up his office and was introduced to Vicki Horn who was a program manager.

Patrick reviewed an email dated February 21, 2009, from Elizabeth Chamberlain for review. Patrick provided that his first full day in the safety department at Julian would have been the Friday prior to this email.

Patrick reviewed month to date (MTD) Violation Details for March dated 3/20/2009. Patrick explained that Adkins sketched out a layout for the report that he wanted to see first. Adkins wanted to see group violation areas and an estimate of penalties. Patrick provided this report weekly. When Patrick first started he was not aware what databases Massey used. Adkins explained what he wanted and Segsworth explained what information was available. Excel spreadsheets were emailed to Segsworth from the mines broken down by

MOI-001431

mine name, significant and substantial (S&S) section, section of the law and estimated penalties. Eventually the emails were sent directly to Patrick.

Patrick created an Axis database to dump the data that was being received from the mine sites. There was also an Axis database for accidents. The database was kept on a shared drive on the Julian server. Patrick explained in order to access the information you went to the shared drive, perm folders location and the information was located in one of the safety folders possibly labeled daily violations or report. Patrick initially kept the information on his PC and then it was transferred to the server. Patrick provided reports to Adkins weekly.

Patrick reviewed an email from him dated 4/7/2010, subject: Violation Copies. Patrick stated that Adkins wanted to see the full violations. The email was later expanded to be sent to others. Once Adkins asked to see violations, Patrick sent a request to have violations sent or faxed to him. Patrick scanned all violations and merged them creating one PDF-Daily Violations. A link had to be created because of the size of the attachment. Patrick explained that Ken Brown was the Chief Surface Engineer for Massey. Todd Cooper was the building manager at the Julian office and that Jennifer Griffith was Mike Snelling's Executive Secretary.

Patrick reviewed an email from him dated 10/30/2009 to Ken Brown. Patrick explained that it was possibly a modified version of the report for surface mines. Patrick believed that he was asked for this report sporadically because he was not that familiar with it. Patrick believed the request came about because of the weekly report.

Patrick reviewed an email from Marsha Lewis dated 3/19/2010. David Owens was the Corporate Controller who put together a template for the violation report that used prices for cost. Toby Edwards was President of Edwight and managed Goals. Patrick was not familiar with Danny Deaton or John Ward.

Patrick reviewed an email dated 1/6/2010 from Chamberlain with attachment: Violations by Group by Quarter. Patrick explained this was not a format that was used often. Patrick could not recall why Chamberlain requested this type of report. Chamberlain did not explain things, she just asked for information. Patrick recalled that the Freedom mine was high on everything and may have been shut down.

Patrick reviewed an email dated 7/26/2009 from Chamberlain, subject: weekly respirable dust report. Patrick does not think this was ever launched. Patrick set up the spreadsheet where the resource groups could input data that would have been reviewed by Chamberlain and Bill Ross. Patrick stated that he did not compile data or distribute the data it would have been for Ross' benefit for dust and ventilation issues. Patrick did not recall ever seeing a dust report.

Patrick reviewed an email dated 5/1/2009, from him, subject: State Violations. Patrick explained that Adkins and Chamberlain wanted to have a reporting on state violations and also wanted historical data for reports. Patrick believed that prior to his involvement some mines combined both state and federal violations together. Patrick stated that this only dealt with West Virginia because they carried monetary penalties. The second page of the Daily Violations Report was state violations. Patrick believed it was tracked because of the monetary penalty.

Patrick reviewed an email dated 4/8/2009 from him, subject: Daily Reports. Patrick explained that a negative response was required.

Patrick reviewed an email dated 3/25/2009 from Chamberlain, subject: D-Sequence. Patrick kept folders in his inbox for these emails. Patrick believed that d-chain involved 104D violations. Chamberlain requested D-Sequence once a quarter or a couple times a year. This was not a scheduled request. Patrick put the

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

information into a basic spreadsheet report when the information was received. Patrick believed that he printed and took physical copies to the Safety Development Group (SDG) meetings.

Patrick reviewed an email dated 6/15/2009 from him with attachment: AR Number Report. This was not a regular report. Patrick believed it was used to get a sense of what inspectors cited. The purpose was not explained to Patrick. The AR field was added when the database was centralized.

Patrick stated that he felt that he could discuss things with Chamberlain, but he would not question why something was needed.

Patrick stated that the Axis database was essentially established to track costs. Chamberlain and Adkins knew a better tracking system was needed. They wanted to be able to pull actual violations, weekly, daily reports and summaries.

Axis was replaced with Microsoft SQL a web based server created by Massey internal programmer Steve Harrison. Harrison was located in Richmond, VA. It is a more extensive database. After the reports that were used on a regular basis were developed the system could generate and send reports. Patrick no longer had to compile the reports. Data input was pushed to the resource group level. This occurred in June or July 2009. Axis was also continued to run year to date reports. Harrison maintained the program.

Patrick reviewed an email dated 5/29/2009 from him, subject: S&S report, with attachment. Patrick explained that is was not a regular report. S&S was part of the weekly report. Patrick was not sure why this would have been requested. Patrick believed that Chamberlain liked to see multiple months in order to see if there was a trend.

Patrick stated that toward the end of Massey prior to the merger Chamberlain asked for a similar report for accidents and violations.

Patrick reviewed an email string dated 5/26/2009 from Berman Cornett, subject: Lost Time Accidents (LTA). Patrick was not sure why he would have received this because of the date. Patrick explained that he would receive these reports and clean up the spelling and make presentable for Chamberlain. This should have gone to Segsworth, but he was probably on vacation.

Patrick explained that when an accident occurred the President of the group would report the accident to Julian and then to Chamberlain. These reports were received with 000 in the MTD field and YTD field. Patrick filled in that information and corrected the spelling. Then the report was sent to Chamberlain. Segsworth inputted the information into the Axis accident tracking database. Patrick and Segsworth both worked for Chamberlain. Segsworth left the safety department in June 2010 and transitioned into the legal department. The accident database was also transferred to the SQL server. The accident information was kept in the same location as Patrick's information using the same path to access as citations.

After Chamberlain reviewed an LTA she would confirm the LTA for distribution Company wide. There was a large disbursement list for distributing LTA's. All Safety Directors, Presidents, Engineers and senior managers received the LTA's. Patrick believed the LTA's were distributed to be used as a reference. This was also done with Potential LTA's (PLTA) that had not yet been determined to be an LTA and restricted duty.

Patrick explained that the process for PLTA's was to run a report in the database in order to follow up. The Safety Directors were relied upon to update and follow up on accidents.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Patrick took over this role when Segsworth went to legal. Segsworth showed Patrick how to do them. Segsworth did not provide Patrick with any written instructions he told Patrick how to do it. Patrick believed that the Safety Directors were supposed to call Segsworth every Friday to update. The accidents were filed by month and year. Patrick explained that there were forms for restricted duty and near misses also. Restricted duty existed prior to Patrick's employment. The same process was used for these also. Patrick received them by email and cleaned them up and sent them to Chamberlain.

LTA's and PLTA's were also discussed during SDG meetings. Patrick believed that near miss forms contained a description, where it happened and the employee involved. Patrick received the information and sent it to Chamberlain. An accident could have been serious and ended up minor, so it was not reportable. The database was only used for LTA's and restricted duty. PLTA's and near misses were kept on the computer in a folder.

A packet was compiled for SDG meetings that contained all forms received since the last meeting plus additional materials. Segsworth was responsible for compiling the packets and then Patrick took over when Segsworth left. Each accident was discussed at the meeting. Patrick believed accidents were discussed for best practices and how to prevent them in the future. Patrick believed that the classification of an accident was discussed by the Safety Directors. Patrick stated that you could refer to the yellow jacket (part 50) and also Lewis Shepard, Training Director for the company put together a PowerPoint in early 2010 prior to UBB. The presentation was about what made an accident reportable. The presentation was given at Julian for the Safety Directors and Technicians. Patrick attended the training with Chamberlain to work on other things. Patrick was not aware of any prior training conducted about the classification of accidents.

Patrick believed that Massey Accidents were audited on two occasions, one of which may have been from an outside firm after the explosion at UBB.

Patrick reviewed an email dated 1/20/2010 from Chamberlain, subject: non-fatal days lost (NFDL) Rate and attachment. Segsworth calculated the NFDL rate. Patrick was instructed by Segsworth on the calculation prior to him leaving. The rate was calculated monthly. Patrick explained that the calculation was the # of LTA's x 200,000 divided by the number of exposure hours. Patrick stated the restricted duty counts. The calculation was computed from the Axis database. Also contractors were recorded, but left out of the NFDL calculation. Reporting was done at the resource group level.

There was a category that was added to the server to account for Form 7000-1 (mine accident, injury and illness report). It was Patrick's understanding that if an employee worked at another location than assigned and was injured it would not be reported to MSHA, but may affect the resource group.

Patrick stated that on one occasion that a Marfork employee went to Elk Run for training. The employee twisted their ankle getting out of the car. Patrick stated that the question was raised who should get the LTA. This was discussed at an SDG meeting.

Patrick explained that the LTA number was generated from accidents that were not contractors. Exposure hours came from payroll. The information went to Segsworth and was loaded into Axis. There was a filter to remove individuals that did not have exposure such as office workers. Chamberlain and Segsworth developed the filter for outside contractors. Chamberlain made the call when determining who had exposure hours. Patrick reviewed the filter once after June 2010. Chamberlain wanted to make sure it was accurate. Patrick believed this occurred during the audit. Changes were made to exclude employees who did not have exposure causing the NFDL to go up. Patrick recalled two audits; one for exposure hours and one for accidents. Patrick made changes to the query payroll file. Patrick provided job codes, title and location. Chamberlain reviewed and added to what was already there. Chamberlain started with the payroll file and came up with a new list to filter.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; and its contents are not to be distributed outside your agency.

Chamberlain put together the first filter. Patrick believed that Chamberlain knew NFDL would go up by decreasing exposure hours.

Patrick believed that an internal audit was conducted on exposure hours. Steve Layell, Director of Internal Audit in Richmond headed up the internal audit concerning exposure hours. Patrick believed that he may have heard about the audit from Chamberlain when they talked about updating the filters. Patrick stated that Chamberlain sent him highlighted information of what should be filtered out and what should be added. Patrick talked with Layell on the phone a couple of times, met him in person and sent Layell emails. Patrick talked to Sabrina Duba about what should be backed up and what was being pulled from exposure hours. Patrick believed that Duba asked for information that was deleted. Patrick does not think the query was saved, but should be part of the prior queries when changes were made by Chamberlain. Patrick believed that the NFDL rate was corrected based on the results of the audit.

Chamberlain sent Patrick back to Logan County Mine Services in early 2010, about a year after reporting to Julian. Patrick was sent back to assist Jason Jude and Lewis Shepard in updating the S1 manual. Jude was a surface safety person and Shepard was with an underground safety group.

Patrick stated that the safety department had been discussing updating S1 for the past year at SDG meetings. This was prior to the UBB explosion. A portion of each SDG meeting for a year was used to discuss S1 policy updates. This included Safety Directors and operations personnel. Jude kept track of the changes that were made at the SDG meetings. It was a collection of word documents separate from the meeting minutes. Patrick was not aware of any particular reason for the S1 update. Patrick never had a small pocket size version of the S1 manual and was not aware if it was used in the field. Patrick had a sense from Chamberlain that this was something that needed to be done. Drafts were printed and handed out at SDG meetings. A portion of the meeting was used to discuss the draft. Patrick believed that Chamberlain led these discussions. Chamberlain usually chaired the meetings. Patrick stated that the discussions were broken up according to areas of expertise.

Chamberlain made changes and sent the changes to Patrick. Patrick's role in the S1 project was to edit the document and put changes into place. Patrick used a standardized format and combined files. Chamberlain sent the changes to Patrick by email and fax. Patrick was not aware if Chamberlain provided copies to upper management for review. Patrick sent drafts to the field to be reviewed by people who did not come to the SDG meetings. Patrick believed that 30 to 40 copies were made for the SDG meetings. Comments were sent to Patrick and Chamberlain.

Patrick stated that UBB diverted attention away from the project. Patrick did not recall any UBB specific changes to the S1 manual. It was Chamberlain's intention that the S1 manual would be updated yearly. There was no outside involvement in the project. The project never finished because of the merger with Alpha.

Patrick last heard from Chamberlain shortly after the merger. She gave Patrick a camera that she no longer used. It was a film camera. Chamberlain talked to Patrick in general prior and then contacted him shortly after the merger.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

**Report of Interview**

**U.S. Department of Labor**
**Office of Inspector General**
**Office of Investigations**



Page  1  of  5

OIG Form 103 (OI – 1/98)

| Investigation on: | February 5, 2014 | At: | Charleston, WV | File: | 31-0862-0001 PC |

By: Special Agent Jeffrey Carter                                          Date Prepared: 2/7/2014

On February 5, 2014, Charlie Bearse accompanied by attorney Tom Scarr was interviewed at the United States Attorney's Office located at 300 Virginia St., Suite 4000, Charleston, WV. Also present and participating in the interview were Steve Ruby, Assistant United States Attorney and Special Agents Jeffrey Carter, U.S. Department of Labor, Office of Inspector General, Office of Labor Racketeering and Fraud Investigations and Jim Lafferty, Federal Bureau of Investigation.

Bearse was the President of Sydney Resource group from 2007 through 2010. Sydney Resource group encompassed the following operations: Taylor, Freedom, Process, Clean and M-3. Bearse worked for Massey for 18 years, left for four years and has been with Massey/Alpha for the past seven or eight years.

Bearse was aware that his operations received violations. He acknowledged that they received a lot of violations. Bearse looked at the differences in the violations. He did not intentionally ignore violations. Bearse believed that he had a feel for the numbers at the time in terms of volume. Bearse was not surprised that he was one of the highest paid Presidents. Bearse suspected that somewhere compensation was tied to safety. Part of Bearse's compensations was quarterly incentives. Bearse could not recall the matrix that was used for the quarterly compensation. It was possibly tied to violations and safety. There was a matrix to measure safety, non-fatal days lost (NFDL) was the primary measure. There were also key performance indicators.

Bearse did not adjust pay because of safety or violations. The mines were written a lot of violations. Bearse stated that a lot of violations are enforced now that used to not be enforced. Bearse stated that he has mined a lot of coal and has never gotten a man killed.

After a mine foreman was killed when he was run over by a shuttle car Bearse made it a policy to wear reflective clothing and 20 years later the state has made it part of their regulations. Bearse stated that he could make a list of safety things that he was involved with and if Don Blankenship was not involved the list would be half that.

Bearse could not compare Massey and Alpha. He stated that things evolve because of events and went on to say the difference is that Alpha is operating under the non-prosecution agreement (NPA), requiring Alpha to meet certain requirements for training and safety. There is a cultural difference with Alpha. You have a lot less interaction from the top at Alpha. Bearse had more interaction with Chris Adkins, Elizabeth Chamberlain and other senior levels at Massey.

Bearse reported directly to Adkins. Bearse mostly interacted with Blankenship through memos. Blankenship would write notes and send them back to Bearse.

There was not a period of time that Bearse was not trying to follow the law. A lot of factors play a role. There was a generation that went to college and didn't work in the mines. Pressure to train because of the generation gap. The bar continues to rise with regulations. The regulations can be interpreted in different

ways. Level of enforcement increased on the federal level and the state followed. Bearse felt that District Manager Norman Page had it out for the Sydney operation.

When asked about the number of citations written for combustible material and rock dust, Bearse stated every mine had to be rock dusted and had to have people to take care of it. Bearse felt it was worked on. Committing violations was not intentional. Bearse believed he had the toughest district manager who had it out for Sydney. You have a 35 year old mine with difficult seam conditions. Bearse believed Page was trying to drive the mine out of business even after Page knew the mine was going to be closed.

Bearse stated that if he had a temporary situation he would have contractors take care of it. If he needed additional staff he talked to Adkins. Bearse stated that he was not going to blame one citation on anyone above him, it stops with Bearse.

Bearse stated that it was not a shortage of manpower that contributed to violations. It's the level of experience. There's a shortage of experience, but it is starting to come back around. The culture of the industry stops at a high school education. Bearse believes most people have good intentions. Bearse stated that it is about money and people also. The industry is down 10,000 miners in Central Appalachia. Some of it is because of the number of citations and some is economic factors.

Massey had a high turnover rate. Massey put pressure on people and held them accountable. Pay was also a factor. It's a race with your competitor. Everyone looks to see who is paying what. If Massey raises rates of pay then the other operators raise their rates. Miners end up going back and forth between mines.

Bearse stated that Taylor Fork in 2008 was one of the first mines to go on potential pattern of violation (PPOV). Freedom may have also been on PPOV at one time. When Taylor Fork was on PPOV, Bearse assigned accountability to people. Maps were put on the walls and areas of responsibility were assigned to people and citations were posted. This worked at Taylor Fork. It shows MSHA that you are trying and that you are making improvements. Bearse stated that he took this way of operating to other mines that weren't on PPOV. Bearse stated that he uses this technique today at Elk Run. Bearse did not recall a change in production when Taylor Fork was on PPOV compared to when it was not.

Bearse never instructed anyone to break the law. The intent was always zero violations. Bearse believed that is was possible to have a lower number of violations at Sydney. People create hazards and people are hazardous. Bearse also added that Sago and Aracoma caused an increase in enforcement.

Bearse stated that the NPA dictated staffing and rock dust. Freedom did not have designated rock dust personnel. There were staffing differences between Massey and Alpha since the takeover. Personnel were added to rock dust as a means to comply with the NPA. Bearse stated that was the only staffing difference.

Massey operated each section with 13 people on the day and evening shift and 9 on midnight. They operated two continuous miners, two shuttle cars, two roof bolters, an electrician, and a foreman. That was the industry standard. Bearse stated that the mine dictates manpower. Bearse does not see a material difference.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Since UBB there has been elevated enforcement and standards. UBB has caused the industry to change. Bearse stated that additional personnel make a difference. Bearse stated that he didn't know why they didn't do more. Bearse assesses the situation by considering what he needs with what he.

Bearse believed that he was one of the highest paid presidents because he had been with Massey for a long time. Bearse stated that he understood Don Blankenship, but others did not. Blankenship was very aggressive and in your face. Blankenship could have done a better job of explaining things. He had so much knowledge and talent. Safety was implied and always there. It takes a while to get a work group there. Even if Blankenship was hands off the message would have been the same. Bearse gave the example of telling someone that you love them. If you don't tell them every time you see them it doesn't mean you don't love them. Bearse stated that was the same with Blankenship, safety was implied.

Bearse explained if there was something wrong at the mine you were expected to stop, fix the problem and then move on. Bearse believed that people did not stand up and do what needed to be done. Bearse had conversations concerning safety, socialistic and capitalistic issues.

A court order was issued to shut Freedom down after Bearse had conversations with Page that Massey was going to shut the mine down. Freedom was bigger and older than other Massey operations.

It is not economically feasible to have zero citations. Bearse stated that you would have to shut down every mine in the industry.

It was decided that Freedom would shut down in 2010. Trying to exit a mine has a lot of ramifications. Where do you go next and how do you exit. It was a proactive decision that was thrown down Massey's throats by the agencies. It was decided to shut down because of compliance and all the problems that a 35 year old mine has. Bearse again stated that he never got anyone killed.

You are always trying to achieve zero violations. Bearse stated that tolerant implies that it is OK to receive violations and if that was true then everyone in the industry is tolerant of violations. Bearse did not meet a goal of zero violations, so does that mean that Alpha tolerated violations.

Apparently violations were tolerated because the system kept operating. There were not discussions that violations were OK, but there were discussions about trying to get better. Massey was not tolerant of anything it recognized that the "head winds" kept getting stronger, referring to compliance such as agency blitzes. Massey was not tolerant of being where it was or staying where it was.

Bearse stated that upper management wanted him to read every citation that was written. Bearse focused on the issues and problems and did not wait to receive a call from Adkins for a D order or "heavy paper". Adkins reviewed some of the citations, because some were more of an issue than others. Everyone at Massey was trying to do a good job, but could have done better. Bearse believed that he was doing everything in his power that he could.

Massey spent more time doing useless exercises trying to get things approved by MSHA. Bearse stated that you need to work together to accomplish more. MSHA was putting up hurdles all the time. Bearse believed that the whole process was dysfunctional.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

You can go to any mine and find safety violations. Bearse worked on safety projects, such as proximity monitors and reflective clothing. Bearse again stated that there was not a tolerance that was OK. Massey could have done a better job and so could MSHA. Bearse stated that he is intelligent, always worked hard and had good relationships with people. Bearse could have kept up with the number of violations better and could have had better awareness. He could have made more people aware and made a bigger deal of things. Massey was weak and the industry has been week concerning training. Bearse was aware that he was receiving a lot of citations and so was upper management. Bearse was not disciplined, but took some tongue lashings over issuance of orders.

Bearse stated that a B order will not cause a shutdown of productivity and went on to say he may have been reprimanded by Adkins. Bearse believed that he was reprimanded for running with no air on a section. Bearse could not recall the specifics with the reprimand, but recalled a harsh conversation concerning the violation. Bearse's salary was not reduced because of safety violations received and he did not have conversations concerning the potential of his pay being reduced. Bearse stated that he feared discipline over certain compliance issues from time to time, but could not give any specific instances. Freedom had particular issues that were touchy. The superintendents were not disciplined because of the number of violations.

Bearse stated that the superintendent at Clean Energy was fired because he advanced near an area that was mined out and full of water. The area was not examined before it was tapped and flooded. Jessie Hunt was the superintendent fired. This would have been in 2009 or 2010. Bearse was not aware if Hunt returned to work at another Massey operation.

Alpha has not added additional people to the section, but has added two additional outby personnel on average per mine. It's a standard increase particularly because of the 85% rock dust law. It's qualified because this is a different day and time. Bearse feels that Massey would have added additional people also. Bearse explained that you staff for what you have.

Bearse has shut down and interrupted production at mines because of safety or compliance. Bearse provided that he interrupted production at Taylor Fork when they hit gas in the roof. Bearse stated that someone has to be responsible for corrections and that they are behavioral based.

Bearse stated that he was aware of advance notice, but it has been a long time. It was a practice in the 1980's. To the best of Bearse's knowledge advance notice was not a practice at Sydney.

Bearse was aware that an internal audit was conducted and was aware that after UBB, Massey was accused of not reporting all accidents. Bearse stated that he worked at UBB for a year after the accident. Bearse believed that Massey was doing a good job reporting accidents. There were discussions about preventing lost time accidents. Bearse was not aware of any accidents that were not reported at Sydney. Bearse stated that at the resource group level and down that if an accident is not reported then someone is pushing the envelope, making it look better and playing with the numbers.

Bearse stated that he did not think that Elizabeth Chamberlain, Blankenship, or Adkins was doing anything with the safety numbers. Steve Endicott was the safety director at Sydney. If Endicott knew about an accident he would report it. Bearse had discussions with Endicott about reportability. If the numbers were played with it was closer to the operations.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

The last contact that Bearse had with Blankenship was in November 2010, when Blankenship resigned. Bearse had contact with Adkins a month ago because Adkins is working for a concrete company. The owner is a friend and they are doing business with the company.

Bearse is currently the general manager of Elk Run Mine (equivalent to president under Massey). Jason whitehead is vice president of operations for Coal River East Business Unit.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

MOI-001395

Report of Interview

**U.S. Department of Labor**
**Office of Inspector General**
**Office of Investigations**



Page _1_ of _4_

OIG Form 103 (OI – 1/98)

| Investigation on: | March 11, 2014 | At: | Charleston, WV | File: | 31-0862-0001 PC |
|---|---|---|---|---|---|

By: Special Agent Jeffrey Carter                                          Date Prepared: 3/14/2014

On March 11, 2014, John Ryan Patrick accompanied by attorney John Carr was interviewed at the United States Attorney's Office located at 300 Virginia St., Suite 4000, Charleston, WV. Present and participating in the interview were Steve Ruby, Assistant United States Attorney and Special Agent Jeffrey Carter, U.S. Department of Labor, Office of Inspector General, Office of Labor Racketeering and Fraud Investigations. The following is the information provided by Patrick:

When Patrick was brought to the Julian office, Chris Adkins sketched out what he wanted and had a discussion about the key points Adkins wanted in the Daily Violation Report. Patrick went on to say that the layout of the report either came from Elizabeth Chamberlain or Adkins.

Information for the report was provided by the safety directors. The safety directors sent a spreadsheet to John Segsworth who sent the information to Patrick. Patrick then inputted the information into a master spreadsheet. The master spreadsheet was a place to combine all the information provided into one database that Patrick could build reports from.

Chamberlain established who would be provided the list of violations. Chamberlain and Patrick were the points of contact.

Sabrina Duba received the report because she was the operations accountant and tried to estimate penalties.

Patrick was instructed to send the report to Don Blankenship. A conference call was held on Tuesday mornings. Patrick stated that it seemed plausible to send to Blankenship if the report was discussed during the calls. Patrick felt that the reports were discussed during the calls based on conversations Patrick had with Chamberlain.

Patrick reviewed violation report dated 4/7/2009. Patrick recalled that Adkins asked to include summary reports and year to date totals. Patrick stated that he didn't think much about it at the time, because it was common for mines to receive violations. This was Patrick's first experience at any level in a company.

Patrick was originally brought in to help get more useful safety information related to violations. Patrick was surprised to receive information by spreadsheets emailed when he first started. The only feedback that Patrick recalled receiving when he started running the reports had to do with the layout, not about violations and penalties.

Patrick stated that David Owings was a controller who was added to the list of recipients. Stan Suboleski is a board member who worked on projects. Segsworth may have asked for Suboleski to be added. Suboleski has a PhD in mine engineering. Suboleski is the only board member that Patrick saw at the office. It was Patrick's understanding that Suboleski was the only board member other than Blankenship that received the report. Patrick stated that he received emails from Suboleski, but couldn't remember what they were related to.

MOI-001436

Patrick believed that Sabrina Duba was the first person to categorize by area of the law. It was Chamberlain's suggestion to add the information into the report. Patrick was given a law book to use in order to classify violations by area of the law.

Patrick didn't know why violations were categorized by area of the law. Patrick was asked to send a similar report to the mine presidents. Patrick believed it was sent to see where the shortcomings were.

Patrick was aware ventilation and combustible materials were the most violated areas. Patrick had some understanding about mining from a class taken in school. Patrick didn't recall that this was a concern.

Patrick was present at Safety Development Group (SDG) meetings. Patrick stated that the safety guys talked about problems in a broad sense, but not directly to Patrick. When violations were discussed at the SDG meetings Patrick got a sense that there was alarm.

Patrick had an understanding that the severity of a violation would increase the points associated with the violation.

Patrick wasn't sure why there was a top 10 dollar violation chart created. Patrick didn't believe that it was part of the daily report. The report may have come about because of Duba. Patrick didn't feel a since of urgency, nor was it discussed with him when a mine showed up on the top 10 list.

Patrick reviewed an email dated 6/5/2009. The recipients list included Stephanie Ojeda, Mark Clemens and Eric Tolbert. Clemens was added because Ojeda asked for him to be added and Ojeda was added to the list because she was working with Duba. Patrick was aware who Clemens was, but didn't think much about him being added to the list. Patrick believed that Tolbert who was the CFO was added because of totals and amounts.

The report revisions came mostly from Duba and Shane Harvey. Harvey asked Ojeda to work with Patrick on the reports. The purpose of the report was to take more high level information and condense it down to violations by day, month, total to date and year to date. Patrick believed that Adkins thought it was important for this type of layout and by key areas of the law. Patrick stated that he was told at some point the severity of a significant and substantial (S&S) violation.

The safety directors were aware of the point system associated with violations. The information came from the safety directors at the mines. Calculations were made based on the point system of the violation. Patrick felt calculation totals were important because of the way the chart was set up and the fact the Duba was involved. Patrick believed graphs were added to the report because Adkins liked graphs. Patrick stated that he was asked to sort by dollar amount and not violation.

The daily report came about because Adkins told Patrick that he needed the report. Once the report was set up the data came from the groups. Patrick explained that it took the majority of the morning to receive the data. Patrick's part was quick based on the way it was set up. Once there was a central database it was programmed to auto send. Patrick didn't recall the report stopping and went on to say it may have stopped after Alpha took over.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Patrick reviewed an email dated 4/30/2009 to Chamberlain and Segsworth, subject: Q1 violations. Patrick vaguely recalled putting it together. It would have been for Chamberlain's board presentation in May. Patrick stated that he frequently helped put together information for Chamberlain for meetings she had with the board. Patrick didn't recall a concern from Chamberlain about showing the numbers to the board. Chamberlain didn't discuss a concern with Patrick. The layout of the information for the board meetings came from Chamberlain.

Patrick stated that 10,000 violations of the safety law seemed high, but there were a lot of mines. People should have been concerned with breaking the laws. Patrick thought the numbers seemed big, but didn't really know. Patrick didn't recall discussions concerning the amount of violations or urgency about the frequency of safety laws being broken. Massey officials were aware their operations were breaking the law.

Patrick recalled that during an SDG meeting Adkins talked about a spider campaign. If you see a situation that would result in a violation take action. Patrick didn't recall any other details about the program at the meeting.

Patrick ran reports for mines that were on potential pattern of violations (PPOV), but didn't have any discussions. Patrick recalled that the Justice Mine and a mine at Independence were on PPOV.

Patrick thought Gary Frampton was responsible for the report card. Frampton asked Patrick about the format. Patrick recalled the pass/fail.

Patrick stated the Alpha has a better database that is more comprehensive and consolidated at one location. You can look at business units on one screen.

Patrick became familiar with categories of violations from reviewing the law book and summary materials. Patrick didn't have a point of reference or comparison when it came to the number of violations.

Patrick believed that based on Chamberlain's positions she had the ability to shut down an operation. Patrick was not aware if Chamberlain shut any operations down.

The numbers on the report were business as usual at Massey. Chamberlain, Keith Hainer, Frampton assigned violation targets to the groups. That may have led to the creation of the report card. No one had discussions with Patrick concerning the reduction in violations.

Patrick was shown a fax from Blankenship to Clemens dated 1/25/2010. Patrick didn't recall seeing many reports that compared years, however Patrick did a graph for year to year.

Duba got involved because she knew what Blankenship wanted in his reports. She knew what he liked. Patrick went on to say Duba may be responsible for the way the first page of the report is layed out.

Rob Asberry was added to the list of recipients to receive the report because he became a compliance officer. Bill Ross was added because he is a ventilation expert. Ross may have been requested by Chamberlain. Mike Snelling requested that a surface person be added. Chamberlain may have had Jason Whitehead added to the list. Patrick wasn't sure why he was added.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Patrick explained that the daily list was an added attachment. It was a printed list of all violations. It was asked for as an overview. The request most likely came from Chamberlain, Adkins, Duba or Frampton. The daily list was generated from the database. It was fairly similar to what the safety directors were sending in their spreadsheets.

West Virginia Violations were added by Ojeda. Patrick believed it was at the direction of Shane Harvey. Patrick believed that West Virginia was added because the violations carry penalties. Patrick didn't think that Virginia or Kentucky state violations had penalties.

Patrick reviewed report dated 4/7/2010, 2009-2010 MSHA penalty comparison. Patrick believed this may have come about from a Blankenship fax. Snelling requested that surface mines be broken out because underground mines were always the top 10.

Patrick didn't recall discussions concerning UBB after the explosion and didn't recall discussions about other operations, such as Freedom, that had a high number of violations.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Report of Interview

**U.S. Department of Labor**
**Office of Inspector General**
**Office of Investigations**



Page  1  of  4                                      OIG Form 103 (OI – 1/98)

| Investigation on: | March 11, 2014 | At: | Charleston, WV | File: | 31-0862-0001 PC |
|---|---|---|---|---|---|

By: Special Agent Jeffrey Carter *(signed)*                           Date Prepared: 3/14/2014

On March 11, 2014, John Segsworth accompanied by attorney John Carr was interviewed at the United States Attorney's Office located at 300 Virginia St., Suite 4000, Charleston, WV. Present and participating in the interview were Steve Ruby, Assistant United States Attorney and Special Agent Jeffrey Carter, United States Department of Labor, Office of Inspector General. The following information was provided by Segsworth:

Segsworth reviewed email with attachments dated March 3, 2008 from him to Baxter Phillips. He wasn't sure what triggered the request. It was prior to John Ryan's report. It contained information submitted by the resource groups. Phillips may have requested the information from Elizabeth Chamberlain and she requested that it be sent to Phillips. The request may have been for the quarterly board meeting. Phillips played a key role in the quarterly board meetings.

Select resource groups may have been selected because of mines that had the potential to be on potential pattern of violations (PPOV). It could have been related to the Tuesday morning meetings. Segsworth has been to one or two of those meetings later in his tenure with Massey. Key members during the meetings were Chris Adkins, Mark Clemens, John Poma, Phillips, Shane Harvey, Chamberlain and Eric Tolbert after Phillips was elevated.

When Segsworth started with the company documents were faxed in. Very few resource groups were faxing on a regular basis. The faxes were similar to the attachments in the March 3rd email. The faxes listed the mines, S & S violations and orders. This was sent on a monthly basis. The faxed information was filed. Then came the report referred to in the email. In order to complete the report you had to refer to the paper files. There were holes in the data. You had to reach out to the resource groups to fill the gaps. Segsworth believed that there was a push to keep better track.

Management knew the importance of violations per inspection day (VPID). Adkins, Chamberlain and Clemens explained the importance of VPID. Segsworth was not sure that he actually knew enough to be surprised by Sydney's numbers. He knew they were higher than others and explained that he didn't have a coal background.

Segsworth reviewed an email dated April 25, 2008, from him to Chamberlain with attached monthly violation data report. At this point more resource groups were added to the report. There was a period of three or four months the sheets weren't completed.

Segsworth reviewed an email dated June 5, 2008, from him to Adkins and others with attached April, February and March comparison. Segsworth didn't recall the purpose, but assumed Chamberlain requested. Chamberlain would have directed who received the email. Segsworth wasn't sure why there was a delay in sending out the information, but speculated that the information from the safety directors may have been delayed. Safety directors are responsible for compiling the data for the resource group before it was sent to Segsworth.

MOI-001511

Segsworth reviewed an email dated August 12, 2008, with June comparison attached from him to all chief engineers and others. He didn't know why the list of who received that report was larger. Jack Snow and David Terry were new safety directors. Segsworth explained that Jeff Gillenwater was drafted by John Poma for projects that arose from board meetings. Segsworth believed that the chart was at the request of Don Blankenship.

Segsworth believed that he stopped doing the reports because John Ryan generated that report from Logan County Mine Services. Segsworth was not aware why at some point the report only went to Chamberlain.

Segsworth believed that Chamberlain was concerned about a handful of mines. Potential Pattern of Violations (PPOV) would have been a focus and area of concern. Second and third cycle lists were produced to predict which mines would be on PPOV. There was a concern about being put on POV. Segsworth explained that PPOV is bad for production and it is not just another inspection. This was discussed at safety development group (SDG) or safety meetings. Segsworth could not recall who presented the information.

Segsworth reviewed an email dated June 16, 2009, from Chamberlain to Harvey, Phillips and Steve Layell-audit supervisor. Auditors handled some of the violation data calculations. Segsworth had to explain things to the auditors.

Segsworth stated that there was a very strong opinion at the mine level and higher, that MSHA wrote violations at Massey mines not written at other operations. Chamberlain asked that company representatives travel with inspectors with a kit to document and take pictures. Segsworth purchased some of the items for the kits. Some violations were vacated based on the accompaniment of inspectors and pictures that were taken.

Segsworth stated that the people he dealt with were involved with cost and that he could not speak to the cost or number of violations. He worked with the accountants who dealt with the cost.

Segsworth reviewed a chart for Select Coal Companies violations 2007, 2008, 2009. Segsworth believed that tons per violation came from the legal department. Amount paid would have been requested from Sabrina Duba or Mark Clemens. Segsworth also worked with Stacy Wagner from accounting. MSHA maintains industry data and Segsworth believed that he compared Massey's numbers to MSHA's numbers. Chamberlain always preached that MSHA's numbers were not correct.

Segsworth explained that several Massey employees became inspectors. Segsworth believed that Chamberlain had a good relationship with MSHA. Chamberlain and Bob Hardman may have worked together in the past. Chamberlain was brought in to Massey because of relationships and the fact that she had not burned bridges.

Segsworth reviewed email dated 5/1/2009, to Baxter Phillips, draft Chamberlain presentation to the board. Phillips and Eric Tolbert would tweak some of the information or ask for more details. Segsworth stated that handouts were given the board meetings. Segsworth believed that he attended a board event, but not an actual meeting. He saw presentations given at the SDG meetings.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Segsworth was asked about the 2009 violation summary Q1 report. He did not recall any reaction to the number of violations. Segsworth believed that there was a focus on the number of violations, because Massey hired Ryan to track data and Gary Frampton as a Compliance Officer.

Segsworth was not familiar how inspection hours were tracked or where the information came from. He could not recall if it was industry data or tracked by the company. Exposure hours were compiled by HR and provided by Duba. Chamberlain was involved with inspection tracking as it related to what was considered an inspection day. Segsworth believed that the violations per inspection days (VPID) were not as bad as at some other operations.

Segsworth reviewed an email dated 7/31/2009, with attachment: Chamberlain Board Presentation. Segsworth believed that changes were made at Freedom Mine and Burman Cornett was moved to UBB. The suggestions came from Chamberlain. There was a big push to conduct respirable dust sampling accurately. Massey purchased the same type of dust kits that were used by inspectors to conduct testing the same as inspectors. Presentation was laid out by category that totaled the first six months of the year and an estimated penalty amount. The categories that were included were the most important and the ones that needed the most focus. Segsworth believed that Ryan was in place at this time and that Segsworth no longer provided the numbers.

Segsworth recalled that Adkins pulled together the foreman on a Saturday to discuss the kill the spider campaign. Segsworth was not aware of any changes.

Segsworth was given a board meeting presentation for review dated February 15, 2009. Segsworth explained that auditors became involved. Data was compiled by MSHA, internal auditors and Ryan's database. At this point Chamberlain would have been dealing with Ryan. Segsworth explained that special assessments could cause a difference in the dollar amounts.

Segsworth did not recall a conversation concerning the rising number of violations, but provided it may have been that more coal was being produced and that there were more exposure hours. Segsworth stated that Chamberlain talked that if you have more people mining coal you will get more violations.

Target mines would have had more safety department presence and Keith Hainer may have been sent to the mines. UBB, Freedom and Ruby mines had safety offices at the mine site. Segsworth believed that George Kelley was required to provide Don Blankenship with updates.

Segsworth stated that Chamberlain, Harvey and upper management kept a board book and on occasion Segsworth would have to use it for reference.

There was a sense that MSHA was picking on Massey and that some violations were legitimate and some were not.

Chamberlain thought that there would be a gradual decrease in violations based on what was implemented. Segsworth believed that categories were addressed in cycles. Segsworth believed trickle dusters were purchased and personal dust monitors were used. Segsworth believed that Massey was aware that they were going to get certain violations.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Segsworth stated that in order to address splicing violations Massey had a manufacture come in and color code the wires. Issues were attacked more on a case by case basis rather than looking at the whole picture to reduce violations on a large scale.

Chamberlain made the comment that the mines received more citations in the winter months. Segsworth stated that Chamberlain was aware that there would be a number of violations issued and that she tried to do a number of things to reduce the numbers. Segsworth believed that the target reduction was based on a percentage. Chamberlain was always pushing to hire more safety individuals. Segsworth recalled that Archie Vance, safety technician acted as a company inspector traveling to mine sites and going underground.

Segsworth believed shutting down Ruby and Randolph mines was discussed in order to get violations under control. Segsworth believed that this would have come from Blankenship through Chamberlain. Segsworth did not believe that Chamberlain had the authority to shut down a mine without Blankenship's approval. Chris Adkins probably had the authority to shut down an operation. Mine presidents and safety directors had the perception that Chamberlain could shut down a mine.

Segsworth received a monthly report regarding production numbers.

There was a high rate of violations that were vacated or contested and the penalties were decreased. Segsworth advised that there was a push not to worry about low level violations. Segsworth believed that he had conversations with Chamberlain about having violations vacated at mines that were on PPOV. The term targeted mines referred to an internal focus not MSHA targeted mines.

Segsworth heard Chamberlain say that challenging violations was monetarily valuable. You saved more than the expense of legal fees. He also heard Chamberlain talking about the benefits of fighting a violation sometimes outweighs the cost because of violation history.

As a legal analyst Segsworth facilitated the process of gathering uncontested and contested violation to be sent to accounting to be paid or to the attorneys.

Segsworth believed that Massey expected they would receive violations. The company was growing based on acquisitions and opening new sections. Segsworth believed this was used to rationalize the number of violations.

No one thought that you could go through an inspection and not receive any violations. Massey knew that violations were part of the industry. Segsworth did not think the attitude was to receive a violation and keep on going. Chamberlain and Hainer would challenge violation based on the regulations.

Segsworth believed that it was the dollar amounts of the violations that attracted the attention.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

**Report of Interview**

**U.S. Department of Labor**
**Office of Inspector General**
**Office of Investigations**

OIG Form 103 (OI – 1/98)

| Investigation on: | June 4, 2014 | At: | Charleston, WV | File: | 31-0862-0001 PC |
|---|---|---|---|---|---|

By: Special Agent Jeffrey Carter JLC    Date Prepared: 6/6/2014

On June 4, 2014, Jason Whitehead accompanied by attorneys Preston Burton and Rachel Li Wai Suen was interviewed at the United States Attorney's Office in Charleston, WV. Present and participating in the interview were Booth Goodwin, United States Attorney, Steve Ruby, Assistant United States Attorney, and Special Agent Jeffrey Carter, U.S. Department of Labor, Office of Inspector General. Whitehead provided the following information:

Whitehead explained that he was pulled into the hazard elimination program. There wasn't a lot of operational or personnel overhead. Whitehead became a member by default because of his new position as operations manager. Whitehead reported directly to Chris Adkins. Adkins was the primary contact for the program. Whitehead generally recalled that Massey was spending $20,000,000 on violations. Whitehead believed that Don Blankenship had reported that to Adkins. Whitehead recalled that the elimination program called for a 50% reduction for violations.

Whitehead was given a PowerPoint presentation dated August 1, 2009 for review. Adkins wanted one word slides and Whitehead believed that Adkins composed some of the slides. Adkins wanted topic slides not bullet points. Whitehead stated that the August PowerPoint package was composed by Adkins, but recommendations went back and forth.

Whitehead stated that the presentation was given at Scott High School. In attendance were superintendents, maintenance chiefs and others. Adkins' focus was inby the section's feeders. Adkins wanted to focus on typical failures and where efforts needed to be refocused. Adkins was the most senior Massey employee at the meeting. As part of Adkin's opening remarks he discussed the reduction of violations. A 50% target reduction in violations was discussed. Whitehead didn't recall a detailed target discussion. The presentation at Scott High School was videotaped. Whitehead wasn't sure why the presentation was videotaped.

The general reaction at the meeting was positive. Massey did a good job of motivating and usually obtained good results. Whitehead believed people left the meeting wanting to reduce violations.

Whitehead received an email copy of a report card from Gary Frampton a couple days before the presentation. Whitehead did not recall seeing a blank report card, but remembered receiving report cards that were filled out. Whitehead stated that Frampton was responsible for the report card. Frampton was the compliance officer. Frampton was the point man on the execution of the program.

The report card areas were divided; Frampton-underground mines, Keith Hainer-electrical and Elizabeth Chamberlain-health and safety violations. Stephanie Ojeda was also involved with the program. Committee meetings were held weekly or bi-weekly. Whitehead attended approximately two meetings. Whitehead was transferred to Independence in early September as interim president.

Whitehead believed that the plan was sent to MSHA District 4. Whitehead later stated that he was not sure if it was sent to District 4. He saw a memo to District 4 without attachments. The memo was from Frampton.

Whitehead went to District 4 with a form of the plan. Adkins, Hainer, Chamberlain and Frampton were also present for the meeting. Whitehead believed that they met with Bob Hardman and Link Selfe. Luthar Mars may have been present also. Whitehead could not recall if MSHA was shown a copy of the report card with target violations numbers. Whitehead stated that MSHA's response was positive and pleased to see some type of action. Whitehead did not recall MSHA assigning a liaison to track the program. Adkins was the lead in the meeting and may have had a power point presentation for the meeting. Whitehead did not recall any follow up to the meeting with MSHA. Hardman believed Adkins was there to build a relationship. Adkins was there to get District 4 to cut them some slack.

Whitehead didn't believe that Massey's internal potential pattern of violations (PPOV) status was the same as MSHA's. Whitehead didn't know how a mine obtained internal PPOV or who was responsible for the evaluation. Whitehead didn't have any mines on internal PPOV.

When MSHA placed a mine on PPOV, everything was thrown at it to get the mine off of PPOV status. Internal PPOV was treated differently. It was less focused on adding labor, but more focused on what you had in place. When UBB was on PPOV, red hats were contracted to shovel conveyors. This would not happen for an internal PPOV classification.

When Whitehead was at Independence he received report cards. Whitehead stated that he was not pressured during his time at Independence, Justus or Revolution. He had major problems relative to what other Massey presidents had to handle. Revolution was evacuated numerous times for excessive methane. It comes down to what we can do to remedy the problem and run the long wall at the same time. Blankenship asked how do we work with this and keep the long wall running. Multiple seals needed to be replaced and holes needed to be drilled in the gob area.

Whitehead recalled receiving the September report card emailed from Gary Frampton. The third quarter target number column was 50% of annualized violations. Whitehead didn't recall the specifics and didn't recall setting specific targets. Whitehead believed that he may have been at Independence at this time. Randolph and Allegiance were smaller mines. Whitehead also believed that Allegiance was inspected by tougher inspectors. Whitehead believed that Justus seemed to be doing better on the report card because the mine may have been inspected early or late during the quarterly inspection cycle.

Whitehead reviewed a fax dated September 9, 2009, Hazard Elimination Program Report Card from Adkins. He recalled receiving the fax with a handwritten note. Whitehead believed that it ended with this fax and doesn't believe it came back up again.

Whitehead interpreted the target number as a drastic reduction and quick results. He was not aware of any consequences for not meeting the target number. Whitehead believed that a pass or fail grade was a useless way to track or calculate. Safety rates were tied to quarterly bonus, but compliance was not. Non-fatal days lost (NFDL) was discussed a lot, but violation counts weren't discussed until the elimination program was started. Whitehead doesn't recall money being tied to whether you passed or failed. Whitehead interpreted the report card to mean that you were at or under good standing as far as the hazardous elimination program.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Atkins may have come by or popped his head in at during the hazard committee meetings. His office was across the hall from the conference room where the meetings were held.

Whitehead reviewed an email dated October 7, 2009. He recalled the report coming out weekly on a regular basis.

Whitehead reviewed a report card dated October 5, 2009. He didn't believe that there were any consequences for not meeting the target number.

Whitehead reviewed an email dated November 10, 2009. Whitehead wasn't sure how the 4th quarter target numbers were established. There weren't any consequences as a result of not obtaining the target number.

Whitehead didn't know why the report cards stopped. Whitehead stated that he only attended the first and second committee meetings. Whitehead wasn't aware if the report card was discussed with Don Blankenship. Whitehead stated that finances get Blankenship's attention.

Stephanie Ojeda was a compliance attorney for Massey. Massey accrued 50% of the face value of a citation. Cases were built on the validity of a citation. Whitehead stated that Ojeda was at the committee meetings that he attended.

Whitehead reviewed an email dated February 23, 2010, hazard elimination program minutes. Whitehead stated that the bullet point about him referred to vulcanizing belts at Slip Ridge. He didn't recall a meeting concerning the belts. Vulcanizing of belts keeps the conveyors good.

Whitehead reviewed an email from Gary Frampton dated March 23, 2010 to committee members with attachments; chart-penalty controls, draft agenda, and chart-last break ventilation. Whitehead's opinion was that money was the focus behind the program and that it was a way to manage or control penalty amounts.

At the meeting conducted at Scott High School, Chamberlain introduced Massey's new policy of requiring 20,000 CFM in the last open break. MSHA required 9,000 cfm in the last open break. Whitehead asked Adkins how many sections will be idle because they can't meet the 20,000 cfm requirement. A handful of sections were down, but not all day. The policy went into effect on August 3. The meeting at Scott High School was held on August 1. Whitehead believed that Adkins coordinated with Blankenship to make the policy.

Whitehead went to UBB in March of 2010. He believed that it was after March 12. Whitehead told Blanchard that he didn't have 20,000 cfm in last open break. Blanchard told Whitehead that he had a waiver from Blankenship for UBB #1-headgate 22. Whitehead didn't recall any talks about waivers. A waiver may have been given, because there wasn't an easy way to get 20,000cfm. Whitehead believed that they may have achieved it. There was no easy way to get air on the section. Using belt air on the section would have been practical. Travelable returns were required and belt air was taken away. The tailgate entry was isolated and underground airflow was restricted. Whitehead worked well with Joe Machowiak (ventilation specialist, MSHA), but believed others didn't.

There wasn't an increase in labor resources after the hazard elimination program was started. There were no more resources than before, nothing related to the program. The focus was on the process with the number

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

of people that you already had.  There wasn't a change in staffing, or production requirements.  Production targets weren't cut because of the number of violations.  Whitehead believed that the report cards weren't taken seriously.

After the explosion Blankenship was at UBB frequently.  Whitehead was at UBB for eight days after the explosion.  Blankenship spent time at the Performance office meeting with the families.  Baxter Phillips was at UBB after the explosion.  Blanchard was also there during the eight days that Whitehead was present.

Whitehead and Frampton didn't talk much.  Whitehead wasn't aware of any complaints that Frampton had.  Frampton didn't discuss not meeting target numbers during committee meetings.  Phillips or the board members weren't involved in the program.

Whitehead didn't recall any discussions about the report card.  The report cards had to be signed and returned.  Whitehead didn't recall any discussions about the signature, but stated it was "typical Massey style."  Blankenship was big on accountability.  Whitehead didn't recall Blankenship ever firing or disciplining anyone on any level for missing the target number.

Revolution was having problems around vacation time.  Blankenship asked Whitehead if he was going to run during vacation.  A letter was sent to the miners asking; I will work to save my company.  I will work to save my job.  All miners signed the letter and opted to run and not take vacation.  Blankenship wanted signoffs of everything.

Whitehead didn't put a lot of thought in to the established target number of violations.  Violations are so subjective.  It's not good to play the victim.  You want your employees to take it seriously.  That's not a good way to manage a program.  It makes everyone rally around confrontation with MSHA.  There were valid violations.  There were real violations in Massey's underground mines.  Whitehead believed that there had been instances of fabrication, but stated that wasn't the problem.  Whitehead went on to say that something in MSHA's opinion is a violation and in Massey's opinion it isn't a violation.  He also went on to say that MSHA didn't make up facts.  Whitehead gave an example if you have a rock hanging from the mine roof.  MSHA wants the rock down.  It takes four plus people to remove it.  MSHA then writes a violation for the hanging rock.  It is subjective.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG).  It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

**Report of Interview**

**U.S. Department of Labor**
**Office of Inspector General**
**Office of Investigations**



Page  1  of  3

OIG Form 103 (OI – 1/98)

| Investigation on: | August 14, 2014 | At: | Charleston, WV | File: | 31-0862-0001 PC |

By: Special Agent Jeffrey Carter

Date Prepared: 8/18/14

On August 14, 2014, Gary Frampton accompanied by attorneys Whitney Ellerman and Matt Palmer-Ball was interviewed at the United States Attorney's Office in Charleston, WV.  Present and participating in the interview were Steve Ruby, Assistant United States Attorney, Gabriele Wohl, Assistant United States Attorney and Special Agents Jeffrey Carter, U.S. Department of Labor, Office of Inspector General and Jim Lafferty, Federal Bureau of Investigation. Frampton provided the following information:

In 2009 Frampton became the compliance officer for Massey.  Prior to 2009, Massey did not have a target number for violations until Frampton implemented the hazard elimination program.  Massey did not discipline employees for high levels of violations.

Frampton was presented an email dated 9/8/2009 from him to Chris Blanchard and attachment report card dated 9/1/2009 for review: Frampton stated the email was for the purpose of taking the information from the level of Chris Blanchard and providing it to other levels of management such as the superintendent and mine manager to share and to return the signed portion.  The spreadsheet was set up by resource group. The 2008 and 2009 columns represented the number of violations issued by MSHA.  The target was derived from numbers from the previous quarter.  The target would have been a 50 percent reduction in violations based on the average of the last two quarters.  The third quarter actual column is the actual number of citations issued at that point in time.  The mines were graded on the third quarter actual.  Whether the mines actual met or exceeded the target number assigned.  Frampton explained that Freedom passed because they were at or below the target number.

The second sheet of the 9/1/2009 attachment was specific to everything that Blanchard was in charge of.  Frampton was responsible for creating the spreadsheet.  Frampton was not sure if the large spreadsheet went out to everyone.  The report card was sent to all mine presidents.  Frampton stated that the first round of report cards were signed and sent back, but after that it dropped off.  Frampton did not have any conversations about getting the signed report cards returned.  Frampton maintained signed copies of the report cards.

Frampton stated that there were not any consequences for receiving a failing grade.  There was not any discussion of consequences when the program was set up.  Frampton discussed financial penalties for not meeting goals after the UBB explosion.  Frampton believed that this conversation took place around mid to late April, possibly in May.  Frampton did not recall if any changes were made after this conversation.

The following individuals were present during the hazard committee meetings: Frampton, Chris Adkins, Elizabeth Chamberlain, Stephanie Ojeda, and Jason Whitehead.  The meetings were conducted at the Julian office.  Adkins was not present for the meetings after the UBB mine explosion.

Frampton was presented an email dated 10/7/2009 from him to Don Blankenship, Baxter Phillips and Sandra Davis with the subject heading report cards along with attachment report card dated 10/5/2009.  Frampton could not recall if this email was just sent or if it was requested.  It may have been sent to Phillips because he

MOI-001417

had a job title change and his involvement may have been because of that. Phillips attended at least one hazard elimination meeting. Frampton recalled that Stan Suboleski attended meetings as well. He had a lot of interest in ventilation questions at the operations. Suboleski worked on several projects and would give input and direction.

Frampton stated that Blankenship was familiar with the hazard elimination program along with Adkins and Chamberlain. Frampton was not sure when Blankenship first became aware of the program. Blankenship was well aware of the meetings whether through the minutes or conversations Blankenship had with Adkins and Chamberlain. Frampton was aware of at least one conversation Adkins had with Blankenship.

Frampton reviewed Attachment dated 10/5/2009. This was the same format as September, with updated numbers and grades utilizing the same system. Most of the underground operations had failing grades. Frampton stated that he was not aware of any discipline from the results of the October 5, 2009 report card and didn't have any conversations about discipline for failing grades.

Frampton reviewed a handwritten note were Blankenship communicates with Frampton, Keith Hainer, Adkins and Chamberlain. Writing on the first page of the spreadsheet indicates that it was reviewed by Blankenship. Frampton took the note to mean Blankenship was not happy with the failed rates and violations, that a corrective action plan was needed and to set meeting up.

Frampton reviewed an email dated 10/21/2009 with the subject heading violation meeting sent to him, Chamberlain, Hainer and Adkins. Frampton recalled that they flew from Julian to Lauren Land to meet with Blankenship to discuss violations. It was apparent that Adkins was disturbed about something. Frampton stated that Rock Fork Guyandotte #51 was down because of issues with the seals. Blankenship was made aware of the situation at Rock Fork. After Blankenship was made aware the meeting didn't go as planned. During the meeting Hainer suggested a change in the fire suppression system. Blankenship gave his approval for the system and seals. This consumed the day and not much was discussed about what was intended. The meeting was never rescheduled and the subject didn't come back up.

Frampton reviewed an email dated 11/10/2009 with a report card attachment. Frampton stated that the fourth quarter numbers were set based on a 50% reduction. The column not labeled was the actual numbers. Frampton stated that there were no consequences or discipline that followed the November report card.

Frampton reviewed a spreadsheet dated 1/4/2010. Frampton doesn't recall a discussion not to send the report out. Frampton stated that it was his decision not to send. Frampton didn't recall when it was stopped. Frampton stated that it may have been because of the lack of signatures and that it was not taken seriously.

Frampton didn't have discussions about compliance for the big underground mines.

Frampton explained that during hazard committee meetings there would have been a three to four page handout. A summary spreadsheet would have been included instead of showing each individual operation.

Frampton reviewed a daily violations report dated 6/30/2009. Frampton was aware that the largest number of violations was ventilation. Typically this is the highest cited category in the industry. Frampton stated that it was never discussed to shut down and correct. When asked about 400 series violations for combustible materials and rock dust Frampton stated it's not complicated to a point when you look at 35 to 40% rock dust

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

on a conveyor. It's not as hazardous as a piece of equipment in the face. Frampton wasn't aware of any discussions to shut down because of violations. Frampton recalled during a hazardous committee meeting they discussed the policy requiring each piece of equipment to be cleaned and washed once a week and discussed requiring it more often to comply. This would have been in 2009 -2010. This wasn't in the committee's action plan. They didn't have discussions of shutting down to help compliance.

Frampton didn't recall mines cutting back on production for cleanup and compliance. Frampton stated that it would have been reasonable to add crews to help with compliance. It would have been reasonable to take more time to tighten curtains and dust the face. Frampton stated that the focus was on the top five standards at the time.

Frampton reviewed the last page of violation report dated 6/30/2009. When asked about the last page of the violation report comparison penalty 2008 – 2009. Frampton stated the page was added for mines with the most violations. Frampton recalled that the highest five mines were added; Freedom, UBB, Knox Tiller and Ruby. Frampton stated that Freedom and Ruby stood out, because he thought they were on potential pattern of violations (PPOV).

Frampton stated that he was not certain of his duties and power. There wasn't a clear understanding of duties on a day to day basis. He had the opportunity to visit operations and make suggestions. Frampton stated that he couldn't recall things that he wished he had done or changes that he wished he had made. Frampton stated that he was frustrated at seeing the number of violations.

Frampton was not aware of any issues raised in relation to setting target numbers. Frampton was not aware if there was a limit on the amount of citations the company would allow before it took action. Frampton wasn't aware of any instances of action taken or consequences against the miners.

When asked about the target number Frampton explained it was to show a movement to be more compliant and show progress. It was the first step in getting something in place to start a reduction, and to show a relative improvement, not approval, but meeting goals. A passing grade would satisfy the program.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302 (Rev. 5-8-10)

- 1 of 5 -



## FEDERAL BUREAU OF INVESTIGATION

Date of entry     11/17/2014

ANDY COALSON was interviewed at the United States Attorney's Office located in Charleston, West Virginia. COALSON was accompanied by his attorney, John Carr. United States Attorney Booth Goodwin, Assistant United States Attorney (AUSA) Steve Ruby, and AUSA Gabrielle Wohl participated during the interview. AUSA Ruby participated in the interview by telephone. After being advised of the identities of those in attendance and the nature of the interview, COALSON provided the following information:

COALSON is still employed at Alpha Natural Resources (Alpha). COALSON works for Coal River East's Marfork - Slip Ridge mine. COALSON is a mine foreman. JASON WHITEHEAD is the vice president of operations. CARL LUCAS is the general manager.

COALSON advised the when he worked for the Upper Big Branch (UBB) mine, CHRIS BLANCHARD would remind him to let the employees working underground know when inspectors were entering the mine for inspections. COALSON added that BLANCHARD would ask him if he had informed his section that inspectors were at the mine. COALSON stated that if he had not yet informed his section when BLANCHARD asked him, he (COALSON) would provide the advance notice. COALSON stated that advance notice was a known practice at UBB.

Advance notice was provided so that a section could fix violations before the inspector arrived. This reduced the number of violations a section would receive. COALSON advised that a section would have thirty minutes to an hour to fix what they could before the inspector arrived. COALSON stated that during that time a section could fix curtains, make sure the ventilation was working properly, and ensure that entries had been cleaned and dusted. COALSON added that you wanted the section to look good when the inspector arrived.

COALSON advised that he had never seen flooding similar to the

Investigation on   09/18/2014   at   Charleston, West Virginia, United States (In Person)

File #   318A-PG-78655-FD302                                    Date drafted   10/01/2014

by   James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

MOI-001362

FD-302a (Rev. 05-08-10)

318A-PG-78655-FD302

Continuation of FD-302 of  Interview - Andy Coalson                          , On  09/18/2014 , Page  2 of 5

magnitude of flooding that occurred on the headgate and in the bleeder
areas of the longwall at the UBB mine.  COALSON has not seen that level of
flooding since he left the UBB mine.

COALSON stated the air pumps used to address the flooding stopped
working a lot.  The air pumps would stop working once they jammed.  When
the air pumps stopped working the water would rise.  COALSON described using
the air pumps as a fragile situation.

COALSON confirmed that plans were made to grade the headgate and
bleeder entries of the longwall to stop flooding from occurring in those
areas.  BLANCHARD and JAMIE FERGUSON informed COALSON that they did not
have time to finish the grading because they were ready to start running
the longwall.  COALSON advised that some grading had been done on the top
end of the Bandytown shaft where the turbine pump was installed.  COALSON
estimated it would have taken six to ten more shifts to finish the grading.
COALSON advised that the grading was never performed to allow water to run
to the sump.  The plan was to start grading at the 110 break so that by the
time you reached the 100 break, a ten foot slope would exist to help drain
water.  COALSON stated that the number 3 and 4 entries eventually roofed
out with water at the 100 break.

COALSON advised that BLANCHARD instructed him to haul out equipment and
structure from the longwall return entry.  COALSON asked BLANCHARD if it
was legal.  BLANCHARD ignored COALSON's question and told COALSON that it
needed to be done.  COALSON advised that BLANCHARD informed him that
timbers would not be set while he (COALSON) was removing the structure.
COALSON pulled out structure for two weeks.  COALSON stopped pulling out
structure when the longwall coordinator informed him that he had to start
propping timbers and that he had held off as long as he could while COALSON
worked to remove the structure.

COALSON stated that a D order was issued when he was caught by a Mine
Safety and Health Administration (MSHA) inspector pulling equipment out of
an area of the mine where track still existed while a ventilation change
was being made.  COALSON advised that he should not have been in the area
pulling out structure.

BLANCHARD instructed COALSON to build a solid wall of kennedy panels to
try and stop the heaving of the mine floor that was crushing out stoppings.
COALSON advised that this was a far fetched idea.  COALSON had never seen
stoppings crush out like they were near the longwall.  Building the kennedy
panels did not work.  COALSON told BLANCHARD to try mining a new tailgate.
BLANCHARD told COALSON that this was not going to happen because it would

FD-302a (Rev. 05-08-10)

318A-PG-78655-FD302

Continuation of FD-302 of  Interview – Andy Coalson ,On 09/18/2014 ,Page 3 of 5

cost too much money and they did not have the time.  After COALSON left
UBB, the kennedy wall panel project was abandoned.  Prior to working at
UBB, COALSON had experience working on a longwall as a face boss.

COALSON advised that the new tailgate would not have been finished
before the longwall was ready to be put in service.  COALSON added that if
the longwall was operational it would not have been idled to finish the new
tailgate section.

COALSON stated that the ribs of the mine wall were rolling out daily.
The stoppings were crushing out and the kennedy panels bowed as well.
COALSON described this as being very dangerous. The ribs had to be hand
packed.  Crews worked to try and keep the headgate.  COALSON does not know
if the kennedy wall panel project was proposed to MSHA.

COALSON advised that when the Bandytown fan was running, the mine had
good ventilation.  Before the fan was installed, the mine had poor
ventilation.  The #1 section had to be shut down because it did not have
its own return due to flooding and stoppings that were crushing out.  This
made the ventilation fragile and the #1 section could not start running.

COALSON did view citations that were written when he was a mine foreman
at the UBB mine.  COALSON would make copies of the citations and send them
to the main office. BLANCHARD would question COALSON about the citations.

COALSON advised that the only person he could think of that was
disciplined over a safety issue was JACK MARTIN.

COALSON stated that the UBB mine did not have the people needed to take
corrective actions when the belts needed cleaned.  COALSON added that
employees assigned to do maintenance work did not have time to clean the
belts.  COALSON advised that there was an unspoken understanding that a
certain level of safety violations would be tolerated.  COALSON stated that
there was an understanding that the mine was going to get violations and
receiving citations was cheaper than hiring people to take care of the
issues causing the citations to be written.

COALSON asked BLANCHARD to hire people to work on the belts. BLANCHARD
informed COALSON that hiring additional employees was not in the budget and
there would not be any new hires.

COALSON advised that when old production equipment started breaking
down, new equipment was purchased.  COALSON stated that production
equipment was replaced on the #2 section when the equipment on the tailgate
was breaking down.  COALSON was a section boss at that time.  COALSON added
that he was never denied production needs.

MOI-001364

FD-302a (Rev. 05-08-10)

318A-PG-78655-FD302

Continuation of FD-302 of  Interview - Andy Coalson , On 09/18/2014 , Page  4 of 5

COALSON confirmed that he received pressure to mine as much coal as possible, and to do so as cheap as he could while he worked at the UBB mine.

COALSON stated that the number of citations written at the UBB mine could have been cut if people had been hired to work on the belts and on outby maintenance.

COALSON advised that the mine would have done better with belt maintenance if he had the flexibility to move individuals from the production crews to maintenance crews. COALSON stated that this was not an option at Massey. COALSON advised that he never tried to move an employee from a production crew to a maintenance crew. COALSON stated that he knew you could not do it, so he did not try. COALSON added that he would not have stayed in his position long if he had tried to move resources away from a production crew. BLANCHARD knew additional people were needed to clean the belts because of the number of citations that were written for problems in or around the belts.

COALSON stated that if a citation did not result in stopping the section's production, he would not hear about the citation from BLANCHARD. If the citation affected production, BLANCHARD would want to know why the conditions had gotten so bad.

COALSON never had a conversation with BLANCHARD about safety other than when they received safety violations. COALSON spoke with BLANCHARD almost daily. Their conversations were always about production.

COALSON knew that BLANCHARD was under a lot of pressure. BLANCHARD never expressed to COALSON that he was under a lot of pressure. COALSON was under a lot of pressure from BLANCHARD.

COALSON understood that he could get another job in the coal industry. COALSON knew BLANCHARD would fire him if he did not follow his orders. COALSON did not want to give up at UBB. COALSON advised that if he had given up he would have felt like the job at UBB had beaten him and COALSON did not want to feel that way.

Ventilation is important to remove dust and gases from the mine. If you do not remove dust and gas from the mine, you could have an explosion. COALSON advised that rock dust is non-combustible which would stop the force of an explosion.

Roof control is important because it helps prevent rock falls and rib rolls. Roof control allows people to work safely. When coal is cut, the ceiling is unstable because of the void left between two layers of rock.

FD-302a (Rev. 05-08-10)

318A-PG-78655-FD302

Continuation of FD-302 of _Interview – Andy Coalson_ , On _09/18/2014_ , Page _5 of 5_

Loose coal allowed to accumulate around belt lines can cause a heat source which could cause a fire.

Thorough examinations, weekly and daily, helps to ensure that areas where miners are working are safe for crews.

Belts connect up mines to sections that produce coal which is then transported to the outside of the mine.  Float dust can potentially carry an explosion to areas where others are working far away from where the explosion originated.  Bad ventilation, float dust, accumulated coal dust, and crushed ribs can all lead to explosions.

**Report of Interview**

**U.S. Department of Labor**
**Office of Inspector General**
**Office of Investigations**



Page  1  of  9

OIG Form 103 (OI – 1/98)

| Investigation on: | 10-22-2014 | At: | Charleston, WV | File: | 31-0862-0001 PC |

By: Special Agent Jeffrey Carter                                      Date Prepared: 10-23-2014

On October 22, 2014, Chris Blanchard accompanied by attorneys Larry Robins, Alan Strasser and Lanora Pettit was interviewed at the United States Attorney's Office in Charleston, WV. Present and participating in the interview were Booth Goodwin, United States Attorney, Steve Ruby, Assistant United States Attorney, Gabriele Wohl, Assistant United States Attorney and Special Agents Jeffrey Carter, U.S. Department of Labor, Office of Inspector General and Jim Lafferty, Federal Bureau of Investigation. Blanchard provided the following information:

Blanchard was aware that at the Upper Big Branch Mine (UBB), mine safety laws were regularly violated. Numerous violations were written at UBB. The violations that were written were accurate according to the mine laws.

Blanchard transferred to UBB in mid-2007. UBB's operations fell under the Marfork group. Prior to Marfork, UBB fell under the control of Elk Run. Blanchard was not sure why he was transferred to UBB. He was summoned by helicopter to meet with Don Blankenship. Blankenship told Blanchard effective immediately he was the President of Performance Coal and UBB. Blanchard could not recall any explanation given for the change.

Blanchard stated that when he was transferred to UBB the mine was only operating continuous miner sections and didn't have a longwall section at that time. There was a change in the metallurgical coal market in 2007 – 2008. A decision was made to bring the longwall back to UBB. The decision was based on the increase in metallurgical coal. Ultimately it was Blankenship's decision to return the longwall to UBB.

The longwall left UBB previously because it was hard to ventilate, the gates on the northern panels had fallen and production had fallen off, so the decision was made for the longwall equipment to go to Logan's Fork. It was not economical to drive the gates at UBB and Logan's Fork was ready to produce.

Blanchard was present during project meetings where ventilation was discussed, particularly when the North mains were discussed. Production was down to 100 feet per shift, partly because of conditions and ventilation. Chris Adkins and Blankenship were present during project meetings. Adkins was certainly present during discussions concerning difficulties to ventilate the gates. Craig Boggs would also have been present during ventilation discussions.

When it was decided that the longwall would return to UBB there were discussions concerning ventilation. It was discussed to drive a set of mains parallel to the #4 and #5 belts to help with ventilation. It was a 10 to 12 month process to cut in at the 6 North Head where the 45 degree angle is located. Construction was for the sole purpose to ventilate the longwall panels.

In 2008, it was approved in the budget to drill an air shaft, but was ultimately denied when Blanchard wanted to have it installed. Blanchard wanted to install a fan on the tail gate side of the longwall. It was the only

location to install or you had to wait until you went through the mountain. Blanchard believed that the cost of the fan was either 1 million or 1.8 million. Blanchard believed that it was denied due to cost.

With the decision to return the longwall to UBB, came the pressure to produce and maintain production levels. Production levels were raised with the return of longwall mining. You could not meet production levels if you were working on construction projects. It became a deferred loss on the longwall. When the longwall was originally at UBB it was calculated that it made $300 in profit every minute. Blanchard calculated that in 2009 – 2010 the average revenue from Marfork was $1,500 - $2,000 a minute. That was blended product and tied to tons from UBB. UBB had low sulfur coal and was the biggest contributor by volume.

It was projected that the longwall would be ready to return to UBB late 2009. Projections showed it would be ready by then, however the longwall returned to operation September 2009. Blanchard stated that there was tremendous pressure on the gate roads and very little preparation for the longwall could take place until the gate road was complete. During preparation for the longwall you didn't have production, but had labor costs.

The tail gate and head gate were low on air. There was enough to meet the minimum requirement, but not much more. Conditions had to be perfect in order to comply with the law. It was manageable until the last three bleeders were driven to where the bandy town fan was installed. There was no way to get air out. There was barely enough air to meet compliance in the last open break.

Blanchard met with MSHA concerning the ventilation issues and discussed converting from split air to sweep air. Although the mine had ventilation issues UBB managed to mine and install the Bandytown fan. MSHA conducted a blitz of the mine during this period.

Blanchard was aware of ventilation violations that were issued during this time period. He saw most of the violations. During the summer of 2009 a violation reduction initiative was started by Massey. Information for the mine was collected that was sent to the Safety Director and then on to Blanchard daily.

Blankenship was aware of the difficulties with ventilation on the longwall section of the mine at UBB.

Blanchard reviewed a capital expenditure submitted by him dated April 16, 2008. Adkins originally approved it, but Blanchard did not recall the specifics. It was ultimately denied by attrition. With the mine advancing there was only one shot to install and the opportunity was missed. It would have required all crews to pull back and would have caused the longwall to be delayed. This was a project that couldn't be done in house.

Staffing at UBB, particularly outby the longwall face was staffed for perfection. Blankenship would ask Blanchard how long it took a fire boss to travel the belts. Staffing became a numbers game to comply with legal requirements. It was the same with supply men and even worse for the rock dust crews. Because Blankenship felt the mine was rock dusted as it was advanced and that you did not need to go back to dust. The fire boss had to complete an inspection so the next shift could enter the mine. Fire bosses did not have the time to clean or correct hazards. Staffing had to be defendable from a mathematical point of view which didn't take into account circumstances that may arise.

Blanchard hired contractors when behind on projects. Blankenship approved weekly, but did not look in depth until quarterly meetings. Blankenship wanted labor to be kept under control.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Blanchard explained that Blankenship worked for the Keebler Cookie Company prior to the mining industry. Blankenship frequently quoted how things were done at Keebler. Blanchard explained that mining is not the same environment, but that was Blankenship's mindset, cost accounting and math.

Blanchard was aware that Blankenship received violation reports from mid-2009. Blankenship did not change staffing or provide feedback based on violations or the reports. However, Blankenship provided feedback based on production. Blankenship was a micromanager who was down "in the weeds" in higher margin operations. Marfork was the largest producer and therefore under the microscope. Blanchard explained that he used to provide Blankenship with a report every two hours. Blankenship had Blanchard shift to provide Blankenship with a report every 30 minutes. The report was called out every 30 minutes and then faxed. This was required at the longwall operations. Rock Fork was also required to provide 30 minute reports. Blanchard also thought that Revolution was also on a 30 minute reporting. The report was also sent during the night shift operations. The longwall was 1000 feet, so you may spend 10 minutes walking to the phone to call out the report. Blanchard stated that it was too much data.

Blanchard believed largely that Blankenship did not trust people to do their job. Blanchard explained that daily calls were conducted with Blankenship for approximately a year to a year and a half that included all of 2009. The previous day's production was discussed along with what went wrong and how it was going to be fixed.

Blanchard explained that after the roof fall and water accumulation behind the longwall, production of the longwall stopped, causing a strain on his professional relationship with Blankenship. With the longwall down his professional relationship with Blankenship ended. In November of 2009, Blanchard and Blankenship had a disagreement about the water and restarting the section. Blankenship was mad because he wanted the section running. Blanchard stated that around Thanksgiving 2009, MSHA issued a K order for the water. They worked with MSHA and the order was released.

Andy Coalson called Blanchard and reported water behind the longwall impeding travel to the bleeder section. The section was getting air, but some of the entries were roofed. Entry one and two were walkable for the longwall and the number four entry for the headgate was walkable. Blanchard stated that they needed a walkable return. It was decided that the longwall would not be restarted although MSHA had released the order. This information was relayed to Chris Adkins and his response was get the water pumped out of there before Blankenship gets back from his trip. Pumps were set in entries 3 and 4. When the water was low enough to travel the longwall was restarted. Matt Walker and Eric Lilly had a plan to ventilate so you did not have to travel the number 4 entry. Final approval was received on December 22.

Blanchard didn't have communications with Blankenship after the longwall was restarted. Blankenship was disappointed with Blanchard for playing engineer and didn't communicate with Blanchard because Blankenship was mad. Blanchard did not have much communication with Blankenship until the time of the accident.

Blanchard told Blankenship that they had air. Blankenship told Blanchard that this was nonsense and that Blanchard was letting MSHA run his mine. Blankenship told Blanchard to run and Blanchard refused. Changes were made, the plan was approved and the section started running again.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Blanchard wasn't worried about his job, but was convinced it may have been the end of his career, as far as, advancement in the company. Blanchard believed that Blankenship wanted people to toe the company line. Jason Whitehead being promoted to oversee route 3 operations led Blanchard to believe this. Whitehead was promoted around the same time that Blanchard refused to start the section. Blanchard had discussions with Adkins about moving into the role that Whitehead was promoted. Prior to Whitehead being promoted Wayne Francisco was in that role. Blanchard was aware that Blankenship had conversations with Adkins about moving Blanchard into the role.

In 2010, Blankenship would communicate with Blanchard through calls, Blankenship's secretary or by notes.

Blankenship did not raise issues with mine safety violations during calls with Blanchard in 2009. Blanchard stated that the number of violations could have been reduced by hiring additional people.

Blanchard was there when the mine was on potential pattern of violations (PPOV). Additional staff, rock dusters and labor for cleanup on belts were added during this period. Mike Vaught initiated the additions and sent to Elizabeth Chamberlain. Blanchard believed that it was ultimately approved by Blankenship. When the mine was not placed on POV the individuals that were added were lost through attrition and not replaced or moved to production and not replaced. Blanchard stated that you had to show a percentage of improvement in order to be removed from PPOV status. If a mine was placed on pattern of violations (POV), economically it could cause a mine to shut down. While on PPOV you work to eliminate the risk of being put on POV status. Once you were off PPOV, you went to the matric of what do you need to operate the mine.

Blankenship was aware that added positions would lower the amount of citations issued. Blanchard stated that you could add one more miner and do better than you were doing before. Salaries ranged from $75,000 to $80,000 a position on production and $20 to $22 an hour for outby personnel.

Blanchard stated that UBB should have been staffed at 300 personnel, 55 to 60 people per production unit. UBB was staffed around 218, 45 people maybe 48 people per production unit. If UBB was staffed with 55 to 60 people the difference would have been additional outby personnel to rock dust, clean belts and handle supplies. It would have also allowed for a fulltime ventilation engineer and additional management.

The staffing mindset was the same as it was when Massey was operating single section mines in the mid 1990's. Also prior to the Mine Act, enforcement was different. UBB was a 25 year old large mine with deterioration and nonproduction related issues. Staffing decisions were made by Blankenship. Blankenship was not always part of the staff meetings, but Blanchard was directed by feet per man hour. Target was 3 to 3.5 tons per hour and that was directed by Blankenship. Blanchard explained that you could not make cuts in production because that would cut tons.

Blanchard explained that the budget was an eight month process. In late April or early May the five year budget map projections were due. A meeting would be conducted with Atkins, Clemens and sometimes Blankenship. Production rates, feet per shift and longwall advance was critiqued. In July, preliminary revised maps and numbers were put into the budget along with the business plan to include profit and loss. Capital expenditures were reviewed and cuts were made during this process. Costs were dropped from what was projected. After cuts a final business plan was prepared for the group.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

In October a meeting would be conducted with the groups concerning the budget. Blanchard explained that the meeting consisted of Blankenship, Adkins, Clemens and Sabrina Duba. The meeting was group controlled; however Blankenship had final approval of the budget. You adopted what was dictated although it was a group budget. Blanchard didn't recall that Blankenship ever said add additional people or cut production to allow time to comply with safety laws.

Blanchard set his numbers based on what he needed and what he could obtain from other operations. Everyone asked for a track rock duster. Paul Thompson got it included in the budget, but was later cut. Blanchard was not sure who made the cut. Permissible 4 wheelers were requested for fire bosses, but always got cut. Blankenship didn't think they would do their job and thought they would do better if they walked.

Marfork had to consistently help other operations. Blanchard explained that he started low with his budget numbers, but over time was increased because he exceeded them. Blanchard explained that beat the plan refers to the budget.

Blanchard reviewed a handwritten note to Blanchard from Blankenship dated March 7, 2008. Blanchard stated that the note may be in reference to the Coon Eagle Mine, because they had low equipment. It could have been in reference to UBB 3.

Blankenship did not like overcasts, because it was non-production work and over engineering. Blanchard had a lot of back and forth with Blankenship concerning overcasts. Building overcasts was construction, not production.

Blanchard explained that overcasts provided a permanent separation for the air course. Air lock doors have four controls. The doors are constructed of aluminum with plaster walls for installation and are prone to leak. The doors are opened and shut, and don't provide an air tight seal. Blanchard explained that the biggest risk is that all the doors are opened at once and traveled through creating no separation of air. Blankenship was aware of the differences between installing overcasts and air lock doors.

Blanchard stated that he gave in to Blankenship to install doors at # 1 headgate over the tracks. The doors comply with the law, but are not as effective. Blanchard stated that if overcast were installed he would try to leave out of the report so Blankenship did not see. Blanchard cut in overcasts without Blankenship's knowledge.

Blanchard reviewed a Longwall Mid-Day Report with handwritten notes dated February 8, 2008. The report was printed by Sandra Davis. When asked about the note at the bottom of the page Blanchard stated that Blankenship thought they were installing more bolts or cutting height that was not necessary. It was something other than production. UBB had an area that you needed to cut more height to avoid falls and move equipment. The fear was that it was a construction section and not focused on production.

Blanchard reviewed a memorandum to him from Blankenship dated February 11, 2008. When asked about the statement "You're playing engineer there." Blanchard stated that Blankenship was an accountant by practice and he took the statement to mean that he was over planning and designing and looking at the long term focus and not the immediate. Blankenship knew what was needed. It wasn't about play, Blanchard wished he would have done more engineering. Blankenship wanted to run with the mentality of a small mine. UBB needed a well-designed plan, not putting out fires and fixing with band aids.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Massey was successful in operating small mines, but didn't adapt to new regulations, change in climate or changes to the laws.

Massey had the resources to hire an engineer. Blanchard was limited in being able to provide raises to maintain staff his staff. He could not attract a seasoned engineer. The salary was low and a vehicle was not provided. Matt Walker received a raise. Walker was more seasoned and about to leave for Alpha when he received a raise. Walker may have received a vehicle. Requests would go through Jeff Gillenwater and then on to Blankenship. Blanchard did not think that Gillenwater approved anything.

Blanchard explained that in February 2008 they moved on to the tail gate and were in desperate need for ventilation in the North.

Blanchard stated that ventilation is the second most important thing behind roof control. You need roof control, ventilation and a system in place that can withstand the realities of mining is critical for safety and the job. At UBB you could have enough ventilation to be compliant, but the air would be barely moving.

Ventilation provides fresh air to miners and sweeps dust and gases away from them. Secondarily, ventilation sweeps dust and gas away from idle and inactive areas of the mine.

UBB was on a ten day spot inspection at the time of the accident.

Blankenship understood ventilation at the time of the memo (memo dated February 11, 2008-previously referenced). Blanchard stated that you always need to be worried about ventilation and you should worry about it more at a mine like UBB. Blanchard was surprised by the memo. It was similar in contrast to a memo from Blankenship in 2006 after Aracoma.

Blanchard reviewed a report UBB Recovery sent to him from Blankenship dated March 10, 2009. Blanchard explained that the report was filled out by Jamie Ferguson concerning recovered equipment and value. Blanchard was not sure about the two different forms mentioned. Blankenship cared about recovery, because it was a capital savings.

Blanchard was asked about a handwritten note on the report that stated, "You have a kid to feed." Blanchard felt that that statement was a threat from Blankenship. This note was over the top compared to most. Blanchard felt that he could be removed or reprimanded if he didn't fall in line with Blankenship. Blanchard referenced another memo he recalled receiving from Blankenship that stated, "Do you think your daughter would be proud of you now." It was reference to a low production day and Blankenship knew that Blanchard had a young daughter at the time.

Blanchard recalled that Blankenship had Drexel Short fire Nelson Sumter, President, Raw Sales, because he made the statement that if you don't like what I'm doing, then fire me.

Blanchard reviewed a memorandum dated February 9, 2009. Blanchard recalled the last couple of lines. Blanchard discussed it with Craig Boggs who was still over Elk Run. Boggs didn't think it was directed at Blanchard. It was consistent with messages that Blanchard received from Blankenship.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Blanchard reviewed memorandum dated February 25, 2009. Blanchard stated that there is no way to do it and keep same staffing. It's a 25 percent reduction in labor costs. Cuts would have to come from outby personnel, belts, supply, outby supervisors and fire bosses. If you cut fire bosses it deteriorates examinations. You end up fixing major problems instead of correcting miner problems. There is no way to make these cuts without increasing violations.

Blanchard stated that he did not get any feedback, negative or positive from Blankenship concerning the violation packets that Blankenship received. Blanchard stated that this was implicit acceptance at a certain level.

Blanchard stated that in 2009, Massey started budgeting for violations. It was rolled in as part of the supply cost. Blanchard believed the line item was added by Sabrina Duba. Blanchard believed it was at the direction of Blankenship based on Blankenship's practices. It was the number of violations rolled over from the previous year.

Blanchard stated that discipline of mine personnel came from his level within the groups and was not dictated from above. Blanchard stated the he was never disciplined for his mines nor had any other person at his level been disciplined in his 14 years.

Blanchard stated that Blankenship would call when the mine was shut down because of an order issued. Blanchard was required to notify Adkins and Blankenship if the mine was down more than one or two hours.

Blankenship viewed violations as the cost of doing business and felt violations were going to be written by MSHA. There are always going to be violations that MSHA could cite. Blankenship had a distain for MSHA first, above DEP and the state. Blankenship felt MSHA made things up.

Blanchard did not have the ability to hire company personnel, but would hire contractors. The contractors usually were released at the quarter, but Blanchard would hire them back when possible.

Blanchard stated that there was a 60 hour rule, but Blanchard regularly worked over, largely for cleanup efforts, construction, outby and future concerns.

Blanchard stated that he regrets that he didn't push back harder.

Blanchard asked for additional people. He started with a number close to what was desired. If the number did not meet the plan, numbers were reduced to make up for the shortfall. Blanchard explained that you squeeze to cut costs. The belts are the first place for cuts without effecting production.

Blanchard stated that when Massey went public in 2000 he was a superintendent at the time. Capital was a lot more controlled after going public. There wasn't a difference in staffing. There was more complexity and laws without adjustment in staffing levels.

Blanchard stated that advance warning was a practice at UBB and throughout Massey. In 2001 training class conducted by Frank Foster, Safety Director, it was instructed that you call underground unless an inspector requests that you don't.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Blanchard stated that the purpose of calling is to fix things, "lighten up compliance" and to make sure people are in place for safety concerns.

Blanchard explained that in a small mine you may have 10 to 15 minutes before an inspector would reach the section, but at UBB you had 45 minutes to an hour or longer before the inspector would arrive. From a time stand point you had enough time to build a stopping.

Adkins was present for a training session meeting that discussed working with inspectors and civil verses criminal. During the meeting the topic of calling underground was discussed. It was stated that once an inspector crossed the mine property and could write violations that you could call underground, because the inspection already had started.

Blanchard stated that he would call Adkins if multiple inspectors arrived at the mine. Adkins would ask Blanchard if the crews knew. Blanchard stated that he believed it was implied that they should. Blanchard informed Adkins that they were aware.

Blanchard was scheduled to have a call with Blankenship when Blanchard received a call from Ferguson informing him that Joe Mackowiak and Kevin Lyle were at the mine and that an air change was being made on headgate 22, so it could be walked. Blanchard called Blankenship because he needed to cancel the call. Blankenship asked Blanchard if the crews knew that inspectors were there. Blanchard stated that Blankenship implicated that if they don't then let them know. Blanchard told Blankenship that the crews were aware.

Around the summer of 2009, Massey implemented a company policy that required mines to have 20,000 cfm at the last open break. Blanchard couldn't comply with what Massey had implemented. Adkins gave Blanchard a verbal waiver of the policy. Dean Jones called and stated that he could not get 20,000 cfm and was instructed to get 9,000 cfm the amount required to run by MSHA.

Blanchard stated that it was illegal to violate health and safety standards and that when he was president of UBB violations could have been prevented.

Blanchard was asked if he was aware under the mine act that it was a misdemeanor for the operator to violate safety standards. Blanchard stated that he did not know the distinction. Blanchard's understanding was that if he told someone to violate that law it went from a civil matter to a criminal matter.

Blanchard knew that at some level it was wrong for Massey to not give resources to reduce the number of violations. It was the cost of prevention verses loss of production and civil fines. Blanchard explained that he was put in a situation and in return put others in that situation at UBB that violations would be inevitable. The mine was staffed like it was a controlled environment.

When asked about the bore holes at UBB Blanchard stated that he recalled that MSHA denied a ventilation plan, but that he didn't consider the bore holes denied, because bore holes were not part of the ventilation plan. Blanchard didn't believe that you needed approval for bore holes. Blanchard explained that a map was submitted with information that was not germane to the purpose it was submitted. Blanchard didn't direct what was on the map. Eric Lilly was responsible for the content. It was intended to reroute return air from

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Case 5:14-cr-00244   Document 663-2   Filed 04/18/18   Page 58 of 92 PageID #: 23150

the section.  The pumps on the map were for future needs.  You are able to calculate water flow for future needs.  Blanchard stated that you needed a long term basis not current.

Blanchard explained that the hatch marks for water on the submittal map represented what they thought the steady state water level would be, not what the level was at the time the map was submitted.  Blanchard recalled that he sat down with Lilly and discussed what they thought the water levels would be.  It was based on what could be achieved with the pumps based on the level of the water.  (Map discussed dated 12-14-2009)

MSHA traveled to the water area shortly after Thanksgiving.  Blanchard believed that MSHA was aware of the flooding, had seen the water and it was common knowledge at the mine.

Blanchard stated that the submittals were focused for other things not water and pumps.  You don't need approval to drill a hole if the hole didn't create a major ventilation change.  Blanchard stated that the annual map was required to show holes that penetrated the mine.  Blanchard stated that the holes were not used and didn't have power.

Blanchard stated that the second dewatering hole tied into the first discharge.  It couldn't be used at the same time and provided as a backup if the first one failed.

Blanchard was involved with a ventilation change when the fan was started in late August to the 1st of September.  The mine was idle four to five days to make the change.  MSHA had to be notified about the ventilation change.  Blanchard stated that MSHA inspected everything on September 2nd.  Blanchard stated that production on the North end 3 and 4 was started that day by Everett Hager.  Blanchard stated that it was pure ignorance not deliberate.

Blanchard stated that he did go underground in response to a violation to adjust a regulator.  Blanchard explained that the change did not constitute a major ventilation change.

Blanchard stated that on one instance that Blanchard and Jason Whitehead traveled to an isolated return on the tailgate longwall section.  The overcast air was pulling from the return.  They knocked a hole in order to take a reading.  A hole was opened to increase the air on headgate 22.  Blanchard had Wayne Persinger add it to the map.  Blanchard stated that it was the only time that he could recall he opened a hole.  A submittal was not made it was late March.  It would have been included on future submissions as a built control, because it was not a major vent change.

Blanchard is currently working as a consultant.

(Records reviewed during the interview are attached)

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG).  It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302 (Rev. 5-8-10)

- 1 of 3 -



## FEDERAL BUREAU OF INVESTIGATION

Date of entry    02/02/2015

BRUCE CANTERBURY, telephone number (304) Redacted - Privacy interviewed at the United States Attorneys Office, located in Charleston, West Virginia. Assistant United States Attorney Steve Ruby and Department of Labor - OIG Special Agent Jeff Carter were present and participated throughout the interview.  After being advised of the identities of those in attendance and the nature of the interview, CANTERBURY provided the following information:

CANTERBURY worked as a technician at Moore Ford for twenty four years. Moore Ford was owned by DAN MOORE.

MOORE's son, DANIEL MOORE, talked a lot.  Not more than ten years ago, DON BLANKENSHIP got in trouble for insider trading. DANIEL MOORE told CANTERBURY that he and his dad, MOORE, made millions.

DANIEL MOORE floated around all three dealerships his father owned years ago. DANIEL MOORE is now forty four years old.

CANTERBURY saw BLANKENSHIP around the dealership from time to time. BLANKENSHIP would meet with MOORE.

MOORE's company did a lot of work for Massey. A second shift was created to work on Massey's vehicles. CANTERBURY worked the second shift. The second shift lasted until 2001. Business with Massey slacked off at that time, however, MOORE continued to do some business with Massey.

Years ago, DANIEL MOORE told CANTERBURY while at Starter's that BLANKENSHIP, BUCK HARLESS, and MOORE had overinflated the stock at Matewan National Bank.

MOORE was Massey's Chairman of the Board.

MOORE stated that if in a legal bind, MOORE would have to side with his

Investigation on   11/21/2014   at   Charleston, West Virginia, United States (In Person)

File #   318A-PG-78655                                              Date drafted   01/27/2015

by   James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

MOI-001405

FD-302a (Rev. 05-08-10)

318A-PG-78655

Continuation of FD-302 of Bruce Canterbury - Interview _____ , On 11/21/2014 , Page 2 of 3

wife or side with BLANKENSHIP.

Engine oil was dumped on the ground behind the Moore Ford location in Williamson, West Virginia. Eventually, a double walled tank was obtained to store the engine oil. The contractor who also took care of the building advised MOORE to get the double walled tank.  Six to seven years ago, while repairing a gas line, large quantities of oil was discovered.

Moore Realty, which is owned by BETTY JOE MOORE, owns the property where Moore Ford is located.

SHARON MAY, an office manager, has been at the store for twenty four years. Two and a half years ago the new general manager, J.W. SINK, was hired as a consultant. SINK made the comment in the parts department that he wished he had never got into MOORE's books. SINK resides [Redacted - Privacy] [Redacted - Privacy] telephone number (980) [Redacted-Privacy] SINK was first hired as a consultant and then promoted to a general manager along with his wife. This lasted for approximately six weeks to two months. MOORE called SINK at home and fired him.

Finance managers at Moore Ford would submit a deal and the bank would turn them down. The finance managers would add money to the incomes of those attempting to obtain loans and submit the applications to other banks. SHANNON DOTSON and TERRY HEINZ, nee KITCHEN, were the finance managers.

MOORE wrote off $40,000 to $50,000 of old inventory. The inventory was kept in stock and sold. FRANCIS "Bugs" NORMAN would have more information about the inventory.  NORMAN now works for MIKE FARRELL.

A year and a half ago, CANTERBURY learned that dumping was taking place in the back lot of Moore GM, located in South Williamson, Kentucky.

ROSS HARRIS was convicted of buying off a judge. It was thought that he had died in 2006.

Majestic Holleries, which is owned by ROSS HARRIS, has a contract to mine 200 acres over two years. ROSS HARRIS owns Alma and Majestic.

BLANKENSHIP has been trying to get a contract with India for his company, Concept Lodging.  JAMES BOOTH is the president of Concept Lodging.  JIM HARRIS, the brother of ROSS HARRIS, is the secretary for Concept Lodging.  CANTERBURY believes that coal from ROSS HARRIS' mines are going to be used to fill these contracts with India.

DAVE CANTERBURY, CANTERBURY's cousin, is a boss for the highwall and has

FD-302a (Rev. 05-08-10)

318A-PG-78655

Continuation of FD-302 of Bruce Canterbury - Interview _____, On 11/21/2014, Page 3 of 3

worked at different mines.  DAVE CANTERBURY would have more information
about ROSS HARRIS and JIM HARRIS.

MOI-001407

FD-302 (Rev. 5-8-10)

- 1 of 4 -



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    01/27/2015

LISA WILLIAMS, residing at [ **Redacted - Privacy** ] was
interviewed at the United States Attorney's Office located in Charleston,
West Virginia. United States Attorney Booth Goodwin, Assistant United
States Attorney Steve Ruby, and Paralegal Debbie Watson were present and
participated in the interview. After having been advised of the nature of
the interview, WILLIAMS provided the following information:

WILLIAMS still works at the Marfork Coal Company (Marfork) which is a
part of Coal River East. WILLIAMS does not like working for Alpha Natural
Resources (Alpha). WILLIAMS advised that the same individuals who were in
management at Massey Energy Company (Massey) are still in management
positions at Alpha. JASON WHITEHEAD is employed at Coal River East. KEITH
HAINER and MIKE SNELLING are Senior Vice Presidents at Coal River East.

WILLIAMS has not been contacted by anyone from DON BLANKENSHIP's defense
team.

WILLIAMS started at Massey in October of 1995. WILLIAMS' first job was
as a receptionist at Marfork. From 2008 through 2010, WILLIAMS was the
administrative assistant for CHRIS BLANCHARD. The Marfork resource group
included Performance Coal Company which included the Upper Big Branch (UBB)
mine.

The longwall was a big coal producer at the UBB mine. The longwall had
started up nine to ten months before the explosion at the UBB mine. The
longwall was located at the Logan's Fork mine which was a part of the Elk
Run Coal Company before it was moved to the UBB mine.

WILLIAMS described the upper management at Massey to include BLANKENSHIP
and CHRIS ADKINS.

GREG CLAY e-mailed production reports for the longwall to WILLIAMS.
On occasion, KATHY POPE, SANDRA DAVIS' assistant, would call five minutes

Investigation on  01/15/2015  at  Charleston, West Virginia, United States (In Person)

File #  318A-PG-78655-302                                    Date drafted  01/21/2015

by  James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of _Lisa Williams - Interview_ , On _01/15/2015_ , Page _2 of 4_

before the longwall production reports were due to be sent to BLANKENSHIP. Three day production reports went into production report software used at Massey.

Faxes containing handwritten notes from BLANKENSHIP would be faxed to BLANCHARD. WILLIAMS would hand deliver the faxes to BLANCHARD. These faxes containing BLANKENSHIP's handwritten notes would be received many times a week. BLANKENSHIP kept a close watch on the UBB mine. WILLIAMS added that the longwall at UBB was the money maker.

BLANKENSHIP would contact WILLIAMS and let her know what he needed from BLANCHARD if BLANCHARD was not available. WILLIAMS stated that most of the time BLANKENSHIP would write the questions he had for BLANCHARD and they would be faxed to Marfork. WILLIAMS advised that most of BLANKENSHIP's requests were related to production. WILLIAMS would obtain the information and send it to BLANKENSHIP. WILLIAMS would try to discuss with BLANCHARD the information she was sending to BLANKENSHIP before it was sent. WILLIAMS advised that she discussed this with BLANCHARD to ensure that the grammar and spelling was correct. BLANKENSHIP would correct misspellings and mistakes in grammar. WILLIAMS stated that BLANKENSHIP was tough on everybody including her. WILLIAMS described BLANKENSHIP as a control freak.

WILLIAMS was not surprised that BLANKENSHIP was as hands on as he was when she started in an executive office position at Massey. WILLIAMS was made to take the position in the executive office. WILLIAMS did not want the job. WILLIAMS had heard horror stories about BLANKENSHIP. WILLIAMS advised that at a meeting at Marfork, BLANKENSHIP embarrassed a secretary who had ordered a menu that did not take into consideration a diet that BLANKENSHIP was on. WILLIAMS advised that BLANKENSHIP embarrassed the secretary in front of everyone including CSX officials who were at the meeting. BLANKENSHIP got angry with WILLIAMS once when she handed him a coffee cup placed on a saucer.

BLANKENSHIP was at Marfork often early on but as Massey grew he spent less time at Marfork.

WILLIAMS worked at Raleigh General Hospital prior to working at Massey. WILLIAMS has a degree in human resources. WILLIAMS recently obtained a master's degree.

WILLIAMS advised that the hand written notes that BLANCHARD had from BLANKENSHIP from the time BLANCHARD worked at Rawl Sales to his time at Marfork were saved electronically by WILLIAMS at BLANCHARD's request. WILLIAMS did not ask BLANCHARD why he kept the hand written notes. WILLIAMS thought BLANCHARD was smart for doing so.

MOI-001374

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of __Lisa Williams - Interview__ , On __01/15/2015__ , Page __3 of 4__

BLANKENSHIP was most concerned about the longwall within the Marfork resource group.

WILLIAMS thought BLANKENSHIP understood coal mining operations.

BLANKENSHIP and ADKINS told BLANCHARD to get the longwall running before water problems they were having were addressed. WILLIAMS could not remember if this direction was given to BLANCHARD during a telephone call or from a note BLANCHARD received. BLANCHARD frequently talked on a speaker phone with BLANKENSHIP. WILLIAMS would make sure no one could hear the phone call. WILLIAMS would close BLANCHARD's door or her door when BLANCHARD was on the phone with BLANKENSHIP.

WILLIAMS stated there were calls from BLANKENSHIP to BLANCHARD to complain of D orders. BLANKENSHIP wanted the problem fixed because the D order would not allow the mine to produce coal. WILLIAMS advised that BLANKENSHIP never called BLANCHARD out of concern that the problems that needed to be addressed were dangerous. WILLIAMS stated that there was never a complaint made by BLANKENSHIP over safety violations that did not affect production.

BLANCHARD would travel to the Mine Safety and Health Administration Office to address issues.

WILLIAMS thought violations were faxed to ADKINS at Massey's Julian office and BLANKENSHIP at the Lauren Land office or wherever BLANKENSHIP was at that time. WILLIAMS added that the policy was to always fax the violations to DAVIS.

WILLIAMS did not believe Massey's S1 policy was taken seriously. WILLIAMS stated that it was her opinion that no one paid attention to Massey's S1 - P2 - M3 policy. WILLIAMS described her understanding of S1 as meaning safety would be considered first before production. This meant that problems would be fixed at a mine before coal was produced. WILLIAMS thought the safety director probably took his job as important, but not everyone else. WILLIAMS advised that she believed others at Massey had heard of Massey's S1 - P2 - M3 policy but nothing was ever made of it.

WILLIAMS advised that BLANCHARD did what he could to cut costs. WILLIAMS does not believe that BLANCHARD cut anything to affect safety. BLANCHARD received pressure to cut costs from executive management. BLANCHARD tried to get what people needed with the limits he was under. BLANCHARD was worried about safety violations for miner's safety. BLANCHARD was in a mining accident and someone saved his life. WILLIAMS thought BLANCHARD did the best he could with the circumstances his bosses created.

MOI-001375

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Lisa Williams - Interview                    , On  01/15/2015 , Page  4 of 4

    WILLIAMS had respect for BLANKENSHIP because of his abilities with
numbers. WILLIAMS thought BLANKENSHIP was smart. WILLIAMS could not say
that she liked him all of the time. WILLIAMS advised that she would tell
the truth no matter what.

    WILLIAMS has not had any contact with BLANKENSHIP since he left Massey.
WILLIAMS has not spoken to BLANCHARD in two years. WILLIAMS called
BLANCHARD once to see if he was okay. WILLIAMS told BLANCHARD she did not
blame him for the UBB explosion. WILLIAMS sees ADKINS quite often. WILLIAMS
goes to church where ADKINS' father-in-law preaches. ADKINS works at Wright
Concrete. WILLIAMS stated that ADKINS might own Wright Concrete.

    WILLIAMS knew the UBB mine was involved in advanced notice. WILLIAMS
advised that advance notice was given to take care of issues before
inspectors arrived at a section of the mine. WILLIAMS did not hear
BLANKENSHIP talk about advance notice.

    WILLIAMS stated that based on how mines were ran Massey expected there
would be a lot of violations. WILLIAMS believed that BLANKENSHIP was
willing to accept a number of violations to run mines the way he wanted.

    WILLIAMS advised that the statement released to shareholder's regarding
Massey not condoning violations was not true. WILLIAMS stated that all of
Massey's locations condoned safety violations. WILLIAMS stated that the
statement was made for the shareholder's to hear.

MOI-001376

**Report of Interview**

**U.S. Department of Labor**
**Office of Inspector General**
**Office of Investigations**



Page __1__ of __2__                                         OIG Form 103 (OI – 1/98)

| Investigation on: | January 16, 2015 | At: | Charleston, WV | File: | 31-0862-0001 PC |

By: Special Agent Jeffrey Carter                                         Date Prepared: 1/20/2015

On January 16, 2015, Andy Coalson accompanied by his attorney John Carr was interviewed at the United States Attorney's Office in Charleston, WV. Present and participating in the interview were Booth Goodwin, United States Attorney, Steve Ruby, Assistant United States Attorney, and Special Agents Jeffrey Carter, U.S. Department of Labor, Office of Inspector General and Jim Lafferty, Federal Bureau of Investigation. Coalson provided the following information:

Coalson is currently employed by Alpha Natural Resources at the Slip Ridge Operation.

Don Blankenship was the best man that Coalson had ever worked for. He was a powerful man and Coalson wished he worked for Blankenship now.

When Coalson worked for Massey he didn't worry about his job or having a job tomorrow. Coalson wasn't aware of the day to day operational decisions, but believes the decisions made under Massey must have been better than the ones being made now. Coalson believes the business decisions must have been better.

Coalson stated that when they were driving headgate 21 there were discussions about installing an exhaust fan in the return. Installation of the exhaust fan was denied. The decision was not explained. Coalson speculated and stated it may have been denied because of issues with power or money.

Coalson stated that UBB's ventilation was on the border. They operated with enough air, but if a curtain fell there wouldn't be enough.

Coalson recalled that on one occasion methane readings were high, but stated it's not too bad if you have enough air.

Chris Blanchard made the decision to build kennedy stoppings because of the conditions. Headgate 21 was experiencing rib rolls, the floor was heaving and stoppings were blowing out. The kennedy stoppings were installed to create a separate return.

Coalson stated that he was told by Blanchard that additional outby resources wouldn't be added because of budget reasons. Coalson stated that there were enough people to conduct examination, but there weren't enough to fix the problems found during the examinations. Things couldn't get fixed because of the size of the area that needed to be examined.

Coalson explained that you could produce coal safely without getting someone hurt. There were plenty of people working in the face areas of the mine. The issue was the amount of outby workers. Coalson stated that you had everything that you needed on the section to operate safely; timbers, roof bolts and personnel.

MOI-001408

UBB had an outby dust crew. Coalson stated that his area was dusted, but also stated that there were areas off the track that the equipment couldn't reach. Coalson once again stated that there weren't enough outby personnel.

Coalson never had a conversation or direct contact with Don Blankenship.

Coalson believed that if he had a legitimate reason why he shouldn't do something then he didn't worry about being fired. Times were good, there were plenty of jobs and he wasn't scared for his job. Coalson stated that if the reason was to keep production going or for the greater good of production that he didn't worry about being fired.

Coalson believed that he would have been replaced if he said he couldn't run coal because he needed more outby personnel.

Coalson wasn't aware of any condition at UBB bad enough to cause an explosion. Coalson was aware of the violations being issued at UBB and stated that everyone above him was aware of the violations.

Conditions were carried over in the examination books because there weren't enough people to take care of the issues. Things weren't going to get fixed because the focus was on running and producing.

It wasn't an option to refuse to run coal. Coalson stated that he wasn't going to let anything beat him. It was his job and that he had to get it done.

Coalson spent 11 years with Massey. Blankenship was the Godfather and what he said went. Blankenship was all business. Blankenship was 100% in charge. Coalson respected Blankenship. Never missed a payday and had job security. Blankenship knew the decisions to make. Blankenship found ways to run more coal and sell more coal. Blankenship stockpiled coal when the market was bad and waited for it to turn.

When Coalson was working for Massey, metallurgical coal was selling for $300 a ton and currently it is $88 a ton.

FD-302 (Rev. 5-8-10)

- 1 of 2 -



## FEDERAL BUREAU OF INVESTIGATION

Date of entry   01/27/2015

JACOB FERTIG contacted the interview agent by telephone. After having
been advised of the identity of the interviewing agent and the nature of
the interview, FERTIG provided the following information:

FERTIG was contacted Sunday, January 11th, on his home phone by someone
who wanted to ask him questions about his knowledge of DON BLANKENSHIP and
the Upper Big Branch (UBB) investigation. FERTIG informed the lady asking
him questions that he was somewhat aware of the indictment.

FERTIG was informed of three separates charges filed against
BLANKENSHIP. FERTIG was asked if he thought BLANKENSHIP was guilty, not
guilty, or if there was not enough information available to make a
determination in relation to the three charges. FERTIG stated to the
interviewer that he did not have enough information.

FERTIG advised that during the telephone call he asked the interviewer
from where she was calling. She informed FERTIG she was calling from New
Mexico. FERTIG stated to the interviewer that she probably thought West
Virginia was some podunk state that was exploited for its natural
resources. FERTIG described BLANKENSHIP as the most recent on a list of
assholes who have used the state.

FERTIG does not remember being asked about the Mine Safety and Health
Administration investigation of the UBB explosion or any other
investigaitons of the UBB explosion.

FERTIG was asked if he was a firefighter, a policeman, or a third option
that he could not remember. FERTIG replied that he was not in any of the
profession listed. FERTIG was asked if he was a felon. FERTIG replied that
he was not a felon.

FERTIG was not asked if he thought BLANKENSHIP could get a fair trial in
southern West Virginia.  FERTIG was not asked any question about the

Investigation on   01/16/2015   at   Charleston, West Virginia, United States (Phone)

File #   318A-PG-78655-302                                    Date drafted   01/21/2015

by   James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Jacob Fertig - Interview                              , On  01/16/2015 , Page  2 of 2

judicial process. FERTIG was not asked if BLANKENSHIP should have to prove
his innocence.  FERTIG was not asked any questions about the makeup of his
family.

MOI-001368



FD-302 (Rev. 5-8-10)

- 1 of 4 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    01/27/2015

STANLEY STEWART was interviewed at the United States Attorney's Office, located in Charleston, West Virginia. STEWART was accompanied by Chuck Donnelly and Mindi Stewart. United States Attorney Booth Goodwin, Assistant United States Attorney Steve Ruby, and Department of Labor - OIG Special Agent Jeff Carter were present and participated in the interview. After having been advised of the nature of the interview, STEWART provided the following information:

Massey Energy Company (Massey) opened the Upper Big Branch (UBB) mine in November of 1994. Massey called employees to work at the UBB mine based on seniority. STEWART first worked at the UBB mine a few months after it opened.

In January of 2009, STEWART took a miner operator job at UBB. At the time of the explosion at UBB, STEWART was working the evening shift at headgate 22. STEWART worked on the evening shift from January of 2009 up through the date of the explosion.

STEWART stated that DON BLANKENSHIP did not like the longwall sitting outside of the UBB mine. There was a big push to get the longwall running.

In 2009, STEWART contacted JOHN KINDER and informed him that his crew was working in an intake that did not have any air. KINDER investigated STEWART's complaint.

STEWART felt for the section bosses who worked at UBB. RICK HUTCHENS, a section boss at UBB, quit. Before quitting, HUTCHENS did his job the best he could under the circumstances. HUTCHENS met with CHRIS BLANCHARD every week where BLANCHARD would tear into him. In one instance, HUTCHENS had knocked the power of headgate 22 when the air flow on the section was so low the anemometer would not turn on. HUTCHENS and BRENT RACER attempted to

Investigation on  01/20/2015  at  Charleston, West Virginia, United States (In Person)

File #  318A-PG-78655-302                                        Date drafted  01/21/2015

by  James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

MOI-001369

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Stanley Stewart - Interview                         , On  01/20/2015 , Page  2 of 4

determine why they did not have any air.  BLANCHARD informed HUTCHENS that
if he did not get the miner operators into coal he would find someone who
could.

STEWART stated that some of the guys who carried out orders at UBB were
not bad guys but did what they had to do to keep their jobs.
STEWART advised that at UBB it was ok to break laws to produce coal.

STEWART advised that staggered centers were built every ten feet on the
tail entry return leading back to the gob. STEWART stated that this
approach would not hold up the roof. The roof did not hold which led to no
air flow and water filling up the area.

The UBB mine liberated a lot of methane. STEWART experienced 8 to 9%
methane in the bleeder areas at UBB. STEWART stated that the bleeder areas
typically liberated 2 to 3% methane. Management was aware of the liberation
of methane they were experiencing.

Although STEWART worked the evening shift at UBB, he was aware of the
citations that were written during the day shift.

Mine inspectors would tell STEWART's crew to inform them of problems
they were experiencing when they would pass each other. The mine inspectors
did not want the miners to have to be seen talking to them. STEWART
believed that Massey instilled the mentality in its employees that mine
inspectors were the bad guys.

Headgate 22 continued to have a lack of air. STEWART does not recall
experiencing explosive levels of methane on headgate 22.  Before the
explosion, there was some water in the #3 entry of headgate 22. Prior to
that the water was not bad on headgate 22.

The discussion of bad weather was the most common way STEWART was aware
of advance notice being given at UBB. STEWART did not hear the use of words
like "hamburgers" or "cheeseburgers" being used to give advance notice.
Advance notice was provided so that a section would not be caught doing
something it should not have been doing. STEWART added that this would
include not properly hanging curtains which he described as being a common
practice. STEWART stated that hanging curtains took time and it was not
usually done at UBB until the end of a shift.

STEWART stated that a "miner helper" could have assisted in keeping the
cable out of the way of the miner and hanging curtains and flypads when
needed. Massey did not have miner helpers. Sometimes a section boss might
help a miner operator with these tasks. STEWART described the miner helper
as a big asset.

MOI-001370

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Stanley Stewart - Interview                                                   , On  01/20/2015 , Page  3 of 4

STEWART advised that it was impossible to get enough air on the face of a section if the curtains are not hung properly. STEWART advised that if an inspector was traveling to a section and the section did not have enough air to operate legally, the section would not mine coal and would instead clean up the area with a scoop and rock dust.

STEWART remembered PETE HENDRICKS and DREXEL SHORT commenting that the miners did not need to worry about a bathhouse because Massey made its money in the face.

STEWART advised that there were two occasions when votes were made to decide if the UBB mine would become a union mine. These votes occurred in 1996 or 1997 and 2006 or 2007. BLANKENSHIP visited the mine prior to the voting and listed on a piece of paper the positives available with Massey and the positives available with the union. The union side of the paper had nothing listed. BLANKENSHIP explained to the employees that Massey needed flexibility you did not get under the union.

STEWART saw BLANKENSHIP at Christmas parties.

STEWART felt the directions to break laws at Massey were coming from BLANKENSHIP.

STEWART was never suspended or disciplined while working at Massey. STEWART has never been arrested.

STEWART stated that Massey would bite it's nose off to spite it's face by trying to run two continuous miners in three entries. There was not enough time or space to use the scoop properly, to rock dust, or to hang curtains up to the face.

STEWART worked with GREG CROUSE, JACOB DOSS, RACER, and DERRICK WILLIAMS.

STEWART does not know if the wall of kennedy stoppings built at UBB served any purpose.

STEWART would not take deep cuts illegally.

STEWART felt that the UBB mine was a ticking time bomb. STEWART based his comment on the long term experience he had working in coal mining. KENNY WOODRUM had told STEWART about the bad air they had on the longwall at UBB.

STEWART advised that brand new air lock doors are not air tight if they are built over a track. An opened air lock door could have influenced the

MOI-001371

FD-302a (Rev 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Stanley Stewart - Interview _____ , On 01/20/2015 , Page 4 of 4

short circuiting of air on headgate 22.

If the belts were down, STEWART's crew would try to catch up on cleaning and rock dusting the section. This type of work was not rocket science, it just took some time to accomplish. STEWART added it was not a complicated undertaking. STEWART stated that air regulations are not complicated either. STEWART had never heard of Massey's policy of having 20,000 cubic feet per minute of air in the last open break. STEWART never saw 20,000 cubic feet per minute of air on a miner section at UBB.

STEWART considered S1 - P2 to be a joke. Everybody at Massey knew better than to believe that Massey was about S1 - P2. STEWART does not believe that S1 was taken seriously. STEWART stated that the miners received gloves and other equipment that was S1 related.

Massey fought every violation written by MSHA. Massey had guys that walked inspectors away from bad areas and tried to talk them out of writing violations. STEWART thought Massey would have had a great program if they actually followed what they had said.

STEWART stated that it was not accurate to say that Massey did not condone safety violations and tried to obey all safety regulations.

STEWART's son, STANLEY STEWART II (STANLEY), saw fireballs on the sheer of the longwall at UBB. STANLEY was told that his bits were hot.  STANLEY lost a part of his finger while working at the mine. Massey wanted STANLEY to come back to work to avoid a lost time accident (LTA). STEWART knew that the LTA rate for Massey was fake. STEWART saw more miners injured in his first five years at UBB than he saw the entire time he was in coal mining.

Massey employees did not quit working for Massey because you did not quit a job unless you had another job. STEWART stated there was a lack of other jobs available. STEWART advised that some individuals did quit working at Massey.

STEWART stated that his son, STANLEY, was contacted by BLANKENSHIP when STANLEY was dispatching at the Logan's Fork mine. BLANKENSHIP called to complain that a couple of the production reports STANLEY had prepared were one shield off. BLANKENSHIP chewed out STANLEY for the mistake. CRAIG BOGGS tore into STANLEY for messing up the production reports. STANLEY was dispatching at Logan's Fork because of an ankle injury he suffered at home.

**Report of Interview**

**U.S. Department of Labor**
**Office of Inspector General**
**Office of Investigations**



Page  1  of  1

OIG Form 103 (OI – 1/98)

| Investigation on: | January 21, 2015 | At: | Charleston, WV | File: | 31-0862-0001 PC |

By: Special Agent Jeffrey Carter

Date Prepared: 1/26/2015

On January 21, 2015, Jamie Ferguson accompanied by attorney Nick Preservati was interviewed at the United States Attorney's Office in Charleston, WV. Present and participating in the interview were Booth Goodwin, United States Attorney, Steve Ruby, Assistant United States Attorney, and Special Agent Jeffrey Carter, U.S. Department of Labor, Office of Inspector General. Ferguson provided the following information:

Ferguson is not currently employed in the mining industry. He has applied for federal and state inspector positions and has also applied for a federal training position.

Ferguson stated that outby positions were an issue. The fire bosses worked on outby issues, but didn't have time to take care of the issues found because they had to examine the mine. Outby crews were discussed in the budget with mine presidents, but were not normally added.

Ferguson left UBB in January of 2010 and took over the Independence operation. The Revolution mine at Independence operated a longwall.

Ferguson became president of Marfork on May 3, 2010. Ferguson didn't feel that he was pressured when he became president. Ferguson stated that his numbers were better at Marfork. When Ferguson became president of Marfork he told Don Blankenship that production was going to drop, because Ferguson wanted to get it right. As president of Marfork he spoke with Blankenship once a month. Ferguson didn't hear from Blankenship until he became a mine president. Ferguson got along with Blankenship.

Ferguson wasn't disciplined or demoted by Blankenship. Ferguson was suspended on one occasion around 2007. Ferguson explained that he called Chris Adkins about working underground. Bill Potter accused Ferguson of overstepping his boundaries and suspended him. Potter found out that Ferguson had called Adkins. Adkins and Potter didn't have a good relationship. Potter was eventually demoted.

Ferguson believed that he did a better job than Chris Blanchard as president because of Ferguson's management style, his relationship with MSHA, the state and mine personnel. Ferguson characterized himself as a leader and not a dictator. Blanchard had a bad reputation with his personnel.

Ferguson believed that UBB looked good when it came to rock dust, but also admitted that there where areas of the mine that had problems with rock dust. There were several failed samples after the disaster. Ferguson stated that the samples failed mainly because of soot.

Ferguson was let go by Alpha. Charlie Bearse told Ferguson that Alpha was going in a different direction and that they didn't have anything for Ferguson.

MOI-001416

FD-302 (Rev. 5-8-10)

- 1 of 2 -



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry   02/02/2015

TIM BLAKE was interviewed at the United States Attorneys Office, located in Charleston, West Virginia.  BLAKE was accompanied by his attorney, Benny Jones.  United States Attorney Booth Goodwin and Assistant United States Attorney Steve Ruby were present and participated throughout the interview.  After being advised of the nature of the interview, BLAKE provided the following information:

BLAKE advised that his whole crew had moved from the Slip Ridge mine to the #4 section of the Upper Big Branch (UBB) mine. BLAKE's crew moved from the #4 section to the tailgate to mine the new longwall panel. The other headgate panel had flooded out and a new panel needed to be mined. The flooded area could not be ventilated. DEAN JONES' crew was mining the headgate for the new longwall panel.

BLAKE has never worked on a longwall.  The longwall had been the money maker at the UBB mine. There was a lot of money in the unmined coal seams at UBB. There was a lot of pressure to get the tailgate mined. BLAKE advised that they mined the tailgate section as quick as they could. There was a lot of water on the tailgate section. The water was at least eighteen inches high. The water slowed production. The crew had to work hard to pump water out of the area. There were breakdowns because of the water and time was needed to maintain the pumps. The tailgate section was started a couple of months before the explosion at UBB.

BLAKE advised that eighteen inches of water was common on the tailgate. The faces were kept dry. The water was located where the crew dumped their coal. The power center was located at the edge of this water.

The poor condition of the air lock doors were obvious. Motors would hit the doors and push them open. This would bend the doors. Some overcast were cut in the mine. BLAKE did not question why more overcast were not built. Some airlock doors would take two men to open because of the pressure.

Investigation on  01/27/2015  at  Charleston, West Virginia, United States (In Person)

File #  318A-PG-78655-302                                          Date drafted  01/30/2015

by  James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Tim Blake – Interview                                    ,On  01/27/2015 , Page  2 of 2

The track duster was used on the midnight shift.

When advance notice was given, boards would be bolted into the roof to put flypads up where they needed to be. The lack of curtains and flypads lead to the lack of air on the face of a section. BLAKE advised air on the face of the section was important to the safety of the section and the people who work on the section.

BLAKE stated that his tailgate crew could not be pressured. The crew wanted to run as much coal as they could. BLAKE's crew thought that if they ran more coal they would be able to get above the water.

The evening shift working on the tailgate did not hang boards or keep up with the ventilation that well. The evening shift used solid pieces of curtain instead of putting boards up to hang fly pads.

BLAKE stated the injury he suffered to his finger occurred at home. BLAKE was moved from a roof bolter position to a buggy while recovering from his injury.

BLAKE advised that a curtain would be rolled up to allow a scoop man and a miner to be able to come right to the face to work. It gave them easier ability to travel.

There had been no issues regarding how he had been treated at Massey. BLAKE never got into trouble at Massey. BLAKE was never suspended while working for Massey. BLAKE had no personal dealing with DON BLANKENSHIP. BLAKE did not have an opinion of BLANKENSHIP before the explosion. BLAKE dealt with CHRIS ADKINS when he (ADKINS) was the president at the Low Gap mine at Marfork Coal Company. ADKINS was a good person to work under. BLAKE had no conflicts with ADKINS.

BLAKE advised that he would only say things that were truthful. BLANKENSHIP never personally told BLAKE to violate a safety law. BLAKE sued Massey, its board of directors, BLANCHARD, JASON WHITEHEAD, and others. The lawsuit was settled to BLAKE's satisfaction.

MOI-001381

FD-302 (Rev 5-8-10)

- 1 of 4 -



## FEDERAL BUREAU OF INVESTIGATION

Date of entry    02/02/2015

BOBBIE PAULEY was interviewed at the United States Attorneys Office located in Charleston, West Virginia. United States Attorney Booth Goodwin and Assistant United States Attorney Steve Ruby were present and participated throughout the interview. After being advised of the nature of the interview, PAULEY provided the following information:

PAULEY just got promoted by MSHA. PAULEY took a demoted position after she testified in the ELBERT STOVER trial. PAULEY understood being moved from enforcement because she had given advance notice while working for Massey Energy Company (Massey). PAULEY does not understand why she was demoted. PAULEY is now at a GS 9 - 10 level.

When PAULEY began working at the Upper Big Branch (UBB) mine she worked for a red hat crew of a half dozen workers. PAULEY does not know if the mine was on a potential pattern of violation (PPOV) status at that time. PAULEY was not sure if she would have known what that meant at the time.

PAULEY advised that she had a son in junior high, was on public assistance, was receiving food stamps, and was unable to get a job. PAULEY had a forty hour surface miner card but no one would hire her. PAULEY learned that entry level positions in underground coal mines were easier to obtain. PAULEY asked public assistance if they would send her to the United Mine Worker's program. She was informed that no one had ever asked to attend the training. Public assistance agreed to send her to the training. The United Mine Worker's program required 360 hours of training. PAULEY also learned that if she had her Emergency Medical Technician (EMT) card she could not be denied a job. PAULEY obtained her EMT card through ERISA. PAULEY then registered with Dave Stanley.

PAULEY was first assigned to work with a crew of a dozen miners at a Harris mine. The work she did at the Harris mine was under the worst

Investigation on    01/27/2015    at    Charleston, West Virginia, United States (In Person)

File #    318A-PG-78655-302                                    Date drafted    01/30/2015

by    James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

MOI-001385

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of Bobbie Pauley - Interview , On 01/27/2015 , Page 2 of 4

conditions she had ever seen. Nine miners eventually left. PAULEY worked
thirty to thirty five days with no days off. PAULEY left the Harris mine at
the end of 2007.

TOM REDMOND ran the Dave Stanley office. REDMOND asked PAULEY if she
wanted to work at the Upper Big Branch (UBB) mine. JENNIFER CHANDLER had
told REDMOND not to send any women, but REDMOND did not have enough red hat
coal miners to send to UBB. REDMOND asked PAULEY if she wanted to go.
PAULEY agreed to go. PAULEY advised that two hours into her training at
Massey she was pulled from the class. REDMOND told her to leave the
facility because Massey did not have the facilities to accomodate hiring a
female. REDMOND explained to PAULEY that Dave Stanley's corporate office
was going to fire him for sending her to Massey. PAULEY advised that JONAH
BOWLES, a Massey employee, was there listening to the conversation she was
having with REDMOND. PAULEY advised that BOWLES looked scared. PAULEY left
the facility and traveled back to Dave Stanely. Upon returning to the
office, PAULEY learned from REDMOND that the decision had been made for her
to work at the UBB mine. REDMOND was eventually fired from Dave Stanley.
REDMOND has since passed away.

PAULEY advised that at UBB, LACEY COX took PAULEY and other red hat coal
miners under caution tape in the belt entry on the old #3 section. The belt
was on and was still operating. PAULEY observed roof bolts hanging down
from the roof. The roof was unstable. PAULEY notified the men that she was
going to use the bathroom. PAULEY decided against traveling in the area by
herself after she saw the extent of the roofing issues. PAULEY asked COX if
he was the boss for their crew. PAULEY told COX he would have to be a boss
if he was supervising over five red hats. COX said he was not a boss. COX
informed PAULEY that the belt area was cautioned off because of the
condition of the roof bolts. PAULEY told COX they should not be working in
the area. COX asked PAULEY where she received her training. PAULEY informed
COX that she took the United Mine Worker's training. COX informed PAULEY
that she was right, they should not be working in the area. COX informed
PAULEY that he was doing what he had been told to do. PAULEY thought to
herself that if the company was willing to put five red hats with someone
who was not a section boss, what other advantages would they take with the
red hat miners.

PAULEY later learned that COX had his bossing papers but lost them when
he was caught by CLARENCE DISHMAN, an inspector, dating up a board early.

PAULEY stated that it was a rule at UBB that you did not paint a roof
bolt red. It meant that you were aware that there was an issue with a bolt.

PAULEY stated that on one occasion, CHRIS ADKINS and CHRIS BLANCHARD
traveled to the longwall at the UBB mine. ADKINS was upset that they had to

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Bobbie Pauley - Interview          , On  01/27/2015 , Page  3 of 4

keep opening air lock doors.

PAULEY advised that the night CARL GRIMMETT quit working at UBB, PAULEY
believed GRIMMETT was upset that a stopping had been removed to bring
equipment and supplies through.

PAULEY stated that on one occasion, BILL HARLESS traveled with an
inspector into the mine. PAULEY observed HARLESS trying to get on the phone
with someone. PAULEY thought something was not right with the situation.
RICK HODGE was the superintendent at that time.

BRANDON BOWLING testified to MSHA that they never had any methane at
UBB. PAULEY stated that BOWLING's testimony about methane was a lie. PAULEY
described BOWLING as a "yes" man.

There was no tolerance for down time at Massey. Production reports were
falsified. BLANCHARD would look at down times. BLANCHARD would chew
somebody out if he saw down times.

PAULEY worked for TOM "Pickle" HARRAH's crew. PAULEY described HARRAH as
one of the best bosses she ever had at UBB. HARRAH cared about his people.
PAULEY snapped her ankle while working with HARRAH's crew. PAULEY was
walking through a muddy entry that had not been cleaned. An MSHA inspector
was there when she injured herself. The inspector's last name was STEPHENS.
The mantrip used to transport PAULEY out of the mine died on her way out. A
new mantrip was brought in to take her the rest of the way out. An
ambulance was waiting on PAULEY when she exited the mine. STEPHENS called
PAULEY at home to make sure she was ok.

People at UBB joked about S1. People would talk about S1 sarcastically.
PAULEY stated that it was said that you leave S1 at the portal on your way
into the mine. People would comment that at UBB it was P1 - S2. Bosses that
PAULEY worked for never gave an example of what S1 required. PAULEY advised
that Massey had a safety program on paper. PAULEY had never heard of the
hazard elimination program.

PAULEY advised that the statement that Massey did not condone any
violations of safety laws and that they strived to follow all safety laws
was obviously not in Massey's culture.

PAULEY stated the violation of safety laws was the cost of doing
business at Massey. PAULEY advised that this phrase was said a lot at
Massey.

Nobody ever told miners at the UBB mine that they had the worst mine in
the nation.

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Bobbie Pauley - Interview _____ , On  01/27/2015 , Page  4 of 4

    PAULEY stated that it was a fair statement to say the people in charge
of the UBB mine would tolerate violations of mine safety laws to run coal.

    PAULEY advised that she called an MSHA office and was transferred to a
male. PAULEY told him that she was placing a call about the UBB #1 section
and that she was the wife of a miner who worked at the mine. PAULEY told
the male that there was not any air on the section and that someone was
going to get killed. The individual informed PAULEY that she had called the
wrong MSHA office but that he would pass the information along to the Mt.
Hope office. PAULEY told BOONE PAYNE that they would have a mine inspector
at the mine after she made the call. PAULEY learned from PAYNE that a mine
inspector never showed. PAYNE informed PAULEY that he had called MSHA's
toll free number, however, PAYNE did not go into any detail.

MOI-001388

FD-302 (Rev. 5-8-10)






FEDERAL BUREAU OF INVESTIGATION

Date of entry 02/02/2015

LARRY ADAMS was interviewed at the United States Attorneys Office located in Charleston, West Virginia. Assistant United States Attorney Steve Ruby was present and participated throughout the interview. After being advised of the nature of the interview, ADAMS provided the following information:

ADAMS stated he never had any direct dealings with DON BLANKENSHIP.

ADAMS worked at Eastern Associated Coal Company's Harris #1 mine in 1967. ADAMS worked there as a general laborer for a couple of months. ADAMS then worked a service station at the Island Creek Coal Company for a couple of years before returning to Eastern Associated Coal Company. ADAMS worked at the Wharton mine as a general laborer, an equipment operator, a dispatcher, a supply maintenance foreman, a section foreman, and as a fireboss. ADAMS worked there until 1978 when he was layed off. ADAMS then worked at Armco Steel as a section foreman for a year. ADAMS was fired from Armco Steel. ADAMS was told he was being fired for being out under an unsupported roof. ADAMS advised that he was fired for associating with union men after work hours. ADAMS was hired by Bethlehem Steel where he worked at the #122 mine located in Van, West Virginia, until 1982 or 1983. ADAMS hurt his back and was told by a doctor that he could not go back to work. ADAMS was unable to get social security. ADAMS began working as a salesman for a company in Beckley, West Virginia, until 1990. ADAMS was called back to work at Bethlehem Steel. ADAMS was sent to take a physical in Ohio after the company who had said for years he could work, decided that he could not work. ADAMS passed his physical and worked at Bethlehem Steel until 1996 when the mine shut down. ADAMS then began working for Low Places Contracting which was located in Cabin Creek, West Virginia. ADAMS was brought on to work for Massey Energy Company (Massey).

ADAMS advised that a red hat cleanup crew was put together to keep UBB off of pattern of violation (POV) status. ADAMS was able to pick the red

Investigation on 01/28/2015 at Charleston, West Virginia, United States (In Person)

File # 318A-PG-78655-302 Date drafted 01/30/2015

by James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of Larry Adams - Interview                          , On 01/28/2015 , Page 2 of 3

hats and he got the five best red hats that he could. The UBB mine did not
get a violation on the belt for a year after his crew cleaned up the belt.
ADAMS stated it was an example of how you could take care of belts when you
dedicated people to take care of them. ADAMS' crew was also responsible for
building rescue chambers that stored oxygen and had an air-lock section
when you entered the chamber.

The red hat crew was taken away from ADAMS when there was a reduction in
work force at UBB. ADAMS added that the red hats were the first to go when
there was a reduction in work force. After the red hats were laid off,
ADAMS was responsible for doing the job that his entire red hat crew had
been responsible for doing.

Each fireboss at UBB was assigned a belt and was responsible for the
maintenance of the belt. The responsibilities would include greasing the
belt drive, replacing rollers that weighed approximately 250 lbs., rock
dusting the belt entry, and firebossing. ADAMS added that the six foot belt
was impossible to shovel from one side of the belt. In order to completely
shovel the belt, he would have to walk around the belt and shovel the other
side of the belt as well.

Most of the firebosses who worked at UBB were assigned to work the
dayshift because inspectors were there during the dayshift.

Management was aware there was no way spillage could be kept from around
the belts based on the number of firebosses they had at UBB. ADAMS stated
the common response he would get when he mentioned spillage to management
was that the other guy who used to fireboss could keep it clean. ADAMS
also heard that if he could not do the job they would find someone who
could.

The day ADAMS quit, the other fireboss working that day was JOHN NEALY.
ADAMS described NEALY as a lazy employee. After ADAMS quit, ANDY COALSON
grabbed miners from the longwall to help NEALY.

The largest problem at UBB was ventilation.

ADAMS advised that if you wrote down a hazard you would be the one
required to fix the hazard. ADAMS stated that you did not have time to do
this considering the other responsibilities you had. This requirement was
initiated to try to keep you from writing down hazards that you saw.

ADAMS stated that it looked like the airways had been rock dusted one
time. ADAMS was not aware of the intake or the return ever being rock
dusted while he was at UBB. ADAMS stated you could see some dust on the
sides and a little rock dust on the roof. ADAMS added that there was not a

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Larry Adams - Interview _____ , On  01/28/2015 , Page  3 of 3

lot of room in the walkways because of the rib rolls that were occurring.
At the end, the escape walkways were starting to get cleaned up and looked
pretty good.

The belts would be rock dusted in areas that could be reached with the
track duster.

ADAMS advised that you could hear air blowing through stoppings on the
belt line which was located next to the intake entry. Some of the stoppings
were old and were crushing out. The stoppings needed proper outby
maintenance. The UBB mine did not have enough men on the midnight shift to
handle the outby work that was needed. The midnight shift was usually busy
advancing the belt.

ADAMS stated that the number of men UBB had assigned to maintain the
belts and perform outby maintenance was not enough to keep up with what was
required to not break the law.

ADAMS advised that everybody had the impression that S1 was a show. You
left S1 outside when you traveled into the mine to work.

ADAMS had never heard of the hazard elimination program.

ADAMS has never had any trouble with the law. ADAMS has had a few
traffic tickets. ADAMS was never suspended while working at Massey. ADAMS
treated people the way he wanted to be treated.

ADAMS advised that after he quit working at UBB he met with JASON Last
Name Unknown (LNU), a human resources employee, at Elk Run. JASON LNU
offered ADAMS a job at any mine he wanted, on any shift he wanted if he
would not quit. ADAMS figured he would experience the same thing he
experienced at UBB and declined the offer.