FD-302 (Rev. 5-8-10)

- 1 of 3 -



## FEDERAL BUREAU OF INVESTIGATION

Date of entry    02/02/2015

RICK HUTCHENS was interviewed at the United States Attorneys Office, located in Charleston, West Virginia.  Assistant United States Attorney (AUSA) Steve Ruby was present and participated throughout the interview. After being advised of the nature of the interview, HUTCHENS provided the following information:

HUTCHENS had surgery two years ago. He has been off of work since the surgery on long term disability. After leaving the Upper Big Branch (UBB) mine, HUTCHENS worked at Speed where he bossed a longwall and a section crew. HUTCHENS has worked thirty four years in coal mining.

In 2007 or 2008, JASON WHITEHEAD asked HUTCHENS to transfer to the UBB mine. WHITEHEAD explained to HUTCHENS there were problems with the UBB mine getting violations. WHITEHEAD wanted HUTCHENS to go to the UBB mine and straighten it up.

HUTCHENS stated the dayshift on the headgate 22 crew was responsible for setting up a belt head. The crew had knocked a hole in a stopping to get dust off of them. The dust was coming from rock that the crew was mining. DEAN JONES was the dayshift section boss for the headgate 22 crew. HUTCHENS, who was the boss for the evening shift tailgate crew, had to build the stopping back to get air for his crew in the evening. HUTCHENS informed EVERETT HAGER, the mine superintendent, and TERRY MOORE, the mine foreman, that the dayshift headgate 22 crew had knocked stoppings down. HAGER and MOORE acted surprised.

The budgeted amount of coal scheduled to be mined at UBB needed to be reached. If you came in below budget, management would be very upset. Massey Energy Company (Massey) would move people in to bossing positions who could reach the budgeted amount of coal that needed to be mined whether it was done the right way or the wrong way.

The triple duster was set up on headgate 22. The triple duster was able

Investigation on  01/28/2015  at  Charleston, West Virginia, United States (In Person)

File #  318A-PG-78655-302                                    Date drafted  01/30/2015

by  James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

MOI-001382

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Rick Hutchens - Interview  .On  01/28/2015 .Page  2 of 3

to rock dust five breaks. When the UBB mine received a violation for rock
dust accumulations in the belt entry, HUTCHENS would be directed to rock
dust the belts. HUTCHENS would put the trickle duster on a scoop and rock
dust the belts.

Most of the belt would not get rock dusted if HUTCHENS was not told to
rock dust. The UBB mine was shorthanded on outby labor. CHRIS BLANCHARD did
not want to spend the money on extra labor.

The belt had piles of coal in areas where coal had not been cleaned up
for a long period of time. Miners would be assigned to clean it up when a
citations needed to be abated.

HUTCHENS advised that rock dust needs to be reapplied. HUTCHENS added
that you have to stay up to date on rock dusting.

HUTCHENS stated that cribs and big cable bolts should have been used
instead of building a wall of kennedy panels behind the longwall. HUTCHENS
advised that cribs and big cable bolts were not used because of the time
and labor that would have been involved.

HUTCHENS took BRENT RACER with him a couple of times when he had to
travel to the Bandytown shaft to date and initial a board. HUTCHENS was
afraid of being hit with a rock and no one would be able to find him.
HUTCHENS was also afraid of drowning while traveling to the board. HUTCHENS
had to walk through water to get to the board. HUTCHENS was unable to get
to the board on one occasion because the area was flooded. HUTCHENS stated
that when he expressed his concerns with HAGER, HAGER told him to do it or
else.

HUTCHENS stated that DON BLANKENSHIP's approach to mining was to
threaten you with your job and scare you to get what they could out of you.
HUTCHENS advised that BLANKENSHIP has said coal miners are worth $10 an
hour. HUTCHENS believed that BLANKENSHIP would have paid coal miners less
if he could have. BLANKENSHIP tried to hire Mexican workers to work in the
coal mines. BLANKENSHIP had a hotel for the Mexican workers to stay while
they were working in the mines. BLANKENSHIP's plan did not work out.

HUTCHENS advised that building overcast was not a big deal. HUTCHENS has
built them before.

HUTCHENS could not remember the air limits required under S1. HUTCHENS
stated that S1 advised that you should not run coal unless you had the air
required under S1.  HUTCHENS advised that this was not true, you had to run
coal at Massey. S1 - P2 was on paper only.

FD-302a (Rev 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of _Rick Hutchens - Interview_ , On _01/28/2015_ , Page _3 of 3_

HUTCHENS has not heard from anyone but the federal government in regards to the BLANKENSHIP case.

HUTCHENS stated it was ok with management at UBB to run against the rules in order to mine coal. HUTCHENS advised it was an unspoken understanding. If you reached your mining quote for the day, you did good. If you did not meet your mining quota, you were pressured to run coal. If you did not get it done the way they wanted it done, you would be blacklisted. HUTCHENS believed in getting in and out of a mine safely. HUTCHENS felt that for Massey to have been a multi-billion dollar company they had a poor perspective on mining. HUTCHENS added that Massey felt labor costs took away from profits. In reality, labor helps you produce better when it is paid well and treated well.  The management at UBB put production over safety.

HUTCHENS had classes on S1 at Massey, atended safety meetings where the attendees had to sign a sheet of paper documenting that they had attended the meetings, and attended S1 - P2 program classes. HUTCHENS advised that the S1 - P2 program they had on paper was a good thing, however, it was only on paper. HUTCHENS heard at these meetings that BLANKENSHIP really enforced S1 - P2. HUTCHENS does not know what BLANKENSHIP said to people he supervised.

HUTCHENS had never heard of the hazard elimination program. HUTCHENS stated that if he did hear of the program he does not remember.

HUTCHENS stated that when he was eighteen years old and still in high school he got in trouble for trying to pop a hubcap off of a vehicle. HUTCHENS had no suspensions at Massey.

FD-302 (Rev. 5-8-10)

- 1 of 7 -


**OFFICIAL RECORD**

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry     02/06/2015

STANLEY STEWART II (STEWART), telephone number (304) [Redacted - Privacy] was interviewed at the United Mine Worker's Office located in Charleston, West Virginia. STEWART was accompanied by his father, STANLEY STEWART, MINDI STEWART, and CHRIS DONNELLY. United States Attorney Booth Goodwin and Assistant United States Attorney Steve Ruby were present and participated throughout the interview. After being advised of the identities of those in attendance and the nature of the interview, STEWART provided the following information:

STEWART currently attends West Virginia State. STEWART is trying to become a high school science teacher.

STEWART's first day in an underground coal mine was on October 1, 2001, at the Upper Big Branch (UBB) mine. STEWART moved to Logan's Fork when the longwall was moved to the mine. In December of 2008 or January of 2009, STEWART took a fireboss job at Elk Run.

STEWART worked as a general laborer and assisted with belt moves on the midnight shift when he started at UBB. STEWART moved to the longwall in August of 2002. STEWART was a jack setter, shield operator, and a sheer operator on the longwall. STEWART began operating the sheer in the middle of 2003. The longwall moved to Logan's Fork in 2006.

Longwall production reports were due every two hours at Logan's Fork. STEWART worked as a dispatcher at Logan's Fork after he broke his leg riding a four-wheeler. If there were any discrepancies with the production report, someone would call him to discuss them. STEWART spoke with DON BLANKENSHIP a couple of times. BLANKENSHIP really paid attention to longwall production reports.

STEWART received a call from BLANKENSHIP because BLANKENSHIP was curious about a discrepancy in a production report. STEWART had to explain to BLANKENSHIP what was going on with the production report.

---

Investigation on   01/30/2015   at   Charleston, West Virginia, United States (In Person)

File #   318A-PG-78655-302                                        Date drafted   02/02/2015

by   James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of _Interview - Stanley Stewart II_ , On _01/30/2015_ , Page _2 of 7_

STEWART advised that on another occasion the bosses called out and gave inaccurate information about the shield.  STEWART faxed the production report containing the inaccurate information to BLANKENSHIP's office. SANDRA DAVIS called and wanted to speak with CRAIG BOGGS.  BOGGS went over to the phone.  BOGGS was red faced when he returned.  STEWART does not know if BOGGS spoke with DAVIS or BLANKENSHIP.  BOGGS chewed out STEWART because BOGGS had been chewed out.  STEWART stated that in the production report the longwall had over reported by one shield.  STEWART assumed that BLANKENSHIP realized the production report was wrong by looking at prior production report information that would have been included on the same report where BLANKENSHIP noted the discrepancy.  STEWART tried to tell BOGGS that the longwall bosses are under a lot of pressure and a lot of stress because of dangers involved in shield moves.  EDDIE LESTER eventually settled the dispute between STEWART and BOGGS when LESTER explained to BOGGS that he should travel to the longwall and see what STEWART was talking about.  STEWART advised that this was a perfect example of the stress everyone was under at Logan's Fork.  The stress in this case filtered from BOGGS to STEWART.  The issue was corrected in the next production report.

If a production report was late, DAVIS would call to find out why the report was late.  If the production report showed that the longwall was ten minutes late starting up, BLANKENSHIP's office would want to know why the longwall was late.  BOGG's office would also call as well.

A red phone used only to communicate with BLANKENSHIP existed at Elk Run.  The red phone was located on the left in the main mine office.  The red phone sat on a table.  STEWART advised that everybody would leave the area if the phone rang.  STEWART was told by all of management that BLANKENSHIP had to be called "sir" or "Mr. Blankenship."

BOGGS called STEWART three or four times while he was dispatching to find out where the longwall crew was at with the shield move.  STEWART argued with BOGGS that it took time to bolt the face and you could not expect the crew to operate dangerously.  STEWART suggested to BOGGS that he go help the longwall crew bolt the face to see the conditions they were under.  STEWART stated that bolting the face of the longwall was time consuming.

BOGGS stated that moving shields involved an incredible amount of work. The process involved cleaning up a twenty break area so that the area could be bolted.  Bolting involved the use of two bolts machines.  Bolts were put up between the face and the canopy of the shield.  Wire mesh was put up with ten foot cable bolts.  Once the twenty breaks had been bolted, another area of breaks was cleaned up and that area was then bolted.

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - Stanley Stewart II                            , On 01/30/2015 , Page 3 of 7

Inspectors gave miners dust pumps before they traveled underground. The inspectors would travel underground at the end of the shift and pick up the dust pumps.

STEWART advised that the company dust pumps would be kept with the section boss who would stand in the intake air course in fresh air. STEWART knew it was wrong but did not think much of it because he had started in coal mining at Massey.

STEWART stated that his boss, PHILLIP DILLON, was told by LESTER to do the right thing with the company dust pumps. DILLON asked LESTER what was the right thing. LESTER informed DILLON that he knew what was the right thing. Later, DILLON told the crew that they were going to do the right thing. DILLON handed out the dust pumps and made the crew wear the dust pumps. The dust pumps were horribly out of compliance. STEWART advised that the inspectors "went wild." When the inspectors arrived, the mine was somehow able to get air to the longwall. The longwall had extra water sprays and curtains were lined up to get air to the longwall. STEWART described the air as being like a "hurricane." The longwall was also limited to mine twenty shields at a time with the inspectors present. STEWART advised that this incident occurred at the UBB mine around the time when the longwall was getting ready to be moved to Elk Run.

DILLON was on the blacklist after this incident with the dust pumps. STEWART advised that when you get on the blacklist you will be fired if you are caught doing something. A month after the longwall crew arrived at Elk Run, DILLON was gone. Massey was coming down on DILLON hard, so he quit.

STEWART stated that some people do not understand how things were done at Massey. STEWART advised it was hard to leave a job when you are in the situation where you need a job, you are trying to feed your family, you are consistently working, and you are working with friends. In addition, Massey employees had to sign non-compete contracts one time.

STEWART advised that he worked with RICKY REAGAN on the face of the longwall without any air ventilation. Dust from mined sand rock was so thick STEWART could not see REAGAN's cap light. REAGAN was working next to STEWART at the time. STEWART saw a fireball around the drum on the sheer. STEWART shut down the sheer. STEWART started the sheer back up and had another fireball develop around the drum. STEWART decided to inform his boss, HOGAN WILLIAMS. WILLIAMS was twenty breaks away. STEWART told WILLIAMS that the bits were hot. STEWART went back and ran the sheer. On their trip out of the mine, REAGAN stated to STEWART that one of those days they were going to blow the top off of the mountain.

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - Stanley Stewart II                          , On  01/30/2015 , Page  4 of 7

Massey had a "wall of shame" which was a big wall used to place the names of individuals who suffered lost time accidents.  The wall was used to show employees who caused them to lose Raymond points.  Raymond points were earned as part of the Raymond Safety Program.  Raymond points were earned at mines where no lost time accident are recorded.  The points could be exchanged for nice gifts.

To avoid reporting lost time accidents, if you got hurt Massey would list you as unscheduled for a couple of days if that was enough time to allow you to recover.

STEWART injured his arm when the hose on a jack blew up spraying 3,000 psi of emulsion fluid.  STEWART received twenty four stitches.  This accident occurred one day before miner's vacation.  STEWART spent his time on vacation receiving antibiotics through an IV at the doctor's office. The doctor told STEWART not to get dirty.  STEWART took two days off work so that he could have his stitches removed before he returned to work. STEWART's accident had to be counted as a lost time accident.  STEWART had to go through an investigation of the accident, which involved completing a form.  The form required that you listed a reason why you caused yourself to get hurt.  MIKE VAUGHT, the safety director, asked STEWART what he had done to cause the accident.  STEWART explained to VAUGHT that he had not done anything to cause the accident.  VAUGHT told STEWART that he did not want to do it but he explained he had to list what STEWART had done to get hurt. VAUGHT had to counsel STEWART to not repeat what he had done to cause the accident.  VAUGHT listed that if STEWART had used channellocks he would have finished working on the hose earlier and would not have been injured when the hose busted.  STEWART stated that the yield valve has to be changed out on hoses to stop them from rupturing.  STEWART advised that he later learned the yield valve on the jack had not been changed.  BOBBY GOSS was the maintenance boss.

STEWART learned that his name had been put on the wall of shame. STEWART learned that GREG FERNETT said at a safety meeting when discussing STEWART's accident that there was no reason why his injury should have been a lost time accident.  FERNETT stated that STEWART should have put a band-aid on the injury and kept working.  STEWART learned from HARLEY TAYLOR and MIKE FARRELL, who were at the safety meeting, what FERNETT had said.  STEWART stated that TAYLOR and FARRELL are his friends.

The longwall crew did not have to go to the safety meetings that everyone else attended.  The longwall crew needed to be mining coal.

STEWART stated that the longwall at the UBB mine was started up before all of the shields were set.  The longwall had no ventilation at all.  The longwall would be started so that someone could tell BLANKENSHIP that they

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - Stanley Stewart II _____ , On _01/30/2015_ , Page _5_ of _7_

were in the coal. STEWART advised the he told the crew to shut down the
longwall while he was setting the shield on the longwall. STEWART advised
that this type of behavior happened every time they moved shields on the
longwall.

STEWART was told by the longwall coordinator, JOHN HUBBARD, to haul a
sheer with a broken canopy. STEWART advised that he was not forced to haul
the sheer but he was asked. When STEWART refused to operate with the
broken canopy, HUBBARD was upset that he had to call outside to bring in a
new canopy.

On October 22, 2008, STEWART cut off his finger while trying to
determine why the section belt was down near the glory hole at Elk Run.
The belt boss informed STEWART that he thought it was a gob switch that had
switched off the belt. STEWART advised that it could have also been a cut
cable that would have caused the belt to shut off. STEWART climbed up on
the belt to try to pull the cable to see if it had been cut. STEWART
placed his hand on a guard that was supposed to keep you from making
contact with the roller. The guard had a hole that had been worn into it.
STEWART placed his hand in the hole and cut off his finger. STEWART
advised that the guard had been like that for at least a year. First Name
Unknown (FNU) "Stumpy" STUMP almost lost his finger a year before when he
placed his hand in the worn out guard. The guard had never been changed.
The guard was changed after STEWART cut off his finger.

STEWART met his father at the hospital. STEWART was treated at CAMC
General Hospital. STEWART could remember the safety director being at the
hospital. STEWART could not remember the safety director's name. STEWART
advised that it did not seem like the safety director wanted to be there.
The safety director asked STEWART when he would be able to return to work.
STEWART's accident was not considered a lost time accident. STEWART sat in
the office for three weeks until he could return to his regular job
duties. STEWART dispatched and cleaned the bathhouse while he was working
in the office. STEWART advised that as far as he knows his accident was
not reported as a lost time accident. STEWART received a 6% worker's
compensation award as a result of losing his finger. STEWART was sure
BOGGS knew that people worked light duty to avoid reporting lost time
accidents. STEWART added that everybody at Massey knew how the game was
played.

In 2008 or 2009 at an operator's meeting attended by all of Massey's
mine superintendents, BLANKENSHIP had everyone give a mine superintendent a
round of applause. BLANKENSHIP then announced that the superintendent's

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview – Stanley Stewart II _____ , On 01/30/2015 , Page 6 of 7

mine had the most lost time accidents. BLANKENSHIP then removed him as a
mine superintendent. STEWART learned about this incident from DAVE
ASBURY.

STEWART was asked by BOGGS to take a section boss job. STEWART informed
BOGGS that he knew how he treated his bosses and he did not want any part
of it. STEWART explained to BOGGS that he had witnessed BOGGS and the
superintendents constantly chewing out the section bosses. BOGGS asked
STEWART what he would do if he made STEWART a section boss. STEWART
informed BOGGS that he would quit.

STEWART was not interviewed at the mine academy after the explosion.

STEWART stated that it was not acceptable at Massey to put hazards in
fireboss books. STEWART advised that after the longwall was moved to the
UBB mine, Logan's Fork still needed to examine evaluation points behind the
longwall panel. STEWART stated that it had flooded out behind the longwall
panel and it took a while to travel back to the area to set pumps. There
was no air in the area. STEWART advised that while firebossing the area he
noticed methane was increasing .10% daily. Methane levels eventually
reached 3%. STEWART told RON GOBLE, the superintendent, about the levels
of methane he was finding. GOBLE told STEWART to not record the methane
levels in the book. STEWART complied with GOBLE's request. STEWART
reiterated that Massey did not want methane and flooding issues recorded in
the book.

STEWART saw things that had been scratched out and whited out of a
fireboss book. STEWART stated that his report on belts that needed rock
dusting had been scratched out and a new report written by someone else had
been entered. His initials had also been forged. STEWART stated that he
had already signed the book. STEWART advised that if an inspector had
found the conditions, STEWART could have been cited for an inadequate
fireboss report. STEWART advised that DON KELLY was the superintendent at
that time.

STEWART advised that there were too many belts to fireboss. The belts
could not be firebossed in three hours. STEWART added that it was
impossible to walk the belts in the time available. ASBURY told STEWART
that if they got company, meaning inspectors, date up the boards late and
they would take the violation. It was accepted that a fireboss could not
do two fireboss runs and all of the outby work that they should have been
doing. STEWART advised that Massey did not want to spend money on outby
labor. STEWART saw areas that were black and without any rock dust.

STEWART would take rock dust and throw in areas where inspectors would
be traveling. STEWART advised that some inspectors would tell operators

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - Stanley Stewart II _____ , On  01/30/2015 , Page  7 of 7

where they would be traveling.  STEWART stated that the inspectors would
tip off their buddies about where they were traveling.

MOI-001426

FD-302 (Rev. 5-8-10)

- 1 of 6 -



## FEDERAL BUREAU OF INVESTIGATION

Date of entry    02/06/2015

SABRINA DUBA was interviewed at the United States Attorney's Office located in Charleston, West Virginia. DUBA was accompanied by her attorneys, Stephen Miller and Rebecca Brody. United States Attorney Booth Goodwin and Assistant United States Attorney Steve Ruby were present and participated throughout the interview. After being advised of the identities of those in attendance and the nature of the interview, DUBA provided the following information:

DUBA is from Man, West Virginia. DUBA is still working for Alpha Natural Resources (Alpha), in Julian, West Virginia. DUBA is the Vice President of Financial Analyst for the Northern Region.

DUBA was the office manager at the Logan County Public Defender's Office prior to joining Massey Energy (Massey) in November 2000. DUBA was hired as an accountant trainee. DUBA stated that she is a Certified Public Accountant. DUBA worked in Martin County before moving to Massey's Chapmanville office at the end of 2001. DUBA was still an accountant trainee when she began handling special projects for DON BLANKENSHIP. DUBA built the daily profit and loss models that were used to standardize and consolidate Massey's profit and loss statements. DUBA worked for SEAN TESSIE until he left in 2002. DUBA then worked for SCOTT SPEARS. Once SPEARS left, DUBA began reporting to MARK CLEMMONS and ERIC TOLBERT. DUBA advised that TESSIE, who was the manager of subsidiary accounting, was also responsible for handling special projects for BLANKENSHIP. TESSIE passed off this responsibility to DUBA. DUBA was promoted to assistant controller before being named the vice president of subsidiary accounting in 2006. DUBA remained in this role until Massey's merger with Alpha.

DUBA started working on Massey's budgeting process in 2003.

DUBA was provided with an e-mail and attachment she sent on Monday, August 11, 2008, regarding the revised 2009 business plan timetable. DUBA advised that Massey started preparing these plans for the following year in

Investigation on  02/04/2015  at  Charleston, West Virginia, United States (In Person)

File #  318A-PG-78655-302                                      Date drafted  02/05/2015

by  James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

MOI-001410

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of Sabrina Duba - Interview                    , On 02/04/2015 , Page 2 of 6

April.

DUBA advised that the preparation of five year mine plans were prepared
by the chief engineers who would review the mine plans with the group
presidents.

DUBA stated that Hyperion was a computer program used for budgeting.
Prior to 2006, Massey used Excel spreadsheets for budgeting.  Hyperion was
locked to keep individuals from making changes to the budget until an
approved time period.  DUBA advised that the activity involving the entry
of preliminary five year production and release data completed with
Hyperion was referring to the time period when changes could be made to the
budget in Hyperion.

DUBA advised that production at underground mines would include section
footage, tons per feet mined, and other data.

Data would be pulled from Hyperion over to an Excel spreadsheet before
it was provided to BLANKENSHIP.  CLEMMONS reviewed the spreadsheet with
DUBA before sending the report to BLANKENSHIP.

Massey's board of directors did not review the five year production
summary.

JOHN MARCUM was a controller who worked for DUBA.

The resource groups had their own projections for staffing and man hours
worked.  The resource groups would provide their information to DUBA for
input into Hyperion.  The man hours worked was a projected figure and was
not an actual figure.

The mine map review would occur at Massey's regional office.  DUBA
started going to mine map reviews in 2009.  Engineers would discuss timing
and capital needs.  Geology issues would be discussed as well.  Budget
figures and staffing figures were not typically discussed unless the
discussions involved the addition of a new section.

The cost input entered into Hyperion was a driver based model that was
measured on a per yard or per foot basis.  Costs were keyed to projected
tonnage.  DUBA provided as an example that the number of bolts needed per
foot or the costs per bolt used were measured.  Labor costs would include
the head costs, hours worked per day, and the number of people that would
work multiplied by the number of days they would work.  These figures were
provided by the human resource managers or the group presidents.

The final staffing and man hours worked were discussed after production

MOI-001411

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of Sabrina Duba - Interview ,On 02/04/2015 ,Page 3 of 6

reviews occurred.  Sales projections would assist in determining which
mines would be operational.

The summary of final production with detailed worksheets sent to
BLANKENSHIP would include worksheets that listed the clean tons produced
per foot and other information.  Information for above ground operations
such as detailed surface by spread were included in the worksheets.
BLANKENSHIP would tell them to go back and make sure the figures used were
not too aggressive.  DUBA added that on average a mine would run coal 240
days out of the year.

While reviewing the activity involving the allocation of production to
customers using projected prices, DUBA stated that when she first got
involved in the budget process, BLANKENSHIP and CLEMMONS were involved in
this meeting.  This shifted to CLEMMONS and the Richmond sales group being
involved in the meeting.  DUBA would help some once CLEMMONS and the sales
group became involved in the meeting.  This meeting was used to determine
where coal was going to come from to fill orders.

DUBA advised that the group on-site review was an internal review that
did not involve BLANKENSHIP or CLEMMONS.

DUBA stated that she sat in on the preliminary business plan reviews.
The review occurred in Julian and included group presidents and group
controllers.

A full review of profit and loss and a full review of accounting took
place.  There was a discussion of how the profit and loss statements were
built from the bottom up.  Head counts were discussed to include how many
people would be working on the belt or at a load out.  DUBA advised that
the staffing at a mine was standard.  There would be an ancillary head
count of the administrative staffing.  The staffing of production crews
would depend on how the sections were set up.  The face set up was pretty
standard.  DUBA was pretty sure the standardized set ups were written down
on a staffing chart or a sections setup chart.  DUBA added that everyone
was familiar with the setup from experience.

There was no standard chart for the staffing of outby areas and belt
crews. DUBA advised that the head count was different per mine.  DUBA
stated that the larger the mines, the larger the size of the belts.  DUBA
had never heard of a measurement involving a certain number of people per
feet of belt.  DUBA was asked if there were discussions related to the
cutting of labor cost in relation to outby areas and fireboss positions.
DUBA advised that CHRIS ADKINS and CLEMMONS would have discussed this with
group presidents.  DUBA was not aware of the conversations that took place
but she was sure they did have those discussions.  Everyone took notes in

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of Sabrina Duba - Interview                              , On 02/04/2015 , Page 4 of 6

their budget books.  There was a follow up later to make sure the issues
that had been noted were addressed.

DUBA advised that the attendance of BLANKENSHIP at these meetings
changed over time.  In 2006 everyone showed up for the meetings.  In 2009
when the meetings began occurring in Julian, BLANKENSHIP never attended a
budget meeting.  Later, DUBA stated that BLANKENSHIP became less involved
in the budget review over a two to three year span.  Before the meetings
were moved to Julian, BLANKENSHIP attended the profit and loss meetings and
the budget meetings.  BLANKENSHIP was not involved in the final business
plan reviews.  Some resource groups were not involved in these meetings.
DUBA, MARCUM, MIKE SNELLING, and ADKINS were involved in different aspects
of the meetings.  If BLANKENSHIP reviewed the budget plans he reviewed them
on his own.

Three copies of the final plan book were made for BLANKENSHIP.  A copy
of the final plan book was sent to Lauren Land, to BLANKENSHIP's home, and
to BLANKENSHIP's office in Julian.

DUBA would hear from BLANKENSHIP regarding the tweaking of pricing on
uncommitted pricing and other issues.

DUBA reviewed an e-mail she sent to BLANKENSHIP on September 15, 2009,
with an attached first draft of the 2010 consolidated plan summary.  DUBA
stated it was her practice to keep BLANKENSHIP updated on where they were
in the process of preparing the consolidated plan summary.  BLANKENSHIP
would sometimes call or fax questions to DUBA.  BLANKENSHIP was interested
in cash flow and EBIDTA figures.

DUBA advised that any time she had information she felt was good enough
to share with BLANKENSHIP she would pass the information along.  DUBA
usually received two faxes a day from BLANKENSHIP.  DUBA received more
faxes on Mondays.  DUBA communicated often with BLANKENSHIP.

DUBA communicated every day with BLANKENSHIP regarding the consolidated
profit and loss statements.  DUBA described the communication as being
constant.

DUBA went to a few board meetings.  DUBA did not sit in on board
sessions.  DUBA was not involved in committee meetings.  DUBA attended the
board meetings in case she was needed.  DUBA then remembered that she did
set in on one session.  DUBA was not sure why she was invited to sit on on
this one session.

BLANKENSHIP reviewed a high level summary of the budget book.

MOI-001413

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Sabrina Duba - Interview                    , On  02/04/2015 , Page  5 of 6

    JOHN POMA and CLEMMONS prepared a powerpoint summarizing information
from the final consolidated books.  DUBA does not believe the board got a
copy of the final consolidated books.

    BLANKENSHIP would have questions regarding the daily profit and loss
reports he would receive from DUBA.  BLANKENSHIP would want to know why the
feet of coal mined per shift was low.  DUBA would go back to the resource
group presidents and controllers to obtain answers for BLANKENSHIP.

    DUBA reviewed an e-mail and attachment sent to BLANKENSHIP on April 1,
2009, regarding YTD March Violation data.  DUBA advised that there were two
reasons why she was asked to prepare this data.  First, DUBA was over field
accounting which was involved in the payment of violations.  Second, DUBA
also handled reporting projects for BLANKENSHIP.  DUBA knew how BLANKENSHIP
liked to receive data.  DUBA added that she was referring to the visual
presentation of the data.

    DUBA advised that DAVID OWINGS was a corporate controller for Massey.

    DUBA advised that there was a discrepancy in what Massey was showing
internally for the amount owed in citations and what MSHA was reporting.
BLANKENSHIP wanted to make sure that Massey was accruing their fines
correctly.  The process included reconciling data from MSHA with Massey's
information.  DUBA advised her reference point was in dollars.  DUBA stated
that Massey discovered that they were processing payments several times for
the same violation.

    DUBA stated that ELIZABETH CHAMBERLIN had sent an e-mail about DUBA's
controller processing a late payment.  BLANKENSHIP responded by asking
questions about how payments to MSHA were processed and how they were
tracked.  DUBA advised this analysis was a part of Massey's M-3.  This
sparked a new process of how payments were made to MSHA.

    ADKINS informed DUBA that he wanted to focus on the more serious types
of violations like S&S violations and where they were getting them.  ADKINS
was specifically interested in focusing on eliminating serious violations.
BLANKENSHIP instructed DUBA go to the IT department and reprogram the
system to determine which people were responsible for violations and who
was responsible for not eliminating violations.  DUBA believed these
instructions were made via fax.  BLANKENSHIP wanted to know who were the
repeat offenders.

    DUBA knew that the overall assessment amount for citations had gone up
significantly in 2008.  DUBA added that the assessment amount for citations
had gone up year after year.  DUBA could not say why BLANKENSHIP wanted
violations tracked.

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Sabrina Duba - Interview                                      , On  02/04/2015 , Page  6 of 6

    DUBA provided the violation report to BLANKENSHIP that she thought he would want.  DUBA advised that after working for Massey for ten years she knew wanted they wanted.  DUBA worked with IT to come up with a model that was used for the daily violation report.  DUBA may have faxes related to this issue at her office.

    DUBA sent BLANKENSHIP a personal e-mail one and a half years ago letting him know what was going on in her life.  BLANKENSHIP responded.  DUBA advised that BLANKENSHIP took an interest in some people he worked with.  BLANKENSHIP would ask DUBA about her extended family.  DUBA gets some of BLANKENSHIP's tweets forwarded to her by CLEMMONS.  DUBA does not get tweets directly from BLANKENSHIP.  BLANKENSHIP took an interest in DUBA's career advancement at Massey.  Prior to her last e-mail exchange with BLANKENSHIP, DUBA and BLANKENSHIP exchanged a couple of e-mails.  DUBA described the e-mails as communication where they were just checking in with each other.  Since BLANKENSHIP was indicted there had been no effort by BLANKENSHIP or anyone on behalf of BLANKENSHIP to contact DUBA.

    JONATHAN IMES rolled together daily production reports for DUBA.  This was IMES' full time job.  Production reports had to go out by 11 a.m.  The production reports had to be reconciled with other reports.  IMES had an IT background.  IMES is now involved in Alpha's sourcing group.

    All resource controllers reported up through DUBA.  DUBA was also responsible for Massey's payroll department, accounts payable departments, and staff accountants.

    DUBA described her department as the operations accounting focused.  The corporate accounting focus involved pensions and black lung issues.  DUBA described this as more of a "street" focus.

MOI-001415

FD-302 (Rev. 5-8-10)

- 1 of 2 -


OFFICIAL RECORD

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry   03/30/2015

RICK HODGE, residing at [Redacted - Privacy], [Redacted - Privacy] telephone number (681) [Redacted - Privacy] was interviewed at the United States Attorney's Office located in Charleston, West Virginia. Assistant United States Attorney (AUSA) Steve Ruby, AUSA Greg McVey, and AUSA Gabriele Wohl participated in the interview. After being advised of the nature of the interview, HODGE provided the following information:

HODGE had been working for Rhino which was based out of Kentucky. Rhino was sold out to Patriot.

HODGE was tested to have 25% black lung in 1992. HODGE was advised to get out of the mines but he continued to work in the mines. HODGE has been tested since and was told that his black lung had not gotten any worse.

HODGE advised that a mine placed on potential pattern of violation (PPOV) status suffered a huge hit to production.

HODGE stated there was one track duster in the yard at the Upper Big Branch (UBB) mine that did not work. HODGE was able to get it working and the mine was able to run two track dusters at that time.

HODGE remembered red hat crews being assigned to firebosses to clean up the belts at UBB. One of the firebosses was LARRY ADAMS.

HODGE and CHRIS BLANCHARD got into it over BLANCHARD trying to take away the red hat coal miners. HODGE explained to BLANCHARD that the belts could not be maintained with no one there to take care of them. BLANCHARD wanted to put the firebosses on 12 hour shifts so that they could shovel the belts. HODGE told BLANCHARD that the firebosses were older and could not shovel the belts alone. HODGE recollected that BLANCHARD backed off on taking away all of the red hat coal miners. HODGE added that he was not sure if his recollection on this matter was accurate.

---

Investigation on   03/17/2015   at   Charleston, West Virginia, United States (In Person)

File #   318A-PG-78655                                      Date drafted   03/19/2015

by   James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency. It and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

318A-PG-78655

Continuation of FD-302 of  Interview - Rick Hodge                          , On  03/17/2015 , Page  2 of 2

    BLANCHARD would not tell HODGE why they were taking away the red hats coal miners.  HODGE knew that it was being done to reduce costs at the mine.  HODGE stated the reason why he could not get a new track duster was because costs were being reduced at the mine. HODGE guessed that a track duster would cost $150,000 to $160,000.  HODGE remembered getting a quote for a track duster at ALE.

    HODGE agreed that BLANCHARD was willing to accept a certain amount of violations to get the longwall set up.  HODGE added that there was a conscious decision by BLANCHARD to violate the law.  HODGE did not get along with BLANCHARD very well.

MOI-001441

FD-302 (Rev. 5-8-10)

- 1 of 4 -

**FEDERAL BUREAU OF INVESTIGATION**



Date of entry    03/30/2015

GARY YOUNG, [Redacted - Privacy] telephone number (304) [Redacted - Privacy] was interviewed at the United States Attorney's Office, located in Charleston, West Virginia.  Assistant United States Attorney (AUSA) Steve Ruby, AUSA Greg McVey, and AUSA Gabriele Wohl were present and participated during the interview.  After being advised of the identities of those in attendance and the nature of the interview, YOUNG provided the following information:

YOUNG owns Afflicted, a business located in Beckley, West Virginia.

YOUNG worked for Bluestone Coal after leaving the Upper Big Branch (UBB) mine.  YOUNG began working at Bluestone Coal a month or two after the UBB explosion.  YOUNG worked at Bluestone Coal until 2012.  YOUNG then opened Afflicted.  YOUNG advised that he started his own business because he had to get out of mining.

YOUNG stated that a lot of times he would take bags of dust from a pallet sitting outside of the UBB mine and walk into the portal with one bag at at time.  YOUNG would rock dust the mine one bag at a time.  YOUNG added that when this happened there really was not a reason to be there at the mine.

YOUNG never received a tour of the UBB mine.  When YOUNG was put on the rock dust crew, he was assigned to work with DUSTIN Last Name Unknown (LNU), a red hat coal miner, who YOUNG was told knew the mine.  DUSTIN LNU wanted to work somewhere else and he was eventually assigned to another job.  YOUNG advised that there would be times when he would show up for work and not be able to find DUSTIN LNU.

YOUNG stated that the white rock dust machine looked newer than the machine they normally used.  The white rock dust machine sat outside.  YOUNG was told that it was broke down.

---

Investigation on   03/17/2015   at   Charleston, West Virginia, United States (In Person)

File #   318A-PG-78655                                    Date drafted   03/19/2015

by   James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

MOI-001445

FD-302a (Rev. 05-08-10)

318A-PG-78655

Continuation of FD-302 of __Interview - Gary Young__ , On __03/17/2015__ , Page __2 of 4__

YOUNG did not feel like the dusting job was important to GARY MAY.

YOUNG advised that sand helps slow down equipment traveling on a track. YOUNG stated that you are not allowed to run a motor without sand.

YOUNG stated that during one shift he contacted EVERETT LNU, a foreman at UBB, to find out what he should do during a shift. EVERETT LNU informed YOUNG that he was not YOUNG's "fucking" boss and he did not care what YOUNG "fucking" did. YOUNG never met EVERETT LNU.

YOUNG advised that it seemed like every day something at UBB was getting "D ordered" for the lack of dust. YOUNG stated that despite the D orders he would be ordered to go somewhere else to work.

YOUNG stated that he may have spoken with MAY about the entry where he wrote he was being set up to fail.

YOUNG advised that bosses at the UBB mine worried about the longwall and getting coal out of the mine.

YOUNG stated that while taking in supplies on the midnight shift he found two red hats splicing belt by themselves. YOUNG talked about finding the red hats working by themselves for the rest of the day. YOUNG mentioned to his boss that the red hats were working by themselves. YOUNG could not remember his boss's name. YOUNG remembered the red hats getting mad over his comments. YOUNG was told that red hats had to be within hearing distance of an experienced miner.

YOUNG tried to point out concerns that he saw at UBB. YOUNG worked well enough to keep a job at UBB. YOUNG added that his mouth was a problem.

YOUNG felt that dusting was the lowest priority at UBB. YOUNG got along well with MAY. YOUNG wanted to have a good relationship with MAY so that he could point out issues to him.

YOUNG stated that before he was laid off by Massey he had wanted to talk to MAY about safety issues. YOUNG had not been able to work for a few days in a row. MAY never called YOUNG. YOUNG advised that he along with a group of contract laborers were laid off. YOUNG advised that there were three different contract companies working at UBB. YOUNG believes that all of the contractors were laid off. YOUNG stated that someone told him that all of the contractors were laid off. Before he was laid off, YOUNG rock dusted with CLINTON LNU.

YOUNG advised that while working at UBB he told his wife every day that he was not sure if he was going to come back home. YOUNG stated that there

FD-302a (Rev. 05-08-10)

318A-PG-78655

Continuation of FD-302 of  Interview - Gary Young                        , On  03/17/2015 , Page  3 of 4

were daily conversations at the mine that the place was going to blow up.

YOUNG received no training at UBB on how to rock dust.  YOUNG attended the Appalachian Training Group where he learned about rock dusting.  YOUNG added that they also studied the Aracoma mine disaster at the training group.  YOUNG stated that the track at the UBB mine usually looked pretty decent while the rest of the mine was black.

YOUNG advised that it would have taken a lot more than one person to rock dust the UBB mine.

YOUNG stated that an oil car would go into the UBB mine before YOUNG would be allowed to enter the mine.  The oil car was used for longwall maintenance.  YOUNG advised you could not be in the way of the longwall crew entering the mine.

YOUNG does not recall receiving an S-1 manual.  YOUNG has never heard of the hazard elimination program.

YOUNG advised that the thermostat on the duster was broken.  The thermostat had to be rigged for it to work.  The duster would be turned off when it started smoking or if the duster began to smell.

YOUNG has seen DON BLANKENSHIP before.  YOUNG has never spoken to BLANKENSHIP.

YOUNG advised that he had heard that 70% of the employees at the UBB mine had signed union cards at one time.  YOUNG heard that BLANKENSHIP traveled into the mine and told the miners that he would shut the mine down if they joined the union.

YOUNG advised that he would make statements that if there was a union at the UBB mine the stuff he witnessed would not be happening.  YOUNG had started at a union mine.  YOUNG stated that at Massey Energy you would be sent home if you said something about what was happening at the mine.  YOUNG added that at a union mine a safety guy could shut the mine down over safety concerns.

YOUNG's father, who is also named GARY, works for the UMWA.

YOUNG has never testified in anything over than a divorce proceeding.

YOUNG did not have any suspensions or disciplinary issues while working at UBB.

DONNIE SNYDER may have worked at UBB before YOUNG began working there.  SNYDER owns a barber shop at the mall.  YOUNG talks to SNYDER from time to

MOI-001447

FD-302a (Rev. 05-08-10)

318A-PG-78655

Continuation of FD-302 of  Interview - Gary Young                                        , On  03/17/2015 , Page  4 of 4

time.

YOUNG stated that he was arrested for being drunk in a hotel.  YOUNG had a scuffle with the police.  YOUNG advised that the police officer called him and told him that the charges against him would be dropped if he agreed to drop charges against the police officer.  The charges were eventually dropped.

MOI-001448

FD-302 (Rev. 5-8-10)

- 1 of 3 -

**FEDERAL BUREAU OF INVESTIGATION**



Date of entry _____ 03/30/2015 _____

MIKE SMITH, home telephone number (304) [Redacted - Privacy] cellular telephone number (304) [Redacted - Privacy] was interviewed at the United States Attorney's Office located in Charleston, West Virginia. United States Attorney Booth Goodwin, Assistant United States Attorney (AUSA) Steve Ruby, AUSA Greg McVey, and AUSA Gabriele Wohl participated in the interview. After being advised of the identities of those in attendance and the nature of the interview, SMITH provided the following information:

SMITH spent a total of 7 years at Massey Energy. SMITH started with Massey Energy in 2008. SMITH was laid off in August of 2014. After the Upper Big Branch (UBB) explosion, SMITH was sent to Ellis Eagle for two weeks. SMITH was then transferred to the Slip Ridge mine where he worked the #1 section. SMITH has worked at Cliff Natural Resources' Pinnacle Creek Mine since August of 2014. SMITH is a general inside laborer at the Pinnacle Creek Mine. The Pinnacle Creek Mine is 33 square miles in size. It has been in existence since 1969. Metallurgical coal is mined from the Pinnacle Creek Mine. Pinnacle Creek Mine is currently mining four section but plans on adding two more sections.

SMITH spent two weeks laying track at the Kingston mine before he was transferred to the UBB mine. SMITH started at the UBB mine as a contract laborer employed by David Stanley. On January 11th or the 17th of 2008, SMITH was hired by Massey Energy.

SMITH stated that the incident where he experienced 5% methane and was told that they did not need to worry about the methane until it reached the power center was the reason why he got his bossing papers. SMITH wanted to know what was the right thing to do so that he would not have to rely on others. SMITH firebossed for one and a half years at the Slip Ridge mine. SMITH is a fill-in fireboss for Cliff Natural Resources.

SMITH was told many times at the UBB mine that if you do not do something that is asked of you they will find someone that will.

---

Investigation on _03/19/2015_ at _Charleston, West Virginia, United States (In Person)_

File # _318A-PG-78655_                                                                Date drafted _03/19/2015_

by _James F. Lafferty II_

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev 05-08-10)

318A-PG-78655

Continuation of FD-302 of  Interview - Mike Smith _____ , On  03/19/2015 , Page  2 of 3

SMITH did not know that the UBB mine had been placed on potential
pattern of violation (PPOV) status while he was working there.

SMITH stated that when he began shoveling belts at UBB, eight contract
employees would line up near a heater.  Firebosses would perform their
examination and then pick from the contractors to shovel belts.  The
firebosses would also perform an exam at the end of the shift.  This lasted
for a couple of months.  CHARLIES SEMANSKE would usually pick SMITH, ALVIS
ALDERMANN, and MICHAEL BUNCH.  ALDERMANN currently works at Cliff Natural
Resources.  BUNCH is out of work on worker's compensation.  SEMANSKE was
responsible for the belt located next to the track.  SEMANSKE would drop
off the contractors and let them shovel for a couple of breaks.  SEMANSKE
would then catch up with them on the motor.  SMITH was then assigned to
work on LARRY ADAMS' crew for a month shoveling belt.  SMITH was then
assigned to run a scoop on the #1 section.  SMITH then suffered an injury
and was off of work for two months.  When SMITH returned he was assigned to
run a bolt machine.  JOHN COOPER and BRIAN COLLINS taught SMITH how to roof
bolt.  SMITH roof bolted the rest of the time he worked at the UBB mine.

SMITH stated that the UBB mine had so many air reversals that his crew
would continue to mine while the air was reversed.  If someone was working
to fix the air reversal, the miners would be brought outside.  SMITH
assumed that the opening of air lock doors caused the air reversals.

SMITH had heard that the guy responsible for rock dusting got caught
sleeping and was fired.  SMITH remembered that the individual was a black
male.

SMITH does not remember the incident where a stopping was knocked out
when it was hit by a scoop.

SMITH advised that it was a joke at UBB that the inspectors had the air
violations written before they went underground.

SMITH advised that you could tell by the temperature if you had air at
the UBB mine.  SMITH advised that once you had traveled through the door at
the 85 break the mine was warmer.  The mine was the warmest near the Glory
Hole which was located near break 128.

SMITH stated that when he was available for light duty Massey Energy did
not have anything available for him to work.

SMITH has never met DON BLANKENSHIP.  SMITH has never spoken to
BLANKENSHIP.

FD-302a (Rev. 05-08-10)

318A-PG-78655

Continuation of FD-302 of  Interview - Mike Smith _____ , On  03/19/2015 , Page  3 of 3

    SMITH has never been arrested.  SMITH has received some traffic violations.

    SMITH was suspended at Slip Ridge for running over a mine cable with a roof bolter.  SMITH was suspended for three days.

MOI-001444

**Report of Interview**

**U.S. Department of Labor**
**Office of Inspector General**
**Office of Investigations**



Page  1  of  1

OIG Form 103 (OI – 1/98)

| Investigation on: | 3/26/2015 | At: | Charleston, WV | File: | 31-0862-0001 PC |

By: Special Agent Jeffrey Carter                                   Date Prepared: 3/31/2015

On March 26, 2015, Mike Vaught was interviewed at the law offices of Shuman, McCusky and Slicer. Vaught was accompanied by his attorney John McCusky. Also present and participating in the interview were United States Attorney Booth Goodwin, Assistant United States Attorney (AUSA) Steve Ruby, AUSA Greg McVey and Special Agent (SA) Jeffrey Carter, U.S. Department of Labor, Office of Inspector General (OIG). After being advised the nature of the interview Vaught provided the following information:

Vaught reviewed an email string dated December 18, 2007, from himself to Paul Thompson. Vaught advised this was during the time UBB was on potential pattern of violations (PPOV).

Vaught reviewed an email dated January 2, 2008, subject: Attention Rick Hodge with attachment: PPOV memo. Vaught advised that there was a window of time to achieve reduction. If a mine is on Pattern of Violations (POV) and a significant and substantial (S&S) violation is issued it would become an order causing a shutdown and the withdrawal of miners until corrected. Vaught advised that the areas in the email would not have been tracked if the mine was not on PPOV.

Vaught stated that UBB used 3rd party contractors at the mine to assist in various areas like shoveling belts and assisting outby belt crews on day shift. Larry Adams managed the contractors that shoveled the belts.

Vaught stated that there was a discussion about using a trickle duster to have dust on the sections.

After UBB was no longer on PPOV the heightened alert was relaxed and it was not as intense.

Vaught believed that the reference in the memo to weekend warriors referred to clean up work and maintenance that would get you S&S violations, basically safety compliance to avoid being issued an S&S.

Vaught stated that he had additional duties while on PPOV status. He recorded inspection days and the S&S rate per inspection days. Vaught was also responsible for training to explain PPOV and POV, what it meant and the circumstances of being placed on PPOV and POV. Vaught believed that UBB could have operated if it achieved POV status.

Vaught stated that he disagreed with mine management on certain things.

Greg Raines replaced Vaught as safety director. Vaught worked with Raines for two weeks and then went to mine rescue fulltime.

Vaught currently works for Jason Whitehead, Vice President of Operations, Alpha Natural Resources, Coal River East.

FD-302 (Rev. 5-8-10)                    - 1 of 2 -



## FEDERAL BUREAU OF INVESTIGATION

Date of entry    03/31/2015

　　　SANDRA DAVIS was interviewed at the United States Attorney's Office located in Charleston, West Virginia.  DAVIS was accompanied by her attorney, Tim Dipiero.  Assistant United States Attorney (AUSA) Steve Ruby, AUSA Greg McVey, and AUSA Gabriele Wohl participated in the interview. After being advised of the nature of the interview, DAVIS provided the following information:

　　DAVIS stated that her employment status has not changed.

　　DAVIS advised that approximately twelve people worked in Massey Energy's Belfry, Kentucky office.

　　A security guard would take packages DAVIS prepared for DON BLANKENSHIP to his home.  JAMES HONAKER, BLANKENSHIP's groundskeeper at the Sprigg, West Virginia residence, would pick up documents and take them to BLANKENSHIP as well.

　　If BLANKENSHIP was out of town, DAVIS would send production reports to him.  DAVIS advised that if BLANKENSHIP was staying at a hotel she would fax a summary page to BLANKENSHIP at the hotel.

　　DAVIS would put copies of documents containing BLANKENSHIP's handwritten notes and documents containing BLANKENSHIP's dictated notes in packets so that BLANKENSHIP could review what had gone out.  DAVIS added that if a response came back to BLANKENSHIP, DAVIS would give the responses to him.

　　DAVIS did not work in Massey Energy's safety department.

　　DAVIS reviewed PCC-DOJ-01742376.  DAVIS recognized some of the handwriting as being BLANKENSHIP's handwriting.  DAVIS does not believe the other handwriting belonged to her.  DAVIS stated that the other handwriting may belong to HEATHER POPE.

---

Investigation on   03/31/2015   at   Charleston, West Virginia, United States (In Person)

File #   318A-PG-78655-302                                    Date drafted   03/31/2015

by   James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

MOI-001449

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - Sandra Davis                    , On  03/31/2015 , Page  2 of 2

DAVIS reviewed PCC-DOJ-01079892 and Aracoma008441.  DAVIS confirmed that these documents were dictated by BLANKENSHIP and sent out by her.

DAVIS reviewed PCC-DOJ-01730971, PCC-DOJ-03114300, and PCC-DOJ-03114301.  DAVIS confirmed that the handwriting on the documents belonged to her and BLANKENSHIP.

DAVIS advised that it was her opinion that BLANKENSHIP paid attention to detail.  DAVIS believed that BLANKENSHIP wanted to receive reports.  BLANKENSHIP had DAVIS call mine managers or group presidents to let them know that reports were late.  DAVIS never had BLANKENSHIP tell her that there were reports he did not want to receive.  DAVIS stated that BLANKENSHIP was active in managing Massey Energy.  DAVIS stated that BLANKENSHIP was concerned about daily operations and all facets of operations at Massey Energy.  DAVIS stated that BLANKENSHIP looked at everything Massey got.

DAVIS would call to make sure documents from BLANKENSHIP were put into the hands of the person who was supposed to receive the documents.  If DAVIS was told that documents sent to BLANKENSHIP were urgent, DAVIS would make sure the documents got into BLANKENSHIP's hands quickly.

DAVIS has never been in a mine.

DAVIS has not communicated with BLANKENSHIP since the indictment.  DAVIS stated that someone from a law firm contacted her and informed her that she was not invited to BLANKENSHIP's Christmas party because it would not be appropriate.

MOI-001450

FD-302 (Rev. 5-8-10)

- 1 of 3 -



FEDERAL BUREAU OF INVESTIGATION

Date of entry    03/31/2015

JOHN RYAN PATRICK,                    Redacted - Privacy                   , residing at
                          Redacted - Privacy                          , telephone number
(304)  Redacted - Privacy , was interviewed at the United States Attorney's Office
located in Charleston, West Virginia.  PATRICK was accompanied by his
attorney John Carr.  United States Attorney Booth Goodwin, Assistant United
States Attorney (AUSA) Steve Ruby, AUSA Greg McVey, and AUSA Gabriele Wohl
participated in the interview.  After being advised of the nature of the
interview, PATRICK provided the following information:

PATRICK is now working for himself doing computer repairs.

PATRICK advised that he did not keep the individual citations in a
folder.

PATRICK advised that originally he created the violation spreadsheets to
track costs for DAVID OWINGS, who was a controller for Massey Energy.
PATRICK added that the purpose of the spreadsheet was to track costs from
monetary penalties that went along with receiving citations.

PATRICK stated that ELIZABETH CHAMBERLIN or SABRINA DUBA would have
instructed him to send the daily violation reports to DON BLANKENSHIP.
PATRICK advised that DUBA was an accountant who was interested in the costs
related to safety violations.

CHAMBERLIN informed PATRICK of the Tuesday telephone calls made by CHRIS
ADKINS.  PATRICK stated that according to what he learned from CHAMBERLIN,
BLANKENSHIP took part in those Tuesday calls.

PATRICK advised that he sent out the daily violation reports every day
excluding holidays.

PATRICK stated that the access database used in 2009 was set up by him.

---

Investigation on  03/25/2015  at  Charleston, West Virginia, United States (In Person)

File #  31SA-PG-78655-302                                    Date drafted  03/30/2015

by  James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

MOI-001451

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - John Ryan Patrick                    , On  03/25/2015 , Page  2 of 3

PATRICK reviewed an e-mail and attached daily violation report that he sent on July 1, 2009.  PATRICK stated that the formatting, sorting, and presentation of the spreadsheet was devised by DUBA.  PATRICK advised that based on the way the spreadsheet was designed it was created to track costs associated with violations.

PATRICK has never been inside an operational mine.  PATRICK has never gone inside an underground Massey Energy mine.

PATRICK reviewed an e-mail and attached daily violation report that he sent on August 18, 2009.  PATRICK stated that the daily list was added after someone told him to include the daily list for ADKINS' benefit. PATRICK could not remember what each letter listed under the action type stood for.  PATRICK added that it was somehow related to the specific type of violation that had been cited.  PATRICK stated that the instruction to add the specific type of violation would probably have come from CHAMBERLIN.

PATRICK stated that the table listing the top ten worst mines in the company for safety citations was added to the report after having a conversation with DONNA MOORE or ADKINS.  MOORE informed PATRICK that ADKINS liked graphs.

PATRICK did not have an understanding at the time of what D orders were.  PATRICK assumed they were serious citations if he was being asked to identify them in the report.

PATRICK reviewed an e-mail and attached daily violation report that he sent on January 8, 2010.  PATRICK does not remember the penalties related to D orders attracting his attention when he created the daily violation report.

PATRICK reviewed an e-mail and attached daily violation report that he sent on January 4, 2010.  PATRICK advised that this was the last daily violation report sent for the year 2009.

PATRICK stated that the original version of the daily list showed the violation number.  A description of the violation was included on the daily list shortly thereafter.

In 2010, Massey Energy held a banquet for the mine rescue teams. PATRICK was the photographer and took pictures at the event.  BLANKENSHIP attended the banquet.

PATRICK advised that in the office BLANKENSHIP was called Mr. BLANKENSHIP or the Chairman.

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - John Ryan Patrick                    , On  03/25/2015 , Page  3 of 3

PATRICK stated that he attended the safety development group (SDG) meeting where the "kill the spider" program was introduced by ADKINS. PATRICK could not remember if there was a significant number of violations at Massey Energy after the "kill the spider" program was implemented.

PATRICK does not remember taking violations off of the daily list. GARY FRAMPTON, BILL ROSS, and safety directors would ask PATRICK for charts related to specific mines. PATRICK does not have a specific memory of anyone at the UBB mine asking for charts to be prepared. PATRICK would have supplied charts requested by e-mail. PATRICK added that the exception would have been FRAMPTON who worked on the same floor as PATRICK. PATRICK was never asked to check to ensure that the numbers he had been supplying were too high or too low.

PATRICK remembered learning that the number of violations Massey Energy was reporting was low. PATRICK realized he might not be getting all of the citations when VERNON ADAMS asked for copies of violations she knew had been written but had not been supplied to her. Massey Energy received a file from MSHA that had all of the citations that the company had received. PATRICK was able to enter open data from MSHA and compare MSHA's data with Massey Energy's data. This comparison happened in early 2010.

PATRICK did not have any disciplinary issues at Massey Energy. PATRICK has never been arrested or had any legal troubles. PATRICK was involved in a civil lawsuit with the University of Phoenix. PATRICK advised that the University of Phoenix tried to collect full tuition on a course PATRICK withdrew from early. PATRICK won the lawsuit. PATRICK never had to testify in the civil lawsuit. PATRICK did not get deposed. PATRICK has never filed for bankruptcy. PATRICK advised that he worked from home while employed at Massey Energy when he could not get to work because of weather. PATRICK would access Massey Energy's database remotely from his home.

PATRICK never talked to BLANKENSHIP about the daily violation reports. PATRICK does not know if BLANKENSHIP looked at the daily violation reports.

CHAMBERLIN, FRAMPTON, and KEITH HAINER all had different roles in monitoring violations. HAINER was responsible for electric and maintenance violations.

PATRICK does not know if citations were removed from the daily violation reports after Massey Energy had challenged the citations.

FD-302 (Rev. 5-8-10)

- 1 of 2 -

 **Official Record**

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    04/13/2015

KAREN HANRETTY was interviewed telephonically. Assistant United States Attorney Steve Ruby participated in the interview. After having been advised of the nature of the interview, HANRETTY provided the following information:

HANRETTY owns a consulting firm. HANRETTY works with the American Beverage Association and clients from the energy industry.

HANRETTY has not had any contact with DON BLANKENSHIP since the last time she spoke with the federal government.  HANRETTY has not been contacted by BLANKENSHIP's attorneys.

HANRETTY advised that BLANKENSHIP had a twitter account. BLANKENSHIP would approve any tweet that was posted to his twitter account.  HANRETTY may have retweeted posts that went out under BLANKENSHIP's twitter account. HANRETTY does not think that she has posted anything else related to Massey Energy or BLANKENSHIP.

HANRETTY has never been arrested. HANRETTY has never testified in a court proceeding. HANRETTY has never given a deposition.

HANRETTY advised that BLANKENSHIP would call the president of Qorvis and ask that HANRETTY be fired. HANRETTY did not worry about BLANKENSHIP's threats. HANRETTY added that working for BLANKENSHIP for two years was a miracle since BLANKENSHIP fired other public relation firms sooner. HANRETTY advised that Fleishman may have quit working for BLANKENSHIP. HANRETTY stated that Fleishman quit after a memorandum they prepared describing how BLANKENSHIP was perceived was not liked one bit by BLANKENSHIP.

HANRETTY does not believe that BLANKENSHIP liked being challenged. HANRETTY believed that in the end BLANKENSHIP respected her for challenging him.

| Investigation on | 04/01/2015 | at | Liberty, West Virginia, United States (Phone) |
|---|---|---|---|

File #   318A-PG-78655-302                              Date drafted   04/03/2015

by   James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

MOI-001460

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - Karen Hanretty                              , On  04/01/2015 , Page  2 of 2

HANRETTY believed that the corporate cabin was wired and video recorded.
HANRETTY stayed at the cabin a couple of times for work purposes. HANRETTY
stated she suspected she was being recorded at the cabin because it was in
BLANKENSHIP's nature. The cabin was surrounded by German Shepard dogs that
were trained in German. There was a security guard that was always driving
around the property. HANRETTY advised that someone who used to work for
BLANKENSHIP who subsequently worked for Senator JOE MANCHIN confirmed that
BLANKENSHIP had the cabin wired. HANRETTY believed the employee worked in
security.

HANRETTY advised that after the explosion BLANKENSHIP had her sit in the
front of the vehicle they were riding in while BLANKENSHIP sat in the back.
BLANKENSHIP explained to HANRETTY that no one would shoot her. HANRETTY
added that BLANKENSHIP was afraid that if he sat in front of the vehicle
someone would try to shoot him.

BLANKENSHIP told the story to HANRETTY multiple times about how someone
tried to shoot him. BLANKENSHIP kept the television with the bullet hole in
the trailer where he worked.

BLANKENSHIP had HANRETTY and a colleague watch excerpts from a movie
based on a union brawl that involved BLANKENSHIP in some capacity. HANRETTY
does not know the point behind BLANKENSHIP wanting HANRETTY to watch the
excerpts. HANRETTY speculated that BLANKENSHIP wanted her to understand how
much of a victim he was. HANRETTY added that BLANKENSHIP thought everyone
was getting rich off of him.

FD-302 (Rev. 5-8-10)

- 1 of 2 -

 **OFFICIAL RECORD**

# FEDERAL BUREAU OF INVESTIGATION

Date of entry    04/13/2015

DENNIS SIMS, residing at ┌─────────────────────┐
│      **Redacted - Privacy**      │
└─────────────────────┘
Redacted - Privacy telephone number (304) Redacted - Privacy was interviewed telephonically.
Assistant United States Attorney (AUSA) Steve Ruby participated in the
interview. After having advised of the nature of the interview, SIMS
provided the following information:

SIMS stated that the Upper Big Branch (UBB) mine had been open for six
months to a year before he began working at the mine. SIMS advised that for
twelve years he bolted outby the longwall section. Outby bolting consisted
of using eight feet to fourteen feet long cables, placing belt hangers, and
placing mesh in areas that were bolted. SIMS advised that the section crews
did not have time to do the outby bolting. The section would be responsible
for regular bolting on the section. The outby bolting crew would do extra.
This was eventually changed at UBB where the section crews would be
responsible for all bolting. When the outby bolting stopped, SIMS began
working for DEAN JONES' section crew.

SIMS advised that air lock doors were put up to regulate air from the
longwall to JONES' section. SIMS does not know if that change was approved.

SIMS stated that it was common to have to do outby air work to increase
ventilation on the section.

SIMS advised that stoppings were knocked down, stoppings were built, air
lock doors were installed, and walls were built over an overcast in an
attempt to get air to JONES' crew. MARVIIN PERDUE was the boss at that
time.

SIMS stated that when an inspector was on the section, the section would
run one buggy and would tighten the curtains. When these things were done a
minimum amount of air could be achieved. Once the inspector left, the
section would go back to running two buggies.

Investigation on   04/01/2015   at   Liberty, West Virginia, United States (Phone)

File #   318A-PG-78655-302                                Date drafted   04/03/2015

by   James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - Dennis Sims                          , On  04/01/2015  , Page  2 of 2

    SIMS advised that a high level of safety violations were going to be accepted to run the most coal. SIMS added that what was done at UBB was whatever it took to run the most coal.

    SIMS stated that in the fall of 2007 or 2008 when the longwall was located at Elk Run, evaluation points at UBB could not be reached because of a roof fall. Miners were building cribs when a federal inspector made the miners stop working. SIMS understood that the only way UBB would be able to mine the north end of the mine again would be for a new fan and airway to be constructed. SIMS thought that plans had been made to go to Hazy to put in a new portal. SIMS stated that BENNY PRESSLEY was his boss at that time. WENDELL WILLS was the superintendent at the time.

    SIMS advised that CHRIS ADKINS was at UBB when the mine was shut down for not having enough air.

    SIMS met DON BLANKENSHIP years ago. BLANKENSHIP was at the UBB mine every day when he was trying to get the union out of the mine. After he was able to get the union out of the mine, SIMS did not see BLANKENSHIP at the mine.

MOI-001465

FD-302 (Rev 5-8-10)                              - 1 of 4 -                          

### FEDERAL BUREAU OF INVESTIGATION

Date of entry ___04/08/2015___

CHRIS BLANCHARD was interviewed at the United States Attorney's Office, located in Charleston, West Virginia. BLANCHARD was accompanied by his attorneys, Alan Strasser and Dan Lerman. United States Attorney Booth Goodwin, Assistant United States Attorney (AUSA) Steve Ruby, AUSA Greg McVey, and AUSA Gabriele Wohl participated in the interview. After having been advised of the nature of the interview, BLANCHARD provided the following:

BLANCHARD is working for CHRIS CLINE. BLANCHARD spends most of his time in Canada. BLANCHARD was spending 90% of his time in Canada but now travels to Canada every other week.

BLANCHARD has not had any contact with DON BLANKENSHIP since BLANKENSHIP was indicted. BLANCHARD has not been contacted by BLANKENSHIP's attorneys. No one from CLINE's operations has spoken to BLANCHARD about the substance of the case against BLANKENSHIP.

BLANCHARD advised that it may have been the last week of May of 2009 when he had the conversation with BLANKENSHIP about advance notice.

BLANCHARD stated that from the Marfork office it was five miles to the Ellis Portal at the Upper Big Branch (UBB) mine. On April 5, 2010, GREG CLAY called BLANCHARD's assistant who transferred the call to BLANCHARD. BLANCHARD learned from CLAY that the fan had shut down, belt communication had been lost, and no one could be reached in the UBB mine. BLANCHARD called CHRIS ADKINS and informed him of what he had learned and that he did not know what was going on. BLANCHARD called JASON WHITEHEAD who was at the Slip Ridge mine and told him to meet him at the Ellis Portal.

When BLANCHARD arrived at the Ellis Portal he could not communicate with anyone in the mine. BLANCHARD called JONAH BOWLES by cell phone and told him to report the incident to the state and federal agencies and explain

Investigation on ___04/02/2015___ at  Charleston, West Virginia, United States (In Person)

File # 318A-PG-78655-302                              Date drafted  04/03/2015

by  James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - Chris Blanchard  , On  04/02/2015  , Page  2  of  4

the issues they were having at the UBB mine that were known at the time.
BLANCHARD called ADKINS and told him to send rescue crews to the UBB mine.

Approximately six or seven individuals entered the mine including
BLANCHARD. WHITEHEAD, EVERETT HAGER, and WAYNE PERSINGER were among the
group that entered the mine. BLANCHARD wanted to get in the mine to find
out what they had before the mine was placed on an order. While traveling
in the mine, BLANCHARD saw a light coming toward the group. At that point
they encountered TIM BLAKE who told them that there were men down and BLAKE
had been unable to get them all. BLAKE informed the group that there had
been an explosion. BLANCHARD and WHITEHEAD grabbed some self contained,
self rescuers (SCSRs) and moved on into the mine. BLANCHARD and WHITEHEAD
found the mantrip. The detectors were still going off. BLANCHARD advised
that JAMES WOODS and STEVE HARRAH were still breathing. The carbon monoxide
was 150 parts per million. BLANCHARD and WHITEHEAD dragged WOODS and HARRAH
into fresh air a couple of breaks from the mantrip. BLANCHARD and WHITEHEAD
provided SCSRs to WOODS and HARRAH. WOODS and HARRAH were loaded onto a
mantrip once a mantrip reached their location. The mantrip was sent back
outside. BLANCHARD and WHITEHEAD continued into the mine to see if there
were individuals in the refuge shelters.

BLANCHARD advised that once they reached the mother drive a hand held
carbon monoxide detector was going off. A victim was there but they did not
see him. BLANCHARD called outside at the 50 break and spoke with ADKINS.
BLANCHARD and WHITEHEAD then moved on to the seals to see if they had blown
out. The seals were not blown out. BLANCHARD and WHITEHEAD then got within
a break and a half of the tail drive. While in a cross cut they measured
300 parts per million of carbon monoxide. BLANCHARD and WHITEHEAD put on
SCSRs and retreated back. BLANCHARD and WHITEHEAD traveled to the 21 cross
over up to the headgate. BLANCHARD and WHITEHEAD continued wearing their
SCSRs. They found three victims in the headgate entry. BLANCHARD advised
that the victims had suffered blunt force injuries. BLANCHARD stated that
the carbon monoxide levels were off the chart.

BLANCHARD and WHITEHEAD made it to the refuge shelters. The shelters had
not been deployed. BLANCHARD and WHITEHEAD then traveled to the belt entry
at the longwall. BLANCHARD tried to look down the longwall but did not see
any lights. BLANCHARD added that it was black as could be. BLANCHARD stated
that a couple of victims were close to where he was located but he did not
see anything at the time. BLANCHARD and WHITEHEAD then retreated to the 78
break.

At the 78 break BLANCHARD and WHITEHEAD met a mine rescue team. MIKE
HICKS was with the mine rescue team. BLANCHARD and WHITEHEAD traveled
outside and exited the mine at two or three that night. BLANCHARD and

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of _Interview - Chris Blanchard_ , On _04/02/2015_ , Page _3 of 4_

WHITEHEAD did a debrief after exiting the mine. The governor and KEVIN STRICKLIN were there for the debrief. BLANCHARD and WHITEHEAD told everybody where they had traveled in the mine. BLANCHARD advised that the last thing that was on his mind while he was in the mine was tampering with evidence.

BLANCHARD advised that he heard the story after the fact about the sniffer on the longwall shearer. BLANCHARD does not believe that tampering with the sniffer on the longwall shearer had happened for fifteen years. BLANCHARD advised that he did not take a bag off of the sniffer or unbridge the sniffer while in the mine.

BLANCHARD stated that he informed the governor for a week that there was no chance there was anyone alive in the mine. BLANCHARD added that it was not factual at that time. BLANCHARD stated that certain families could have been told the first night that their loved ones were not alive, however, the decision was made not to inform the families for a week.   DEAN JONES and two other individuals were not found immediately.

BLANCHARD did not know who was unaccounted for when he entered the UBB mine.

BLANCHARD does not believe that BLANKENSHIP went into the UBB mine while BLANCHARD was president of Performance Coal Company. BLANKENSHIP was at the mine after the explosion. BLANKENSHIP traveled to the Marfork office a few times a year. BLANKENSHIP traveled to the Marfork office by helicopter.

BLANCHARD stated there were no disciplinary actions related to the UBB mine failing the hazard elimination report card. There was no contact with BLANKENSHIP about the UBB mine failing the report card.

BLANCHARD saw the S1 manual. BLANCHARD had a copy of the S1 manual. BLANCHARD advised that it was fair to say that a lot of violations at the UBB mine were in violation of the S1 manual. BLANCHARD stated that the S1 manual was not enforced how it should have been at the UBB mine. BLANCHARD believed that the S1 manual was out of date. BLANCHARD stated that it was accurate that as Massey Energy grew the company began to experience a lot of turnover. Training of the S1 program was not kept up. BLANCHARD advised that the S1 manual was less enforced as the years passed. BLANCHARD was never disciplined for violating the S1 manual.

BLANCHARD was chastised by ADKINS because all of the air lock doors at the UBB mine were supposed to be electronic doors. BLANCHARD advised that the UBB mine had received some violations for doors not having an air tight seal. Air lock doors were ordered in January of 2009. BLANCHARD showed ADKINS the purchase orders.

MOI-001456

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of _Interview – Chris Blanchard_ , On _04/02/2015_ , Page _4 of 4_

    BLANCHARD felt that he needed to repeat the companies wishes to his employees as his own ideas. BLANCHARD did not want to undercut the company. BLANCHARD added that regardless of where the direction was coming from it appeared that the direction was coming from him. BLANCHARD told WHITEHEAD and his superintendents to get in the mine, be the good guys, blame him when they had to, and let him be the bad guy.

    BLANCHARD advised that he never knowingly gave a direct order where he told someone to do something that caused a law to be broken.

MOI-001457

FD-302 (Rev. 5-8-10)

- 1 of 2 -



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    04/07/2015

CHARLIE JUSTICE was interviewed at the United States Attorney's Office located in Charleston, West Virginia. United States Attorney Booth Goodwin, Assistant United States Attorney (AUSA) Steve Ruby, AUSA Greg McVey, and AUSA Gabriele Wohl participated in the interview. After having been advised of the nature of the interview, JUSTICE provided the following information:

JUSTICE stated that advance notice was a common every day occurrence. JUSTICE never went underground at the Upper Big Branch (UBB) mine. JUSTICE worked at the UBB mine for one and a half years.

JUSTICE advised that he used to work for a company that sold mining equipment and performed appraisals. JUSTICE did appraisals for the company. JUSTICE has testified in a court room while working for the company.

JUSTICE dispatched for the Coon Cedar mine and the Ellis Eagle mine after working at the UBB mine.

JUSTICE has never spoken to DON BLANKENSHIP. JUSTICE has never met BLANKENSHIP.

JUSTICE was told that in the past around the time the longwall was at UBB there was a red phone at UBB that went straight to BLANKENSHIP.

JUSTICE stated that he heard the comment at Massey Energy that $1,100 a minute was lost when the belts were down.

JUSTICE had the impression that if individuals at UBB were going to be doing something illegal he would receive a phone call from inside the mine asking if inspectors were on-site.

JUSTICE learned from miners that there was not enough air while the last two panels were being mined at UBB.

Investigation on   04/03/2015   at   Charleston, West Virginia, United States (In Person)

File #   318A-PG-78655-302                                     Date drafted   04/03/2015

by   James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - Charlie Justice _____ , On  04/03/2015 , Page  2 of 2

    JUSTICE stated that GARY MAY and ANDY COALSON would find out which
section an inspector was on and would use a regulator to send air to the
section.  JUSTICE could not remember who told him MAY or COALSON were going
to switch the regulator.  JUSTICE advised that he did see MAY or COALSON go
underground to switch the regulator.  MAY or COALSON would call out and ask
where an inspector was going once they were underground. JUSTICE does not
know where the regulator was located.

    JUSTICE advised that in addition to the mine managers he has named in
the past, HOMER WALLACE and RICK HODGE would also direct JUSTICE to give
advance notice.

    Advance notice was given discreetly. Advance notice was never provided
in front of inspectors. Management and miners knew that advance notice was
not "kosher." After the UBB explosion JUSTICE became more concerned about
the consequences of giving advance notice. JUSTICE reiterated that he knew
all along that giving advance notice was not "kosher."

    JUSTICE stated that the longwall crew refused to do inventory at UBB.
Eventually, JUSTICE was asked to come in on his day off and do the longwall
inventory. JUSTICE refused to do it.

    JUSTICE could never figure out why he made less money at the UBB mine
than he did at other Massey Energy operations when working at the UBB mine
was horric, busy, and a nightmare.

    JUSTICE was not fully aware it was unlawful to give advance notice but
he was fully aware that it was not right. JUSTICE knew for sure that it was
unlawful when mine blitzes began taking place and people were fined for
giving advance notice. JUSTICE did not realize he could be fined for giving
advance notice until after the UBB explosion.

FD-302 (Rev. 5-8-10)

- 1 of 2 -



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry     04/13/2015

    STANLEY STEWART was interviewed at the United States Attorney's Office,
located in Charleston, West Virginia. STEWART was accompanied by his wife,
Mindi Stewart. United States Attorney Booth Goodwin, Assistant United
States Attorney (AUSA) Steve Ruby, AUSA Greg McVey, and AUSA Gabriele Wohl
participated in the interview. After having been advised of the nature of
the interview, STEWART provided the following information:

    STEWART advised that DON BLANKENSHIP came down to the longwall at the
Upper Big Branch (UBB) mine in the late 1990s or early 2000s to watch the
longwall perform. STEWART stated there was a sticker prepared that said the
longwall produced $400 a minute.

    STEWART stated that a couple of months before the explosion the bosses
were told to start writing people up and fire them. STEWART advised that
RICK HUTCHENS was aware of this.

    STEWART advised that company officials at the UBB mine turned off fans
in 2008 before employees had exited the mine.

    STEWART stated that he started to write down notes to describe his
experiences at the UBB mine because he thought something was going to
happen at the mine. STEWART told his wife that she would be able to sue
Massey Energy if something happened to him. STEWART's wife suggested that
he write things down because she would need to know the different mining
terms and what had happened at the mine.

    STEWART advised that during the operational cycle of the working section
at the UBB mine the section was not rock dusted properly. The section would
try to rock dust at the end of the shift. STEWART stated that rock dusting
during the operational cycle was hard to do with all of the equipment they
had on the section. STEWART stated that sometimes they would rock dust
properly. STEWART added that sometimes they would dust over top of loose
coal.

---

Investigation on   04/08/2015   at   Charleston, West Virginia, United States (In Person)

File #   318A-PG-78655-302                                    Date drafted   04/13/2015

by   James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency. It and its contents are not
to be distributed outside your agency

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - Stanley Stewart                                          , On  04/08/2015 , Page  2 of 2

    STEWART stated that he is interested in making coal mines safe for all
miners. STEWART advised that he felt like miner's safety was best
represented in union coal mines than in Massey Energy coal mines.

MOI-001467

FD-302 (Rev. 5-8-10)                          - 1 of 2 -



## FEDERAL BUREAU OF INVESTIGATION

Date of entry     04/13/2015

RICK HODGE was interviewed at the United States Attorney's Office
located in Charleston, West Virginia. United States Attorney Booth Goodwin,
Assistant United States Attorney (AUSA) Steve Ruby, AUSA Greg McVey, and
AUSA Gabriele Wohl participated in the interview. After having been advised
of the nature of the interview, HODGE provided the following information:

HODGE stated that he was at Rhino when it went through two potential
pattern of violation (PPOV) situations. HODGE advised that this occurred
after his time at the Upper Big Branch (UBB) mine. The UBB mine was the
first mine where HODGE had to deal with a PPOV. HODGE added that it was not
a common occurrence.

HODGE believed that CHRIS BLANCHARD wanted to be a little DON
BLANKENSHIP.

HODGE advised that when he left the UBB mine, it was one of the better
mines where he had worked.

HODGE stated that it was a Massey Energy's policy that the track could
not be more than two breaks from a section. HODGE advised that while he was
at UBB, both tracks were more than 1,000 feet from the sections. BLANCHARD
would not send track to HODGE to allow the track to be built. HODGE told
JAMES HANCOCK who was going to be attending a Massey Energy meeting in
Charleston about the issues he was experiencing with the two tracks. HODGE
told HANCOCK to tell CHRIS ADKINS that he was going to idle the UBB mine
until he got the track he needed. HANCOCK told HODGE that he could not do
that. HODGE told HANCOCK that he was going to idle the mine. Later that
night, HODGE received a telephone call and was told that the track would be
at the UBB mine the next morning.

HODGE was working at the Marshfork Eagle mine in 2005.

HODGE advised that he very seldom had conversations with BLANKENSHIP.

Investigation on  04/09/2015  at  Charleston, West Virginia, United States (In Person)

File #  318A-PG-78655-302                              Date drafted  04/13/2015

by  James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of ___Interview - Rick Hodge_____ , On _04/09/2016_ , Page _2 of 2_

HODGE had more dealing with BLANCHARD. BLANKENSHIP did not travel to the
UBB mine while HODGE was working at the mine. HODGE may have received a
telephone call from BLANKENSHIP or ADKINS while he was at the UBB mine.

In approximately 2006 HODGE's ex-wife had him arrested on a couple of
occasions. HODGE was arrested for violating a domestic violence protection
(DVP) order and as a result of having a fight with his wife. HODGE advised
that the DVP order required that he be 500 feet from his home. HODGE stated
that his wife was also arrested when he was arrested for violating the DVP
order. The charges related to the two arrests were dismissed. HODGE added
that after he made bail nothing ever happened with them.

HODGE has never had to testify in court. HODGE has given a deposition
related to a fatality at the Rhino Eagle mine in June of 2011. DENNIS
HATFIELD would be able to say who represented HODGE in the Rhino Eagle
deposition. HODGE was involved in 110 investigations where he had to give
depositions.

In 2011 MSHA pursued a 110 investigation against HODGE for an order that
was written for a section at the Rhino Eastern Eagle #1 mine. BILLY BANE,
an MSHA inspector, wanted information that HODGE would not give him. HODGE
advised that the 110 investigation was dropped and he was never fined or
heard anything else about it.

HODGE suspended himself in the late 1990s over a D-1 citation that he
received. HODGE had to suspend the section boss and did not feel right
suspending the section boss without suspending himself. Massey Energy gave
HODGE three days off with pay.

HODGE reviewed PCC-DOJ-01303255 and PCC-DOJ-01303256. HODGE advised that
he has seen the e-mail. HODGE advised that he understood a weekend warrior
crew to be a crew that ran coal on the weekend. HODGE was not sure what was
being referred to in the memorandum. HODGE stated that third party
assistance would be referring to assistance from contractors. HODGE advised
that public relations would be referring to MSHA and state inspectors.

MOI-001463

FD-302 (Rev. 5-8-10)

- 1 of 2 -



FEDERAL BUREAU OF INVESTIGATION

Date of entry    04/30/2015

CLIFTON STOVER, <span>Redacted - Privacy</span> was interviewed at the United States Attorney's Office, located in Charleston, West Virginia. Assistant United States Attorney (AUSA) Steve Ruby, AUSA Greg McVey, and AUSA Gabriele Wohl participated in the interview. After being advised of the identities of those in attendance and the nature of the interview, STOVER provided the following information:

STOVER is working for Superior Contracting at Alpha Natural Resources' Castle Transfer mine as a general laborer.

STOVER worked at Parker Peerless for a year after leaving the Upper Big Branch (UBB) mine. STOVER was working at Horse Creek last June of 2014 when he left work to have his fourth hernia surgery.

STOVER advised that the longwall crew at the UBB mine got the motor first. The longwall crew also had the first pick of which motor they wanted.

STOVER advised it took two individuals to run the motor and duster. One individual would run the motor while the other individual would operate the duster.

GARY MAY moved STOVER to the dust crew. GARY YOUNG did not know much about rock dusting.

STOVER stated that the rock dust stored in the silo would have moisture that was present in the rock dust when it was delivered to the UBB mine by the vendor.

STOVER advised that if the UBB mine had spent a little more on doors or built overcasts a majority of the air problems at UBB would have been solved.

Investigation on   04/23/2015   at  Charleston, West Virginia, United States (In Person)

File #  318A-PG-78655-302                                    Date drafted  04/30/2015

by  James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

MOI-001479

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview of Clifton Stover                          , On  04/23/2015 , Page  2 of 2

    STOVER stated that when he was at UBB if a crew was behind on a belt move, he would get pulled off of rock dusting to assist with the belt move.

    STOVER advised that there was not much you could do with rock dusting by hand.  STOVER added that the area would look like salt and pepper after you finished hand dusting an area.  STOVER stated that hand dusting was a waste of time.  STOVER advised that management knew the UBB mine was not properly rock dusted.

    STOVER has never been in trouble with the law.  STOVER has never testified.  STOVER was never disciplined or suspended when he worked for Massey Energy.  STOVER has not had any trouble while employed with Superior Contracting.  STOVER started with Superior Contracting on March 19, 2015.  STOVER believes that Superior Contracting has some type of contract with Alpha Natural Resources.

MOI-001480

FD-302 (Rev. 5-8-10)                          - 1 of 1 -



## FEDERAL BUREAU OF INVESTIGATION

Date of entry    04/30/2015

    RICK HODGE contacted the interviewing Agent by telephone.  HODGE
thereafter providing the following information:

    HODGE stated that approximately thirty minutes ago, he was cutting grass
when two individuals approached him and informed him that they worked for
DON BLANKENSHIP.  The two individuals asked HODGE if he would be willing to
take a look at some violations that had occurred when he worked at the
Upper Big Branch (UBB) mine.  HODGE added that the individuals wanted him
to go through all of the paperwork they had.  HODGE advised that the
individuals asked him if he was represented.  HODGE informed the
individuals that he was not represented and he did not feel like he needed
representation.

    HODGE advised that he informed the individuals that he did not think he
was allowed to talk to them.  HODGE stated that the individuals left after
he declined to talk to them.

    HODGE was informed by the interviewing Agent that he could talk to the
individuals but he did not have to talk to them if he did not want to.
HODGE was also informed by the interviewing Agent that he had not done
anything wrong by declining to talk to the individuals.  HODGE was reminded
that he had previously been instructed that he could talk to individuals
representing BLANKENSHIP if he chose to, but that he did not have to talk
to them.

---

Investigation on  04/29/2015  at  Charleston, West Virginia, United States (Phone)

File #  318A-PG-78655-302                                Date drafted  04/30/2015

by  James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

MOI-001473

FD-302 (Rev. 5-8-10)

- 1 of 5 -

**FEDERAL BUREAU OF INVESTIGATION**



Date of entry      05/05/2015

BILL ROSS, date of birth (DOB) [Redacted - Privacy], home telephone number (304) [Redacted - Privacy] cellular telephone number (304) [Redacted - Privacy] was interviewed at his residence, **Redacted - Privacy**
After being advised of the nature of the interview, ROSS provided the following information:

ROSS was the Chief of Technical Services at Massey Energy. ROSS remained with Alpha Natural Resources (Alpha) on a contract basis until December of 2014.

ROSS advised that he was hired by Massey Energy to teach foremen about ventilation, respirable dust, and other safe workplace measures. ROSS was able to travel wherever he wanted to travel. ROSS would also be told by CHRIS ADKINS to visit certain mines where they thought his assistance was needed.

ROSS also spoke to ELIZABETH CHAMBERLIN. CHAMBERLIN wanted ROSS to look at the number of violations Massey Energy was receiving for ventilation issues and non-compliance with respirable dust.

ROSS stated that the results Massey Energy was getting for respirable dust could not be obtained if the cassettes used to measure the dust were hanging in his living room. ROSS also found that the foremen that were handling the sampling for Massey Energy were not certified to assemble, calibrate, and maintain the equipment used to measure respirable dust. ROSS added that if you were not a certified technician you were not allowed to touch the equipment. ROSS advised that he was able to better the programs at some Massey Energy mines. ROSS suggested to CHAMBERLIN that they call MSHA and request that they assist with the issues Massey Energy was experiencing. ROSS was concerned that the internal results for respirable dust testing were lower than the results obtained when MSHA tested for respirable dust. In addition, while Massey Energy tested as having a small amount of respirable dust at its mines, these same mines

---

Investigation on   05/04/2015   at   Beaver, West Virginia, United States (In Person)

File #   318A-PG-78655-302                                            Date drafted   05/05/2015

by   James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

MOI-001474

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - Bill Ross ,On 05/04/2015 ,Page 2 of 5

were receiving repeat violations for ventilation issues and improper rock dusting.

ROSS advised that in or around June of 2009, ADKINS contacted him and instructed him to sit down with STEPHANIE OJEDA and STAN SUBOLESKI to discuss some of the issues he had observed while visiting Massey Energy mines. ROSS stated that his meeting with OJEDA and SUBOLESKI lasted all day. ROSS took all of his notes with him to the meeting. At the end of the meeting, OJEDA took all of ROSS' notes.

ROSS stated that some of the issues he discussed with OJEDA and SUBOLESKI included the following:

- ROSS discussed the massive number of violations Massey Energy received and the fact that Massey Energy was being cited for the same type of violations repeatedly.

- The violations Massey Energy received were for low air conditions, failure to clean up areas, roof control violations, accumulations of coal, and improper examinations.

- ROSS stressed that if Massey Energy would comply with four or five of these types of mine laws, most other things would fall into place.

- ROSS expressed his opinion that Massey Energy's foremen lacked experience and a basic knowledge of the law.

- ROSS raised the issue that most of Massey Energy's engineers were not certified miners.

- ROSS advised that 75% of Massey Energy's foremen did not know how to ventilate a working face.

- ROSS explained that he had learned from foremen that they did not have enough manpower.

- ROSS stated that sections acted like it was a crime when he would shut down a section so that he could teach them how to follow the law.

ROSS advised that the Marfork Resource Group had a large engineering staff. HEATH LILLY was a certified miner who could be in the mine without supervision. The engineering staff also included two engineers and two technicians. These four individuals were not allowed to be alone in a mine.

ROSS stated that when he traveled Massey Energy's mines he found ventilation and runway spillage being two big issues. ROSS would shut down

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - Bill Ross                         , On  05/04/2015 , Page  3 of 5

the section when he found these issues and would teach the section how to
do things the right way.  ROSS got the impression that Massey Energy
employees did not feel like they had enough people to address
non-production issues and that they had to run coal.  ROSS tried to tell
them that they had to be right when running coal.

ROSS stated that after he met with OJEDA and SUBOLESKI he received a
telephone call from ADKINS.  ADKINS informed him that DON BLANKENSHIP
wanted to meet him for lunch at Lauren Land.  ROSS advised that the meeting
occurred in June of 2009.  ROSS met with BLANKENSHIP at 10 a.m.  BLANKENSHIP
took notes during his meeting with ROSS.  ROSS advised that after his
meeting with BLANKENSHIP they had lunch together.  ROSS advised that he was
so nervous he could not eat.

At their meeting, ROSS asked BLANKENSHIP what he should call him.
BLANKENSHIP informed ROSS that he could call him, Don.  ROSS informed
BLANKENSHIP that he may want to fire him after he heard what he had to
say.  ROSS went on to inform BLANKENSHIP that if he wanted to fire him that
would be okay because what he was going to tell him was the truth.

ROSS stated that he discussed with BLANKENSHIP all of the issues he
addressed with OJEDA and SUBOLESKI.  ROSS informed BLANKENSHIP that Massey
Energy's mines were receiving violations in the hundreds.  BLANKENSHIP
informed ROSS that Massey Energy was going to have to look at that and get
a handle on it.  ROSS stated to BLANKENSHIP that sooner or later if mines
continued to get repeat violations, MSHA would get harsher on enforcement
of their mines and would eventually start shutting down mines.

ROSS informed BLANKENSHIP that Massey Energy's foremen did not know what
to do with respirable dust.  BLANKENSHIP was informed that non-certified
people were handling the dust pumps.  ROSS stated that mine management was
supposed to know who at their mines were certified dust technicians.
BLANKENSHIP was told that ROSS had learned that miners had been told to put
their cassettes in the intake air course in order to obtain favorable dust
readings.  ROSS informed BLANKENSHIP that Massey Energy needed to find out
who had provided those instructions.  ROSS stated to BLANKENSHIP that
Massey Energy could not exist like that.  ROSS advised that if Massey
Energy continued to do things in a flagrant manner, MSHA was going to stay
on them and become more vigilant.

ROSS spoke to BLANKENSHIP about labor issues at Massey Energy.
BLANKENSHIP informed ROSS that the number of employees needed for each mine
was determined by cost per ton and cost per man hour.  ROSS told
BLANKENSHIP that he (BLANKENSHIP) knew the numbers and why there could only
be a certain number of people.  ROSS informed BLANKENSHIP that employees

MOI-001476

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of __Interview - Bill Ross__ , On __05/04/2015__ , Page __4 of 5__

hired to address issues such as cleaning up sections, building stoppings, and hanging curtains would pay for their own salaries.

BLANKENSHIP asked ROSS what he thought he should do.  ROSS informed BLANKENSHIP that management needed to hear from him that he wanted them to comply with the law.  ROSS suggested that he send out an e-mail or a letter addressing his concerns about compliance with mine laws and send it to the group presidents with the instruction to share the correspondence with their employees.  ROSS advised BLANKENSHIP that the message should be that he wanted Massey Energy's mines to comply with the law regardless of any other message they received.  ROSS told BLANKENSHIP his employees were not going to take it to heart if they heard it from anyone else.  BLANKENSHIP informed ROSS that he would make a video.  BLANKENSHIP instructed ROSS to write a five minute script and to have the script on his desk in four to five days.

ROSS had the script ready the following Monday.  ROSS stated he believed he e-mailed the script to BLANKENSHIP.  BLANKENSHIP responded to ROSS stating that he would need to send the script to Massey Energy's attorneys first.  ROSS advised that a video was never made by BLANKENSHIP.

ROSS advised that at the conclusion of his conversation with BLANKENSHIP, ROSS informed BLANKENSHIP that he had told him the truth and that the issues they discussed needed to be addressed.  ROSS also told BLANKENSHIP that Massey Energy could not afford to have a disaster and that a disaster would wipe out the company.  BLANKENSHIP shook his head in response to ROSS' comments.

ROSS stated that BLANKENSHIP never challenged him over the issues he raised during their meeting.

On August 5, 2009, at a meeting with all of Massey Energy's salaried people at Scott High School attended by ADKINS, CHAMBERLIN and two other senior officials, ADKINS stated to those in attendance that he wanted to take the pressure off of the foremen.  ADKINS stated that they should comply with all regulations at the mine site and that they did not have to worry anymore.  After ADKINS made the announcement, those in attendance applauded the announcement.  ROSS advised that violations were discussed at this meeting as well.

ROSS stated that after ADKINS' speech eight out of the ten mines he visited were doing well.  By the first of the year, things at these mines were in bad shape again.

ROSS stated that he discussed the issues he found at Massey Energy with BLANKENSHIP, CHAMBERLIN, OJEDA, and SUBOLESKI.  ROSS discussed to a minor

MOI-001477

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - Bill Ross _____ , On 05/04/2015 , Page 5 of 5

degree some of the issues with ADKINS.

MOI-001478

FD-302 (Rev. 5-8-10)

- 1 of 6 -



## FEDERAL BUREAU OF INVESTIGATION

Date of entry     05/26/2015

    BILL ROSS was interviewed at the United States Attorney's Office, located in Charleston, West Virginia. United States Attorney Booth Goodwin, Assistant United States Attorney (AUSA) Steve Ruby, AUSA Greg McVey, ASUA Gabriele Wohl, and Paralegal Debbie Watson were present and participated in the interview. After being advised of the identities of those in attendance and the nature of the interview, ROSS provided the following information:

    ROSS stated that he could not recall if he kept a copy of the handwritten notes he provided to STEPHANIE OJEDA. ROSS believed that the reference to notes made on page 1 of OJEDA's memorandum was referring to ROSS' handwritten notes. ROSS met OJEDA and STAN SUBOLESKI somewhere in Charleston, West Virginia. ROSS was stationed at an office in Marfork, West Virginia.

    ROSS advised that he was released from work at 2 p.m. on the day he retired from MSHA. On the way home ROSS received a telephone call from CHRIS ADKINS. ADKINS wanted to know if ROSS was interested in working for Massey Energy (Massey). ROSS told ADKINS that he would have to think about the offer.

    In April of 2008, ROSS had dinner with ADKINS. ADKINS made ROSS an offer at dinner and ROSS accepted. ADKINS informed ROSS that he wanted him to teach Massey members how to ventilate working faces in a mine and how to make examinations. ROSS added that teaching how to ventilate working faces would include instruction on how to draft ventilation plans that MSHA would accept. ADKINS promised ROSS that he would receive a classroom, materials, and an overhead projector to aid with his teaching. ROSS advised that he did not get everything that he had been promised. ROSS eventually got a projector but it was old and did not work very well. ROSS taught courses on ventilation, respirable dust, and record keeping. ROSS did receive a

---

Investigation on  05/12/2015  at  Charleston, West Virginia, United States (In Person)

File #  318A-PG-78635-302                                Date drafted  05/13/2015

by  James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

MOI-001485

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - Bill Ross                        , On  05/12/2015  , Page  2 of 6

classroom that he could use to teach.  ROSS also traveled to other mine
sites and conducted training.

ROSS was asked to travel to different mines to assist with cases where
mines were experiencing low ventilation.  ROSS would travel into the mines
on occasion.  ROSS would meet with the superintendents and foremen at these
mines.  ROSS would help resolve the ventilation problems they were
experiencing and would teach them how to ventilate a mine.

ELIZABETH CHAMBERLIN would send violations to ROSS for him to review.
ROSS would review the violations Massey received.  ROSS advised that he was
sent the number of citations Massey had received and the cost assessed to
those citations.  ROSS stated that the daily violation reports that he
received were broken out by companies, individual mines, and the types of
violations.  ROSS would get sent to locations where his help was needed.

ROSS put together the training he provided.  When ROSS provided
training, men from different mines would attend the same training.  Each
mine would have a different ventilation plan.  ROSS would try to teach to
all plans during these sessions and would differentiate between plans while
he taught his class.  Class would last between one to two hours in length.
Some mine presidents would sit in on ROSS' training.  ROSS had limited time
available to train the mine foremen.  ROSS would have the mine president
select what areas he would cover during the training session.

ROSS stated that he tried to teach his class to all of the foremen at
Marfork first.  ROSS expanded to different mines from there.

ROSS advised that he wrote the statement mentioned in the report
prepared by OJEDA.

ROSS stated that as he viewed the daily violation reports he wondered
what people were doing about all of the citations Massey was receiving.
ROSS told people to follow the law and everything would fall into place.
ROSS advised that it did not appear miners had the ability to do what they
wanted to do.  ROSS asked the miners about their concerns so that he could
share their thoughts with management.  ROSS explained that he had concerns
about what he was hearing and he reported his concerns to ADKINS and
CHAMBERLIN.  ROSS asked ADKINS to explain why Massey was getting so many
citations for dust and the mine ventilation plan.  ROSS told ADKINS that
Massey mined so fast that due to the limited number of people working on
Massey's production crews, the crews were not able to keep up with
ventilation and dusting.

OJEDA had been hired by Massey shortly after ROSS was hired.  ROSS first
met OJEDA at a dinner hosted by Massey.  ROSS advised the next time he met



FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - Bill Ross  , On  05/12/2015  , Page  3 of 6

OJEDA was at his meeting with her and SUBOLESKI. ROSS was not sure why he
was sent to OJEDA and SUBOLESKI. ROSS had never met SUBOLESKI prior to
their meeting.

ROSS had approximately twenty pages of handwritten notes when he met
with OJEDA and SUBOLESKI. SUBOLESKI seemed surprised by ROSS' statements.
OJEDA took notes during the meeting. OJEDA appeared to be unaware of the
issues ROSS addressed.

ROSS was asked about specific quotes from Massey employees that he
mentioned to OJEDA and SUBOLESKI. ROSS advised that he did not write down
who made the comments he noted. ROSS added that he would not write down
the names of the individuals who told him things in confidence. ROSS did
notify the safety directors of the mines he was visiting what was said
during his visits to the mine sites.

ROSS instructed foremen that if they were cheating on dust samples
someone would find out about their cheating. ROSS asked foremen who
attended the mine foremen training if anyone had cheated on dust samples.
ROSS stated that two or three foremen would raise their hands when he asked
the question. ROSS told the safety directors and CHAMBERLIN about the
fraudulent dust samples. ROSS informed the safety directors at the mines
he visited that Massey's mine foremen could not answer questions on
respirable dust sampling.

After his meeting with SUBOLESKI, ROSS received a telephone call from
ADKINS. ADKINS instructed ROSS to go tell DON BLANKENSHIP what he thought
about Massey and MSHA's view of Massey.

ROSS stated that when he met with BLANKENSHIP he had boxes of documents
that he took with him. When ROSS tried to pull documents out of the boxes,
BLANKENSHIP informed ROSS that he did not need to pull out any documents.
BLANKENSHIP then stated to ROSS that he was pretty well aware of what it
was costing the company for Massey to mine coal. BLANKENSHIP also informed
ROSS that Massey needed to reduce violation for sure.

ROSS reviewed the memorandum prepared by OJEDA describing ROSS' comments
during his meeting with OJEDA and SUBOLESKI. ROSS stated that it was an
accurate write-up of what he told her. ROSS advised that OJEDA had done a
good job of reflecting his thoughts.

ROSS advised that he saw the last half minute of a video that featured
BLANKENSHIP and ADKINS in October of 2010. ROSS was not sure what was in
the video.

ROSS stated that when mines get repeat violations with no improvement,

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of Interview - Bill Ross , On 05/12/2015 , Page 4 of 6

enforcement actions by MSHA increases at those mines.

ROSS told BLANKENSHIP that either Massey's foremen did not know their ventilation plans, they were not certified to handle dust pumps, or the foremen did not know how to ventilate.

ROSS explained to BLANKENSHIP that Massey miners think the way they are doing things was the right way for BLANKENSHIP. BLANKENSHIP informed ROSS that he did not know why they were getting this idea. BLANKENSHIP stated that he did not know that was the way Massey miners thought.

ROSS advised that when a mine receives low weight gain samples over and over again it was a red flag. ROSS stated that there was something wrong somewhere when a mine with high production received low weight gain samples.

ROSS stated that the face of Massey's sections were lacking manpower. ROSS explained that Massey had a lot of super section mines. Each super section had one foreman, two shuttle cars, two bolters, and two continuous miner operators. This created a situation where the foreman had more jobs to do than he could handle. ROSS added that witnessing what took place on one of Massey's super sections was hard to describe. ROSS stated that when inspectors showed up a lot of violations would be found. The conditions causing the violations could not be addressed with the small crews working the super sections.

ROSS advised that other mines he visited while he worked for MSHA, such as Eastern and Pinnacle, used ten to thirteen people on a super section.

ROSS advised that Massey got a little more serious about the clean up process on a working face after ROSS had worked for Massey for a while. A couple of mines got a clean up man. ROSS does not know if this happened at other Massey mines.

ROSS stated that when he raised his concerns about the lack of manpower at Massey's mines, BLANKENSHIP did not see things ROSS' way. ROSS stated that BLANKENSHIP quoted him what it would cost to put another man on the working face. ROSS told BLANKENSHIP the additional man would pay for himself. BLANKENSHIP informed ROSS that there was more to it than he understood.

ROSS advised that when a Massey mine was close to being put on a potential patter of violation (PPOV) status, Massey would put the resources in place to have clean inspections. Six months later, the mine would be on the verge of being placed on PPOV status again. ROSS stated that this proved resources would keep you from getting these violations.

MOI-001488

FD-302a (Rev 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - Bill Ross                          , On  05/12/2015 , Page  5 of 6

ROSS advised that irregardless of the cost involved with adding more men to a working section, a company had to follow the law.

MSHA used a one to ten rating system at their Mt. Hope office. ROSS stated that the idea of the rating system was that if a mine had high violations and a high number of accidents, bad things were soon to follow. ROSS saw the list of mines generated using the rating system while he worked at the Mt. Hope office. ROSS advised that Massey as a whole was on the list. Massey's mines were not separated out to be rated.

The foremen who attended ROSS' training did not get extra pay for attending his class. Massey's foremen were salary employees. ROSS advised that he saw foremen fall asleep during his class, especially when the foremen had just worked the third shift.

ROSS advised that in general he learned from superintendents that they did not have enough people for outby work. ROSS learned that employees from production sections were assigned to assist when problems occurred. ROSS learned that in general there were no assigned outby people with the exception of a roaming electrician.

ROSS stated that the Upper Big Branch (UBB) mine needed a lot of dust in outby areas. ROSS stated that when he visited the UBB mine there was a lot of construction work for the next longwall panel. In addition, miner units were operational at the same time. ROSS thought that if Massey could get in compliance at the UBB mine, MSHA would be impressed and believe that Massey was capable of operating a large mine. ROSS advised that he knew the UBB mine was getting a lot of violations. ROSS stated it was another reason why he wanted UBB to be the model mine.

ROSS advised that BLANKENSHIP informed him that Massey's S1, P2 program was better than what MSHA had in the law. ROSS informed BLANKENSHIP that Massey's P2 policy for installing curtains allowed dust from the continuous miner to go over roof bolters and the shuttle car operators. ROSS explained that if anything failed in Massey's ventilation plan, including having too much air, the scrubbers Massey used would not ventilate properly.

ROSS stated that Massey had hired a professor from West Virginia University to teach Massey employees who were going to become mine foremen. ROSS observed that the professor taught out of a state law book. The employees taking the class did not have a copy of the law book. ROSS asked CHRIS BLANCHARD if he had any state law books. BLANCHARD advised that he would try to get some, which he was eventually able to do.

MOI-001489

FD-302a (Rev. 05-08-10)

ROSS was hired by Alpha Natural Resources (Alpha) as a contractor. ROSS worked as a contractor for Alpha from March of 2014 through December of 2014. ROSS taught classes for Alpha prior to being brought on as a contractor.

ROSS reviewed a memo he sent to OJEDA in January of 2010. ROSS stated that Massey developed a "kill the spider" policy. ROSS thought that if Massey would eliminate the hazards at their mines it would take care of the problems they were having. Massey also tried to get in place a hazard elimination/reduction plan that fell into place with the "kill the spider" program. ROSS advised that his memorandum to OJEDA from January of 2010 was accurate with his impressions and did not need to be changed.

ROSS stated that after the meeting in August of 2010 where he thought things had changed at Massey, a foreman asked ROSS if he really believed what he had heard at the meeting. ROSS informed the foreman that he did believe what he had heard. The foreman told ROSS that nothing had changed.

ROSS did not look at the daily violation reports every day.

ROSS stated that Massey had given him a title, no authority, and no people to supervise. ROSS added that he could teach and that was it. ROSS was concerned with what he had learned from people who worked at Massey.

ROSS served in the military from 1965 to 1968. In November of 1969 ROSS joined the Westmoreland Coal Company. ROSS worked for the company until 1975. ROSS started as a red hat coal miner. ROSS learned how to operate equipment and the fundamentals of coal mining. ROSS became a foreman in 1973. ROSS received a lateral transfer to a fireboss position in 1973. ROSS remained in that position until he left the company in April of 1975. ROSS then joined the Sterling Smokeless Coal Company, located in Whitley, West Virginia, where he worked until August of 1975. ROSS worked for Snyder Electric Company for a short period of time. ROSS joined MSHA in October of 1975 and remained with them until April of 2008. ROSS has been an inspector at MSHA's Mt. Hope and Sophia offices. ROSS became a ventilation specialist at some point in time while employed at MSHA. ROSS visited all of MSHA's offices. ROSS became a ventilation supervisor in 2004. MSHA's Mt. Hope office was responsible for 230 to 240 mines. ROSS had confidence in what he knew. ROSS was the only supervisor at the Mt. Hope office who did not have a professional engineering degree. ROSS stated that he had a lot of experience. ROSS left MSHA in April of 2008 and joined Massey. ROSS remained employed with Massey/Alpha until 2013.

ROSS provided a document that will be retained as evidence.

MOI-001490

FD-302 (Rev. 5-8-10)

- 1 of 4 -

 OFFICIAL RECORD

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    05/21/2015

TOMMY ESTEP, telephone number (304) [Redacted - Privacy] was interviewed at the United States Attorney's Office, located in Charleston, West Virginia. Assistant United States Attorney (AUSA) Steve Ruby, AUSA Greg McVey, and AUSA Gabriele Wohl were present during the interview.  After being advised of the identities of those in attendance and the nature of the interview, ESTEP provided the following information:

ESTEP stated that the last shift he worked before the Upper Big Branch (UBB) mine explosion was the Saturday evening shift the evening before Easter Sunday.

ESTEP advised that the only way to pump the amount of water required to feed water to the longwall was to pump the water out of the river that ran near the mine.

ESTEP stated that the issue with dirty water pumped to the longwall took place from day 1 and had been an issue they dealt with for years.  The power center/pump station had five individual filter canisters that could be individually isolated to allow for one canister to be cleaned while the other canisters were still working.  ESTEP added that there was a filter located at the area where water from the river entered the water line. Even with all of these filters, muddy water was still able to make it to the longwall.  ESTEP advised that storms caused the muddy rivers.  If the river was clear, the water sprays would not clog.

ESTEP stated that the way the longwall crew handled clogged water sprays was the only way they could do it.  ESTEP advised that he would have done things the same way if he had been supervisor.  ESTEP advised that if the longwall crew had not removed the water sprays from the drums, the longwall would not have had any water at all.  The longwall drums were four feet tall.  Removing eight water sprays gave equal space around the drive for the water to circulate properly.

---

Investigation on  05/14/2015  at  Charleston, West Virginia, United States (In Person)

File #  318A-PG-78655-302                              Date drafted  05/20/2015

by  James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

MOI-001481

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of _Interview - Tommy Estep_ _____ , On _05/14/2015_ , Page _2 of 4_

When asked why he did not idle the longwall and stop production to allow the drums to be flushed, ESTEP advised that he would not have had a job long with Massey Energy if he had idled the longwall.  ESTEP added it would take days to flush out the drum.

ESTEP advised that in an attempt to remedy the clogged water sprays, the water from the river was pumped to a tank to allow for the sediment to settle in the tank.  The water was then pumped into the mine from the tank.  ESTEP stated that this did not work because the tank eventually filled up with sediment and the problem continued.  ESTEP added that the system was not perfect.

JACK ROLES was the longwall coordinator.  ROLES was aware of the practice of removing water sprays to flush out the drum.  ESTEP advised that ROLES would have been fired too if he had tried to idle the longwall to flush the drums.

CHRIS BLANCHARD had pressure on him to make sure the longwall ran all of the time.  ESTEP assumed that BLANCHARD was receiving this pressure from DON BLANKENSHIP.  BLANCHARD answered to BLANKENSHIP.

ESTEP stated that in 2004 or 2005 he met BLANKENSHIP while ESTEP was working on the longwall at Cedar Grove.  BLANKENSHIP introduced himself to ESTEP.  The longwall was not running very well.  The longwall eventually caved in and the entire longwall was lost.  The mine had a soft top.  The longwall used water from the same river that supplied water to the UBB mine.  ESTEP was not told that BLANKENSHIP would be visiting the longwall. CHRIS ADKINS was with BLANKENSHIP when he visited the longwall.

ESTEP never received classes that showed him the specifics of what was expected with any particular MSHA laws.  ESTEP was told a few things from time to time of what he should be doing.  ESTEP advised that he would be told these things before his shift would begin.  ESTEP could not remember if he saw the dust control plan for the longwall.

ESTEP knew that the water sprays on the longwall shearer had to be in. ESTEP knew the water sprays needed to have a certain amount of water pressure.  The longwall crew was required to have a pressure gauge.  The water sprays would have to be removed to measure the water pressure.  If the water line was muddy the longwall shearer could not get close to obtaining the required water pressure.

ESTEP was not the face electrician at the longwall a lot.  When a longwall was being assembled at a different site, ESTEP would be directed to work on the longwall set-up crew.

MOI-001482

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - Tommy Estep                         , On  05/14/2015 , Page  3 of 4

ESTEP could not recall a time when an inspector was at the longwall and they were having problems with water pressure.

ESTEP stated that the longwall being down cost Massey Energy a lot of money.  ESTEP advised that Massey Energy had a sticker that stated a longwall that was running good made $1,000 a minute.

ESTEP advised that people in a position of responsibility on the longwall knew that the water sprays could not be removed while the longwall was in operation.

ESTEP stated that his biggest concern at the UBB mine from the first day he worked at the UBB mine was the ridiculous air lock doors at the 78 break.  ESTEP advised that he heard from the miner section crews that BLANCHARD would not allow the time to cut a permanent overcast at the area where the air lock doors were located.  ESTEP advised that the air lock doors had to be opened by hand and were not air tight.  The air lock doors were in the main intake air course that supplied air to the longwall.

ESTEP advised that he heard EVERETT HAGER tell BLANCHARD that an overcast needed to be built to replace the use of the airlock doors at the 78 break.  BLANCHARD told HAGER to get the hell out of there and find something to do.  BLANCHARD would not let HAGER use a miner section to back up and construct an overcast.

When the airlock doors would be opened to allow for equipment and motors to travel through the area, the longwall would lose ventilation for fifteen to twenty seconds.  ESTEP spent a lot of time as the electrician watching for problems.  ESTEP could tell a difference when someone was going through the airlock doors.  ESTEP blamed the short circuiting of air that would occur when the airlock doors were opened as being 100% to blame for the explosion.  ESTEP could not recall a time when all four airlock doors were in place at the same time.  ESTEP added that usually one set would be knocked down.

ESTEP stated the night before the explosion the first set of airlock doors were laying on the ground at the 78 break.

ESTEP called BLANCHARD the most arrogant asshole someone would have to deal with in their life.  ESTEP added that you could not talk to BLANCHARD.

ESTEP believed that the MSHA report on the explosion was ridiculous.

ESTEP stated that every time the airlock doors were opened the ventilation plan at the UBB mine was violated.  ESTEP advised that this

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - Tommy Estep                                    , On  05/14/2015 , Page  4 of 4

violation happened daily.  ESTEP stated that not having an overcast at the
78 break was a safety issue.

ESTEP advised that if he had been a section boss he would have shut down
the UBB mine until the issue with the 78 break had been fixed.  ESTEP
advised that he more than likely would have been job hunting after that.

ESTEP believed that it would have taken at most one shift to build an
overcast at the 78 break.  ESTEP stated that the mine roof at this location
was hard.

MOI-001484

FD-302 (Rev. 5-8-10)          - 1 of 13 -



## FEDERAL BUREAU OF INVESTIGATION

Date of entry     06/19/2015

BILL ROSS was interviewed at the United States Attorney's Office located in Beckley, West Virginia. ROSS was accompanied by his attorney, Mike Gibson. Assistant United States Attorney (AUSA) Steve Ruby, AUSA Greg McVey, and AUSA Gabriele Wohl participated in the interview. After being advised of the nature of the interview, ROSS provided the following information:

ROSS reviewed a Massey Coal Services (Massey) memorandum written on April 11, 2008, from CHRIS ADKINS to all Massey Members. ROSS advised that he has seen the memorandum. ROSS could not remember when he first saw the memorandum.

ROSS stated that the "Step Forward Somebody" document is his handwriting.

ROSS was not a part of the Monday morning meetings. ROSS attended quarterly meetings which were attended by general mangers and presidents.

ROSS would be asked about ventilation issues. ROSS stated that it did not seem that foremen had any idea what the ventilation plans were for their mines.

ROSS reviewed the "Closing the Gap" speech that he prepared. ROSS planned on giving the speech to upper management. ROSS added that the issues he saw at each Massey mine he visited were the same.

ROSS stated that some foremen who attended ROSS' training sessions were brave enough to say in front of the presidents who also attended that they did not have enough labor.

ROSS advised that a pre-shift examination needed to occur within three hours of a shift beginning. The pre-shift examination included recording hazards and violations in the examination book. ROSS learned that a lot of

---

Investigation on   05/29/2015   at   Beckley, West Virginia, United States (In Person)

File #   318A-PG-78655-302                                    Date drafted   06/03/2015

by   James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

MOI-001491

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - Bill Ross                                    , On  05/29/2015 , Page  2 of 13

individuals did not know what constituted a violation. ROSS provided as an
example an individual who told him that he did not have enough time to
conduct the pre-shift examination within the three hour time period. ROSS
learned that the individual started an hour early in order to complete his
pre-shift examination. The individual was not aware that he could not start
his pre-shift examination early. ROSS asked the president of the mine if he
had heard what the individual had told him (ROSS).  The president responded
by looking at the individual. ROSS asked the individual what he was writing
in the examination book. ROSS asked the individual if he was lying in the
book about how long it took to conduct the pre-shift examination.

    ROSS stated that the pre-shift examination is not complete until the
results of the pre-shift examintation is written in the examination book.
ROSS advised that at Massey the individual who conducted the pre-shift
examination would call out from inside the mine that the pre-shift
examination had been completed.

    ROSS advised that he was not trying to catch the individuals doing
something wrong. ROSS stated that the individuals who attended his training
sessions were telling him these things. The individuals would talk more
when the general managers and presidents did not attend the training.

    ROSS advised that Massey examiners were so pressed for time they were
predating examination times.

    ROSS reviewed a June 16, 2009 e-mail he sent to STEPHANIE OJEDA and STAN
SUBOLESKI.  ROSS advised that when he wrote in the e-mail that this had
been a long awaited issue he was referring to the fact that he had been
hearing of these issues since he started at Massey. ROSS could not put
together why Massey was not concerned with the issues he was witnessing.
ROSS advised that the number of citations Massey received would have
captured the attention of the upper management of other companies. ROSS was
concerned about a major accident occurring because of the number of
citations Massey was receiving.

    ROSS stated that Massey's mine rescue teams would visit mines and write
audits of issues they found at the mine. The audits would be given to mine
management. Nothing changed at the mine after the audit reports were turned
over to mine management.

    ROSS advised that during his meeting with DON BLANKENSHIP, ROSS informed
him that a lot of the respirable dust results were not right. ROSS had
started looking at Massey's respirable dust program at the request of
ELIZABETH CHAMBERLIN. BLANKENSHIP was most interested in knowing why MSHA
was so biased against Massey.

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - Bill Ross                     , On  05/29/2015 , Page  3 of 13

ROSS got access to dust data from Massey in or around June of 2008. CHAMBERLIN wanted ROSS to work for her. ADKINS told CHAMBERLIN that ROSS worked for him and that she could use him when he was available.

ROSS emphasized that Massey needed to allow the dust results to be what they were. ROSS stressed that Massey could not solve the problems they had with dust until the dust program was done right. ROSS advised that he informed Massey that they would not know the problems they had with dust if they were going to cheat.

ROSS advised that when the president of the mine would not attend his training sessions, seven to eight out of every ten individuals who attended the training would tell ROSS the truth about what was happening in their mines. ROSS would be told that their mines needed more people. ROSS told the presidents what their employees were saying about the labor shortages at their mines.

ROSS stated that one Massey miner who had been at Massey for a long time informed ROSS that he (ROSS) could stand up and say what he wanted but nothing was going to change. The miner informed ROSS that they did not have enough people; they were told to mine coal regardless of the labor shortages; and that if the miner did not like it he could grab his bucket and go home. The miner suggested that ROSS travel into a mine and take a look at what he was talking about.

ROSS advised that when he traveled to a mine he would look at the examination books. The books would list no violations observed and the presence of good ventilation. ROSS would travel in behind the section crew and would find stoppings out and a dirty section. ROSS told the foreman to stop working, fix the ventilation, and clean up the section. The foreman would tell ROSS that they could not stop because they had to continue mining coal. ROSS asked the men how they lived with themselves working that way.

ROSS stated that a utility employee would not be paid as much as a miner man.

ROSS advised that Massey was always in a hurry. ROSS saw poorly prepared mine plans from the engineering departments. ROSS stated that in his experience the mine president, mine foreman, and engineer worked on mine plans together. At Massey, the mine engineers just prepared the paperwork. The engineer did not get to go underground and do what an engineer should be doing.  Engineers were treated like secretaries at Massey.

ROSS stated the conditions at the Upper Big Branch (UBB) mine changed daily. The UBB mine had three or four people working on mining plans who

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of __Interview - Bill Ross__ , On __05/29/2015__ , Page __4 of 13__

were not working together. The controls in place underground did not match
the mine map. ROSS told CHRIS BLANCHARD what he had seen. ROSS talked to
PAUL MCCOMBS. ROSS asked MCCOMBS to assign engineers to specific mines so
that they could visit the mines and become more familiar with the mines.
ROSS wanted an engineer assigned to the UBB mine. ROSS spoke to BLANCHARD
about assigning an engineer to the UBB mine. In late 2009 or early 2010,
ERIC LILLY was assigned to the UBB mine. At that time ROSS was "kind of"
banned from UBB.

ROSS advised that when he worked for MSHA he invited BLANKENSHIP to
Massey's mines to see what the mines were like compared to the mine maps
MSHA received. ROSS provided as an example that he had received mine maps
that left water off of the maps when MSHA knew that the mine had
accumulations of water. ROSS wanted to show Massey that if legitimate mine
maps were submitted to MSHA they would not be sent back multiple times.

ROSS was aware that Massey would make changes inside a mine before MSHA
had approved the mine plan and would operate without an approved mine plan.
ROSS saw that mine foremen were told to make changes to ventilation plans
without receiving approved plans.

ROSS remembered the impact respirable dust inspections conducted by BOB
THAXTON. THAXTON told ROSS and CHRIS ADKINS that MSHA was doing impact
inspections at other companies and was not focused only on Massey. ROSS
does not know if ADKINS looked at results of Massey's respirable dust
samples. ADKINS thought he was being targeted. ROSS reminded ADKINS of the
conversations he had had with ADKINS about Massey's respirable dust
results. ROSS looked at Massey's respirable dust results with ADKINS,
BERMAN CORNETT, and JONAH BOWLES. ADKINS was angry at CHAMBERLIN that he
was not notified of low weight gain results. ROSS stated that it should not
have been a surprise at Massey that they were being inspected for their
respirable dust program.

ROSS stated that dust is an important issue. Breathing in dust for ten
years can cause serious health issues for an individual.

ROSS asked BOWLES and CORNETT to walk him through a typical day of dust
sampling. ROSS learned that during the pre-shift examination the dust pumps
would be cleaned and assembled. The dust pumps would then be handed out to
the mine foreman. The mine foreman would place the dust pump on the
operator. The operator would bring the dust pump back at the end of the
shift with a card stating how much coal was mined and other information.
When ROSS asked to look at the card completed after a dust sample was taken
he learned that the card had been left at the mine. When ROSS got the
samples back from the previous day he learned that the pumps had been left
running. ROSS learned that the foreman was not certified to handle the dust

MOI-001494

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - Bill Ross _____ , On  05/29/2015 , Page  5  of  13

pumps. ROSS advised that this had occurred at one of Marfork's mines but it
was not at the UBB mine.

ROSS found out from MSHA which Massey employees were certified to handle
dust pumps. ROSS learned that approximately four individuals who were
handling dust pumps were not certified.

ROSS experienced Massey making promises and not following through when
he worked for MSHA. ROSS provided as an example the situation where an
engineer would give a mine foreman the new mine plan, however, the foreman
would never be made aware of changes that had been made to the approved
ventilation plan.

ROSS advised that when he got to Massey he learned that Massey did
things exactly how he thought they did.

ROSS learned from foremen that ventilation changes were being made
without employees being removed from the mine. Changes would be made to a
mine that when completed did not work. Instead of changing things back to
the way they were before, the mine would continue to work with the failed
ventilation changes.

ROSS stated that while he was with MSHA, a Massey mine would get
violations for having water on their track. Massey would promise to move
the track. ROSS would wonder where the mine was going to get the resources
to move the track. Massey would have to take employees from production
crews to move the track. When MSHA would go back to the mine they would
find the same conditions.

ROSS advised that if someone conducting an examination says that there
is enough dust, an issue with rock dusting would not be recorded. If an
inspector thinks that the same area needs more rock dust, the inspector
would write a citation. The inspector would not take a sample for analysis.

ROSS showed foremen he trained photographs of their mines and provided
examples of areas that would be cited for improper rock dusting.

GARY FRAMPTON fixed up kits for foremen to carry. The kits included
sampling cassettes and other equipment. ROSS advised that if the foremen
had enough time to do their job they could have used the kits, however,
there were not enough people or time to use the kits properly.

ROSS advised that if an operator was complying with the law nobody would
question what they were doing.

MOI-001495

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - Bill Ross                          , On  05/29/2015 , Page  6 of 13

JIM Last Name Unknown (LNU), a section foreman at Marfork, told ROSS at a ventilation/dust class that he was doing the best he could do. JIM LNU told ROSS that if he took time to do a lot of the things ROSS was teaching Massey would fire him.  JIM LNU stated to ROSS that he had to run coal. After Alpha Natural Resources (Alpha) had purchased Massey, ROSS saw JIM LNU at Wal-Mart. JIM LNU informed ROSS that although the company name had changed the same people were running the mines.

Between 2000 to 2002 while ROSS was with MSHA, ROSS was told by Massey employees that they could not talk to MSHA employees. ROSS advised that the Massey employees informed him that MSHA would use their words against them. ROSS told them that he was not trying to put them in jail. ROSS explained that he wanted to make sure they knew how to stop the problems they were experiencing. ROSS added that the Massey employees were good people and that they were just following orders.

ROSS advised that MSHA provided training that was free to coal companies who wanted to attend.  The training was held at the mine academy. The state provided training as well. Massey did not take advantage of the training programs.

ROSS stated that while providing training he placed a $100 bill on the table and offered it to the first person who could list the eighteen things listed in each mine's three page plan that needed to be checked. One individual was able to name sixteen of the eighteen. When ROSS first made the offer he was training a class of seven to ten foreman. This increased to twenty foreman per class to twenty classes. ROSS never gave the $100 to anyone. ROSS offered 150 people from Massey and 1,200 people from Alpha the $100 for naming the eighteen things they should know about their plan. ROSS never lost his $100.

ROSS advised that if the material is in place it would take two men 1 1/2 to 2 hours to build a legal stopping. The stopping would stand the life of the panel which could be from one to two years. ROSS stated that normally two pallets of supplies were needed to build a stopping depending on the size of the stopping. ROSS advised that one more employee could help build stoppings properly.

ADKINS asked ROSS to conduct a survey at a fairly new Massey mine. The mine was having trouble getting air to the working faces. The mine had a large fan that opened up into two intake entries. ROSS recorded 230,000 CFM at the fan. By the time he reached the area where the mine broke off into two intake entries, ROSS recorded 40,000 CFM of air. ROSS traveled past twenty five stoppings before reaching the two intake air entries. The air loss was due to poorly constructed stoppings. ROSS advised that the mine

FD-302a (Rev 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of   Interview - Bill Ross _____ , On   05/29/2015 , Page   7 of 13

was a Rt. 3 mine. ROSS advised that it was either a Marfork or Elk Run coal mine.

ROSS advised that continuous miners operating at one of Massey's seven entry working face sections ventilated with sweep air would return to the number seven entry and begin mining while the bolt crew was down wind bolting another area. ROSS drew a sketch depicting how this occurred.

An extra laborer could have helped with clean up of a production section and building conrols. This would include rock dusting.

ROSS stated that a mine's clean up program is mine wide and not just on the face. The clean up program includes all active workings.  Having a clean up program was required by the mine safety laws.

When ROSS would ask foremen if they were following their clean up plan the foremen advised that they had never seen the clean up plan. ROSS stated that if you are getting violations you are either not following your clean up plan or it is an inadequate plan that you are following.

ROSS stated that outby staffing takes care of laying track, extending water lines, handling electrical issues, advancing fire sensors, cleaning up outby areas, building stoppings, dealing with water accumulations, and maintaining return air courses. ROSS added that the return air courses get most of the float coal dust.

ROSS advised that if you run a trickle duster in returns close to the working section you would take care of a lot of the return entry issues.

A mine needs suppliers to deliver supplies for outby crews. ROSS stated that the outby crews are responsible for delivering their own supplies.

ROSS stated that the larger the mine, the more problems you will have in outby areas. The larger mines need more outby staffing. ROSS stated that UBB may have needed two crews to deal with a mine of that size. ROSS added that this was his opinion.

ROSS advised that it was his experience working for both MSHA and Massey that Massey's presidents did not attend close-out meetings with inspectors. ROSS stated that it was important that the president heard about the problems the inspector experienced at the mine. This could help in determining issues that the mine may experience in the future. When an inspector would close out at a Massey mine there would be no one there. In contrast, if an inspector was going to close a mine, the president would come right over to the mine.

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of   Interview - Bill Ross   , On   05/29/2015   , Page   8 of 13

    ROSS stated that it was easy to blame MSHA or the state when your mine gets shut down. ROSS thought that Massey should have looked at itself first. BLANCHARD and other mine presidents would blame MSHA. ROSS would ask them if they had ever read a law manual. ROSS asked them if they did not know the law manual how do they expect their foremen to know the law manual.

    ROSS advised that when he was with MSHA he would ask Massey's upper management about the condition of their mine. Upper management would be unable to answer the question. The mine foremen would not be at the meeting with upper management. ROSS stated that other companies would show up with upper management and mine foremen who would be in agreement on the condition of their mine.

    ROSS stated that Massey's NFDL rate looked good. ROSS does not know much about the NFDL rate. ROSS was not involved with NFDL when he worked at MSHA.

    ROSS advised that MSHA inspectors thought that if they shut down a Massey mine they were helping someone and maybe saving someone's life. ROSS did not always agree with shutting the mine down but understood why the inspector had shut it down.

    ROSS stated that when he worked for MSHA he visited a Massey mine where a friend of his worked as the general manager. The Massey mine was under union leadership. ROSS took his ventilation crew with him to the mine. ROSS advised this visit occurred before he became the ventilation supervisor. ROSS added that this would have been between 2000 and 2004. ROSS found a lot of things wrong at the mine. ROSS put his friend on the violation since his friend was traveling with him in the mine. ROSS' friend told him that he had been instructed to run no matter what and to not stop running. ROSS wrote thirty five to forty violations. ROSS' friend did not understand two of the orders that ROSS had written. After everyone had been removed from the mine, ROSS explained everything to the group of Massey employees. ROSS' friend informed ROSS it would take two to three weeks to get the mine up and running. ROSS' friend informed ROSS that other mine inspectors had not found the issues ROSS had found. ROSS asked his friend why he had not found the issues. ROSS asked his friend why it was up to MSHA to find the issues and not Massey. ROSS stated that his friend was really angry with him. ROSS' friend then moved to another part of the country and ROSS joined Massey. ROSS spoke with his friend after he joined Massey. ROSS' friend told him that he had learned more from that inspection than he had learned prior to it occurring.

    ROSS advised that he visited a Massey mine in Kentucky and a Massey mine operated by Elk Run Coal Company that were using their chief electricians

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - Bill Ross _____ , On  05/29/2015 , Page  9 of 13

who were certified foremen to replace foremen who were off of work. The
chief electricians were being used to run pieces of equipment when they
were needed. ROSS was told that the chief electricians were assigned to
different tasks two to three times on average a week.

ROSS has seen mines as complex as the UBB mine operating without
citations, having everything in order, and still being profitable. ROSS
added that he knew it could be done properly. ROSS provided as examples the
Harris #1 and #2 mine, the Keystone mine, and the Beckley coal mine.

ROSS told OJEDA and SUBOLESKI that the miners at the UBB mine needed to
be experienced and knowledgeable to deal with all of the issues at the
mine. The UBB mine need quality people and the proper number of people.

ROSS wanted mine rescue members to police the respirable dust program.
CHAMBERLIN followed up on ROSS' idea.

Mine rescue members would write up issues they observed at mines. ROSS
did not understand why these things were not taken care of instead of the
mine rescue member only writing up the issues. The mine rescue members
would provide their write-ups to the safety departments. The mine rescue
members never talked directly to BLANCHARD and JASON WHITEHEAD.

ROSS stated that when the fire at Aracoma occurred he was an MSHA
supervisor. MSHA started doing mine surveys. ROSS learned from his
employees that MSHA mines were looking better after the fire. ROSS learned
that the stoppings had improved, life lines were being installed properly,
and the belts were being mantained at Massey mines. ROSS advised that
Massey still had problems with inexperienced engineers preparing mine
plans. After a period of time, Massey went back to their old ways.

ROSS does not know if BLANKENSHIP saw the violations that Massey was
receiving. ROSS advised that BLANKENSHIP was on the e-mail chain that
received the daily violation reports.

ROSS advised that when he met with BLANKENSHIP, BLANKENSHIP wanted to
know if Massey was getting all of the violations because MSHA was biased.
ROSS explained to BLANKENSHIP that the reason MSHA received violations was
because they had compliance issues.

ROSS stated that respirable dust results should be posted on a board for
all the employees to see. ROSS saw that the results were not posted. ROSS
was told by a foreman that they were not made aware of the results.

Massey had a completely adversarial role with MSHA.

MOI-001499

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - Bill Ross                        , On  05/29/2015 , Page  10 of 13

ROSS was told by two MSHA inspectors who are now retired that they knew if they inspected a Massey mine they were going to find torn up curtains, low ventilation, and accumulations.

ROSS advised that MSHA kept up with the performance of its inspectors. MSHA tracked the number of citations inspectors had written and the number of S & S violations they had written.

ROSS reviewed an e-mail dated June 30, 2009, written by ADKINS. ROSS stated that he did not understood why the e-mail talked about ROSS' concerns. ROSS thought everybody should have been concerned.

ROSS responded in an e-mail to OJEDA on July 1, 2009.

ROSS advised he told everyone he could tell about what he saw at Massey. ROSS told foremen, safety directors, presidents, CHAMBERLIN, ADKINS, SUBOLESKI, and BLANKENSHIP. ROSS stated that it was obvious Massey had problems everywhere. ROSS conveyed that thought to all of them.

ROSS stated that most other mines had a person who handled the respirable dust programs for their mines. This individual would travel into the mines to follow through on compliance of the program.

JOE PAVLOVICH was doing underground audits for CHAMBERLIN to identify the same type of issues ROSS and the mine rescue teams were finding. PAVLOVICH was addressing concerns that CHAMBERLIN had. ROSS has met PAVLOVICH.

ROSS stated that a portable dust monitoring system could be placed in an entry or worn by an operator to see where dust concentrations are coming from. ROSS recommended that they be used at Massey mines.

Massey's P-2 program was a production oriented program that allowed for seamless mining. Massey's M-3 program was a management type approach to managing situations.

A safety clerk was used to assist with report writing and to handle dust pumps after normal work hours. This was important especially during the evening shift when the safety department had gone home for the day. Most companies had a safety clerk.

ROSS studied Massey's P-2 program. ROSS advised that some mines were borderline on ventilation requirements. Following P-2 would have allowed for more air. If P-2 was not used at these mines, the mines would violate their ventilation plan. ROSS added that the miners were not following P-2 which normally followed the company's mine plan.

MOI-001500

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of   Interview - Bill Ross                              , On 05/29/2015 , Page 11 of 13

ROSS told BLANKENSHIP that most of the new Massey mines that he visited
when he worked with MSHA and Massey are started with four entries. ROSS
informed BLANKENSHIP that he should put in one more entry that could be
used as a return air course. ROSS informed BLANKENSHIP that if he put in
two entries that could both be used as return air courses he would praise
BLANKENSHIP a lot. ROSS explained to BLANKENSHIP that the airlock doors
they installed would not hold because of the pressure from the fan. ROSS
also explained that the stoppings Massey built were poorly constructed.
BLANKENSHIP stated to ROSS that it would cost too much to develop the
entries and deal with the overburden. ROSS asked BLANKENSHIP to consider
everything they had to do once they started mining the four entry mine.
ROSS explained to BLANKENSHIP that they had pressure problems and are
forced to do things anyway to deal with the problems. ROSS stated the next
two mines developed by Massey were five entry mines.

ROSS told BLANKENSHIP that one mine being developed with ten entries
utilizing one hundred foot centers had one mine foreman supervising the
entire section. ROSS added that these sections are called super sections.
ROSS discussed with the foreman and the crew the amount of time it would
take him to walk the area he was responsible for. The mine foreman did not
have a law book. ROSS read the law book to them. ROSS informed the mine
foreman that he would need to walk almost two miles every four hours if he
was doing his job right. The mine foreman had not thought of it that way.

ROSS reviewed an e-mail he sent to OJEDA on July 2, 2009. ROSS asked
OJEDA to let him know when BLANKENSHIP reviewed the notes of his meeting
with OJEDA and SUBOLESKI. ROSS wanted a quick response from BLANKENSHIP.
ROSS hoped that things at Massey would change after BLANKENSHIP had
reviewed ROSS' concerns.

ROSS reviewed his draft script e-mail. ROSS advised that every year
Massey had a slogan term. The "Do The Math" slogan took into consideration
the cost associated with the violations the company received. It also took
into consideration the number of times things had to be done again and
again. ROSS stated that BLANKENSHIP was always interested in lowering costs
of projects discussed at operator's meetings.

ROSS pulled data from MSHA to compare citations Massey received with
other non-Massey mines. ROSS had been to non-Massey mines. Non-Massey mines
did not look like Massey mines.

The increased dollar figure for some citations occurred because Massey
repeatedly violated the same laws.

ROSS reviewed the handwritten note from BLANKENSHIP written on ROSS'
July 21, 2009 e-mail he sent to SANDRA DAVIS.  ROSS advised that

MOI-001501

FD-302a (Rev 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of _Interview - Bill Ross_____ ,On _05/29/2015_ ,Page _12 of 13_

BLANKENSHIP's statement discussed safety. ROSS wanted BLANKENSHIP to focus
on compliance of the law. BLANKENSHIP talked about a commitment to safety.
This was not the message ROSS discussed with BLANKENSHIP. ROSS' message was
that if you followed the law, safety would follow.

ROSS reviewed a Feburary 1, 2010 e-mail he sent to OJEDA. ROSS advised
that after the August 2009 meeting, the employees who attended the meeting
were more enthused about learning the safety laws.  This changed over
time.

Under the scheme that the UBB mine was using in December of 2009, ROSS
told ADKINS that it was not possible to stop the use of belt air with the
plan they were trying to implement. ROSS traveled into the UBB mine with
two foremen and others. ROSS and the other individuals were told what to do
and were scattered throughout the mine. ROSS was told to travel to the
return air course near the longwall. Everyone communicated with ADKINS and
BLANCHARD who were outside by the mine telephone. A regulator on the
longwall belt controlled the amount of air traveling the belt. ROSS
measured air on the longwall belt at 48,000 CFM. The intake air course had
120,000 CFM. ROSS suggested that a stopping be built around the belt.
ADKINS informed ROSS to build the stopping. The pressure was so great that
they were only able to cut the air down on the belt to 32,000 CFM. ROSS
advised that they were unable to stop the flow of air on the belt. ROSS
choked the air in the return to one half of a block. The pressure was so
great that the air would blow out the stopping. ROSS then opened up the
regulator. ROSS measured 15,000 CFM of air on the belt. ROSS was told to
knock some more of the overcast out. ROSS then measured 6,800 to 7,000 CFM
of air on the belt. ROSS then knocked the rest of the overcast out. ROSS
still had air on the belt. ROSS could not get it to work. ROSS suggested
that ADKINS and BLANCHARD go back to MSHA and discuss a new plan.

ROSS advised that the pressure on the return entry's longwall doors was
so great someone had to hook something to the doors and use a motor to open
the door.

ADKINS called BOB HARDMAN and told him he could not get the plan to
work. ROSS liked ADKINS plan to put in an exhaust shaft that would be used
by the miner sections. Before the members of Massey met with MSHA, ADKINS
informed ROSS that he (ADKINS) would do all of the talking and instructed
ROSS not to say a word at the meeting.

HARDMAN, LINC SELFE, JOE MACKOWIAK, DAVE MORRIS, RAYMOND BROWNING, and
another ventilation specialist attended the meeting from MSHA. ADKINS
explained his plan to add another shaft. ADKINS was asked if they were able
to turn the belt air around at the 26 break. ADKINS told MSHA that he could
turn the air around at the 26 break. ROSS was not happy with ADKINS

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - Bill Ross                                    , On  05/29/2015 , Page  13 of 13

agreeing to do this because it would cause the longwall to lose too much air.

Later, ROSS asked ADKINS if they were able to turn the belt air around at the 26 break. ROSS offered to call ERIC LILLY and go into the UBB mine to check. ADKINS told ROSS to not call LILLY and that ADKINS would let ROSS know if they had been successful in turning the air around at the 26 break.

ADKINS allowed ROSS to start developing future plans at UBB with LILLY.

ROSS reviewed a memorandum he sent to OJEDA on January 29, 2010. ROSS advised the new slogan for Massey was "Do The Right Thing." ROSS advised that at this point OJEDA was the only person he was in direct contact with on the issues he was trying to get addressed. ROSS does not recall hearing back from OJEDA.

ROSS stated that the Hazard Elimination Program was a speech that did not include anything on paper.

ROSS does not remember specifically the meeting on February 2, 2010.

ROSS advised that Massey put off training during the winter months. ROSS was asked to travel to specific mines during that time of the year. ROSS did not hear much about the UBB mine during that time.

ROSS reviewed an e-mail he sent to BLANKENSHIP on December 14, 2010. ROSS advised that he was trying to be polite to BLANKENSHIP. ROSS added that he would be polite to anyone blessed enough to reach their retirement.

ROSS advised that the only thing that came out of his discussion with BLANKENSHIP was the speech that ADKINS gave in August of 2009.

Massey had young mine foremen between the ages of twenty five and thirty years old. ROSS wanted to make sure these foremen were aware they were responsible for the mine and that when they signed off on examination books they were responsible for what was recorded in the books.

ROSS has received about a dozen hang up phone calls in the last six weeks. The caller does not speak when ROSS picks up the phone.

The sketch drawn by ROSS will be retained as evidence.

MOI-001503



MOI-001504