FD-302 (Rev. 5-8-10)                       - 1 of 10 -



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry        07/09/2015

    STEPHANIE OJEDA was interviewed at the United States Attorney's Office located in Charleston, West Virginia.  OJEDA was accompanied by her attorneys, Steven McCool and Julia Fisher.  United States Attorney Booth Goodwin, Assistant United States Attorney (AUSA) Steve Ruby, AUSA Greg McVey, and AUSA Gabriele Wohl participated in the interview.  After having been advised of the nature of the interview, OJEDA provided the following information:

    OJEDA did not know BILL ROSS' position at Massey Energy (Massey) until she recently saw the announcement to Massey members dated April 11, 2008.

    OJEDA worked at a Massey building located in Kanawha City.  The building was located near the Goodwill.  Massey built a corporate office in Julian, West Virginia.  Massey moved their offices from the Kanawha City location to the Julian office at the end of 2008.

    OJEDA met ROSS at one of the first operator's meetings she attended.

    OJEDA was notified that she would be taking part in a meeting with ROSS and STAN SUBOLESKI by talking to SHANE HARVEY.  OJEDA was already aware of the meeting when she received the e-mail from CHRIS ADKINS on June 16, 2009, requesting that she meet with them.

    OJEDA had met SUBOLESKI at an operator's meeting.  OJEDA knew that he was a mining engineer and was a member of Massey's Board of Directors.

    OJEDA thought the meeting between ROSS and SUBOLESKI was unusual.  OJEDA does not remember if HARVEY explained why SUBOLESKI was meeting with ROSS.  OJEDA knew that ROSS worked closely with ELIZABETH CHAMBERLIN on training and dust issues.  OJEDA thought ROSS had raised issues that SUBOLESKI wanted to hear about.  OJEDA did not talk to SUBOLESKI before the meeting occurred.

---

Investigation on  06/03/2015  at  Charelston, West Virginia, United States (In Person)

File #  318A-PG-78655-302                              Date drafted  06/03/2015

by  James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

MOI-001518

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of _Interview - Stephanie Ojeda_ ,On _06/03/2015_ ,Page _2 of 10_

The meeting with ROSS and SUBOLESKI took place at Massey's Julian office.  ROSS talked the majority of the time.  ROSS had a notebook with a lot of handwritten notes.  OJEDA asked ROSS if she could make a copy of his notes.  ROSS allowed OJEDA to make a copy of his notes.  ROSS spoke fast and addressed multiple topics.  OJEDA believed at the time that ROSS had been underground making observations at specific mines and conducting training with foremen, bosses, and maybe superintendents.  ROSS had written comments from conversations he had with people from Massey.  OJEDA and SUBOLESKI mostly listened to what ROSS had to say.  SUBOLESKI asked ROSS some follow up questions.

OJEDA and SUBOLESKI's notes taken during the meeting were almost identical.  OJEDA could not remember any agreement she made with SUBOLESKI where he would prepare a memorandum of what ROSS had discussed.

OJEDA would have kept her notes from the ROSS meeting.  SAMANTHA HILL, OJEDA's assistant at Massey, would have retained OJEDA's notes in a file folder.  All of the handwritten notes from the Hazard Elimination Program were kept with the memorandums prepared from the notes.  OJEDA's notes were maintained with the Hazard Elimination Program's notes and memorandums.

OJEDA had not spoken with DON BLANKENSHIP directly about her and SUBOLESKI's meeting with ROSS.  OJEDA would have told HARVEY how the meeting went and that ROSS had handwritten notes.  OJEDA would have told HARVEY that she could not attest to the accuracy of the information in ROSS' notes.

OJEDA reviewed a handwritten note BLANKENSHIP wrote on an e-mail ADKINS sent to OJEDA and copied to others dated June 16, 2009.  OJEDA advised she was not sure at that time if BLANKENSHIP even knew that they had already met with ROSS.  OJEDA knew that BLANKENSHIP wanted a report but was not sure how she learned that.

OJEDA reviewed an e-mail she sent to ADKINS on June 22, 2009.  OJEDA could not remember talking to ADKINS about BLANKENSHIP wanting a report. It was not unusual to ask ADKINS if he wanted to see the report before it was sent to BLANKENSHIP.  OJEDA added that it was not unusual considering ADKINS sent her the initial e-mail requesting that she attend the meeting between ROSS and SUBOLESKI.

At the end of the meeting with ROSS, SUBOLESKI informed OJEDA that he wanted everything addressed by ROSS included in the report.  OJEDA does not remember SUBOLESKI stating why he wanted everything included in the report instead of just providing a summary of what ROSS had discussed.

OJEDA reviewed an e-mail she sent to ADKINS on June 22, 2009.  OJEDA

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of _Interview - Stephanie Ojeda_ _____ , On _06/03/2015_ , Page _3 of 10_

advised that when she referred to ROSS' handwritten notes not being good
she was referring to the seriousness of the issues being addressed in the
notes and the fact that the notes were disorganized.   OJEDA does not know
how ROSS got access to the information included in his notes.   OJEDA did
not know the reason for the meeting with ROSS until the meeting occurred.
OJEDA did not know ROSS' background for knowing the information he
provided.

OJEDA believed HILL copied ROSS' entire notebook.   OJEDA reviewed the
notes in the possession of the United States Attorney's Office.   OJEDA does
not believe the notes she reviewed were the entire set of notes HILL
copied.   OJEDA does not believe anyone directed ROSS to prepare the notes
he made.   OJEDA believed ROSS prepared the notes on his own.

OJEDA does not remember having a conversation with ADKINS before the
memorandum of ROSS' meeting with SUBOLESKI was sent to BLANKENSHIP.   OJEDA
does not remember discussing the memorandum with ADKINS.

After reviewing the June 25, 2009 e-mail she sent to BLANKENSHIP,
ADKINS, HARVEY, and SUBOLESKI, OJEDA stated that it was her idea to send a
lengthy, detailed memorandum because of the importance of the issues being
addressed by ROSS, ROSS' overall concern with Massey's safety program, and
ROSS' concerns with Massey's relationship with MSHA.   OJEDA was concerned
with the idea that Massey's foremen and mine managers were raising the
issues ROSS discussed at the meeting.

OJEDA stated it would not have been her job to find out if ROSS was a
legitimate source for the information he provided.

OJEDA knows she discussed with HARVEY the contents of ROSS' notes.
OJEDA believed she showed HARVEY a copy of ROSS' notes.

OJEDA described ROSS as a nice man who got very confused sometimes while
speaking.   OJEDA added that what she meant was that ROSS was very animated
when he spoke which caused him to have a "bumbling" speech pattern.

OJEDA would have mentioned to HARVEY how ROSS had obtained this
information, where he conducted training, and what violations ROSS had
reviewed.

OJEDA did not tell HARVEY that Massey should not take ROSS' concerns
seriously.

OJEDA had concerns that SUBOLESKI, a board member, was attending a
meeting where ROSS would be expressing his concerns with Massey directly to
him.   OJEDA had concerns that the meeting would have triggered some type of

MOI-001520

FD-302a (Rev 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview – Stephanie Ojeda                                    , On  06/03/2015 , Page  4 of 10

disclosure obligation.  OJEDA advised she probably mentioned to HARVEY the issues raised by having SUBOLESKI in the meeting.

OJEDA had worked at Dupont.  OJEDA was not familiar with a board member attending the type of meeting that took place between ROSS and SUBOLESKI. OJEDA does not remember discussing her concerns with ADKINS.

OJEDA advised she had knowledge of Massey's involvement with civil litigation matters including the Aracoma mine fire litigation.  OJEDA had concerns with putting the issues discussed at the ROSS meeting in a memorandum.  OJEDA was fairly certain she raised this issue with HARVEY. OJEDA probably raised her concerns with HARVEY before and after the meeting.  OJEDA could not remember how HARVEY responded to her concerns.

OJEDA stated that at the time of the meeting with ROSS, she believed SUBOLESKI was on Massey's safety committee.  OJEDA was not sure how ROSS' concerns got to SUBOLESKI's attention.

OJEDA believed SUBOLESKI wanted to have the meeting with ROSS.  Massey probably thought that having OJEDA at the meeting allowed for the meeting and the memorandum prepared after the meeting to remain privileged.

OJEDA stated that Massey had received direction from their outside counsel to have an attorney present if the company wanted something to remain privileged.

OJEDA was not specifically told to attend the ROSS meeting so that the meeting between ROSS and SUBOLESKI would remain privileged.  OJEDA based her opinion as to why she was told to attend the meeting on her familiarity with the common practices at Massey.  OJEDA advised that the intended privilege claim would extend to everyone included in the e-mails.

OJEDA does not remember discussing with ADKINS the requirement to keep the ROSS documents confidential.

OJEDA advised that it was typical to include a warning on privileged documents to provide notice that approval from the legal department was needed before documents could be shared with others.

OJEDA reviewed the warning she wrote in an e-mail she sent to ROSS and SUBOLESKI on June 25, 2009.  OJEDA advised that the warning was more than she usually provided.  OJEDA does not remember adding the language that the report should not be shared with non-practicing attorneys to warn ROSS not to share the report with CHAMBERLIN.  OJEDA could not remember discussing the issue of sharing the report with CHAMBERLIN with SUBOLESKI or ROSS. OJEDA stated that the language related to non-practicing attorneys was not

MOI-001521

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of _Interview - Stephanie Ojeda_____ , On _06/03/2015_ , Page _5 of 10_

standard.  OJEDA does not recall why the language was added.  RICHARD
GRINNAN and JOHN POMA were two non-practicing attorneys who worked in
Massey's Richmond office.  OJEDA does not think HARVEY wrote the e-mail
that OJEDA sent to ROSS and SUBOLESKI.  OJEDA may have cut and pasted the
contents of the e-mail.

OJEDA had no specific conversations other than the communication she
sent to ADKINS about concerns with keeping the ROSS memorandum privileged.

OJEDA reviewed an e-mail BLANKENSHIP sent to JIM TWIGG on June 29,
2009.  OJEDA stated that TWIGG had worked at Massey at one time, but was
not sure in what capacity.  OJEDA could not remember if TWIGG worked in
corporate or operations at Massey.  OJEDA could not remember discussing the
idea of getting TWIGG involved with the issues ROSS raised.

OJEDA does not remember having discussions of raising ROSS' concerns
with the board of directors.  OJEDA did not discuss this issue with
HARVEY.  OJEDA assumed ROSS' concerns would have to be shared with the
entire board.  OJEDA believed it would have to be shared because SUBOLESKI
was a board member and he had been personally provided with so much
information from ROSS.  OJEDA was not sure if ROSS' concerns were disclosed
to the board of directors.  OJEDA believed ROSS' concerns were disclosed in
the safety presentation.  OJEDA was not a part of the board meeting.  OJEDA
saw some of the presentations provided to the board.  SUBOLESKI led the
safety committee and was a board member.

OJEDA reviewed an e-mail she received from ADKINS written on June 30,
2009.  OJEDA does not remember getting any pre-notification that she was
going to get the e-mail about ROSS.  BLANKENSHIP and ADKINS seemed to think
that ROSS was legitimate.  OJEDA thought they were looking for solutions
from ROSS.  OJEDA advised that the letter she was going to receive from
ROSS was being channeled through her for privilege purposes.  OJEDA added
that another purpose of sending the letter to her was so that OJEDA could
make the information that ROSS was providing more understandable since ROSS
could ramble.

OJEDA stated that this was the first time ROSS was involved in sending
documents he prepared to the legal department.  OJEDA added that this was
the reason why she told him to mark confidential on every page of the
document.  OJEDA advised it was standard practice to have each page of a
confidential document marked as confidential.

OJEDA advised that around the time of the meeting between ROSS and
SUBOLESKI, the handling of violations had just been transferred to the
legal department.  OJEDA had just started getting the daily violation

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - Stephanie Ojeda                     , On  06/03/2015 , Page  6 of 10

reports.  OJEDA did not know if the amount of citations Massey was
receiving was common.  OJEDA stated the number of fines and the amounts
assessed were huge.

OJEDA reviewed an e-mail she sent to BLANKENSHIP, BAXTER PHILLIPS,
ADKINS, and others on July 6, 2009.  OJEDA advised she kept the memorandum
she prepared close to the notes provided by ROSS.  OJEDA did this because
it appeared this was what they wanted from ROSS.  OJEDA stated it looked
like the reason she was put in the middle of the communication with ROSS
was to keep the communication privileged.  OJEDA knew this did not
necessarily make the communication privileged.

OJEDA would have let HARVEY know that she had received ROSS' notes and
had prepared a memorandum.  OJEDA may have let HARVEY read ROSS' typed up
notes.

OJEDA was not sure why PHILLIPS was added to the e-mail communication
regarding issued raised by ROSS.  OJEDA was not sure why he was not on the
first ROSS memorandum's e-mail chain.  OJEDA assumed the first ROSS
memorandum had been communicated to him at some point.  OJEDA advised that
someone would have told her to include PHILLIPS on the e-mail.

Either ADKINS, HARVEY, SUBOLESKI, or ROSS told her to add PHILLIPS to
the e-mail chain.  OJEDA does not remember discussing the issues raised by
ROSS with PHILLIPS directly.

OJEDA was asked about ADKINS' comments in an e-mail he sent to OJEDA on
July 2, 2009.  OJEDA read ADKINS' statement to mean he knew how BLANKENSHIP
was going to react to ROSS' recommendations.  OJEDA advised that
BLANKENSHIP was probably not happy with the memorandum prepared after the
first meeting with ROSS.  ADKINS was over the operations of Massey.
Because of ADKINS' position, BLANKENSHIP would have discussed the issues
raised by ROSS with ADKINS.  BLANKENSHIP did not like learning of
inadequacies at Massey.  OJEDA also thought that part of ADKINS' problem
was with the formatting of the memorandum.  When asked why ADKINS did not
ask her to reformat the memorandum, OJEDA stated that ADKINS would not have
asked her to reformat the memorandum.  OJEDA then advised that ADKINS was
going to take the heat for what ROSS had stated.

OJEDA did not know that ADKINS brought ROSS into the company.  OJEDA
thought ROSS reported to CHAMBERLIN.

OJEDA was not aware that BLANKENSHIP had asked ROSS to write a script
for a training video.

OJEDA remembered seeing a "Do The Math" video or powerpoint at an

MOI-001523

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of <u>Interview - Stephanie Ojeda</u> , On <u>06/03/2015</u> , Page <u>7 of 10</u>

operator's meeting.  OJEDA added that she may have seen a t-shirt with the
"Do The Math" slogan.

OJEDA did not know that ROSS met with BLANKENSHIP at Lauren Land.

OJEDA reviewed an e-mail and memo ROSS sent to her on February 1, 2010.
OJEDA does not remember the e-mail.  OJEDA stated that ROSS was attending
or had attended hazard elimination meetings.  ROSS may have read his memo
at one of the hazard elimination meetings.

OJEDA reviewed a Hazard Elimination Committee memorandum prepared by her
on February 8, 2010.  OJEDA believed that ROSS provided more in the meeting
than what was portrayed in her memorandum.  OJEDA would have written in her
notes what ROSS had said at the meeting.  OJEDA does not know why she did
not put more of what ROSS provided into her memorandum.  OJEDA does not
remember what ROSS said at the meeting but she would have memorialized what
he had said in her notes.  OJEDA's notes would have been kept in a folder
or placed in a binder.  OJEDA thought her notes were scanned at some point
after the Upper Big Branch explosion.  OJEDA acknowledged that not all of
the issues ROSS addressed in his January 29, 2010 memo were covered in the
memorandum prepared for the hazard elimination meeting held on February 2,
2010.  OJEDA acknowledged that pre-shift examinations does not cover the
scope of what ROSS covered in his memo.

OJEDA advised that she shared everything that ROSS provided to her.
OJEDA sometimes faxed documents but she typically did not use faxes to
share documents with individuals located in the corporate offices.  OJEDA
would not have mailed ROSS' January 29, 2010 memo.  OJEDA reiterated that
she shared everything ROSS provided to her.  OJEDA does not have a specific
memory of sharing ROSS' memo but she believed she would have shared the
document based on her typical practice.  OJEDA advised that she would have
shared ROSS' memo first and foremost with HARVEY.  OJEDA may have shared
the memo with ADKINS.  OJEDA stated that if she had hand-delivered the
document to ADKINS, she would have prepared a cover letter to accompany the
document.

OJEDA would not have sent ROSS' memo to BLANKENSHIP without HARVEY's
permission.  Based on the follow up BLANKENSHIP had asked for regarding
other information ROSS had provided, OJEDA believed he would have wanted to
know what ROSS had said in this January 2010 memo.  OJEDA added that based
on her prior experience with BLANKENSHIP, ROSS' memo would have been
something BLANKENSHIP would have wanted to see.

OJEDA reviewed an e-mail she sent to HARVEY on October 19, 2010.  OJEDA
advised that she handled a lot of employment/labor disputes at Massey that
involved discrimination allegations, special treatment allegations, and

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - Stephanie Ojeda _____ , On 06/03/2015 , Page 8 of 10

gender bias claims.  OJEDA advised that it was not her experience that
women at Massey were not taken seriously.  OJEDA stated her experience at
Massey was that people thought she was more direct with people than they
were accustomed to receiving from a woman.  OJEDA never received feedback
that people did not appreciate her speaking up.  OJEDA's brother, a Massey
employee, told her that people were not used to women speaking up at
Massey.  OJEDA worked primarily with men.

    CHAMBERLIN commented to OJEDA when she (OJEDA) started with the company
that Massey did not take women as seriously as they did men.  OJEDA could
not remember having any other conversations with CHAMBERLIN about women
having issues at Massey.  OJEDA thought some men were threatened by women
in high positions at Massey.  OJEDA advised that she experienced this with
Alpha Natural Resources and to some extent with Patriot as well.  SABRINA
DUBA was a controller at Massey.

    CHAMBERLIN intimidated people.  CHAMBERLIN had a very harsh personality,
was very unpleasant, and was a difficult person to work with.  OJEDA added
that CHAMBERLIN was very territorial.  CHAMBERLIN was furious when she
learned that the violation work was being transferred to the legal
department.  CHAMBERLIN intimidated OJEDA.  OJEDA believed the problems
CHAMBERLIN had with Massey personnel was due to her personality.  The
issues people had with CHAMBERLIN had nothing to do with the fact that she
was a woman.  OJEDA stated that CHAMBERLIN probably thought that she was
not taken as seriously by executive management and subordinates because she
was a woman.

    OJEDA advised she was not thinking of anything specific when she made
the comment that Massey thought women who worked there were crazy.

    OJEDA reviewed e-mails HARVEY sent to her on January 29, 2011 and
January 30, 2011.  OJEDA believed HARVEY sent the January 29, 2011 e-mail
to all Massey attorneys.  OJEDA advised the January 30, 2011 e-mail was not
a typical e-mail HARVEY would send.  Prior to this e-mail HARVEY had never
said anything to OJEDA about Massey being a crazy company where the top few
kept all the money.  OJEDA assumed that HARVEY was speaking of Massey in
his e-mail.  OJEDA was not sure who HARVEY was referring to when he talked
about the top few.

    OJEDA advised that she had seen individuals disciplined at Massey for
reasons that did not make any sense.

    OJEDA advised that any follow up discussions at Massey related to ROSS'
recommendations did not include her involvement.  OJEDA could not imagine

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of _Interview - Stephanie Ojeda_ , On _06/03/2015_ , Page _9 of 10_

that some type of follow up discussions did not occur because of the importance of the matter, the individuals who were involved in the matter, and the requests made that ROSS provide specific recommendations.

OJEDA would not know the details of Massey's operations other than what she learned through citation litigation.

The Hazard Elimination Committee started around the same time as ROSS' recommendations were made. OJEDA does not remember ROSS' recommendations being discussed at the Hazard Elimination Committee meetings. OJEDA advised that some issues addressed by the committee paralleled what ROSS had discussed. OJEDA does not remember ROSS in any other hazard elimination meetings other than the one noted on February 2, 2010. OJEDA advised that she did not remember ROSS attending the February 2, 2010 meeting until she reviewed the memorandum prepared after the meeting.

ROSS was involved in things with CHAMBERLIN and other issues while the Hazard Elimination Committee was meeting.

ROSS attended some safety director meetings and operator's meetings.

OJEDA believed that if ROSS' recommendations were addressed at the Hazard Elimination Committee meetings there was no reason why those discussions would not have been reflected in her notes.

OJEDA remembered meeting with BOB HARDMAN and MSHA when the Hazard Elimination Program began. OJEDA assumed ROSS' recommendations were a part of the Hazard Elimination Program.

OJEDA never asked why ROSS' recommendations were not being specifically addressed. OJEDA was certain issues raised by ROSS were discussed by the Hazard Elimination Committee. OJEDA does not know of anything every happening as a result of ROSS' recommendations. OJEDA does not believe ROSS' memorandum was shared with anyone outside of those included in the e-mails. OJEDA believed ROSS shared his information with others. OJEDA does not believe the reason why ROSS' information was not addressed by the Hazard Elimination Program was because it was assumed ROSS had already shared his concerns with Massey members.

OJEDA believed CHAMBERLIN saw ROSS' memorandum but does not know that to be true. HARVEY may have provided a copy of the memorandum to CHAMBERLIN. OJEDA was not sure if GARY FRAMPTON received a copy.

CHAMBERLIN had commented about ROSS' concerns and his notes. CHAMBERLIN had encouraged ROSS to raise issues. CHAMBERLIN knew ROSS was meeting with OJEDA and SUBOLESKI. OJEDA could not remember if she brought up the

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - Stephanie Ojeda _____ , On 06/03/2015 , Page 10 of 10

meeting between ROSS and SUBOLESKI or if CHAMBERLIN brought it up first.
CHAMBERLIN knew ROSS was keeping notes and assumed he was sharing his notes
with CHAMBERLIN.  OJEDA could not remember if CHAMBERLIN was glad ROSS was
coming in to talk to SUBOLESKI.  ROSS was happy to know he was going to be
able to address his concerns.  OJEDA noted that this was how ROSS was.

   ROSS had a large notebook he kept his handwritten notes in.

   OJEDA was not sure how she remembered CHAMBERLIN received a copy of
ROSS' memorandum.  OJEDA concluded CHAMBERLIN must have had a copy of the
memorandum.  OJEDA does not have knowledge that she was given the
memorandum.

   OJEDA was stunned that the federal government did not have ROSS'
memorandum until recently.

   BLANKENSHIP's attorneys wanted to talk to OJEDA a few weeks ago.  OJEDA
was asked general questions about documents.  These documents included the
Hazard Elimination Committee documents.  BLANKENSHIP's attorneys asked
about the preparation of documents that went to the board of directors.
This included powerpoint presentations prepared by the safety department
and presented to the board.  OJEDA was asked questions about the
preparation of public speeches and statement preparation.  OJEDA informed
BLANKENSHIP's attorneys that she was not involved in preparing public
speeches and preparing statements.  OJEDA advised that HARVEY was involved
in the preparation of public speeches and preparing statements.  OJEDA
added that a press relations firm was involved.  MICHA RAGLAND worked with
this company.  OJEDA was asked if she was involved in operator's meetings
or other meetings where BLANKENSHIP instructed others to break the law.
OJEDA was asked if BLANKENSHIP every directed her to instruct others to
break the law.  OJEDA advised that the ROSS issue did not come up at all.
OJEDA was asked about operation specific matters that she did not know
about.  An Alpha attorney was present during her meeting with BLANKENSHIP's
attorneys.

   OJEDA stated that investigators working for BLANKENSHIP were looking for
people who used to work for Massey who now work for Patriot.  The
investigators were looking for JOHN JONES who is now a vice president at
Patriot.

MOI-001527

**Report of Interview**

**U.S. Department of Labor**
**Office of Inspector General**
**Office of Investigations**



Page __1__ of __2__

OIG Form 103 (OI – 1/98)

| Investigation on: | June 24, 2015 | At: | Richmond, VA | File: | 31-0862-0001 PC |
|---|---|---|---|---|---|

By: Special Agent Jeffrey Carter                                      Date Prepared: 6/25/2015

On June 24, 2015, Special Agent (SA) Jeffrey Carter, U.S. Department of Labor, Office of Inspector General (OIG), interviewed James Twigg at the Embassy Suites Hotel located at 2925 Emerywood Parkway, Richmond, VA.

After being advised of the nature of the interview and proper display of credentials, Twigg provided the following information:

Twigg currently resides at [Redacted - Privacy]. Twigg's home phone number is (804) [Redacted - Privacy] and his cellular phone number is (804) [Redacted - Privacy].

Twigg stated that he is currently working on a part time basis. Twigg was approached by Mike Bauersachs two or three years ago to see if Twigg was interested in working together. Twigg agreed and works as a consultant for MDB Energy located in the Richmond, VA area. Twigg explained that their business consists of two steps. The first step provides a free quarterly newsletter that consists of compiled historical actuals from publically traded companies in the coal, steel and gas industries. Step two is a pay service that develops information and provides understandable projections and gives guidance. The service is provided every quarter and currently has six or seven members.

Twigg stated that he started his career in public accounting working for Deloitte & Touche and worked for the company for approximately six years. Twigg was a Certified Public Account, but has not kept his license current.

In 1981, Twigg was hired by Massey as the Director of the Tax Department and reported to the Chief Financial Officer (CFO). Twigg was later promoted to Vice President of Tax and Treasure and then in 1993 or 1994 was promoted to CFO reporting directly to Don Blankenship. Twigg stated that he resigned from Massey in 1997, because of his health. He stated that he felt like he was going to have a nervous breakdown or a heart attack because of the pressure he was putting on himself. He explained the business was growing 15 percent a year. Twigg stated the he was responsible for all the financials and that he prepared the tax returns for 11 or 12 years for Massey.

Approximately two or three months after Twigg resigned he was asked to return to Massey working as an independent contractor. Twigg stated in his role as an independent contractor that he reported to various people in power depending on the project that he was working on. Twigg explained that he took direction from Blankenship, Baxter Phillips, the CFO and the sales department. Twigg explained that he worked with credit, acquisitions, sales contracts, and basically anything financial. Twigg stated that he helped put together information that was used at the board meetings. Twigg prepared support schedules for other coal companies, worked on the strategic plans and the actual documents. Twigg explained his work was dependent on what information was needed for the meetings.

Twigg went to some operations meetings. Twigg stated that at some of the meetings time was slotted for him to talk about how other coal companies were performing. Twigg also gave CFO presentations when he held that position.

Twigg had a written contract with Massey and was paid per hour. Twigg worked up until the merger with Alpha Natural Resources. Twigg explained the contract was still in place after the merger, but that he did not perform any work for Alpha after the merger.

Twigg contacted Alpha to discontinue his contract because he was going to provide consulting for a small startup company. Twigg explained that his contract contained a 48 hour clause that could be exercised by the company or by him. Although he had not been doing any work for Alpha he contacted them concerning his consulting because he did not want to breach the contract.

Twigg was presented with an email from Blankenship to twiggfam@aol.com dated June 29, 2009, subject Report on Meeting with Bill Ross Regarding MSHA Violations-Confidential-Attorney-Client Privileged and attachment, Report of June 17 Meeting MSHA Violation.

After reviewing the documents Twigg stated that he did not recall the documents or receiving them. Twigg identified twiggfam@aol.com as his personal email account. Twigg does not know why anything like the document presented would have been sent to him. Twigg also stated that the documents would not have served any function for his purposes within the company. Twigg stated that after review of the email that it did not warrant a response because the body of the email read FYI. Twigg corresponded with Blankenship mostly by phone and some by fax. Twigg would not have responded by email. Twigg stated that he had a Massey email account, but this was probably sent to his personal account because he was out of the office because of personal health reasons or a death in the family. Twigg stated that he did not know who Bill Ross was and that he did not recall the name. When it was explained to Twigg that Ross used to work for MSHA and was hired by Massey, Twigg stated that he was aware that Massey had hired someone for the safety department that used to work for MSHA.

Twigg stated that the only time he had anything to do with penalties was when he was preparing the company tax returns. Twigg explained that the company had book income and taxable income. Twigg went on to say that he was aware of daily reports of violations. He did not recall ever receiving the report. Twigg became aware of the report when he was working on Massey's acquisition of Cumberland Resources. Twigg believed that this was around the middle part of April 2010. Twigg became aware of the report through his oversight of the acquisition and the need to obtain transitional information of the acquisition. Twigg explained that he spent a month in Abingdon working on the merger.

Twigg stated that he also worked as the intermediator between Blankenship and Massey concerning Blankenship's contracts. Twigg stated that Blankenship has asked him personal financial questions about things such as taxes, bonds and stocks. Twigg stated that he believed Blankenship asked him questions because Twigg followed the industry and related companies.

Twigg stated the last time he talked to Blankenship was prior to the indictment and that he has not been contacted concerning the investigation. Twigg occasionally talked with Blankenship prior. Twigg considers Blankenship a friend based on their working relationship. Twigg stays in contact with Phillips who he considers a personal friend and also with what Twigg characterized as the old Massey people.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302 (Rev. 5-8-10)

- 1 of 4 -



## FEDERAL BUREAU OF INVESTIGATION

Date of entry     08/05/2015

   BILL ROSS was interviewed at the United States Attorney's Office
located in Beckley, West Virginia.  ROSS was accompanied by his attorney,
Mike Gibson.  Assistant United States Attorney (AUSA) Steve Ruby, AUSA Greg
McVey, and AUSA Gabriele Wohl were present and participated in the
interview.  After being advised of the nature of the interview, ROSS
provided the following information:

   ROSS stated that Massey Energy (Massey) fought with MSHA, argued with
inspectors, and had mines that were a mess.  ROSS advised that he has
spoken with former MSHA inspectors who still do not like Massey because of
the way they were treated while inspecting Massey's mines.

   ROSS took to his meeting with DON BLANKENSHIP reports for eight to ten
mines, unwarrantable violations, and respirable dust samples.  BLANKENSHIP
did not want to look at the things ROSS had brought to the meeting.
BLANKENSHIP wanted ROSS to talk to him about the issues.  ROSS specifically
talked about a few of the mines.

   ROSS did not know how much it cost to hire a new employee with a
particular expertise.  ROSS talked to BLANKENSHIP about hiring laborers for
Massey.  When considering the cost of hiring laborers, ROSS had considered
wages and insurance costs.  BLANKENSHIP explained to ROSS costs that he had
not thought about.

   CHAMBERLIN made comments at the August of 2009 meeting about doing
better with dust sampling.  ROSS was not sure if CHAMBERLIN understood how
Massey was handling dust samples.

   ROSS never went back to the Upper Big Branch (UBB) mine after December
of 2009.

   ROSS could not remember getting a response from STEPHANIE OJEDA after he
sent her his January 2010 memorandum.

---

Investigation on  07/27/2015  at  Beckley, West Virginia, United States (In Person)

File #  318A-PG-78655-302                                Date drafted  07/28/2015

by  James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

MOI-001530

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of Interview ~ Bill Ross _____ , On 07/27/2015 , Page 2 of 4

ROSS advised that the information he saw in reports he reviewed was the same information available to everyone at Massey.

ROSS sometimes thought everyone at Massey was aware of the same information ROSS knew but did not want to do anything about it or could not do anything about it.

ROSS advised he traveled underground into a Massey mine on average once a month.

ROSS thought he was hired by Massey to provide some expertise on how to follow safety laws.

ROSS advised that you would be hard pressed to go to a mine and not find some violations, however, Massey's mines had many violations that were more serious.  ROSS stated it bothered him that mine management was aware these conditions existed at their mines.

ROSS stated that the one thing he has learned is that you cannot make people learn.  ROSS added people have to want to learn and apply what they have been taught.

ROSS did not have the authority at Massey to hire more staff.  ROSS did not have a role in setting budgets.  ROSS did not have the authority to send Massey's miners to any government provided training.  ROSS added that he wished he had some of that type of authority while he worked at Massey.

ROSS felt that Massey's larger mines, particularly the UBB mine, did not have people with the experience needed to handle a large mine.

ROSS traveled into the UBB mine in 2009 a dozen times.  ROSS traveled into the UBB mine a lot while he worked for MSHA.  ROSS stated that he had traveled into the UBB mine at least fifty times.

ROSS's office was right next to CHRIS BLANCHARD's office.  ROSS spoke regularly with the mine engineers who worked on plans for UBB.  ROSS had a closer look at the UBB mine than the other Massey mines.

CHRIS ADKINS was afraid the longwall would be shut down at UBB if he did not turn the longwall ventilation around.  ROSS knew ADKINS did not understand how the ventilation functioned at UBB.  ROSS tried to explain this to ADKINS.  The ventilation system at UBB was changing daily.

ADKINS had promised to get air immediately to the miner sections.  ROSS advised that an exhaust fan that had been discussed would have given the air somewhere to go.

MOI-001531

FD-302a (Rev 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - Bill Ross                          , On  07/27/2015 , Page  3 of 4

    BOB HARDMAN and ERIC LILLY understood what ROSS thought should have been done with UBB's ventilation plan.

    ROSS stated that the UBB mine should have shut down the miner units because they could not ventilate the sections properly.

    ROSS advised that the UBB mine was set up to fail based on the ventilation system MSHA forced the UBB mine to use. ROSS thought if he could explain this to HARDMAN he could have resolved the issue. ADKINS did not want ROSS to talk during the meeting.

    JOE MACKOWIAK did not want belt air to be used to ventilate the mines in his district. ROSS told MACKOWIAK he should reconsider what he was saying with mines that liberated a lot of methane.

    ROSS did not know Massey cut staffing in 2010.

    ROSS recently learned from RAY MCKINNEY, the former administrator of coal at MSHA, that the order not to allow belt air to ventilate a mine came from Arlington. MCKINNEY referred to the people in Arlington as idiots. HARDMAN and MACKOWIAK did not say that their orders regarding belt air were coming from Arlington.

    ROSS advised he first spoke with MCKINNEY in mid-May of 2015 when MCKINNEY contacted him and asked if he would be interested in working for an attorney who represented Massey. The attorney was reviewing citations that had been written by MSHA. MCKINNEY informed ROSS the attorney was interested in hiring him (ROSS). ROSS informed MCKINNEY he would have to think about it. Three to four days later MCKINNEY called back and informed ROSS that the case was coming up soon and the attorney wanted to know if ROSS was interested in helping. ROSS told MCKINNEY he was not interested. MCKINNEY called back a third time and wanted to know if ROSS would change his mind. MCKINNEY called back a fourth time and left a message. ROSS returned the call and left a message. ROSS advised that on the fifth or sixth time MCKINNEY called him he was invited to meet MCKINNEY and JESSIE COLE for lunch. COLE was a former district manager for MSHA. ROSS was unable to meet them for lunch. MCKINNEY is now sending ROSS e-mails. ROSS advised the last time he heard from MCKINNEY was early last week. MCKINNEY did not mention any Massey mines in particular in relation to the citations that were being questioned. MCKINNEY informed ROSS the attorney paid well.

    KEVIN STRICKLAND replaced MCKINNEY as the administrator of coal. MCKINNEY was a district manager in Virginia as well. ROSS advised he and MCKINNEY had both worked at MSHA in the past but did not work together.

MOI-001532

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - Bill Ross                                    , On  07/27/2015 , Page  4 of 4

ROSS had been surprised his contact with MCKINNEY began shortly after he had been contacted by the FBI.

ROSS advised that UBB had done more than what was required by law to use belt air.

ROSS advised that a section boss at the Ellis Eagle mine made the comment that Massey employees were treated like robots who were told to run coal until they got caught before they would fix the problem.

MATT WALKER, a Rt. 3 engineer, told ROSS that they could not wait on MSHA to approve a plan before they started using the plan.

SCOTTY Last Name Unknown (LNU), a mine foreman at Independence, told ROSS that they did not have enough people to fix the violations at his mine. ROSS advised he asked the president of the mine if he was allowing SCOTTY LNU to run the mine while knowing that these conditions existed. SCOTTY LNU later told ROSS he was now aware of the position he had been put in.

ROSS advised that when the individual told him he was cheating on the respirable dust sampling, he did not want to know the name of the individual. ROSS informed JONAH BOWLES, the safety director, of what he had been told.

ROSS stated that a section boss from one of Massey's mines in Greenbrier County told him that he had been told to shut up and do what he was told.

HAROLD LILLY told ROSS that at Massey you were allowed to violate the law as long as you ran coal. HAROLD LILLY worked for LARRY WARD.

ROSS stated he heard similar comments as described above multiple times. ROSS heard the comments enough to where it gave the complaints credibility in ROSS's mind. BEN DORLEN, JACK LNU, and JOEY ATHEY worked at Massey before joining MSHA. JACK LNU was an engineer at Massey. DORLEN, JACK LNU, and ATHEY made similar comments as described above while relaying their experiences working for Massey.

ROSS advised that several people told him they were not certified to handle dust pumps. When MARSHA LEWIS tried to determine who at Massey was certified, she found more people who were not certified to handle dust pumps who were handling them at Massey.

MOI-001533

FD-302 (Rev. 5-8-10)

- 1 of 2 -

**FEDERAL BUREAU OF INVESTIGATION**



Date of entry    08/05/2015

   BRENT RACER, [ Redacted - Privacy ], was interviewed at the
United States Attorney's Office, located in Charleston, West Virginia.
Assistant United States Attorney (AUSA) Greg McVey, AUSA Steve Ruby, and
AUSA Gabriele Wohl were also present and participated in the interview.
After being advised of the identities of those in attendance and the nature
of the interview, RACER provided the following information:

   RACER was represented by ED HILL in a civil lawsuit against Massey
Energy (Massey).  RACER quit living after the Upper Big Branch (UBB)
explosion.  RACER suffered from anxiety issues.  RACER would be alarmed by
loud sirens.  RACER sold his motorcycle and lost his house after the
explosion.  RACER saw a psychiatrist who along with others urged him to sue
Massey.  HILL agreed to represent RACER and explained to RACER that he
would not have to pay him.  The civil lawsuit was eventually settled.

   RACER was told the air at UBB would get better once they got the
Bandytown fan installed.  The air was horrible while driving back to the
location where the fan was installed.  RACER's boss, SMURF, was the only
guy at the UBB mine worth anything.  SMURF cared if his crew could
breathe.  Others at the mine made it hard on SMURF.  SMURF would take air
readings in the main intake that were so low the crew would have to spend
hours trying to get the air right.

   SMURF's crew would be told outside they should have air on the section.
When they would arrive the air would not be legal.

   RACER witnessed methane levels between 8 to 9%.  The bolting machine had
to be shut down because of the high levels of methane.  The methane was
discovered after the roof-bolter complained of having a headache.

   CHRIS BLANCHARD told SMURF either run coal or he would find someone who
could.  SMURF also received a hard time from JASON WHITEHEAD and JAMIE
FERGUSON.  They were both vice presidents for Performance Coal Company.

Investigation on  07/31/2015  at  Charleston, West Virginia, United States (In Person)

File #  318A-PG-7B655-302                                    Date drafted  08/03/2015

by  James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

MOI-001528

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - Brent Racer                          , On  07/31/2015 , Page  2 of 2

    RACER does not believe BLANCHARD found out that SMURF had the belt
started up to make it appear like their section was running.

    RACER advised that you could not breathe very will when sandstone was
mined in low air conditions at UBB.  Miners could not see anything in those
conditions.  Miners would have to turn the lights off on their helmets
because the lights reflecting off the dust would blind them.  The
continuous miner operator had to cut by feel.  RACER would have to ring a
bell to let the continuous miner operator know to stop loading his buggy.
No one could see each other in the low air conditions.

    RACER stated that on the way back to the flooded areas behind the
longwall, fifty to sixty feet of ribs would roll out at one time.

    RACER advised that ANDY COALSON had personally put him in danger at
UBB.  RACER added that GARY MAY had put everybody in danger at UBB.

    RACER worked at Marshfork after the UBB mine explosion.  RACER did not
like working in the low coal.  RACER was told to work in height conditions
that were illegal.  An illegal cut would be one that was less than two
feet.  RACER built stoppings at Marshfork that required only a block and a
half.  RACER faked like he was sick and left work when he decided he no
longer wanted to work in those conditions.

    RACER was familiar with S1 - P2.  RACER advised a running joke at UBB
was that the policy was P1 - S2.  SMURF would ask his crew if he was ready
to go over P1 - S2.  RACER always knew that S1 - P2 was a joke at Massey.
RACER advised that his crew looked out for the guys they worked with.
RACER added people like BLANCHARD were not looking out for you and were
only worried about their bonuses.

    RACER never had any contact with DON BLANKENSHIP.  RACER saw a video
where BLANKENSHIP talked about how he cared about Massey's employees.
RACER watched this video at the human resources department at Elk Run.
BLANKENSHIP stated in the video that he was taking a pay cut for his
employees.  RACER advised this occurred around the time the contracts at
Massey were redone.  RACER also saw BLANKENSHIP speak on some of the
retraining videos he watched.

    RACER advised that if you said the wrong thing to BLANCHARD you could be
fired.  An individual who worked from Massey would go from making $350 to
$2,000 a week.  The individual's family relied on them to provide for the
family and could not afford to be fired.

FD-302 (Rev. 5-8-10)                    - 1 of 2 -



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    09/11/2015

        BILL ROSS was interviewed at the United States Attorney's Office,
located in Beckley, West Virginia.  ROSS was accompanied by his attorney,
Mike Gibson.  United States Attorney Booth Goodwin, Assistant United States
Attorney (AUSA) Steve Ruby, AUSA Greg McVey, and AUSA Gabriele Wohl were
present and participated in the interview.  After having been advised of
the nature of the interview, ROSS provided the following information:

    ROSS served in the Navy for three and a half years.

    ROSS told ELIZABETH CHAMBERLIN that he was thinking of quitting Massey
Energy at least a year after he had started with the company.  ROSS advised
that people did not seem interested in learning the information he was
teaching.  CHAMBERLIN informed ROSS she was thinking of leaving as well.

    ROSS stated that Massey Energy was a large company and had all of the
resources necessary to alleviate their problems.

    ROSS advised he never understood why mine rescue teams had to inspect
Massey Energy's mines looking for violations when foremen and mine
employees should have been finding the violations.

    ROSS stated that mine employees would be sent home when equipment broke
down instead of using the opportunity to do work needed at the mine.

    ROSS advised that he traveled to a Sydney operation to meet with the
MSHA District Manager in regards to one of the mines that had been shut
down over water issues.  ROSS pointed out to ADKINS that the Sydney
operation had more violations and problems than the Upper Big Branch (UBB)
mine.  ADKINS informed ROSS that the MSHA office was tougher in Sydney's
district.  ROSS did not understand the mind set that blamed MSHA instead of
trying to correct the problems they were having at Sydney.

    ROSS provided a Suddenlink envelope containing phone records and copies

Investigation on   08/28/2015   at   Beckley, West Virginia, United States (In Person)

File #   318A-PG-78655-302                          Date drafted   08/31/2015

by   James F. Lafferty II, Brent A. Stanze

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

MOI-001553

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - Bill Ross                                          , On  08/28/2015 , Page   2 of 2

of e-mails between him and RAY MCKINNEY.  These records will be retained as
evidence.

MOI-001554

Report of Interview

**U.S. Department of Labor**
Office of Inspector General
Office of Investigations



Page  1  of  5

OIG Form 103 (OI – 1/98)

| Investigation on: | September 9, 2015 | At: | Charleston, WV | File: | 31-0862-0001 PC |
|---|---|---|---|---|---|

By: Special Agent Jeffrey Carter                                        Date Prepared: 9/10/2015

On September 9, 2015, Jay Mattos was interviewed at the United States Attorney's Office in Charleston, WV. Present and participating in the interview were Assistant United States Attorneys Steve Ruby, Greg McVey and Gabriele Wohl, and Special Agents Jeffrey Carter, U.S. Department of Labor, Office of Inspector General and Jim Lafferty, Federal Bureau of Investigation.

Derick Baxter and Jake Hargraves from the Department of Labor, Mine Safety and Health Administration (MSHA), Office of the Solicitor (SOL) participated by conference call.

After being advised of the participating parties and the nature of the interview, Mattos provided the following information:

Mattos graduated from the University of Maryland in 1974 with a degree in Economics. He went to work for the Department of Labor as an economist in 1977. Mattos went to work for MSHA in 1983 and worked for MSHA until he retired earlier this year. Mattos started as a program analyst for Coal Mine Safety and Health (CMSH). He became the management officer for CMSH. Mattos became the chief for the office of Program Policy and Evaluation and he held the position of deputy director for Program Evaluation Information Resources (PEIR). He also held positions within the Office of Assessments, Accountability, Special Enforcement and Investigations (OAASEI).

Mattos stated that MSHA's database was housed within PIER under Program Evaluation and Resources. He utilized and had access to the database. Mattos played a role in the development of the database over the years.

Prior to 1983 all records were maintained in a paper format. Starting in 1983 and years that followed records became computerized. Civil Assessments also computerized their records during the same time period as PIER. A data warehouse was created to maintain data while Mattos was working in PIER. The data warehouse was a stovepipe system. Each department had its own system and each departmental system's information was compiled and maintained within the data warehouse.

During the time period from January 2008 until April 2010, MSHA inspectors used an application called Inspectors' Portable Application for Laptops (IPAL). This program was developed internally by MSHA. Information is entered and stored locally. The locally stored information is uploaded periodically through the network to the database located in Denver, Colorado. MSHA also has backup servers located at the MSHA Academy and Arlington, VA.

Information can be extracted from the data warehouse using preprogrammed reports or through system queries. MSHA maintains multiple databases. The production database is an Oracle data system and the data warehouse is a sequel server. The information produced by the warehouse is dependent upon the request. The most common is delineative format that can be imported into an Excel or Access program.

MOI-001541

Mattos transferred to Assessments in 2006. While working in Assessments he continued to access and work within the database. Mattos relied heavily on the database during his work in Assessments, evaluating mines for Pattern of Violations.

Mattos was shown a summary chart of citations and orders issued at the Upper Big Branch (UBB) Mine from January 1, 2008 until April 5, 2010. Mattos was familiar with the amount of citations and orders issued at UBB. Mattos was responsible for compiling the numbers used for the summary. Mattos was not aware of any changes.

Mattos explained that inspectors print citations and orders from their laptop in the field. Someone with access can print citations and orders in the same format from the Oracle database as the inspectors in the field.

Mattos stated that Massey paid their fines. Their system was confusing and their bookkeeping was awful. Each Massey operation was responsible for their civil penalties, which made it hard for MSHA to match up and track. Payments were received from each sub entity of Massey.

Mattos explained the background of a citation; under the Mine Act, MSHA has the responsibility of conducting a complete inspection on a mine. Inspectors are required to issue citations based on observations made by the inspector. Withdrawal orders are issued if an area is affected by an imminent danger or unwarrantable failure of the mine. Citations are written because of an identified condition and orders for withdrawal are issued for the areas of certain violations. If the area is a production area you are required to shut down production activity and only perform the activities associated with the abatement of the citation. Civil penalties are assessed based on the citation or order written.

Inspectors are trained to observe, conduct set evaluations, evaluate mine practices, evaluate the likelihood any injury could occur, and the gravity of the condition observed. An inspector documents what is occurring or not occurring in the body of the citation. Inspectors use notes taken during inspection activities. The inspector uses those notes to enter the information in a preprogramed form located on the inspector's laptop. That information is later uploaded to the oracle database located in Denver, CO. The inspectors have portable printers to utilize at the mines to print out citations. This practice was in place during the period of 2008 through 2010.

Mattos was familiar with the information uploaded to the Oracle database. Mattos was familiar with the process. Mattos used the database extensively and was familiar with extracting information from it. Mattos was familiar with citations and orders written at UBB and was familiar with the amount written. He was aware that 835 violations were issued at UBB from January 1, 2008 through April 5, 2010. Mattos was familiar with significant and substantial (S & S) violations and explained that they are violations that were reasonably likely to result in serious injury.

Mattos explained the following orders: 103 (k) order was for the withdrawal of miners for an accident investigation, 104 (b) is a withdrawal order for the failure to abate a citation, 104 (g) is a withdrawal order issued for a particular miner who does not have the proper training, and a 107 (a) is an order written for an imminent danger.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Mattos explained that during an inspection if the inspector believes conditions or practices are due to an unwarrantable failure by the operator the inspector can issue a 104 (d) withdrawal order.

Mattos explained that ERP stands for emergency response plan. He explained that they are not violations of MSHA safety standards. Mattos explained that part 45 and 50 was for record keeping and accounting purposes.

Mattos reviewed an email dated March 17, 2015, requesting Mattos to review citation numbers. Mattos reviewed and was familiar with the number of citations written at UBB. He explained that inspectors sometimes vacate citation or order before it goes anywhere.

Mattos was shown a chart comparing UBB to other mines dated September 9, 2015. Mattos was not responsible for picking the mines used for comparison with UBB and was not sure how they were selected.

Mattos explained that data was used to compare mines. Inspection hours are used to compare mines because it gives you the most accurate comparison. A larger mine would receive a higher number of citations and orders than a small one. It is a way to normalize the data. Violations per Inspection Day (VPID) are essentially the same means of comparison. An inspection day is considered five inspection hours. It made it easier to work with the numbers.

Mattos was shown a citation. He explained that the citation number is computer generated. The inspector filled in the body of the citation based on conditions or practices observed.

Mattos was asked to explain various boxes within the citation:

Box 9: Designates what is being cited, whether it was safety, health or other. Some citation can be both. Ventilation is an example that could affect both areas.
Box 9 (c): Designates what specific regulation within title 30 that was violated.
Box 10 (a) identifies the gravity of the condition. The likelihood of injury occurring. The severity of the injury if the condition cited caused an accident. It is the inspector's evaluation of injury occurring.
Box 10 (c) Significant and Substantial (S & S). S & S is assigned if a condition is reasonable likely or higher to result in injury. Number of Persons: refers to the number of people regularly working in the area cited.
Box 11: Degree which the operator avoided a condition or practice.
Box 12: Type of action or authority used to cite under the Mine Act. Order is short for withdrawal. Safeguard doesn't have a regulation that bars the condition cited, but puts the mine on notice. A good example of written notice is a Pattern of Violations (POV) letter.

Mattos has never been underground at UBB. He did not travel underground often and has not been underground in years.

Mattos explained that the reorganization involving the Office of Assessments was a formality. The Office of Assessments was a stand-alone office and assumed Special Investigations. Technical Compliance and Investigations under the Bush administration started enforcing POV. Mattos explained that this just formalized what had already occurred.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Mattos explained that POV is a section of the act given to mines the exhibit a pattern. Potential Pattern of Violations (PPOV) is a component where operations are notified that they are exhibiting a pattern of violations. UBB was in this status. UBB significantly reduced their number of citations and were removed from PPOV status because they no longer exhibited a pattern of violations. UBB successfully reduced their number of citations, but went back to their old ways.

Mattos explained that UBB was not notified of POV status because of an error from his office. There was a problem with the computer concerning an unwarrantable failure order. Mattos explained that Part 50 would not have played a role in determining UBB's POV status.

Mattos explained that PPOV doesn't shut a mine down. It gives a mine the opportunity to clean up their act and maintain a certain threshold.

If you are on POV status and receive an S & S citation it becomes a withdrawal order. MSHA can only shut down a mine for the period of time it takes to abate the condition. They do not have the power to just shut a mine down.

Mattos stated that he was familiar with past Office of Inspector General reports (OIG) concerning POV. The reports established that it was hard to determine what POV was making the program hard to manage. The report credited coming up with a method for identification. The number of PPOV mines was limited. The program did not want more than three mines in one district on the status. Mattos explained this was because of resource issues. Mattos stated that PPOV threatened mine productivity.

Mattos explained that there was not consistency in 110 investigations. District Manager had discretion over what to pursue and what not to pursue. There are a lot of variables that play a role; resources, sequestration, and prosecutorial discretion.

Mattos agreed that the explosion was a black mark on MSHA's reputation. MSHA published their issues when they released the internal review report conducted after the explosion. Mattos stated that nothing in this case is going to resolve the issues that have already been identified and addressed by the internal review. Mattos was interviewed by the internal review team, mainly concerning POV. Mattos believed that he may have received parts of the internal report to review and that he may have been part of some meetings concerning remedial action. He did not recall disagreeing with the sections he reviewed.

Mattos explained that every internal resulted in identification of weaknesses. In every case MSHA took action. He acknowledged that there are reoccurrences that happen over time. Mattos stated that the problem with an internal review is tracking or keeping tabs of deficiencies that have been identified over time. Mattos relayed that you also have changes in the administration and agency priorities.

Mattos worked with the corrective action taken based on the internal review. Mattos explained that deficiencies are not often identified until something like UBB occurs.

When asked about incomplete inspections identified by the internal review Mattos explained it mainly involved supervisor oversight. The things found were minor in nature stating that not all "i's" were dotted and "t's" crossed. Mattos explained that it is difficult to supervise and that MSHA struggles trying to find tools to identify things when supervisors are not there.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Mattos explained that there is a system in place to track specific things such as memos regarding methane. He stated that there was a large turnover prior to UBB and that the supervisors struggled to keep up with current policies.

Tyler is a program analyst at MSHA. In his job he creates spreadsheets and extracts information from the databases. He identifies mines for special enforcement screening for POV.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302 (Rev. 5-8-10)

- 1 of 4 -



## FEDERAL BUREAU OF INVESTIGATION

Date of entry     09/23/2015

    CHRIS BLANCHARD was interviewed at the United States Attorney's Office located in Charleston, West Virginia.  BLANCHARD was accompanied by his attorneys, Larry Robbins, Alan Strasser, and Dan Lerman.  United States Attorney Booth Goodwin, Assistant United States Attorney (AUSA) Steve Ruby, AUSA Greg McVey, AUSA Gabriele Wohl, and EPA-OIG Special Agent Jeff Carter were present and participated in the interview.  After being advised of the nature of the interview, BLANCHARD provided the following information:

    DON BLANKENSHIP's approval was needed weekly for the use of contract employees.

    BLANKENSHIP sat in some budget meetings.  BLANKENSHIP reviewed the consolidated reports and ultimately they would come back from BLANKENSHIP with changes that needed to be made.

    BLANCHARD typically received less manpower than what he asked for in his budget request.

    BLANCHARD listened to a portion of call #1260.  BLANCHARD advised he received many phone calls from BLANKENSHIP similar to call #1260.  BLANCHARD recognized his voice and the voice of BLANKENSHIP.  BLANCHARD advised that in this call BLANKENSHIP was telling BLANCHARD to do exactly what he told him to do and nothing else.  BLANCHARD does not recall BLANKENSHIP referring to him in third person that often.  BLANCHARD does not remember sending LARRY SAUNDERS to the Randolph mine.  BLANCHARD advised his goal when talking to BLANKENSHIP on the phone was to get off of the phone call.  BLANCHARD did not know his calls with BLANKENSHIP were being recorded.  BLANCHARD does not know why BLANKENSHIP was recording their phone conversations.

    BLANCHARD listened to a portion of call #589.  BLANCHARD remembered the phone call. BLANCHARD recognized his voice and the voice of BLANKENSHIP.  BLANCHARD stated this phone call was typical as to BLANKENSHIP's involvement in mines ran by BLANCHARD.

    BLANCHARD stated that the UBB mine being placed on PPOV in 2008 did not hurt as bad as it would have if the mine had been placed on PPOV after the

---

Investigation on  09/12/2015  at  Charleston, West Virginia, United States (In Person)

File #  318A-PG-78655-302                                            Date drafted  09/16/2015

by  James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - Chris Blanchard                    , On  09/12/2015 , Page  2 of 4

longwall was brought back to UBB.

BLANCHARD advised there was a major difference in the amount of
citations the UBB mine received while on PPOV in 2008.  When underground
miner positions were eliminated after the UBB mine was removed from PPOV
the numbers of citations increased, particularly in 2009.

BLANCHARD reviewed a portion of call #1535.  BLANCHARD recognized his
voice, the voice of CHRIS ADKINS, and the voice of BLANKENSHIP.  BLANCHARD
stated that BLANKENSHIP did not want others undermining decisions he made.

BLANCHARD was aware there was not enough staffing for support work at
his mines.

BLANCHARD advised he did a poor job of communication with his men.
BLANCHARD knew he was not the most popular guy with the miners at the UBB
mine.  BLANCHARD stated that at the time he thought the miners did not like
him because he was tougher on them than some presidents.

BLANCHARD recalled the meeting for the hazard elimination program in the
summer of 2009.  BLANCHARD thought presidents, vice presidents,
superintendents, and maybe mine foremen attended the meeting.  The hazard
elimination program called for the reduction of violations at all mines by
taking a look at the mines and using best practices at the mines.  This
would cause the cost of citations to go down at Massey Energy.  BLANCHARD
stated that after the hazard elimination program was announced he did not
get any additional staffing.  Tonnage expectations at his mines were not
reduced after the hazard elimination program was announced.

SABRINA DUBA was the top practical accountant at Massey Energy.

BLANCHARD stated there was no amount of money or resources that could
take care of all violations at a mine.

BLANKENSHIP did not come to the UBB mine or go in the UBB mine during
the time period named in the indictment.

BLANCHARD stated that BOONE PAYNE was working the #1 section which was
made up of headgate 21 and 22.  BLANCHARD thought six foot tension bolts
were being used on the #1 section.  BLANCHARD could not imagine saying
anything to PAYNE other than telling him to use the tension bolts that
needed to be used.

BLANCHARD was named in 21 lawsuits.  A law firm handled the lawsuits.
BLANCHARD had one meeting with his attorney to discuss the lawsuits.
BLANCHARD was aware the lawsuits were settled.  BLANCHARD advised there is

MOI-001547

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - Chris Blanchard ,On 09/12/2015 ,Page 3 of 4

no pending litigation.  BLANCHARD advised the lawsuits were settled before
he entered into an immunity agreement with the United States government.

BLANCHARD stated he would get upset when production reports were late.
BLANCHARD added he was more upset that his mine foremen had to spend more
time running around getting numbers for the production reports than doing
their actual jobs.

BLANCHARD advised that he probably said he would fire all the miners on
the longwall if they did not start running coal.  BLANCHARD added he does
not deny putting pressure on miners to run coal.  BLANCHARD advised it was
an empty threat.

BLANCHARD was aware ANDY COALSON was recovering equipment from behind
the longwall.  BLANCHARD does not remember if he told COALSON to take the
scoop behind the longwall.  BLANCHARD believed the scoop was permissible.

BLANCHARD suspended COALSON for a week for not telling BLANCHARD sooner
that there was a problem with water behind the longwall.  BLANCHARD did not
suspend COALSON because the build up of water was his fault.  COALSON asked
BLANCHARD if he could take his vacation time for the week he was
suspended.  BLANCHARD allowed COALSON to take his suspension as vacation
time.

BLANCHARD did not feel that approval was needed to build the wall of
kennedy panels.  BLANCHARD advised it became clear to him that any
stoppings that were built were going to crush out.  The stoppings would
crush out between weekly exams.

BLANCHARD advised that it was accurate that he told COALSON no new
employees would be hired to work on the belts.

JASON WHITEHEAD fired BRIAN COLLINS for shutting down his entire section
while working on ventilation in one area.  BLANCHARD supported WHITEHEAD's
decision.  Massey Energy eventually rehired COLLINS.  COLLINS was rehired
as a bolter.  COLLINS may have become a foreman again.  JAMIE FERGUSON may
have rehired COLLINS.

BLANCHARD instructed that overcast should not be constructed at the 78
break.  Air lock doors wee eventually installed.  BLANCHARD and ADKINS got
enormous pressure from BLANKENSHIP not to construct overcast.  BLANCHARD
admitted to miners that not constructing an overcast at the 78 break was a
mistake.  BLANCHARD advised that using air lock doors at the 78 break hurt
production.  Sixty minutes of production were lost per day because of the
air lock doors.

MOI-001548

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - Chris Blanchard                          , On  09/12/2015 , Page  4 of 4

BLANCHARD admitted that he put pressure on people to finish jobs.

BLANCHARD advised he bought waders for the people who had to work in water at the UBB mine.  BLANCHARD does not know if enough waders were purchased.  BLANCHARD does not remember stating that money was not there to purchase additional waders.  BLANCHARD does not remember turning down requests to purchase additional waders.

BLANCHARD does not remember moving the rock dust crew who worked at night to perform other types of work.  The decision to move the rock dust crew would have been made by a foreman.

BLANKENSHIP beat BLANCHARD up for taking people off of their primary jobs.

BLANCHARD was sure he played a role in the reassignment of employees who had been assigned to the UBB mine while the mine was on PPOV.  A lot of the projects the additional employees performed involved things that had been in the making for fifteen years.

BLANCHARD agreed that there was an increase in violations after the UBB mine was removed from PPOV.  BLANCHARD agreed that there was a lack of resources to handle the violations.

BLANCHARD agreed that the number of violations written for issues related to the air lock doors would have been prevented by the construction of overcasts.

FD-302 (Rev. 5-8-10)                          - 1 of 1 -



## FEDERAL BUREAU OF INVESTIGATION

Date of entry    09/23/2015

    MICHAEL SMITH was interviewed at the United States Attorney's Office. United States Attorney Booth Goodwin, Assistant United States Attorney (AUSA) Steve Ruby, AUSA Greg McVey, and AUSA Gabriele Wohl were present and participated in the interview.  After being advised of the nature of the interview, SMITH provided the following information:

    SMITH is currently employed at Cliffs Natural Resources.  SMITH advised that working at Cliffs Natural Resources is different than working at Massey Energy.  SMITH described working at Massey Energy as a free for all where it seemed like if you did the right thing you never moved up.  When a miner has a problem where he works now the issue can be raised with the company and the problem is addressed within a week.

    SMURF, SMITH's section boss at the Upper Big Branch (UBB) mine, used to joke that he was leaving Massey Energy to avoid paying his wife more money in their pending divorce.

---

Investigation on   09/13/2015   at  Charleston, West Virginia, United States (In Person)

File #   318A-PG-78655-302                                        Date drafted   09/16/2015

by   James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

MOI-001555

FD-302 (Rev. 5-8-10)

- 1 of 1 -

 **OFFICIAL RECORD**

## FEDERAL BUREAU OF INVESTIGATION

Date of entry      09/23/2015

KAREN HANRETTY was interviewed via video teleconference. United States Attorney Booth Goodwin, Assistant United States Attorney (AUSA) Steve Ruby, AUSA Greg McVey, AUSA Gabriele Wohl, and Department of Labor – OIG Special Agent Jeff Carter participated in the interview. After being advised of the identities of those in attendance and the nature of the interview, HANRETTY provided the following information:

HANRETTY did not attend the meetings between DON BLANKENSHIP and the families of those who were killed in the Upper Big Branch (UBB) explosion. HANRETTY understood that BLANKENSHIP met with each family individually to discuss the layout of the mine and where their family member would have been working when the explosion occurred.

HANRETTY advised that due to the media's reporting of Massey Energy's violation history, Massey Energy was trying to secure a statement regarding Massey Energy's safety record.

HANRETTY was not aware of any filing of a Form 8K to the SEC in response to the explosion at the UBB mine.

HANRETTY stated it was obvious a statement needed to be made about Massey Energy's safety record and violation history. Everyone was anxious to put out a statement to make sure the press was reporting things accurately. Waiting 48 hours to release a statement was not ideal.

HANRETTY does not recall why BLANKENSHIP's name came out of the press release.

HANRETTY had no personal knowledge of the accuracy of the information in the draft press release she reviewed. HANRETTY added the information came from the company. HANRETTY could not independently confirm the data in the press release.

HANRETTY advised that it was unique to the client, Massey Energy, that everything had to be ran by BLANKENSHIP, the Chief Executive Officer, before it was released.

---

| | | |
|---|---|---|
| Investigation on | 09/17/2015 | at | Charleston, West Virginia, United States (, Other (Video Teleconference)) |

File #   318A-PG-78655-FD302

Date drafted   09/23/2015

by   James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

MOI-001552

FD-302 (Rev. 5-8-10)

• 1 of 2 •



## FEDERAL BUREAU OF INVESTIGATION

Date of entry ___09/23/2015___

CHRIS BLANCHARD was interviewed by telephone. Alan Strasser and Dan Lerman, attorneys for BLANCHARD participated by telephone. United States Attorney Booth Goodwin, Assistant United States Attorney (AUSA) Steve Ruby, AUSA Greg McVey, AUSA Gabriele Wohl, and Department of Labor - OIG Special Agent Jeff Carter participated in the interview. After being advised of the nature of the interview, BLANCHARD provided the following information:

BLANCHARD advised that he remembered the memorandum sent to CHRIS ADKINS regarding staffing reductions. BLANCHARD could not remember the back story behind the reduction of miners. BLANCHARD referred to ADKINS as Mr. Adkins in the memorandum because of a disagreement he had had with ADKINS earlier that day. BLANCHARD thought the disagreement was over the reduction of miners. BLANCHARD usually is more informal when addressing memorandum to ADKINS.

BLANCHARD reviewed an e-mail sent by LISA WILLIAMS to SABRINA DUBA. BLANCHARD advised that the ability to comply with the safety laws in the outby areas and belts would have been affected by the reduction of miners at the Upper Big Branch (UBB) mine. The decision to reduce miners would have made compliance with the safety laws more difficult. Most of the cuts were dealing with individuals who worked in outby areas who were responsible for maintaining belts and building stoppings. BLANCHARD disagreed with the decision to make cuts. BLANCHARD was frustrated that miners who were specialized in one area were being assigned to perform other tasks.

BLANCHARD does not think DON BLANKENSHIP understood how difficult it was to attract and retain quality people. BLANCHARD added that BLANKENSHIP's lack of understanding led to situations where miners were forced to work in areas that were outside of their specialized areas.

BLANCHARD wanted to purchase a new track duster that would be used in addition to the track duster that was already located at the UBB mine. The request for the new track duster was not granted. The new track duster was considered more of a want item than an item that was needed since the UBB mine already had one track duster. Because of this, the new track duster was trimmed from the budget.

Investigation on ___09/21/2015___ at ___Charleston, West Virginia, United States (Phone)___

File # ___318A-PG-78655-302___                    Date drafted ___09/23/2015___

by ___James F. Lafferty II___

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - Chris Blanchard _____ , On  09/21/2015 , Page  2 of 2

　　BLANCHARD agreed that the UBB mine would have been more adequately rock
dusted with the addition of a second track duster.

　　BLANCHARD advised that a few overcast were built without BLANKENSHIP's
knowledge.  This was done because BLANCHARD knew that BLANKENSHIP did not
like overcast to be built.

　　BLANCHARD remembered receiving a memorandum from BLANKENSHIP in the late
winter of 2009 or the early spring of 2010 that made him so angry he threw
the memorandum in the trash.  BLANCHARD advised that he still gets angry
thinking about the memorandum.

　　BLANCHARD stated that since the morning of April 6, 2010, he has wanted
to tell everything he knew about the UBB mine.  BLANCHARD took the Fifth
Amendment during the MSHA investigation on the advice of his lawyers.
BLANCHARD has wanted to cooperate and contribute from the beginning.
BLANCHARD does not want anything to happen at another mine similar to what
happened at the UBB mine if something he can say could help prevent it.

MOI-001551

FD-302 (Rev. 5-8-10)                    - 1 of 2 -                    

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    10/05/2015

PERRY BROWN was interviewed at the MSHA District 4 Office located in Mt. Hope, West Virginia.  Special Assistant United States Attorney (SAUSA) Dana Ferguson and SAUSA Jake Hargreaves were present and participated in the interview.  After being advised of the identities of those in attendance, BROWN provided the following information:

BROWN believed that ALEX MACIA served him a trial subpoena in the case of the U.S. v. Donald L. Blankenship.  BROWN advised that MACIA gave him a card but he has since lost it.  MACIA was by himself.

BROWN advised that MACIA told him that the United States was trying to convict DON BLANKENSHIP of a conspiracy to not use curtains or ventilate sections.  MACIA asked BROWN if he believed the allegations made against BLANKENSHIP.  BROWN informed MACIA that he did not have any comment on anything.

MACIA confirmed with BROWN that he was at the closeout for the Upper Big Branch (UBB) mine for the last complete quarter before the explosion. MACIA informed BROWN that he said the mine was in good shape.  BROWN responded to MACIA's statement by saying that he does not recall saying those things.  BROWN then told MACIA that it had been a long time and that he had notes that would tell what he had said during the closeout.

MACIA asked BROWN if he e-mailed colleagues about the UBB mine.  BROWN notified MACIA that he knew he had not e-mailed any of his colleagues about the UBB mine.  BROWN could not recall anyone else e-mailing colleagues about the UBB mine.

BROWN informed MACIA that he had no ax to grind and he would appear at the trial and answer questions.

Later after meeting with MACIA, BROWN contacted KEITH STONE who was also at the closeout.  STONE pulled BROWN's notes and they discussed the comments BROWN had made.

BROWN advised that he issued 32 citations for the short period of time he was inspecting the UBB mine.  BROWN added that this indicated to him that the UBB mine was not in good shape.

---

Investigation on  09/24/2015  at  Charleston, West Virginia, United States (In Person)

File #  318A-PG-78655-302                                    Date drafted  09/30/2015

by  James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - Perry Brown                                   , On  09/24/2015  , Page  2 of 2

BROWN provided the interviewing agent a copy of a letter, trial subpoena, and check he received from MACIA.

MOI-001564





**SPILMAN THOMAS & BATTLE.** PLLC

ATTORNEYS AT LAW

Alexander Macia
304.340.3835
amacia@spilmanlaw.com

September 18, 2015

Mr. Perry Brown

Redacted - Privacy

Dear Mr. Brown:

Enclosed is a subpoena requiring your attendance at the federal courthouse in Charleston to testify as a witness in the case of United States v. Donald L. Blankenship. Also enclosed is a check in the amount of $163.65, which includes a one day witness fee and the legal mileage allowance for travel to and from the courthouse. The address of the courthouse is: Robert C. Byrd United States Courthouse, 300 Virginia Street, East, Suite 2400, Charleston, WV 25301.

Please note that the subpoena requires your appearance at Courtroom 5000 on **October 13, 2015, at 9:00 am**. You are required to appear on that date and time, unless we inform you otherwise. It is very possible that your testimony will not be given on that date. We will do our best to inform you of the estimated date of your testimony. We understand that a subpoena causes inconvenience, and we will do what we can to accommodate you. However, we have limited control over the manner in which the trial will proceed. If you have any questions, please contact me at (304) 340.3835 (office) or (304) 541.1932 (cell).

Sincerely,

Alexander Macia
Counsel for Donald L. Blankenship

Enclosures

Spilman Center : 300 Kanawha Boulevard, East · Post Office Box 273 | Charleston, West Virginia 25321-0273
www.spilmanlaw.com | 304.340.3800 : 304.340.3801 fax

West Virginia      North Carolina      Pennsylvania      Virginia

MOI-001565

AO 89  (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case

# UNITED STATES DISTRICT COURT
for the

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No.    5:14-cr-00244 |
| Donald L. Blankenship | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE

To:      Perry Brown

**Redacted - Privacy**

**YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place shown below to testify in this criminal case. When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place of Appearance: | Robert C. Byrd United States Courthouse 300 Virginia Street, East Charleston, WV 25301 | Courtroom No.: | 5000 |
|---|---|---|---|
| | | Date and Time: | 10/13/2015 at 9:00 a.m. |

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

*(SEAL)*

Date:   SEP 0 2 2015

CLERK OF COURT

*Megan Malhotra*
*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*
Donald L. Blankenship
, who requests this subpoena, are:

Alexander Macia, Esq.
Spilman Thomas & Battle, PLLC
300 Kanawha Boulevard, East
Charleston, WV 25301
(304) 340.3835
amacia@spilmanlaw.com

MOI-001566



**SPILMAN THOMAS & BATTLE** PLLC
A T T O R N E Y S   A T   L A W

Branch Banking & Trust
69-339/515

**132294**

BB&T Charleston Operating
P. O. Box 273
Charleston, West Virginia 25321-0273
304-340-3800

| DATE | AMOUNT |
|------|--------|
| September 18, 2015 | $163.65 |

PAY     ONE HUNDRED SIXTY-THREE AND 65/100 USD

TO THE
ORDER OF

Brown, Perry

**Redacted - Privacy**

Void if not presented for payment
within 90 days after date of issue.

AUTHORIZED SIGNATURE

AUTHORIZED SIGNATURE
TWO SIGNATURES REQUIRED IF OVER $10,000

## Redacted - Privacy

**SPILMAN THOMAS & BATTLE** PLLC
A T T O R N E Y S   A T   L A W

09-18-15                            132294

| Invoice Date | Invoice Number | Invoice Description | | Payment Amount |
|--------------|----------------|---------------------|---|----------------|
| 09-18-15 | Witness fee | Witness fee (21968.1) | | 163.65 |

TOTAL CHECK        $163.65

MOI-001567

FD-302 (Rev. 5-8-10)

- 1 of 2 -



## FEDERAL BUREAU OF INVESTIGATION

Date of entry    10/05/2015

ALBERT BENNY CLARK was interviewed at the MSHA District 4 Office located in Mt. Hope, West Virginia. Special Assistant United States Attorney (SAUSA) Dana Ferguson was present and participated in the interview. After being advised of the identities of those in attendance, CLARK provided the following information:

CLARK has not received a trial subpoena from DON BLANKENSHIP's defense team.

CLARK reviewed a field office supervisor report summarizing a supervisor visit to the Upper Big Branch (UBB) mine. CLARK confirmed he was the acting field office supervisor on November 14, 2009. CLARK does not remember writing the comments noted in the report. CLARK stated that the only time he traveled from the surface of the mine to a section during this time period was on November 14, 2009. CLARK wrote several citations. CLARK stated the rock dust appeared to be on the tracks. It appeared to be a typical coal mine. The belt also appeared to be rock dusted well. The section was in a fair condition. CLARK visited the headgate or tailgate section. CLARK did not walk the longwall. CLARK did not walk back into the bleeder areas. CLARK advised this was the only place he visited at the UBB mine that day. CLARK stated that if the conditions he saw had been worse, he would have written citations to coincide with his notes.

CLARK does not remember GARY MAY or EVERETT HAGER talking to him about problems they were having at the UBB mine.

CLARK does not think MSHA was tougher on Massey Energy than any other coal company. CLARK treated mines owned by Massey Energy like any other mine.

CLARK considered it a part of his job to teach miners the law so that MSHA would not have to write citations. CLARK would pull individual miners to the side and have a safety meeting with them.

CLARK had no arguments with others from MSHA regarding how MSHA was treating the UBB mine. CLARK had no reason to doubt the citations that were written by other inspectors at the UBB mine.

---

Investigation on  09/24/2015  at  Mt. Hope, West Virginia, United States (In Person)

File #  318A-PG-78655-302                                    Date drafted  09/30/2015

by  James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Case 5:14-cr-00244   Document 663-4   Filed 04/18/18   Page 52 of 82 PageID #: 23334

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview – Albert Benny Clark                              , On  09/24/2015 , Page  2 of 2

    CLARK never had a Massey Energy employee complain about not being able to talk to MSHA inspectors.  CLARK advised that in general Massey employees would not talk to MSHA inspectors.

    CLARK had been back in the bleeders on another occasion with KEVIN LYALL.  At the time, the UBB mine was down due to an inundation of water.

    CLARK knew HAGER from seeing him at other mines where HAGER had worked. CLARK thought HAGER was a likeable person.

    CLARK had been told by individuals who worked for Massey Energy that BLANKENSHIP does not take care of the people who work for him.  CLARK also heard from individuals who worked for Massey Energy that BLANKENSHIP had cut salaries and laid people off to get a bonus for himself.

    CLARK has never met BLANKENSHIP.

    CLARK recalled a case MSHA had against Massey Energy in 1999 related to water in the escape way.  MSHA won the case.

MOI-001569

FD-302 (Rev. 5-8-10)

- 1 of 1 -



FEDERAL BUREAU OF INVESTIGATION

Date of entry    10/05/2015

On September 24, 2015, the interviewing Agent met with Jerome Stone, Joe Mackowiak, and Glen Poe at the National Mine Health and Safety Academy located in Beaver, West Virginia. They were allowed to review citations they wrote at the Upper Big Branch mine from January 1, 2008, through April 9, 2010.

Each individual recognized their names, signatures, and AR Numbers listed on their citations. Each individual agreed that they had issued the citations and advised that they did not disagree with any of the evaluations made when they issued the citations.

Investigation on  09/24/2015  at  Beaver, West Virginia, United States (In Person)

File #  318A-PG-78655-302                                    Date drafted  09/30/2015

by  James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

MOI-001574

FD-302 (Rev. 5-8-10)                          - 1 of 3 -



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    10/05/2015

KEITH MCELROY was interviewed by telephone.  Assistant United States
Attorney (AUSA) Steve Ruby, AUSA Greg McVey, AUSA Gabriele Wohl, Special
Assistant United States Attorney Dana Ferguson, and DOL-OIG Special
Agent Jeff Carter participated in the interview.  After being advised of the
identities of those in attendance and the nature of the interview, MCELROY
provided the following information:

MCELROY has been with MSHA for ten years.  MCELORY has worked at MSHA's
District 6 office for his entire tenure.  MCELROY started as an electrical
inspector.  MCELROY trained to be an accident investigator.  MCELROY
received two weeks of accident training at MSHA's mine academy.  MCELROY
also traveled to investigations with individuals who were certified
accident investigators.

MCELROY worked for two years on the Upper Big Branch (UBB) mine
explosion.  Early on in the investigation, MCELROY traveled with the flames
and forces group and took photographs.  MCELROY was then involved with
investigating the longwall shearer which was located at the tailgate of the
longwall.  MCELROY is now a conference litigator representative for
District 6.

Prior to joining MSHA, MCELROY worked in the mining industry from 1977
through 2005.  MCELROY began his career working manual labor jobs,
operating shuttle cars, roof bolting, and running mobile equipment.  In
1981, MCELROY obtained his assistant mine foreman certification.  MCELROY
ran his own mine as an operator for a few years.  MCELROY worked as a mine
foreman at the Boylan mine before joining Consol.  MCELROY worked for
fourteen years at a Consol mine located in Kentucky.  The mine was a room
and pillar operation.  MCELROY worked as a mine foreman for Consol.

MCELROY advised the UBB longwall shearer and sprays were examined
thoroughly.  MCELROY could see in the cutter drum that sprays were
missing.  Later, it was determined during the inspection other sprays and a
spray block were missing from the cutter drum.  MCELROY advised an open
ended hose was being used where the spray block was missing. MCELROY added
many of these issues were learned when water was put through the shearer.
The water was brought into the mine from the surface using a 3 inch

Investigation on    09/28/2015    at    Charleston, West Virginia, United States (Phone)

File #    318A-PG-78655-302                                    Date drafted    09/30/2015

by    James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

MOI-001571

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of _Interview - Keith McElroy_ _____ , On _09/28/2015_ , Page _2 of 3_

stainless steel water line and a filtration system.  A borehole was used to
drop the water line into the mine.  MCELROY understood that trucks with
water were located on the surface.

MCELROY advised that the missing sprays robbed the rest of the system of
water.  The sprays should have been getting a minimum of 90 psi.  A missing
spray takes away a gallon of water per minute from the rest of the system.
MCELROY stated pulled sprays does not help the intended purpose of the
sprays which is to suppress dust.  MCELROY added that you could still run
the shearer with sprays missing.

MCELROY advised that the UBB mine had too many gallon per minute type
sprays they were using at the mine to allow enough water to reach the
longwall.  MCELROY advised that even if the shearer had been operating with
all of its sprays, the investigation determined that the shearer could not
have obtained 90 psi.

JASON WHITEHEAD produced a video at another mine site that showed a
shearer could still work with one spray removed.  MCELROY reiterated that a
column of rotating water is not effective in suppressing dust.

Water sprays are used to cool the motor, control dust, cool the bits,
and reduce methane that might form around the mining bits.

The longwall shearer used a pick face water flushing system that was
designed primarily for dust control.

The longwall shearer was using counterfeit sprays.  The sprays were
being used at the wrong angle.  The water sprays were located in front of
the mining bits.  MCELROY saw slag and creek sediment in the drum and in
the stopped up sprays.

MCELROY agreed that the longwall shearer at UBB could keep running with
some of the sprays out.  The electric motor on the longwall shearer could
not function without water.  MCELROY stated the fire suppressant system had
been disassembled was was not being used.

MCELROY stated the sprays on the longwall shearer were staple lock
sprays.  In order to install the sprays you have to push the bit down and
drive a staple down into the sprays.  MCELROY advised there were no signs
of fragments found that would have indicated the sprays had been ripped out
of the shearer because of the explosion.

CHRIS SCHIMMEL stated that MSHA could write up whatever they wanted and
he would write up a report to knock it down.  SCHIMMEL's comment was made
in front of a group of twenty one individuals who were working near the

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - Keith McElroy _____ , On  09/28/2015 , Page  3 of 3

shearer during the inspection.  MCELROY advised DAVE STEFFEY included the
comment in his notes.

MOI-001573

Report of Interview

**U.S. Department of Labor**
**Office of Inspector General**
**Office of Investigations**



Page __1__ of __5__                                   OIG Form 103 (OI – 1/98)

| Investigation on: | September 29, 2015 | At: | Charleston, WV | File: | 31-0862-0001 PC |

By: Special Agent Jeffrey Carter _Ja.C._                                   Date Prepared: 9/29/2015

On September 29, 2015, Sandra Davis accompanied by Tim Dipiero was interviewed at the United States Attorney's Office in Charleston, WV. Present and participating in the interview were, Assistant United States Attorney Steve Ruby, Special Agent Jeffrey Carter, U.S. Department of Labor, Office of Inspector General and Patty Fisher, Technology Specialist.

Also present for portions of the interview were, United States Attorney, Booth Goodwin, Assistant United States Attorneys Greg McVey and Gabriele Wohl.

After being advised of the nature of the interview, Davis provided the following information:

Davis stated that she was familiar with individuals who had regular contact with Don Blankenship.

Davis recalled that there were two TeleCorder machines at Blankenship's office, with one being replaced, because it crashed. Davis believed that someone from the Massey office in Richmond arranged for the installation of the device. Davis was notified that the machine was being installed.

Davis was shown the Total Recall system that was in the office. Davis provided that the machine sat behind her desk in the office.

Davis recognized her signature on the Electronic Evidence Consulting Change of Custody Record form that noted two TeleCorder devices with serial numbers and an audio CD containing 833 calls and a duplicate audio CD of the 833 calls. Davis advised that the form contained her signature.

Davis reviewed portions of the following recordings: As part of the review, Davis listened to portions of the recordings from the CD retrieved from Davis as noted on the evidence custody record along with a copy of the recording and transcript. After Davis conducted her review she provided the date and initials on each copy.

Recording number 166: Davis listened to a portion of the recording and provided that she recognized Blankenship's voice and that she thought the second voice was Jim Twig. Twig was a consultant for Massey. After review, Davis provided date and initials on copy.

Recording number 162: Davis listened to a portion of the recording and provided that she recognized Blankenship's voice and the voice of Della Kline. Kline was Blankenship's girlfriend. After review, Davis provided date and initials on copy 162A.

Recording number 596: Davis listened to a portion of the recording and provided that she recognized Blankenship's voice and the voice of Chris Adkins. Adkins was an executive manager at Massey. After review Davis, provided date and initials on copy.

Recording number 597: Davis listened to a portion of the recording and provided that she recognized Blankenship's voice and that she could not recognize the second voice.  After review, Davis provided date and initials on copy.

Recording number 601: Davis listened to a portion of the recording and provided that she recognized Blankenship's voice and that she could not recognize the second voice.  After review, Davis provided date and initials on copy.

Recording number 347: Davis listened to a portion of the recording and provided that she recognized Blankenship's voice and stated that the second voice sounds like Mark Clemens.   After review, Davis provided date and initials on copy 347B.

Recording number 606: Davis listened to a portion of the recording and provided that she recognized Blankenship's voice and the voices of Adkins and Clemens.   After review Davis provided date and initials on copy 606B. Davis provided that Roger Hendriksen worked in the Richmond office and was over something to do with investors.

Recording number 734: Davis listened to two separate portions of the recording, 734A and 734B.  Davis listened to a portion of the recording and provided that she recognized Blankenship's voice and the voice of Chris Adkins.   After review Davis provided date and initials on copy 734A.

Recording number 734: Davis listened to two separate portions of the recording, 734A and 734B.  Davis listened to a portion of the recording and provided that she recognized Blankenship's voice and the voice of Adkins.  After review Davis provided date and initials on copy 734B.

Recording number 735: Davis listened to two separate portions of the recording, 735A and 735B.  Davis listened to a portion of the recording and provided that she recognized Blankenship's voice and that the second voice sounds like Jim Twig. Davis provided that Dan Moore was a Massey board member.   After review Davis provided date and initials on copy 735B.

Recording number 736: Davis listened to a portion of the recording and provided that she recognized Blankenship's voice and the voice of Adkins.   After review Davis provided date and initials on copy.

Recording number 1110: Davis listened to a portion of the recording and provided that she recognized Blankenship's voice and that she could not recognize the second voice.  After review Davis provided date and initials on copy.

Davis initialed the original CD as being the CD recovered and signed for by Davis on the evidence custody record from her office.

Davis reviewed portions of the following recordings: As part of the review, Davis listened to portions of the recording from a copy and reviewed the transcript. After Davis conducted her review she provided the date and initials on each copy.

---

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG).  It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Recording number 735: Davis listened to two separate portions of the recording, 735A and 735B.  Davis listened to a portion of the recording and provided that she recognized Blankenship's voice and that the second voice sounded like Jim Twig.  Davis provided that Dan Moore was a Massey board member.  After review Davis provided date and initials on copy 735A.

Recording number 1304:  Davis listened to a portion of the recording and provided that she recognized Blankenship's voice and the voice of Mike Snelling.  Snelling was a Massey manager in charge of surface mining.  Davis provided that Stan Suboleski was a Massey board member.  After review Davis provided date and initials on copy.

Recording number 1305:  Davis listened to a portion of the recording and provided that she recognized Blankenship's voice.  After review, Davis provided date and initials on copy.

Recording number 1329:  Davis listened to a portion of the recording and provided that she recognized Blankenship's voice.  After review, Davis provided date and initials on copy.

Recording number 1330:  Davis listened to a portion of the recording and provided that she recognized Blankenship's voice and the voices of Hendriksen and Baxter Phillips.  Davis provided that Eric Tolbert was a controller in the Richmond office and that Jeff Jarosinski was in accounting.  Davis provided that the call was possibly in reference to a press release and that this was a typical review process for Blankenship.  After review, Davis provided date and initials on copy.

Recording number 1547:  Davis listened to a portion of the recording and provided that she recognized Blankenship's voice and that she did not recognize the second voice.  After review, Davis provided date and initials on copy.

Recording number 1577:  Davis listened to a portion of the recording and provided that she recognized Blankenship's voice.  After review, Davis provided date and initials on copy.

Recording number 1596:  Davis listened to a portion of the recording and provided that she recognized Blankenship's voice.  Davis provided that Elizabeth Chamberlain was over safety.  After review, Davis provided date and initials on copy labeled 1596B.

Davis listened to recording number 562 from the Total Recall System and reviewed the transcript.  Davis also listened to a copy of the recording.  Davis provided that she recognized Blankenship's voice.  After review, Davis provided date and initials on copy.  Davis provided that this was the typical way that dictation would have been done.  The dictation would be transcribed and sent to recipients and in this instance the recipients were group presidents and controllers.

Davis was shown a memorandum dated October 19, 2005, to All Deep Mine Superintendents.  Davis provided that this memo was transcribed.  Her initials were on the memo representing she transcribed it.  The memo was dictated by Blankenship.  Davis was Blankenship's executive assistant during this time.

Davis reviewed a memorandum dated July 17, 2006, to Group Presidents, Subject: Labor Costs.  Davis stated that this was an intercompany memo.  The memo was transcribed by Davis and dictated by Blankenship represented by Davis's and Blankenship's initials on the memo.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG).  It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Davis reviewed and email with attachment: Report Card, dated October 7, 2009, from Gary Frampton to Blankenship and Davis. Davis received emails from Frampton who was a Massey employee. This email was characteristic of emails she received. Davis reviewed the attachment and recognized the report. Davis would have provided this type of report to Blankenship. Davis was aware that the report dealt with violations. Davis provided that Performance Coal was a resource group of Massey and that UBB was in that resource group.

Davis reviewed an email from Eric Tolbert dated January 20, 2009, to Blankenship, Baxter Phillips, and Mark Clemens, Subject: MSHA Fines Summary. Davis provided that Tolbert worked in accounting at the Richmond office. Davis recognized the report. This would have been a report that Davis would have provided to Blankenship. Davis received Blankenship's email and would have given him a copy of this email. Davis explained that she opened all of Blankenship's emails.

Davis reviewed an email and attachment: Ross Recommendation for violation Reduction, dated July 6, 2009, from Stephanie Ojeda sent to Blankenship and copied to Davis. Davis would have provided the email and attachment to Blankenship.

Davis reviewed a memorandum dated June 25, 2009, from Ojeda to Blankenship. Davis provided that this was an intercompany memo and that she would have received this on behalf of Blankenship and provided it to him. Davis stated that marked confidential was typical of something received from Ojeda.

Davis reviewed an email and attachment: Consolidated Daily P&L (profit and Loss), dated February 2, 2009, from Jonathon Immes to Blankenship copied to Davis. Davis provided that Immes was a controller or accountant for Massey. Davis recognized the attachment as P&L Massey wide. Davis received the report daily and provided it to Blankenship. Davis explained that she printed Blankenship's emails to include attachments and provided them to him.

Davis also reviewed the following emails concerning P &L:

Email dated February 27, 2009: Davis would have printed the email and attachment and provided to Blankenship.

Email dated March 31, 2009: Davis provided that John Marcum was an accountant for Massey in the Charleston Office. Davis would have printed email and attachment and provided to Blankenship.

Email dated May 1, 2009: Davis would have printed the email and attachment and provided to Blankenship.

Email dated June 1, 2009: Davis would have printed the email and attachment and provided to Blankenship.

Email dated July 1, 2009: Davis would have printed the email and attachment and provided to Blankenship.

Email dated August 3, 2009: Davis would have printed the email and attachment and provided to Blankenship.

Email dated September 1, 2009: Davis would have printed the email and attachment and provided to Blankenship. The derivative report would have been handled the same way.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Email dated October 1, 2009:  Davis would have printed the email and attachment and provided to Blankenship.

Email dated November 2, 2009:  Davis would have printed the email and attachment and provided to Blankenship.

Email dated December 1, 2009:  Davis would have printed the email and attachment and provided to Blankenship.

Email dated December 31, 2009:  Davis would have printed the email and attachment and provided to Blankenship.  Davis provided that it was the same document process and they all would have been provided to Blankenship.

Davis reviewed an email dated April 6, 2010, from Richard Grinnan.  Davis provided that Grinnan was a corporate attorney in the Richmond office.  Davis would have received the email and provided it to Blankenship.

Davis reviewed an email with attachment dated April, 9, 2010, from Richard Grinnan to Blankenship.  Davis provided that she would have received the email and attachment and that she would have printed it and provided to Blankenship.

Davis was provided with a document dated May 18, 2009, Safety Environmental and Public Policy Committee.  Davis recognized the document as a presentation for the board meeting.  Davis would have received this prior to the meeting for Blankenship to review.  It would have been sent from the Richmond office to the printer at Davis's office.  This would have been included in the binder for Blankenship.

Davis reviewed an email dated April 3, 2009, from John Patrick, Subject: Daily Violation Report with Attachment: Daily Report.  Davis provided that Patrick worked at the Massey office.  Davis was familiar with this report and would have provided it to Blankenship.

Davis reviewed an email with Attachment: Safety Statement for Review dated April 9, 2010, from Karen Hanretty to Blankenship copied to Davis.  Davis provided that Hanretty works for Qorvis Communications a public relations firm.  Davis would have provided it to Blankenship.

Davis reviewed an email from Blankenship to Hanretty with attachment dated April 9, 2010.  Davis would have sent this email and attachment on behalf of Blankenship.  It was typical for Blankenship to respond in writing.  Blankenship would have given written response to Davis to send to Hanretty.  Davis recognized the written note on the attachment as Blankenship's writing.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG).  It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302 (Rev. 5-8-10)                          - 1 of 1 -



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry     10/05/2015

GARY YOUNG was interviewed at the United States Attorney's Office located in Charleston, West Virginia.  United States Attorney Booth Goodwin and Assistant United States Attorney Gabriele Wohl were present and participated in the interview.  After being advised of the nature of the interview, YOUNG provided the following information:

The Upper Big Branch (UBB) mine was unlike any other mine where he has worked.  YOUNG stated that when he complained about being able to do his job, GARY MAY told him there were 1,000 people waiting to take his job if he wanted to leave.

YOUNG has worked in union coal mines.  YOUNG stated that if you walked up on a section that was not rock dusted at a union mine, you had the ability to refuse to work until the area was properly rock dusted.  YOUNG advised you did not have that freedom at the UBB mine.

Investigation on   09/29/2015   at   Charleston, West Virginia, United States (In Person)

File #   318A-PG-78655-302                                Date drafted   09/30/2015

by   James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

MOI-001575

FD-302 (Rev. 5-8-10)                           - 1 of 1 -



## FEDERAL BUREAU OF INVESTIGATION

Date of entry     10/05/2015

        GARY MAY was contacted by telephone.  After being advised of the nature
of the phone call, MAY provided the following information:

    ALEX MACIA visited MAY yesterday.  MACIA identified himself as an
attorney.  MACIA informed MAY that he would not get a subpoena from DON
BLANKENSHIP's legal team unless the federal government subpoenaed him to
testify.  MACIA informed MAY that if the government called him to testify,
BLANKENSHIP's team would have the ability to cross examine him.  MACIA
talked to MAY about how potential charges against his ex-wife had been
dropped as part of MAY's plea agreement.  MAY took MACIA's comment to mean
they would try to make the point that MAY had pleaded guilty to keep his
ex-wife out of jail.

    MAY advised he informed MACIA that his direct contact was with CHRIS
BLANCHARD, not BLANKENSHIP.

Investigation on   09/30/2015   at   Charleston, West Virginia, United States (Phone)

File #   318A-PG-78655-302                                      Date drafted   09/30/2015

by   James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency

MOI-001570

FD-302 (Rev. 5-8-10)

- 1 of 3 -


OFFICIAL RECORD

## FEDERAL BUREAU OF INVESTIGATION

Date of entry   10/15/2015

MICHAEL S. ELLISON was interviewed at the United States Attorney's Office located in Charleston, West Virginia.  Also present and participating in the interview was Assistant United States Attorney Steve Ruby.  After being advised of the identities of those in attendance and the nature of the interview, ELLISON provided the following information:

ELLISON advised that he has never heard of the Hazard Elimination Program.  ELLISON has heard of S-1, P-2.  ELLISON received no training on S-1 during his three years working for Massey Energy.  ELLISON advised that the extent of training he received in regards to S-1 was to be told that S-1 means safety first.  ELLISON had heard S-1 exceeded MSHA and state rules.  ELLISON stated that once you entered a mine, S-1 would go out the window.  ELLISON added that if you mentioned a safety issue you would be told to just do your job.

ELLISON had heard of Massey Energy's policy to have 20,000 CFM of air in the last open break.  ELLISON stated this did not happen at the Upper Big Branch (UBB) mine.  ELLISON advised his crew never had the correct amount of air.

ELLISON advised that while working on Headgate 22, air was taken from his section to get air to an area where a belt head was being set up.  ELLISON added that this was done by opening doors that helped direct air to the belt head area.  The belt head was being set up for the new longwall panel.  ELLISON advised the belt head was worked on for two to three months while he was on Headgate 22.

ELLISON described an incident where his crew learned that TERRY MOORE, a mine foreman, had opened the door to direct air to the belt head.  MOORE told ELLISON that ELLISON's boss, DEAN JONES, could not run coal out of a stockpile.  MOORE described the complaint of not having enough air on Headgate 22 as an excuse for why JONES' section could not get anything done.  ELLISON advised that there were other instances where his crew found the doors had been opened to direct air to the belt head.  The doors would be shut to get air back to Headgate 22.

ELLISON described trying to rock dust on Headgate 22 as useless.

---

Investigation on   10/13/2015   at   Charleston, West Virginia, United States (In Person)

File #   318A-PG-78655-302                                      Date drafted   10/14/2015

by   James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

MOI-001576

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of _Interview - Michael S. Ellison_ , On _10/13/2015_ , Page _2 of 3_

ELLISON advised that the scoop man would rock dust on the section but because of the lack of air, float dust would cover up the rock dust within twenty minutes. In addition, the working face would become as black as coal. ELLISON advised you could not see because of the coal dust. The continuous miner would have to be shut down until the float dust settled.

ELLISON advised that while working on the 3 section in April or May of 2009 he was directed by GARY MAY to knock stoppings out to direct air to areas where inspectors were traveling in the mine. ELLISON would then be directed to rebuild and seal the stoppings. ELLISON stated that while working on Headgate 22 he was directed by MOORE to knock stoppings out to direct air to areas where inspectors were traveling in the mine. ELLISON would then be directed to rebuild and seal the stoppings.

ELLISON advised that when he worked on the outby crew he worked on the tracks, bulk dusted, helped with the motor, and built timbers. ELLISON was never trained on how to operate the motor. ELLISON recalled two rock dust machines at the UBB mine. ELLISON advised that one machine did not work, while the other machine would work on occasion. ELLISON estimated he worked two weeks on the outby crew at the end of 2009. ELLISON stated that he was off of work for weeks at a time after being assigned to the outby crew.

ELLISON was not aware of a meeting at Scott High School involving Massey Energy employees. ELLISON was aware that Massey Energy had a lot of meetings with bosses. ELLISON never received any instructions that the pressure had been taken off of producing coal at UBB.

ELLISON has seen DON BLANKENSHIP once. The day after the explosion ELLISON traveled to the UBB mine to see if he could help. ELLISON saw BLANKENSHIP in a vehicle. BLANKENSHIP did not get out of the vehicle.

ELLISON advised there were two major air changes that took place while he was underground. The first occurred in August of 2009. The second occurred when he worked on Headgate 22. ELLISON described the air changes as illegal and miners were pulled out of the mine on both occasions.

ELLISON stated there was nothing an average miner could do about the ventilation at UBB. ELLISON complained about the lack of air to MAY and MOORE. ELLISON was told that people had been laid off and they were waiting to take his job.

ELLISON had never heard that violations were tracked at Massey Energy. ELLISON advised proximity detectors were not used at UBB. ELLISON stated the UBB mine did not use pogo sticks. The UBB mine did not have heavy duty

FD-302a (Rev 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview – Michael S. Ellison      , On  10/13/2015 , Page  3 of 3

curtains.  ELLISON advised he thought the rock bolting machine on Headgate 22 had an angled boom drill.

ELLISON advised a typical Massey Energy mine had three bolt men and two buggy men.  One of the bolt men would float between roof bolt machines.  A miner would assist with scooping up accumulations and rock dusting. ELLISON advised that with this lack of manpower maintaining ventilation and rock dusting did not get done.  ELLISON advised that continuous miner operators would begin mining coal before the area had been cleaned up and rock dusted.

MOI-001578

FD-302 (Rev. 5-8-10)                          - 1 of 4 -



### FEDERAL BUREAU OF INVESTIGATION

Date of entry     10/20/2015

     CHRIS BLANCHARD was interviewed at the United States Attorney's Office,
located in Charleston, West Virginia.  Participating by telephone was
BLANCHARD's attorney, Alan Strasser.  Assistant United States Attorney
(AUSA) Steve Ruby and AUSA Gabriele Wohl were present and participated in
the interview.  After being advised of the nature of the interview,
BLANCHARD provided the following information:

     BLANCHARD stated the first memorandum dated June 7, 2010 he prepared
after the Upper Big Branch (UBB) mine explosion was done at the request of
SHANE HARVEY.  HARVEY had asked BLANCHARD for some color and background
regarding some violations.  BLANCHARD added the media had been reporting on
UBB's violation history.  HARVEY wanted details on the citations with the
primary focus being on D orders.  BLANCHARD pointed out that he did not say
in the memorandum that the MSHA violations were not legitimate.  BLANCHARD
agreed that they were legitimate.  BLANCHARD was not working at the UBB
mine at the time the request was made by HARVEY.  BLANCHARD had been
transferred to the Julian, West Virginia office.

     BLANCHARD discussed his thoughts on the longwall belt air being turned
around.  BLANCHARD advised that the ventilation plan originally approved by
MSHA allowed for the usage of belt air.  BLANCHARD learned later that the
UBB mine would not be able to use belt air.  BLANCHARD advised the UBB mine
spent approximately two days trying to turn the belt air around.  BLANCHARD
stated that when the mine was unable to turn the belt air around, BLANCHARD
agreed to turn the belt air around before the longwall reached a certain
break.  In late March of 2010 the longwall reached the break where the belt
air needed to be turned around.  An airlock door was built in the intake of
the longwall to address the issue.  The airlock door acted as a regulator
at all times.  BLANCHARD advised that there were pressure issues at play
with the ventilation system implemented prior to the explosion.  BLANCHARD
added that the miners were unfamiliar with the ventilation system and very
few people understood it.  Lastly, BLANCHARD thought the ventilation system
was complicated.

     BLANCHARD stated that if the longwall had not returned to the UBB mine,
the north end of the mine would still have needed another fan to help with
ventilation issues.

---

Investigation on   10/18/2015   at   Charleston, West Virginia, United States (In Person)

File #   318A-PG-78655-302                                Date drafted   10/19/2015

by   James F. Lafferty II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of   Interview - Chris Blanchard                    , On   10/18/2015 , Page   2 of 4

BLANCHARD does not believe that MSHA or anyone from MSHA was trying to do something to endanger the health and safety of miners. BLANCHARD does think decisions MSHA made ended up endangering the health and safety of miners. BLANCHARD does not think JOE MACKOWIAK was willing to sit down with Performance Coal Company and work out their differences.

BLANCHARD advised that in District #4, MSHA required there be a walkway along the longwall. Using an evaluation point in and evaluation point out was not allowed in District #4. BLANCHARD has checked the language of the regulation and learned that what District #4 was doing followed the letter of the law. BLANCHARD advised the regulation was being enforced on everyone. BLANCHARD added it was hard to argue with the letter of the law.

BLANCHARD stated that the plans approved by MSHA were not impossible to comply with.

BLANCHARD advised that the exhaust shaft he proposed in 2008 and the shaft he proposed in 2010 would have given him more options with the mine's ventilation and would have made things easier. BLANCHARD added both shafts would have made it easier to ventilate the UBB mine.

BLANCHARD reviewed the second memorandum he provided to HARVEY. BLANCHARD advised this memorandum was prepared by him at the request of HARVEY. BLANCHARD does not know why the canopy issue happened. BLANCHARD acknowledged the canopy issue should not have happened. GARY MAY was suspended for a week without pay for the incident.

BLANCHARD reviewed the third memorandum prepared in October of 2010. BLANCHARD stated the purpose of the memorandum was to provide a document bridging the issues at the UBB mine to scientist involved in Massey's investigation into the cause of the explosion. BLANCHARD was working 50% of his time on the UBB investigation. BLANCHARD does not believe the methane that fueled the UBB explosion came from the gob area.

BLANCHARD acknowledged the poor condition of the rock duster made it tougher on the rock dust crew. BLANCHARD never saw the rock dust log. BLANCHARD knew the UBB mine had an old rock duster. BLANCHARD tried to use parts from an old inoperable rock duster.

BLANCHARD acknowledged that part of the reason why violations decreased in late 2009 was because the mine was shut down for a period of that time, the holiday season, and there were less inspection days in the latter part of the year.

BLANCHARD thought WAYNE PERSINGER, JIM WALKER, and BERMAN CORNETT did

MOI-001580

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview - Chris Blanchard  , On  10/18/2015  , Page  3 of 4

all they could do to bring focus on identifying violations at the UBB
mine.  BLANCHARD advised the increased focus on identifying violations was
self imposed and was not brought on by direction from the Julian office.

BLANCHARD reviewed Defense Exhibit #4.  BLANCHARD reviewed item 1.
BLANCHARD never heard of Massey Energy identifying and tracking mine
supervisory personnel by their state identification number.  BLANCHARD did
not think that would be possible.  BLANCHARD reviewed item 4.  BLANCHARD
confirmed that GARY FRAMPTON was placed in the position mentioned.
BLANCHARD reviewed item 5.  JASON WHITEHEAD was in the position mentioned
in or around the time of the meeting at Scott High School.  WHITEHEAD was
not in this position for very long.

BLANCHARD was surprised to read the testimony from UBB miners that
respirable dust fraud was occurring at the mine.  BLANCHARD added the
company did not want people cheating on their respirable dust sampling.

BLANCHARD reviewed Defense Exhibit #14.  BLANCHARD reviewed item 1.
BLANCHARD advised that he received a waiver from CHRIS ADKINS to not follow
this policy.  BLANCHARD reviewed item 2.  BLANCHARD stated the reverse
flapper was not put into use at the UBB mine.  BLANCHARD reviewed item 5.
BLANCHARD confirmed the UBB mine did not have continuous miners with
proximity devices.  BLANCHARD reviewed item 6.  BLANCHARD stated the UBB
mine did not use the hard hats mentioned.  BLANCHARD advised the UBB mine
did not have the pogo sticks mentioned in item 7.  BLANCHARD stated that
the UBB mine had gone to a heavier curtain prior to this e-mail being
circulated.  BLANCHARD reviewed item 9.  BLANCHARD stated the pizza pans at
the UBB mine did not have holes punched into the side of them.  BLANCHARD
stated the UBB mine did not have the rock dust survey kit mentioned in item
11.  BLANCHARD advised every belt head at the UBB mine had a trickle
duster.  BLANCHARD stated the UBB mine did not have doors on their scoops
as mentioned in item 13.

BLANCHARD reviewed Defense Exhibit #15.  BLANCHARD could not remember
any discharges at the UBB mine after the fall of 2009.  BLANCHARD does not
remember being asked to provide data on who had been discharged at the UBB
mine.  BLANCHARD advised the information may have been obtained from the
safety director.  GARY MAY was suspended in October of 2009.  BLANCHARD
advised the suspension of MAY would have happened regardless of the
creation of the Hazard Elimination Program.  Andy Coalson was suspended in
November of 2009.

BLANCHARD reviewed Defense Exhibit #17.  BLANCHARD advised that mines at
Massey Energy were not automatically shut down for not complying with S-1,
P-2, and M-3.

MOI-001581

FD-302a (Rev. 05-08-10)

318A-PG-78655-302

Continuation of FD-302 of  Interview ~ Chris Blanchard                          , On  10/18/2015 , Page  4 of 4

BLANCHARD reviewed Defense Exhibit #19.  BLANCHARD advised the PDM does
the same thing as a dust pump but has a computer that monitors dust
throughout the shift.  The computer allows for time studies to take place.

BLANCHARD reviewed Defense Exhibit #26.  BLANCHARD knew the Hazard
Elimination Committee existed.  BLANCHARD was not privy to what occurred at
their meetings.  Members of the Hazard Elimination Committee did not visit
the UBB mine.

BLANCHARD reviewed Defense Exhibit #38.  BLANCHARD stated the e-mail
discussed issues surrounding production, safety, and finances.  BLANCHARD
was surprised ELIZABETH CHAMBERLIN and safety directors were not sent the
e-mail.

BLANCHARD thought CHAMBERLIN had the authority to shut down a mine had
she chosen to make that decision.  BLANCHARD was not aware of CHAMBERLIN
making that decision.  BLANCHARD stated that CHAMBERLIN had not broken in
to be an insider at Massey Energy.



**United States Department of Justice**

*United States Attorney*
*Southern District of West Virginia*

*Robert C. Byrd United States Courthouse*
*300 Virginia Street, East*
*Suite 4000*
*Charleston, WV 25301*
*1-800-659-8726*

*Mailing Address*
*Post Office Box 1713*
*Charleston, WV 25326*
*304-345-2200*
*FAX: 304-347-5104*

**BY FEDERAL EXPRESS**


February 3, 2017


William W. Taylor, III, Esq.
Zuckerman Spaeder LLP
1800 M Street, NW, Suite 1000
Washington, DC  20036

    Re:  United States v. Donald L. Blankenship
        Criminal No. 5:14-cr-00244

Dear Mr. Taylor:

    We are providing an additional memorandum of interview based
on our search of the file in this case.  Again, if you have any
questions or comments, please do not hesitate to contact me.

               Sincerely,

               CAROL A. CASTO
               United States Attorney

        By:

               R. Gregory McVey
               Assistant United States Attorney

RGM/vld

Enclosure

Report of Interview

**U.S. Department of Labor**
**Office of Inspector General**
**Office of Investigations**



Page __1__ of __3__

OIG Form 103 (OI – 1/98)

| Investigation on: | 11/21/2014 | At: | Charleston, WV | File: | 31-0862-0001 PC |

By: Special Agent Jeffrey Carter                                           Date Prepared: 11/24/2014

On November 21, 2014, Tommy Davis accompanied by attorneys Michael Russ and Pat Jacobs was interviewed at the United States Attorney's Office in Charleston, WV. Present and participating in the interview were Booth Goodwin, United States Attorney, Steve Ruby, Assistant United States Attorney, and Special Agents Jeffrey Carter, U.S. Department of Labor, Office of Inspector General and Jim Lafferty, Federal Bureau of Investigation. Davis provided the following information:

Davis was working at the Upper Big Branch Mine (UBB) for approximately 50 days prior to the explosion. He started working at UBB in February of 2010. Davis was employed at UBB by Dave Stanley as a contract laborer. Davis was paid $10 hourly. Prior to his employment with Dave Stanley, Davis spent seven to eight years running a high wall miner at one of Massey's operations. Davis worked on a track crew with Ralph Plumley, supervisor, and Jackson (first name unknown) installing rail in the area where the long wall was going to mine next. They were installing track at head gate 22 area where Boone Payne worked. Davis reported to Plumley and Keith Stanley for daily direction.

Davis explained that he was assigned to the track crew, but he moved around a lot doing different jobs. He was responsible for getting the man trips ready daily and working around the bathhouse. Afterwards, Davis would travel underground to lay track. Davis explained that one day he may set sand jacks and the next he would install rail or do maintenance.

Davis stated that he was never assigned to clean up work or rock dusting. He did not observe anyone dusting while at UBB. Davis explained that the UBB side of the mine had pod dusters sitting in the shop or inside where supplies were stored. There was a miner in his mid-thirties with a long ponytail that worked the midnight shift assigned to the pod dusters. Davis recalled that the miner always complained about the dusters. Davis stated that he believed Johnny Morris was also assigned to the dust crew. Davis recalled areas on the south side dusted, but not on the UBB side of the mine. The deeper you traveled into the mine the darker it was. The closer you were to the outside the whiter the mine walls were. Two men were assigned to the rock dust crew. Davis was not sure who they reported to. Davis did not recall ever transporting rock dust into the mine. Davis gave the example of a hole in your yard. If you walk around it enough you begin to ignore it.

Some areas of the mine were 10 to 11 miles away that could take one and a half hours to get to. There were a number of doors to travel through. Davis stated that it was the red hats job to operate the switch at the doors. Some of the doors were in bad shape. The doors were supposed to be automatic but did not work. When the doors did not operate automatically you had to constantly get in and out of the buggy to open.

Some of the doors on the long wall section were in good shape. The deeper you traveled in the mine the better the doors were. More of the outby doors were in bad shape because they were constantly getting bumped by the buggies and then the buggies traveled through and let the wind close the doors.

MOI-001346

Davis stated that the only reason he went to UBB was because his son worked there. Davis said five family members were at the mine, Davis, his brother, son and two nephews.

Davis explained that the morning of the explosion the mine was really hot and the air was stale. Davis stated that he was sweating profusely. Signs and the markers on survey stakes on a normal day in the mine would whip back and forth from the ventilation. The day of the explosion the signs and survey markers were not moving and dust was in the air. You could see dust in the air well before the Ellis punch out. A lot of dust in the air that day wasn't normal air. Davis worked on rail the day of the explosion, near the end where Boone Payne's crew was working. Davis was working with Plumley and Jackson and recalled that he saw Everett Hagar.

Davis explained that he had worked underground for a short period of time and was still learning.

The long wall area was wet and muddy. There was a bad water problem. Corey Davis complained a lot about the water, because he was always buying boots. Corey also complained about the work and the long hours.

Davis stated that it was P1 (production) and S2 (safety) not S1 and P2. All pressure at the mine rolled down hill. There was pressure on the long wall. Davis Explained that Timmy Davis carried three or four note pads with him. If the long wall was down Timmy made a note. Timmy logged outby procedures. Timmy logged everything to make sure Timmy was covered. He even kept a personal notebook. You radioed if the long wall was stopped. Everyone felt the pressure that came from the top.

Davis was aware when inspectors were coming. They would get a call and were told to grab your stuff, gloves and glasses. Inspectors had to travel 11 miles to the area and it would take an hour and a half. They would get word that inspectors were coming. It was a common practice. Davis recalled that code phrases were used and it was also just stated that inspectors were coming at UBB.

The whole time Davis was at UBB he felt production was the priority, safety first was just talk. Don Blankenship knew what was going on at UBB. Davis believed that Blankenship could have made changes at the mine. Davis stated that he never saw a safety person in the mine. Timmy Davis and Rick Lane conducted safety briefings and daily safety sheets were read. Davis was aware of two fire bosses at UBB. Davis saw MSHA, but never safety personnel from UBB. As long as you were mining coal everything was fine. When you weren't mining coal pressure went from Blankenship to Chris Adkins to Chris Blanchard on down. Davis would see coal accumulation as he traveled out of the mine. Davis did not recall seeing any written violations at UBB or discussions about violations that were written.

Davis lost three family members in the explosion. Davis stated that he was approximately six to eight breaks underground when the explosion occurred. Davis believed that it was his first day on day shift since the explosion Davis has worked at Kelley Creek, Alloy and the Stockton mines. Davis stated that it was tough working alone after what happened. Davis ran a pod duster at the Stockton mine. Davis stated that at Stockton he shoveled the belts and rock dusted. He wanted to do that after what happened, because it didn't get done at UBB. Davis has seen Atkins, Jason Whitehead and also has dealt with Craig Boggs at the Stockton mine.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Davis stated that he has filled out cards for Alpha and was told if you don't like it there is the door.  He was told by Jamie (last name unknown) who is a boss at the Alloy mine where Davis has worked for the past six or seven months.

Davis stated that if you take care of what you are supposed to, nothing should happen.

Davis suggested talking with the following individuals; Cody Davis-worked on the long wall three to four years, ran the shear.  Ralph Plumley-he laid the first piece of track at UBB.  Harold Lilly worked on the long wall.

Delbert Baily was the individual who shook Blankenship's hand in court.  Davis described Baily as a man of God.  Baily worked at UBB and currently works in the shop at Alpha.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG).  It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

MOI-001348