

**United States Department of Justice**

*United States Attorney*
*Southern District of West Virginia*

*Robert C. Byrd United States Courthouse*
*300 Virginia Street, East*
*Suite 4000*
*Charleston, WV 25301*
*1-800-659-8726*

*Mailing Address*
*Post Office Box 1713*
*Charleston, WV 25326*
*304-345-2200*
*FAX: 304-347-5104*

November 17, 2017

William W. Taylor, III, Esq.
Zuckerman Spaeder LLP
1800 M Street, NW, Suite 1000
Washington, DC  20036

    Re:  United States v. Donald L. Blankenship
        Criminal No. 5:14-cr-00244

Dear Mr. Taylor:

    In further review of the file, we were unable to determine whether the emails contained on the enclosed disc, which are listed below, were previously provided to you.

| | | |
|---|---|---|
| BLANK_00000001 | BLANK_00000004 | BLANK_00000186 |
| BLANK_00000309 | BLANK_00001222 | BLANK_00002137 |
| BLANK_00002331 | BLANK_00002554 | BLANK_00002640 |
| BLANK_00005100 | BLANK_00005308 | BLANK_00005606 |
| BLANK_00007022 | BLANK_00011516 | BLANK_00011981 |
| BLANK_00016206 | BLANK_00016514 | BLANK_00016740 |
| BLANK_00019230 | BLANK_00021570 | BLANK_00022007 |
| BLANK_00023882 | BLANK_00024695 | BLANK_00027515 |
| BLANK_00029746 | BLANK_00032876 | BLANK_00035251 |
| BLANK_00036923 | BLANK_00038992 | BLANK_00046386 |
| BLANK_00046575 | BLANK_00063049 | BLANK_00071305 |
| BLANK_00083712 | BLANK_00098380 | BLANK_00098381 |
| BLANK_00098424 | BLANK_00098621 | BLANK_00098992 |
| BLANK_00100486 | BLANK_00108988 | BLANK_00120080 |
| BLANK_00120560 | BLANK_00121600 | BLANK_00127350 |
| BLANK_00128092 | BLANK_00146675 | BLANK_00157350 |

        Sincerely,

        CAROL A. CASTO
        United States Attorney

By:         
        R. GREGORY McVEY
        Assistant United States Attorney

Enclosure

| From: | Stricklin, Kevin G - MSHA |
|---|---|
| Sent: | Monday, August 30, 2010 9:26 AM |
| To: | Gigliotti, Stephen J. - MSHA |
| Cc: | Thomas, Charles J - MSHA |
| Subject: | RE: Bruce Watzman - advance notice of inspection |

Are you going to participate in the call on Wednesday? I think this should be discussed. No problem if you can't participate. Just let Charlie or I know and we can cover.

**From:** Gigliotti, Stephen J. - MSHA
**Sent:** Friday, August 27, 2010 4:08 PM
**To:** Stricklin, Kevin G - MSHA; Thomas, Charles J - MSHA
**Subject:** Bruce Watzman - advance notice of inspection

I told Bruce that mine operators need to follow the inspectors lead regarding walk around rights for miner's reps and UMWA miners. I told him it was more important to be inconspicuous when an inspector is going to a section than when he is inspecting outby areas. When the inspector gets to the section, he can then call outside for the miner's rep or UMWA miner.

Bruce then pointed out that mine operators are even hesitant to line up transportation especially if there aren't any mantrips or jeeps available. Again, I told Bruce to follow the inspectors lead as he does not have to tell the mine operator where he is going to the last minute. Obviously, this is easier in a multi section mine than in a small one section mine.

I told Bruce we would discuss this further with the DMs next week and I would let him know any additional information.

1

USAO0000002

| From: | Burns, Ronald W - MSHA |
|---|---|
| Sent: | Tuesday, January 31, 2012 8:39 AM |
| To: | Fesak, George M - MSHA; Turow, Stephen D - MSHA; Francart, William J. - MSHA; Weaver, Chris A - MSHA; Weekly, Russel A - MSHA |
| Cc: | Kiser, James A - MSHA |
| Subject: | RE: Topper coal -- Advance Notice |

We could, but I have just a couple of questions.

Is this the only case ever brought before a judge or the commission involving 103(a)? If there are more, we may have to review them to see if there are any opposing findings.
Is this the precedent for advance notice under 103(a)? If yes, since this case involves the operator being put on notice not to call inside, it would appear to be contrary to the AI team's violation.

Other than that, I don't care a bit to write a couple paragraphs on it, with Steve's help of course.

**From:** Fesak, George M - MSHA
**Sent:** Tuesday, January 31, 2012 8:32 AM
**To:** Turow, Stephen D - MSHA; Francart, William J. - MSHA; Burns, Ronald W - MSHA; Weaver, Chris A - MSHA; Weekly, Russel A - MSHA
**Cc:** Kiser, James A - MSHA
**Subject:** RE: Topper coal -- Advance Notice

Do we need to say anything about this in 103(a)?

**From:** Turow, Stephen D - MSHA
**Sent:** Monday, January 30, 2012 4:59 PM
**To:** Francart, William J. - MSHA; Burns, Ronald W - MSHA; Weaver, Chris A - MSHA; Weekly, Russel A - MSHA
**Cc:** Fesak, George M - MSHA; Kiser, James A - MSHA
**Subject:** Topper coal -- Advance Notice

I had thought that I earlier had sent an e-mail to all of you with the *Topper Coal* cases involving advance notice. This is a case in which MSHA explicitly told an operator not to provide advance notice in order to effectively detect smoking materials underground, but the operator did so. MSHA issued a Section 103(a) violation to the operator for interfering with an inspection. The trial judge did not rely on the advance notice *per se* in upholding the violation, but he recognized that Section 103(a) implicitly prohibits an operator from impeding MSHA's authority to conduct an inspection, and given the facts of the case, he determined that the operator intended to interfere with the inspection by providing advance notice. The operator appealed to the full Commission, and without explaining why the advance notice provision in Section 103(a) can apply to the operator (as opposed to MSHA inspectors) and ignoring the "in carrying out" language of the preceding clause, the Commission concluded that they need not consider whether the operator interfered with the inspection, as the operator clearly provided advance notice in violation of Section 103(a). Thus, they affirmed the judge's holding on that basis.

USAO0000003

Interestingly, the case was not appealed by the operator to the United States Court of Appeals, so the FMSHRC decision remains the precedent.  I am aware of no cases since *Topper* that limits the application of the advance notice provision of Section 103(a).

**Stephen Turow**
**Office of the Solicitor, MSH Division**
**202-693-9353**

This message may contain information that is privileged or otherwise exempt from disclosure under applicable law.  Do not disclose without consulting the Office of the Solicitor.  If you think you received this e-mail in error, please notify me immediately by e-mail or by phone at (202) 693-9353.

USAO0000004

| | |
|---|---|
| **From:** | Francart, William J. - MSHA |
| **Sent:** | Wednesday, January 25, 2012 7:39 AM |
| **To:** | Turow, Stephen D - MSHA; Burns, Ronald W - MSHA |
| **Cc:** | Fesak, George M - MSHA |
| **Subject:** | RE: Advance notice section |

I think this version is more representative and places the interviews with MSHA employees in the proper context.

I added a comment to the linked version.  In reading the AI report, the citation is based on the interviews with UBB employees.  It is important to note that these same employees were probably more willing to discuss the obstructive conduct after the explosion – had the AI team interviewed miners pre-explosion, do you believe they would have been as open in their responses?  I do not.  Inspectors may have had suspicions; but without the post-explosion testimony of the miners, would the AI team have issued a citation based on suspicion?  I think not.

**From:** Turow, Stephen D - MSHA
**Sent:** Tuesday, January 24, 2012 5:18 PM
**To:** Burns, Ronald W - MSHA
**Cc:** Francart, William J. - MSHA; Fesak, George M - MSHA
**Subject:** Advance notice section

L:\APN-060\Report Sections for Review\Steve Turow - Sections for Review\103a\Enforcement of Section 103 draft 6.doc

Ron,

The document hyperlinked above is my attempt to modify the document in light of this afternoon's discussion.  As the "track changes" indicators were becoming overwhelming, I accepted all changes in the version that we were discussing this afternoon and highlighted additional modifications in yellow in the document above.  In addition, I deleted the following items from the document that we were discussing this afternoon:

**Removed from *Requirements* section:**

Further, the Manual states:

It is important to note that even in cases where direct enforcement activities are involved, it may be necessary to make some type of arrangement with personnel at the mine when certain preparations are essential to carry out enforcement activities.  The important point to remember is that any arrangements or notice relating to an enforcement activity that is not essential to carry out that activity is considered to be "advance notice" as the term is used in Section 103(a) of the Act.

**Removed from *Conclusion* section:**

Additional guidance and direction is critical given the impact that advance notice played in limiting the Agency's ability to detect hazards at UBB and given operators' enhanced ability to track inspector movements and to communicate with underground personnel following installation of electronic tracking and wireless, two-way communication systems mandated by the MINER Act of 2006.

**Removed from *Recommendations* section:**

1

USAO0000005

The Administrators for Coal and Metal and Nonmetal should assign a task force to consider resources appropriate to devote toward the detection of advance notice during inspections and to develop strategies that may be effective for detecting and documenting advance notice when inspectors have reason to believe that such actions are occurring.  As the Administrators consider appropriate, the task force's findings and recommendations should be formalized to provide training and guidance to inspection personnel.

Also, I need you to address Chris' comment with respect to the second recommendation; it looks like you have made changes in response, but I'm not sure whether this is final formulation for the second recommendation.  Also, in light of changes to the first recommendation, could the two be merged by merely mentioning the *General Coal Mine Inspection Procedures and Inspection Tracking System* handbook along with the *Program Policy Manual* in the first recommendation?

Please take a look at the current version, make necessary modifications, and let me know whether you think that it is ready to go to Bill and George for a final review.

Thanks for your patience and valuable insight!!

Steve

**Stephen Turow**
**Office of the Solicitor, MSH Division**
**202-693-9353**

This message may contain information that is privileged or otherwise exempt from disclosure under applicable law.  Do not disclose without consulting the Office of the Solicitor.  If you think you received this e-mail in error, please notify me immediately by e-mail or by phone at (202) 693-9353.

USAO0000006

| | |
|---|---|
| **From:** | Kiser, James A - MSHA |
| **Sent:** | Monday, September 27, 2010 12:47 PM |
| **To:** | Burns, Ronald W - MSHA; Weaver, Chris A - MSHA; Weekly, Russel A - MSHA |
| **Subject:** | FW: Potential Flagrants from UBB |
| **Attachments:** | Flagrant Subpacket 5.pdf; Flagrant Subpacket 1.pdf; Flagrant Subpacket 2.pdf; Flagrant Subpacket 3.pdf; Flagrant Subpacket 4.pdf |

FYI

**From:** Turow, Stephen D - MSHA
**Sent:** Friday, September 24, 2010 2:23 PM
**To:** Kiser, James A - MSHA
**Cc:** Fesak, George M - MSHA; Doyle, Mary - MSHA
**Subject:** FW: Potential Flagrants from UBB

Jim,

As I noted earlier, I believe that it is difficult to definitively state which violation or violations would be held to be "flagrant" if reviewed by the FMSHRC or by an appellate court, as there is little precedent or direction at this time. However, for purposes of the internal review, one can determine whether a SAR Form should be completed in a district office and sent to the Administrator for Coal Mine Safety and Health pursuant to PIL No. I08-III-02 (5/29/08). While the information currently available to the internal review team is insufficient to determine whether there are mitigating circumstances or lack of proximate cause that ultimately may preclude issuance of a flagrant violation, violations that meet the 4 objective "reckless failure" or the "repeated failure" criteria must be submitted to the Administrator, even in the absence of proximate cause or the existence of mitigating circumstances.

I offer the following input with respect to the violations (and groups of violations) that you forwarded to me for review in accordance with MSHA's existing flagrant violation policy:

- Section 104(d)(2) Order No. 8087709 – I believe that this violation could constitute a "reckless failure" to make reasonable efforts to eliminate a known violation of a mandatory safety standard. As it meets the four "reckless failure" objective criteria in the PIL, District 4 should have submitted a SAR Form to the Administrator.

- Section 104(d)(2) Order Nos. 8087744, 8084966, and 8080094 -- I believe these violations could constitute a "repeated failure" to make reasonable efforts to eliminate a known violation of a mandatory safety standard. Each of the violations involves inadequate ventilation and is cited pursuant to 30 CFR § 75.370(a)(1). As the violations meet the four "repeated failure" objective criteria in the PIL, District 4 should have submitted a SAR Form to the Administrator.

- Section 104(d)(2) Order No. 8082767 -- I agree that this violation likely should not be included as part of a "repeated failure" to make reasonable efforts to eliminate a known violation of a mandatory safety standard. While the order is cited pursuant to 30 CFR § 75.370(a)(1), the failure is a failure to examine, as opposed to a failure to get proper ventilation into an area

1

where miners are working that was cited in predecessor Order Nos. 8087744, 8084966, and 8080094.  While the PIL literally instructs district officials to submit a SAR Form when there are "two prior 'unwarrantable failure' violations of the same safety or heath standard" (emphasis added), precedent from OSHA cases requires a repeated failure to address a particular hazard, and a repeated violation of a broad standard alone is insufficient to constitute a "repeated" failure.  As there is little guidance on this particular issue, I do not think that it is an oversight that merits mention in the internal review report, even if this is a technical failure to follow the PIL.

- Section 104(d)(2) Order Nos. 8090855, 8090856, and 8082840 – From the documents available to the internal review team, I do not believe that it is possible to determine whether these violations constitute a "repeated failure" to make reasonable efforts to eliminate a known violation of a mandatory safety standard.  Order Nos. 8090855 and 8090856, which were issued within one minute of each other, appear to assert the same violative conditions (or at least to overlap).  If so, there would not be the requisite 2 prior 'unwarrantable failure' orders that are necessary to initiate an action for a flagrant violation on Order No. 8090855.

- Section 104(d)(2) Order Nos. 8103337, 8087709, 6612934, 6612460, 8082831 –  In each of these cases, the operator violated 30 CFR § 75.370(a)(1) by permitting air to move in the wrong direction or to "short circuit" air.  While there are 5 similar violations, the last violation (Order No. 8103337) was not S&S, so it could not be assessed as a repeated flagrant violation.  If the district started with the earlier violation (Order No. 8087709), which was S&S, the district would be using the same violation for two flagrant assessments (see bullet no. 1 above).  As none of the remaining violations are S&S, the first criteria of the PIL's "repeated failure" test is not met, and there would be no basis for submitting a SAR Form to the Administrator based on these violations.

Please let Mary or me know whether you would like to discuss any of these violations or my analysis further.

Steve

**Stephen Turow**
**Office of the Solicitor, MSH Division**
**202-693-9353**

This message may contain information that is privileged or otherwise exempt from disclosure under applicable law.  Do not disclose without consulting the Office of the Solicitor.  If you think you received this e-mail in error, please notify me immediately by e-mail or by phone at (202) 693-9353.

---

**From:** Turow, Stephen D - MSHA
**Sent:** Thursday, August 26, 2010 8:21 AM
**To:** Doyle, Mary - MSHA; Kiser, James A - MSHA
**Subject:** Potential Flagrants from UBB

Attached are the 5 groups of violations that Jim sent to me…

USAO0000008

**Stephen Turow**
**Office of the Solicitor, MSH Division**
**202-693-9353**

This message may contain information that is privileged or otherwise exempt from disclosure under applicable law.  Do not disclose without consulting the Office of the Solicitor.  If you think you received this e-mail in error, please notify me immediately by e-mail or by phone at (202) 693-9353.

3

USAO0000009

| From: | Francart, William J. - MSHA |
|---|---|
| Sent: | Monday, May 23, 2011 7:07 AM |
| To: | Fesak, George M - MSHA |
| Subject: | RE: George.doc |

Awesome, and despicable.

---

**From:** Fesak, George M - MSHA
**Sent:** Friday, May 20, 2011 8:50 AM
**To:** Denk, Joseph M - MSHA; Francart, William J. - MSHA; Swentosky, Dennis J - MSHA
**Cc:** Bragg, Melody E - MSHA; Burns, Ronald W - MSHA; Hancher, Chad - MSHA; Kiser, James A - MSHA; Kuzar, John A - MSHA; Weaver, Chris A - MSHA; Weekly, Russel A - MSHA
**Subject:** FW: George.doc

This is pretty damn awesome.

---

**From:** Fritsche, Patricia A - MSHA
**Sent:** Thursday, May 19, 2011 5:56 PM
**To:** Fesak, George M - MSHA
**Cc:** Arendale, Carrie - MSHA; Koenning, Thomas H - MSHA
**Subject:** George.doc

George,
Here are the results of my research into your questions.  I was a bit thrown by the term "Shortly after", which turns out to be about 140 days, or over 4 months.  This makes sense, since that timeframe is slightly more than 2 bimonthly sampling cycles.  If you intend to publish these figures, I would like to take some additional time to validate them with the data team.

I placed comments in the attached document.  <u>There are some factual errors in the excerpt you sent me, which should be corrected, especially the effective date of the reduced dust standards for 060-0 and 061-0</u>

Please let me know if I can be of further assistance.

Is there any way you can query the system to identify other mines that do what UBB was doing?  That is:
<u>All Data are filtered based on actions effective on or after October 1, 2008</u>

- (1) an MMU goes out of compliance on a reduced standard.
  283 citations for violation of reduced dust standard are recorded in the Respirable dust subsystem.  (Excessive dust citations issued against standards 70.101, 71.101, 90.101)

- (2) Shortly after the MMU goes out of compliance, it is deactivated.
  Of 352 deactivations recorded on MMUs that have been cited for exceeding a reduced Respirable dust standard, 29% occurred within 140 days of the issue date of the citation. Of the 7 similar deactivations at UBB, 29% occurred within 140 days.

  Of 3954 deactivations recorded on reduced-standard MMUs, 36% occurred within 140 days of the effective date of the reduced standard.  Of 41 similar deactivations at UBB, 34% occurred within 140 days.

1

USAO0000010

- (3) Around the same time (before or after), another MMU is activated with a 2.0 standard.  I know that we can't be 100%, but it would be god to know where to look to see if another mine is doing what UBB was doing.
  Of 3134 activations recorded on default-standard MMUs, 16% occurred with +/- 140 days of the deactivation of a reduced-standard MMU.  Of the 12 similar activations at UBB, 19% occurred within +/- 140 days.

- Can you tell how many times the default standard (2.0) was over-ridden when activating a new MMU in the last 2 years?
  Of 518 MMUs created since the beginning of FY2009, only 16 show dust standard reduction within 30 days.  Of those, only 1 appears to be a manual over-ride.
  Of 3134 activations recorded on default-standard MMUs only 2 show a manual change to a reduced standard on the same day.

Conclusion:  The patterns mentioned in the comments below definitely exist.  Unfortunately, the long timeframes (> 100 days in many cases) make the patterns difficult to detect by examining the data.  Temporary deactivations occur regularly and appear to be part of a normal mining cycle.  It would be difficult to identify operators deactivating and moving units to avoid reduced dust standards as opposed to deactivations and moves for other, legitimate reasons.  The UBB statistics closely follow the national statistics for the same scenarios, so the practice observed may be widespread in the industry.  From the examples, it appears to me that the operator at UBB would mine for up to 2 bi-monthly cycles before swapping out the continuous miner.

I think we need a better way to track these machines.  From my prior experience with inventory systems, I'm aware of the pitfalls of trying to track this equipment.  While they generally come from the manufacturer with serial numbers, these can be lost or compromised with use, or cannibalized into other machines.

I also think we need a better way to track mining sections, since they seemed to evade reduced dust standards by moving different machines into the same section.

USAO0000011

| | |
|---|---|
| **From:** | Fesak, George M - MSHA |
| **Sent:** | Tuesday, July 20, 2010 10:26 AM |
| **To:** | Denk, Joseph M - MSHA; Francart, William J. - MSHA; Swentosky, Dennis J - MSHA |
| **Subject:** | FW: UBB LW Air |
| **Attachments:** | Request for Entries Parallel to Tailgate 1 North.PDF; UBB Tailgate 1 North_0001.pdf |
| | |
| **Importance:** | High |

Interesting

-----Original Message-----
From: Mackowiak, Joseph C - MSHA
Sent: Tuesday, July 20, 2010 10:04 AM
To: Fesak, George M - MSHA; Kuzar, John A - MSHA
Subject: UBB LW Air
Importance: High

FYI.

I'm working on some things for Kevin Stricklin and I thought you might find this interesting.

The operator had an active request to send 60,000 cfm to mine additional tailgate entries. This change would decrease the intake to the longwall by 60,000 too.

This request was pending at the time of the explosion.

If they had insufficient intake, per the accusations, why wasn't this submittal withdrawn?

1

USAO0000012

| | |
|---|---|
| **From:** | Kiser, James A - MSHA |
| **Sent:** | Tuesday, February 28, 2012 8:55 AM |
| **To:** | Burns, Ronald W - MSHA |
| **Subject:** | RE: another question by JM |

All is well – busy, busy, – had a bad truck accident yesterday – it's going to be ok though – were investigating. My son is still taking a bunch of meds and goes back for another MRI in May. Having said that, he is on schedule to graduate this Spring and has so far been accepted by two graduate schools, Wheeling Jesuit and Atlanta Mercer. Although Tusculum tennis has more players (11) than ever before on the men's team, and are supposed to be a powerhouse this year, they started out losing. Somehow Drew popped back up in the line-up, first in doubles and now in singles as well, so I think It has to be a God thing.

Regarding Sigmon, we interviewed him but I guess we hadn't figured out the roof support issue yet, is that correct?

I miss you guys,
J

**From:** Burns, Ronald W - MSHA
**Sent:** Tuesday, February 28, 2012 8:35 AM
**To:** Kiser, James A - MSHA; Doyle, Mary - MSHA
**Subject:** RE: another question by JM

Hey, Jim. Hope you are well. How is your son?

The answer is yes, it was Sigmon.

**From:** Kiser, James A - MSHA
**Sent:** Tuesday, February 28, 2012 8:34 AM
**To:** Doyle, Mary - MSHA; Burns, Ronald W - MSHA
**Subject:** RE: another question by JM

Was the specialist Sigmon?

**From:** Doyle, Mary - MSHA
**Sent:** Tuesday, February 28, 2012 8:21 AM
**To:** Burns, Ronald W - MSHA
**Cc:** zzMSHA-Upper Big Branch IR2
**Subject:** RE: another question by JM

No, that is very helpful. (I don't know why I can't turn off this darn highlight.) Final question on this:

The tailgate entry was traveled at least four times during the second regular inspection for fiscal 2010. On March 9, 2010, a ventilation specialist and a field office supervisor inspected the tailgate. The Operator's longwall production report for that day indicates that supplemental support required by the December 23, 2009, approved plan should have extended to a point 400 feet outby the location of the face at the time of the explosion. While the specialist and field office supervisor identified a serious violation of the ventilation plan and issued an order for that condition, **they did not cite any violations of the roof control plan.** The specialist left the Agency before he could be interviewed about the roof support in the tailgate entry.

USAO0000013

Do we know why they failed to cite violations of the roof control plan?  We know the last inspector there said he did not remember inspecting for compliance with the roof control plan but why didn't he, if we know?  Sorry to keep bugging you

---

**From:** Burns, Ronald W - MSHA
**Sent:** Tuesday, February 28, 2012 8:09 AM
**To:** Doyle, Mary - MSHA
**Subject:** RE: another question by JM

Maybe because the Handbook states Longwall tailgate travelways shall be inspected.  The tailgate entry is the travelway, so it had to be inspected.  In a nutshell, the No. 7 entry of the 1 North Tailgate was the tailgate travelway, the tailgate entry, and an intake air course, so it had to had to be inspected for compliance.

I hope I am clearing this up and not making it more confusing.

---

**From:** Doyle, Mary - MSHA
**Sent:** Tuesday, February 28, 2012 8:00 AM
**To:** Burns, Ronald W - MSHA
**Subject:** RE: another question by JM

So am I trying to understand why chris said that the travelway was what had to be inspected.  Could he also have just said the tailgate entry had to be inspected.

---

**From:** Burns, Ronald W - MSHA
**Sent:** Tuesday, February 28, 2012 7:54 AM
**To:** Doyle, Mary - MSHA
**Subject:** RE: another question by JM

The tailgate entry and the tailgate travelway is one and the same thing.

---

**From:** Doyle, Mary - MSHA
**Sent:** Tuesday, February 28, 2012 7:52 AM
**To:** Burns, Ronald W - MSHA
**Subject:** RE: another question by JM

Very stupid question – I am very sorry.

Is inspecting the tailgate entry and tailgate travelways the same thing?  We say that The tailgate entry was traveled at least four times during the second regular inspection for fiscal 2010.

Would that necessarily include the tailgate travelways?

Thanks—sorry--Mary

---

**From:** Burns, Ronald W - MSHA
**Sent:** Tuesday, February 28, 2012 7:45 AM
**To:** Doyle, Mary - MSHA; zzMSHA-Upper Big Branch IR2
**Subject:** RE: another question by JM

The following are excerpts from the general inspection procedures handbook.  Both apply to the tailgate entry.

USAO0000014

**Air Courses (including Escapeways).** At least one entry in each intake and return aircourse shall be inspected in its entirety for compliance with applicable standards and approved plans. Additional entries and/or crosscuts within a multiple entry aircourse may need to be traveled to fully evaluate operator compliance with applicable standards and approved ventilation plans.

**Longwall Tailgate Entry.** Longwall tailgate travelways shall be inspected in their entirety for compliance with applicable standards and approved plans.

So, while inspecting this tailgate entry/aircourse, the inspectors had to check for compliance with plans and MSHA regulations.

Does this answer your question?

---

**From:** Doyle, Mary - MSHA
**Sent:** Tuesday, February 28, 2012 7:37 AM
**To:** zzMSHA-Upper Big Branch IR2
**Subject:** another question by JM

Guys,

Yesterday, on page 85 of my version (Enforcement of 75.220(a)(1)), Joe pointed to the paragraph highlighted below—

The 1 North Longwall section began production on September 10, 2009, in the last month of the inspection quarter. At this time, the roof control plan in effect was the base plan approved in October 2005. This plan stipulated that the tailgate entry of the first longwall panel was to have supplemental support in the form of a single row of posts on 5-foot centers or a double row of staggered posts on 8-foot centers for its entirety before mining commenced. The Operator submitted a new base roof control plan on October 27, 2009, which was approved by the District 4 Manager on December 23, 2009. This plan required the tailgate entry of initial longwall panels to have supplemental support in the form of two rows of 8-foot long cable bolts or two rows of posts on 4-foot centers installed in the middle of the entry between primary supports. This supplemental support was required to be maintained 1,000 feet outby the longwall face at all times.

The Accident Investigation team found that the number of posts in the tailgate entry was not sufficient to install more than one row of supplemental support in the tailgate travelway. Many of these posts were lying on the mine floor. The Accident Investigation team did not determine whether the posts had been dislodged as a result of the explosion or whether they had ever been installed. The single row of posts would have complied with the 2005 roof control plan tailgate travelway requirement, but not with the requirement in the 2009 approved plan in effect at the time of the explosion.

The longwall tailgate was inspected on October 7, 2009, during the first regular inspection for fiscal 2010. The inspector did not cite any violations of the roof control plan during this inspection. When asked during an interview if there was supplemental support installed in the tailgate entry, he stated, "It seemed like they did." When asked how many rows of supplemental support was installed or how far out such support extended from the face, the inspector stated he could not remember. The tailgate entry was not inspected again this quarter after the new roof control plan was approved.

The tailgate entry was traveled at least four times during the second regular inspection for fiscal 2010. On March 9, 2010, a ventilation specialist and a field office supervisor inspected the tailgate. The Operator's longwall production report for that day indicates that supplemental support required by the December 23, 2009, approved plan should have extended to a point 400 feet outby the location of the face at the time of the explosion. While the specialist and field office supervisor identified a serious violation of the ventilation plan and issued an order for that condition, they did not cite any violations of the roof control plan. The specialist left the Agency before he could be interviewed about the roof support in the tailgate entry.

3

The specialist commented on the Inspector's Certification Form (MSHA Form 2000-137) in the Uniform Mine File that he only reviewed the mine ventilation plan before traveling to UBB that day. Reviewing a complete UMF is difficult for specialists because their duties can place them at a different mine every day. Because of the time required to review the complete UMF, procedures allowed specialists to review only those sections of the file pertinent to their inspection.

The field office supervisor had been assigned the enforcement responsibility for UBB in January 2010. He documented that he reviewed the Uniform Mine File on January 28, 2010, before accompanying an inspector who was conducting a section 103(i) spot inspection at UBB. He believed the Mine was in compliance with all provisions of the approved plan, but stated that he could not recall if posts or cable bolts had been installed in the tailgate entry.

On March 10, an inspector traveled the 1 North Longwall tailgate travelway on the day shift and the same specialist who issued the order on the previous day traveled the tailgate on the evening shift. Neither the inspector nor the specialist documented any roof control plan violations during these shifts. The inspector certified reviewing the UMF for the regular inspection on January 6, 2010, one day after clerical personnel had filed the roof control plan approved on December 23, 2009, in the UMF.

On March 11, the same inspector was in the tailgate travelway to terminate the order for the violation of the ventilation plan. According to the inspection tracking map, he traveled the entire tailgate travelway. The inspector did not cite a violation of the roof control plan that day, and stated in his interview that he did not recall inspecting the travelway for compliance with the roof control plan. Since he counted this inspection toward completion of the regular inspection of the tailgate travelway, inspection procedures required him to examine the travelway for compliance with the roof control plan. This was the last time MSHA inspected the tailgate before the explosion.

The start of this regular inspection was the first time the inspector inspected underground areas at UBB. He had approximately 22 months of total experience with MSHA during his March 11 inspection of the longwall. He had experience on longwall mining sections prior to being employed by MSHA, but had never been on the UBB longwall tailgate before this inspection.


**Joe's questions:**

**What was MSHA required to inspect? Were they required to inspect the tailgate entry? I believe Chris said that they had to inspect the travelway. (Chris, I assume this is because this is what the Handbook requires? Please tell me if I am wrong or that is an incomplete answer.)**

Thank you--Mary


**Tracking:**

4

USAO0000016

| Recipient | Read |
| --- | --- |
| Burns, Ronald W - MSHA | Read: 2/28/2012 9:02 AM |

USAO0000017

**From:** Fesak, George M - MSHA
**Sent:** Wednesday, July 07, 2010 4:22 PM
**To:** Carpenter, Brent A. - MSHA
**Subject:** FW: Massey's awards?

-----Original Message-----
From: Bullock, Kenneth A - MSHA
Sent: Wednesday, June 02, 2010 1:06 PM
To: Mattos, Jay P - MSHA; Wagner, Gregory - MSHA; Parker, Douglas - MSHA; Stricklin, Kevin G - MSHA; Fesak, George M - MSHA
Cc: Main, Joseph A - MSHA; Strassler, Heidi W - MSHA; Hafeez, Syed - MSHA
Subject: RE: Massey's awards?

All,

Doug's summary in the e-mail below of the Sentinels program is spot on. Additionally, Massey's Chess Processing Plant is slated to win again this year, provided that they clear our Part 50 audit process. Audits with the exception of Chess Processing have begun for the 2009 award winners, thus we will need a decision soon on whether we should proceed with their audit.

Some options for the Sentinels of Safety Program:

1. Continue program as is and emphasize the fact that this program recognizes achievement of not only the company but of individual miner's outstanding safety records identified solely on injury and employment data and not on compliance/violation data. While we know this, the industry and the press will continue to report what they have been reporting.

2. Exclude any Massey properties including Chess Processing from the program this year based on the current climate and events that have occurred. Since we partner with NMA, I would recommend including NMA in on the discussions. Massey will know that they were a potential winner by checking injuries and hours worked on the Data Retrieval System and comparing them to the actual winner's numbers.

3. Inform NMA that we want to re-evaluate the rules, selection criteria and our involvement in the Sentinels Program. For the current 2009 awards program which is already under way, we would provide NMA with a list of winners and runner-ups as we have in the past, but we would remove any reference to MSHA in the program.

I am available to discuss these matters further, as well as meeting with NMA on the direction MSHA elects to take.

Thanks
        Ken Bullock

-----Original Message-----
From: Mattos, Jay P - MSHA
Sent: Wednesday, June 02, 2010 6:55 AM
To: Duncan, Jeffrey A - MSHA; Fesak, George M - MSHA; Bullock, Kenneth A - MSHA; Hurley, Patrick D - MSHA

1

Subject: Fw: Massey's awards?

FYI

-----Original Message-----
From: Wagner, Gregory - MSHA
To: Parker, Douglas - MSHA; Mattos, Jay P - MSHA; Stricklin, Kevin G - MSHA
CC: Strassler, Heidi W - MSHA; Main, Joseph A - MSHA
Sent: Tue Jun 01 22:08:16 2010
Subject: RE: Massey's awards?

Thanks.


It would be useful to figure out what MSHA  s relationship to the pacesetter awards is and the award criteria.


Tomorrow.


g


Gregory R. Wagner, M.D.

Deputy Assistant Secretary

Mine Safety and Health Administration

1100 Wilson Blvd.

Arlington, VA 22209


P:  202-693-9414

M:  703-[Redacted - Privacy]

F:  202-693-9401

wagner.gregory@dol.gov


From: Parker, Douglas - MSHA
Sent: Tuesday, June 01, 2010 10:06 PM
To: Wagner, Gregory - MSHA; Mattos, Jay P - MSHA; Stricklin, Kevin G - MSHA

2

Cc: Strassler, Heidi W - MSHA; Main, Joseph A - MSHA
Subject: RE: Massey's awards?

Here is a basic fact sheet on Massey s awards.  I don t know about the pacesetter awards or the relationship to Holmes.

Sentinels of Safety Awards recognize mining operations in various categories that record the most hours in a calendar year without a single lost-time injury. Beginning in 2005, a minimum of 4,000 hours were required for consideration, and the award categories were expanded to allow greater recognition of the safety accomplishments of both small and large mines. The awards are based on injury and employment information that are reported and verified by the operations, not on compliance/violations.  All active and intermittently active mineral mining operations required to report injury and employment data under the Federal Mine Safety and Health Act of 1977 are eligible to participate. The program is co-sponsored by MSHA and the National Mining Association.

Massey Energy (Controller) 2008 Sentinels of Safety Winners

Mine ID 4607165

NORTH SURFACE MINE

ALEX ENERGY, INC.

Holden, WV

SMALL SURFACE COAL MINE

Hours -- 39,006

3

USAO0000020

Mine ID 4606188

CHESS PROCESSING

ELK RUN COAL COMPANY, INC.

Sylvester, WV

LARGE COAL PROCESSING FACILITY

Hours -- 154,614

Mine ID 4603141

CHESTERFIELD PREP PLANT

OMAR MINING COMPANY

Madison, WV

SMALL COAL PROCESSING FACILITY

Hours -- 28,077

---

From: Wagner, Gregory - MSHA
Sent: Tuesday, June 01, 2010 8:55 PM
To: Mattos, Jay P - MSHA; Stricklin, Kevin G - MSHA
Cc: Strassler, Heidi W - MSHA; Parker, Douglas - MSHA; Main, Joseph A - MSHA
Subject: Massey's awards?

Can someone give me some insight into this?

The inquiries keep on coming.  Perhaps we should get together a fact sheet on these awards based on our QFR answer, but in greater detail?

4

USAO0000021

---------------------------------------------------------------------------------

Subject: Safety agency hands-out awards despite pattern of violations

A Closer Look at Massey s Recent Safety Awards <http://washingtonindependent.com/86061/a-closer-look-at-masseys-recent-safety-awards>

y Mike Lillis <http://washingtonindependent.com/author/mlillis/> 6/1/10 http://washingtonindependent.com/86061/a-closer-look-at-masseys-recent-safety-awards

Amid the growing allegations <http://washingtonindependent.com/86044/massey-miner-i-stayed-scared-to-death> that Massey Energy, the Virginia-based coal giant, doesn t do enough to protect its workers, the company last week was quick to trumpet <http://phx.corporate-ir.net/preview/phoenix.zhtml?c=102864&p=irol-newsArticle&ID=1432349&highlight=> a series of mine safety awards that recently came its way.
The reason for the self-promotion is clear: Massey has been on the defensive ever since its Upper Big Branch mine exploded with deadly results in April, leaving the company in dire need of some good press.
Yet a closer examination of those awards leaves you wondering if they re truly anything to crow about.
Four Massey facilities were honored last month with safety awards presented by the Joseph A. Holmes Safety Association, a 94-year-old non-profit made up, in its own words <http://www.holmessafety.org/index.html> , of representatives from state and federal government agencies, mining organizations and labor. Yet the United Mine Workers Association, the largest miners union, isn t affiliated at all, according to UMWA spokesman Phil Smith. We don t have anything to do with that organization, he said Tuesday. And we didn t have anything to do with Massey getting any awards. The contact number on the Holmes Safety Association s website directs callers to an official in the Mine Safety and Health Administration, which is also under fire <http://washingtonindependent.com/83308/plenty-of-blame-still-to-go-around-in-massey-mining-disaster> for its role in the deadly UBB blast. (MSHA critics contend that the agency has grown too close to the coal companies it s supposed to monitor, and that officials should have closed the doomed UBB mine based on its long record of safety violations <http://www.washingtonpost.com/wp-dyn/content/article/2010/04/05/AR2010040503877.html> .) That official has yet to return a call...

On top of the Holmes awards, five Massey-owned facilities took home MSHA s Pacesetter safety award last month a sign, Massey said, of their outstanding safety records during 2009. Yet one of those mines, the Roundbottom Powellton operation in Boone County, W.Va., was also among the 32 mines singled out by MSHA in August 2009 as having so many safety problems that it should have received a pattern of violations status. (Only the high number of company appeals prevented MSHA from issuing those 32 mines a pattern of violations letter.) Which raises the question: How could the same agency consider the same mine to be eligible for both a safety award and a pattern of violations status in the same year?
It s not a question with which Massey has wrestled. All of these awards are well deserved recognition of how our members are committed to working safely and that Massey s safety culture is effective throughout the organization, CEO Don Blankenship said in a statement.
Whether lawmakers believe Blankenship or their own eyes is another issue altogether.

Gregory R. Wagner, M.D.

USAO0000022

Deputy Assistant Secretary

Mine Safety and Health Administration

1100 Wilson Blvd.

Arlington, VA 22209


P:  202-693-9414

M:  703- Redacted - Privacy

F:  202-693-9401

wagner.gregory@dol.gov

6

USAO0000023

| From: | Fesak, George M - MSHA |
|---|---|
| Sent: | Thursday, February 16, 2012 1:42 PM |
| To: | Francart, William J. - MSHA |
| Subject: | FW: IR report |
| Attachments: | Action Plan for Rollout of Internal Review Report.doc |

**From:** Dondis, Lynn - MSHA
**Sent:** Monday, February 13, 2012 12:24 PM
**To:** Fesak, George M - MSHA
**Subject:** RE: IR report

George, according to the latest schedule, you and Bill should be able to make the all employee meeting on the 6th

**From:** Fesak, George M - MSHA
**Sent:** Monday, February 13, 2012 12:21 PM
**To:** Turow, Stephen D - MSHA
**Cc:** Strassler, Heidi W - MSHA; Dondis, Lynn - MSHA
**Subject:** RE: IR report

Steve,

First, you told Lynn that the Internal Review report still made it appear that MSHA was responsible for a defective ventilation plan at UBB. (It would have been really good if you had told me that, since I am the one who can fix it.) Then you sent Greg Wagner a copy of the IR report with the DOJ redactions. Now you contacted Amy about getting a copy of the report's Executive Summary and General Conclusion, and offered to brief her on the team's findings.

None of these are within the purview of your role as Council to the Internal Review team. Please stop.

George

**From:** Louviere, Amy - MSHA
**Sent:** Monday, February 13, 2012 11:39 AM
**To:** Fesak, George M - MSHA
**Subject:** FW: IR report

George, when can I get a copy of the executive summary and general conclusion so that I can begin drafting the news release? The earlier the better would be ideal.

Thanks. Amy

**From:** Turow, Stephen D - MSHA
**Sent:** Monday, February 13, 2012 8:33 AM
**To:** Louviere, Amy - MSHA
**Subject:** IR report

USAO0000024

The IR team will be meeting with HQ to get final input tomorrow (2/14).  We also had a meeting with the NIOSH Independent Review Panel on 2/2.  It is my understanding that the report is scheduled for release on 3/6.

I don't know whether you have had discussions with George Fesak about reviewing the report, but I suspect that the Executive Summary and General Conclusion sections should be in a fairly final form by the end of this week, and they may be useful starting points to understanding the IR team's report.  Please contact me, if you want me to brief you on aspects of the report prior to release.

**Stephen Turow**
**Office of the Solicitor, MSH Division**
**202-693-9353**

This message may contain information that is privileged or otherwise exempt from disclosure under applicable law.  Do not disclose without consulting the Office of the Solicitor.  If you think you received this e-mail in error, please notify me immediately by e-mail or by phone at (202) 693-9353.

2

| From: | Francart, William J. - MSHA |
|---|---|
| Sent: | Monday, March 28, 2011 3:26 PM |
| To: | Stoltz, Richard T - MSHA |
| Subject: | re: |

It was 30 days and was not required by the district, but rather a commitment from UBB to provide a long-term solution:


The use of belt air to ventilate working sections was approved in the mine ventilation base plan (B4) on April 14, 2005, and in effect at the time the final rule was published.  A new base ventilation plan (B5) was submitted by the mine operator and received in the Mt. Hope office on April 29, 2009.  After review by the Ventilation Department, approval of the B5 plan was denied on July 1, 2009 for several reasons, including a need to address the use of belt air on the longwall section.  This was the first documented action taken by District 4 on the use of belt air at the Mine.

The plan was revised and resubmitted by the company.  It was reviewed and finally approved on September 11, 2009.  This B6 base plan permitted the operator to use air from the belt entry to ventilate the longwall section.  The company specified the air from the belt would be used to control methane and dust produced on the face.  The B6 base plan did not include details justifying the use of belt air as required by 75 CFR § 350(b) or MSHA's relevant policy (CMS&H Memo No. HQ-08-017-S).

A written notification from the District Manager requesting additional information was made on November 20, 2009 during a ventilation plan revision review (B6 A4 - 9493).  The review pointed out that the operator was required to submit a ventilation revision justifying the use of belt air.  Although the final rule was posted on the MSHA internet site, and a copy of the final rule was mailed to all mine operators, an agent for the mine operator informed the District that they did not have a copy of the regulations.  A copy of the regulation was provided to the mine operator by the District on December 9, 2009.

A meeting at the District 4 Office was held on December 11 which included a discussion on the elimination of the use of belt air.  A plan revision specifying the discontinuation of belt air to ventilate the longwall section subsequently was submitted to the District.  The revision was approved on December 18, 2009.  When attempting to reverse the direction of air flow on the longwall belt, the operator found it was not immediately possible due to the influence of the Bandytown fan.  After the mine operator determined that it could not immediately reverse the belt air in an outby direction, it submitted another revision to the ventilation plan requesting the continued use of belt air on the longwall section.  The revision (B6 A 7 (9493)) was approved on December 23, 2009.  Upon approval of the revision, the mine operator committed to provide within 30 days a plan to show a long-term solution to belt entry ventilation.

Revision B6 A15 was submitted to the District on January 11, 2010, and was approved on January 22.  The revision indicated that a point-feed regulator would be installed to inject air into the longwall section belt at crosscut 26 on the longwall headgate.  The belt air would split at this location in both the inby and outby directions.  The air would flow both inby to the section and outby to the return

1

USAO0000026

regulator at No. 1 Crossover.  According to District 4 personnel, a long-term plan addressing the use of belt air was not submitted prior to the explosion on April 5, 2010.

USAO0000027

| | |
|---|---|
| **From:** | Francart, William J. - MSHA |
| **Sent:** | Wednesday, February 16, 2011 2:49 PM |
| **To:** | Page, Norman G - MSHA |
| **Subject:** | FW: Tailgate 22 |

Norman
fyi

---

**From:** Kuzar, John A - MSHA
**Sent:** Wednesday, February 16, 2011 2:47 PM
**To:** Francart, William J. - MSHA
**Subject:** RE: Tailgate 22

Sounds like a violation is in order. Let Norman know about it and I am sure he will be more than happy to give them one more piece of paper.
Jack

---

**From:** Francart, William J. - MSHA
**Sent:** Wednesday, February 16, 2011 2:42 PM
**To:** Fesak, George M - MSHA; Kuzar, John A - MSHA
**Subject:** Tailgate 22

George and Jack,

We are continuing a review of the ventilation plan timeline. We have found a potential violation off 70.220, which requires a written notification of changes in operational status within three working days after the change occurs.

According to the Preshift On-shift records, Tailgate 22 section (MMU 040-0) seems to be mining on March 2 after moving from 2 Section off of the #1 Cut-through. UBB supplied written notification to MSHA that the MMU was reactivated on March 16, in excess of the three day requirement.

1

USAO0000028

| From: | Burns, Ronald W - MSHA |
|---|---|
| Sent: | Saturday, December 10, 2011 9:07 AM |
| To: | zzMSHA-Upper Big Branch IR2 |
| Subject: | FW: advance notice |

I added this to the current version of the report, on page 93, under the "**Enforcement of Section 103(a) of the Mine Act**" section.  See how you think it fits.

During interviews, three inspectors who had been assigned to UBB indicated that they had heard the Operator inform miners underground on the mine phone that they were at the Mine.  However, they did not cite the Operator for providing advance notice.  Five other inspectors stated they had never heard the Operator call underground ahead of them.  Two of these stated it would be advance notice if the Operator did so; one other stated he had never received any clear guidance.

1

USAO0000029

| | |
|---|---|
| **From:** | Francart, William J. - MSHA |
| **Sent:** | Tuesday, January 24, 2012 10:15 AM |
| **To:** | zzMSHA-Upper Big Branch IR2 |
| **Subject:** | RE: Advance Notice section |

We need to have a conference call to discuss rather than circulate this documentation.

**From:** Swentosky, Dennis J - MSHA
**Sent:** Tuesday, January 24, 2012 9:58 AM
**To:** Burns, Ronald W - MSHA; Turow, Stephen D - MSHA
**Cc:** Fesak, George M - MSHA; Francart, William J. - MSHA; Weaver, Chris A - MSHA; Doyle, Mary - MSHA; Weekly, Russel A - MSHA
**Subject:** RE: Advance Notice section

I agree with the approach. The fact is most did not really think that what was going on was advance notice. The lack of citations says a lot.

**From:** Burns, Ronald W - MSHA
**Sent:** Tuesday, January 24, 2012 9:10 AM
**To:** Turow, Stephen D - MSHA
**Cc:** Fesak, George M - MSHA; Francart, William J. - MSHA; Weaver, Chris A - MSHA; Doyle, Mary - MSHA; Swentosky, Dennis J - MSHA; Weekly, Russel A - MSHA
**Subject:** RE: Advance Notice section

Steve:

I have reviewed the documents in the links below and added some comments. I saved both as new documents with today's date at the end.

I appreciate your effort in what you are saying. My thoughts are this, however. I think we are trying to be too narrow by limiting the answers from the inspectors we interviewed to just UBB. I believe some inspectors (see the Bullets document) refer to other mines where they have more evidence. I believe some of the inspectors' answers can be interpreted differently, as you state in your email below. I believe we did not ask the right questions to get the full story from the inspectors. Most of all, I don't believe we can hinge the entire 103(a) issue on the few inspectors that we asked about this, as this will affect the entire country.

As we may have a difference of opinion, maybe we should stick to things the entire team agrees on. There is not any policy or procedures to guide inspectors. It has not been consistently cited by any district in the years leading up to UBB. The interviews at best shows that there was not a uniform consensus that showed the Mt. Hope inspectors knew how to address advance notice. (For those that indicated it was advance notice or that they suspected it was going on, none cited it.)

The main contention is in the paragraph beginning on page two line 26 and going to page three line 13. We may need to once again have a conference call to determine how the team wants to address it.

Anyway, those are my thoughts. I welcome comments. If we want to have a conference call, give me about an hour's notice, as I will have to find a private place to make the call.

Thanks,
Ron

1

USAO0000030

**From:** Turow, Stephen D - MSHA
**Sent:** Monday, January 23, 2012 4:12 PM
**To:** Burns, Ronald W - MSHA
**Cc:** Fesak, George M - MSHA; Francart, William J. - MSHA; Weaver, Chris A - MSHA; Doyle, Mary - MSHA; Swentosky, Dennis J - MSHA
**Subject:** Advance Notice section

L:\APN-060\Report Sections for Review\Steve Turow - Sections for Review\103a\Enforcement of Section 103 draft 5.doc

L:\APN-060\Report Sections for Review\Steve Turow - Sections for Review\103a\Bullets for 103(a).doc

Ron,

After speaking again to everyone about this section of the report, I made further amendments in an attempt to capture issues raised by others on the team. I also inserted information that Mary suggested based on her review of a draft section.

Please review the revised section (hyperlinked above) and revise as you think appropriate. While the track changes function should assist you in indentifying recent revisions, I believe that the revisions are:

- Page 1, lines 8-13
- Page 1, lines 15-17
- Page 1, lines 23-30
- Page 2, lines 26-31
- Page 3, lines 11-13
- Page 3, lines 18-20
- Page 3, line 31 (deleted introductory paragraph of conclusion)
- Page 3, lines 37-39
- Page 4, lines 15-19
- Page 4, lines 23-25
- Footnotes 1 & 2

In considering the revisions, please look at the document that you created regarding the statements made during the interviews ("Bullets for 103(a)" – attached). In a bullet below one of yours (in red font), I outlined the testimony as I read it. I think that this may be important, as I interpret some of the interviewees to have take positions somewhat different than you. It may be important for us to look again at the testimony if you disagree with my assessments, as our understandings of the testimony yield some of our difference of opinion on the content in the section.

Thanks!

Steve

2

USAO0000031

| | |
|---|---|
| **From:** | Francart, William J. - MSHA |
| **Sent:** | Sunday, December 04, 2011 3:45 PM |
| **To:** | Denk, Joseph M - MSHA |
| **Subject:** | Employment History |
| **Importance:** | High |

Joe

How many miners worked their entire career at UBB?  We had a shredding party here in Beckley and the charts you printed for everyone were modified so that they can't be read.

Thanks!

1

USAO0000032

| | |
|---|---|
| **From:** | Louviere, Amy – MSHA |
| **Sent:** | Monday, April 26, 2010 7:55 PM |
| **To:** | Main, Joseph A - MSHA; Wagner, Gregory – MSHA; Davis, Michael A - MSHA; Strassler, Heidi W - MSHA; Duncan, Jeffrey A - MSHA |
| **Cc:** | Pon, Melinda - MSHA; Thomas, Charles J - MSHA; Stricklin, Kevin G - MSHA |
| **Subject:** | RE: hazard complaints news release |

That would probably make for a good quote from Joe, inserted under the paragraph about Cook.


Amy Louviere
Public Affairs Director
Mine Safety and Health Administration
202.693.9423
www.msha.gov


-----Original Message-----
From: Main, Joseph A - MSHA
Sent: Monday, April 26, 2010 7:51 PM
To: Louviere, Amy - MSHA; Wagner, Gregory - MSHA; Davis, Michael A - MSHA; Strassler, Heidi W - MSHA; Duncan, Jeffrey A - MSHA
Cc: Pon, Melinda - MSHA; Thomas, Charles J - MSHA; Stricklin, Kevin G - MSHA
Subject: Re: hazard complaints news release

This is about presenting the facts to the public in a responsible way. But the point about the complaint inspection occuring after the ubb explosion is something to be considered.

-----Original Message-----
From: Stricklin, Kevin G - MSHA
To: Louviere, Amy - MSHA; Main, Joseph A - MSHA; Wagner, Gregory - MSHA; Davis, Michael A - MSHA; Strassler, Heidi W - MSHA; Duncan, Jeffrey A - MSHA
CC: Pon, Melinda - MSHA; Thomas, Charles J - MSHA
Sent: Mon Apr 26 19:29:46 2010
Subject: Re: hazard complaints news release

My only comment is to put a dagger into massey. It would be to say something like even after the explosion at ubb, msha received the complaint at cook on april 9 and spell out the results

-----Original Message-----
From: Louviere, Amy - MSHA
To: Main, Joseph A - MSHA; Wagner, Gregory - MSHA; Davis, Michael A - MSHA; Strassler, Heidi W - MSHA; Stricklin, Kevin G - MSHA; Duncan, Jeffrey A - MSHA
CC: Pon, Melinda - MSHA; Thomas, Charles J - MSHA
Sent: Mon Apr 26 19:23:53 2010
Subject: hazard complaints news release

Dear All:

1

USAO0000033

A number of edits were made since the last version, so please review again. It needs to go out tomorrow morning. Thanks for your help.

amy

USAO0000034

**From:** Fesak, George M – MSHA
**Sent:** Wednesday, February 08, 2012 11:53 AM
**To:** Denk, Joseph M – MSHA
**Subject:** No Subject-647.EML

Acting District Manager John Pyles requested that MSHA Technical Support conduct an evaluation of a floor outburst at UBB that occurred on February 18, 2004, and provide recommendations for controlling gas emissions from future outbursts. Technical Support provided a memorandum to Pyles on March 4, 2004, which he forwarded to the Ventilation and Roof Control Department supervisors and the ADM - Technical. The memorandum identified several factors that may have influenced methane floor outbursts at UBB.

1

USAO0000035

| | |
|---|---|
| **From:** | Kiser, James A - MSHA |
| **Sent:** | Tuesday, February 28, 2012 8:59 AM |
| **To:** | Burns, Ronald W - MSHA |
| **Subject:** | FW: question by Joe Main |

What phone number are you at today?

**From:** Doyle, Mary - MSHA
**Sent:** Tuesday, February 28, 2012 7:25 AM
**To:** Burns, Ronald W - MSHA
**Cc:** zzMSHA-Upper Big Branch IR2
**Subject:** question by Joe Main

Regarding the paragraph on page 75:

Five inspectors stated they had reason to believe that UBB personnel were communicating with miners underground to provide warning of impending MSHA inspection activities. However, none of the inspectors issued a citation under section 103(a) for advance notice of an inspection activity.

Can you tell me who the five inspectors were (if you can remember or easily find the answer) and if we know when these inspectors came to have reason to believe that UBB personnel were communicating with miners underground – did they identify the time or a specific inspection or were these just general suspicions on their part?  Was this later in the review period or earlier in the review period or do we know?

And if we are asked the reason why the team did not follow up more on this line of questioning, is the answer that the team did not understand advance notice to be one of the more significant issues during much of our investigation?

Sorry to bug you about this -- Mary

1

USAO0000036

| | |
|---|---|
| **From:** | Stricklin, Kevin G - MSHA |
| **Sent:** | Monday, November 22, 2010 8:35 AM |
| **To:** | Aaronson, Julie E - MSHA |
| **Subject:** | RE: Pillar report |

Monday, Tuesday or Wednesday will work

-----Original Message-----
From: Aaronson, Julie E - MSHA
Sent: Thursday, November 18, 2010 11:21 AM
To: Stricklin, Kevin G - MSHA
Subject: RE: Pillar report

K -
The report is a draft, confidential report by the internal review team. Looks at ground control and pillar designs at UBB. I haven't read it but am advised the report raises concerns about whether these plans should have been approved.  I am getting a copy for you and will leave it with your office today.

You back tomorrow? Or is Monday a better day to schedule this?

Thanks,
J

-----Original Message-----
From: Stricklin, Kevin G - MSHA
Sent: Wednesday, November 17, 2010 9:31 PM
To: Aaronson, Julie E - MSHA
Subject: Fw: Pillar report

I don't know what he means by pillar report. Can you help me?

-----Original Message-----
From: Main, Joseph A - MSHA
To: Stricklin, Kevin G - MSHA
CC: Aaronson, Julie E - MSHA
Sent: Wed Nov 17 18:51:30 2010
Subject: Pillar report

Need to discuss pillar report. Friday or monday. Let julie know what works.

1

| | |
|---|---|
| **From:** | Bragg, Melody E - MSHA |
| **Sent:** | Tuesday, February 07, 2012 1:28 PM |
| **To:** | Weekly, Russel A - MSHA |
| **Subject:** | RE: |

I wasn't on the call but apparently Kevin got really ugly with Ron on a conference call this morning. He said that first we tell him to stop making so many directives then we make recommendations that tell him to make more. Then he said, "I can't believe that you have five Field Office Supervisors on your team and they don't understand what constitutes advance notice!" or something along those lines. Ron took the conversation as an indication that the guys on the team were not good supervisors. There may have been more to it. From what Ron says Kevin was very angry at the team.

George was supposed to be writing an email to Joe Main about how Kevin's attitude was making the team concerned about their careers and he asked you because he wanted to draw you in. But he decided to wait until after lunch and think about it before he sent it so you know that means it will never get sent.

I will let you know if I find out that George did send the email.
Does that clear up anything?
Melody

---

**From:** Weekly, Russel A - MSHA
**Sent:** Tuesday, February 07, 2012 1:17 PM
**To:** Bragg, Melody E - MSHA
**Subject:** RE:

I have been wondering since that call this morning, what happened with Stricklin, and why did George ask if I was concerned about my job, has Kevin's anger turned to possible threats? Not that it bothers me, but the more I thought about it there seems to have been some veiled problems there that weren't fully explained.

Just Wondering, Russ

---

**From:** Bragg, Melody E - MSHA
**Sent:** Tuesday, February 07, 2012 12:14 PM
**To:** Weekly, Russel A - MSHA
**Subject:** RE:

yes

---

USAO0000038

**From:** Weekly, Russel A - MSHA
**Sent:** Tuesday, February 07, 2012 1:13 PM
**To:** Bragg, Melody E - MSHA
**Subject:**

Are you on a computer that is not available to others?

2

USAO0000039

| | |
|---|---|
| **From:** | Burns, Ronald W - MSHA |
| **Sent:** | Tuesday, February 28, 2012 8:02 AM |
| **To:** | Doyle, Mary - MSHA |
| **Cc:** | Turow, Stephen D - MSHA; Francart, William J. - MSHA; Fesak, George M - MSHA |
| **Subject:** | RE: question by Joe Main |
| **Attachments:** | Follow up inspector statements.xls |

Steve did quite a thorough job of going through the interviews and finding out who knew what about advance notice.  He made the attached spreadsheet which may be able to provide you the answers you seek.  While he and I had a slight disagreement on interpreting what some of them knew, I concur with the five that suspected this at UBB.

Steve may be able to provide you with more information if you have further questions, but I will also help any way I can.

**From:** Doyle, Mary - MSHA
**Sent:** Tuesday, February 28, 2012 7:25 AM
**To:** Burns, Ronald W - MSHA
**Cc:** zzMSHA-Upper Big Branch IR2
**Subject:** question by Joe Main

Regarding the paragraph on page 75:

Five inspectors stated they had reason to believe that UBB personnel were communicating with miners underground to provide warning of impending MSHA inspection activities.  However, none of the inspectors issued a citation under section 103(a) for advance notice of an inspection activity.

Can you tell me who the five inspectors were (if you can remember or easily find the answer) and if we know when these inspectors came to have reason to believe that UBB personnel were communicating with miners underground – did they identify the time or a specific inspection or were these just general suspicions on their part?  Was this later in the review period or earlier in the review period or do we know?

And if we are asked the reason why the team did not follow up more on this line of questioning, is the answer that the team did not understand advance notice to be one of the more significant issues during much of our investigation?

Sorry to bug you about this -- Mary

USAO0000040

| From: | Fesak, George M - MSHA |
|---|---|
| Sent: | Thursday, July 28, 2011 3:30 PM |
| To: | Hancher, Chad - MSHA |
| Subject: | RE: UBB PPOV |

Bless you my son.

---

**From:** Hancher, Chad - MSHA
**Sent:** Thursday, July 28, 2011 2:55 PM
**To:** Kiser, James A - MSHA
**Cc:** Fesak, George M - MSHA; Kuzar, John A - MSHA
**Subject:** UBB PPOV

The 'target' period is all on-site hours during the full length of the E01 inspection (January 7, 2008 – March 24, 2008). This includes other inspection activities during this time period such as E02s.

The chart showing the 44% reduction in the last page of the attached pdf document looks like it was run on March 18, 2008. It seems to me like it was run before all the uploads were completed since it did not include 18 on-site hours on March 14, 18, and 19. This is why if you run the data today (like I did and like Scott Johnson did a few months ago) you get 280.25 on-site hours and when it was run back on March 18, 2008 you get 262.25.

There were originally 19 S&S violations cited. One was modified to non-S&S and one was vacated during the February 2008 conference. One was modified to non-S&S during the March 2008 conference but the subsequent action form was not completed until August 2008.

Therefore, when the data was run on March 18, 2008, it showed 262.25 hours and 17 S&S violations.

If the subsequent action form had been completed in March 2008 and all of the inspection hours had been uploaded, the correct data would have been 280.25 hours and 16 S&S violations. The actual reduction in the S&S rate per 100 on-site hours would have been 51% instead of 44%.

|  | On-Site Hours | S&S Violations | S&S per 100 Hrs. | Prior 24 Month S&S Rate | Percent Reduction |
|---|---|---|---|---|---|
| Data Used on March 18, 2008 | 262.25 | 17 | 6.48 | 11.57 | -44% |
| Correct Data | 280.25 | 16 | 5.71 | 11.57 | -51% |

One violation was reduced to non-S&S during a contest in September 2009 so this is why you'll see 15 S&S violations if you run it today.

Even if all 19 S&S violations were valid, UBB would still have reduced its S&S rate more than 30% regardless of whether you use 262.25 or 280.25 on-site inspection hours.

Therefore, UBB would not have been placed on POV regardless of the conference results and the lack of complete data at the time of the data run.

1

USAO0000041

| | |
|---|---|
| **From:** | Burns, Ronald W - MSHA |
| **Sent:** | Tuesday, January 24, 2012 9:10 AM |
| **To:** | Turow, Stephen D - MSHA |
| **Cc:** | Fesak, George M - MSHA; Francart, William J. - MSHA; Weaver, Chris A - MSHA; Doyle, Mary - MSHA; Swentosky, Dennis J - MSHA; Weekly, Russel A - MSHA |
| **Subject:** | RE: Advance Notice section |

Steve:

I have reviewed the documents in the links below and added some comments. I saved both as new documents with today's date at the end.

I appreciate your effort in what you are saying. My thoughts are this, however. I think we are trying to be too narrow by limiting the answers from the inspectors we interviewed to just UBB. I believe some inspectors (see the Bullets document) refer to other mines where they have more evidence. I believe some of the inspectors' answers can be interpreted differently, as you state in your email below. I believe we did not ask the right questions to get the full story from the inspectors. Most of all, I don't believe we can hinge the entire 103(a) issue on the few inspectors that we asked about this, as this will affect the entire country.

As we may have a difference of opinion, maybe we should stick to things the entire team agrees on. There is not any policy or procedures to guide inspectors. It has not been consistently cited by any district in the years leading up to UBB. The interviews at best shows that there was not a uniform consensus that showed the Mt. Hope inspectors knew how to address advance notice. (For those that indicated it was advance notice or that they suspected it was going on, none cited it.)

The main contention is in the paragraph beginning on page two line 26 and going to page three line 13. We may need to once again have a conference call to determine how the team wants to address it.

Anyway, those are my thoughts. I welcome comments. If we want to have a conference call, give me about an hour's notice, as I will have to find a private place to make the call.

Thanks,
Ron

---

**From:** Turow, Stephen D - MSHA
**Sent:** Monday, January 23, 2012 4:12 PM
**To:** Burns, Ronald W - MSHA
**Cc:** Fesak, George M - MSHA; Francart, William J. - MSHA; Weaver, Chris A - MSHA; Doyle, Mary - MSHA; Swentosky, Dennis J - MSHA
**Subject:** Advance Notice section

L:\APN-060\Report Sections for Review\Steve Turow - Sections for Review\103a\Enforcement of Section 103 draft 5.doc

L:\APN-060\Report Sections for Review\Steve Turow - Sections for Review\103a\Bullets for 103(a).doc

Ron,

After speaking again to everyone about this section of the report, I made further amendments in an attempt to capture issues raised by others on the team. I also inserted information that Mary suggested based on her review of a draft section.

Please review the revised section (hyperlinked above) and revise as you think appropriate. While the track changes function should assist you in indentifying recent revisions, I believe that the revisions are:

1

- Page 1, lines 8-13
- Page 1, lines 15-17
- Page 1, lines 23-30
- Page 2, lines 26-31
- Page 3, lines 11-13
- Page 3, lines 18-20
- Page 3, line 31 (deleted introductory paragraph of conclusion)
- Page 3, lines 37-39
- Page 4, lines 15-19
- Page 4, lines 23-25
- Footnotes 1 & 2

In considering the revisions, please look at the document that you created regarding the statements made during the interviews ("Bullets for 103(a)" – attached). In a bullet below one of yours (in red font), I outlined the testimony as I read it. I think that this may be important, as I interpret some of the interviewees to have take positions somewhat different than you. It may be important for us to look again at the testimony if you disagree with my assessments, as our understandings of the testimony yield some of our difference of opinion on the content in the section.

Thanks!

Steve

USAO0000043

| From: | Fesak, George M - MSHA |
|---|---|
| Sent: | Monday, December 05, 2011 10:26 AM |
| To: | Silvey, Patricia - MSHA |
| Cc: | Francart, William J. - MSHA |
| Subject: | Innundation Reports |
| Attachments: | 4102732-Inundation 07-03-2003.pdf; March 4, 2004.pdf; gauna-10-27-10.pdf; Memo to Al Davis.pdf; Sandin Phillipson Interview.pdf |

Pat,

1.  We could not find any evidence that Technical Support participated in the investigation of the July 3, 2003, methane inundation. The District investigated the accident and prepared a "short form" report (7000-50). It is evident that company officials participated in the investigation. The District may have given a copy of the report to Performance Coal during the closeout conference, **but we can't say for sure. (**See attached report.)

2.  Technical Support did not participate in the investigation of the February 18, 2004, methane inundation. District 4 requested help from Technical Support on geological considerations related to the outbursts. Sandin Phillipson and John Cook from Technical Support conducted an investigation on February 24, 2004. It is evident that they had extensive discussions by the Operator. He prepared a memorandum on his findings to John Pyles on March 4, 2004. **We do not know if the report was given to Performance Coal. District 4 may have.** (See attached report and page from Sandin's interview.)

3.  On May 4, John Pyles requested assistance from Technical Support for controlling gas emissions from floor outbursts at UBB. George Aul and Mike Guana from Technical Support attended a meeting with UBB officials on May 26, 2004, to share information on floor methane outbursts at other Appalachian mines. Aul and Guana prepared a memorandum on the meeting to Steve Gigliotti on July 15, 2004. The report contained "considerations" which are basically recommendations. **We do not know if this report was given to Performance Coal.** (We asked Mike Guana in his interview, and he could not remember. See attached Statement from Mike Guana.)

4.  It is Technical Support's practice not to give their investigative reports directly to the mine operator. They provide additional copies to the District for distribution to the operator, and allow the District to decide whether to give a copy to the operator. (See attached memo to Al Davis.)

Sorry,

George

1

USAO0000044

| | |
|---|---|
| **From:** | Ross, Ernie - MSHA |
| **Sent:** | Friday, January 15, 2010 10:10 AM |
| **To:** | Hardman, Robert G - MSHA |
| **Subject:** | WEVA 2009-580 Performance Coal Company |

Bob,

I have reviewed this case and recommend the following settlement:

6616985:  The employees bathhouse was not being maintained in a clean and sanitary condition, due to coat hangers, discarded tape and newspapers, and mud and coal dirt scattered throughout the floor.
**Modify to non S&S with a penalty of $400.00.**

8069136:  This citation was issued due to two (2) rib bolts, one crosscut out-by the face, were measured to be 64 and 70 inches from the rib.  The inspector's notes indicate that this area was mined within the previous two days.  The Respondent contends that there were no adverse roof conditions present and that this was two separate areas.
**Modify to non S&S with a penalty of $500.00.**

8069239:  **As issued with a penalty of $900.00.**

Total assessed:  $3279.00      Proposed:  $1800.00

Thanks – Ernie
01/15/2010

**Tracking:**

1

| Recipient | Read |
| --- | --- |
| Hardman, Robert G - MSHA | Read: 1/15/2010 10:17 AM |

USAO0000046

| | |
|---|---|
| **From:** | Ross, Bill <Bill.Ross@masseyenergyco.com> |
| **Sent:** | Monday, December 21, 2009 12:28 PM |
| **To:** | Mackowiak, Joseph C - MSHA |
| **Subject:** | RE: UBB PLAN |

Thanks for the reply. I know how the back-log is. Anything you need from this end, give me a shout! BR

**From:** Mackowiak, Joseph C - MSHA [mailto:Mackowiak.Joseph@DOL.GOV]
**Sent:** Monday, December 21, 2009 12:23 PM
**To:** Ross, Bill
**Cc:** Kline, Richard J - MSHA
**Subject:** RE: UBB PLAN

I just processed one on Friday, for the revised return off the #2 headgate section.

The new longwall panel revision is the next to the bottom of our "Priority Review" folder and it will take at least 2 weeks due to the number of plans ahead of it.

That is the best I can do. We are backlogged beyond believe with no relief in sight.

**From:** Ross, Bill [mailto:Bill.Ross@masseyenergyco.com]
**Sent:** Monday, December 21, 2009 12:16 PM
**To:** Mackowiak, Joseph C - MSHA
**Subject:** RE: UBB PLAN

Hey Joe,
 Have you had time to look at any of our other plans? Enjoy the Christmas time! BR

**From:** Mackowiak, Joseph C - MSHA [mailto:Mackowiak.Joseph@DOL.GOV]
**Sent:** Friday, December 18, 2009 12:12 PM
**To:** Ross, Bill
**Subject:** RE: UBB PLAN

I've been in meetings all day, not a minute to spare.

It's down the hall being hand delivered around.

**From:** Ross, Bill [mailto:Bill.Ross@masseyenergyco.com]
**Sent:** Friday, December 18, 2009 11:23 AM
**To:** Mackowiak, Joseph C - MSHA
**Subject:** UBB PLAN

Hey Joe,
 Can't seem to get you by phone? Is there any hope for our plan getting approved today? Is there anything else you need???? BR

1

USAO0000047

| | |
|---|---|
| **From:** | Pon, Melinda - MSHA |
| **Sent:** | Tuesday, February 17, 2009 4:12 PM |
| **To:** | Davis, Michael A - MSHA; Lathram, Layne  - MSHA |
| **Cc:** | Stricklin, Kevin G - MSHA; Fesak, George M - MSHA; Meyer, David L - MSHA; Powasnik, Jack - MSHA; zzMSHA-COAL - HQ Division Managers; Hardman, Robert G - MSHA |
| **Subject:** | Significant Activity - Dust Busters |

This week, two Coal Mine Safety and Health special emphasis "dust busters" teams are in District 4 conducting the first 2 of a series of comprehensive evaluations of occupational exposures to respirable coal mine and quartz dust across the nation. Members of the teams, selected from coal districts, headquarters and Technical Support, will be evaluating the effectiveness of the operator's dust control and sampling programs through multi-shift sampling, data collection, observations of mining cycle and work practices, and conducting interviews.  The mines selected for evaluation this week are A.T. Massey mines in District 4.

This is likely to generate complaints from A. T. Massey that we are picking on them and from the National Mining Association inquiring about what we are doing, why and what our selection criteria are.

Ps. Not for public consumption but the teams are at Randolph Mine and Horse Creek Eagle. They were supposed to start sampling at Upper Big Branch however they were unable to sample because the mine lost the fan motor at 4 AM today. The team was then dispatched from Upper Big Branch to conduct sampling at Horse Creek Eagle.

USAO0000048

| | |
|---|---|
| **From:** | Louviere, Amy - MSHA |
| **Sent:** | Tuesday, April 13, 2010 2:34 PM |
| **To:** | Fillichio, Carl - OSEC; Zapata, Jaime - OPA; Chaurand, Enrique - OPA |
| **Cc:** | Davis, Michael A - MSHA; Silvey, Patricia - MSHA; Mattos, Jay P - MSHA; Main, Joseph A - MSHA; Wagner, Gregory - MSHA; Strassler, Heidi W - MSHA; Parker, Douglas - MSHA |
| **Subject:** | POV statement -- one more change! |

Carl and Jaime:

Please consider one more change to the POV statement (at bottom).  This language makes a much stronger statement.

Amy Louviere
Public Affairs Director
Mine Safety and Health Administration
202.693.9423
www.msha.gov

---

**From:** Mattos, Jay P - MSHA
**Sent:** Tuesday, April 13, 2010 2:32 PM
**To:** Louviere, Amy - MSHA
**Subject:** RE: please verify ASAP

Changed - see below I'd also remove that last sentence - because it is certain that the mine would have met the potential pattern criteria - what is not certain is if they would have received a potential pattern letter from us.

---

**From:** Louviere, Amy - MSHA
**Sent:** Tuesday, April 13, 2010 2:28 PM
**To:** Mattos, Jay P - MSHA
**Subject:** please verify ASAP

Mike Davis' addition to the statement. Please review

AS it turns out, in that 90 day time frame, the Upper Big Branch mine did, in fact, dramatically reduce its level of "significant and substantial" violations – by upwards of 65%. This reduction would have been significant enough to remove UBB from from further pattern notice  consideration . If the computer programming error had not occurred, it is not certain that this mine would have met the pattern criteria and been placed on a pattern of violations.

Amy Louviere
Public Affairs Director
Mine Safety and Health Administration
202.693.9423
www.msha.gov

USAO0000049

| | |
|---|---|
| **From:** | Davis, Michael A - MSHA |
| **Sent:** | Monday, April 12, 2010 4:29 PM |
| **To:** | Louviere, Amy - MSHA |
| **Subject:** | FW: POV and Upper Big Branch |

**From:** Mattos, Jay P - MSHA
**Sent:** Monday, April 12, 2010 3:44 PM
**To:** Mattos, Jay P - MSHA; Davis, Michael A - MSHA; Strassler, Heidi W - MSHA; Parker, Douglas - MSHA; Wagner, Gregory - MSHA
**Subject:** RE: POV and Upper Big Branch

This is to confirm that the computer program did have an error and that UBB should have been included in the list of potential pattern of violations mines I sent to Kevin Stricklin in September. UBB was the only mine omitted from the list due to the computer program logic error. Conversely, no mines were included in the list that should not have been included.

If UBB had been notified they were exhibiting a potential pattern of violations, we would have set a target for them to reduce there S&S issuance rate by 30% - from 10.7 to 7.5 S&S issuances per 100 inspection hours during the fourth quarter of CY 2009. (the national rate for UG bituminous mines during the 24-month review period ending 8/31/2009 was 6.22 - for POV we set targets of either a 30% reduction from each mine's 24-month rate or to the 24-month national rate, whichever is higher).

UBB's S&S issuance rate for the fourth quarter was 3.6 - a reduction of 66% from the 10.7 rate during the 24-month review period and 42% below the 6.22 national rate during the review period.

| | |
|---|---|
| **From:** | Mattos, Jay P - MSHA |
| **Sent:** | Monday, April 12, 2010 1:02 PM |
| **To:** | Davis, Michael A - MSHA; Strassler, Heidi W - MSHA; Parker, Douglas - MSHA; Wagner, Gregory - MSHA |
| **Subject:** | POV and Upper Big Branch |

I went back and reviewed each citation/order issued at UBB to validate the reason why the operation did not meet all the criteria in the September 2009 run. The review at the time showed the operation had no final S&S unwarrantable failure orders during the preceding 24 months, but had met the other nine criteria.

Looking at the record for each of the issuances, I identified eight 104(d) S&S issuances that the company neither paid nor contested and consequently became final orders in January and June of 2009. We sent demand letters to them in March and August.

I checked my computer program that generates the POV data and found an error - not including delinquent violations for which the last action is a first demand letter. sent.

SOL has no record of the company petitioning to reopen these violations, which would have excluded these, as well.

We're reviewing the other program components/submodules to correct this error and will rerun the program to verify that the mine should have been included in the last review and to identify if any other operations would have also been identified.

Jay

1

USAO0000050

USAO0000051

| | |
|---|---|
| **From:** | Strassler, Heidi W - MSHA |
| **Sent:** | Tuesday, November 01, 2011 12:20 PM |
| **To:** | Dondis, Lynn - MSHA |
| **Cc:** | Baxter, Derek - MSHA |
| **Subject:** | RE: UBB report |

Lynn, I can't agree to this being included in the Exec Summary. MSHA's report is an unbiased technical report on the causes of the accident. This is a conclusion for others to make. It makes MSHA look biased to say this right up front. It's perfectly fine for a press release from Joe, but not for the exec summary or elsewhere in the report.

Derek may have other edits to give to you. Thanks, Heidi

MSHA's investigation also reveals that the dangerous conditions at UBB were not the result of inadvertence, but of a concerted pattern of illegal conduct by PCC and Massey that placed production above all other concerns. They concealed hazards from MSHA, intimidated miners to discourage them from reporting hazards or stopping production to make needed corrections, routinely gave advance notice of inspections, and inadequately trained miners.

Heidi W. Strassler
Associate Solicitor for Mine Safety and Health

This message may contain information that is privileged or otherwise exempt from disclosure under applicable law. Do not disclose without consulting the Office of the Solicitor. If you think you received this email in error, please notify me immediately by email or phone, 202-693-9366.

**From:** Dondis, Lynn - MSHA
**Sent:** Tuesday, November 01, 2011 10:44 AM
**To:** Baxter, Derek - MSHA
**Cc:** Strassler, Heidi W - MSHA
**Subject:** RE: UBB report

I highlighted my few changes in yellow. Are these okay with you guys?

**From:** Baxter, Derek - MSHA
**Sent:** Tuesday, November 01, 2011 10:40 AM
**To:** Dondis, Lynn - MSHA
**Cc:** Strassler, Heidi W - MSHA
**Subject:** UBB report

Lynn,

An addition to page 52 of the accident investigation report, at the end of the second full paragraph on advance notice:

On October 26, 2011, Hughie Elbert Stover, PCC's former head of security, was found guilty by a jury sitting in the United States District Court for the Southern District of West Virginia of a felony count

1

of making false, fictitious and fraudulent statements to MSHA. Stover had testified in his interview with the MSHA accident investigation team that Upper Big Branch had a policy prohibiting security guards from providing "advance notice" of MSHA inspections.

Best,

Derek

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Derek Baxter
Co-Counsel for Trial Litigation
U.S. Department of Labor
Office of the Solicitor
Mine Safety and Health Division
1100 Wilson Blvd., 22nd Floor
Arlington, VA 22209
202-693-9328
202-693-9361 (fax)
This message may contain sensitive information that is privileged or exempt from disclosure under applicable law. Do not disclose this message without consulting the Office of the Solicitor. If you think you received this message in error, please notify the sender immediately.

USAO0000053

| From: | Mattos, Jay P - MSHA |
|---|---|
| Sent: | Monday, April 12, 2010 6:18 PM |
| To: | Wagner, Gregory - MSHA; Parker, Douglas - MSHA; Davis, Michael A - MSHA; Strassler, Heidi W - MSHA |
| Cc: | Montali, Peter J - MSHA; Johnson, Scott K - MSHA |
| Subject: | RE: UBB and the potential pattern |

Verified the numbers by 1) listing all violations cited and verifying the numbers issued during the fourth quarter of CY 2009 and 2) listing each inspectors time recorded during the same period. Pete Montali performed a separate verification and we compared results. They matched exactly. The numbers below are accurate.

One additional statistic based on Greg's request. In order to be issued a pattern of violation notice, (assuming notification and failure during the fourth quarter of 2009), the operator would need to have been issued a total of 42 S&S citations during this timeframe - more than double the 20 that were issued.

**From:** Wagner, Gregory - MSHA
**Sent:** Monday, April 12, 2010 4:45 PM
**To:** Harris, Seth - OSEC; Archuleta, Katherine - OSEC
**Cc:** Davis, Michael A - MSHA; Mattos, Jay P - MSHA; Parker, Douglas - MSHA; Strassler, Heidi W - MSHA; Stricklin, Kevin G - MSHA
**Subject:** UBB and the potential pattern

UBB would NOT have been on a POV beginning 1/1/10 because they DID reduce their S&S rate during the fourth quarter of calendar year 2009 sufficiently—even without the notification of a PPOV. In other words, UBB was cited at a significantly lower rate after our PPOV screen than before.

The details from Jay Mattos:

This is to confirm that the computer program did have an error and that UBB should have been included in the list of potential pattern of violations mines I sent to Kevin Stricklin in September. UBB was the only mine omitted from the list due to the computer program logic error. Conversely, no mines were included in the list that should not have been included.

If UBB had been notified they were exhibiting a potential pattern of violations, we would have set a target for them to reduce there S&S issuance rate by 30% - from 10.7 to 7.5 S&S issuances per 100 inspection hours during the fourth quarter of CY 2009. (the national rate for UG bituminous mines during the 24-month review period ending 8/31/2009 was 6.22 - for POV we set targets of either a 30% reduction from each mine's 24-month rate or to the 24-month national rate, whichever is higher).

UBB's S&S issuance rate for the fourth quarter was 3.6 - a reduction of 66% from the 10.7 rate during the 24-month review period and 42% below the 6.22 national rate during the review period.

g

Gregory R. Wagner, M.D.
Deputy Assistant Secretary
Mine Safety and Health Administration
1100 Wilson Blvd.
Arlington, VA 22209

USAO0000054

P: 202-693-9414
M: 703-[Redacted - Privacy]
F: 202-693-9401
wagner.gregory@dol.gov

2

USAO0000055

| From: | Davis, Michael A - MSHA |
|---|---|
| Sent: | Tuesday, April 13, 2010 2:20 PM |
| To: | Louviere, Amy - MSHA |
| Subject: | RE: draft statement |

Open to comment?

**From:** Louviere, Amy - MSHA
**Sent:** Tuesday, April 13, 2010 1:36 PM
**To:** Chaurand, Enrique - OPA; Zapata, Jaime - OPA; Fillichio, Carl - OSEC; Main, Joseph A - MSHA; Wagner, Gregory - MSHA; Davis, Michael A - MSHA; Parker, Douglas - MSHA
**Cc:** Strassler, Heidi W - MSHA; Mattos, Jay P - MSHA; Silvey, Patricia - MSHA
**Subject:** FW: draft statement

Please consider the following changes in red, as provided by Pat Silvey.

Statement from Secretary of Labor Hilda L. Solis on
Upper Big Branch Mine and Pattern of Violations

"Since the tragedy at the Upper Big Branch Mine, officials at the Mine Safety and Health Administration (MSHA) have been reviewing the processes used to determine whether or not the mine should have met the initial screening criteria for pattern of violations status.

On Monday evening, that review found an error in the computer program used to determine whether a mine meets the criteria for inclusion into pattern of violation status. Specifically, the program was not counting unwarrantable failure citations in the "unpaid and uncontested; first demand letter sent" category.

Massey Energy's Upper Big Branch Mine had eight citations in this category, which were not counted in the screening process.

This error was immediately corrected. Had the error in the computer program not occurred, the mine could have been placed into potential pattern of violation status in October of 2009, when the last pattern of violation review for this mine took place.

Upon notification of a potential pattern of violations, the mine would have had a chance to correct any data, and would be given 90 days to reduce its "significant and substantial" violations by either 30%, or to reduce its level of "significant and substantial violations" to the industry average or lower.

AS it turns out, in that 90 day time frame, the Upper Big Branch mine did, in fact, dramatically reduce its level of "significant and substantial" violations – by upwards of 65%. This reduction would have been significant enough to have removed UBB from a pattern notice. If the computer programming error had not occurred, it is not certain that this mine would have met the pattern criteria and been placed on a pattern of violations.

The Department of Labor takes all of our processes very seriously and we are working diligently to improve safety enforcement and prevent future tragedies.

1

At this time the Upper Big Branch mine is closed due to the explosion.  MSHA will not allow the mine to reopen until the investigation is complete and we are assured that Massey Energy can effectively and successfully provide for the safety and health of those in the mine."

Enrique A. Chaurand
Director of Speechwriting
U.S. Department of Labor
200 Constitution Ave, NW
Washington, D.C. 20210
(202) 693-4679 direct line

2

USAO0000057

| | |
|---|---|
| **From:** | Parker, Douglas - MSHA |
| **Sent:** | Friday, July 23, 2010 4:54 PM |
| **To:** | Pon, Melinda - MSHA |
| **Cc:** | Thomas, Charles J - MSHA; Hardman, Robert G - MSHA; Stricklin, Kevin G - MSHA; Main, Joseph A - MSHA; Phillips, Robert L - MSHA; Louviere, Amy - MSHA |
| **Subject:** | RE: Jan. 7 proposal |

Was there a February 2010 proposal on splitting air by Massey? We're trying to figure out the discrepancy between the draft memo's reference to a January 7 proposal and the documents showing that in fact an older proposal was denied that day. We thought there was reference in the briefing to a February proposal. Also, was there any Massey proposal that would have reduced air at the longwall by 150,000cfm as the memo states? If the January reference is incorrect we need to also check that figure and determine how it was derived.

Douglas L. Parker
Special Assistant to the
Assistant Secretary of Labor for Mine Safety and Health Mine Safety and Health Administration U.S. Department of Labor

tel: (202) 693-9405
cell: (703) [Redacted - Privacy]
fax: (202) 693-9401
-----Original Message-----
From: Pon, Melinda - MSHA
Sent: Friday, July 23, 2010 4:47 PM
To: Parker, Douglas - MSHA
Cc: Thomas, Charles J - MSHA; Hardman, Robert G - MSHA; Stricklin, Kevin G - MSHA; Main, Joseph A - MSHA; Phillips, Robert L - MSHA; Louviere, Amy - MSHA
Subject: Re: Jan. 7 proposal

Just an update - local SOL is reviewing the Jan 7 and Mar 5, 2010 documents and the explanation to accompany the denied and pending vent plan revisions. When I get their clearance, I'll forward to you.

We will need the redactions applied before we release to AP. Also, we will need to post these to the UBB single source page in fairness to other reporters who have also requested UBB ventilation plan revisions, denied and pending, via FOIA. As a courtesy, we try to call the FOIA requestors that part of the responses to their requests are posted to the website. Also in the queue for clearance are the other vent plan revision documents - these should be coming your way early next week for clearance.

More later today, I hope.

Mp

-----Original Message-----
From: Pon, Melinda - MSHA
To: Parker, Douglas - MSHA
CC: Thomas, Charles J - MSHA; Hardman, Robert G - MSHA; Stricklin, Kevin G - MSHA; Main, Joseph A - MSHA; Phillips, Robert L - MSHA; Louviere, Amy - MSHA
Sent: Fri Jul 23 10:05:12 2010
Subject: RE: Jan. 7 proposal

1

USAO0000058

Hi Doug,

Coal completed the redactions - next stop OSRV and local SOL for review.  They were put on notice this AM.  Moving right along.

Will work on the explanatory map.

mp

-----Original Message-----
From: Parker, Douglas - MSHA
Sent: Friday, July 23, 2010 9:10 AM
To: Pon, Melinda - MSHA; Phillips, Robert L - MSHA
Cc: Thomas, Charles J - MSHA; Hardman, Robert G - MSHA; Stricklin, Kevin G - MSHA; Main, Joseph A - MSHA
Subject: Re: Jan. 7 proposal

Thanks and yes, put through clearance process immediately.  We will need a write-up pointing out the relevance as you suggest.

-----Original Message-----
From: Pon, Melinda - MSHA
To: Parker, Douglas - MSHA; Phillips, Robert L - MSHA
CC: Thomas, Charles J - MSHA; Hardman, Robert G - MSHA; Stricklin, Kevin G - MSHA
Sent: Fri Jul 23 09:00:57 2010
Subject: RE: Jan. 7 proposal

Joe Mackowiak assisted me on gathering the appropriate, responsive documents.

There is one letter, several maps dated Jan 7, 2010 where the UBB proposed ventilation plan revision, dated November 20, 2009, were denied. There is no UBB submission dated Jan 7.

To answer Doug's question, according to Joe Mac:

"The third page of the small file is from the operator (on their letterhead).  It states that intake was to be coursed towards the LBB#5 area (this is intake to be rerouted away from the active LW to supply ventilation for mining the proposed new panel headgate).

All the maps are relevant, but map 2 shows where they wanted to take 25,000 cfm from the intake (reducing longwall air) and start a development section for the new panel.

Map 5 shows how they proposed to run the new longwall panel.  This would have been done after the current panel was mined out."

Also, Joe mentions the UBB submission on March 5, 2010 that was pending at the time of the explosion.  He believes we should also provide the documents for the following reasons: "The map attached shows where they wanted to take 60,000 cfm from the current longwall intake and start a new section in order to provide better access to the bleeder system.

Oddly, the operator fails to state why better access is necessary!"

USAO0000059

If you concur, I'll get the letters and the maps ready for redaction and clearance for both Jan 7 and March 5.  There needs to be an explanation for the documents because as Joe points out, UBB does not make a declaration on what it is planning to do.

I attached the documents if you wanted to preview them first.
mp

-----Original Message-----
From: Stricklin, Kevin G - MSHA
Sent: Thursday, July 22, 2010 8:15 PM
To: Pon, Melinda - MSHA; Parker, Douglas - MSHA; Hardman, Robert G - MSHA; Phillips, Robert L - MSHA
Subject: Re: Jan. 7 proposal


Terry or mike kalich will have it

-----Original Message-----
From: Pon, Melinda - MSHA
To: Parker, Douglas - MSHA; Stricklin, Kevin G - MSHA; Hardman, Robert G - MSHA; Phillips, Robert L - MSHA
Sent: Thu Jul 22 19:11:34 2010
Subject: Re: Jan. 7 proposal


I'll look first thing tomorrow and let you know.

-----Original Message-----
From: Parker, Douglas - MSHA
To: Stricklin, Kevin G - MSHA; Hardman, Robert G - MSHA; Phillips, Robert L - MSHA; Pon, Melinda - MSHA
Sent: Thu Jul 22 18:23:05 2010
Subject: Fw: Jan. 7 proposal


Can we get this document?  Would it be the whole modification or a cover letter?

-----Original Message-----
From: Navin, Jeffrey - OSEC
To: Louviere, Amy - MSHA; Fillichio, Carl - OSEC; Zapata, Jaime - OPA; Parker, Douglas - MSHA; Main, Joseph A - MSHA
Sent: Thu Jul 22 18:11:33 2010
Subject: RE: Jan. 7 proposal


Doug - can you help push this?  We've got a really good story to tell here, and we need some paper to help back it up.

-----Original Message-----
From: Louviere, Amy - MSHA
Sent: Thursday, July 22, 2010 6:11 PM
To: Navin, Jeffrey - OSEC; Fillichio, Carl - OSEC; Zapata, Jaime - OPA
Subject: RE: Jan. 7 proposal


No. I never got a response from the district


Amy Louviere
Public Affairs Director
Mine Safety and Health Administration
202.693.9423

3

www.msha.gov

-----Original Message-----
From: Navin, Jeffrey - OSEC
Sent: Thursday, July 22, 2010 6:10 PM
To: Fillichio, Carl - OSEC; Louviere, Amy - MSHA; Zapata, Jaime - OPA
Subject: RE: Jan. 7 proposal

Did we get him paper?

-----Original Message-----
From: Fillichio, Carl - OSEC
Sent: Thursday, July 22, 2010 12:04 PM
To: 'SHananel@ap.org'; Louviere, Amy - MSHA; Zapata, Jaime - OPA
Cc: Navin, Jeffrey - OSEC
Subject: Re: Jan. 7 proposal

I'm in boston. Looping in amy for follow up

----- Original Message -----
From: Hananel, Sam <SHananel@ap.org>
To: Fillichio, Carl - OSEC
Sent: Thu Jul 22 11:28:33 2010
Subject: Jan. 7 proposal

Carl,

Do you have the actual written submission from Massey on Jan. 7 where they propose to reduce air on the longwall to ventilate an older section of the mine so they can get more coal? Massey is saying "it is not true."

Thanks,
Sam

Sam Hananel
Reporter
Associated Press
1100 13th St. NW, Suite 700
Washington, D.C. 20005-4076
(202) 641-9539 (office)
(240) [Redacted - Privacy] (cell)
(202) 496-8854 (fax)
AOL Instant Messaging: ap shananel

The information contained in this communication is intended for the use of the designated recipients named above. If the reader of this communication is not the intended recipient, you are hereby notified that you have received this communication in error, and that any review, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify The Associated Press immediately by telephone at +1-212-621-1898 and delete this e-mail. Thank you.

4

[IP_US_DISC]
msk dccc60c6d2c3a6438f0cf467d9a4938

USAO0000062

| | |
|---|---|
| **From:** | Davis, Michael A - MSHA |
| **Sent:** | Monday, April 26, 2010 7:39 PM |
| **To:** | Stricklin, Kevin G - MSHA; Louviere, Amy - MSHA; Main, Joseph A - MSHA; Wagner, Gregory - MSHA; Strassler, Heidi W - MSHA; Duncan, Jeffrey A - MSHA |
| **Cc:** | Pon, Melinda - MSHA; Thomas, Charles J - MSHA |
| **Subject:** | Re: hazard complaints news release |

100% agree.

-----Original Message-----
From: Stricklin, Kevin G - MSHA
To: Louviere, Amy - MSHA; Main, Joseph A - MSHA; Wagner, Gregory - MSHA; Davis, Michael A - MSHA; Strassler, Heidi W - MSHA; Duncan, Jeffrey A - MSHA
CC: Pon, Melinda - MSHA; Thomas, Charles J - MSHA
Sent: Mon Apr 26 19:29:46 2010
Subject: Re: hazard complaints news release

My only comment is to put a dagger into massey. It would be to say something like even after the explosion at ubb, msha received the complaint at cook on april 9 and spell out the results

-----Original Message-----
From: Louviere, Amy - MSHA
To: Main, Joseph A - MSHA; Wagner, Gregory - MSHA; Davis, Michael A - MSHA; Strassler, Heidi W - MSHA; Stricklin, Kevin G - MSHA; Duncan, Jeffrey A - MSHA
CC: Pon, Melinda - MSHA; Thomas, Charles J - MSHA
Sent: Mon Apr 26 19:23:53 2010
Subject: hazard complaints news release

Dear All:

A number of edits were made since the last version, so please review again. It needs to go out tomorrow morning. Thanks for your help.


amy

1

| | |
|---|---|
| **From:** | Parker, Douglas - MSHA |
| **Sent:** | Friday, February 18, 2011 3:32 PM |
| **To:** | Pon, Melinda - MSHA; Dondis, Lynn - MSHA; Block, Sharon - OCIA; Silvey, Patricia - MSHA; Strassler, Heidi W - MSHA |
| **Cc:** | Aaronson, Julie E - MSHA; Stricklin, Kevin G - MSHA; Thomas, Charles J - MSHA |
| **Subject:** | RE: testimony |

Our data indicates employment has increased in FY 10 over FY 09.  We can state the facts, and that the data do not suggest an adverse impact on employment.

Douglas L. Parker
Special Assistant to the
Assistant Secretary of Labor for Mine Safety and Health
Mine Safety and Health Administration
U.S. Department of Labor

tel:  (202) 693-9405
cell:  (703) [Redacted - Privacy]
fax:  (202) 693-9401

**From:** Pon, Melinda - MSHA
**Sent:** Friday, February 18, 2011 3:18 PM
**To:** Dondis, Lynn - MSHA; Block, Sharon - OCIA; Parker, Douglas - MSHA; Silvey, Patricia - MSHA; Strassler, Heidi W - MSHA
**Cc:** Aaronson, Julie E - MSHA; Stricklin, Kevin G - MSHA; Thomas, Charles J - MSHA
**Subject:** RE: testimony

honestly, I do not see how we can make a definitive statement, with Joe under oath, that MSHA's enforcement efforts have NOT hurt employment. I'm not saying it has or hasn't - we just don't have the data to back up such a broad, generalized statement. We can probably say that we have leveled the playing field through our enforcement efforts and made the working conditions safer and healthier for our nation's miners.  But the economic reality is that more orders = more downtime = loss production = lost profits = jobs.

I discussed the proposition with several in coal just now and we all agree that we cannot with confidence make the statement that enforcement efforts have not affected jobs in the mining industry (speaking only for coal). And I can only imagine QFRs asking us to support that statement if indeed Joe were to make that statement.

my 2 cents.

mp

**From:** Dondis, Lynn - MSHA
**Sent:** Friday, February 18, 2011 2:58 PM
**To:** Block, Sharon - OCIA; Parker, Douglas - MSHA; Silvey, Patricia - MSHA; Strassler, Heidi W - MSHA
**Cc:** Aaronson, Julie E - MSHA; Pon, Melinda - MSHA
**Subject:** RE: testimony

Sharon, The testimony does mention it, but does not give any examples.  Julie has some anecdotal information only....she can't get that stuff together today, but said she would try to get it to you over the weekend.

1

Melinda Pon who works up in coal will be talking to the District Managers on Tuesday and said she would ask them as well.

So we will try to get you something, and if not can have it available for Joe for q and a

**From:** Block, Sharon - OCIA
**Sent:** Friday, February 18, 2011 2:49 PM
**To:** Dondis, Lynn - MSHA; Parker, Douglas - MSHA; Silvey, Patricia - MSHA; Strassler, Heidi W - MSHA
**Subject:** RE: testimony

Lynn – We talked about putting in Joe's testimony some discussion of the data that shows that MSHA's increased enforcement efforts have not hurt employment in the mining industry.  I didn't see any of that discussion in the testimony.  Do you have that data that I could insert?  Thanks, Sharon

**From:** Dondis, Lynn - MSHA
**Sent:** Friday, February 18, 2011 1:48 PM
**To:** Block, Sharon - OCIA; Parker, Douglas - MSHA; Silvey, Patricia - MSHA; Strassler, Heidi W - MSHA
**Subject:** RE: testimony

Here is a redlined version of Joe's testimony.....unredlined version to follow  next

**From:** Block, Sharon - OCIA
**Sent:** Friday, February 18, 2011 1:39 PM
**To:** Dondis, Lynn - MSHA
**Cc:** Parker, Douglas - MSHA; Suiter, Carrianna - OCIA
**Subject:** RE: testimony

Lynn – Sounds good.  I'd like to work on the testimony tomorrow and then get it back to you so we can be ready to get it into clearance first thing Tuesday morning.  Attached are the MSHA Q&A one pagers that we put in the Secretary's book for the hearing.  I was going to look through the book from Joe's last hearing and see what Q&A we might need to update from there.  I would really like to limit the number of Q&A we put in Joe's book for this hearing.  Last year we gave him way too many and they weren't really very helpful.  Carrianna has a set of member profiles ready for the book.  Here is what I have in my notes as MSHA questions:

**Desjarlais:**

- What is MSHA doing to correct the mistake in its December impact inspection press release that erroneously names two mines as bad actors?  Obviously the Obama Administration has adopted a policy of enforcement by shaming.  Has it adopted a policy to make it up to companies that are inaccurately shamed?

- How many MSHA employees are there?

- Does MSHA fund itself from the penalties it collects?  If so, doesn't that create an incentive for inspectors to issue more citations so they can get more money for the agency?

- Why is there so much inconsistency in citations?

- Does the Secretary think that when disasters like UBB happen, they are solely the fault of the mine operators or does she think MSHA should take some responsibility also?

- Are mines getting safer?

**Bucshon**

- What are the scientific assumptions that MSHA used for the basis of the respirable coal dust NRPM?  Why won't MSHA release the data underlying those assumptions?  Will the Secretary provide him with an answer to these questions within 10 working days?

2

- Why does MSHA think that the NPRM is necessary?  Isn't the problem that miners don't want to use their respirators?  Won't the reg cost the industry $1 billion?

**Rokita**

- When the Secretary says that MSHA needs mine safety legislation to provide new authority to MSHA, is she saying she knows this because at the time of the UBB disaster the law was being perfectly implemented?

**Thompson**

- Has the preconferencing pilot helped reduce the backlog?  What is the status of the pilot?

---

**From:** Dondis, Lynn - MSHA
**Sent:** Friday, February 18, 2011 12:57 PM
**To:** Block, Sharon - OCIA
**Cc:** Parker, Douglas - MSHA
**Subject:** testimony

Sharon,  I am putting in Joe's final changes now.  Then I was going to read over and send onto you.  I will send the redlined version to you in a few minutes, and then send the cleaned up version soon.

Also, we are putting together prep for Joe for the hearing.  Can you send us the  edited one pagers that Solis was given for her testimony, along with the q and as she got.  I assume you edited these documents.

Thanks, Lynn

Lynn Dondis
Special Assistant to the Assistant Secretary for
Mine Safety and Health
Mine Safety and Health Administration
U.S. Department of Labor

(Tel): (202) 693-9477

3

| | |
|---|---|
| **From:** | Godsey, John F - MSHA |
| **Sent:** | Monday, January 24, 2011 1:36 PM |
| **To:** | Page, Norman G - MSHA |
| **Cc:** | Watkins, Timothy R - MSHA |
| **Subject:** | FW: UBB EP minimum quantities |

**From:** Mackowiak, Joseph C - MSHA
**Sent:** Monday, January 24, 2011 1:22 PM
**To:** Godsey, John F - MSHA
**Cc:** Dickerson, Michael T - MSHA; Hardman, Robert G - MSHA
**Subject:** RE: UBB EP minimum quantities

No where for the Longwall.  They aren't required in the plan, or by MSHA policy.  That's the mine operator's responsibility per 75.334.

The only time we ask for these is if there has been an issue with the bleeder system relative to 75.323

UBB never had a problem with excessive methane levels in their bleeder (that I'm aware of).

**From:** Godsey, John F - MSHA
**Sent:** Monday, January 24, 2011 1:20 PM
**To:** Mackowiak, Joseph C - MSHA
**Cc:** Newsome, Randy A - MSHA
**Subject:** UBB EP minimum quantities

Joe, where can I find the required minimum quantities readings for the EP's and other checkpoints?

Thank you

John Godsey

1

USAO0000067

**From:** Page, Norman G - MSHA
**Sent:** Wednesday, November 23, 2011 9:16 AM
**To:** Maggard, Charles J - MSHA
**Subject:** Fw: report

See below
Norman G. Page

**From:** Stricklin, Kevin G - MSHA
**Sent:** Wednesday, November 23, 2011 09:06 AM
**To:** Page, Norman G - MSHA
**Subject:** Fw: report

Fyi

**From:** Stricklin, Kevin G - MSHA
**Sent:** Wednesday, November 23, 2011 09:05 AM
**To:** Strassler, Heidi W - MSHA
**Cc:** Baxter, Derek - MSHA; Babington, Matthew - MSHA
**Subject:** Re: report

I think rich needs to work through the team.

**From:** Strassler, Heidi W - MSHA
**Sent:** Wednesday, November 23, 2011 09:02 AM
**To:** Stricklin, Kevin G - MSHA
**Cc:** Baxter, Derek - MSHA; Babington, Matthew - MSHA
**Subject:** Fw: report

Pls see Rich's message below. Are you in agreement with substituting his alternative? I think this is a reasonable solution. My folks tell me that there is no evidence of water blocking the cross sectional area. In fact there is witness testimony saying it did not block and pumps took care of it if I have my memory correct. The water rose mainly along the back of the LW headgate leading back to the bandytown fan, but the air still got thru. Please advise soonest. Heidi

This message may contain information that is privileged or otherwise exempt from disclosure under applicable law. Do not disclose without consulting the Office of the Solicitor. If you think you received this email in error, please notify me immediately by email or phone, 202-693-9366.

Heidi W. Strassler
Associate Solicitor for Mine Safety and Health

**From:** Babington, Matthew - MSHA
**Sent:** Wednesday, November 23, 2011 08:45 AM
**To:** Strassler, Heidi W - MSHA
**Subject:** FW: report

Who should I notify about Rich's concerns about the report?

1

USAO0000068

**From:** Stoltz, Richard T - MSHA
**Sent:** Wednesday, November 23, 2011 8:41 AM
**To:** Babington, Matthew - MSHA; Baxter, Derek - MSHA
**Cc:** Morley, Thomas A - MSHA
**Subject:** report

Matt and Derek,
Just started reading the latest version of the report that I could find, 11/22 (red line) and saw the highlighted part of the sentence. I cannot support that statement. I believe water was a persistent problem, but how can you say that it blocked much of the cross-sectional area is beyond me. I could support the following: in several areas in the bleeders, water would accumulate in the entries requiring water pumps to be employed to maintain the water depth at a level which would not affect ventilation or safe travel.

Anyway, I will continue to read.

## Events Preceding the Explosion

The longwall returned to UBB in 2009, several years earlier than planned, because three longwall panels that were to be mined at the Castle mine were, in fact, not mineable due to thin coal. The longwall began production at UBB in September, 2009 even though the tailgate for 1 North Panel at UBB was not designed for a longwall. Instead, it was planned to be used to access continuous miner panels.

Water in the area behind the longwall was a persistent problem at UBB. Water leakage due to subsidence into a flooded area in the overlying Castle mine blocked much of the cross-sectional area of the UBB 1 North Panel bleeders.

*Richard Stoltz*
Chief
Ventilation Division
(412) 386-6953

2

USAO0000069

| | |
|---|---|
| **From:** | Kline, Richard J - MSHA |
| **Sent:** | Thursday, March 20, 2008 11:25 AM |
| **To:** | Mackowiak, Joseph C - MSHA |
| **Subject:** | UBB In gassing seals |

Joe,

UBB, Mike Vaught, Mark Morris, & George Levo, were here today with a plan for drilling from underground.  I said that the drilling did not go 1000 ft back into the gobs.  They will rethink the drilling.  I also was told that the far left gob was out gassing and that they should submit the samples for an out gassing gob.

I set a meeting for Monday 24th at 1 pm, for them to present a new plan.

Hope you will be here.  I said they would not get a violation, today because of the letter you sent.

Rich

USAO0000070