**From:**        Mackowiak, Joseph C - MSHA
**Sent:**        Tuesday, March 16, 2010 1:40 PM
**To:**          Adkins, Chris
**Subject:**     UBB

Low air on the headgate section again, despite last week's shut down.  I called Bill Ross and he is on another project right now.

I think they could use some help.

Good Luck.

1

USAO0000071

| | |
|---|---|
| **From:** | Mackowiak, Joseph C - MSHA |
| **Sent:** | Friday, January 18, 2008 9:22 AM |
| **To:** | Sigmon, Keith A - MSHA |
| **Subject:** | UBB Seal Submittal |
| | |
| **Importance:** | High |

Just to give you a heads up.

The alternative protocol plan for ingassing seals submitted by UBB has been recommended for denial, by me, based on the following:

- The method of sampling proposed does not provide an effective means to evaluate the atmosphere contained within the sealed areas.
- The affected areas referenced on page 4 of the submittal are not shown as indicated.
- The submittal contains water elevations, but the mine map does not show the impounded water or seam elevations.  Therefore the impact of the impounded water on the sealed areas cannot be determined.

No action is required on your part, I will handle it.

Thanks for the concern though.

1

| | |
|---|---|
| **From:** | Agyemang, Tracy - MSHA |
| **Sent:** | Thursday, December 08, 2011 10:00 AM |
| **To:** | Smith, Marcus A - MSHA |
| **Subject:** | RE: Ex-Massey chief has started mining company in Kentucky, records show | The Courier-Journal | courier-journal.com |

Oh boy. The Grinch that stole safety is back.

Tracy Agyemang
Trial Attorney
U.S. Department of Labor
Office of the Solicitor
1100 Wilson Blvd, 22nd Floor
Arlington, Virginia 22209-2296

Telephone: (202) 693-9332
Facsimile: (202) 693-9361
Email: agyemang.tracy@dol.gov

This message may contain information that is privileged or otherwise exempt from disclosure under applicable law. Do not disclose without consulting the Office of the Solicitor. If you think you received this email in error, please notify me immediately by email or telephone.

-----Original Message-----
From: Smith, Marcus A - MSHA
Sent: Thursday, December 08, 2011 7:35 AM
To: Agyemang, Tracy - MSHA
Subject: FW: Ex-Massey chief has started mining company in Kentucky, records show | The Courier-Journal | courier-journal.com

Blankenship is operating a new coal company.

Marcus A. Smith
CMSH Accident Investigations, Analysis and Prevention Union Agency Vice President (AFL-CIO, AFGE, Local 12) Mine Safety and Health Administration
1100 Wilson Blvd, Arlington, VA
Office - (202) 693-9547
Cell - (703) [Redacted - Privacy]

-----Original Message-----
From: Pon, Melinda - MSHA
Sent: Thursday, December 08, 2011 7:19 AM
To: zzMSHA-Coal Administrators Office; zzMSHA-Coal AI Office; zzMSHA-Coal Health Division; zzMSHA-Coal Management Office ; zzMSHA-Coal Safety Division; zzMSHA-Coal District Managers; zzMSHA-Coal Assistant District Managers; zzMSHA-Coal Staff Assistants; zzMSHA-Coal District Managers Secretaries
Subject: Ex-Massey chief has started mining company in Kentucky, records show | The Courier-Journal | courier-journal.com

1

http://www.courier-journal.com/article/20111207/NEWS01/312070118/Don-Blankenship-Massey-coal?odyssey=nav%7Chead

2

USAO0000074

| | |
|---|---|
| **From:** | Stricklin, Kevin G - MSHA |
| **Sent:** | Wednesday, October 19, 2011 8:13 PM |
| **To:** | Thomas, Charles J - MSHA; Bentley, Terry L - MSHA |
| **Subject:** | Fw: Mine Operators Notice, Rock Dust Definition 30 C.F.R. § 75.2 |

**From:** Stricklin, Kevin G - MSHA
**Sent:** Wednesday, October 19, 2011 08:11 PM
**To:** Cornett, Bob E - MSHA; Fetty, Gregory W - MSHA; Mosley, Carlos T - MSHA
**Cc:** Brenegan, Robyn V - MSHA
**Subject:** Fw: Mine Operators Notice, Rock Dust Definition 30 C.F.R. § 75.2

Big issue here. Where did you get it from and who told you to send it out?

**From:** Main, Joseph A - MSHA
**Sent:** Wednesday, October 19, 2011 06:25 PM
**To:** Stricklin, Kevin G - MSHA; Zeiler, Linda F - MSHA; Wagner, Gregory - MSHA; Silvey, Patricia - MSHA
**Subject:** Fw: Mine Operators Notice, Rock Dust Definition 30 C.F.R. § 75.2

See below. Need pib and other actions completed tomorrow. Also stakeholder calls need made as it goes out.

**From:** Watzman,Bruce [mailto:BWatzman@nma.org]
**Sent:** Wednesday, October 19, 2011 04:05 PM
**To:** Main, Joseph A - MSHA
**Subject:** Fw: Mine Operators Notice, Rock Dust Definition 30 C.F.R. § 75.2

Isn't this one of the issues you wanted to discuss? Guess the word is out.

Bruce Watzman
Sr. VP. - Regulatory Affairs.
National Mining Association
(o) 202-463-2657
© 202- Redacted - Privacy

**From:** John Gallick <JGallick@alphanr.com>
**To:** Watzman,Bruce
**Sent:** Wed Oct 19 15:54:41 2011
**Subject:** FW: Mine Operators Notice, Rock Dust Definition 30 C.F.R. § 75.2

We've been hearing about this for a while.

John M Gallick
VP Safety and Health
Alpha NR
PO Box 1020
158 Portal Road
Waynesburg, PA 15370
(724) 627-2258 (Office)

1

(724) [Redacted - Privacy] (Mobile)
(724) 852-5800 (Fax)

**From:** Brian Keaton
**Sent:** Wednesday, October 19, 2011 3:19 PM
**To:** Berman Cornett; Bill Ross; Brandon Pack; Brian Keaton; Bruce Hamrick; Chris Presley; Chris Ray; Christine Rhoades; Clark McCoy; Danny McGlothlin; David Brown; David Schoolcraft; David Varney; Doug Blankenship; Doug Robinson; Forrest Sammons; Gary Frampton; Gary Steele; Greg Fernett; Jack Lovins; James Hancock; James Murray; James Oster; James Walker; Jason Castle; Jason Jude; Jason Strickland; Jeff Bennett; Jim Pablic; Joe Wyatt; John Gallick; John Patrick; Julie Legg; Kenneth Perdue; Kevin Deaton; Kevin N. Hatfield; Marci C. Young; Michael A Vaught (CH) 2510; Michael Sowdon; Paris Charles; Perry Whitley; Joe Pervola EM (2211); Rages Matney; Ram Tankersley; Randy Taylor; Richard Williamson; Rick Triplett; Robert Bohach; Roger Gilliam; Steve Endicott; Terry Keen; Terry Lambert; Terry Theys; Tom Asbury; Vernondia Adams; Wayne Persinger
**Cc:** Michael R. Peelish; Mick Risdon; Bill Mullins; Macs Hall; Suzan Moore; Stephanie Ojeda; Mark Schuerger; Mike Snelling; Eddie Bateman; Jim Bryja
**Subject:** FW: Mine Operators Notice, Rock Dust Definition 30 C.F.R. § 75.2

FYI

**From:** Brenegan, Robyn V - MSHA [mailto:brenegan.robyn@DOL.GOV]
**Sent:** Wednesday, October 19, 2011 3:11 PM
**To:** zzMSHA-Coal 03 All AR's
**Subject:** Mine Operators Notice, Rock Dust Definition 30 C.F.R. § 75.2

BCC: All Stakeholders
Sent for:
*Bob Cornett*

Hello Folks

MSHA and the National Institute for Occupational Safety and Health (NIOSH) have identified possible quality problems with the rock dust used in underground coal mines.  In random samples collected from over 270 underground coal mines over 40% of the samples were found to contain rock dust that did not meet the minimum specification of 70% passing through a 200-mesh sieve. Noncompliant rock dust was found at over 50% of the mines sampled.  Further analysis of the rock dust samples revealed an excessive quantity of very fine particles.  Such particles, in addition to being respirable, increase the tendency of rock dust to agglomerate or cake when exposed to high moisture conditions.

*Rock dust is defined in 30 C.F.R. § 75.2 as pulverized limestone, dolomite, gypsum, anhydrite, shale, adobe, or other inert material, preferably light colored, 100 percent of which will pass through a sieve having 20 meshes per linear inch and 70 percent or more of which will pass through a sieve having 200 meshes per liner inch; the particles of which when wetted and dried will not cohere to form a cake which will not be dispersed into separate particles by a light blast of air; and which does not contain more than 5 percent combustible matter or more than a total of 4 percent free and combined silica (SiO2), or, where the Secretary finds that such silica concentrations are not available, which does not contain more than 5 percent of free and combined silica.*

As you are well aware, mine operators have a responsibility to use rock dust that conforms to the definition of rock dust as contained in 30 C.F.R. § 75.2. Therefore, mine operators should inform their suppliers and rock dust manufacturers that they will only purchase and use quality-assured conforming rock dust.  To verify this, mine operators should send samples of

2

each lot of rock dust received to a laboratory for analysis to ensure that it conforms to the rock dust definition.  Rock dust that does not meet the definition of 30 C.F.R. § 75.2 is considered noncompliant.  Information pertaining to this issue will be published in a Program Information Bulletin (PIB) in the near future.

**Please confirm that this information is conveyed to all underground coal mine operators by October 26, 2011.**

3

USAO0000077

| | |
|---|---|
| **From:** | Ward, William J – MSHA |
| **Sent:** | Monday, December 06, 2010 1:36 PM |
| **To:** | Pon, Melinda – MSHA |
| **Subject:** | RE: Don Blankenship Is an Evil Bastard |

Here is the actual link to the article:

http://www.grist.org/article/2007-12-19-don-blankenship-is-an-evil-bastard

*Bill*

---

**From:** Pon, Melinda - MSHA
**Sent:** Monday, December 06, 2010 1:34 PM
**To:** Ward, William J - MSHA
**Subject:** RE: Don Blankenship Is an Evil Bastard

this appears that you wrote it ????

---

**From:** Ward, William J - MSHA
**Sent:** Monday, December 06, 2010 1:32 PM
**To:** Pon, Melinda - MSHA
**Subject:** Don Blankenship Is an Evil Bastard

Get a load of the title of this one. . .

*Bill*

William J. Ward
Program Analyst
Coal Mine Safety and Health
Office of the Administrator
Mine Safety and Health Administration
1100 Wilson Boulevard
Arlington, VA 22209
Phone: (202) 693-9762
Fax: (202) 693-9501

USAO0000078

| From: | Pon, Melinda - MSHA |
|---|---|
| Sent: | Monday, December 06, 2010 1:37 PM |
| To: | Ward, William J - MSHA |
| Subject: | RE: Don Blankenship Is an Evil Bastard |

that's better.

**From:** Ward, William J - MSHA
**Sent:** Monday, December 06, 2010 1:36 PM
**To:** Pon, Melinda - MSHA
**Subject:** RE: Don Blankenship Is an Evil Bastard

Here is the actual link to the article:

http://www.grist.org/article/2007-12-19-don-blankenship-is-an-evil-bastard

*Bill*

**From:** Pon, Melinda - MSHA
**Sent:** Monday, December 06, 2010 1:34 PM
**To:** Ward, William J - MSHA
**Subject:** RE: Don Blankenship Is an Evil Bastard

this appears that you wrote it ????

**From:** Ward, William J - MSHA
**Sent:** Monday, December 06, 2010 1:32 PM
**To:** Pon, Melinda - MSHA
**Subject:** Don Blankenship Is an Evil Bastard

Get a load of the title of this one. . .



William J. Ward
Program Analyst
Coal Mine Safety and Health
Office of the Administrator
Mine Safety and Health Administration
1100 Wilson Boulevard
Arlington, VA 22209
Phone: (202) 693-9762
Fax: (202) 693-9501

1

USAO0000079

| | |
|---|---|
| **From:** | Stricklin, Kevin G - MSHA |
| **Sent:** | Tuesday, October 05, 2010 12:59 PM |
| **To:** | Gardner, George H - MSHA |
| **Subject:** | Fw: Particle Size Results |

-----Original Message-----
From: Watkins, Timothy R - MSHA
To: Stricklin, Kevin G - MSHA
CC: Page, Norman G - MSHA
Sent: Mon Oct 04 21:40:15 2010
Subject: FW: Particle Size Results

Kevin,

Not sure if you are aware of our preliminary rock dust analysis but I thought you should know before the 8:00 a.m. conference call.  These are the samples collected at the rock dust manufacturer and at UBB.  As you well know 30 cfr requires 70% to pass though a 200 mesh screen.   Four samples were analyzed from each source.

_____

From: Caudill, Steaven D - MSHA
Sent: Monday, October 04, 2010 8:46 PM
To: Watkins, Timothy R - MSHA
Subject: FW: Particle Size Results

_____

From: Montgomery, Terry - MSHA
Sent: Monday, October 04, 2010 5:52 PM
To: Caudill, Steaven D - MSHA
Subject: Particle Size Results

Steve,

1

USAO0000080

Here are the preliminary results for the particle size analysis on the UBB samples.

PE-0318     PE-0318 (A):  67.7%

                 PE-0318 (B):  70.5%     Samples collected from Manufacturer's 40 pound bag.

                 PE-0318 (C):  68.1%

                 PE-0318 (D):  69.6%


PE-0319     PE-0319 (A):  67.4%

                 PE-0319 (B):  69.6%     Samples collected from Manufacture's bulk bag.

                 PE-0319 (C):  68.8%

                 PE-0319 (D):  68.9%


PE-0320     PE-0320 (1A):  61.2%

                 PE-0320 (1B):  64.1%     Samples collected from UBB track duster.

                 PE-0320 (2A):  62.0%

                 PE-0320 (2B):  61.4%


PE-0321     PE-0321 (1A):  68.3%

                 PE-0321 (1B):  68.1%     Samples collected from UBB bulk bag.

                 PE-0321 (2A):  68.7%

                 PE-0321 (2B):  66.4%


PE-0322     PE-0322 (1A):  70.2%

                 PE-0322 (1B):  69.7%     Samples collected from UBB 40 pound bag.

                 PE-0322 (2A):  69.6%

                 PE-0322 (2B):  69.4%

USAO0000081

Please not that these are preliminary results, and a final report will be delivered upon completion of the silica analysis. Please let me know if you have any questions.  Thanks.


Terry G. Montgomery, Supervisory Chemist

MSHA National Air and Dust Laboratory

100 Bluestone Road   Mount Hope, WV   25880

304-877-3900 ext. 162     304-877-3927 (fax)

Montgomery.Terry@dol.gov

USAO0000082

| | |
|---|---|
| **From:** | Bentley, Terry L - MSHA |
| **Sent:** | Monday, April 14, 2008 4:34 PM |
| **To:** | Pon, Melinda - MSHA |
| **Subject:** | FW: MSHA Honors Massey Energy Affiliates for Safety Achievements: Awards for Green Valley and Aracoma Coal Companies |
| **Importance:** | High |

This won't play well with certain parties

**From:** Faraci, Matthew L - MSHA
**Sent:** Monday, April 14, 2008 4:25 PM
**To:** Murray, Kenneth A - MSHA; Stricklin, Kevin G - MSHA; Stickler, Richard - MSHA; Mattos, Jay P - MSHA; Pallasch, John - MSHA; Madden, Andrew - MSHA; Ladik, Jeffrey J - MSHA; Bentley, Terry L - MSHA; Clair, Edward P - MSHA; Bullock, Kenneth A - MSHA; Friend, Robert M - MSHA
**Cc:** James, David - OPA
**Subject:** MSHA Honors Massey Energy Affiliates for Safety Achievements: Awards for Green Valley and Aracoma Coal Companies
**Importance:** High

# FYI

# MSHA Honors Massey Energy Affiliates for Safety Achievements: Awards for Green Valley and Aracoma Coal Companies
## April 14, 2008: 01:09 PM EST

CHARLESTON, W.Va., April 14 /PRNewswire-FirstCall/ -- The Mine Safety and Health Administration (MSHA) has selected the Green Valley Preparation Plant and two mines operated by the Aracoma Coal Company to receive Pacesetter Awards for outstanding safety achievements.

(Photo: http://www.newscom.com/cgi-bin/prnh/20071031/MASSEYENERGYLOGO )

Green Valley and Aracoma are operating units of Massey Energy Company (NYSE: MEE).

The federal mine safety agency will formally present Pacesetter Awards to the Green Valley plant and Aracoma's Alma Mine and Hernshaw Mine at a May 9 ceremony at Oglebay Resort in Wheeling, WV. The awards honor operations with exceptionally low lost-time accident rates.

In 2007, workers at Green Valley logged 64,000 hours without a lost time accident and a NFDL rate of zero. Non-fatal days lost (NFDL) rates are the benchmark used by the coal industry to measure safety.

The miners at Aracoma Coal Company had no lost time accidents in 2007 therefore a 0.00 NFDL rate. During 2007, the miners at Aracoma worked over 574,000 hours.

1

Aracoma also received Massey Energy's prestigious Bradbury Safety Award in March in recognition of their outstanding safety achievements.

"Safety is our top priority at Massey, and we are pleased that MSHA has again recognized our members' unwavering commitment to working safely everyday. Our Aracoma members had a very difficult year after the tragedy in 2006, but they responded by pulling together to create a culture of safety," said Don L. Blankenship, Chairman and CEO. "All of us at Massey Energy are proud of the accomplishments of the members at Green Valley and Aracoma."

The stellar safety records at Green Valley and Aracoma helped Massey Energy achieve its best safety performance in the company's history in 2007. Massey recorded a NFDL rate of 2.05 for the year, far below the industry average of 3.31.

Massey Energy Company, headquartered in Richmond, Virginia, with operations in West Virginia, Kentucky and Virginia, is the fourth largest coal producer by revenue in the United States.

SOURCE Massey Energy Company

**Matthew Faraci**
**Public Affairs**
**Mine Safety & Health Administration**
**U.S. Department of Labor**
**202-693-9406 Direct**
**202-693-4676 Office**
**703** [Redacted - Privacy] **Mobile**
**202-693-9401 Fax**
**faraci.matthew@dol.gov**

2

| | |
|---|---|
| **From:** | McKinney, Ray - MSHA |
| **Sent:** | Thursday, October 08, 2009 10:10 AM |
| **To:** | Rasnick, Nicholas D - MSHA; Meikle, Gregory B - MSHA |
| **Subject:** | FW: Coal News - Thursday, October 8, 2009 |

You think Blankenship has not put together that Byrd and Main are very tight.  Could make for interesting business.

**From:** echafin [mailto:echafin@suddenlink.net]
**Sent:** Wednesday, October 07, 2009 10:59 PM
**To:** Nadzadi, George M - MSHA; Adkins, Paul; MSHA-Tabor, Nancy; MSHA-Pyles, John; Whitaker, Gregory S - MSHA; Haynes, Michael - MSHA; Hooker, Irvin T - MSHA; Page, Norman G - MSHA; McMasters, Gerald W - MSHA; Stricklin, Kevin G - MSHA; McKinney, Ray - MSHA; Marcum, Ernest H - MSHA; Hays, Rhonda B - MSHA; Harmon, Danny D - MSHA; Cornett, Bob E - MSHA; Cook, Sharon A - MSHA; Mullins, Vicki L - MSHA; Boone, Carl E - MSHA; Deel, Danny R - MSHA; Pon, Melinda - MSHA; Gates, Richard A - MSHA; Bentley, Terry L - MSHA; Nicolau, Vincent L - MSHA; Bane, William H - MSHA
**Subject:** Coal News - Thursday, October 8, 2009

# Byrd blasts Massey 'arrogance' over Marsh Fork school

*Charleston Gazette - October 8, 2009*

**CHARLESTON, W.Va. -- Sen. Robert C. Byrd on Wednesday blasted Massey Energy for what he called "disregard for human life and safety," following the company's refusal to help fund a new school so Marsh Fork Elementary students could move away from a Massy coal processing plant and slurry impoundment.**

**"Such arrogance suggests a blatant disregard for the impact of their mining practices on our communities, residents and particularly our children," Byrd said in a statement. "These are children's lives we are talking about."**

**Byrd issued his harshly worded statement in response to news reports that Massey would not consider a request from the Raleigh County Board of Education to help finance relocation of Marsh Fork Elementary.**

**The 225-student school, located near Sundial, sits less than 300 feet from a Massey coal processing plant and just down the hollow from a huge coal-slurry waste impoundment.**

**Environmentalists and some local citizens say the school isn't safe because of pollution from the coal preparation facility and the risk -- no matter how remote -- that the slurry impoundment could fail.**

1

"If Massey were not operating near Marsh Fork Elementary, we would not be debating what to do about moving these young students someplace safer," Byrd said. "This is not the taxpayers' burden to remedy. This is Massey Energy's responsibility to address."

Massey officials could not immediately be reached for comment Wednesday evening. But in a story published Saturday in the Beckley Register-Herald, company spokesman Jeff Gillenwater said Massey would not donate to help relocate the school.

"Massey pays millions of dollars in taxes each year that are available for projects such as this," Gillenwater told the newspaper. "In fact, just the mines in the Marsh Fork area pay nearly $5 million per month in severance, property and other state taxes."

That $5 million figure was the price that school board members had estimated for building a new school.

Marsh Fork's location has been debated before state environmental boards and in the courts, the subject of a four-year battle between citizen groups, Massey and the state Department of Environmental Protection. The simmering controversy increased in July 2005, after The Charleston Gazette revealed that DEP had approved permits for a new coal silo at the site, despite the fact that company permit maps showed the silo off the legal mining boundary.

Earlier this year, the state Supreme Court cleared the way for that silo. Justices ruled that an on-the-ground permit marker, not the maps submitted for public review to DEP, were the official permit boundary. And in June, Marsh Fork was the site of a huge anti-mountaintop removal protest where actress Daryl Hannah and NASA climate scientist James Hansen were arrested.

Slurry impoundments like the one Massey operates near Marsh Fork Elementary have been a major concern for coalfield residents for decades, since the February 1972 collapse at Buffalo Creek in Logan County killed 125 people. Six years before Buffalo Creek, a similar disaster in Aberfan, Wales, killed 144 people, including 116 students at Pantglas Junior School, located just down the mountain from the failed mining waste dam.

"Let me be clear about one thing -- this is not about the coal industry or their hard-working miners," Byrd said. "This is about companies that blatantly disregard human life and safety because of greed. That is never acceptable."

Byrd added, "At a time when coal is under such close scrutiny, coal companies operating in West Virginia should be working together to put their best foot forward.

"For the sake of the entire coal industry, Massey Energy should strive to be a better and more responsible corporate citizen," Byrd said.

And in language that played on the name of Massey Energy Don Blankenship's former political action group, Byrd concluded, "And for the sake of the kids, they should address these serious environmental concerns at Marsh Fork Elementary immediately."

USAO0000086

# 200 gather for pro-coal rally

*Charleston Gazette - October 8, 2009*

CHARLESTON, W.Va. -- About 200 people turned out Wednesday to protest the Obama administration's efforts to more closely examine permits for mountaintop removal coal mining.

Protesters also complained about pending legislation to limit greenhouse gas emissions and more generally about "big government" interfering with the coal industry and with their way of life.

The event, sponsored by the West Virginia Conservative Foundation, focused on the U.S. Environmental Protection Agency's continuing review of 79 coal-mining permits proposed for West Virginia and three other states.

"Every coal miner in the state is under attack by EPA," West Virginia Coal Association President Bill Raney told the crowd, which gathered for the noontime rally at the coal miner statue on the Capitol grounds.

The rally aimed to put more political pressure on EPA and on the state's Democratic elected officials, especially Rep. Nick J. Rahall, who has said EPA is just "doing its job" by more closely examining the mining permits.

Other speakers included a worker at a Massey Energy surface mine, coal association publicist Bryan Brown, who launched the industry group FACES of Coal, and Delegate Troy Andes, R-Putnam, who works as a media spokesman for Massey.

Gov. Joe Manchin has criticized EPA's permit review as "cruel and inhumane," while a United Mine Workers leader, Roger Horton, told West Virginia Public Broadcasting the EPA action "is nothing short of state-sponsored terrorism."

This summer, the Obama administration announced it would take "unprecedented steps" to reduce the environmental impact of mountaintop removal. EPA officials say they want to work with the U.S. Army Corps of Engineers and mine operators to address "potentially significant water quality and environmental issues" related to the 79 permits. They have stressed the review doesn't mean the permits will be denied, especially if changes are made to reduce the impacts.

Overall, the permits EPA wants to more closely review cover more than 60 square miles in West Virginia, Kentucky, Tennessee and Ohio. The permits would bury or otherwise affect more than 170 miles of streams, including 14 miles of larger, perennial streams that flow year-round. The permits propose mining of nearly 300 million tons of coal.

USAO0000087

In a related matter, Department of Justice lawyers this week asked a federal judge for 30 more days so that EPA can consider whether to veto a Corps of Engineers decision to approve the largest mountaintop removal permit in West Virginia history.

EPA officials had asked the corps to suspend or revoke the nearly 2,300-acre permit for Arch Coal Inc.'s Spruce No. 1 Mine in Logan County. EPA cited a variety of problems with the permit and "clear evidence" of likely environmental damage. Corps officials re-examined the permit, but concluded they disagreed with EPA about the impacts.

Now, the EPA is weighing whether to exercise its legal authority to override the corps and block the permit. Arch Coal lawyers want U.S. District Judge Robert C. Chambers to dismiss a citizen group legal challenge that also seeks to block the permit. Administration officials want Chambers to delay ruling for 30 days while EPA decides what action it plans to take.

## *Related Story:*

# Standing Up for Coal

*MetroNews - October 7, 2009*

Dozens of West Virginians gathered in the shadow of the miner's statue on the grounds of the state capitol Wednesday to protest cap and trade.

Coal supporters carried signs reading, "I'm proud to be a coal miner's daughter!" and "Say no to cap and trade!"

Kathy Cochran from Belle made her voice heard. She says the federal government is out of touch and West Virginia faces a real danger if the current cap and trade bill becomes law.

"We're not tourism. We're not lottery. I mean it helps but coal is what we are. It's a God-given natural resource and we need to use it," Cochran said.

Protesters made it known they're upset with the attitude of Third District Congressman Nick Rahall. Responding to last week's announcement that the EPA is holding up approval on 23

USAO0000088

surface mine permits in West Virginia while they're reviewed again, Rahall said the agency was simply doing its job.

Troy Andes, a Putnam County delegate who works for Massey Energy, says Rahall needs to support his constituents, not the Washington elite.

"Call Nick Rahall," Del. Andes said. "Tell him to start standing up for jobs and our values and quit defending the Washington status quo! We want officials that will say 'Yes" to coal and more jobs, not more government and more unemployment!"

Chants of "Rahall must go!" came from the crowd.

A handful of cap and trade supporters showed up at the rally leading to several verbal confrontations.

"Do you breathe?" asked one coal supporter.

The answer from a young environmentalist, "Yes."

"Do you turn on the lights at night? Do you turn your TV on? Do you turn your air conditioning on?" The coal supporter asked.

"I do, but I wish it was with clean energy," countered the environmentalist.

Cap and trade protesters say they can't sit by and watch coal become a fossil fuel of the past.  They said, "It's about time we stand up and do something!"

USAO0000089

# Mining Companies Hit Wall on Mountaintop Blasting

*Wall Street Journal - October 8, 2009*

WHITESVILLE, W.Va.—The coal-mining industry is trying to regroup in the wake of a move by the Obama administration to curtail mountaintop mining to extract coal.

Last week, the Environmental Protection Agency said it was holding up 79 permit applications for mining projects in Central Appalachia due to concerns the projects would damage water quality in nearby streams and violate the Clean Water Act. Another 180 applications are pending.

The companies can resubmit the applications, but uncertainty around permit approval makes planning risky.

"They're trying to find a way to kill us a little bit at a time—death by a thousand cuts," said Michael Snelling, head of surface operations for Richmond, Va.,-based Massey Energy Co.,

6

USAO0000090

which had five permits delayed by the EPA last week. Mr. Snelling said EPA requirements to protect streams might be too burdensome for other projects.

Mountaintop mining involves blasting off the tops and dumping unused rock and dirt into valleys and streams.

The EPA has long had oversight authority over permits that relate to mining's impact on waterways but has challenged few of them--until this year.

Hal Quinn, CEO of the National Mining Association, said more delay and study is "at cross-purposes with our nation's need for affordable energy, investments and secure jobs."

The EPA's move comes as the industry struggles on economic and legislative fronts. The recession cut demand from utilities and steelmakers, driving down prices and earnings, and pushing some utility stockpiles to a 25-year high. Meanwhile, pending federal climate legislation and efforts to boost renewable fuel like solar and wind threaten coal's long-term prospects.

Consol Energy Inc. of Pittsburgh could ultimately benefit, even though five of its permits have been delayed. It mainly mines coal underground, rather than from mountaintops, and could pick up market share if rivals' production is restricted.

"It's too soon to say how this could work out," Consol spokesman Tom Hoffmann said. By some estimates, he said, cutting mountaintop mining would reduce U.S. production by 50 million tons, or 5%, which could boost coal prices.

USAO0000091

That, in turn, could raise prices for electricity consumers, as nearly 50% of U.S. electricity production relies on coal, said Paul Forward, an analyst with Stifel, Nicolaus & Co. Some coal-dependent utilities would be forced to tap natural gas.

The harder line from the EPA could also shift production from the Central Appalachian states of West Virginia, Kentucky and Virginia, where mountaintop mining is more common, to states where mountaintop mining is less common, including Illinois, Indiana, Pennsylvania and Wyoming.

Until about three decades ago, miners in coal-rich Central Appalachia tunneled into mountains. In the 1970s, they found it was more efficient in some cases to remove the mountaintop to expose coal seams.

At a typical mountaintop site, a mining company clears miles of hardwood forest. It then drills holes and packs them with explosives to blast rock, reducing the elevation of a mountain by as much as 800 feet, according to mining companies. Nearly three million pounds of explosives are used each day in West Virginia, most for coal mining, the U.S. Geological Survey says.

When mining is completed, companies are required in some cases by federal law to rebuild a mountain to within 50 feet of its original contour, unless they receive permission to leave land flat for housing, shopping centers or airports. Mining opponents say the projects are eyesores that foul views, streams and nearby towns. Rocks from blast sites can fall into populated valleys.

USAO0000092

Massey says it works to restore landscapes, and limits dust with street sweepers and plant enclosures. "We live here. We care about doing a good job with the environment," says Massey's Mr. Snelling.

The industry-or-environment calculation is particularly stark in this town in West Virginia's western mountains. Whitesville's bowling alley and movie theater closed years ago. In a town of 300 residents, 30% live below the poverty line.

Rising just outside town is Coal River Mountain, one of the few unmined major peaks in a landscape of flattened or reconstructed mountaintops. Massey, which controls the mountain's mineral rights, awaits approval on several permits. Some locals want to preserve it.

Lorelei Scarbro's husband, father, grandfather and son-in-law all worked, or still work, in underground mines. But the 54 year old, who lives on 10 acres with a stream below Massey's proposed mining site, worries about the stream's health and her property's value. "It's a very peaceful place," said Ms. Scarbro, who has protested Massey's mining plans. "There are a lot of peaceful places being destroyed to remove coal."

Some local miners resent efforts to block mountaintop mining. Lee Price, 62, works at a mountaintop mine nearby in Boone County, where poverty stands at 18.2% He earns about $52,000 with overtime, driving a Massey truck.

"I couldn't tell you a higher paying job around," said Mr. Price, whose father and grandfathers mined coal.

USAO0000093

# Hearing on mountaintop removal mining set

# for Pittsburgh

*Pittsburgh Post-Gazette - October 8, 2009*

CHARLESTON, W.Va. -- Six public hearings across the Appalachian coalfields next week, including one in Pittsburgh, figure to be the latest battleground in the fight over the future of a practice known as mountaintop removal mining.

The environmental community and pro-coal forces say they're pushing for big turnouts at the hearings, which will focus on a streamlined process coal companies have used to obtain permits to fill valleys with material left over from mountaintop removal mines.

The Army Corps of Engineers is mulling an outright ban on using streamlined or temporary permitting processes for Appalachian surface mines.

Environmental groups want mountaintop removal mining banned as too destructive, while the industry argues it should be allowed to continue the highly efficient method of extracting coal.

The corps says one proposal would bar issuing valley fill permits in the region using the streamlined process known as nationwide permitting. Coal companies would have to obtain individual permits, which also are under fire. The Environmental Protection Agency has been giving Clean Water Act permits for surface mines closer scrutiny and recently held up 79 applications.

USAO0000094

The other proposal would merely suspend the streamlined process while the corps evaluates changes.

Both options stem from a decision by the Obama administration in June to try eliminating the streamlined process as part of a broader effort to curb surface mining in the region.

The Sierra Club, which is organizing carpools to help boost turnout at the hearings, says the corps is on the right track by proposing an outright ban.

"Mountaintop removal has had a devastating impact on local communities, the economy, and our environment, and the nationwide permits should never have been issued," Sierra Club spokeswoman Mary Anne Hitt said in a statement.

Coal industry supporters are pushing for a big turnout too.

At a pro-coal rally in Charleston today, attorney Mike Stuart urged some 200 people to attend.

"Coal miners don't want a bailout. They simply want a work permit," Mr. Stuart said at the rally put on by the West Virginia Conservative Foundation. "Today, surface mining is under attack. The thousands of jobs we've had for decades are under attack."

The corps hearings are set for Tuesday in Charleston, Pikeville, Ky., and Knoxville, Tenn., and Thursday in Pittsburgh, Cambridge, Ohio, and Big Stone Gap, Va.

# Capito Sends Letter To EPA Chief

*WBOY TV News - October 7, 2009*

Rep. Shelley Moore Capito, R–W.Va., called today on U.S. Environmental Protection Agency Administrator Lisa Jackson to clarify her agency's actions regarding delays in the coal mine permitting process.

USAO0000095

Capito sent her concerns in a letter to Jackson about uncertainty in the Appalachian coalfields, saying continued ambiguity and delays in the permitting process will cost West Virginia miners jobs and slow economic investment in the state.

"Further delay of mining permits creates enormous uncertainty that's forcing mines to delay investment, halt production and lay off workers across the region," she wrote. "It is imperative that the EPA clarify the process for approving or rejecting permits – hardworking West Virginians depend on it."

Capito also asked the EPA to reconcile its stated commitment to an expedient resolution to the 79 outstanding permit applications in Appalachia.

"While we were promised that permits would be reviewed deliberately, but expeditiously, what we have is a process with no apparent end in sight," Capito said.

Capito's office said the EPA has pointed to a 60-day clock for approving permits, but the clock begins only when the Corps is able to officially "pick up" the application. It is unclear whether any of the permits have even been released by the EPA, her office said.

"It's certainly appropriate to have legitimate oversight and review of all proposed permits, but the EPA's most recent statement is only the latest in a series which have created uncertainty and ambiguity for mines across our state and region," Capito wrote.

12

# AEP President Supports Cap and Trade

*MetroNews - October 7, 2009*

The President of American Electric Power says cap and trade will eventually drive up the price of electricity, but Mike Morris says it's a necessary step for the United States and countries around the world when it comes to dealing with climate change.

"We think that it's probably the best way to go about addressing the issue of global warming and I underline the phrase 'global warming' because, at the end of the day, that's the challenge," Morris said on Wednesday's MetroNews Talkline.

The U.S. House of Representatives has already approved the massive climate change bill that is now being considered in the U.S. Senate.

"We are trying to get the very best piece of legislation that we can which gives us an opportunity to move forward and do it," he says of the ongoing cap and trade debate.

If the cap and trade provision is approved as part of the bill, the federal government will bring down the amount of carbon released into the atmosphere gradually over time by issuing credits.

Companies that produce more carbon than allowed will have to buy more credits.  Those that have not used all of their carbon allowances can sell their remaining credits.

Morris says global warming is real and cap and trade is the best option being considered to address it.

13

USAO0000097

However, he says, it is an option that will cost you more.

"The cost of electricity is going to go up to address this issue of global warming," Morris says. "It's a technology challenge and the technology is being developed." AEP is currently testing out a carbon sequestration project at the Mountaineer Plant in New Haven.

Morris says in order to have an impact on the climate, though, it cannot be just the United States making these changes. If the U.S. stands alone, Morris says it will only be the U.S. economy that'll be impacted.

"Clean coal is going to be as cheap or cheaper than any of the alternatives that you continue to hear people talk about."

American Electric Power serves five million customers in eleven states. It is the largest coal powered utility in the United States.

# Feds issue safety, health warnings to 10 US mines

*Charleston Gazette - October 8, 2009*

CHARLESTON, W.Va. (AP) - The operators of 10 U.S. mines, including the largest private-sector coal company in the world, have been warned they must improve health and safety conditions or face stricter enforcement and penalties, the federal Mine Safety and Health Administration said Wednesday.

Half the mines are in West Virginia, the nation's second-largest coal producer. One is a lead and zinc mine in Missouri and the rest are coal operations in Kentucky, Indiana and Virginia.

Inspectors found high levels of violations that could cause serious injuries or illnesses at each of the operations, MSHA said. For instance, Massey Energy Co.'s Tiller No. 1 underground mine in Virginia received citations for serious violations at 222 percent of the national average, according to MSHA.

14

USAO0000098

The agency hopes the notification will encourage the operators to make improvements, MSHA deputy director Gregory Wagner said in a statement. MSHA didn't identify specific violations in the letters, giving only numbers and rates of violations.

MSHA has issued similar warnings four times since June 2007. Operators have 90 days to reduce the number of violations, and will face closer scrutiny if they don't. MSHA also can order mines evacuated until violations are fixed.

Tiller No. 1 was one of three Massey mines identified for persistent problems. The other two are underground mines in West Virginia.

The Richmond, Va.-based company said it will take corrective action at the mines and noted it has done so in the past when MSHA notified it of excessive violations at other operations.

"Massey's safety record is consistently better than the industry average," the company said. "Massey will take all necessary steps to ensure that these operations notified of the potential pattern of violations meet Massey Energy's standards."

In Missouri, Bob Roscoe, vice president of mining at The Doe Run Co., said the company was surprised at MSHA's notice about the Buick Mine and Mill near Viburnum, one of the company's six underground mines.

Roscoe said the company is taking the MSHA notice "extremely seriously."

"Safety has been and will always be an important priority for Doe Run," Roscoe said. "In the meantime, we will continue to equip, train and work with all of our employees to deliver on our commitments to keep each other safe."

The list also included mines operated by coal industry giant Peabody Energy in Indiana, Richmond, Va.-based James River Coal in Kentucky, St. Louis-based Patriot Coal in West Virginia and New York-based Renco Group, as well as three smaller operators.

A Peabody spokeswoman had no immediate comment, while representatives of James River, Patriot and Renco did not immediately respond to requests for comment.

| | | | |
|---|---|---|---|
| Black Beauty Coal Co. | Air Quality # 1 Mine | Coal | Ind. |
| McCoy Elkhorn Coal Corp. | Mine #15 | Coal | Ky. |
| Pleasant View Mining Co., Inc. | Richland No. 9 | Coal | Ky. |
| Doe Run Co. | Buick Mine/Mill | Lead-Zinc | Mo. |
| Knox Creek Coal Corp. | Tiller No. 1 | Coal | Va. |
| Mountain Reclamation & Construction | Anna Branch | Coal | W.Va. |

15

USAO0000099

| Spartan Mining Co., Inc. | Ruby Energy | Coal | W.Va. |
| Pine Ridge Coal Co., LLC | Big Mountain No.16 | Coal | W.Va. |
| Laurel Coal Corp. | Winifrede 12 Mine | Coal | W.Va. |
| Mammoth Coal Co. | Slabcamp | Coal | W.Va. |

## _Related Story:_

# Feds issue safety, health warnings to 10 US mines

_Courier Journal - October 8, 2009_

The operators of 10 U.S. mines, including the largest private-sector coal company in the world, have been warned they must improve health and safety conditions or face stricter enforcement and penalties, the federal Mine Safety and Health Administration said Wednesday.

Half the mines are in West Virginia, the nation's second-largest coal producer. One is a lead and zinc mine in Missouri and the rest are coal operations in Kentucky, Indiana and Virginia.

Inspectors found high levels of violations that could cause serious injuries or illnesses at each of the operations, MSHA said. For instance, Massey Energy Co.'s Tiller No. 1 underground mine in Virginia received citations for serious violations at 222 percent of the national average, according to MSHA.

The agency hopes the notification will encourage the operators to make improvements, MSHA deputy director Gregory Wagner said in a statement.

The Kentucky mines are McCoy Elkhorn Coal Corp. Mine #15, Kimper, Ky. and Pleasant View Mining Co. Inc. Richland No. 9, Madisonville, Ky. Both mines are operated by James River Coal, where a representative did not immediately respond to a request for comment.

MSHA has issued similar warnings four times since June 2007. Operators have 90 days to reduce the number of violations, and will face closer scrutiny if they don't. MSHA also can order mine's evacuated until violations are fixed.

Tiller No. 1 was one of three Massey mines identified for persistent problems. The other two are underground mines in West Virginia.

16

USAO0000100

The Richmond, Va.-based company said it will take corrective action at the mines and noted it has done so in the past when MSHA notified it of excessive violations at other operations.

"Massey's safety record is consistently better than the industry average," the company said. "Massey will take all necessary steps to ensure that these operations notified of the potential pattern of violations meet Massey Energy's standards."

# Supreme Court hears case on justice's e-mails

*Charleston Gazette - October 8, 2009*

CHARLESTON, W.Va. -- Arguments over a former state Supreme Court justice's e-mails to a prominent coal company executive have come down to what constitutes a public document.

Patrick McGinley, a lawyer representing The Associated Press, told the Supreme Court on Wednesday that all of former Chief Justice Elliot "Spike" Maynard's e-mails to Massey Energy chief executive Don Blankenship should be released.

The AP is appealing a 2008 circuit court decision that released five of 13 e-mails between the two. The judge in that case ruled the eight others didn't involve public business.

The Supreme Court's administrator is also appealing, arguing that none of the documents are public and should be exempt from the state's Freedom of Information Act.

## *Related Story:*

# Public or Not?

*MetroNews - October 7, 2009*

The state Supreme Court is considering whether emails between former Justice Spike Maynard and Massey Energy President and CEO Don Blankenship are public documents.

The appeal filed by the Associated Press in connection with the Freedom of Information Act was argued before the High Court Wednesday.

AP won a lower court case that required some of the emails to be released, but the wire service appealed because Kanawha County Circuit Judge Duke Bloom ruled eight emails

USAO0000101

were no longer public documents after Justice Maynard decided to remove himself from Massey cases.

"The Associated Press does not believe that the public record created can subsequently be rendered not a public record," AP attorney Patrick McGinley argued.

Attorney Ancil Ramey, who represents Supreme Court Administrator Steve Canterbury in the case, told the Court none of the emails, 13 in 22 months, meet the requirements of public documents.

"You look at the contents of the emails," Ramey said. "If the content of the email doesn't have to do with the performance of the official's duties it's not a public record."

Ramey says none of the emails had to do with Supreme Court cases.

Maynard's relationship with Blankenship became the focus of criticism during Maynard's reelection bid in 2008 including pictures that surfaced of the two vacationing together. Maynard was defeated in the Democratic Primary Election.

Justice Robin Davis said Wednesday the argument by the Associated Press isn't a new one. "The press in most of these cases has asserted the same argument that they've asserted here and not one court in this country has adopted it," Davis said.

The state Supreme Court will issue a written opinion on the emails later this year.

# New MSHA chief approved by Senate panel

*Courier Journal - October 8, 2009*

WASHINGTON — The nation's mine safety agency is one step away from getting a new boss.

The Senate Health, Education, Labor and Pensions Committee approved Joseph Main's nomination to be head of the federal Mine Safety and Health Administration on Wednesday.

The nomination now goes to the full Senate for confirmation.

Main's nomination, by President Barack Obama in July, produced no controversy. So the Senate panel dispensed with a formal confirmation hearing, and Main did not appear at the meeting.

USAO0000102

Sen. Tom Harkin, D-Iowa, the committee's chairman, said he was eager to see Main confirmed. Harkin is the son of an Iowa coal miner and has played a major role in enacting mine-safety legislation.

"I hope that we can continue to have an open dialogue, both in our committee and with the Department of Labor, to ensure that America's miners receive better protection on the job," Harkin said.

Main was a teenager when he first worked in the coal mines in the late 1960s. He worked his way up through the United Mine Workers union to become the administrator of its Occupational Health and Safety Department.

From that post, he was a vocal critic of some of the policies of the agency he soon will head. He frequently testified before congressional committees on behalf of the UMW and was involved in investigations of many fatal mining accidents, both in union and non-union mines.

A native of Pennsylvania who now lives in Virginia, Main most recently has been a consultant on mine safety issues.

MSHA regulates underground and surface coal mines, metal and non-metal mines and other operations that together employed about 270,000 in 2007, the latest year for which data is available.

Kentucky has nearly 17,000 coal miners, second only to West Virginia's 20,000. Kentucky produces more coal east of the Mississippi River than any state except West Virginia.

# In seeking state money, Pike County flexes environmental muscles

*Lexington Herald Leader - October 8, 2009*

PIKEVILLE — Touting Pike County as a leader in not only coal but greener energy technology, businessmen and local officials made presentations to the General Assembly's joint committee on energy Wednesday.

The county seeks state money to develop an ethanol plant on its landfill site, county leaders have attended national meetings about wind power, and officials pushed to ensure the

USAO0000103

courthouse being built in Pikeville will be the state's first that meets Leadership in Energy and Environmental Design standards, Judge-Executive Wayne T. Rutherford said.

Legislators should help the region diversify its energy resources and protect the atmosphere from carbon spewed by coal, Rutherford said — a departure from earlier speeches by officials who urged protectionism of surface mines and low electricity prices.

The county's energy plan is one reason it was honored recently by the National Association of Counties, Rutherford said.

"Kentucky needs to know and the nation needs to know what Pike County can contribute to the energy situation in this country," he said.

Coal, of which Pike County is one of the state's leading producers, is part of the plan.

Rutherford called coal-to-liquids fuel for cars "the answer to transportation" in the country. He outlined plans for a coal gasification plant north of Pikeville and said he rejected offers from companies that couldn't ensure carbon sequestration to limit environmental impact.

Natural gas also is being developed. EQT, Appalachia's largest natural gas producer, recently located its regional headquarters in Pike County. Environmentalists see natural gas as a bridge fuel to lead away from coal-fired power plants.

Some of Pike's efforts have faced setbacks.

The landfill biofuel plant did not get funding sought in Congress, and private funding dried up. Agresti Biofuels, an Indiana company, scaled back its plans and is seeking $8 million in state money to supplement its investment of $5 million to build a demonstration plant. Only then can private funding of $200 million be secured to build the full-scale plant, said Agresti Program Director Zbigniew "Zig" Resiak. Collecting carbon credits in a cap-and-trade situation, bringing in "tipping" fees for dumping at the landfill, as well as selling any ethanol or butanol produced are the plant's economic benefits, Resiak said.

"Pike County certainly should be commended," said Rodney Andrews, director of the University of Kentucky's Center for Applied Energy Research. "One of the problems we have in energy development is poor planning."

Andrews and Rutherford attended a conference in Virginia to learn about the viability of wind energy in Appalachia. Studies have shown that the only area of Kentucky with enough wind to make windmills feasible is southeast Kentucky. Rutherford touted this potential Tuesday, along with the hydro-electric potential of Fishtrap Dam and the Big Sandy River, though experts say biomass energy made from wood and other crops, not wind and water, are better investments in Eastern Kentucky.

Rutherford has pushed to have county buildings retrofitted with wind and solar power-generating panels, he said, but he hasn't found the money for it.

USAO0000104

Nevertheless, the county is "certainly being very aggressive in trying to make sure these projects are located in the county," Andrews said.

# Senators seek job creation, protection in climate bill

*Lexington Herald Leader - October 7, 2009*

WASHINGTON -- A Senate Democrat who's been worried about the impact of impending climate and energy legislation on manufacturing said Wednesday that he'd back the historic legislation if it contains enough investment incentives and protection for American businesses.

Sen. Sherrod Brown of Ohio said those provisions, combined with limits on greenhouse gas emissions, would unleash private capital and create new businesses and a vast number of new jobs.

"Once we do that," he said, "we'll spark a new industry in this country like we haven't done in a long time."

Support from Brown and other Democrats from industrial states that are heavily dependent on coal is crucial to muster enough votes to pass the bill in the Senate.

In August, Brown led a group of 10 senators who wrote President Barack Obama to say that a climate bill had to protect American manufacturing to win their support. He said on Wednesday that the Obama administration is helping to craft a plan to protect energy-intensive industries that would face competition from countries with no climate rules. Six industries fit that profile -- glass, aluminum, cement, chemicals, paper and steel -- and Ohio has them all.

The impact of climate and energy legislation on business will be a key part of the debate on a proposed bill, set for later this fall.

Opponents charge that mandatory limits on greenhouse gas emissions will devastate the economy and kill jobs because it will make coal, oil and natural gas more expensive. On the contrary, Brown, clean energy business executives and administration officials said Wednesday, the bill would advance U.S. competitiveness in a new global clean-energy industry.

Brown said that climate legislation should include provisions to prevent disadvantages for U.S. manufacturers, provide long-term investment tax credits, put a price on carbon

21

emissions, require a portion of electricity to be generated from renewable energy and help workers transition to new jobs.

Obama and Sens. John Kerry, D-Mass., and Barbara Boxer, D-Calif., the bill's sponsors, "understand . . . that climate legislation simply doesn't work for reducing carbon dioxide emissions if a company closes down in Findlay, Ohio, and moves to Shanghai, because carbon emissions will get worse, not to mention job loss," Brown said.

Part of that protection would be tariffs on goods from countries with no similar climate laws, Brown said.

He said that White House officials were helping senators "develop all the information we need to decide what to do at the border."

Earlier Wednesday, Carol Browner, the top White House energy adviser, said the White House wants the energy and climate bill to contain protection for energy-intensive industries that face global competition. She also listed other elements the administration wants: a national requirement to generate some electricity from renewable energy, an economy-wide system of emissions cuts and tradable pollution permits, support for nuclear energy and consumer protection.

Bill Keith, a self-described conservative businessman from Indiana who was in Washington to promote green jobs, said the new energy policy wouldn't result in job loss. "There's a jobs gain," he said.

Keith, the president of SunRise Solar Inc. of St. John, Ind., met with Browner and Brown and other senators on Wednesday along with dozens of clean-energy business executives from around the country who were lobbying for the bill.

Ten years ago, Keith said, he was hauling shingles up ladders to replace roofs and sweating in attics to install ventilation. He said he came up with the idea for a solar-powered ventilation system, built it in his garage, borrowed money against his house when banks refused to lend him enough money, and built a company that expects $4 million in revenue this year.

Keith said he buys almost everything for his business in the U.S. except the solar panels, which he said he can't get domestically and imports from Hong Kong. He said the supplier said it would make the panels in Indiana if the U.S. passed a climate and energy bill that encourages investment.

USAO0000106

# Consol cleans Naugatuck slurry spill

*Williamson Daily News - October 7, 2009*

Consol Energy, located at Naugatuck, had a coal slurry break last week. Crews are currently working to clean up the damage caused by the break by dredging the creek located by the roadway to the mines. Mingo County OES Director Jarred Fletcher said the spill was small, as it leaked for a short amount of time. Fletcher explained that a slurry line that traveled back to the impoundment broke apart. Fletcher said Consol is going through the proper arrangements with his office and the West Virginia Department of Environmental Protection. Crews were dredging the creek beside the roadway to the mines yesterday.

USAO0000107

| | |
|---|---|
| **From:** | Montoya II, Stephen W (Steve) <Stephen.W.Montoya@ElPaso.com> |
| **Sent:** | Friday, July 23, 2010 10:49 AM |
| **To:** | Del Duca, Peter A. - MSHA |
| **Subject:** | RE: quote of the day |

Wow, just Wow. I think Cord tried to join this tribe.  Turn down your volume, there is some annoying-ass music in the background.
http://lrivera0327.tripod.com/

**Stephen Montoya**
**El Paso Corporation**
**1001 Louisiana**
**Houston, TX 77002**
**Office: (713) 420-4638**

**From:** Del Duca, Peter A. - MSHA [mailto:delduca.peter@DOL.GOV]
**Sent:** Friday, July 23, 2010 9:09 AM
**To:** Montoya II, Stephen W (Steve)
**Subject:** RE: quote of the day

I would buy the DVD, and it would make me sexually aroused.

**From:** Montoya II, Stephen W (Steve) [mailto:Stephen.W.Montoya@ElPaso.com]
**Sent:** Friday, July 23, 2010 10:05 AM
**To:** Del Duca, Peter A. - MSHA
**Subject:** RE: quote of the day

I'm not gay, but I would pay money to see glen beck deephorn a rhino

**Stephen Montoya**
**El Paso Corporation**
**1001 Louisiana**
**Houston, TX 77002**
**Office: (713) 420-4638**

**From:** Del Duca, Peter A. - MSHA [mailto:delduca.peter@DOL.GOV]
**Sent:** Friday, July 23, 2010 8:52 AM
**To:** Montoya II, Stephen W (Steve)
**Subject:** RE: quote of the day

Ahh yes, rhino face-sitting.  I've heard of this fetish.

**From:** Montoya II, Stephen W (Steve) [mailto:Stephen.W.Montoya@ElPaso.com]
**Sent:** Friday, July 23, 2010 9:47 AM
**To:** Del Duca, Peter A. - MSHA
**Subject:** RE: quote of the day

I think that a rhino can double penetrate, although there will be some facesitting involved

1

Stephen Montoya
El Paso Corporation
1001 Louisiana
Houston, TX 77002
Office: (713) 420-4638

**From:** Del Duca, Peter A. - MSHA [mailto:delduca.peter@DOL.GOV]
**Sent:** Friday, July 23, 2010 8:39 AM
**To:** Montoya II, Stephen W (Steve)
**Subject:** RE: quote of the day

I hope that him and Glenn Beck get raped by a rhinoceros.  Horn end.

**From:** Montoya II, Stephen W (Steve) [mailto:Stephen.W.Montoya@ElPaso.com]
**Sent:** Thursday, July 22, 2010 4:22 PM
**To:** Del Duca, Peter A. - MSHA
**Subject:** RE: quote of the day

I saw that, what a fuck face. I wish someone would break him in half and then goat-fuck him.

Stephen Montoya
El Paso Corporation
1001 Louisiana
Houston, TX 77002
Office: (713) 420-4638

**From:** Del Duca, Peter A. - MSHA [mailto:delduca.peter@DOL.GOV]
**Sent:** Thursday, July 22, 2010 3:20 PM
**To:** Montoya II, Stephen W (Steve)
**Subject:** quote of the day

Don Blankenship, CEO of Massey energy said the following quote in reference to the UBB explosion:

"It's impacting production in that people are trying to make sure they're in compliance with every rule," he said in the interview.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

2

3

USAO0000110

THIS E-MAIL AND ANY MATERIALS TRANSMITTED WITH IT MAY CONTAIN CONFIDENTIAL OR PROPRIETARY
MATERIAL FOR THE SOLE USE OF THE INTENDED RECIPIENT. ANY REVIEW, USE, DISTRIBUTION OR
DISCLOSURE BY OTHERS IS STRICTLY PROHIBITED. IF YOU ARE NOT THE INTENDED RECIPIENT, OR
AUTHORIZED TO RECEIVE THE INFORMATION FROM THE RECIPIENT, PLEASE NOTIFY THE SENDER BY
REPLY E-MAIL AND DELETE ALL COPIES OF THIS MESSAGE.

USAO0000111

****************************************************************
****************************************************************
THIS E-MAIL AND ANY MATERIALS TRANSMITTED WITH IT MAY CONTAIN CONFIDENTIAL
OR PROPRIETARY MATERIAL FOR THE SOLE USE OF THE INTENDED RECIPIENT. ANY
REVIEW, USE, DISTRIBUTION OR DISCLOSURE BY OTHERS IS STRICTLY PROHIBITED.

USAO0000112

IF YOU ARE NOT THE INTENDED RECIPIENT, OR AUTHORIZED TO RECEIVE THE
INFORMATION FROM THE RECIPIENT, PLEASE NOTIFY THE SENDER BY REPLY E-MAIL
AND DELETE ALL COPIES OF THIS MESSAGE.
**********************************************************************
****************************************************************


THIS E-MAIL AND ANY MATERIALS TRANSMITTED WITH IT MAY CONTAIN CONFIDENTIAL OR PROPRIETARY
MATERIAL FOR THE SOLE USE OF THE INTENDED RECIPIENT. ANY REVIEW, USE, DISTRIBUTION OR
DISCLOSURE BY OTHERS IS STRICTLY PROHIBITED. IF YOU ARE NOT THE INTENDED RECIPIENT, OR
AUTHORIZED TO RECEIVE THE INFORMATION FROM THE RECIPIENT, PLEASE NOTIFY THE SENDER BY
REPLY E-MAIL AND DELETE ALL COPIES OF THIS MESSAGE.


****************************************************************
****************************************************************
THIS E-MAIL AND ANY MATERIALS TRANSMITTED WITH IT MAY CONTAIN CONFIDENTIAL OR PROPRIETARY
MATERIAL FOR THE SOLE USE OF THE INTENDED RECIPIENT. ANY REVIEW, USE, DISTRIBUTION OR
DISCLOSURE BY OTHERS IS STRICTLY PROHIBITED. IF YOU ARE NOT THE INTENDED RECIPIENT, OR
AUTHORIZED TO RECEIVE THE INFORMATION FROM THE RECIPIENT, PLEASE NOTIFY THE SENDER BY
REPLY E-MAIL AND DELETE ALL COPIES OF THIS MESSAGE.
****************************************************************

USAO0000113

| | |
|---|---|
| **From:** | Hughes, Jessica R - MSHA |
| **Sent:** | Wednesday, August 05, 2009 3:32 PM |
| **To:** | Hardman, Robert G - MSHA; Ross, Ernie - MSHA; Hosch, Richard D - MSHA; Hrovatic, Linda G - MSHA |
| **Subject:** | Settlement Proposal Recommendation -- WEVA 2008-1494 (Performance Coal) |

Bob, Ernie, Dana, and Linda,

Please find below a discussion of our settlement recommendation in WEVA 2008-1494 (Performance Coal/Upper Big Branch Mine South). Unless we hear otherwise from you with any questions or concerns by **Monday, August 10, 2009**, I will consider it acceptable to MSHA and covey the terms to Operator's counsel.

1. Citation 7261300 (violation of 75.321(a)/air quality). This citation was written for excessive levels of silica in the air. However, after discussion with the lawyers in the MSH Division of the Solicitor's Office (in particular, Mark Malecki), we cannot sustain a violation for excessive silica under this standard and, at this time, we have no other standard under which to cite excessive silica measurements. Accordingly, we understood that if the operator's counsel raised this issue, we would have to vacate the citation. As we expected, operator's counsel has argued that this standard cannot be used to support excessive silica and that we vacate the citation. For the reasons explained above, we agree that this vacation should be vacated.

2. Citation 7278775 (violation of 75.202(a)/protection from roof and rib falls). The citation was written with a gravity of reasonably likely and fatal, with 1 person affected. The negligence was cited as moderate. Specifically, the citation states that the Left Return for the #2 section at spad #21048 had 2 roof bolts that were over 6' from the rib and 2 that were over 8' from the rib. The MSHA inspector, Kevin Lyall, indicates in his notes that the fall of any roof or rib material would be from over 7' in height and that the condition existed for several months. However, nothing in his notes states what evidence existed to prove that this condition had existed for several months. The operator's position is that the condition was the result of sloughage; initially the roof was supported in a 4 x 4 pattern, but a piece of rib came loose. The operator's foreman is supposedly going to testify that the condition was unlikely to cause a serious injury and that the operator had taken appropriate action. Accordingly, the operator seeks a reduction to low negligence, dropping the S&S designation, and a commensurate reduction in penalty. We think it is premature to accept these terms. Rather, we think that we need to develop additional evidence – discussion with Mr. Lyall about his recollection to flesh out his notes – and review of the operator's evidence in support of its position. However, given the lack of information in Inspector Lyall's notes as to how he ascertained that the condition had existed for several months, thereby supporting a finding of moderate negligence, we may need to reconsider our negligence designation. Therefore, we recommend rejecting the terms as it relates to this citation.

3. Citation 7278767 (violation of 77.904/circuit breakers readily identified). The citation was for the failure to label the circuit breaker in the warehouse. Operator's counsel made no proposal on this citation. I will confirm with them that they will accept this citation as written. However, if it was an oversight that operator's counsel did not make a proposal on this citation, we need to be prepared to defend the S&S designation. This will depend on not only the location of the circuit breaker, but what the circuit breaker controlled.

4. Citation 7278779 (75.400/accumulation of combustible materials). The citation states that the North beltline between the #7 and #8 breaks had 2 bottom belt rollers turning in loose coal and float coal dust. The citation was written with a gravity of reasonably likely and fatal, with 1 person affected. The negligence was moderate, and it was marked S&S. The operator wants to modify the citation to unlikely and drop the S&S designation, with an appropriate reduction in penalty, due to the lack of an ignition source. The operator's theory is that there was no methane, the belts were not frozen, and the belts were not hot to the touch or

1

USAO0000114

smoking.  Or, if they were, that is not indicated in the inspector's notes.  However, our evidence is that the belts were turning in loose coal; this causes friction and could be an ignition source.  Just because there was no imminent danger, does not mean the S&S designation is unwarranted.  Accordingly, we recommend rejecting the offer on this citation.

As always, thank you for your assistance.

Best regards,

Jessica

Thank you for your assistance with this matter.

Best regards,

Jessica

Jessica R. Hughes, Esq.
U.S. Department of Labor
Office of the Solicitor
1100 Wilson Boulevard
22nd Floor West
Arlington, VA  22209
(202) 693-9336 (direct)
(202) 693-9392 (fax)

This email may contain information that is privileged or otherwise exempt from disclosure under applicable law.  Please do not disclose this message or any information herein without consulting with the Office of the Solicitor, U.S. Department of Labor.  If you believe you received this email in error, please notify me immediately by email or telephone.

USAO0000115



**United States Department of Justice**

*United States Attorney*
*Southern District of West Virginia*

---

*Robert C. Byrd United States Courthouse*
*300 Virginia Street, East*
*Suite 4000*
*Charleston, WV 25301*
*1-800-659-8726*

*Mailing Address*
*Post Office Box 1713*
*Charleston, WV 25326*
*304-345-2200*
*FAX: 304-347-5104*

BY FEDERAL EXPRESS

February 14, 2017

William W. Taylor, III, Esq.
Zuckerman Spaeder LLP
1800 M Street, NW, Suite 1000
Washington, DC  20036

      Re:  United States v. Donald L. Blankenship
           Criminal No. 5:14-cr-00244

Dear Mr. Taylor:

     As a result of our ongoing review of the *Blankenship* file, we are providing the following memoranda of interview, designated by the name of the person interviewed and the date of the interview:

| NAME | DATE OF INTERVIEW | PREVIOUSLY PROVIDED |
|---|---|---|
| Larry Adams | 1/28/2015 (3 pages) | 2/24/11 grand jury transcript PCC-GJ-TRANS-000766 - 000780 (15 pages) |
|  |  | 6/30/10 MSHA transcript (92 pages) |
| Chris Blanchard | 04/02/2015 (4 pages) | FBI 302 11/11/14 MOI-001285 - 001291 (7 pages) |
|  | 09/12/2015 (4 pages) | 11/12/14 grand jury transcript (official) |
|  | 09/21/2015 (2 pages) | DBL-GJ-TR-000089 - 000167 (79 pages) |

| | 10/18/2015<br>(4 pages) | 11/12/14 grand jury transcript<br>(unofficial)<br>DBL-GJ-TR-000001 - 000031<br>(31 pages)<br><br>Immunity Agreement<br>IMM-AGMT-000005<br><br>Voluntary Production (Notebook)<br>Original Bates: VP-CB-000001 -<br>000077<br>ReBates: VP-KP-000001 - 000077 |
| --- | --- | --- |
| Andy Coalson | 01/16/2015<br>(2 pages) | FBI 302 4/29/10<br>MOI-000028 - 000032 (5 pages)<br><br>FBI 302 9/14/10<br>MOI-000453 (1 page)<br><br>FBI 302 8/24/11<br>MOI-000858 - 000870 (13 pages)<br><br>9/13/11 grand jury transcript<br>PCC-GJ-TRANS-000921 - 000941<br><br>8/6/10 MSHA transcript<br>(45 pages)<br><br>Immunity Agreement<br>IMM-AGMT-000012 - 000013<br><br>Voluntary Production named<br>"Notebook notes - provided<br>2011.09.07"<br>Original Bates: VP-AC-000001 -<br>000009<br>ReBates: USAO-DLB-00011485 -<br>000114 |
| Jamie Ferguson | 01/21/2015<br>(1 page) | FBI 302 2/15/11<br>MOI-000608 - 000617 (10 pages)<br><br>FBI 302 5/10/11<br>MOI-000672 - 000678 (7 pages)<br><br>FBI 302 8/31/11<br>MOI-000871 - 000874 (4 pages)<br><br>FBI 302 8/23/13<br>MOI-001205 - 001208 (4 pages) |

USAO0000117

| | | |
|---|---|---|
| | | FBI 302 8/15/14<br>MOI-001259 (1 page)<br><br>9/13/11 grand jury transcript<br>PCC-GJ-TRANS-000942 - 000952<br>(11 pages)<br><br>11/13/14 grand jury transcript<br>(official)<br>PCC-GJ-TRANS-000315 - 000327<br>(13 pages)<br><br>11/13/14 grand jury transcript<br>(unofficial)<br>PCC-GJ-TRANS-000045 - 000052<br>(8 pages)<br><br>Immunity Agreement<br>IMM-AGMT-000018 - 000019 |
| Rick Hutchens | 01/28/2015<br>(3 pages) | ROI 12/8/11<br>MOI-001057 - 001062 (5 pages)<br><br>FBI 302 5/11/10<br>MOI-000119 - 000122 (4 pages)<br>2/24/11 grand jury transcript<br>PCC-GJ-TRANS-000781 - 000796<br>(16 pages)<br><br>7/12/10 MSHA transcript<br>(86 pages) |
| Bill Ross | 05/04/2015<br>(5 pages)<br><br>05/12/2015<br>(6 pages)<br><br>05/29/2015<br>(14 pages)<br><br>07/27/2015<br>(4 pages)<br><br>08/28/2015<br>(2 pages) | FBI 302 5/12/10 - MOI-000185 -<br>000188 (3 pages)<br><br>9/13/11 grand jury transcript<br>PCC-GJ-TRANS-001001 - 001007<br>(7 pages)<br><br>Voluntary Production 5/12/15<br>(12/14/10 Ross email to<br>Blankenship re: Retirement) -<br>VP-BR-000001 |
| Stanley Stewart II | 01/30/2015<br>(7 pages) | |

USAO0000118

As I stated in my previous correspondence, by simply providing these additional memoranda, the United States is taking no position on whether they were required to be provided pre-trial or whether the defendant suffered any prejudice because they were not provided previously.

Thank you for your attention to this matter. Again, if you have any questions, please do not hesitate to contact me.

Sincerely,

CAROL A. CASTO
United States Attorney

By:

R. Gregory McVey
Assistant United States Attorney

RGM/vld
Enclosure



**After printing this label:**
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning**. Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

USAO0000120



**United States Department of Justice**

*United States Attorney*
*Southern District of West Virginia*

Robert C. Byrd United States Courthouse        Mailing Address
300 Virginia Street, East                      Post Office Box 1713
Suite 4000                                     Charleston, WV 25326
Charleston, WV 25301                           304-345-2200
1-800-659-8726                                 FAX: 304-347-5104

**BY FEDERAL EXPRESS**

January 31, 2017

William W. Taylor, III, Esq.
Zuckerman Spaeder LLP
1800 M Street, NW, Suite 1000
Washington, DC  20036

  Re:  United States v. Donald L. Blankenship
     Criminal No. 5:14-cr-00244

Dear Mr. Taylor:

  On January 19, 2017, we received notice that a number of memoranda of interview were not provided to you prior to the trial in *United States v. Blankenship.*

  We immediately began a review of the file and are providing additional memoranda to you, in addition to the 347 memoranda which were previously provided to you in discovery.  This disclosure includes the following, designated by the name of the person interviewed and the date of interview:

      Charlie Bearse   02/05/2014
      Chris Blanchard  10/22/2014
      Mark Clemens   11/10/2011
      Andy Coalson   01/25/2012
      Andy Coalson   09/18/2014
      Gary Frampton   08/14/2014
      John Ryan Patrick 11/27/2012
      Steve Sears    11/10/2011
      John Segsworth  03/11/2014
      Jason Whitehead  06/04/2014

  Please note that simply by providing these memoranda, the United States is taking no position on whether they were required to be provided pre-trial or whether the defendant suffered any prejudice because they were not provided previously.

William W. Taylor, III, Esq.
January 31, 2017
Page 2


    Steve Ruby is no longer with our office.  Therefore, because our review of the file is ongoing, you may direct any correspondence concerning this matter directly to me.

                  Sincerely,

                  CAROL A. CASTO
                  United States Attorney

By:
                  R. Gregory McVey
                  Assistant United States Attorney

RGM/vld

Enclosure



### *United States Department of Justice*

*United States Attorney*
*Southern District of West Virginia*

| | |
|---|---|
| *Robert C. Byrd United States Courthouse* | *Mailing Address* |
| *300 Virginia Street, East* | *Post Office Box 1713* |
| *Suite 4000* | *Charleston, WV 25326* |
| *Charleston, WV 25301* | *304-345-2200* |
| *1-800-659-8726* | *FAX: 304-347-5104* |

**BY FEDERAL EXPRESS**

February 2, 2017

William W. Taylor, III, Esq.
Zuckerman Spaeder LLP
1800 M Street, NW, Suite 1000
Washington, DC  20036

     Re:  United States v. Donald L. Blankenship
         Criminal No. 5:14-cr-00244

Dear Mr. Taylor:

    As a follow-up to our letter of January 31, 2017, the chart below outlines what our ongoing search of the file reveals with regard to the following individuals listed:

| NAME | PROVIDED JANUARY 31, 2017 | PROVIDED IN PRE-TRIAL DISCOVERY |
|---|---|---|
| Chris Blanchard | 10/22/2014 memorandum (9 pages) | FBI 302 11/11/14 MOI-001285 - 001291 (7 pages)<br><br>11/12/14 grand jury transcript (official) DBL-GJ-TR-000089 - 000167 (79 pages)<br><br>11/12/14 grand jury transcript (unofficial) DBL-GJ-TR-000001 - 000031) (31 pages) |

| | | |
|---|---|---|
| | | Immunity Agreement IMM-AGMT-000005

Voluntary Production (Notebook) Original Bates: VP-CB-000001 - 000077 ReBates: VP-KP-000001 - 000077 |
| Andy Coalson | 01/25/2012 memorandum (2 pages);

09/18/2014 memorandum (5 pages) | FBI 302 4/29/10 - MOI-000028 - 000032 (5 pages)

FBI 302 9/14/10 - MOI-000453 (1 page)

FBI 302 8/24/11 - MOI-000858 - 000870 (13 pages)

9/13/11 grand jury transcript PCC-GJ-TRANS-000921 - 000941

8/6/10 MSHA transcript (45 pages)

Immunity Agreement IMM-AGMT-000012 - 000013

Voluntary Production named "Notebook notes - provided 2011.09.07" Original Bates: VP-AC-000001 - 000009 ReBates: USAO-DLB-00011485 - 00011493 |
| Gary Frampton | 08/14/2014 memorandum (2 pages) | FBI 302 6/19/12 - MOI-001215 - 001227 (13 pages) |
| John Segsworth | 03/11/2014 memorandum (4 pages) | FBI 302 12/18/12 - MOI-001181 - 001193 (13 pages) |

| Jason Whitehead | 06/04/2014 memorandum (4 pages) | FBI 302 11/16/11 - MOI-001095 - 001117 (23 pages)<br><br>FBI 302 8/9/13 MOI-001209 - 001214 (6 pages)<br><br>Immunity Agreement IMM-AGMT-000034 |
| --- | --- | --- |

As I stated above, our review is ongoing and we will provide any additional documents warranted by that review. Again, the United States takes no position on whether what was provided to you on January 31, 2017, were required to be provided pre-trial or whether the defendant suffered any prejudice because they were not provided previously.

Sincerely,

CAROL A. CASTO
United States Attorney

By: R. Gregory McVey
Assistant United States Attorney

RGM/vld



*United States Department of Justice*

*United States Attorney*
*Southern District of West Virginia*

_____

Robert C. Byrd United States Courthouse
300 Virginia Street, East
Suite 4000
Charleston, WV 25301
1-800-659-8726

Mailing Address
Post Office Box 1713
Charleston, WV 25326
304-345-2200
FAX: 304-347-5104

**BY FEDERAL EXPRESS**

February 3, 2017

William W. Taylor, III, Esq.
Zuckerman Spaeder LLP
1800 M Street, NW, Suite 1000
Washington, DC  20036

     Re:  United States v. Donald L. Blankenship
         Criminal No. 5:14-cr-00244

Dear Mr. Taylor:

    We are providing an additional memorandum of interview based
on our search of the file in this case.  Again, if you have any
questions or comments, please do not hesitate to contact me.

               Sincerely,

               CAROL A. CASTO
               United States Attorney

          By:

               R. Gregory McVey
               Assistant United States Attorney

RGM/vld

Enclosure

Report of Interview

**U.S. Department of Labor**
**Office of Inspector General**
**Office of Investigations**



Page  1  of  3                                          OIG Form 103 (OI – 1/98)

| Investigation on: | 11/21/2014 | At: | Charleston, WV | File: | 31-0862-0001 PC |

By: Special Agent Jeffrey Carter *Jwc*                    Date Prepared: 11/24/2014

On November 21, 2014, Tommy Davis accompanied by attorneys Michael Russ and Pat Jacobs was interviewed at the United States Attorney's Office in Charleston, WV. Present and participating in the interview were Booth Goodwin, United States Attorney, Steve Ruby, Assistant United States Attorney, and Special Agents Jeffrey Carter, U.S. Department of Labor, Office of Inspector General and Jim Lafferty, Federal Bureau of Investigation. Davis provided the following information:

Davis was working at the Upper Big Branch Mine (UBB) for approximately 50 days prior to the explosion. He started working at UBB in February of 2010. Davis was employed at UBB by Dave Stanley as a contract laborer. Davis was paid $10 hourly. Prior to his employment with Dave Stanley, Davis spent seven to eight years running a high wall miner at one of Massey's operations. Davis worked on a track crew with Ralph Plumley, supervisor, and Jackson (first name unknown) installing rail in the area where the long wall was going to mine next. They were installing track at head gate 22 area where Boone Payne worked. Davis reported to Plumley and Keith Stanley for daily direction.

Davis explained that he was assigned to the track crew, but he moved around a lot doing different jobs. He was responsible for getting the man trips ready daily and working around the bathhouse. Afterwards, Davis would travel underground to lay track. Davis explained that one day he may set sand jacks and the next he would install rail or do maintenance.

Davis stated that he was never assigned to clean up work or rock dusting. He did not observe anyone dusting while at UBB. Davis explained that the UBB side of the mine had pod dusters sitting in the shop or inside where supplies were stored. There was a miner in his mid-thirties with a long ponytail that worked the midnight shift assigned to the pod dusters. Davis recalled that the miner always complained about the dusters. Davis stated that he believed Johnny Morris was also assigned to the dust crew. Davis recalled areas on the south side dusted, but not on the UBB side of the mine. The deeper you traveled into the mine the darker it was. The closer you were to the outside the whiter the mine walls were. Two men were assigned to the rock dust crew. Davis was not sure who they reported to. Davis did not recall ever transporting rock dust into the mine. Davis gave the example of a hole in your yard. If you walk around it enough you begin to ignore it.

Some areas of the mine were 10 to 11 miles away that could take one and a half hours to get to. There were a number of doors to travel through. Davis stated that it was the red hats job to operate the switch at the doors. Some of the doors were in bad shape. The doors were supposed to be automatic but did not work. When the doors did not operate automatically you had to constantly get in and out of the buggy to open.

Some of the doors on the long wall section were in good shape. The deeper you traveled in the mine the better the doors were. More of the outby doors were in bad shape because they were constantly getting bumped by the buggies and then the buggies traveled through and let the wind close the doors.

MOI-001346

Davis stated that the only reason he went to UBB was because his son worked there. Davis said five family members were at the mine, Davis, his brother, son and two nephews.

Davis explained that the morning of the explosion the mine was really hot and the air was stale. Davis stated that he was sweating profusely. Signs and the markers on survey stakes on a normal day in the mine would whip back and forth from the ventilation. The day of the explosion the signs and survey markers were not moving and dust was in the air. You could see dust in the air well before the Ellis punch out. A lot of dust in the air that day wasn't normal air. Davis worked on rail the day of the explosion, near the end where Boone Payne's crew was working. Davis was working with Plumley and Jackson and recalled that he saw Everett Hagar.

Davis explained that he had worked underground for a short period of time and was still learning.

The long wall area was wet and muddy. There was a bad water problem. Corey Davis complained a lot about the water, because he was always buying boots. Corey also complained about the work and the long hours.

Davis stated that it was P1 (production) and S2 (safety) not S1 and P2. All pressure at the mine rolled down hill. There was pressure on the long wall. Davis Explained that Timmy Davis carried three or four note pads with him. If the long wall was down Timmy made a note. Timmy logged outby procedures. Timmy logged everything to make sure Timmy was covered. He even kept a personal notebook. You radioed if the long wall was stopped. Everyone felt the pressure that came from the top.

Davis was aware when inspectors were coming. They would get a call and were told to grab your stuff, gloves and glasses. Inspectors had to travel 11 miles to the area and it would take an hour and a half. They would get word that inspectors were coming. It was a common practice. Davis recalled that code phrases were used and it was also just stated that inspectors were coming at UBB.

The whole time Davis was at UBB he felt production was the priority, safety first was just talk. Don Blankenship knew what was going on at UBB. Davis believed that Blankenship could have made changes at the mine. Davis stated that he never saw a safety person in the mine. Timmy Davis and Rick Lane conducted safety briefings and daily safety sheets were read. Davis was aware of two fire bosses at UBB. Davis saw MSHA, but never safety personnel from UBB. As long as you were mining coal everything was fine. When you weren't mining coal pressure went from Blankenship to Chris Adkins to Chris Blanchard on down. Davis would see coal accumulation as he traveled out of the mine. Davis did not recall seeing any written violations at UBB or discussions about violations that were written.

Davis lost three family members in the explosion. Davis stated that he was approximately six to eight breaks underground when the explosion occurred. Davis believed that it was his first day on day shift since the explosion Davis has worked at Kelley Creek, Alloy and the Stockton mines. Davis stated that it was tough working alone after what happened. Davis ran a pod duster at the Stockton mine. Davis stated that at Stockton he shoveled the belts and rock dusted. He wanted to do that after what happened, because it didn't get done at UBB. Davis has seen Atkins, Jason Whitehead and also has dealt with Craig Boggs at the Stockton mine.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

MOI-001347

Davis stated that he has filled out cards for Alpha and was told if you don't like it there is the door. He was told by Jamie (last name unknown) who is a boss at the Alloy mine where Davis has worked for the past six or seven months.

Davis stated that if you take care of what you are supposed to, nothing should happen.

Davis suggested talking with the following individuals; Cody Davis-worked on the long wall three to four years, ran the shear. Ralph Plumley-he laid the first piece of track at UBB. Harold Lilly worked on the long wall.

Delbert Baily was the individual who shook Blankenship's hand in court. Davis described Baily as a man of God. Baily worked at UBB and currently works in the shop at Alpha.

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

MOI-001348

USAO0000129



*United States Department of Justice*

*United States Attorney*
*Southern District of West Virginia*

*Robert C. Byrd United States Courthouse*          *Post Office Box 1713*
*300 Virginia Street, East, Suite 4000*            *Charleston, WV  25326*
*Charleston, WV  25301*                            *FAX: 304-347-5104*
*Telephone: 304-345-2200*                          *1-800-659-8726*

<u>By U.S. Mail and Email</u>

April 6, 2018

Benjamin L. Hatch
McGuireWoods LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, VA 23510-1655

      Re:    United States v. Donald L. Blankenship
             Criminal No. 5:14-cr-00244

Dear Mr. Hatch:

      Please find enclosed documents for which I became aware of this morning.  As best as I can ascertain, these documents have not previously been disclosed to your client.  To the best of my knowledge, this office was not aware of the documents or subject matter until late yesterday.

      If you have any questions or comments, please let me know.

                        Sincerely,

                        MICHAEL B. STUART
                        United States Attorney

Enclosures

cc:  Howard C. Vick, Jr., Esq. (with enclosures)

USAO0000130

**U.S. Department of Labor**    Mine Safety and Health Administration
1100 Wilson Boulevard
Arlington, Virginia 22209-3939



APR 09 2013

MEMORANDUM FOR CHARLES J. THOMAS
                    Deputy Administrator
                    Coal Mine Safety and Health

FROM:           *Patricia W. Silvey*
                    PATRICIA W. SILVEY
                    Deputy Assistant Secretary for Operations

SUBJECT:        Decision Letter

By letter dated December 4, 2012, Ernest Cameron, Director, Administration and
Management, proposed to suspend you from pay and duty status for seven (7) calendar
days from your position of Deputy Administrator, ES-1822, in Coal Mine Safety and
Health.

The proposal advised you of your right to respond orally and/or in writing. On
December 21, 2012, you submitted your written reply to the proposed suspension. On
January 10, 2013, you presented your oral reply. Also in attendance at the oral reply
were Executive Assistant Monique Molina, MSHA, and Donna Kramer, Supervisory
Human Resources Specialist, Office of the Assistant Secretary for Administration and
Management.

I have considered the proposed suspension issued to you by Mr. Cameron, and all
supporting documentation, as well as your written and oral replies. Considering the
record as a whole, including your willingness to work with a mentor, I have determined
that the seven (7) day suspension shall be reduced to a Letter of Reprimand, which will
be issued separately. This decision is taken to promote the efficiency of the Federal
Service and is based on your failure to carry out your official duties.

If there is anything in this decision letter that you do not understand and wish to have
explained, you may contact Donna L. Kramer, Supervisory Human Resources
Specialist, Employee and Labor Relations, at 202-693-7686.

USAO0000131

**U.S. Department of Labor**          Mine Safety and Health Administration
                                      1100 Wilson Boulevard
                                      Arlington, Virginia 22209-3939



APR 0 9 2013

MEMORANDUM FOR CHARLES J. THOMAS
                 Deputy Administrator
                 Coal Mine Safety and Health

FROM:            PATRICIA W. SILVEY
                 Deputy Assistant Secretary for Operations

SUBJECT:         Letter of Reprimand

This memorandum is issued to you as an official reprimand for failure to carry out your official duties. This action is initiated for such cause as it will promote the efficiency of the Federal Service.

By way of background: On April 5, 2010, an explosion occurred at the Upper Big Branch (UBB) Mine killing 29 miners and injuring two. As is MSHA's usual practice, the Assistant Secretary directed that an Internal Review (IR) of the Agency's performance before the explosion be conducted. The details in this letter of reprimand are derived from issues identified in the IR report.

Critical standards that field staff must enforce deal with the review and approval of certain mine plans. The IR identified several instances where District 4 management failed to follow CMS&H policies and procedures applicable to the plan approval process.

1. District 4 management did not follow the provisions of CMS&H Memo No. HQ-08-058-A when approving the UBB roof control plan. The Administrator for CMS&H issued this memorandum to provide guidance for review and approval of complex and non-typical roof control plans and amendments following the August 2007 fatal coal outbursts at the Crandall Canyon mine.
2. District 4 management did not implement the checklists specified by CMS&H Memo HQ-08-059-A when reviewing roof control plans and revisions. Instead, the roof control department continued to use its own checklists.
3. District 4 management did not revise the roof control plan approval SOP to comply with the Program Policy Manual as recommended by the Office of Inspector General in its 2008 Audit report.
4. District 4 management did not follow national guidance outlined in Procedure Instruction Letter No. I09-V-03, which specified that separate ventilation and dust control plans were to be consolidated into a single mine ventilation plan subject to a single review date.

You can now file your MSHA forms online at www.MSHA.gov. It's easy, it's fast, and it saves you money!

USAO0000132

2

At the time of the UBB accident, you were detailed to the Deputy Administrator position. In that position, you shared the responsibility with others in the National Office to see that criteria and methods for ensuring compliance with safety and health standards are properly and uniformly applied by all Coal Mine Safety and Health (CMS&H) Districts. However, you focused your management oversight on Districts 7, 8, and 9.

In reaching my decision to issue this letter of reprimand, I have considered the factors established by Merit System Protections Board case Douglas v. VA, 5 MSPB 313 (1981)

I considered the nature and seriousness of your actions. Failing to carry out your official duties is one of the most serious infractions that can be committed. Although you were the Acting Deputy Administrator at the time of the IR report, you were assigned direct responsibility for all CMS&H districts.

The Deputy Administrator for CMS&H is a very prominent position. You are recognized by the public, mine operators, miners, representatives of miners, and MSHA personnel as having an in-depth knowledge of the Mine Act, MINER Act, implementing standards and regulations, and MSHA policies and procedures.

You were on notice of the Agency policies and procedures. In your position of record as the Director, Office of Accountability, you determined compliance with MSHA policies and procedures. Yet, as Acting Deputy Administrator you did not always to take timely corrective action when your subordinate managers were not carrying out their official duties in an effective manner.

As a management official you are tasked with setting a positive example for subordinate employees. You were and still are assigned direct responsibility for all CMS&H districts, including review of the work of the management and inspection personnel. If you are unable to enforce agency policies, the inspectorate may be held to a lower standard of quality work which could jeopardize the safety of the miners MSHA is tasked with protecting.

In reaching my decision, I also considered that the District 4 District Manager, Assistant District Manager, and field office supervisors in your management chain were reluctant to raise areas of concern to your attention; thus limiting your ability to correct all infractions. Although you are responsible for the quality and quantity of work produced by your subordinates while ensuring agency policies are adhered to, I considered that you may have been precluded from taking all necessary corrective action due to your limited knowledge of all matters occurring in every district.

3

Your "Highly Effective" performance ratings for Fiscal Years (FY) 2010 and 2011, your "Exemplary" performance rating for FY 2009, the lack of any prior disciplinary action in your personnel file, and your approximate 22 years of federal service were also considered.

It is my belief that you will not commit these same or similar infractions in the future. I am confident that you can be successful in carrying out all of your upcoming official duties. Your dedication to MSHA and the safety and health of all miners during your career is appreciated.

However, these mitigating factors do not outweigh the seriousness of your actions. I have determined that a letter of reprimand will promote the efficiency of the service. As a supplement to this letter of reprimand, I will identify a veteran member of the Senior Executive Service to serve as a mentor for you during the period that this letter of reprimand remains in your file. I will also identify training that must be completed. I believe these actions are appropriate.

This Letter of Reprimand is a matter of record and a copy will be placed in your Official Personnel Folder (OPF), where it will remain for no longer than one (1) year.

If you believe that your actions are due to personal problems, I would like to remind you of the Department's Employee Assistance Program (EAP). The EAP is designed to provide counseling and assistance to any employee who is experiencing personal problems of any kind and services are strictly confidential. You may contact EAP directly by calling 202-693-8888.

**NOTICE OF RIGHTS:**
You have a right to file a grievance under DPR Chapter 771, Administrative Grievance System, dated October 1, 2008. You must present the grievance directly under the formal procedure within ten (10) workdays of your receipt of this action. A formal grievance must: (1) be in writing; (2) contain sufficient detail to clearly identify the matter being grieved; and (3) specify the personal relief being requested. Your grievance must be filed with:

John K. Moran
Deputy Assistant Secretary
Veterans' Employment and Training Services
200 Constitution Ave., NW
Room S 1325
Washington, DC 20210

4

The time limit for filing a grievance may be extended for good cause by mutual agreement between you and Mr. Moran.

If you believe this action was taken in reprisal for whistleblowing, you may raise the matter by filing a complaint with the Office of Special Counsel. The Office of Special Counsel will investigate your complaint and will either file an action on your behalf or notify you of your right to file an Individual Right of Action appeal to the MSPB. A complaint may be filed electronically at www.osc.gov, or may be filed in writing by filling out Form OSC-11, and faxing or mailing the completed form to the Office of Special Counsel at the following address or fax number:

Complaint Examining Unit
Office of Special Counsel
1730 M Street NW, Suite 218
Washington, DC 20036-4505
Fax: 202-254-3711

If you feel that you have been discriminated against because of race, religion, color, age, sex, national origin, or disability, you may file an equal employment opportunity (EEO) complaint with the U.S. Department of Labor. If you file an EEO complaint with the U.S. Department of Labor, you should submit it to the Civil Rights Center, Room N-4123, 200 Constitution Avenue, N.W., Washington, DC 20212.

You have the right to be represented by an attorney or other representative of your choice so long as there is no conflict of interest to the agency. However, you must designate your choice of representative in writing to Mr. Moran. Any choice must include your representative's name, address, and phone number.

You are entitled to a reasonable amount of duty time to prepare and present a grievance if otherwise in a duty status. You must request and receive approval from your immediate supervisor for the use of duty time for this purpose.

If there is anything in this notice that you do not understand or if you have a question about the process used, please contact Ms. Donna Kramer, Supervisory Human Resources Specialist, at 202-693-7686.

**U.S. Department of Labor**    Mine Safety and Health Administration
1100 Wilson Boulevard
Arlington, Virginia 22209-3939



APR 0 9 2013

MEMORANDUM FOR DANIEL R. PETROLE
Deputy Inspector General

FROM:    JOSEPH A. MAIN
Assistant Secretary of Labor for
Mine Safety and Health

SUBJECT:    Response to Disciplinary or Administrative Actions

This is in response to your request of April 2, 2013 related to the Mine Safety and
Health Administration's (MSHA) disciplinary or administrative action related to MSHA's
Internal Review following the Upper Big Branch (UBB) Mine Accident. MSHA has
administered disciplinary action related to the UBB accident.

If you need additional information please contact Deputy Assistant Secretary
Patricia W. Silvey at 202-693-9642.

USAO0000136

**U.S. Department of Labor**     Office of Inspector General
Washington, D.C. 20210



APR - 2 2013

MEMORANDUM FOR:    JOSEPH A. MAIN
Assistant Secretary of Labor for
Mine Safety and Health

FROM:    DANIEL R. PETROLE
Deputy Inspector General

SUBJECT:    Disciplinary or Administrative Actions related to MSHA's Internal
Review following the Upper Big Branch Mine Accident.

In June of 2012, I requested that MSHA inform the OIG as to whether or not any disciplinary or
administrative actions would be taken as a result of the March 06, 2012, internal review
following the Upper Big Branch mine accident. We have not received any information related to
this request. Please provide an official response by April 10, 2013.

Please contact me or Nancy Ruiz-de-Gamboa, Assistant Inspector General for Management and
Policy, at (202) 693-5100 if you have any questions.

cc: Patricia W. Silvey, Deputy Assistant Secretary for Operations, MSHA

*Working for America's Workforce*

USAO0000137

U.S. Department of Labor

Office of Inspector General
Washington, D.C. 20210



JUN 18 2012

MEMORANDUM FOR PATRICIA W. SILVEY
             Deputy Assistant Secretary for Operations
             Mine Safety and Health Administration

FROM:           *Daniel R. Petrole*
                DANIEL R. PETROLE
                Deputy Inspector General

SUBJECT:        Disciplinary or Administrative Actions related to MSHA's Internal
                Review following the Upper Big Branch Mine Accident

In early April, you referred the MSHA internal review report released on March 06, 2012 to
OASAM and SOL to evaluate whether any disciplinary or administrative actions are warranted
given the findings contained in the report. Once you have received their recommendations, I am
requesting that you inform the OIG whether or not MSHA will be taking any disciplinary or
administrative action.

Please contact me or Nancy Ruiz-de-Gamboa at (202) 693-5100 if you have any questions.


cc: Joseph A. Main, Assistant Secretary of Labor for Mine Safety and Health

*Working for America's Workforce*

**U.S. Department of Labor**

Mine Safety and Health Administration
1100 Wilson Boulevard
Arlington, Virginia 22209-3939



APR 03 2013

MEMORANDUM FOR LINCOLN L. SELFE, JR.
Supervisory Mine Safety and
Health Inspector

FROM:          PATRICIA W. SILVEY
Deputy Assistant Secretary for Operations

SUBJECT:       Decision Letter

By letter dated December 5, 2012, Ernest Cameron, Director, Administration
and Management, proposed to suspend you from pay and duty status for
seven (7) calendar days from your position of Supervisory Mine Safety and
Health Inspector[1], GS-1822-14, in the District 4 Office in Mount Hope, WV,
of the Mine Safety and Health Administration (MSHA).

On December 20, 2012, you presented me with your oral reply to the
proposed suspension. Also in attendance at the oral reply were Executive
Assistant Monique Molina, MSHA, and Donna Kramer, Supervisory Human
Resources Specialist, Office of the Assistant Secretary for Administration and
Management (OASAM).

During the oral reply you also provided your written reply. An extension was
granted until January 18, 2013, to allow you to supplement your written
reply, if you so desired. On January 17, 2013, you submitted an e-mail
containing additional information for my consideration.

I have considered the oral and written replies that you presented to me as
well as the proposed suspension issued to you by Mr. Cameron and all
supporting documentation. This decision is taken to promote the efficiency
of the Federal Service and is based on your failure to carry out your official
duties.

---

[1] This position is referred to as Assistant District Manager.
   You can now file your MSHA forms online at www.MSHA.gov. It's easy, it's fast, and it saves you money!

USAO0000139

2

## **Discussion on Decision to Suspend**

Specification 1 of the proposed suspension concerned your failure to provide adequate management oversight by ensuring that inspectors and supervisors under your supervision reviewed potentially flagrant violations in accordance with the procedures established by Procedure Instruction Letter (PIL) No. I08-III-02.

During your oral reply and in your written reply, you noted that of the two types of flagrant violations, inspectors only had difficulty with the repeated failure criterion. You also stated that at the time of the Upper Big Branch (UBB) mine explosion there was not any mechanism available to assist an inspector in determining whether or not a cited violation was a repeat violation other than the inspector's or his or her supervisor's memory.

Both of your replies also reference the issue as being nationwide in scope and your belief that you should not be disciplined for a national problem.

Although I have considered your comments, for the purpose of this decision letter, I am focused on your actions regarding lack of adequate management oversight over the review of potentially flagrant violations in accordance with the provisions of the PIL.

As stated in the proposed suspension, one of the key responsibilities of your position is to evaluate the results of policy implementation within your area of enforcement responsibility. The Mt. Hope Field Office inspectors issued eight section 104(d)(2) orders for violations at UBB that met the "numbered objective criteria" in PIL No. I08-III-02 for review as potentially flagrant violations. The eight violations were not reviewed as potentially flagrant violations by inspectors or supervisors.

During your interview with the Internal Review (IR) team, you demonstrated a comprehensive understanding of MSHA procedures regarding flagrant violations. Nevertheless, you personally reviewed three of the eight violations at UBB that met the "numbered objective criteria" outlined in PIL I08-III-02 and did not recognize them as potentially flagrant. Therefore, I find that this specification is supported by the evidence.

Specification 2 of the proposed suspension concerned your failure to provide necessary management oversight to ensure that Right of Entry (ROE) trainees in the Mt. Hope Field Office did not conduct inspection activities apart from Authorized Representatives (ARs).

In your oral and written replies you stated you did not have any knowledge that ROE trainees were conducting inspection activities apart from ARs. You

3

also stated that you had no reason to believe or question that the directives you had issued regarding when an ROE trainee could be apart from the AR were not being followed. You asserted that had you known these actions were occurring you would have taken disciplinary action against those who had failed to follow your directives.

Although the IR team determined that for portions of five of the six regular inspections at UBB, ROE trainees did conduct inspection activities apart from ARs, I cannot find any evidence that indicates you were aware of these occurrences. As such, I am removing this specification.

Specification 3 of the proposed suspension cites your failure to effectively use established Agency tools to identify and correct errors on the part of your subordinate inspectors and supervisors regarding Accompanied Activities (AAs) and Field Activity Reviews (FARs). This specification also references supervisors' lack of documentation of required information on many AA and FAR forms such as correct event activity codes, dates of the Uniform Mine File reviews, dates when inspectors were debriefed, and, in some cases, supervisors not accompanying inspectors on all aspects of an inspection or investigation. Your failure to identify apparent deficiencies in two second level reviews you conducted was also cited.

Your written response identified an error in Specification 3. The Coal Mine Safety and Health Supervisor's Handbook requires a supervisor to accompany an inspector during all aspects of a mine visit, not all aspects of an inspection or investigation as stated in Specification 3.

In the oral and written replies, you did not dispute the fact that Mt. Hope Field Office supervisors did not conduct (or document) several required AAs and FARs. You indicated that the oversights occurred because there were acting supervisors in the Mt. Hope Field Office between May and December 2009. You also stated there was no training on conducting AAs, FARs, and second level reviews provided to acting supervisors, supervisors, and assistant district managers until after the UBB internal review.

You asserted that you had identified issues with AAs during your second level reviews and addressed the issues with your subordinate supervisors. Finally, you stated that Specification 3 inappropriately holds you accountable for deficiencies in AAs and FARs that you did not review and were not required to review.

After reviewing this specification and your replies, I am removing this specification. Thus, I am sustaining one (1) of the three (3) specifications in the proposed seven (7) day suspension issued to you.

USAO0000141

4

## Penalty Selection

In reaching my decision to an appropriate penalty, I have considered the factors established by Merit System Protections Board (MSPB) case Douglas v. VA, 5 MSPB 313 (1981).

I considered the nature and seriousness of your actions. Failing to carry out your official duties is one of the most serious infractions that can be committed. As a management official you are tasked with setting a positive example for subordinate employees. You were and still are assigned to review the work of the management and inspection personnel under your jurisdiction. If you are unable to enforce agency policies and follow National Office directives, inspectors may be held to a lower standard of quality work which could jeopardize the safety of the miners MSHA is tasked with protecting.

A CMS&H Assistant District Manager is a prominent position. You are responsible for the quality and quantity of work produced by your subordinates while ensuring agency policies are adhered to. Additionally, you are recognized by mine operators, miners, miners' representatives, and MSHA as having an in-depth knowledge of the Federal Mine Safety and Health Act of 1977, as amended by the Mine Improvement and New Emergency Response Act of 2006.

Your responses to the IR team relative to Specification 1 indicated that you were aware of the criteria in PIL No. I08-III-02 for reviewing violations as potentially flagrant. Although, as you indicated in both your oral and written replies, there may be other districts in violation of the Agency policies and directives, you did not acknowledge responsibility for your role in implementing the flagrant violation procedures in your enforcement division. Your statements that every other ADM in the country needs to be disciplined since you are being disciplined and MSHA is using the IR report as a "gotcha" does not indicate your acknowledgement that you could have carried out your official duties better. If other districts have deficiencies, you are responsible for District 4 and must be held accountable.

In reaching my decision, I have considered your "Highly Effective" performance ratings for Fiscal Years (FY) 2010 and 2011, the lack of any prior disciplinary action in your personnel file, and your approximate 30 years of federal service. I have also considered your years of dedicated service on the MSHA mine rescue team.

It is my belief that you will not commit these same or similar infractions in the future. I am confident that you can be successful in carrying out all of

your upcoming official duties. Your dedication to MSHA and all miners during your career is appreciated.

However, these mitigating factors do not outweigh the seriousness of your actions. I have determined that a one (1) calendar day suspension will promote the efficiency of the service and is the least action I can take to correct your unacceptable conduct.

Your one day suspension will take place on April 9, 2013, during which time you will be in a non-pay status. Paid leave may not be used to offset the loss of pay resulting from suspension. A Standard Form 50, Notification of Personnel Action, will be accessible via your electronic Official Personnel Folder (eOPF).

You will officially return to a duty status on April 10, 2013. You will continue in your current position, grade, and salary pending the effective date of this action. Upon request, you may use accrued leave that is properly scheduled and approved before and after the effective date of this action.

**NOTICE OF RIGHTS**
You have a right to file a grievance under DPR Chapter 771, Administrative Grievance System, dated October 1, 2008. You must present the grievance directly under the formal procedure within ten (10) workdays of your receipt of this action. A formal grievance must: (1) be in writing; (2) contain sufficient detail to clearly identify the matter being grieved; and (3) specify the personal relief being requested. Your grievance must be filed with:

John K. Moran
Deputy Assistant Secretary
Veterans' Employment and Training Services
200 Constitution Avenue, NW
Room S 1325
Washington, DC 20210

The time limit for filing a grievance may be extended for good cause by mutual agreement between you and Mr. Moran.

If you believe this action was taken in reprisal for whistleblowing, you may raise the matter by filing a complaint with the Office of Special Counsel. The Office of Special Counsel will investigate your complaint and will either file an action on your behalf or notify you of your right to file an Individual Right of Action appeal to the MSPB. A complaint may be filed electronically at www.osc.gov, or may be filed in writing by filling out Form OSC-11, and

6

mailing or faxing the completed form to the Office of Special Counsel at the following address or fax number:

Complaint Examining Unit
Office of Special Counsel
1730 M Street NW, Suite 218
Washington, DC 20036-4505
Fax: 202-254-3711.

If you feel that you have been discriminated against because of race, religion, color, age, sex, national origin, or disability, you may file an equal employment opportunity (EEO) complaint with the U.S. Department of Labor.  If you file an EEO complaint with the U.S. Department of Labor, you should submit it to the Civil Rights Center, Room N-4123, 200 Constitution Avenue, NW, Washington, DC  20212.

You have the right to be represented by an attorney or other representative of your choice so long as there is no conflict of interest to the agency. However, you must designate your choice of representative in writing to Mr. Moran.  Any choice must include your representative's name, address, and phone number.

You are entitled to a reasonable amount of duty time to prepare and present a grievance if otherwise in a duty status.  You must request and receive approval from your immediate supervisor for the use of duty time for this purpose.

If there is anything in this notice that you do not understand or if you have a question about the process used, please contact Ms. Donna Kramer, Supervisory Human Resources Specialist, at 202-693-7686.

If you believe that your actions are due to personal problems, I would like to remind you of the Department's Employee Assistance Program (EAP).  The EAP is designed to provide counseling and assistance to any employee who is experiencing personal problems of any kind, and its services are strictly confidential.  You may contact EAP directly by calling 202-693-8888.

**U.S. Department of Labor**      Mine Safety and Health Administration
1100 Wilson Boulevard
Arlington, Virginia 22209-3939



**NOV 29 2012**

MEMORANDUM FOR KEVIN G. STRICKLIN
　　　　　　　　　Administrator
　　　　　　　　　Coal Mine Safety and Health

FROM:　　　　　　PATRICIA W. SILVEY
　　　　　　　　　Deputy Assistant Secretary for Operations
　　　　　　　　　Mine Safety and Health

SUBJECT:　　　　Letter of Counseling

This is to notify you of my concern regarding your management responsibilities as they relate to the duties of your position. The duties of the Administrator for Coal Mine Safety and Health (CMS&H) require you to exercise management control and direction of all programs authorized by the Federal Mine Safety and Health Act of 1977 to ensure the safety and health of the nation's coal miners. However, your oversight and control of all CMS&H programs has not been as effective as it should be.

The issues relating to this matter were raised to my attention when I read the report on the "Internal Review of MSHA's Actions at the Upper Big Branch Mine – South." The Internal Review (IR) evaluated MSHA's performance prior to the April 10, 2010, explosion at the Upper Big Branch Mine. Accordingly, since I have recently become aware of your actions via the IR report, I am now addressing your conduct through this Letter of Counseling.

The IR report revealed that you relied heavily on acting Deputy Administrator Charles Thomas to provide leadership and direction to the District staff in the planning, development, execution, and administration of policies and programs designed to prevent injury, disease, and death in the coal mining industry.

You were unaware of issues that required your experience and attention even though you had regular briefings with Mr. Thomas and the District 4 staff. Specifically, you were unaware that District 4 failed to provide the necessary oversight to ensure that the "too wet to sample" rock dust survey computer application was used in the Mt. Hope and Princeton field offices; that District 4 failed to provide adequate oversight to ensure that inspectors reviewed potentially flagrant violations in accordance with Procedure Instruction Letter, No. I08-III-02; and that the District 4 Roof Control Department was not following CMS&H Memo No. HQ-08-058-A when reviewing and approving complex and non-typical roof control plans and amendments. In addition, you did not appreciate that Headquarters memos, which were not incorporated into the centralized Agency directives system, were not being distributed to all appropriate employees.

USAO0000145

2

I have concerns with your conduct, as described above. Therefore, I must take corrective measures to address this conduct. I am directing you, as an employee under my direct supervision, to complete the following tasks prior to April 30, 2013.

- Ensure that corrective actions to address IR recommendations related to: (1) enforcement of 30 CFR 75.400 and 30 CFR 75.403; (2) review of potentially flagrant violations; and (3) review and approval of complex and non-typical roof control plans and amendments are effectively and timely implemented.

- Work with the Director of the Office of Assessments, Accountability, Special Enforcement, and Investigations to develop a means for evaluating the effectiveness of corrective actions prescribed in the UBB Internal Review report.

- Ensure that new and revised inspection policies and procedures are implemented through the established MSHA Directives System.

I believe timely completion of the tasks above, in addition to this memorandum, will ensure appropriate future conduct.

You are requested to sign and date this memorandum as evidence that you received it. Your signature does not mean you agree with the contents of this memorandum. Your failure to sign will not void the contents of this memorandum.

I acknowledge receipt of this memorandum as indicated below:

KEVIN G. STRICKLIN
PRINT NAME                    SIGNATURE                    11/29/12
                                                           DATE

USAO0000146

U.S. Department of Labor       Mine Safety and Health Administration
                              1100 Wilson Boulevard
                              Arlington, Virginia 22209-3939



APR 03 2013

MEMORANDUM FOR DONALD WINSTON
                Supervisory Mine Safety and
                Health Specialist

FROM:           PATRICIA W. SILVEY
                Deputy Assistant Secretary for Operations

SUBJECT:        Decision Letter

By letter dated December 5, 2012, Ernest Cameron, Director, Administration
and Management, proposed to suspend you from pay and duty status for
seven (7) calendar days from your position of Supervisory Mine Safety and
Health Specialist, GS-1822-13, in the Mount Hope, WV District 4 Office, of
the Mine Safety and Health Administration (MSHA).

On December 20, 2012, you presented me with your oral reply to the
proposed suspension. Also in attendance at the oral reply were Executive
Assistant Monique Molina, MSHA, and Donna Kramer, Supervisory Human
Resources Specialist, Office of the Assistant Secretary for Administration and
Management (OASAM).

During the oral reply I granted an extension for submission of any written
reply until January 18, 2013. On January 7, 2013, you submitted your
written reply.

I have considered the oral and written replies that you presented to me as
well as the proposed suspension issued to you by Mr. Cameron and all
supporting documentation. This decision is taken to promote the efficiency
of the Federal Service and is based on your failure to carry out your official
duties.

**Discussion on Decision to Suspend**
Specification 1 of the proposed suspension concerned your failure to follow
CMS&H Memo No. HQ-08-058A, when you recommended that the District 4
Manager approve the base roof control plan submitted in October 2009 for

2

Upper Big Branch (UBB), without requiring Performance Coal Company to submit a risk assessment specific to the particular mining operation, including the data and evaluation supporting the proposed roof control plan.

During your oral and written replies, you noted that CMS&H Memo No. HQ-08-058A lists four criteria to be used in determining if a roof control plan is complex and/or non-typical. The fourth criterion concerns other conditions considered unusual by the District Manager, such as retreat mining between two gob areas, mining of high stress areas created by multiple seam interaction, or active mining above or below longwall panels or isolated remnant pillars.

After reviewing this specification, I have determined that the Memo does allow District Managers to exercise discretion relative to risk assessments based upon their knowledge and experience with multiple seam mining. Given your experience with multiple seam mining and roof control, I find that you acted within the parameters of the Memo when you recommended that the District Manager approve the base roof control plan for UBB absent a risk assessment. As such, I am removing this specification.

Specification 2 of the proposed suspension concerned your failure to implement provisions of CMS&H Memo No. HQ-08-059A when you did not require District 4 Roof Control Department specialists to use the checklists specified by the memorandum when reviewing roof control plans and revisions. Instructions for all roof control personnel to begin using these checklists were e-mailed to District Managers and Assistant District Managers on January 27, 2009.

Additionally, the District 4 plan approval records for the October 2009 UBB base roof control plan did not contain the Headquarters or the District 4 checklists as required by the Memo.

In both your oral and written replies you stated that prior to CMS&H Memo No. HQ-08-059A being issued, District 4 had developed checklists to be used when reviewing roof control plans. You stated that the District 4 checklists contained a large majority of the items that the CMS&H Memo No. HQ-08-059A checklists contained and you thought the District 4 checklists were sufficient.

During your replies, you acknowledged that you continued to complete the District 4 checklists even after the Headquarters checklists were disseminated. You also affirmed that the October 2009 UBB base roof control plan file did not contain any checklist, Headquarters or District 4.

3

In your written reply you stated that it is your understanding that on January 27, 2009, instructions requiring roof control specialists to use the Headquarters checklists were e-mailed to District Managers and Assistant District Managers. However, you stated that the e-mail distribution did not include roof control supervisors; you did not receive the Headquarters checklists; and you were not informed that you had been using the incorrect checklists.

During the oral reply, you asserted the same position that your written reply contained regarding the checklists; that you were not on the e-mail distribution list and were not informed that you were using the incorrect checklists. However, during the oral reply, I asked you whether or not you received the Headquarters checklists. Your response was that you could not say and you were not going to lie to me. If you received the checklists, it would have been from Assistant District Manager Richard Kline.[1] You continued to state that you could only tell me that you were not aware of the Headquarters checklists.

Based on the information shared during the oral reply, I find that this specification is supported by the evidence. Thus, I am sustaining one (1) of the two (2) specifications in the proposed seven (7) day suspension issued to you.

**Penalty Selection**
In reaching my decision as to an appropriate penalty, I have considered the factors established by Merit System Protections Board (MSPB) case Douglas v. VA, 5 MSPB 313 (1981).

I considered the nature and seriousness of your actions. Failing to carry out your official duties is one of the most serious infractions that can be committed. As a management official you are tasked with setting a positive example for subordinate employees. You were and still are assigned to review the work of the specialists under your supervision. If you are unable to enforce agency policies and follow National Office directives, the inspectorate may be held to a lower standard of quality work which could jeopardize the safety of the miners MSHA is tasked with protecting.

A Supervisory CMS&H Specialist is a prominent position. You are recognized by the mine operators, miners, miners' representatives, and MSHA as having an in-depth knowledge of the Federal Mine Safety and Health Act of 1977, as amended by the Mine Improvement and New Emergency Response Act of 2006. You are also recognized by the Office of the Solicitor (SOL) as an

---

[1] Assistant District Manager Kline has retired.

4

expert on roof control as they have utilized your expertise on several legal cases in which MSHA received favorable settlements.

As a Supervisory CMS&H Specialist you are responsible for the quality and quantity of work produced by your subordinates while ensuring agency policies are adhered to. Although the Internal Review team concluded that the District 4 checklists for reviewing roof control plans were adequate to ensure the plans submitted by Performance Coal Company included the required information, you were unable to explain why neither checklist was present in the October 2009 UBB base roof control plan file.

Regardless of what happened to the checklist for the October 2009 UBB base roof control plan, I find that you failed to exercise due diligence in implementing the checklists in CMS&H Memo No. HQ-08-059A.

In reaching my decision, I have also considered your "Highly Effective" performance ratings for Fiscal Years (FY) 2009, 2010, and 2011, the lack of any prior disciplinary action in your personnel file, and your 20 years of federal service.

It is my belief that you will not commit these same or similar infractions in the future. I am confident that you can be successful in carrying out all of your upcoming official duties and appreciate the dedication that you have shown to MSHA.

However, these mitigating factors do not outweigh the seriousness of your actions. I have determined that a one (1) calendar day suspension will promote the efficiency of the service and is the least action I can take to address your unacceptable conduct.

Your one day suspension will take place on April 9, 2013, during which time you will be in a non-pay status. Paid leave may not be used to offset the loss of pay resulting from suspension. A Standard Form 50, Notification of Personnel Action, will be accessible via your electronic Official Personnel Folder (eOPF).

You will officially return to a duty status on April 10, 2013. You will continue in your current position, grade, and salary pending the effective date of this action. Upon request, you may use accrued leave that is properly scheduled and approved before and after the effective date of this action.

## NOTICE OF RIGHTS
You have a right to file a grievance under DPR Chapter 771, Administrative Grievance System, dated October 1, 2008. You must present the grievance

5

directly under the formal procedure within ten (10) workdays of your receipt of this action.  A formal grievance must: (1) be in writing; (2) contain sufficient detail to clearly identify the matter being grieved; and (3) specify the personal relief being requested.  Your grievance must be filed with:

John K. Moran
Deputy Assistant Secretary
Veterans' Employment and Training Services
200 Constitution Avenue, NW
Room S 1325
Washington, DC 20210

The time limit for filing a grievance may be extended for good cause by mutual agreement between you and Mr. Moran.

If you believe this action was taken in reprisal for whistleblowing, you may raise the matter by filing a complaint with the Office of Special Counsel.  The Office of Special Counsel will investigate your complaint and will either file an action on your behalf or notify you of your right to file an Individual Right of Action appeal to the MSPB.  A complaint may be filed electronically at www.osc.gov, or may be filed in writing by filling out Form OSC-11, and mailing or faxing the completed form to the Office of Special Counsel at the following address or fax number:

Complaint Examining Unit
Office of Special Counsel
1730 M Street NW, Suite 218
Washington, DC 20036-4505
Fax: 202-254-3711.

If you feel that you have been discriminated against because of race, religion, color, age, sex, national origin, or disability, you may file an equal employment opportunity (EEO) complaint with the U.S. Department of Labor.  If you file an EEO complaint with the U.S. Department of Labor, you should submit it to the Civil Rights Center, Room N-4123, 200 Constitution Avenue, NW, Washington, DC  20212.

You have the right to be represented by an attorney or other representative of your choice so long as there is no conflict of interest to the agency. However, you must designate your choice of representative in writing to Mr. Moran.  Any choice must include your representative's name, address, and phone number.

6

You are entitled to a reasonable amount of duty time to prepare and present a grievance if otherwise in a duty status. You must request and receive approval from your immediate supervisor for the use of duty time for this purpose.

If there is anything in this notice that you do not understand or if you have a question about the process used, please contact Ms. Donna Kramer, Supervisory Human Resources Specialist, at 202-693-7686.

If you believe that your actions are due to personal problems, I would like to remind you of the Department's Employee Assistance Program (EAP). The EAP is designed to provide counseling and assistance to any employee who is experiencing personal problems of any kind, and its services are strictly confidential. You may contact EAP directly by calling 202-693-8888.

USAO0000152