DOL SA #1 and FBI SA #1 prepared six MOIs memorializing Witness #4 interviews from the following dates:  October 22, 2014; November 11, 2014; April 2, 2015; September 12, 2015; September 21, 2015; and October 18, 2015.  In fact, the government had disclosed only the pre-indictment MOI dated November 11, 2014.  According to Ruby, he mistakenly believed that the second pre-indictment MOI, dated October 22, 2014, had also been disclosed.  Because the remaining four Witness #4 MOIs reflected post-indictment interviews, Ruby intentionally had not disclosed them.  Ruby's statement to the court that the government had "turned over 302s from our interviews with this witness" was arguably misleading.[217]

Ruby told OPR that he did not intend to mislead the court, and that his statement was meant to refer to the two pre-indictment MOIs (one of which Ruby mistakenly believed had been disclosed).[218]  Ruby said that he did not mean to state that all of Witness #4 MOIs had been disclosed and that it never crossed his mind to mislead the court.[219]  Witnesses told OPR that Goodwin attended the trial every day.[220]  Because Ruby's statements about the disclosure of Witness #4 MOIs were made in open court, Goodwin presumably heard them.  Because Goodwin declined OPR's request for an interview, OPR was unable to ask Goodwin why he did not correct Ruby's arguably misleading statement, if, as Ruby asserts, Goodwin knew that the government had not disclosed post-indictment MOIs.

### C.    Zuckerman Asked the Government Whether It Was Disclosing All MOIs

On April 15, 2015, a Zuckerman attorney sent an e-mail to Ruby, asking, "From your earlier statements to us and the Court, we understand that all of the [MOIs] that the government conducted as part of its investigation . . . have been provided to the defense. . . . If our understanding is incorrect, please let us know."[221]  On April 17, 2015, the same Zuckerman attorney sent another e-mail to Ruby, asking him to respond to the attorney's April 15 e-mail.  OPR found no evidence that Ruby forwarded either of these e-mails to anyone.  Both AUSA #1 and AUSA #2 told OPR that they did not recall seeing this e-mail.[222]  OPR found no evidence that Ruby responded to Zuckerman's question, notwithstanding that the e-mail showed that Zuckerman wrongly understood that it had

---

[217]    OPR notes that Ruby's statement to the court on October 30, 2015 that "[w]e have also turned over 302s from our interviews with this witness" occurred only 12 days after the government's final interview of Witness #4 on October 18, 2015.  Ruby attended that interview.  In addition, Witness #4 was interviewed twice in September 2015, the month before Ruby made his arguably inaccurate statement to the court; both Ruby and Goodwin attended those interviews.

[218]    Ruby Interview at 118.

[219]    *Id.* at 119-20.

[220]    AUSA #1 Interview at 29.

[221]    In his April 15, 2015 e-mail, the Zuckerman attorney stated that the defense could not locate all of the MOIs that the government had previously disclosed, and that the MOIs appeared to have different Bates-stamp markings.  Ruby responded to that portion of Zuckerman's April 15 e-mail.  On April 21, 2015, Ruby sent Zuckerman a list of all MOIs that the government had disclosed, arranged by Bates-stamp numbers.

[222]    AUSA #1 Interview at 21; AUSA Interview at 48.

received all MOIs in the government's possession.[223]  OPR asked Ruby why he did not respond to Zuckerman's e-mail.  Ruby said that as a result of Goodwin's decision that the team should not respond to Zuckerman's e-mails, he may not have read the e-mail carefully, but that it was not his intent to mislead Zuckerman by failing to respond.[224]

### D. Evidence that Zuckerman Knew or Should Have Known that the Government Was Not Disclosing All MOIs

As described above, on several occasions the government made statements to the court that could be read to indicate that the government was providing the defense with all MOIs in its possession.  OPR found no reason to believe that the court knew or should have known that the government was not in fact disclosing all MOIs to the defense.  In contrast, OPR found evidence that by August 2015 Zuckerman knew or should have known that the government was not disclosing all MOIs.

First, Zuckerman was aware that the Witness #2 MOI that was disclosed in August 2015 was the only post-indictment MOI it received.  In its March 7, 2016 letter to the Department of Justice alleging government misconduct, Zuckerman noted that the government "provided the defense with only a single [MOI] conducted after the indictment was returned."[225]

Second, on September 21, 2015, Ruby sent Zuckerman a letter in which he disclosed potential exculpatory statements the government had obtained during interviews of Witness #7, Witness #8, and Witness #13  In the letter, Ruby told Zuckerman that the information he was disclosing came from witness interviews.  Zuckerman therefore knew that at least for these three witnesses, the government was not providing complete MOIs memorializing the interviews.

Third, all of the MOIs disclosed to the defense were marked with Bates-stamp numbers.  In August 2015, Ruby sent the defense the Witness #2 MOI, with Bates-stamp markings MOI 1534-1540.  The highest Bates-stamp marking of an MOI provided to the defense prior to the disclosure of the Witness #2 MOI was MOI 1356-1361.  Had Zuckerman carefully examined the MOIs it received from the government, it would have seen that there was a gap of almost 200 pages.  The obvious explanation for that gap is that there were MOIs marked with Bates-stamp numbers MOI 1362-1533 that the government had not disclosed.[226]

---

[223]  AUSA #2 said that AUSA was generally aware that Ruby did not respond to all of Zuckerman's e-mails.  AUSA #2 said that the team was concerned that whatever the response, it would be used against the government.  AUSA #2 Interview at 49-50.

[224]  Ruby Interview at 124-26.

[225]  March 7, 2016 letter at 3.

[226]  The fact that there was a 200-page Bates-stamp number gap between the Witness #2 MOI and next highest numbered MOI is evidence that Ruby did not intentionally mislead the defense about the existence of undisclosed MOIs.  Had Ruby sought to hide the existence of the undisclosed MOIs, he would have directed that the Witness #2 MOI be marked with the Bates-stamp number MOI-1362, the number immediately after the last page of the highest Bates-stamp number on an MOI disclosed to the defense.

Fourth, OPR found evidence to suggest that Zuckerman was communicating with some witnesses after those witnesses had been interviewed by the government. If that is so, and if Zuckerman never received MOIs for those witnesses, then Zuckerman knew or should have known that it was not receiving all MOIs. For example, in its March 7, 2016 letter to the Department, Zuckerman stated that it had learned that "the government interviewed several individuals who provided information that obviously was favorable to Mr. Blankenship's defense but was never disclosed."[227] When OPR asked Zuckerman to identify those individuals, Zuckerman identified Witness #1, Witness #6, and Witness #8. In fact, the government had interviewed Witness #1 and Witness #8 and had not disclosed the MOIs from those interviews (though Ruby did provide the defense with some information about Witness #8 interview in his September 21, 2015 letter as discussed above). It is reasonable to conclude that Zuckerman spoke to those witnesses or their counsel after the government had interviewed them, and thus had reason to believe that it had not received all MOIs, if MOIs had been prepared after the government's interviews of those witnesses.

In sum, there is substantial evidence that by August 2015, Zuckerman was or should have been aware that it was not receiving all MOIs the government generated.

## V.   FACTS RELEVANT TO THE GOVERNMENT'S SEARCH FOR EXCULPATORY EVIDENCE

Zuckerman alleged that the government systematically withheld exculpatory evidence. OPR found evidence inconsistent with Zuckerman's assertion that the government ignored or intentionally violated its discovery obligations. OPR found that the government searched MSHA documents at least three times for exculpatory evidence. In addition, as noted above, in pleadings filed with the court, the defense acknowledged that the government had disclosed what the defense described as exculpatory material both in MOIs and documents that the government had disclosed.

### A.   February 2015 Search of MSHA Documents

According to DOL Attorney, in February 2015, Ruby instructed the DOL to search MSHA documents for potentially exculpatory evidence.[228] On February 20, 2015, DOL Attorney sent Ruby an e-mail describing in detail how DOL intended to search MSHA documents. In DOL Attorney e-mail, DOL Attorney stated that DOL would use the following search terms to identify potentially relevant documents: Blankenship; UBB; Upper Big Branch; PCC; Performance Coal; Advance Notice. DOL Attorney told Ruby that those search terms would be used to search the e-mail accounts of four groups of MSHA employees within specific time frames: MSHA District 4 (which included UBB) from January 1, 2008 to April 5, 2010; MSHA Headquarters from January 1, 2008 to March 6, 2012; the MSHA Accident Investigation team, from April 12, 2010 to December 6, 2011; and the MSHA Incident Review team, from April 29, 2010 to March 6, 2012. DOL Attorney also told

---

[227]   March 7, 2016 letter at 3.

[228]   DOL Attorney Interview.

Ruby that DOL would search Incident Review team non-e-mail documents, using the same search terms.[229]

Ruby forwarded [DOL Attorney] e-mail to Goodwin.  Goodwin responded to [DOL Attorney] e-mail on February 24, 2015.[230]  Goodwin told [DOL Attorney] that "the point of this exercise is to determine if there is any 'exculpatory' information concerning Massey/UBB in general, and Defendant Blankenship in particular."  Goodwin told [DOL Attorney] that such exculpatory information would include, but would not be limited to "(1) statements or indications that Blankenship/UBB was good on safety; (2) statements or indications that MSHA was targeting UBB/Blankenship for improper motives (e.g. because he was critical of MSHA); or (3) statements or indications that citations issued at UBB might be overstated."

On March 26, 2015, [DOL Attorney] told Ruby that DOL attorneys had reviewed about 24,000 e-mails and marked 936 as potentially exculpatory, though [DOL Attorney] noted that "[m]ost of these are not likely to be exculpatory when you review them—we're erring on the side of inclusion."[231]  In March 27 and 30 e-mails, [DOL Attorney] informed Ruby that contractors for DOL were sending Ruby discs containing the 936 e-mails.  Ruby forwarded both e-mails to [AUSA #2].

When OPR initially interviewed the trial team members, they either said they had no knowledge of the February/March 2015 MSHA e-mail searches, or did not recall whether the government had disclosed any of the 936 e-mails identified by DOL attorneys.[232]  Because no prosecution team member could recall with any certainty whether any of the 936 MSHA e-mails that DOL attorneys had identified as potentially exculpatory had been disclosed, OPR asked the USAO to determine what had happened to the 936 e-mails.

---

[229]     Ruby told OPR that he thought that DOL attorneys searched non-e-mail documents only from the Incident Review team because non-e-mail documents from the other three groups had already been searched.  Ruby Interview at 51-52.

[230]     Ruby told OPR that he believed that Goodwin responded to [DOL Attorney] e-mail because this was around the time ████████████████████████.

[231]     March 26, 2015 e-mail from [DOL Attorney] to Ruby.  [DOL Attorney] also told Ruby that the team reviewing the e-mails had stopped reviewing e-mails that had been sent "to" those whose e-mail accounts they were searching, and were only searching e-mails that had been sent "from" those whose e-mail accounts they were searching.  [DOL Attorney] told OPR that DOL had stopped searching "to" e-mails because they were mostly duplicative of other e-mails, and the search terms were so broad that they captured irrelevant documents such as media reports about the UBB explosion that were contained in "to" e-mail accounts, but not in "from" e-mail accounts.  [DOL Attorney] Interview.

[232]     [DOL SA #1] and [AUSA #1] said they had no knowledge about the February/March DOL search of MSHA e-mails. [DOL SA #1] Interview at 21-22; [AUSA #1] Interview at 50.  [FBI SA #1] said █ did not know whether the 936 e-mails identified by DOL attorneys were disclosed.  [FBI SA #1] Interview at 29.  Even though contemporaneous e-mails showed that [AUSA #2] reviewed the 936 e-mails identified by DOL attorneys, during █ interview ███ had no recollection of doing so.  [AUSA #2] Interview at 33.  [DOL Attorney] said █ had no knowledge about whether any of the 936 e-mails identified by DOL attorneys were disclosed.  [DOL Attorney] Interview.  Ruby said he did not recall why in February 2015 he asked DOL to initiate a search of MSHA documents for exculpatory evidence.  Ruby Interview at 51.  Ruby said that most of the 936 e-mails identified by DOL attorneys were not exculpatory, and some were disclosed, though he did not recall how many.  *Id.* at 52-53.

After reviewing its records, the USAO determined that Ruby had asked ████ to review the e-mails identified by DOL attorneys. ████ reviewed the e-mails, and selected those ████ believed might be discoverable. On April 1, 2015, ████ sent Ruby a link to an electronic folder containing the e-mails ████ had identified, and on April 3 ████ sent the same link to Goodwin, ████ and Ruby (again). In those e-mails, ████ said that ████ had identified e-mails about how MSHA inspectors "did not know how advance notice worked," and identified post-explosion e-mails that contained MSHA employees' negative opinions about Blankenship or Massey. On April 6, 2015, Ruby sent Zuckerman a letter concerning various issues. At the end of the letter, Ruby stated that the government was disclosing "a small set of additional documents." Those documents included nine MSHA e-mails (and one attached spreadsheet) related to the issue of advance notice. These e-mails were among the 936 e-mails identified by DOL attorneys as potentially containing exculpatory material. The government did not at that time disclose any of the other 936 e-mails identified by DOL attorneys.

After OPR asked the USAO to try to determine how many of the 936 e-mails identified by DOL attorneys had been disclosed, the United States Attorney asked the *Blankenship* team to review those e-mails to determine if further disclosures were warranted. On November 17, 2017, the USAO sent Zuckerman a disc containing 48 e-mails that were among the e-mails the DOL attorneys had identified as potentially exculpatory in March 2015 that had not previously been disclosed. OPR asked the USAO to explain why it had selected those 48 e-mails to disclose to the defense. The USAO said that, "[t]here is no one specific reason why the emails were selected. If they arguably related in any way to a negative attitude toward or treatment of Massey or Blankenship, we included them."[233]

Nine of the 48 MSHA e-mails that the USAO disclosed in November 2017 were dated before the UBB mine explosion. The 48 e-mails contained information about several different issues, including the following: MSHA employees' negative opinions of Blankenship or Massey (most of those date from after the UBB mine explosion); whether MSHA inspectors knew about or enforced the rule against mines providing advance notice of MSHA inspector activities; discussions of various issues related to UBB as MSHA's report of its internal review about the explosion was being drafted and revised; and technical discussions of various conditions at UBB prior to the explosion (in some cases several years before the explosion). OPR did not reopen its investigation to determine whether the government was required to disclose the 48 e-mails before trial because: (a) OPR reached conclusions regarding similar disclosure issues with respect to MOIs; (b) OPR's investigation was substantially complete when the USAO disclosed the 48 MSHA e-mails; and (c) Blankenship's Section 2255 motion raised the issue of the late disclosure of the 48 MSHA e-mails and is pending before the court.[234]

---

[233]   December 15, 2017 USAO e-mail to OPR. The defense discussed some of the 48 e-mails in its Section 2255 motion.

[234]   On April 6, 2018, after OPR's investigation was complete, the USAO informed OPR that on that date it had made another disclosure of MSHA documents to Blankenship's attorneys. The USAO disclosed documents related to MSHA's disciplining of four MSHA employees as a result of information learned during its internal review of its pre-explosion enforcement activities at UBB. The documents showed that two employees received one-day suspensions, one employee received a letter of reprimand, and one employee received a letter of counseling. The defense discussed some of these documents in its Section 2255 motion. In May 2018, the USAO informed OPR that

- 60 -

### B.     June 2015 Search of Selected Documents in the USAO's Database

The defense made repeated motions seeking an order compelling the government to disclose *Brady* material.  Although the court largely denied those motions, on June 12, 2015, the court ordered that the government should "designate and disclose to defense counsel any and all *Brady* material by the close of business on June 22, 2015."[235]  To comply in part with the court's order, Ruby selected approximately 600 documents.  On June 18, 2015, Ruby told AUSA #1 and AUSA #2 that he and they would each review approximately 200 documents to identify potential *Brady* material.  Both AUSA #1 and AUSA #2 reviewed their sets of documents and sent Ruby a list of documents that they suggested be identified as potential *Brady* material.[236]  On June 21, 2015, Ruby sent a letter to the defense, identifying approximately 140 documents and ten MOIs as containing potential *Brady* material.

### C.     September 2015 Search of MSHA Documents

On August 13, 2015, the defense moved for an early-return subpoena seeking production of certain MSHA documents.  The government thereafter disclosed approximately 70,000 pages of documents.  Ruby asked DOL attorneys to search those documents for discoverable evidence.  On September 8, 2015, DOL Attorney sent Ruby an e-mail, attaching a chart listing 115 documents that might be considered exculpatory.  DOL Attorney told OPR that many of the documents on the chart were duplicates, and so the actual number of potentially exculpatory documents was less than 115.  In a September 10, 2015, letter to Zuckerman, Ruby identified as potentially exculpatory two of the documents that DOL Attorney had identified in its chart.  Ruby told OPR that although he had no recollection of how many of the documents identified in the September search as potentially exculpatory were disclosed, some of the documents on the chart DOL Attorney prepared were used by the defense at trial, which suggested that they had been disclosed.[237]  DOL Attorney said that the defense used some of the documents on DOL Attorney chart during its cross-examination of witnesses during trial.[238]

DOL SA #1 and AUSA #1 told OPR they had no knowledge about the September search of MSHA documents.[239]  AUSA #2 said that he did not recall ever seeing the chart DOL Attorney sent Ruby listing

---

it was disclosing additional MSHA documents to the defense, some of which were related to the MSHA documents disclosed on April 6.

[235]     Memorandum Opinion and Order at 14.

[236]     Neither AUSA #1 nor AUSA #2 knew whether Ruby accepted their suggestions as to what documents should be designated as discoverable.  AUSA #2 Interview at 26-28; AUSA #1 Interview at 41, 45-46.  AUSA #2 said that to identify potential *Brady* material, he looked for documents in which Blankenship expressed anger about a mine's safety record, or where he said something positive about mine safety.  AUSA #2 Interview at 26-28.

[237]     Ruby Interview at 64-65.

[238]     DOL Attorney Interview.

[239]     DOL SA #1 Interview at 21-22; AUSA #1 Interview at 51.

115 documents.[240] ▓FBI SA #1▓ said ▓▓ was aware of the September search of MSHA documents because there had been discussions in court about that issue during pretrial motions.[241]

As noted above, in March 2015, DOL attorneys identified 936 MSHA e-mails as potentially exculpatory. In September 2015, in response to a subpoena, the government produced thousands of MSHA documents. The USAO told OPR that there were approximately 200 documents that were included in both the March and September 2015 sets of documents.[242] Thus, in September 2015, the government had disclosed to the defense about 200 of the e-mails that DOL attorneys had identified in March 2015 as potentially exculpatory.

## VI.    APPLICABLE STANDARDS

### A.    OPR's Analytical Framework

OPR finds professional misconduct when an attorney intentionally violates or acts in reckless disregard of a known, unambiguous obligation imposed by law, applicable rule of professional conduct, or Department regulation or policy. In determining whether an attorney has engaged in professional misconduct, OPR uses the preponderance of the evidence standard to make factual findings.

An attorney intentionally violates an obligation or standard when the attorney (1) engages in conduct with the purpose of obtaining a result that the obligation or standard unambiguously prohibits; or (2) engages in conduct knowing its natural or probable consequence, and that consequence is a result that the obligation or standard unambiguously prohibits.

An attorney acts in reckless disregard of an obligation or standard when (1) the attorney knows or should know, based on his or her experience and the unambiguous nature of the obligation or standard, of an obligation or standard; (2) the attorney knows or should know, based on his or her experience and the unambiguous applicability of the obligation or standard, that the attorney's conduct involves a substantial likelihood that he or she will violate, or cause a violation of, the obligation or standard; and (3) the attorney nonetheless engages in the conduct, which is objectively unreasonable under all the circumstances. Thus, an attorney's disregard of an obligation is reckless when it represents a gross deviation from the standard of conduct that an objectively reasonable attorney would observe in the same situation.

If OPR determines that an attorney did not engage in professional misconduct, OPR determines whether the attorney exercised poor judgment, made a mistake, or acted appropriately under all the circumstances. An attorney exercises poor judgment when, faced with alternative courses of action, he or she chooses a course of action that is in marked contrast to the action that the Department may reasonably expect an attorney exercising good judgment to take. Poor judgment differs from professional misconduct in that an attorney may act inappropriately and thus exhibit poor judgment even though he or she may not have violated or acted in reckless

---

[240]    ▓▓▓▓▓ Interview at 33.

[241]    ▓FBI SA #1▓ Interview at 29.

[242]    November 6, 2017 USAO e-mail to OPR.

disregard of a clear obligation or standard. In addition, an attorney may exhibit poor judgment even though an obligation or standard at issue is not sufficiently clear and unambiguous to support a professional misconduct finding. A mistake, on the other hand, results from an excusable human error despite an attorney's exercise of reasonable care under the circumstances.

### B.   Standards of Conduct

#### 1.   Applicable Bar Rules

Department of Justice regulations provide that Department attorneys shall, in all cases, conform to the rules of ethical conduct of the court before which a particular case is pending.[243] *Blankenship* was pending before the U.S. District Court for the Southern District of West Virginia. That court has adopted the West Virginia Rules of Professional Conduct (RPC) as the rules governing the professional conduct of attorneys who litigate criminal cases in that court.[244] ███

███████████████████████████████████████████████████████████████
██████████████████████████████████ ██████████████████████████████
.[245]
██████████████████████████████████████ ██████████████████████████
█████████████████████████████████.[246]   Therefore, OPR applies the West Virginia RPC in evaluating the conduct of Ruby and Goodwin.[247]

#### 2.   Duty to Disclose Favorable Evidence to the Defense

The *Blankenship* prosecution team had a duty to disclose favorable evidence to the defense. This duty was required by: (a) the Constitution, as explained and promulgated in *Brady* and its progeny; (b) Department of Justice policy, as set forth in the United States Attorneys' Manual (USAM), the Ogden Memorandum, and USAO rules; and (c) the West Virginia RPC.

---

[243]    28 C.F.R. §§ 77.3 and 77.2(j)(1)(i).

[244]    Local Rule of Criminal Procedure 44.7.

[245]    Because Goodwin declined to be interviewed by OPR, OPR does not know whether Goodwin is a member of any other state bar.

[246]    ████████████████████████████████████████



[247]    ████████████████████████████████████████████████████████████ As discussed below, West Virginia RPC 3.8(d) requires prosecutors to make certain pretrial disclosures to the defense. ████████████████████
█████████████████████████████████████████████████████████████████
█████████████████████████████████████, no West Virginia court or disciplinary authority has discussed whether the scope of West Virginia RPC 3.8(d) is broader than, or co-extensive with, a prosecutor's duty under *Brady*. For the reasons OPR explains below, it does not reach a finding as to whether Ruby and Goodwin violated West Virginia RPC 3.8(d). ████████████████████████████████████████████████████rs.

OPR - 000068

a.      **Constitutional Obligations**

The Fifth Amendment's due process requirements as explained in *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny require a prosecutor to disclose to the defense evidence favorable to the accused that is material either to guilt or punishment. *Brady*, 373 U.S. at 87. In addition, the government must disclose material evidence affecting a witness' credibility. *Giglio v. United States*, 405 U.S. 150, 154 (1972). Exculpatory or impeachment evidence is material if its "omission is of sufficient significance to result in a denial of the defendant's right to a fair trial," *United States v. Agurs*, 427 U.S. 97, 108 (1976), or its suppression undermines confidence in the outcome of the trial. *United States v. Bagley*, 473 U.S. 667, 678 (1985).

A *Brady* violation occurs when: (1) evidence that is material and favorable to the accused, either because it is exculpatory or because it is impeaching; (2) is suppressed by the government, either willfully or inadvertently; and (3) prejudice ensues. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

*Brady* is not violated if the defendant either knows of the exculpatory evidence or could have obtained it through the exercise of due diligence. *See, e.g., United States v. Sipe*, 388 F.3d 471, 478 (5th Cir. 2004); *Fullwood v. Lee*, 290 F.3d 663, 686 (4th Cir. 2002) (the *Brady* rule "does not compel the disclosure of evidence available to the defendant from other sources, including diligent investigation by the defense."); *United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990) (when the exculpatory evidence at issue is "not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the *Brady* doctrine."); *United States v. Diaz*, 922 F.2d 998, 1007 (2d Cir.1990) ("there is no improper suppression within the meaning of *Brady* where the facts are already known by the defendant.").

b.      **Department of Justice Policies**

(i)      **The United States Attorneys' Manual**

The Department's policy on the disclosure of exculpatory and impeachment information is set forth in Section 9-5.001 of the U.S. Attorneys' Manual (USAM), which generally requires prosecutors to produce exculpatory and impeachment information beyond that which is constitutionally and legally required. Section 9-5.001(C) is titled, "Disclosure of exculpatory and impeachment information beyond that which is constitutionally and legally required." That section expressly states that prosecutors must disclose information "beyond what is 'material' to guilt" as articulated under the Supreme Court precedent cited above. Section 9-5.001(C)(1)-(3) reads:

(1)   Additional exculpatory information that must be disclosed. A prosecutor must disclose information that is inconsistent with any element of any crime charged against the defendant or that establishes a recognized affirmative defense, regardless of whether the prosecutor believes such information will make the difference between conviction and acquittal of the defendant for a charged crime.

(2)   Additional impeachment information that must be disclosed. A prosecutor must disclose information that either casts a substantial doubt upon the accuracy of any evidence—including but not limited to witness testimony—the prosecutor

- 64 -

intends to rely on to prove an element of any crime charged, or might have a significant bearing on the admissibility of prosecution evidence. This information must be disclosed regardless of whether it is likely to make the difference between conviction and acquittal of the defendant for a charged crime.

(3) Information. Unlike the requirements of *Brady* and its progeny, which focus on evidence, the disclosure requirement of this section applies to information regardless of whether the information subject to disclosure would itself constitute admissible evidence.

USAM Section 9-5.001(F) summarizes prosecutors' disclosure obligations as follows: "[T]his policy encourages prosecutors to err on the side of disclosure in close questions of materiality and identifies standards that favor greater disclosure in advance of trial through the production of exculpatory information that is inconsistent with any element of any charged crime and impeachment information that casts a substantial doubt upon either the accuracy of any evidence the government intends to rely on to prove an element of any charged crime or that might have a significant bearing on the admissibility of prosecution evidence."

### (ii)   USAO Policies

The USAO Discovery Policy became effective in October 2010. Section I(C) notes that, "The Department of Justice has adopted a policy that requires us to go beyond even the strict requirements of *Brady* and *Giglio* and other relevant case law." Section I(C) then summarizes the requirements of USAM Section 9-5.001. The USAO Discovery Policy notes that a prosecutor's disclosure obligations are also governed by West Virginia RPC 3.8(d), discussed below. The USAO Discovery Policy specifically addresses the disclosure of MOIs: "Generally, we disclose reports of interview to defense counsel, in the exercise of an expansive discovery practice."

### (iii)   The January 2010 Ogden Memorandum

On January 4, 2010, then-Deputy Attorney General David W. Ogden issued a detailed memorandum (the Ogden Memorandum) to all Department prosecutors that set forth rules regarding criminal discovery. The memorandum directs prosecutors to familiarize themselves with the government's disclosure obligations, including the duties set forth in *Brady* and *Giglio* and the Department's policies as set forth in USAM § 9-5.001. The memorandum encourages prosecutors "to provide discovery broader and more comprehensive than the discovery obligations" imposed by *Brady* and *Giglio* and the Federal Rules of Criminal Procedure.

The Ogden Memorandum specifically addresses the disclosure of information obtained during trial preparation meetings with witnesses. The memorandum notes that although such meetings "generally need not be memorialized . . . prosecutors should be particularly attuned to new or inconsistent information disclosed by the witness during a pretrial witness preparation session."[248]

---

[248]   Ogden Memorandum, Step 1, Gathering and Reviewing Discoverable Information, Section B(8)(b).

The Ogden Memorandum requires prosecutors to "ensure that [information the government obtains] is reviewed to identify discoverable information," and to "develop a process for review of pertinent information to ensure that discoverable information is identified."[249]

The Ogden Memorandum specifically addresses the practice of making required disclosures by letter: "If discoverable information is not provided in its original form and is instead provided in a letter to defense counsel, including particular language, where pertinent, *prosecutors should take great care* to ensure that the full scope of pertinent information is provided to the defendant."[250]

### c.    West Virginia Rule of Professional Conduct 3.8(d)

West Virginia RPC 3.8(d) requires that a prosecutor in a criminal case shall "make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense . . . ."  Most states have a rule of professional conduct similar or identical to West Virginia RPC 3.8(d).  There is a split among the courts and disciplinary authorities of those states as to whether the scope of a prosecutor's duties under 3.8(d) is broader than, or co-extensive with, the requirements of *Brady* and its progeny.

Courts and authorities that interpret the scope of 3.8(d) as broader than the requirements of *Brady* include:  *McMullan v. Booker*, 761 F.3d 662, 675 (6th Cir. 2014); *Brooks v. Tennessee*, 626 F.3d 878, 892–93 (6th Cir. 2010); *United States v. Wells*, No. 3:13-CR-00008-RRB, 2013 WL 4851009, at *4 (D. Alaska Sept. 11, 2013); *United States v. Acosta*, 357 F. Supp. 2d 1228, 1232-36 (D. Nev. 2005); *In re Kline*, 113 A.3d 202, 212-16 (D.C. 2015); *In re Feland*, 820 N.W.2d 672, 678 (N.D. 2012); *Schultz v. Commission for Lawyer Discipline*, No. 55649, 2015 WL 9855916 (Texas Bd. Discipl. App. December 17, 2015); State Bar of Arizona Ethics Comm. Op. 94-07 (1994); Association of the Bar of the City of New York Prof'l Ethics Committee, Formal Opinion 2016-3, "Prosecutors' Ethical Obligations to Disclose Information Favorable to the Defense" (July 22, 2016).

Courts and authorities that interpret the scope of 3.8(d) as co-extensive with the requirements of *Brady* include:  *United States v. Weiss*, Criminal Case No. 05-CR-179-B, 2006 WL 1752373, at *5-7 (D. Colo. June 21, 2006); *In re Attorney C*, 47 P.3d 1167, 1170-71 (Colo. 2002);  *In re: Ronald Seastrunk*, No. 2017-B-0178, 2017 WL 4681906 (La. October 18, 2017); *Disciplinary Counsel v. Kellogg-Martin*, 923 N.E.2d 125, 135-39 (Ohio 2010);  *State ex rel. Oklahoma Bar Ass'n v. Ward*,  353 P.3d 509, 520-22 (Okla. 2015);  *In re Riek*, 834 N.W.2d 384, 388-93 (Wis. 2013).

As far as OPR is aware, neither West Virginia courts nor disciplinary authorities have yet addressed the issue of the scope of RPC 3.8(d).  OPR therefore does not know whether that rule imposes a greater disclosure obligation on the *Blankenship* prosecutors than that required by *Brady* and its progeny.

---

[249]    Ogden Memorandum, Step 2, Conducting the Review.

[250]    Ogden Memorandum, Step 3, Making the Disclosures, Section C (emphasis added).

RPC 3.8(d) does not by its express terms address the issue of whether a prosecutor violates its requirements if he acts recklessly, or whether the rule is violated only by intentional acts. OPR is aware of only one authority that appears to have addressed this issue with regard to West Virginia RPC 3.8(d), albeit in *dicta*. In *Lawyer Disciplinary Board v. Hatcher*, 483 S.E.2d 810, 817-18 (W.Va. 1997) (emphasis added), the court noted in passing that a prosecutor "who *knowingly* fails to make a timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, also runs the risk of violating the West Virginia Rules of Professional Conduct, particularly Rule 3.8, concerning the special responsibilities of a prosecutor." *Hatcher* appears to interpret Rule 3.8(d) to mean that prosecutors are subject to discipline under RPC 3.8(d) only if they intentionally fail to disclose evidence that tends to negate the guilt of the accused.

### d.     No Duty to Disclose Entire MOIs

In the *Blankenship* case, the government voluntarily disclosed hundreds of MOIs and did not disclose 61 MOIs. There is no legal requirement that the government disclose to the defense entire MOIs. In fact, Fed. R. Crim. P. 16(a)(2) explicitly exempts reports of law enforcement agents from mandated government pretrial disclosures:

> Information Not Subject to Disclosure. Except as permitted by Rule 16(a)(1)(A)-(D), (F), and (G), this rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case. Nor does this rule authorize the discovery or inspection of statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500.

*See United States v. Fort*, 472 F.3d 1106, 1107 (9th Cir. 2007) ("We hold that the documents in dispute [reports prepared by local law enforcement agents] are not discoverable because they are covered by Federal Rule of Criminal Procedure 16(a)(2) whether prepared by federal, state, or local officials."); *United States v. Holihan*, 236 F. Supp. 2d 255, 263-64 (W.D.N.Y. 2002) ("The FBI 302 reports are internal investigative documents 'made by the attorney for the government or any other government agent investigating or prosecuting the case' and, as such, are excepted from Rule 16 discovery. Fed. R. Crim. P. 16(a)(2). Such information may also qualify as Jencks Act material pursuant to 18 U.S.C. § 3500, and for which the court is without authority to order pretrial disclosure.").

Of course, notwithstanding Rule 16(a)(2), the government must make a timely disclosure of all potential *Brady* and *Giglio* material in an MOI. As the Ogden Memorandum makes clear, that disclosure can be made by means other than the disclosure of the entire MOI, such as by letter.

### 3.     Duty of Candor

#### a.     Prosecutors Have a General Duty of Candor to the Court

A Department attorney has a general duty of candor to the court that emanates from case law and judicial expectations:

> All attorneys, as 'officers of the court,' owe duties of complete candor and primary loyalty to the court before which they practice. An attorney's duty to a client can never outweigh his or her responsibility to see that our system of justice functions smoothly. This concept is as old as common law jurisprudence itself.

*Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1546 (11th Cir. 1993). *See also Berger v. United States,* 295 U.S. 78, 88 (1935) (stating that "The United States Attorney is the representative . . . of a sovereignty . . . whose interest [] in a criminal prosecution is not that it shall win a case, but that justice shall be done."); *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 457-58 (4th Cir. 1993) (noting that lawyers have the "first line task" of ensuring the integrity of the adversary system).

Lack of candor encompasses not just overt false statements but also the selective omission of relevant information. *Ndreko v. Ridge*, 351 F. Supp. 2d 904, 910 (D. Minn. 2004). As one court stated: "Selective omission of . . . relevant . . . information exceeds the bounds of zealous advocacy and is wholly inappropriate." *Montgomery v. City of Chicago*, 763 F. Supp. 301, 307 (N.D. Ill. 1991). Stressing the relationship between candor and the administration of justice, one federal court highlighted the increased obligation of attorneys appearing in federal court:

> Attorneys appearing before a federal court are its officers. As such, they owe a primary duty to the administration of justice. They owe the court and the public duties of good faith and complete candor in dealing with the judiciary. In addition, as officers of the court, they have a duty to protect and preserve the right to a fair trial. To fulfill such requirements, attorneys must ensure that they bring all conditions and circumstances that are relevant in a given case directly before the court.

*In re Dinova*, 212 B.R. 437, 447 (1997).

### b.   West Virginia RPC 3.3(a)(1)

West Virginia RPC 3.3, Candor Toward the Tribunal, reads in part, "(a) A lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." RPC 3.3(a)(1). As defined in the RPC, "'knowingly' . . . denotes actual knowledge of the fact in question. A person's knowledge may be inferred from circumstances." RPC 1.0(f).

By its express terms, RPC 3.3(a)(1) arguably prohibits only false statements, and does not address statements that are factually correct yet misleading. Also, by inclusion of the word "knowingly," RPC 3.3(a)(1) arguably prohibits only intentional false statements, and not false statements made recklessly. As far as OPR is aware, neither West Virginia courts nor disciplinary authorities have yet addressed the issue of the scope of RPC 3.3(a)(1), and whether it prohibits reckless or misleading statements. Other jurisdictions and authorities have interpreted the scope of 3.3(a)(1) to include reckless and misleading statements. *See, e.g.*, *In the Matter of Egbune*, 971 P.2d 1065, 1065 (Colo. 1999) (when considering Rule 3.3(a)(1), recklessness is equivalent to "knowing" for disciplinary purposes); *Office of Disciplinary Counsel v. Wrona*, 908 A.2d 1281, 1289 (Pa. 2006) (an attorney violated Rule 3.3(a)(1) because the attorney made accusations against

- 68 -

the presiding judge "with reckless disregard of the truth or falsity of the accusations."); Annotated Model Rules of Professional Conduct (8th Edition), Rule 3.3, Statements Or Omissions That Mislead ("courts routinely employ Rule 3.3(a)(1) and equivalent rules to discipline lawyers who have misled through their silence . . . Any differences between 'false' and 'misleading' statements are irrelevant for Rule 3.3(a)(1) purposes)" (citations and quotations omitted).

### c.   West Virginia RPC 4.1

West Virginia RPC 4.1, Truthfulness In Statements To Others, reads in part, "In the course of representing a client a lawyer shall not knowingly: (a) make a false statement of material fact or law to a third person; or (b) fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client." Comment 1 to RPC 4.1 reads in part, "A lawyer is required to be truthful when dealing with others on a client's behalf, but generally has no affirmative duty to inform an opposing party of relevant facts . . . Misrepresentations can [] occur by partially true but misleading statements or omissions that are the equivalent of affirmative false statements." OPR notes that the comment to RPC 4.1 expressly discusses misrepresentations, whereas the comments to RPC 3.3 do not, though both rules prohibit false statements.

## VII.   FINDINGS AND ANALYSIS

In the following section, OPR sets forth its findings and analysis regarding the allegations that: (1) the government engaged in misconduct in the manner alleged by Zuckerman in its correspondence with the Department; (2) the prosecution violated its discovery obligations by failing to disclose discoverable statements contained in 61 undisclosed MOIs; (3) the prosecution failed to include all discoverable information made in a proffer session and contained in three MOIs that it summarized in two disclosure letters; and (4) the prosecution made misrepresentations and false statements to the court and Zuckerman regarding its disclosure of MOIs.

### A.   Zuckerman's Initial Allegations Lack Merit

In Zuckerman's initial letter to the Department alleging prosecutorial misconduct, Zuckerman complained that the government had engaged in a pattern of misconduct. OPR finds that those claims lack merit.

Perhaps most important, OPR found that the prosecution team's conduct was inconsistent with Zuckerman's portrayal of it as intentionally suppressing a wide variety of evidence and information in order to prevent the defense from having access to such material. Perhaps the best example of that inconsistency is Ruby's direction to MSHA soon after the indictment was filed to conduct a thorough search for exculpatory documents. In response to Ruby's direction, Department of Labor attorneys and other personnel spent a significant amount of time searching MSHA e-mails and documents for discoverable evidence. While it is true that few e-mails were disclosed as a result of that time-consuming search, if Ruby had acted consistently with Zuckerman's portrayal of him, he would not have asked MSHA to conduct that search.[251] Ruby

---

[251]   As noted, Ruby initiated a search of MSHA e-mails for exculpatory material, and Goodwin provided DOL attorneys conducting the search with examples of potentially exculpatory topics. Ruby directed ████ to review the

- 69 -

was responsible for two additional searches of documents for exculpatory evidence in June and September 2015, and directed the government's initial discovery production, which disclosed to the defense four million pages of documents in an electronically searchable format.

### 1.     The Government Did Not Misrepresent the Facts Concerning Blankenship's Attendance at Budget Meetings

OPR finds Zuckerman's contention that the government presented false information to the court and jury by arguing that Blankenship attended Massey budget and planning meetings to be without merit. Neither the indictment nor the evidence the government presented at trial asserted that Blankenship attended every budget meeting. Indeed, as Zuckerman alleged, and as the evidence Ruby provided to OPR showed, Blankenship did not attend every budget meeting. But that fact is irrelevant. As alleged in the indictment and argued at trial, the government contended that Blankenship made budget and planning *decisions* that placed profit over safety. It is irrelevant where those decisions were made – in a budget meeting or elsewhere. What is important is who made them, and the government presented evidence that Blankenship made such decisions. OPR finds Zuckerman's allegation to be without merit.

### 2.     The Government Did Not Withhold MSHA Inspector E-Mails

Zuckerman alleged that the government disclosed only two e-mails between MSHA inspectors regarding UBB conditions, and inferred that the government must have been intentionally withholding other exculpatory e-mails. Ruby provided OPR with numerous e-mails to and from MSHA inspectors who had inspected the UBB mine, which showed that Zuckerman's inference was incorrect. Moreover, even if it were the case that the government disclosed fewer MSHA inspector e-mails than one would expect, when Zuckerman raised this issue with the court, Department of Labor attorneys cited an MSHA policy that discouraged MSHA inspectors from documenting inspection findings in documents other than the official forms used for such purposes. The court rejected the defense's argument that the government had failed to disclose all exculpatory MSHA inspector e-mails. OPR finds Zuckerman's allegation to be without merit.

### 3.     The Government Appropriately Relied on UBB Miners to Testify About UBB Conditions

Zuckerman alleged that the government did not use MSHA inspectors as trial witnesses because it was trying to hide exculpatory or damaging testimony. Other than noting that MSHA inspectors did not testify, Zuckerman offered no evidence to support its claim. Ruby plausibly explained that the government did not call MSHA inspectors at trial because the trial team was concerned that a West Virginia jury might unfavorably view the testimony of federal government

---

MSHA e-mails identified by DOL attorneys as potentially exculpatory and to select those that might be discoverable. OPR finds that these facts support a conclusion that Ruby and Goodwin did not intentionally withhold exculpatory material. However, prior to trial the government disclosed very few of the e-mails the DOL attorneys had identified, and the USAO disclosed 48 additional MSHA e-mails in 2017. Given these facts it is possible that notwithstanding Ruby's and Goodwin's laudatory intent when initiating the search of MSHA e-mails, they failed to conduct a sufficient review of the e-mails identified by the search. For the reasons stated above, OPR did not attempt to resolve that issue. As the defense has raised the issue of the late disclosure of the 48 MSHA e-mails in its Section 2255 motion, the government and the court will have an opportunity to address that issue.

employees, and because the government could use coal miners to elicit the same facts about UBB conditions. Several trial team members agreed with Ruby's explanation. OPR found Zuckerman's allegation to be without merit.

### 4. The Court Found No Merit to the Claim that an MSHA Employee Destroyed MSHA Documents Shortly After the UBB Explosion

Zuckerman alleged that the government failed to investigate an allegation that shortly after the UBB explosion an MSHA employee destroyed documents related to UBB. Zuckerman raised this issue with the court, which questioned one of the two persons who had made the allegation. The court rejected the allegation, finding it rife with hearsay. Zuckerman presented no additional information to OPR. Ruby told OPR that the government had not learned of the allegation until Zuckerman raised it mid-trial. As the court examined and rejected this claim, and because Zuckerman presented OPR with no new evidence, OPR finds the claim to be without merit.[252]

### 5. The Government Did Not Withhold Exculpatory Statements Made by ████████████

Zuckerman alleged that during cross-examination, Witness #4 made exculpatory statements; that Witness #4 testified that ██ made those statements to the government prior to trial; and that the government did not disclose those statements during discovery. Zuckerman told OPR that other than Witness #4 testimony, it had no other evidence to support its contention that the government intentionally withheld exculpatory statements allegedly made by Witness #4 None of the five undisclosed Witness #4 MOIs, nor the handwritten notes of the agents who wrote those MOIs, contained the exculpatory statements that Witness #4 made during cross-examination. Ruby told OPR that the government was surprised by Witness #4 testimony on cross-examination. OPR found no evidence to support Zuckerman's allegation that the government knew about and intentionally withheld the exculpatory statements Witness #4 made during cross-examination.

### 6. The Government Did Not Intentionally Withhold Two Discoverable Documents

Zuckerman alleged that the government withheld two exculpatory documents:  a letter in which an MSHA official "applaud[ed]" a Massey initiative to reduce safety violations, and a chart

---

[252]     As discussed above, in November 2017, the USAO disclosed 48 MSHA e-mails to the defense. In one of those e-mails, dated December 4, 2011, an MSHA employee wrote to another MSHA employee the following: "How many miners worked their entire career at UBB?  We had a shredding party here in Beckley and the charts you printed for everyone were modified so that they can't be read."  Blankenship's attorneys discuss this e-mail in their Section 2255 motion, and assert that it supports their contention that MSHA intentionally destroyed documents. The content of the December 4, 2011 e-mail is unrelated to Zuckerman's contention during trial that an MSHA employee destroyed MSHA documents shortly after the UBB explosion.  The MSHA employees named in the two alleged incidents are different, and the document destruction referenced in Zuckerman's original allegation occurred more than a year prior to the December 2011 e-mail.  The December 4, 2011 e-mail therefore does not provide any new support for the allegation that an MSHA employee destroyed documents shortly after the UBB explosion. OPR did not reopen its investigation to determine whether the government was required to disclose the December 4, 2011 e-mail before trial because OPR's investigation was substantially complete at the time it first learned of the e-mail and because Blankenship's Section 2255 motion raised the issue of the late disclosure of that e-mail, and the motion is pending before the court.

- 71 -

showing, *inter alia*, the results of a UBB inspection by an MSHA inspector who was complimentary of UBB conditions.

OPR found no evidence that the prosecution team possessed the "applaud" letter prior to the time when Zuckerman attached it to one of its discovery motions in September 2015. The "applaud" letter was sent by an MSHA official to Witness #10 When Witness #10 attorneys met with Ruby and AUSA #2 in August 2014, they discussed the contents of the letter, but AUSA #2 notes of the meeting and contemporaneous e-mails make clear that for unknown reasons, Witness #10 attorneys did not give the government a copy of the letter. Ruby subsequently disclosed by letter some of what Witness #10 attorneys told Ruby and AUSA #2 though as noted below, OPR found that Ruby's summary failed to disclose all of the discoverable statements contained in AUSA #2 notes taken during the meeting. Although Zuckerman's allegation that the government intentionally did not disclose the "applaud" letter was incorrect, OPR found that Ruby should have made further disclosures about what Witness #10 attorneys told him in August 2014.

The prosecution team did not possess the chart containing the exculpatory entry made by an MSHA inspector. Ruby explained that because the chart contained information about mines other than UBB, it was not included within the scope of documents the team had requested. Ruby correctly noted, however, that the team had disclosed the handwritten notes taken by the MSHA inspector, and that those notes contained many of the exculpatory statements found in the chart entry. OPR finds that although the government did not intentionally withhold the chart with the notation about the UBB inspection, it would have been better if the government had obtained and disclosed all relevant documents, regardless of whether they related solely to UBB. In any event, the disclosure of the handwritten notes greatly reduced or eliminated any prejudice resulting from the failure to disclose the chart.

## B. The Failure to Disclose Discoverable Statements Contained in MOIs

### 1. The Failure to Disclose 11 Pre-Indictment MOIs Was Not Intended to Suppress Exculpatory Statements

The government disclosed to the defense 372 pre-indictment MOIs, but failed to disclose 11 pre-indictment MOIs. OPR finds that Ruby alone was responsible for the failure to disclose the 11 MOIs. However, Ruby's failure to disclose them was not intended to withhold exculpatory material from the defense.

#### a. Ruby Alone Was Responsible For the Failure to Disclose 11 Pre-Indictment MOIs

Ruby and the prosecution team's legal assistants were responsible for the technical aspects of the government's discovery disclosures, whether by letter, e-mail, overnight delivery, or other means of providing information. OPR found no evidence that Goodwin, AUSA #1 AUSA #2 DOL SA #1 or FBI SA #1 transmitted to the defense any discovery disclosures. Ruby, or a legal assistant acting at Ruby's direction, sent the defense all of the MOIs disclosed by the government. Therefore, no one on the prosecution team, other than Ruby and the legal assistants, had actual knowledge of what MOIs were disclosed or not disclosed, and any knowledge they had regarding that issue came from Ruby, the legal assistants, or through a review of the government's discovery productions.

- 72 -

Ruby told OPR that he and Goodwin decided to disclose all pre-indictment MOIs. Although he could have assigned the task to others, Ruby decided to make all of the government's discovery disclosures himself, aided by the legal assistants, who faithfully followed Ruby's directions. All of the 11 undisclosed pre-indictment MOIs were sent to Ruby or a legal assistant after they were drafted. None were sent to any other attorney on the prosecution team. Therefore, no attorney other than Ruby knew that the law enforcement agents on the prosecution team had sent the USAO 11 MOIs for pre-indictment interviews several months after the November 2014 indictment, and after the government's December 2014 initial discovery disclosures to the defense. OPR found that AUSA #1 AUSA #2 DOJ SA #1 and FBI SA #1 were credible witnesses, and found no evidence to contradict their assertions that they believed all MOIs had been disclosed.

Based on the foregoing facts, OPR finds that Ruby is solely responsible for the failure to disclose the discoverable statements contained in the 11 pre-indictment MOIs identified in the chart attached at Tab H to this report.

### b. Ruby's Failure to Disclose Discoverable Statements In 11 Pre-Indictment MOIs Was Not Intended to Withhold Exculpatory Material from the Defense

Ruby asserted that his failure to disclose 11 pre-indictment MOIs was not intended to withhold exculpatory statements from the defense. Although there is some evidence that contradicts Ruby's assertion,[253] OPR finds that preponderant evidence supports Ruby's contention that his failure to disclose discoverable statements contained in the 11 pre-indictment MOIs was a result of Ruby's mistaken belief that those 11 MOIs were post-, not pre-, indictment MOIs.

There are several sources of evidence that support Ruby's contention that his failure to disclose the 11 pre-indictment MOIs was unintentional. First, there appears to be no logical reason why Ruby would have disclosed 372 pre-indictment MOIs, but not the 11 MOIs identified in the chart attached at Tab H. If the 11 undisclosed MOIs contained discoverable statements that were obviously more exculpatory than the discoverable statements contained in the hundreds of disclosed MOIs, one might then draw a reasonable inference that Ruby intentionally treated those 11 MOIs differently. But OPR found no difference in the exculpatory value of the discoverable statements contained in the disclosed and undisclosed pre-indictment MOIs. *Compare* Section III(D)(4) above (discoverable statements in 11 undisclosed pre-indictment MOIs) with Section III(I)(2) above (discoverable statements in ten disclosed pre-indictment MOIs that Ruby identified for the defense as containing potentially exculpatory statements). It is counterintuitive to suggest that Ruby intentionally disclosed hundreds of MOIs, and also intentionally withheld 11 MOIs, even though the exculpatory value of the discoverable statements contained in those 11 MOIs was no different than the exculpatory value of the discoverable statements contained in the MOIs that were disclosed.[254]

---

[253]   For example, the fact that Ruby received e-mails that clearly showed the dates of the pre-indictment MOIs, makes it more difficult to accept his explanation that he believed all MOIs he received after the indictment reflected post-indictment interviews.

[254]   Indeed, in a pleading filed in July 2015, the defense acknowledged that "many" of the 350 MOIs disclosed by the government contained "exculpatory information." Motion to Compel Compliance with *Brady* Order at 4.

Second, the only difference that OPR observed between the disclosed and undisclosed pre-indictment MOIs was that the 11 pre-indictment MOIs that were not disclosed were not provided to the USAO until after the November 2014 indictment, and in some cases many months after the indictment. That fact supports Ruby's contention that he thought that all MOIs the USAO received after November 2014 contained statements made during post-indictment interviews, which he and Goodwin had decided not to disclose.

Third, Ruby's responses to OPR's questions suggest that he believed that all pre-indictment MOIs had been disclosed. During its investigation, OPR told Ruby that it might show Zuckerman all of the material that Ruby provided to OPR, in order to obtain Zuckerman's response to Ruby's contentions. Thereafter, Ruby provided OPR with two of the 11 undisclosed pre-indictment MOIs (pertaining to Witness #4 and Witness #6, *see* chart attached at Tab H). If Ruby had intentionally withheld the Witness #4 and Witness #6 MOIs, it would make no sense for him to then provide them to OPR, knowing that OPR intended to show them to Zuckerman, which would immediately claim a discovery violation (which is exactly what happened with the Witness #4 MOI).

Fourth, many of the discoverable statements contained in the 11 undisclosed pre-indictment MOIs were available to the defense from other sources, including the hundreds of disclosed MOIs. It makes little sense to intentionally withhold statements that the defense already possessed.

OPR finds that preponderant evidence supports a finding that Ruby's failure to disclose 11 pre-indictment MOIs was not the result of an intentional decision to withhold exculpatory evidence.

## 2.   The Decision Not to Disclose 50 Post-Indictment MOIs Was Not Intended to Suppress Exculpatory Statements

The government did not disclose 50 post-indictment MOIs. OPR finds that the failure to disclose those 50 MOIs was intentional, and that Ruby and Goodwin were responsible for that decision. Although the decision to not disclose 50 post-indictment MOIs was intentional, OPR finds that neither Ruby nor Goodwin made that decision with the intent to withhold exculpatory evidence from the defense.

### a.   Ruby and Goodwin Made the Decision Not to Disclose Post-Indictment MOIs

According to Ruby, he and Goodwin decided not to disclose to the defense post-indictment MOIs; they decided instead that they would make any required disclosures of potentially exculpatory statements contained in those MOIs by letter. Ruby also stated that all of the prosecution team members knew and approved of that decision. AUSA #1, AUSA #2, DOL SA #1 and FBI SA #1 however, all denied that they knew about and approved of the decision to disclose discoverable statements in post-indictment MOIs by letter, and to withhold the remainder of the MOIs. To the contrary, all told OPR that they thought all MOIs, including those memorializing post-indictment interviews, were disclosed to the defense.

OPR found no documentary evidence, including contemporaneous e-mails, to support Ruby's contention that others knew about his and Goodwin's plan for how they would handle their disclosure obligations pertaining to the potentially exculpatory statements contained in post-indictment MOIs. OPR found Witness #1 AUSA #2 DOL SA #1 and FBI SA #1 to be credible witnesses. OPR told AUSA #1 AUSA #2 DOL SA #1 and FBI SA #1 that they were not subjects of OPR's investigation. They therefore did not face disciplinary consequences as a result of their conduct, and had no incentive to mislead OPR regarding their knowledge of the disclosure of MOIs. Because AUSA #1 AUSA #2 DOL SA #1 and FBI SA #1 were credible, had no reason to provide OPR with inaccurate information, and because OPR found no documentary evidence inconsistent with their assertions, OPR finds that the preponderant evidence supports their contention that they believed that all MOIs, whether pre- or post-indictment, were disclosed to the defense.

The issue of whether Goodwin, as Ruby insists, knew and approved of the decision not to disclose post-indictment MOIs is more complicated. In a short written statement that did not address the majority of OPR's written questions to him, Goodwin told OPR that he instructed Ruby to make full disclosures, and that it would be frustrating to learn that some MOIs were not disclosed. When OPR asked Goodwin for an interview, OPR informed him that because he both supervised and participated in the *Blankenship* prosecution, OPR considered him to be a subject of OPR's investigation. Goodwin declined OPR's request for an interview. After OPR interviewed Ruby, OPR again asked Goodwin for an interview, and informed him that it had received information inconsistent with Goodwin's professed frustration at learning that some MOIs had not been disclosed, and that OPR had concerns that the government had filed three pleadings that might have contained misleading information about the disclosure of MOIs. Goodwin did not respond to OPR's second interview request. In Goodwin's response to OPR's draft report, which sets forth in detail Ruby's claim that it was Goodwin who made the decision not to disclose post-indictment MOIs, Goodwin did not clearly agree with or refute that claim. Goodwin merely stated that, "I apparently do not recall matters in the exact way [Ruby] does."[255]

OPR found Ruby to be credible. He acknowledged that he made mistakes regarding the process he followed in determining which post-indictment MOIs to disclose, and the process he followed to decide what information to put in his summary disclosure letters. Ruby provided OPR with specific details regarding Goodwin's role in making the decision not to disclose post-indictment MOIs, and regarding Goodwin's review and approval of the September 21, 2015 letter disclosure. Ruby's specific recollection is largely unrebutted because of Goodwin's decision not to answer most of OPR's written questions, and refusal to be interviewed. Although Goodwin stated that he was "frustrated" if MOIs were not disclosed, that general denial is not sufficient to overcome the evidentiary weight of Ruby's specific recollection.

OPR acknowledges that it is treating Goodwin differently than it is treating AUSA #1 AUSA #2 DOL SA #1 and FBI SA #1 All five deny that they knew that MOIs were not disclosed, and there is no documentary evidence to contradict those denials. All five would therefore seem to be similarly situated and deserving of the same treatment by OPR. There are, however, significant differences among the five that led OPR to conclude that Goodwin – unlike AUSA #1 AUSA #2 DOL SA #1 and

---

255     April 19, 2018 Goodwin letter to OPR at 3.

FBI SA #1 – knew about the decision to withhold post-indictment MOIs and to make any required discovery disclosures by letter.

First, Goodwin was the United States Attorney, and he had supervisory authority over Ruby. It is difficult to believe that Ruby, a relatively inexperienced prosecutor, would make a decision to stop disclosing MOIs in such a high-profile case without consulting with Goodwin.[256] In contrast, the evidence shows that Ruby made most discovery decisions without consulting AUSA #1 AUSA #2 DOL SA #1 or FBI SA #1

Second, the facts show that the *Blankenship* case was of the utmost importance to Goodwin, who was deeply involved in the government's investigative and pretrial work, attended every day of trial, examined several of the government's witnesses at trial, and delivered the government's closing argument. OPR found Ruby's assertion credible that because of the importance of the *Blankenship* prosecution, Goodwin was involved in every major prosecution decision, including the decision not to disclose certain MOIs.[257] Ruby also plausibly explained that Goodwin became irritated at Zuckerman's aggressive defense strategy, and responded to it by reducing the government's discovery disclosures to the required minimum; as stated previously, this explanation was emphatically denied by Goodwin himself.

Third, because AUSA #1 AUSA #2 DOL SA #1 and FBI SA #1 agreed to OPR's request to be interviewed, OPR was able to ask them specific questions about Ruby's contention that the prosecution team was aware and approved of the decision not to disclose post-indictment MOIs and to make required disclosures by letter. Goodwin's refusal to be interviewed prevented OPR from asking him similar questions.

Fourth, in both civil and administrative disciplinary proceedings, courts and disciplinary authorities may draw an adverse inference when a witness refuses to testify after probative evidence has been offered against them. *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them."); *Book v. U.S. Postal Service*, 675 F.2d 158, 160 fn.4 (8th Cir. 1982) (in affirming a Merit Systems Protection Board order of dismissal from the federal service, the court stated, "Although the silence of Book may be considered and thereby produce an adverse inference, the disciplinary action, whatever it may be, may not be based exclusively on the employee's failure to testify but it must be demonstrated by independent evidence that it is warranted."). Here, OPR told Goodwin that OPR had evidence that was inconsistent with his initial statement that he was frustrated if MOIs were not disclosed. The evidence to which OPR referred was Ruby's testimony that Goodwin knew and approved of the decision not to disclose post-indictment MOIs, and Goodwin's approval of the letters sent to the defense that summarized several MOIs. Goodwin chose to remain silent despite being informed that OPR had obtained evidence inconsistent with his initial assertions.

---

[256]   Ruby said that if Goodwin had not decided to stop disclosing post-indictment MOIs, he probably would have continued the practice of disclosing all MOIs. Ruby Interview at 192.

[257]   Indeed, Goodwin participated in many of the witness interviews for which MOIs were not disclosed. Goodwin attended four of Witness #4 interviews; two of [redacted] interviews; and the interviews of Witness #3 Witness #2 Witness #5 Witness #18 and Witness #19 among others.

After OPR provided Goodwin with OPR's draft report, which contained a detailed account of Ruby's claim that it was Goodwin who decided not to disclose post-indictment MOIs, Goodwin did not provide OPR with specific information about that decision, noting only that he and Ruby did not recall matters in exactly the same way.

OPR may therefore, under the case law cited above, draw an adverse inference from Goodwin's silence.  Accordingly, given Goodwin's refusal to provide any information, explanation, or contrary evidence even after being informed there was probative evidence against him, OPR can rely on the uncontroverted evidence before it and infer that Goodwin was aware and approved of the decision not to disclose post-indictment MOIs, and also of the letters summarizing discoverable statements contained in several MOIs.

In sum, under the circumstances discussed above, it is appropriate for OPR to treat Goodwin differently from the other trial team members.

Although OPR finds that Ruby and Goodwin intentionally did not disclose 50 post-indictment MOIs, OPR does not find that Ruby's and Goodwin's decision was made with the intent to withhold exculpatory evidence from the defense.  The primary bases for this conclusion are the facts that:  (a) Ruby made a letter disclosure of some of the discoverable statements contained in the ████ and ████ post-indictment MOIs; (b) Ruby disclosed the entire ████ post-indictment MOI; (c) Ruby made no effort to conceal the existence of the post-indictment MOIs (the ████ MOI had Bates-stamp numbers of 1534-1540, and the next highest Bates-stamped MOI that was disclosed was numbered 1356-1361); (d) it would make little sense to intentionally withhold information contained in MOIs when, as the trial team credibly asserted, that information was available to the defense from other sources; (e) it would make little sense to withhold information contained in MOIs when the government knew that the defense was talking with at least some of the witnesses whose MOIs were not disclosed;[258] and (f) the defense acknowledged that the government disclosed exculpatory material in both disclosed MOIs and documents; there is no logical reason why Ruby and Goodwin would authorize the disclosure of some exculpatory material, but intentionally withhold other exculpatory material of the same nature as that previously disclosed.

### b.      The Government Had No Duty to Disclose Entire MOIs

The fact that Ruby and Goodwin intentionally did not disclose 50 MOIs does not by itself demonstrate that any specific discovery obligation was thereby violated.  Fed. R. Crim. P. 16(a)(2) explicitly exempts law enforcement agents' reports from Rule 16's mandatory disclosure requirements.  Although the USAO discovery policy for the Southern District of West Virginia provides that the usual practice in that office is to disclose MOIs, that practice is not mandatory.  The analysis of a claim that the government violated its discovery obligations because it failed to disclose entire MOIs would therefore be straightforward, except for the fact that the government did in fact disclose in their entirety 372 MOIs.  Given those prior disclosures, absent some reason to believe otherwise, it would be reasonable for the defense to conclude that the government was

---

[258]      Many of the undisclosed MOIs memorialized interviews with high-ranking Massey employees.  It is likely that Blankenship and his attorneys had ready access to those witnesses.

disclosing all MOIs in their entirety. OPR's analysis of the issue of whether Ruby and Goodwin misled Zuckerman and the court is discussed in Section VII(D) below.

### 3.    Some of the Undisclosed MOIs Contained Discoverable Statements

Although the government did not have a duty to disclose MOIs in their entirety, the Constitution, Department policy, and the West Virginia RPC impose a duty on the government to disclose certain types of material. Specifically, the government is required to disclose evidence or information (as distinct from admissible evidence) that: is favorable to the accused and that is material either to guilt or punishment; is inconsistent with any element of any crime charged against the defendant or that establishes a recognized affirmative defense; casts substantial doubt upon the accuracy of any evidence – including but not limited to witness testimony – the prosecutor intends to rely on to prove an element of any crime charged; and that tends to negate the guilt of the accused or mitigates the offense.

#### a.    Statements Inconsistent with the Government's Factual Basis for Alleging Criminal Conduct

Some of the undisclosed MOIs contained statements that were inconsistent with the government's factual basis for alleging criminal conduct as set forth in the indictment (*see* Section I(D)(2)(a)-(g), above). A sample of such statements follows.

Part of the government's factual basis for alleging criminal conduct as set forth in the indictment was that UBB conditions were unsafe and caused the explosion, and at least by implication that MSHA citations were accurate, reliable, unbiased, and evidenced unsafe UBB conditions. There were a variety of statements in undisclosed MOIs that were inconsistent with that factual basis, such as those suggesting that UBB was run safely; MSHA violations were subjective; MSHA was biased against Massey; MSHA violation citations were inevitable and unrelated to safety; and that MSHA decisions made UBB unsafe. Several examples of such statements contained in undisclosed MOIs follow.

Witness #14 ██████████████, stated that when a certain fan was running, UBB had good ventilation. Witness #8 ██████████████, said that it was not possible to have zero MSHA violations. Witness #12 ██████████████, said that MSHA violations were subjective. Witness #1 ██████████████, said that UBB was a well-run mine. Witness #17 ██████████████, said that MSHA wrote violations for Massey mines that it did not write for other mines and that the violations per inspection rate for Massey were not as bad as for other mines. Witness #4 ██████████████ said that MSHA decisions endangered miner health and safety. Witness #13 ██████████████, said that UBB was going to fail because of MSHA ventilation requirements that UBB was required to use. Witness #19 ██████████████, said that UBB was one of the better mines.

Part of the government's factual basis for alleging criminal conduct as set forth in the indictment was that Blankenship cared more about profit than about safety, and that Blankenship disregarded safety violations when communicating with employees. There were statements

contained in undisclosed MOIs that were inconsistent with that part of the indictment.  Several examples follow.

███ said that if Blankenship had not been involved, the number of Massey safety initiatives would have been half of what it was.  He maintained that Massey put pressure on employees and held them accountable, and that there never discussions indicating that safety violations were acceptable.  ███ said that ███ feared being disciplined over compliance issues.

Witness #6 ███████████, said that when Blankenship made notations on citation reports, it meant that ███ was not happy with the violations and that ███ wanted a corrective action plan.  Witness #6 said ███ started the Hazard Elimination Program to cut violations by 50%.  Witness #16 ██████████████, said that Massey's primary focus was safety, that Blankenship pushed safety more than any other CEO, and that people were fired because of safety violations.  Witness #17 said that ███ did not believe that Massey had the attitude that safety violations were acceptable.

Witness #4 said that several UBB managers did all they could to focus on safety.  ████ said that Blankenship told ████ that Massey needed to reduce violations and that ███ talked about a commitment to safety.  Witness #3 ███████████, said that Blankenship told ████ to reprogram the computer system so that it could determine who was responsible for violations and to identify repeat offenders.  Witness #15 ██████████, said that accidents were discussed in the context of best practices and how to prevent them from recurring.

Part of the government's factual basis for alleging criminal conduct as set forth in the indictment was that Blankenship compromised worker safety by failing to hire a sufficient number of employees to accomplish jobs necessary for adequate safety.  There was at least one statement in an undisclosed MOI that was inconsistent with that portion of the indictment.  ███ stated that it was worker inexperience, not manpower shortages, that led to safety violations.

Part of the government's factual basis for alleging criminal conduct as set forth in the indictment was that members of the conspiracy falsified respirable dust samples.  There were statements in undisclosed MOIs that were inconsistent with that portion of the indictment.  For example, Witness #17 said that there was a big push to conduct accurate respirable dust sampling.  Witness #4 said that ███ was surprised that dust fraud was occurring as Massey did not want cheating on dust sampling.

Part of the government's factual basis for alleging criminal conduct as set forth in the indictment was that Blankenship used employee compensation to send the message that profit was more important than safety.  There were statements in undisclosed MOIs that were inconsistent with that portion of the indictment.  For example, Witness #8 stated that ███ suspected that compensation was tied to safety.

Part of the government's factual basis for alleging criminal conduct as set forth in the indictment was that Blankenship set coal production quotas so high as to preclude workers from performing necessary safety tasks.  There were statements in undisclosed MOIs that were inconsistent with that portion of the indictment.  For example, Witness #4 said that Blankenship instructed that production figures should not be too aggressive.  Witness #1 said that in 2009, no one

wanted to buy coal. That statement is arguably inconsistent with the indictment, for if demand for coal was low, then there would be little pressure to increase coal production if the mined coal could not be sold.

Part of the government's factual basis for alleging criminal conduct as set forth in the indictment was that UBB miners unlawfully received advance notice that MSHA inspectors were on their way to conduct inspections. There were statements in undisclosed MOIs that were inconsistent with that portion of the indictment. For example, Witness #14 stated that the prohibition against advance notice was not an enforced rule.

###### b. Statements Casting Doubt On Witness #4 Testimony

Many MOIs contained statements critical of Witness #4, arguably one of the government's most important witnesses. There were so many such statements that after Ruby asked Paralegal #1 to identify negative statements made about Witness #4 in MOIs, she prepared a 59- page chart. Some of the statements in Paralegal #1 chart came from ten undisclosed MOIs. For example, Witness #14 stated that Witness #4 ignored Witness #14 question about whether a particular action was legal, and ordered Witness #14 to do it.

###### c. Ruby Disclosed 11 MOIs as Possible *Brady* Material, But Failed to Disclose 61 Others Containing the Same or Similar Statements

Prior to trial, Ruby told the defense that the government had identified 11 MOIs that the defense might conclude contained potential *Brady* material, including the Witness #2 MOI and the ten MOIs Ruby identified in June 2015 as part of a larger disclosure letter. OPR agrees with Ruby that the 11 MOIs he identified for the defense contained discoverable statements. *See* Sections III(E)(3) and III(I)(2) above (the Witness #2 MOI and the ten MOIs, respectively). OPR also found that some of the 61 undisclosed MOIs contained discoverable statements. *See* Sections III(D)(4) and III(E)(6) above (discoverable statements in the 11 pre-indictment MOIs and 50 post-indictment MOIs, respectively). After comparing the discoverable statements contained in the 11 MOIs Ruby identified for the defense and the discoverable statements in some of the 61 undisclosed MOIs, OPR found that there were no significant differences between the discoverable statements in those two sets of MOIs. This finding supports OPR's conclusion that the discoverable statements in the 61 undisclosed MOIs should have been disclosed, and also supports the prosecution team's contention that the defense was not prejudiced by the failure to disclose those statements, because they were available to the defense from other materials in its possession.

OPR provides below examples of similar discoverable statements contained in both the 11 MOIs Ruby identified for the defense as containing potential *Brady* material, and in some of the undisclosed 61 MOIs.

Witness #2, said that MSHA was harder on Massey than other companies; Witness #17 similarly had stated that MSHA wrote violations for Massey that it did not write for others. Witness #2 said MSHA violations are opinions; Witness #12 similarly had stated that MSHA violations were subjective. Witness #2 said that rock dusting was always good; Witness #11 similarly had stated that when inspected UBB found

the rock dusting to be good. [Witness #2] said that MSHA decisions caused a decrease in airflow ventilation; [Witness #] similarly had stated that UBB was going to fail because of MSHA ventilation decisions.

[Witness #19] said that [Witness #4] once advised him to operate UBB in such a way as to violate the law; [Witness #1] said essentially the same thing in an undisclosed MOI. [Witness #26] ▆▆▆▆▆▆▆▆▆, said that Massey management did not tolerate violations; [Witness #8] similarly had stated that Massey put pressure on people and held them accountable. [Witness #24] ▆▆▆▆▆▆▆▆, said that a certain statistical measure of safety was the only thing that figured into executive compensation; [Witness #8] similarly had stated that [▆▆] suspected that compensation was tied to safety. [Witness #2] said that safety was always discussed at Massey; [Witness #15] similarly had stated that accidents were discussed in the context of best practices and how to prevent them from recurring. [Witness #6] said that [▆▆] was sure that MSHA knew that miners received advance notice of inspections; [Witness #14] similarly had stated that the prohibition against advance notice was not an enforced rule.

### 4.  The Failure to Disclose Discoverable Statements Violated Department Policy

As shown above, statements in some of the 61 undisclosed MOIs contained evidence or information that was inconsistent with the government's factual basis for alleging criminal conduct as set forth in the indictment. These statements were therefore required to be disclosed by USAM Section 9-5.001(C)(1)-(3) and by the USAO discovery policy. The failure to do so violated those policies.

OPR's conclusion is consistent with the actions of the USAO and the opinions of most of the prosecution team. The USAO learned in 2017 that the government had not disclosed 61 MOIs, and shortly thereafter appropriately disclosed all of those MOIs to the defense.[259] In addition, when OPR asked members of the prosecution team whether certain statements contained in the undisclosed MOIs would have been helpful to the defense, there was general agreement that most of the statements identified by OPR would have been helpful.

The Ogden Memorandum requires prosecutors to "develop a process for review of pertinent information to ensure that discoverable information is identified." The "process" that Ruby and Goodwin followed when determining which statements in post-indictment MOIs to disclose was to try to recall from memory what had been said during the interviews they attended. Neither Ruby nor Goodwin actually reviewed post-indictment MOIs before making disclosure decisions. Ruby acknowledged that relying on his memory was not an ideal way to handle his disclosure obligations. OPR finds that not only was that process not ideal, but that it violated the Ogden Memorandum requirements, because relying on one's memory of numerous interviews cannot ensure that all discoverable information is disclosed. The process by which Ruby and

---

[259]     The USAO told the defense that the production was not an admission that the 61 MOIs were required to be disclosed prior to trial or that the defense was prejudiced by the government's failure to disclose them.

Goodwin made disclosure decisions regarding statements contained in post-indictment MOIs therefore violated Department policy.[260]

### 5.  Ruby and Goodwin Committed Professional Misconduct by Recklessly Violating Their Duty to Disclose Discoverable Evidence

Ruby was responsible for the government's failure to disclose discoverable statements contained in 11 pre-indictment MOIs.  Ruby and Goodwin shared responsibility for the government's failure to disclose discoverable statements contained in 50 post-indictment MOIs.  Both therefore violated the Department's discovery policies.  OPR found that neither Ruby nor Goodwin intentionally violated the Department's discovery policies for the purpose of withholding discoverable evidence from the defense.  OPR found that Ruby's and Goodwin's violation of the Department's discovery policies was the result of their reckless conduct, and therefore constituted professional misconduct.[261]

Ruby stated that while he intended to disclose all pre-indictment MOIs, he mistakenly failed to disclose 11 such MOIs.  That mistake was a result of Ruby's reckless conduct.  Ruby received e-mails and attachments that clearly showed that he was receiving for the first time pre-indictment MOIs, albeit after the November 2014 indictment had been returned and the December 2014 initial discovery disclosures had been made.  Moreover, Ruby said that he "probably" reviewed the Witness #8 MOI before summarizing it.  OPR ultimately credited Ruby's contention that he failed to notice the dates of those 11 MOIs when he received them, and that he did not notice the date of the Witness #8 MOI.  Those failures, however, were the result of Ruby's reckless disregard of information that would have alerted him to the fact that numerous pre-indictment MOIs had not been disclosed.  Ruby's failure to notice the dates of the 11

---

[260]  In his April 19, 2018 response to OPR's draft report, Goodwin asserted that OPR's conclusion that it was reckless not to have a system for reviewing potentially discoverable material in MOIs was erroneous, because that review happened in "real time" during witness interviews.  OPR finds Goodwin's argument unpersuasive, and disagrees with his assertion that reviews happened in "real time."  The government's post-indictment interviews occurred throughout the winter, spring, and summer of 2015.  Ruby sent one letter in September 2015 disclosing discoverable statements in three MOIs.  Ruby's "review" of post-indictment interviews to decide what to disclose occurred in September 2015, not in "real time."

[261]  In his May 7, 2018 response to OPR's draft report, Ruby asserted that OPR's conclusion that he had recklessly violated the Department's disclosure policies was erroneous.  Ruby argued that none of the statements in the 61 undisclosed MOIs would have been helpful to the defense, and that the defense clearly agreed with that assessment, because although the defense possessed the 61 MOIs in early 2017, it did not file its Section 2255 motion until April 2018.  Ruby's argument is not persuasive.  OPR expressly stated that it did not reach the conclusion that the failure to disclose the 61 MOIs violated *Brady* or *Giglio*, precisely because OPR could not establish that the defense had been prejudiced by the failure to disclose them.  The Department's discovery policies state explicitly that the Department imposes discovery obligations on prosecutors that are broader than those required by *Brady* and *Giglio*.  Ruby never claimed that he decided not to disclose the 11 pre-indictment MOIs and the 50 post-indictment MOIs because they did not contain helpful information.  He claimed he mistakenly failed to disclose the 11 pre-indictment MOIs, and intentionally withheld the 50 post-indictment MOIs.  Therefore, the issue of whether the statements in the 61 MOIs would actually have been helpful to the defense is relevant only to the analysis of whether the defense was prejudiced by the failure to disclose the 61 MOIs, and not to the issue of whether the failure to disclose them violated the Department's broad disclosure policies.

- 82 -

undisclosed pre-indictment MOIs and the resulting failure to disclose the discoverable statements in those MOIs, caused the government to violate its disclosure obligations.

Ruby was equally reckless in the manner in which he made decisions about what statements to disclose from post-indictment MOIs. Ruby stated that he relied on his memory of what occurred during post-indictment interviews when making decisions about what statements to disclose to the defense. That process led Ruby to disclose the ▊Witness #2▊ MOI in its entirety, but to provide only limited information about the ▊Witness #7▊ and ▊Witness #14▊ MOIs in a letter disclosure. Ruby disclosed no other statements from any of the other post-indictment MOIs.

For several reasons, OPR finds the process Ruby employed was so haphazard and inadequate that it demonstrated a reckless disregard of the government's discovery obligations. First, Ruby did not attend at least two post-indictment interviews, including a May 2015 ▊Witness #13▊ interview and a September 2015 ▊Witness #3▊ interview. Ruby could not rely on his memory when attempting to ensure that discoverable statements for interviews he did not attend were appropriately disclosed. Second, given all of Ruby's duties and responsibilities pertaining to such a large and complex case, it was reckless for him to rely on his memory when identifying discoverable statements made in 50 post-indictment interviews. Many of those interviews occurred months before Ruby sent his September 2015 letter disclosing discoverable statements contained in post-indictment MOIs. Ruby acknowledged to OPR that relying on his memory when determining which statements contained in post-indictment MOIs to disclose was an imperfect and not ideal process. OPR finds that Ruby's decision to rely on his memory to identify discoverable statements in 50 post-indictment MOIs was unjustifiable and objectively unreasonable.

Ruby told OPR that Goodwin was aware that Ruby was not reviewing post-indictment MOIs, and instead was using his memory to decide whether they contained discoverable statements that were required to be disclosed. Goodwin apparently approved of, or at least did not object to, that reckless practice. In addition, Goodwin attended numerous post-indictment interviews, including multiple interviews of two of the government's most important witnesses, ▊Witness #4▊ and ▊Witness #13▊ and interviews of others who provided discoverable statements, such as ▊Witness #3▊ ▊Witness #7▊ ▊Witness #5▊ ▊Witness #15▊ and ▊Witness #16▊ Goodwin therefore either was, or should have been, aware that there were statements made during those interviews that were required to be disclosed. OPR found no evidence that Goodwin made any effort to ensure that any exculpatory statements made in post-indictment MOIs were disclosed, even though he knew, and was in large part responsible for the fact, that the MOIs themselves would not be. According to Ruby, he and Goodwin discussed what disclosures needed to be made from post-indictment MOIs, and Goodwin agreed with Ruby's decisions regarding those disclosures. As discussed below, OPR found that those disclosures were deficient. OPR concludes that Goodwin acted in reckless disregard of his obligation to take the requisite steps to ensure that the government complied with the Department's discovery policies.

In sum, OPR concludes that both Ruby and Goodwin recklessly violated the Department's disclosure policies, and therefore committed professional misconduct.[262]

---

[262]    Although OPR found that Ruby and Goodwin recklessly violated their obligations under the Department's broad discovery policies, ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊

6.  **OPR Found Insufficient Evidence Based Upon Which It Could Determine Whether the Failure to Disclose Discoverable Statements Contained in Undisclosed MOIs Violated *Brady*, *Giglio*, or West Virginia RPC 3.8(d)**

OPR found that Ruby and Goodwin committed professional misconduct by acting in reckless disregard of their obligation imposed by Department policy to disclose discoverable statements in some of the 61 undisclosed MOIs. That finding, however, is not a sufficient basis upon which to conclude that Ruby and Goodwin also violated the requirements of *Brady* and *Giglio* with respect to those discoverable statements. A prosecutor violates *Brady's* requirements only if a defendant is prejudiced by the disclosure violation. Witnesses OPR interviewed adamantly maintained that Blankenship suffered no prejudice as a result of the government's failure to provide him with the discoverable statements contained in the 61 undisclosed MOIs, because those same statements were available to the defense from other sources, including the 372 MOIs that were disclosed, as well as the millions of pages of documents that also were disclosed. The fact that undisclosed evidence was known and available to the defense from other sources is a well-recognized defense to an alleged *Brady* violation.[263]

In such circumstances, OPR ordinarily would attempt to rigorously test the accuracy of the prosecution team's assertion that the discoverable statements contained in the undisclosed MOIs were known and available to the defense from other sources. Here, however, OPR faced a serious obstacle in attempting to engage in such an assessment. OPR asked Zuckerman to provide OPR with evidence that Blankenship's defense was prejudiced by the government's failure to disclose discoverable statements contained in the 61 undisclosed MOIs. Although Zuckerman alleged generally that Blankenship had in fact been prejudiced, Zuckerman explicitly declined to provide OPR with any evidence to support its assertion. Zuckerman stated that it did not believe that OPR's investigation was "the appropriate forum" to address its claim of prejudice, at least in part because Blankenship might raise the issue with the court.

Zuckerman, the party in the best position to know whether Blankenship was prejudiced by the government's failure to disclose discoverable statements contained in the 61 undisclosed MOIs, declined to provide OPR with the requested information about that issue. Because the prosecution team credibly asserted that Blankenship was not prejudiced, and because OPR has insufficient countervailing information to refute the government's contention, OPR cannot establish by preponderant evidence that Blankenship was in fact was prejudiced by the government's nondisclosures; it therefore similarly cannot establish that the government's failure resulted in a *Brady* or *Giglio* violation.[264]

---

[263]    *See* cases cited in Section VI(B)(2)(a) above.

[264]    Because West Virginia authorities have not, to OPR's knowledge, decided whether the scope of West Virginia RPC 3.8(d) is broader than, or co-extensive with, the scope of *Brady* and its progeny, OPR cannot find that Ruby and Goodwin violated RPC 3.8(d). Although OPR found that Ruby and Goodwin recklessly violated the

**C.      Ruby and Goodwin Recklessly Violated the Ogden Memorandum's Requirement That Letter Disclosures Contain All Exculpatory Material**

On June 22, 2015, and September 21, 2015, Ruby sent Zuckerman letters in which he provided them with discoverable statements made in two attorney proffer sessions, and three MOIs, respectively. The Ogden Memorandum states that when disclosure of exculpatory material is made by letter, "*prosecutors should take great care* to ensure that the full scope of pertinent information is provided to the defendant."[265] OPR concludes that Ruby and Goodwin recklessly violated that requirement, and therefore committed professional misconduct.

Ruby's June 22, 2015, letter to Zuckerman informed Zuckerman that attorneys representing Witness #10 had provided the government with discoverable material. Ruby summarized that material in two sentences: "Blankenship was involved in the development of violation targets and report cards for the so-called hazard elimination program." Witness #10 also believed that Massey made some degree of effort to comply with mine safety laws." When OPR examined AUSA #2 handwritten notes from the attorney proffer session, it found that those notes contained the following discoverable statements:

- Witness #10 *wanted the hazard elimination program to reduce violations by 20%, but Blankenship wanted them reduced by 50%.*

- *Massey mines were safe.*

- *MSHA violations were not related to safety.*

- *Having zero violations was not realistic.*

- *If you fix 75 violations, MSHA would find 75 more.*

- *MSHA inspections are subjective.*

- *MSHA was harder on Massey than other mines.*

- *The number of violations corresponds to the number of MSHA inspection hours.*

- *Receiving violations did not mean that a mine was unsafe.*

- *Blankenship received the weekly minutes from the Hazard Elimination Committee.*

- *Report cards were Blankenship's idea to increase accountability.*

On September 21, 2015, Ruby sent a letter to Zuckerman in which he provided discoverable statements contained in the three MOIs of Charlie Witness #8 Witness #13, and Witness #7

---

[265]     Ogden Memorandum, Step 3, Making the Disclosures (emphasis added).

[Witness #7] Ruby's disclosures regarding those three MOIs were highly truncated. Ruby revealed that: (1) [Witness #7] said [Witness #8] was not sure that Blankenship received the memorandum about mine safety that [Witness #8] had sent [Witness #8] in February 2010; (2) [Witness #8] said that [████] did not agree with a particular MSHA mine ventilation policy; and (3) [Witness #8] said that Blankenship was interested in safety even though [████] did not expressly say so, and Blankenship was involved with a number of changes to equipment that [Witness #8] believed improved safety. OPR reviewed the [Witness #8] MOI is set forth in Section III(D)(4) above, and OPR's analysis of the [Witness #13] and [Witness #7] MOIs is set forth in Section III(E)(6) above.

OPR finds that Ruby's June 22, 2015, and September 21, 2015, letter disclosures did not fully disclose all of the discoverable statements made by [Witness #10] attorneys, or contained in the [Witness #8] [Witness #13] and [Witness #7] MOIs. The fact that Ruby made a partial disclosure is evidence that supports his contention that he did not intentionally withhold exculpatory evidence. Nevertheless, OPR finds that Ruby did not disclose all of the discoverable statements [Witness #10] attorneys, and [Witness #8] [Witness #13] and [Witness #7] provided the government. That failure was at least in part a result of Ruby's reckless decision to rely on his memory of what occurred during his discussions with [Witness #10] attorneys and what was said in the [Witness #8] and [████] interviews when making required disclosures. Because Ruby did not take "great care" when making those letter disclosures, he recklessly violated the Ogden Memorandum's requirements and committed professional misconduct.

Ruby asserted that Goodwin reviewed and approved the contents of the September 21, 2015 letter before Ruby sent it to Zuckerman, and that Goodwin knew that Ruby was relying on his memory when deciding what information to include in the disclosure letter. Because Goodwin declined OPR's request for an interview, and thus did not rebut Ruby's contentions, the preponderant evidence supports Ruby's claim that Goodwin reviewed and approved the letter and was aware of the process by which Ruby was making disclosure decisions. OPR therefore finds that Goodwin also recklessly violated his duty to take "great care" when making a letter disclosure of exculpatory information, and hence committed professional misconduct.[266]

### D. Ruby and Goodwin Did Not Intentionally Mislead the Court or Zuckerman About the Government's MOI Disclosures

In response to defense motions requesting, *inter alia*, the disclosure of exculpatory evidence and the handwritten notes of the agents who drafted MOIs, the government filed three pleadings that in part discussed the government's MOI disclosures. Ruby, [AUSA #1] and [AUSA #2] each drafted one of the pleadings, and all of the prosecution team attorneys, including Goodwin, either reviewed drafts of the pleadings or received copies of them after they were filed. The three pleadings contained statements about the government's disclosure of MOIs. The February 2015 pleading stated that "the United States has provided extensive discovery . . . including . . . FBI 302s." The May 2015 pleading stated that "the United States has . . . produc[ed] . . . typed 302 reports." The July 2015 pleading stated that "The United States has produced [MOIs] that reflect

---

[266]   Although OPR found that Ruby and Goodwin recklessly violated Department discovery policies regarding disclosure letters, [████████████]

the substance of well over 300 witness interviews." Each of those statements, taken in isolation, was technically accurate. The United States did disclose numerous FBI 302s and over 300 MOIs.

However, even if technically correct, OPR finds that given the context in which they were made, those statements, both individually and collectively, were potentially misleading. In response to defense motions to obtain handwritten notes from all government interviews, OPR finds that any neutral party, such as the court, reading the government's responses might reasonably interpret them to mean that the United States had disclosed to the defense all 302s and memoranda of witness interviews, and the government therefore was not required to disclose the underlying notes. At the time each of those pleadings was filed, the government possessed post-indictment MOIs that had not been disclosed, and Ruby and Goodwin knew those MOIs would in fact not be disclosed. Moreover, those statements were central to the government's arguments that the defendant's motions should be denied because the government had complied with, or exceeded, its discovery obligations. For example, the court denied a defense motion to obtain agents' handwritten notes taken during witness interviews, because the substance of those interviews was contained in disclosed MOIs. The court may well have resolved that motion differently if it had known that for some witnesses, the defense received neither an MOI nor the agent's handwritten notes.

During trial, in response to a defense argument that the government had failed to disclose certain exculpatory statements that Witness #4 had allegedly made to the government prior to trial, Ruby told the court that the government had "turned over 302s from our interviews" of Witness #4 Although the government had disclosed one Witness #4 pre-indictment MOI, and Ruby incorrectly believed that the government had disclosed a second pre-indictment MOI, at the time Ruby made that statement to the court, the government had not disclosed five Witness #4 MOIs, some of which were completed shortly before Ruby made his statement to the court. OPR finds that given the context in which this statement was made, it was potentially misleading. OPR finds that any neutral party, such as the court, listening to that statement might reasonably interpret it to mean that the United States had disclosed all of Witness #4 302s to the defense.

Ruby told OPR that neither the government's pleadings nor his oral statements to the court concerning the government's MOI disclosures were meant to mislead the court. Ruby said that all of the government's representations regarding MOI disclosures were intended to refer to the government's production of pre-indictment MOIs. In his May 7, 2018 response to OPR's draft report, Ruby argued in part that: (1) none of the government's written statements were made in the context of a discussion about whether all MOIs had been disclosed; (2) the natural interpretation of assertions that the government disclosed MOIs is that the government did not disclose all MOIs; and (3) the small prosecution team was overwhelmed by Blankenship's much larger defense team, and therefore had little time to carefully parse every word in every pleading. Ruby also argued that: (1) the court would not have naturally interpreted his oral statement to mean that all Witness #4 MOIs had been disclosed; (2) defense counsel knew that the government had interviewed Witness #4 and had not disclosed all MOIs; and (3) the court did not reference MOIs in a later discussion about Witness #4 while it did mention Witness #4 grand jury testimony.

Given OPR's factual findings, and after carefully considering Ruby's objections to those findings, OPR reaches the following conclusions regarding the allegation that the government filed

- 87 -

false or misleading pleadings and made one false or misleading statement to the court regarding the government's MOI disclosures.

### 1.    Neither Ruby Nor Goodwin Intentionally Misled the Court Regarding the Government's MOI Disclosures

For several reasons, OPR concluded that neither Ruby nor Goodwin intentionally made false written or oral statements to the court regarding the government's MOI disclosures. First, as discussed below, OPR found that by the time of trial, Zuckerman knew that the government had not disclosed all MOIs in their entirety. If Ruby and Goodwin had intended to mislead the court by asserting that the government had disclosed all MOIs, they would not have given the defense information that showed that assertion to be false. Second, the only possible reason why Ruby or Goodwin would have intentionally provided the court with false information about the government's MOI disclosures would be to hide a disclosure violation. But OPR found that neither Ruby nor Goodwin intentionally withheld potentially exculpatory material from the defense. Since neither Ruby nor Goodwin believed they had done anything wrong, or had anything to hide from the court, they had no reason to intentionally mislead the court about the government's MOI disclosures.

### 2.    Neither Ruby Nor Goodwin Intentionally Violated West Virginia RPC 3.3(a)(1)

Because OPR found that neither Ruby nor Goodwin intentionally misled the court regarding the government's MOI disclosures, OPR also found that neither Ruby nor Goodwin violated West Virginia RPC 3.3(a)(1), which prohibits an attorney from "knowingly . . . mak[ing] a false statement of fact . . . to a tribunal."

### 3.    Neither Ruby Nor Goodwin Intentionally Violated West Virginia RPC 4.1

OPR finds that neither Ruby nor Goodwin violated West Virginia RPC 4.1 in their communications with Zuckerman. Zuckerman was arguably misled by the government's first pleading in February 2015 about the extent of the government's MOI disclosures. Thereafter, in April 2015, Zuckerman twice asked Ruby whether the government was disclosing all MOIs. Ruby failed to answer Zuckerman's questions. Zuckerman was aware of Ruby's silence at the time the government filed its May and July pleadings containing representations about the government's MOI disclosures. In August 2015, Zuckerman received the only post-indictment MOI disclosed by the government, and in September 2015 it received a letter disclosing statements made during three witness interviews. Finally, it appears that Zuckerman spoke to witnesses who had been interviewed by the government, and for whom the government had not disclosed an MOI. Thus, beginning in April 2015, and certainly before the start of the trial, Zuckerman possessed information indicating that the government was not disclosing all MOIs. OPR therefore finds insufficient evidence to conclude that Ruby and Goodwin violated RPC 4.1 by "knowingly . . . mak[ing] a false statement of material fact" to Zuckerman.

Ruby's failure to respond to Zuckerman's questions about whether the government was disclosing all MOIs in its possession does not violate RPC 4.1, for as a comment to RPC 4.1 makes

clear, an attorney "has no affirmative duty to inform an opposing party of relevant facts." While Ruby may not have violated RPC 4.1, OPR nevertheless finds that his conduct fell below the high standards the Department expects its prosecutors to maintain. The Department expects its prosecutors to deal honorably with opposing counsel, even if prosecutors vehemently disagree with how opposing counsel are representing defendants. Ruby's repeated failure to correct Zuckerman's misunderstanding of the extent of the government's MOI disclosures falls short of the Department's expectations for how its prosecutors will communicate with opposing counsel.

<blockquote>

**4.    Because OPR Was Unable to Interview the Court, OPR Does Not Reach a Conclusion As to Whether Ruby or Goodwin Recklessly Violated Their Duty of Candor to the Court**

</blockquote>

The question as to whether OPR can prove by preponderant evidence that Ruby and Goodwin recklessly violated their general duty of candor to the court by making misleading written and oral assertions about the government's MOI disclosures is exceedingly close. OPR believes that the most natural understanding of Ruby's oral statement that the government had disclosed "302s from our interviews" of Witness #4 is that the government had disclosed all of Witness #4 MOIs. OPR also believes that the most logical reading of the government's assertions in three pleadings about its MOI disclosures, in the context of defense motions for orders requiring the government to disclose all handwritten notes of interviews, is that the government had disclosed all MOIs. However, Ruby offered several arguments in support of his contention that the government's statements were not made recklessly.

OPR acknowledges that it is possible that the court may not have interpreted the written and oral statements at issue in the same manner as has OPR. In such circumstances, OPR would ordinarily seek to interview the court, so as to learn how the court interpreted the government's statements about its MOI disclosures. If the court understood that the government had disclosed all MOIs, OPR would very likely find that Ruby and Goodwin recklessly made the statements at issue in violation of their duty of candor to the court. If the court understood that the government had disclosed some, but not necessarily all, MOIs, OPR would likely find that Ruby and Goodwin did not violate that duty.

Because the *Blankenship* case is being actively litigated, and Blankenship has alleged in his Section 2255 motion that the government made misrepresentations to the court about its MOI disclosures, OPR cannot at this time engage the court in *ex parte* communications about that issue. Because OPR is currently unable to obtain the evidence it needs to resolve the question as to whether the court was misled by Ruby's and Goodwin's statements, OPR will not make a finding resolving the question of whether Ruby and Goodwin recklessly violated their duty of candor to the court. Because the defense has raised that issue in its Section 2255 motion, the court will have an opportunity to provide the parties with its view of the merits of the defense's allegation.

Although OPR does not reach a conclusion as to whether Ruby or Goodwin recklessly violated their duty of candor to the court by making misleading statements about the government's MOI disclosures, OPR finds that the pleadings they filed and Ruby's oral statement to the court about those disclosures were a product of their exceedingly careless conduct. Both Ruby and Goodwin should have been much more careful about the written and oral statements they made to the court. Ruby's assertion that the defense overwhelmed the government by virtue of its greater

- 89 -

resources, even if true, does not excuse a careless course of conduct by government attorneys. The Department expects its prosecutors to take great care when informing the court about the government's actions to comply with its constitutional obligations. Neither Ruby nor Goodwin adhered to that expectation in their communications with the court about the government's MOI disclosures. If either Ruby or Goodwin had remained in the federal service, OPR would have referred this finding to the Department to take whatever action it thought appropriate to ensure that such conduct was not repeated.

## CONCLUSION

On April 5, 2010, an explosion in the West Virginia Upper Big Branch (UBB) coal mine killed 29 coal miners. The United States Attorney's Office for the Southern District of West Virginia commenced a criminal investigation shortly after the explosion.

On November 13, 2014, a federal grand jury indicted Donald Blankenship, Chief Executive Officer and Chairman of the Board of Directors of Massey Energy Company, which owned UBB. AUSA Steven Ruby led the government's criminal investigation and litigation team. United States Attorney R. Booth Goodwin II was an active participant during the criminal investigation and trial. Blankenship was represented by the law firm Zuckerman Spaeder LLP (Zuckerman). The *Blankenship* case was tried in the fall of 2015. At the conclusion of the trial, Blankenship was convicted of a misdemeanor conspiracy to violate mine safety standards and acquitted of all other charges.

In March 2016, Zuckerman sent a letter to the Department of Justice Criminal Division's Assistant Attorney General, alleging, among other things, that: (a) the government failed to disclose exculpatory e-mails in the possession of the Mine Safety and Health Administration (MSHA); (b) the government made false statements to the court and jury about Blankenship's involvement in Massey budget decisions; (c) the government did not call MSHA inspectors to testify at trial in order to avoid revealing the government's discovery violations; and (d) an MSHA employee destroyed MSHA documents shortly after the UBB explosion. Zuckerman's allegations were forwarded to the Department's Office of Professional Responsibility (OPR).

As a result of its investigation, OPR found that Zuckerman's initial misconduct allegations were without merit. OPR found that: (a) the government did not withhold exculpatory MSHA e-mails; (b) the government did not make false statements about Blankenship's involvement in the Massey budget process; (c) the government did not inappropriately decide not to use MSHA inspectors as trial witnesses; and (d) there was no evidence to support the allegation that an MSHA employee destroyed MSHA documents shortly after the UBB explosion.

During OPR's investigation, however, OPR learned that the government had failed to disclose to the defense numerous memoranda of interviews (MOIs) written by law enforcement agents on the prosecution team. Although prior to the *Blankenship* trial the government disclosed to the defense approximately 370 MOIs, it failed to disclose discoverable statements contained in 61 MOIs, including 11 pertaining to pre-indictment interviews, and 50 pertaining to post-indictment interviews. As a result of its investigation, OPR made the following factual findings and reached the following conclusions regarding Ruby's and Goodwin's conduct related to the failure to disclose the 61 MOIs:

(1) Some of the undisclosed MOIs contained discoverable statements that were required to be disclosed by applicable Department discovery rules and policies, including United States Attorneys' Manual Section 9-5.001(C)(1)-(3). OPR concludes that neither Ruby nor Goodwin withheld discoverable statements from the defense with the intent of preventing the defense from obtaining those statements. However, OPR found that: (a) Ruby recklessly violated Department-mandated discovery obligations by failing to disclose the discoverable statements contained in 11 pre-indictment MOIs; (b) Ruby and Goodwin recklessly violated Department-mandated discovery obligations by failing to disclose the discoverable statements contained in some of the 50 post-indictment MOIs; (c) Ruby and Goodwin recklessly violated discovery requirements imposed by a January 2010 memorandum from then-Deputy Attorney General David Ogden (the Ogden Memorandum), which requires prosecutors to "develop a process for review of pertinent information to ensure that discoverable information is identified;" (d) Ruby's and Goodwin's "process" for deciding which statements contained in post-indictment MOIs to disclose was to rely on their memory of what was said during interviews, some of which occurred months before they made disclosure decisions; their deficient process resulted in the failure to disclose discoverable statements contained in numerous post-indictment MOIs; and (e) because Ruby and Goodwin recklessly violated the Department's discovery policies regarding the disclosure of discoverable statements, they committed professional misconduct.

(2) OPR found insufficient evidence to conclude that Ruby's and Goodwin's failure to disclose discoverable statements contained in the undisclosed MOIs violated *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), or West Virginia Rule of Professional Conduct (RPC) 3.8(d), which requires the disclosure of information that tends to negate the accused's guilt. The government violates its *Brady* obligations only if, *inter alia*, a defendant is prejudiced by the failure to disclose. Zuckerman Spaeder LLP, the firm representing Blankenship, and the entity in the best position to explain whether, how, and to what extent the defense was prejudiced by the government's failure to disclose the 61 MOIs, explicitly declined OPR's request to provide it with that information. Prosecution team members credibly told OPR that the discoverable statements contained in the 61 undisclosed MOIs were not only available to the defense from other sources, but were in fact used during the defense's cross-examination of government witnesses. Based on the facts known to it, OPR cannot prove by preponderant evidence that Blankenship was prejudiced by the government's failure to disclose the discoverable statements in the 61 MOIs, and so cannot conclude that the government's conduct violated *Brady, Giglio,* or West Virginia RPC 3.8(d).

(3) Ruby failed to make a full disclosure of discoverable statements contained in three MOIs, and statements made during one proffer session, which he attempted to summarize in two summary disclosure letters. OPR found Ruby's disclosures to be inadequate and incomplete. Although OPR concludes that Ruby's inadequate disclosures were not intended to withhold exculpatory statements from the defense, OPR nevertheless concludes that Ruby's inadequate disclosures were made in reckless disregard of the requirement, as set forth in the Ogden Memorandum, that prosecutors take "great care" when making disclosures by summary letter. Ruby was responsible for both of the deficient letter disclosures. OPR found that Goodwin was also responsible for the inadequate and incomplete disclosures in one of the two summary disclosure letters. OPR finds that Ruby and Goodwin recklessly violated the Ogden Memorandum's requirements and therefore committed professional misconduct.

(4) The government filed three arguably misleading pleadings with the court, and Ruby made one arguably misleading statement in court, regarding the government's MOI disclosures. Those pleadings and Ruby's statement may have led the court to reasonably, but erroneously, believe that the government had disclosed all MOIs in its possession. OPR reached the following conclusions about the alleged misstatements to the court:

(a) Ruby and Goodwin did not intentionally mislead the court regarding the government's MOI disclosures.

(b) Ruby and Goodwin did not violate West Virginia RPC 3.3(a)(1), which prohibits an attorney from *knowingly* making a false statement to the court, because OPR found that neither Ruby nor Goodwin intentionally made false statements to the court.

(c) OPR found insufficient evidence to conclude that the government's pleadings and Ruby's statement in court about the government's MOI disclosures violated West Virginia RPC 4.1, which prohibits attorneys from knowingly making false material statements to third parties such as Zuckerman Spaeder LLP.

(d) For the following reasons, OPR did not reach a conclusion about whether Ruby and Goodwin recklessly made arguably misleading statements to the court about the government's MOI disclosures. When OPR investigates an allegation that the government made misleading statements to the court, OPR would ordinarily request to interview the court to ask how the court interpreted the statements at issue. OPR could not follow its usual procedures in the *Blankenship* case, because the case is being actively litigated, and the court would be unable to engage in *ex parte* communications with the government. OPR is therefore unable to ascertain the court's views as to whether the court was misled by the government's statements about its MOI disclosures. In its Section 2255 motion, McGuireWoods has alleged that the government made misrepresentations to the court about its MOI disclosures. The defense, if it chooses, may further pursue that allegation in the post-conviction litigation, which will allow the court to inform the parties as to whether it was misled by the statements at issue.

OPR - 000097