# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA
## BECKLEY DIVISION

| | |
|---|---|
| **DONALD L. BLANKENSHIP,** | **Civil Action No. 5:18-CV-00591** |
| **Movant,** | **Criminal Action No. 5:14-CR-00244** |
| **vs.** | |
| **UNITED STATES OF AMERICA,** | |
| **Respondent.** | |

## GOVERNMENT'S CONSOLIDATED RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO VACATE UNDER 28 U.S.C. § 2255 AND DEFENDANT'S REQUEST FOR EVIDENTIARY HEARING

The United States, by and through undersigned counsel, opposes Donald L. Blankenship's motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255 (R. 663, 704, 705.)[1] For the following reasons, the defendant's motion should be denied in its entirety without a hearing.

## BACKGROUND

Defendant Donald L. Blankenship is the former chairman and chief executive officer of Massey Energy Company ("Massey"). Massey owned and operated the Upper Big Branch ("UBB") coal mine in Montcoal, West Virginia. This case arises from the tragic accident on April 5, 2010, at the UBB mine, which caused the death of 29 miners.

The United States Court of Appeals for the Fourth Circuit, in a published opinion affirming the defendant's conviction, stated the factual background of this case as follows:

---

[1] Record citations include the record number and the relevant PageID # from the filings in Case No. 5:14-CR-00244.

In the years leading up to the accident, the federal Mine Safety & Health Administration ["MSHA"] repeatedly cited Massey for violations at the Upper Big Branch mine of the Mine Safety & Health Act of 1977, 30 U.S.C. § 801 *et seq.* (the "Mine Safety Act"), and its implementing regulations.  In 2009 alone, MSHA identified 549 violations at the Upper Big Branch mine.  Indeed, in the 15 months preceding the April 2010 accident, the Upper Big Branch mine received the third-most serious safety citations of any mine in the United States.  Many of these violations related to improper ventilation and accumulation of combustible materials—problems that were key contributing factors to the accident.  The defendant was aware of the violations at the Upper Big Branch mine in the years leading up to the accident, receiving daily reports showing the numerous citations for safety violations at the mine.

Not only did the defendant receive daily reports of the safety violations, beginning in mid-2009, but he also received warnings from a senior Massey safety official about the serious risks posed by the violations at Upper Big Branch.  And the safety official informed the defendant that "[t]he attitude at many Massey operations is 'if you can get the footage, we can pay the fines.'"  (J.A. 1907.)  Evidence suggested that the defendant had fostered this attitude by directing mine supervisors to focus on "run[ing] coal" rather than safety compliance and to forego construction of safety systems.  (J.A. 1902, 1924.)  The defendant also told the Massey employee in charge of the Upper Big Branch mine that "safety violations were the cost of doing business" and that it was "cheaper to break the safety laws and pay the fines than to spend what would be necessary to follow the safety laws."  (J.A. 790–91.)

Notwithstanding the numerous citations and warnings, the defendant had a "policy to invariably press for more production even at mines that he knew were struggling to keep up with the safety laws."  (J.A. 793.)  For example, the defendant directed the supervisor of Upper Big Branch to reopen a mine section to production even though it lacked a legal return airway.  Additionally, Massey employees advised the defendant that the lack of adequate staff was a key factor in the high number of safety violations at Upper Big Branch.  Contrary to this advice, Massey reduced staff at the Upper Big Branch mine less than two months before the accident, a decision that the defendant would have had to approve given his close supervision of mine operations and staffing.

*United States v. Blankenship*, 846 F.3d 663, 666–67 (4th Cir. 2017).  A federal criminal investigation commenced shortly after the explosion on April 5, 2010.

**Indictment.**  On November 13, 2014, a federal grand jury returned a four-count indictment charging the defendant with (1) conspiring to willfully violate federal mine safety laws and regulations; (2) conspiring to defraud federal mine safety regulators; (3) making false statements

to the Securities & Exchange Commission regarding Massey's safety compliance; and (4) engaging in securities fraud.  (R. 1.)

*Superseding Indictment.*  On March 10, 2015, the same grand jury returned a three-count superseding indictment, which combined the conspiracy counts into a single, multi-object conspiracy charge and included additional allegations.  (R. 169.)  The false statements and securities fraud counts were substantially unchanged.

*Jury Trial and Sentence.*  Trial commenced in October 2015.  At trial, the government introduced numerous safety citations at UBB.  The government also presented other evidence and testimony, including memoranda and statements between the defendant and his employees, which allowed the jury to determine that the defendant prioritized coal production at the expense of safety compliance.  The government further presented other evidence establishing that the citations reflected serious safety violations.  Following a six-week trial, on December 3, 2015, the jury convicted the defendant of conspiring to violate mandatory federal mine safety laws.  (R. 529.)  The district court sentenced the defendant to one year of imprisonment and a fine of $250,000, both of which were the maximum permitted by law.  (R. 589.)

*Appeal.*  The defendant appealed.  (R. 591.)  On appeal, he challenged the sufficiency of the superseding indictment and asserted various trial errors.  The Fourth Circuit held that the district court committed no reversible error and affirmed the defendant's conviction.  *See Blankenship*, 846 F.3d at 666.  The defendant subsequently filed a petition for writ of certiorari (R. 655), which the Supreme Court denied, 138 S. Ct. 315 (2017).

*OPR Complaint.*  While serving his sentence of imprisonment, the defendant filed a formal complaint with the Department of Justice's Office of Professional Responsibility ("OPR"),

alleging that the United States suppressed evidence and violated his constitutional rights.  During OPR's subsequent investigation, it learned that the government had failed to disclose to the defense numerous memoranda of interviews ("MOIs") written by law enforcement agents on the prosecution team.  (R. 712-6, at 25952–55.)  OPR found that the failure to disclose some of the MOIs violated applicable Department of Justice discovery rules and policies.  (*See* 717-1, at 26117–19.)  OPR ultimately found that neither of the prosecutors on the case, United States Attorney Booth Goodwin ("USA Goodwin") or Assistant United States Attorney Steve Ruby ("AUSA Ruby"), violated *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), or West Virginia Rule of Professional Conduct 3.8(d), which requires the disclosure of information that tends to negate the accused's guilt.  (*See* 717-1, at 26117–19; *see also* R. 712-6, 712-7, 712-8.)  OPR also concluded that neither USA Goodwin nor AUSA Ruby intentionally misled the court regarding any nondisclosures.  (*See* 717-1, at 26117–19; *see also* R. 724 & 725 (final findings from the Professional Misconduct Review Unit, which hears internal OPR appeals, regarding USA Goodwin and AUSA Ruby).)

*§ 2255 Motion.*  On April 18, 2018, while on supervised release, the defendant filed the instant motion to vacate, set aside, or correct his sentence pursuant to 18 U.S.C. § 2255.  (R. 663.)  On September 6, 2018, the defendant filed his amended memorandum in support (R. 705, 712-5), as well as a separate motion for an evidentiary hearing (R. 704-1).

## ARGUMENT

A motion made under 28 U.S.C. § 2255 is a collateral attack on a conviction or sentence imposed in a separate proceeding.  To succeed on such a motion, the movant must prove that the conviction or sentence was imposed in violation of the laws or Constitution of the United States;

or the court imposing sentence lacked jurisdiction; or the sentence exceeded the maximum authorized by law; or the sentence was otherwise subject to collateral attack.  28 U.S.C. § 2255.

The defendant's § 2255 motion centers on the nondisclosure of various MOIs and other documents that the defendant claims would have helped him mount his defense.  The defendant alleges that the withheld documents constitute violations of *Brady*/*Giglio* and the Jencks Act, and also support a claim of prosecutorial misconduct.  (*See generally* R. 712-5.)  For purposes of this Response, the United States does not dispute that some of these materials were discoverable and should have been disclosed pursuant to Department of Justice policies.  (*See* R. 712-6, at 25947.)

Those errors, however, are not sufficient to entitle the defendant to relief on collateral review.  While the government responds to each allegation separately below, as to all, the defendant has not shown that he suffered the required prejudice or harm to warrant relief under 28 U.S.C. § 2255.[2]  His motion should be denied without a hearing.

---

[2] In its Order issued on September 10, 2018, the Court directed the United States to address the issue of mootness.  (R. 711, at 25895 n.1.)  Justiciability of a motion to vacate under § 2255 turns on two questions of timing—one statutory and one constitutional.  First, the defendant must demonstrate that he satisfies the statutory requirement that he was "in custody" when he filed his motion.  28 U.S.C. § 2255(a); *Spencer v. Kemna*, 523 U.S. 1, 7 (1998).  As the defendant filed the present motion while still serving his term of supervised release, his motion satisfies this statutory requirement, notwithstanding the fact that his term of supervision has since finished.  *See Maleng v. Cook*, 490 U.S. 488, 490–91 (1989) (noting "in custody" requirement turns only on status "at the time his petition is filed"); *United States v. Swaby*, 855 F.3d 233, 238–39 (4th Cir. 2017) (citing *United States v. Pregent,* 190 F.3d 279, 283 (4th Cir. 1999)).

The constitutional question looks to whether the defendant has Article III standing to maintain his challenge.  *Spencer*, 523 U.S. at 7.  While the statutory question is resolved at the time of filing, this constitutional question lingers because a federal court retains subject matter jurisdiction only for so long as an actual "case or controversy" exists.  *Id*.  The defendant contends that because he paid a fine as part of his judgment of conviction, he has sufficient stake in the outcome so as to avoid mootness.  In light of the Fourth Circuit's decision in *Nakell v. Attorney General of North Carolina*, 15 F.3d 319, 322 (4th Cir. 1994), the United States does not disagree.

1. __The defendant's *Brady* and *Giglio* claims are meritless because the undisclosed favorable evidence was not material.__

The defendant first claims that the government violated its obligations to produce exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and evidence related to the credibility of government witnesses under *Giglio v. United States*, 405 U.S. 150, 153–54 (1972). To establish a *Brady*/*Giglio* violation, the defendant must show that the evidence in question (1) was favorable to the defendant (*i.e.*, it had exculpatory or impeachment value), (2) was suppressed by the government, and (3) was material. *See Brady*, 373 U.S. at 87; *United States v. Sterling*, 724 F. 3d 482, 511 (4th Cir. 2013). For purposes of this motion, the government does not dispute the second element (*see* R. 712-5, at 25925 n.7), so the inquiry focuses on whether the defendant has shown that the withheld evidence was both favorable and material. *See Garlotte v. Fordice*, 515 U.S. 39, 46 (1995) ("[T]he habeas petitioner generally bears the burden of proof . . . ."); *United States v. Chavez*, 894 F.3d 593, 600 (4th Cir. 2018) (burden is on defendants to establish *Brady* claim); *United States v. Wilson*, 624 F.3d 640, 660–61 (4th Cir. 2010).

These remaining requirements—that the evidence was both favorable and material—are meaningful restraints on *Brady*'s scope. The Supreme Court and the Fourth Circuit have long rejected the notion that a prosecutor commits reversible error by failing to disclose insignificant, albeit favorable, evidence. *United States v. Bagley*, 473 U.S. 667, 675 & n.7 (1985); *Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 555 (4th Cir. 1999) ("*Brady* does *not* create a full-scale, constitutionally-mandated discovery right for criminal defendants."). Instead, in evaluating allegations of *Brady* violations, courts may reverse convictions "only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." *Bagley*, 473 U.S. at 678. Accordingly, evidence is material—and thus a *Brady* violation occurs—only if the cumulative effect of all the favorable, suppressed evidence "raises a reasonable probability that its

disclosure would have produced a different result." *United States v. Bartko*, 728 F.3d 327, 340 (4th Cir. 2014) (quoting *Kyles v. Whitley*, 514 U.S. 419, 421–22 (1995)).  As the Supreme Court put it in *Strickler v. Greene*, 527 U.S. 263, 281 (1999), "there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict."

Fourth Circuit case law also provides guidance on evaluating materiality and favorability. For instance, impeachment evidence may be material when the witness in question "supplied the only evidence of an essential element of the offense," especially if the undisclosed evidence provided the only significant impeachment material. *Bartko*, 728 F.3d at 339.  On the other hand, impeachment evidence is immaterial where it is "cumulative of evidence of bias or partiality already presented," and thus of only "marginal additional support" to the defense. *Id*. (internal quotation marks omitted).  Likewise, evidence is only useful for impeachment—and thus favorable—if it is attributable to the witness and actually inconsistent or damaging to the witness's credibility. *See Spicer*, 194 F.3d at 560 (King, J., dissenting).

Moreover, the *Brady* rule does not extend to categories of information that was previously available to the defendant.  *See United States v. Jeffers*, 570 F.3d 557, 573 (4th Cir. 2009) (government has no duty to turn over evidence known to defense, evidence defense should have known, or evidence available to defense from other sources); *United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990) ("[W]here the exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the *Brady* doctrine.").

The defendant points to three broad categories of evidence he claims are favorable to his defense and then asserts that the cumulative effect of this evidence is material.  (*See* R. 712-5, at

25926–37.)  As detailed in the following sections, however, much of the evidence the defendant points to does not fall within *Brady*'s scope because it was either available to the defendant or not favorable.  And the remaining evidence is not material, as the defendant has not shown a reasonable probability of a different outcome.

### 1.1.  The MSHA evidence would neither have supported nor led to evidence that would have supported the defense.

The defendant bases his MSHA-related arguments on internal emails and post-accident disciplinary records.   He contends that the undisclosed MSHA documents "are incredibly favorable" to him and "would have provided significant support for his defense at trial on multiple issues."   (R. 712-5, at 25926.)   To the contrary, the MSHA materials neither relate to the defendant's criminal charges, nor would they have led to evidence that would have supported his defense.

The defendant first claims that MSHA destroyed and altered documents that he claims— without support—"likely contained additional exculpatory and impeachment information."  (*Id.* at 25297.)  He points to documents from the Department of Labor's Office of Inspector General ("OIG") that, he argues, reveal Joe Mackowiak destroyed different documents than the ones at issue in the past.  (*See id.*; *see also* R. 712-2, at 25906–08; R. 712-3, at 25912.)  The OIG fully investigated the matter, however, and the reports from that investigation establish that none of the alleged witnesses has any knowledge of any such document destruction.  (*See generally* Ex. 1; *see also* R. 619, at 20187–201 (the Court previously questioning Bill Ross about alleged MSHA document destruction involving a separate FOIA case); R. 549, at 12029 (the Court finding no link

between the allegations of document destruction and this case).)  Therefore, after the full OIG investigation, the U.S. Attorney's Office declined to prosecute.  (R. 703-17, at 26790.)[3]

The defendant next points to an email chain in which MSHA officials discuss advance notice, a practice that violates § 103 of the Mine Act, 30 U.S.C. § 813(a).  (R. 712-5, at 25927 (regarding USAO000030).)  Advance notice was the second object charged in Count 1 of the Superseding Indictment.  Because the defendant was acquitted of this aspect of Count 1, the email is immaterial.  (R. 529, at 9726–27.)  The email is also immaterial because it occurred on January 24, 2012 (*see* R. 663-5, at 23408), which is after the period of time at issue in the Superseding Indictment (*see* R. 169, 2270 ¶ 1 ("Beginning no later than January 1, 2008 and continuing through April 9, 2010 . . . .").)  The allegedly undisclosed email is therefore irrelevant at this stage.

The defendant also cites an internal MSHA attorney–client communication regarding settlement in an administrative matter.  (*See* R. 712-5, at 25928 (regarding (USAO0000114).)  According to the defendant, this email shows that he could not have been acting willfully.  Not so.  The email does not undermine the evidence and testimony presented at trial, which showed that there were 836 violations issued to UBB from January 2008 to April 2010, as well as established the defendant's knowledge regarding UBB violations.  (R. 601, at 16237; R. 609, at 18033; R. 610, at 18291; R. 614, at 19210 (Blanchard testifying that the defendant received daily violation reports); R. 618, at 19848, 19854–55, 19855, 19935–37; R. 619, at 20208 (Ross testifying about same); R. 602, at 16509, 16513–15, 16517 (Davis testifying about same)); *see also Blankenship*, 846. F.3d at 666 ("In 2009 alone, [MSHA] identified 549 violations at [UBB].").  Moreover, as

---

[3] In his Motion, the defendant also refers to a 2011 MSHA email regarding alleged document destruction. (R. 663, at 23086 ¶ 46 (regarding USAO0000032).)  He does not cite this email in his Memorandum.  To the extent the argument is not waived, the email is outside the indictment period and it has no apparent relationship to any of the charges, convictions, or evidence in this case.  Accordingly, and in light of the significant evidence supporting the verdict, the email provides him no support.  *Strickler*, 527 U.S. at 281 (1999); *Machibroda v. United States*, 368 U.S. 487, 495 (1962); *Bartko*, 728 F.3d at 339.

the jury was instructed and the Fourth Circuit confirmed on direct appeal, mere reckless disregard is sufficient mens rea. *Id.* at 674. In the face of the overwhelming evidence, these isolated internal discussions do not call into doubt the remaining evidence of the defendant's willful conduct.

The defendant relies on additional emails to support his argument that MSHA was biased in its enforcement of mine regulations and standards regarding UBB. (*See* R. 712-5, at 25928–29.) For example, he points to an email exchange regarding the issuance of a single citation at UBB during the MSHA accident investigation in 2011. (*See id.* at 25928 (regarding USAO000028).) The email is not favorable to the defendant, as it is outside of the indictment period and also further reflects the pattern of violations at UBB. The defendant argues that the email's reference to "giv[ing] [UBB] one more piece of paper" in response to a claim of a "potential violation" establishes bias and a "willingness to issue citations without sufficient proof." (R. 712-5, at 25928–29.) Not so. The underlying email cites specific records that demonstrate the violation. (*See* R. 663-5, at 23404.) The willingness of MSHA employees to cite UBB for documented violations does not demonstrate bias.

The defendant further points to four more emails—none of which supports the defendant's theory of agency bias. One is a single intemperate comment from an MSHA employee shortly after the tragedy at UBB that again does not show wide-spread bias (R. 712-5, at 25929 (regarding USAO0000033)); to that end, the response from a DOL assistant secretary redirected the focus to "presenting the facts [about the tragedy] in a responsible way." (R. 663-5, at 23413.) Another is a profane statement in an exchange involving an MSHA employee with no apparent enforcement connection to UBB, and an employee from the private sector. (*See* R. 712-5, at 25929 (regarding USAO0000109).) Another email, which involves the Secretary of Labor, came after the indictment and the period of time at issue in the indictment, and therefore has no relation to any

possible pre-indictment MSHA enforcement bias.   (*See id.* (regarding DLB-001532).)   The defendant finally relies on a February 2012 email exchange between MSHA counsel and MSHA team members drafting the UBB Internal Review Report.   (*See* 712-5, at 25930 (regarding USAO0000024).)   The email is outside the time period at issue in the indictment, has nothing to do with bias, and reflects internal discussion in the Report drafting process regarding phrasing related to ventilation—none of which would have supported the defendant's defense.

These additional emails are not favorable for other reasons.   None of the individuals on the emails was employed by the Department of Justice or involved in the criminal investigation.   None of the individuals played any role regarding potential criminal charges against Massey or the defendant during the charged period.   Although the defendant claims that these emails could have undermined MSHA's credibility, he ignores that this matter was not brought by MSHA, and did not rely solely on testimony from MSHA employees.   Moreover, the defense was given ample opportunity to cross-examine trial witnesses about MSHA bias after extensive testimony about the issue on direct.   (*See, e.g.*, R. 617, at 19734; R. 618, at 19805, 19899–901; R. 619, at 20096.) These additional emails also would not have made a difference given the evidence at trial, which established an egregious pattern of 836 violations during the charged period.   (R. 601, at 16237.) Four isolated emails from people not involved in the criminal case do not refute a large volume of evidence of properly issued citations against UBB.

The defendant next points to disciplinary actions taken by MSHA against MSHA employees responsible for enforcement at UBB.   He argues that the disciplinary actions demonstrate that MSHA actually caused many of the violations for which the government sought to hold him accountable.   This is inaccurate.   The disciplinary letters, which are attached to his § 2255 motion, show that the disciplinary decisions were made following MSHA's post-UBB

11

Internal Review.  (R. 663-6, at 23550–78; *see* R. 712-5, at 25929–30.)  The letters also mirror the primary findings of that investigation: that MSHA was not responsible for the accident, and that MSHA's failure, on several occasions, to follow internal agency policies in enforcement at UBB actually resulted in less stringent enforcement at the mine.  *See* https://www.msha.gov/ PerformanceCoal/UBBInternalReview/UBBInternalReview.asp.  In other words, the documents show that MSHA should have been harder on the defendant for his repeated violations of mine-safety regulations.  They are therefore not favorable to the defense.

Finally, the defendant again repeats his argument about ventilation plans.  (R. 712-5, at 25929–30.)  Although he again contends that the type of ventilation plan required by MSHA was responsible for the safety issues at UBB (*see id.*), testimony on this issue came out at trial (*see, e.g.*, R. 618, at 19998–20003; *see also* R. 601, at 16238–39 (61 of 836 UBB violations during indictment period related to ventilation-plan issues).)  Moreover, the jury was not allowed to consider evidence and arguments related to any disagreements between MSHA and UBB regarding the interpretation or application of certain ventilation standards.  (*See* R. 463 (granting motion *in limine* about belt air.).)

### 1.2.  The evidence would not have led to the identification of defense witnesses.

The defendant next contends that other allegedly suppressed materials, mainly the MOIs, would have supported his defense by leading to "fruitful lines of pre-trial investigation and/or identifying potential defense witnesses at trial."  (R. 712-5, at 25930.)  Specifically, he claims that the undisclosed MOIs identified five potential defense witnesses who could have given

exculpatory testimony on his behalf: Mark Clemens, Steve Sears, Sabrina Duba, Charlie Bearse, and Stephanie Ojeda.[4]

The defendant is not entitled to the benefit of *Brady* as to information pertaining to any of these witnesses because they were all "not only available to the defendant but also . . . source[s] where a reasonable defendant would have looked." *Wilson*, 901 F.2d at 381. This conclusion stems from the fact that all five of these individuals were the defendant's own employees. Moreover, all of them except Sears were actually listed on the defendant's initial witness list, which was provided, by the Court's Order (R. 280, at 4985), shortly before trial began via email to counsel for the United States on or about October 8, 2015. The defendant even acknowledges that he knew these individuals were obvious candidates to interview because they "were all employees whose roles gave them more insight than many of the witnesses who ultimately testified." (R. 712-5, at 25931.) In these circumstances, it "would have been natural" for the defendant to interview his own employees "to determine if [they] could have supplied [him] with exculpatory evidence." *Wilson*, 901 F.2d at 381; *see Jeffers*, 570 F.3d at 573 (applying *Wilson*); *Hoke v. Netherland*, 92 F.3d 1350, 1355 (4th Cir. 1996) (finding no *Brady* violation where prosecutors failed to disclose to murder/rape defendant police interviews with three men who claimed they had consensual sex with victim because "it [was] quite likely that, had [defendant] undertaken reasonable investigation, he would have learned of all three men in question and of their relations with" the victim). In light of *Wilson*, the defendant cannot predicate any *Brady* claim on these materials.

---

[4] In the defendant's § 2255 motion, he also lists Gary Frampton as a potential defense witness who could have given exculpatory testimony on his behalf. (R. 663, at 23081–82 ¶ 29.) In his amended memorandum in support of his § 2255 motion, however, the defendant makes no mention of Frampton. (*See generally* R. 712-5.) Accordingly, the United States considers any argument regarding Frampton to be abandoned. Even if not abandoned, any contentions as to Frampton fail for the same reasons articulated in this Response.

The defendant's arguments fail for the additional reason that the witnesses would not have provided favorable, material evidence.

***Mark Clemens.***  The defendant claims that the MOI for Mark Clemens would have been favorable to his defense since Clemens could have addressed the government's theory that the defendant pressured his subordinates to run coal and ignore safety.  In support, he points to a statement in the Clemens MOI that "there was pressure to run coal, but not enough to overlook safety."  (R. 663-2, at 23095.)  The record demonstrates, however, that Clemens was not involved with mine safety or MSHA compliance.  (*Id.* at 23096.)  At best, the record reflects that Clemens was listed as a recipient, usually as a "CC," on emails or memoranda regarding production, business plans, and mine performance.  Because Clemens had such minimal involvement in mine safety, the omission of his MOI did not prejudice the defendant.

***Steve Sears.***  Similarly, the defendant claims that the MOI for Steve Sears would have been favorable to his defense because it stated, "Massey's primary focus was safety.  Blankenship started a safety program for individuals and pushed safety more than any other CEO in the industry.  People have been fired because of safety."  (*Id.* at 23099.)  While this statement is admittedly favorable to the defense, its nondisclosure did not prejudice the defendant for two reasons.  First, Sears made the statement while he was employed by the defendant; specifically, Sears oversaw Massey Coal Sales and was—in the defendant's own words—"Massey's sales arm."  (R. 712-5, at 25931.)  As such, any favorable statements made by Sears should be treated with a degree of suspicion.  Sears certainly possessed an aspect of self-interest in protecting both himself and Massey.  Moreover, the defendant exercised an extraordinary amount of influence over Sears and would have had access to him at all times.

14

Second, the MOI for Sears demonstrates that Sears did not have any legitimate knowledge of MSHA requirements or compliance. Even beyond his lack of knowledge, the MOI reveals Sears's true interest in elevating production over safety. According to the MOI, in 2009, MSHA suddenly wanted a new vent plan at UBB. (R. 663-2 at 23099.) Absent, however, is any recognition that the law requires a new plan when mining conditions change. Moreover, Sears's only concern was that production suffered, not that MSHA shut the long wall down for ventilation issues, revealing that Sears was most concerned about production and least concerned with health risks arising from poor ventilation. (*See id.*) The Sears MOI is, therefore, significantly undermined by not only the influence that Massey and the defendant exercised over Sears, but also by Sears's own interest in production over safety. Moreover, in light of the substantial evidence adduced at trial, any benefit provided by the Sears MOI is only of "marginal additional support" to the defense, and it is therefore immaterial. *Bartko*, 728 F.3d at 339.

***Sabrina Duba.*** The defendant claims that the MOI of Sabrina Duba, a senior accountant at Massey who ran the budgeting process for the mines, would have contradicted the government's theory that the defendant pushed for production over safety. Specifically, the defendant points to the statement "Blankenship would tell them to go back and make sure the [production] figures used were not too aggressive." (R. 663-3, at 23200.) When read in the context of the full MOI, however, it is clear that the statement is about the defendant's receipt of final production, including detailed worksheets, his review of those worksheets, and his concern with the numbers. The statement had nothing to do with reducing production figures to allocate more funds to safety or MSHA compliance. The statement was purely a description of the budgeting process and information reviewed by the defendant to determine sales and production. As the Duba MOI

further clarifies, "Blankenship was interested in cash flow and [accounting] figures." (*Id.* at 23201.)

The defendant also relies on the Duba MOI to claim that she would have testified that: (1) the defendant did not participate in budget meetings or have involvement in final business plan reviews; (2) Chris Adkins instructed Duba to focus on eliminating the most serious violations; and (3) the defendant directed her to identify the people responsible for violations who were the "repeat offenders." (R. 712-5, at 25932.)  Putting aside the fact that none of the above-listed information is exculpatory, Duba's position at Massey was unrelated to the charges in the Superseding Indictment.  Further, the Duba MOI clarifies that the defendant's motive for requesting certain information, such as the tracking of violations, was unclear. (R. 663-3, at 23202.)  Lastly, the Duba MOI was cumulative of testimony adduced at trial of other witnesses, including Chris Blanchard and Bill Ross, regarding the defendant's micro-management governing style and his focus on costs and profits.  The minimal influence, if any, that Duba asserted over the defendant, her stated uncertainty about his motives, and the cumulative nature of her MOI establish that the defendant suffered no prejudice from any nondisclosure.

***Charlie Bearse.***  The defendant also claims that the MOI of Charlie Bearse, a president of a Massey resource group, would have undermined the government's theory of the case.  Specifically, the defendant relies on the statement noting Bearse's opinion that Massey's section staffing was the "industry standard." (R. 663-2, at 23112.)  The defendant also contends that the MOI of Bearse contains a myriad of statements that support Massey's alleged concern with mine violations.

Bearse held the same position as Chris Blanchard who was cross examined for five days.  This information was equally available from him.  Additionally, all of the statements cited by the

defendant from the Bearse MOI are general statements taken out of context.  For example, the defendant relies on the following explanation in support of the defendant's alleged focus on safety: "if there was something wrong at the mine, you were expected to stop, fix the problem, and then move on."  (*Id.* at 23113.)  The defendant fails to include the remaining portion of the statement, in which Bearse acknowledged that "people did not stand up and do what was needed to be done." (*Id.*)

As another example, the defendant cites to an alleged confirmation by Bearse of being reprimanded over a violation for a mine section operating without air and that he at times feared discipline over compliance issues.  (*Id.* at 23114.)  But the full context demonstrates that Bearse never received more than an oral reprimand over the issuance of orders.  (*See id.*)  Indeed, the oral reprimand that he received was so lackluster in its administration that Bearse could not recall a specific instance in which he actually feared discipline; Bearse could recall, however, that his pay was never adjusted for violations.  (*Id.*)  While the defendant cites to the Bearse MOI to support Massey's supposed concern for violations, the record indicates the opposite.  (*See id.* ("[V]iolations were tolerated because the system kept operating.").)

***Stephanie Ojeda.***  Finally, the defendant claims that the MOI of Stephanie Ojeda, an in-house attorney at Massey, would also have undermined the government's theory of prosecution. Specifically, he claims that Ojeda's MOI provides the following: "(1) Ojeda knew that Blankenship wanted a report [on her meeting with Ross] but was not sure how she learned that; (2) Blankenship and Adkins seemed to think Ross was legitimate, and Ojeda thought they were looking for solutions from Ross; (3) Blankenship did not like learning of inadequacies at Massey [and] Ojeda [] advised that Adkins was going to take heat for what Ross had stated; (4) the Hazard Elimination Committee started around the same time as Ross' recommendations were made; and

17

(5) Ojeda was certain that issues raised by Ross were discussed by the Hazard Elimination Committee." (R. 712-5, at 25933) (quotation marks and citations omitted).)

None of this helps the defendant. The fact that the defendant would want a report on Ojeda's meeting with Ross came out at trial through Ross's testimony. (R. 618, at 19916–17; *see id.* at 19778, 19783.) Similarly, many of the conclusory statements that the defendant relies on were available from other witnesses. Witnesses Ross and Blanchard were subject to extensive cross-examination regarding the hazard elimination program, the Hazard Elimination Committee, and the defendant's attitude towards violations. (*See, e.g.*, R. 618, at 19941–42; R. 619, at 20122, 20134–35, 20157 (cross-examination of Ross); *see also* R. 612, at 18712–14, 18736–39, 18785, 18794, 18797, 18801; R. 613, at 18832–34, 18856–58, 18951 (cross-examination of Blanchard).) In sum, the availability of the information contained in the Ojeda MOI subverts any likelihood of prejudice that the defendant allegedly suffered.

### 1.3.  The evidence would not have led to impeachment of key witnesses.

The defendant further asserts that the United States withheld MOIs that would have led to more effective cross-examination of witnesses Chris Blanchard and Bill Ross, claiming that the MOIs "were rife with impeachment information" that could have been used against the two. (R. 712-5, at 25934.) Any alleged impeachment evidence contained in the MOIs, however, was made available at trial. *See United States v. Smith Grading & Paving, Inc.*, 760 F.2d 527, 532 (4th Cir. 1985) (no *Brady* violation if defense is aware of evidence in time to reasonably and effectively use it at trial). There is therefore no support for this claim.

***Chris Blanchard.*** The defendant first argues that the MOIs of Chris Blanchard, the Massey employee in charge of UBB, contained impeachment information that could have been used at

18

trial.[5] These MOIs cannot substantiate any *Brady/Giglio* violation because they were utterly immaterial. All of the information that the defendant points to was either thoroughly elicited in Blanchard's testimony or otherwise inadmissible pursuant to the Court's order.

First, the defendant cites Blanchard's trial testimony that there was an "implicit understanding" at Massey and UBB that it was often cheaper simply to pay the fines that came along with violations than it was to spend the money that would have been necessary to follow the law. (R. 614, at 19112–13.) The defendant claims that the Blanchard MOIs undermine this testimony on the grounds that Blanchard actually meant that (a) the defendant believed MSHA fines were inevitable, and (b) some incorrect citations were not worth disputing. (R. 712-5, at 25935.)

But the defendant ignores that Blanchard actually was examined on what he meant by "understanding." Blanchard testified to the defendant's belief in the inevitability of fines, stating, "I think we both realized that violations would be written." (R. 611, at 18485.) The government, continuing in this line of inquiry, plainly asked Blanchard whether violations were inevitable, to which Blanchard responded, "Yes, sir." (*Id.*; R. 614, at 19136; *see* R. 611, at 18378.) The statements from the Blanchard MOIs that the defendant relies on were redundant of this point.

Second, the defendant points to a statement in an MOI indicating Blanchard's surprise that "respirable dust fraud was occurring at the mine" because "the company did not want people cheating on their respirable dust sampling." (R. 663-4, at 23358.) Again, Blanchard was extensively cross-examined by the defense about his knowledge of respirable dust fraud. (*See,*

---

[5] The defendant also had access to any information regarding Blanchard in the form of extensive pretrial preparation. By the time examinations were complete, both the defense and the United States viewed Blanchard as a witness in support of the defendant. (*See* R. 614, at 19122 (Blanchard admitting that he had considerable contact with defense counsel in preparing for cross-examination, and that his attorney's fees were covered by Massey).) In light of *Wilson*, the defendant cannot predicate any *Brady* claim on these materials.

*e.g.*, R. 613, at 18859–60.)  Blanchard's testimony was entirely consistent with the MOI, as he clearly indicated that he understood Massey did not want people cheating on their respirable dust samples because it could trigger investigations by MSHA.  (*Id.*)  Disclosure of the MOI would not have affected the trial or the impeachment of this witness in any way.

Finally, the defendant claims that the Blanchard MOIs reveal Blanchard's opinion that MSHA endangered the health and safety of miners.  (R. 663-4, at 23357.)  The MOI actually states, however, that "Blanchard does not believe that MSHA or anyone from MSHA was trying to do something to endanger the health and safety of miners.  Blanchard does think decisions MSHA made ended up endangering the health and safety of miners.  Blanchard does not think Joe Mackowiak was willing to sit down with Performance Coal Company and work out their differences."  (*Id.*)  This particular statement, when read in the full context of the MOI, related to Blanchard's disagreement with MSHA about the application of a specific regulation to the ventilation plan proposed by UBB.  Moreover, this specific disagreement was excluded from trial by the Court's order granting the government's motion *in limine*.  (*See* R. 463.)  The defendant cannot now circumvent a trial ruling here.  Since this information would not have been admissible in any event, the defendant cannot point to this to show any likelihood of a different jury verdict.

**Bill Ross.**  Like his arguments about the Blanchard MOIs, the defendant contends that the MOIs of Bill Ross, Massey's chief of technical services, contained a bounty of impeachment information that could have been used at trial.  (*See* R. 712-5, at 25936.)  The defendant again fails to recognize that the alleged impeachment evidence contained in the MOIs was made available at trial.

The defendant argues that the MOIs reveal that Ross encouraged Joe Mackowiak to reconsider his objection to belt air as a means to ventilate mines because it liberated high levels of

methane. (*See id.*) During trial, however, Ross was asked a series of questions about his relationship with Mackowiak. (R. 618, at 20004–07.) Amidst these questions, Ross testified that he had strongly encouraged Mackowiak to reconsider the use of belt air specifically because UBB produced high levels of methane. (*Id.*)

The defendant also asserts that the Ross MOIs demonstrate Ross's opinion that UBB was set up to fail because of the ventilation system that MSHA had forced UBB to use. (R. 712-5, at 25936.) At trial, however, Ross testified at great length on this issue. Ross testified that belt air was necessary for proper ventilation, but the positioning of certain fans made it impossible for UBB to present proper evidence to MSHA to justify the use of belt air. (R. 618, at 19998–20003.) Additionally, Ross gave testimony about his disagreement with the ventilation supervisor at MSHA about the ventilation system Ross and Massey claimed MSHA forced UBB to use. (R. 618, at 20006–07.) In short, all of this came out at trial.

### 1.4.  The undisclosed favorable evidence was not material.

Ultimately, the defendant's *Brady* claim is meritless because he fails to establish that the undisclosed favorable evidence was material. That is because it is highly unlikely that the outcome of the trial would have been different had the government turned over the undisclosed favorable documents to the defendant. (R. 529.)

First, the evidence supporting the defendant's conviction was overwhelming. The government elicited extensive testimony connecting the numerous safety citations at UBB to actual conditions observed by miner witnesses. (*See, e.g.*, R. 604, at 16960–75 (Racer re-direct); R. 606, at 17254–303 (Hutchens direct); *id.* at 17443–91 (Adams direct); R. 608, at 17857–905 (Halstead direct); *see also* R. 614, at 19194–251; R. 615, at 19259–86, 19286–364, 19371–404 (Blanchard re-direct).) A records custodian for MSHA testified regarding the volume and location of the

information in hundreds of the cited safety hazards, and he identified a number of specific violations issued to UBB during the indictment period.  (*See* R. 601, at 16280–311 (Childress); *see also id.* at 16312–15 (Childress testifying on cross-examination that all information on the number and type of citations issued to UBB during indictment period was publically available on MSHA's website).)  The government also presented other evidence and testimony that allowed the jury to determine that the defendant prioritized coal production at the expense of safety compliance, including memoranda between the defendant to Massey employees and statements from the defendant to Blanchard and Ross.  (*See, e.g.*, R. 615, at 19485–86 (defendant telling Blanchard to reopen mine section even though it lacked legal return airway); R. 604, at 17071 & Gov. Trial Ex. 79 (defendant telling supervisors to "run coal" and not "build overcasts," which are ventilation systems); R. 609, at 18153 & Gov. Trial Ex. 160 ("You need to . . . run some coal. We'll worry about ventilation or other issues at an appropriate time.").)  The government further presented other evidence establishing that the citations reflected serious safety violations.  (R. 609, at 18067–69, 18097–98; R. 614, at 19119–21, 19127.)  Moreover, the Fourth Circuit found that the district court correctly instructed the jury several dozen times that it needed to find the defendant guilty beyond a reasonable doubt, in addition to its instructions regarding the presumption of innocence and the government's burden.  *See Blankenship*, 846 F.3d at 679.

Second, as detailed above, much of the information that the defendant now points to was already available and effectively used through alternative means.  *See Bartko*, 728 F.3d at 337–40 (identifying egregious pattern of *Brady* violations by government but concluded failures were not material due to the strength of the government's case and the defendant's already extensive impeachment of a key government witness).  Blanchard and Ross were fully and effectively cross-examined for multiple days apiece.  Also, the predominant approach of the defense was to impugn

the credibility of MSHA, seeking to portray it as an overzealous and vindictive regulator.  (*See generally* R. 217.)  And while the defendant repeatedly claims that the new evidence calls into doubt whether he acted willfully, the Fourth Circuit has already held in his direct appeal that all the jury had to find was reckless disregard.  *Blankenship*, 846. F.3d at 674.  None of the evidence at issue here undermines the jury's unanimous finding in that respect.

Thus, when reviewing the withheld favorable evidence subject to *Brady* disclosures "in the context of the entire record," *Agurs*, 427 U.S. at 112, this Court should conclude there is no reasonable probability that the jury would have reached a different verdict.  Accordingly, the evidence was not material and no *Brady* violation occurred.

## 2. The defendant's Jencks Act claim is meritless because the statements were not relevant to the witnesses' testimony on direct examination.

The defendant next claims that the United States violated the Jencks Act by withholding MOIs related to testifying witnesses.  (R. 712-5, at 25939–41.)  He bases his claims on MOIs authored by SA Lafferty.  (*See id.*; R. 703-6, at 24449 (table of undisclosed pre-indictment MOIs, of which SA Lafferty authored #1); *id.* at 24451–54 (table of undisclosed post-indictment MOIs, of which SA Lafferty authored #s 2–9, 11, 13–35, 37–41, and 43–50).)  Some of the MOIs related to Blanchard (*see id.* at 24451–54, #s 19, 37, 38, 50), and some to Ross (*id.* #s 26, 29, 30, 35, 40). Others related to testifying witnesses the defendant does not specify.

His Jencks claim fails for two primary reasons.  First, the defendant does not show that any of the MOIs were in fact Jencks material.  Setting aside the MOIs relating to Blanchard and Ross, the defendant fails to specify any of the MOIs authored by SA Lafferty that allegedly qualify as Jencks Act material.  Moreover, none of the undisclosed MOIs are Jencks Act material as to SA Lafferty because none of them related to the substance of his testimony.  Likewise, the defendant's claims with respect to MOIs relating to Ross and Blanchard also fail because the MOIs at issue

are not Jencks material as to those witnesses.  Second, any failure to disclose the MOIs did not

result in prejudice.  The vast majority of the information came out at trial; the rest was either

inculpatory or would have provided weak grounds for impeachment.  The defendant also had a

full opportunity to cross-examine—and did vigorously cross-examine—each witness.  For these

reasons, the defendant's claims related to the Jencks Act should be dismissed.[6]

## 2.1.  MOIs authored by Special Agent Lafferty

Except for isolated quotations regarding Blanchard and Ross, the defendant does not point

to a single specific example from any other SA Lafferty-authored MOIs that he contends qualifies

as Jencks Act material.  (R. 712-5, at 25939–41.)  The law, however, requires greater specificity

to allege sufficiently a Jencks Act violation.  *United States v. Roseboro*, 87 F.3d 642, 645 (4th Cir.

1996) (explaining that a defendant "must first make a sufficiently specific request and provide

some indication that the witness gave a pretrial statement to a government agent generally related

to the witness' direct testimony"); *see id.* at 645–46 ("To invoke a court's duty under the

Act, . . . [t]he defendant's showing . . . must be more than a mere automatic demand for

---

[6] The defendant argues that the alleged Jencks Act violations violated his due process rights.  (R. 712-5, at 25939–41.)  He cites no law in support of this argument, nor does he argue or make a showing of bad faith. Even so, any due process claim therefore centers on whether there was in fact a Jencks violation and, if so, whether there was prejudice.  *See, e.g.*, *United States v. Stalvey*, No. 92-5008, 1992 WL 122288, at *2 (4th Cir. June 8, 1992) ("In the absence of bad faith or prejudice, the failure to disclose Jencks Act material will not result in reversal."); *United States v. MacDonald*, 778 F. Supp. 1342, 1350 (E.D.N.C. 1991) ("A failure to turn over statements of witnesses required under the Jencks Act will only warrant a new trial where the prosecutor's error was not harmless."); *see also United States v. Valenzuela-Bernal*, 458 U.S. 858, 872 (1982) ("Jencks Act violations . . . rise to the level of due process only when they so infect the fairness of trial as to make it more a spectacle . . . than a disciplined contest," which hinges on "favorab[ility] and material[ity]" (quotations omitted)); *cf. United States v. Augenblick*, 393 U.S. 348, 356 (1969) ("Indeed our Jencks decision and the Jencks Act were not cast in constitutional terms."); *id.* (lower court erroneously "elevated to a constitutional level what it deemed to be an infraction of the Jencks Act); *Scales v. United States*, 260 F.2d 21, 43 (4th Cir. 1958) (describing Jencks as procedural).  As this Response demonstrates, the defendant cannot show a Jencks violation and he cannot demonstrate prejudice.  To the extent he alleges an independent due process claim, it therefore fails as well.

government witness' statements"); *id.* at 646 ("An inadequate foundation may be grounds alone on which the court can properly deny further inquiry.").

Even assuming the defendant alleges a sufficiently specific Jencks claim regarding nearly all of the MOIs, documents implicate the Jencks Act only if they "relate[ ] to the subject matter *as to which the witness has testified*." 18 U.S.C. 3500(b) (emphasis added). "A statement relates to the subject matter of trial testimony if it 'relate[s] generally to the events and activities' to which the witness testified." *United States v. Poulin*, 461 F. App'x 272, 285 (4th Cir. 2012); *see United States v. Derrick*, 507 F.2d 868, 871 (4th Cir. 1974) (Jencks Act applies to "statements relat[ing] to the general context of the testimony of the witness"). Though Fourth Circuit case law providing further explanation of this language is scant, case law from other circuits indicates that "[r]elate[s] generally" does not apply to any statement that might happen to relate to the overall subject matter of the case. *See, e.g.*, *United States v. Susskind*, 4 F.3d 1400, 1404 (6th Cir. 1993) ("[T]he statutory test for production of a witness statement under the Jencks Act is not whether the statement relates to the subject matter 'at issue in [the] case.'"); *United States v. Smaldone*, 544 F.2d 456, 460–61 (10th Cir. 1976); *cf. United States v. Atkinson*, 513 F.2d 38, 39–42 (4th Cir. 1975) (CI notes of meetings with defendant in drug case—even though meetings pertained to related drug deals—not required to be turned over under Jencks because CI did not testify about the meetings and the meetings were not part of charged conduct).

None of the MOIs should be viewed to relate to SA Lafferty's testimony. SA Lafferty was a summary witness, whose testimony centered largely on the SEC charges, summary exhibits regarding information that he personally knew as a result of the investigation, and a review of a large volume of documents. (*See generally* R. 622, R. 623.) By contrast, the MOIs at issue concerned the specifics of the interviewees' job duties, underground mine conditions, or the

interviewees' relationships with the defendant or mine management, among other things outside of SA Lafferty's personal knowledge. (*See, e.g.*, R. 663-2, at 23167–70, 23177–80; R. 663-3, at 23205–06; R. 663-4, at 23303–04, 23352–54.) SA Lafferty's testimony did not focus on this information or on any other information provided by any of the individuals whose MOIs he authored. Moreover, Lafferty's testimony on whatever those witnesses discussed during their interviews would have been inadmissible hearsay.

Only two witnesses' MOIs could even be remotely construed to relate to SA Lafferty's testimony. SA Lafferty testified at certain points, and in broad terms, about daily violation reports. (*See, e.g.*, R. 622, at 20778–81.) Witness Sandra Davis did as well. (*See, e.g.*, R. 602, at 16514.) That said, any material information from Sandra Davis's MOIs came out at trial. (*See* R. 663-3, at 23219–20 (Davis MOI explaining her duties as the defendant's secretary); R. 663-4, at 23342–46 (Davis MOI identifying voice recordings and emails); R. 601, at 16398–99 (Davis testifying about her duties as the defendant's secretary); *id.* at 16454–60 (Davis identifying voice recordings at trial); R. 602, at 16514 (Davis's testimony about daily violation reports, and about her providing the defendant with those reports).)

SA Lafferty was also asked (but, because he did not have personal knowledge, indicated he would have to review additional information before offering further testimony) about UBB's fireboss files. (*See* R. 622, at 20984, 20986.) Witness Larry Adams, a fireboss at UBB, testified about examining belts, which was part of his job duties. (*See, e.g.*, R. 606, at 17453–55, 17498–99; R. 607, at 17506–37.) Adams provided some testimony that was helpful to the defendant (at one point, UBB hired extra staff to combat safety violations, *see* R. 606, at 17447), and some that was not (at another point, the defendant oversaw a reduction in force that harmed mine safety, *see id.* at 17451–53). All of that information was in Larry Adams's MOI. (*See, e.g.*, R. 663-2, at

23182–84.)  Thus, even if those MOIs qualified as Jencks Act material, any failure to disclose them did not result in prejudice.  *See Rosenberg v. United States*, 360 U.S. 367, 370 (1959).

### 2.2.  MOIs Relating to Bill Ross and Chris Blanchard

The defendant contends that Ross's and Blanchard's MOIs would have aided in their cross-examination.  (*See* R. 712-5, at 25937, 25940.)  His argument has no merit because those MOIs are not Jencks Act material as to Ross or Blanchard.  A written MOI qualifies as Jencks Act material if it was authored by the witness or if it was otherwise read to or adopted by the witness. *Roseboro*, 87 F.3d at 645; *see United States v. Hinton*, 719 F.2d 711, 715 (4th Cir. 1983) (witness statement is Jencks "'only upon a finding of unambiguous and specific approval'" (quoting *Goldberg v. United States*, 425 U.S. 94, 112 (1976) (Stevens, J., concurring))).  None of these circumstances applies to the MOIs generated for the interviews with Ross or Blanchard.  SA Lafferty—not Blanchard or Ross—authored the MOIs.  And the defendant does not point to any evidence that either witness read the MOIs, had the MOIs read back to them, or otherwise approved or adopted the MOIs.

The defendant tries to rebut this shortcoming by noting that the MOIs he cites have direct quotations in them.  While the MOIs appear to contain quotation marks, none of the quotes appear to be attributable to the interview subjects.  Even were it otherwise, the defendant's assertion would not change the conclusion that the MOIs are not Jencks Act material as to Ross or Blanchard.  *See Roseboro*, 87 F.3d at 645 (noting that "interview notes that 'merely select[ ] portions, albeit accurately, from a lengthy oral recital" fail Jencks Act's requirement of a "substantially verbatim recital." (quoting *United States v. Palermo*, 360 U.S. 343, 352 (1959))).

### 2.3.  The defendant was not prejudiced.

Even were the court to assume that the MOIs are subject to disclosure under the Jencks Act, the defendant still would not be entitled to relief because there is no prejudice.  Since a Jencks Act violation is not of constitutional dimension, *Augenblick*, 393 U.S. at 356, a Jencks claim is cognizable in a § 2255 motion only if it reveals "a fundamental defect which inherently results in a complete miscarriage of justice."  *Davis v. United States*, 417 U.S. 333, 346 (1974); *cf. United States v. Schell*, 775 F.2d 559, 567 (4th Cir. 1985); *Lovern v. United States*, 689 F. Supp. 569, 578 (E.D. Va. 1988) (explaining that "the defendant must make some showing of prejudice").  Although the defendant broadly asserts that the alleged violation was "so pervasive and prejudicial" as to run afoul of due process, closer examination of the record and the materials at issue shows no prejudice.

The defendant's only argument with respect to prejudice turns on a strawman in which he imagines a trial where the testimony of Lafferty, Blanchard, and Ross were all stricken.  (*See* R. 712-5, at 25940–41.)  He cites no authority to suggest that is how prejudice from a Jencks Act violation is measured even on direct appeal, let alone collateral review here.  *Cf. United States v. Smith*, 723 F.3d 510, 512 (4th Cir. 2013) (holding that even for constitutional errors, harmlessness on collateral review looks for "substantial and injurious effect or influence in determining the jury's verdict" (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993))).

Instead, the proper inquiry looks to whether the undisclosed Jencks material—had it been made available to the defense—would have made any difference to the verdict.  For instance, the Fourth Circuit has held alleged Jencks violations harmless—because the defendant did not suffer prejudice—where the substance of the material: was turned over elsewhere, *see Schell*, 775 F.2d at 567; came out at trial in any event during cross-examination, *see Rosenberg*, 360 U.S. at 370;

*United States v. Clark*, Nos. 87-7188, 87-8043, 88-7057 and 88-7058, 1988 WL 70413, at \*1 (4th Cir. July 5, 1988); would have provided weak grounds for impeachment even if turned over, *see United States v. Truong Dinh Hung*, 667 F.2d 1105, 1107 (4th Cir. 1981); or the defendant otherwise had an opportunity for full and effective cross-examination, *see United States v. Lewis*, 35 F.3d 148, 152 (4th Cir. 1994).  As described below, all of these circumstances apply here, and there is thus no prejudice.[7]

**Chris Blanchard.**  To support his Jencks Act argument regarding Blanchard, the defendant points to one sentence in a Blanchard MOI about advance notice: "Blanchard stated that the purpose of calling is to fix things, 'lighten up compliance' and to make sure people are in place for safety concerns."  (R. 712-5, at 25940 (quoting R. 663-2, at 23149).)  Any failure to disclose this MOI did not result in prejudice for two reasons.  First, Blanchard testified on direct examination at trial about advance notice.  (*See, e.g.*, R. 609, at 18109 (Blanchard testifying that he was aware of what advance notice was, that it took place at UBB, and that it was illegal).)  He also did so on cross examination.  (*See, e.g.*, R. 610, at 18323, 18327–30.)  Given Blanchard's lengthy cross-examination that lasted nearly five days, the defendant sustained no prejudice.  Moreover, one sentence from an MOI would have provided, at best, "weak grounds for impeachment even if turned over."  *Truong Dinh Hung*, 667 F.2d at 1107.

Second, and most significantly, the defendant was acquitted of any charges relating to advance notice.  (*See* R. 547, at 12000 (Court's order breaking conspiracy into two parts, with the first part linked to conspiracy to violate federal mine safety and health standards in violation of 30 U.S.C. § 820(d)); R. 529, at 9726 (finding the defendant guilty of "conspir[ing] to willfully violate

---

[7] Any failure to disclose the MOIs regarding Blanchard and Ross also did not result in prejudice for the same reasons articulated in the sections of this Response concerning the defendant's *Brady* arguments.

mandatory mine health and safety standards"); R. 169, at 2303 (¶ 87a of Superseding Indictment listing, as one of the two objects, conspiring to violate mine safety and health standards in violation of 30 U.S.C. § 820(d));) 30 U.S.C. § 820(d) (criminalizing willful violations of MSHA "health or safety standard[s]," which are regulations promulgated pursuant to 30 U.S.C. § 811(a)); (*see also* R. 169, at 2303 (¶ 87b of Superseding Indictment listing, as the other object, conspiring to defraud the United States, which necessarily excluded any charges related to 30 U.S.C. § 820(d));) 30 U.S.C. § 820(e) (penalizing advance notice, which, according to 30 U.S.C. § 813(a), is a substantive provision of the Mine Safety and Health Act, rather than the "safety and health standards," or regulations, incorporated into the conspiracy under R. 169 ¶ 87a). The defendant provides no explanation—nor can he—for how he could have possibly been prejudiced by the failure to disclose this information.

*Bill Ross.* The defendant cites a statement from an MOI of Bill Ross in support of his argument that he could have utilized it at trial to demonstrate his attention to mine safety. (R. 712-5, at 25940.) This theory, however, is refuted by several statements from other MOIs, including another Ross MOI. When Ross provided the defendant with safety recommendations for UBB, the defendant challenged him by drawing Ross's attention to the costs associated with mine safety, and by telling Ross that there was more to it than he understood. (R. 663-3, at 23260; *see also id.* at 23254 (defendant shaking his head in response to Ross telling him Massey could not afford a disaster); *id.* at 23270 (defendant alleging MSHA bias when Ross confronted him with issues with respirable dust sampling).) In short, the single example the defendant cites is far outweighed by several counter-examples. The allegedly undisclosed information also came out at trial. Ross testified about the defendant's reaction to his safety recommendations. (*See* R. 618, at 19902–05; *id.* at 19907 ("When, when the meeting was over and I was ready to leave I said, 'Well, Mr.

Blankenship, irregardless of whatever comes of, of this, there's one thing you can't afford to have happen.'  And he said, 'What's that?'  I said, 'You can't afford to have a disaster because most mines don't survive a disaster.'").)

The defendant further notes that he did not have a copy of a diagram sketched by Ross that was attached to one of the Ross MOIs.  (*See* R. 712-5, at 25940.)  The sketch, which concerned sweep air and continued production, depicted Ross's rendition of the mining sequence at the working face of a UBB mine section.  (*See* R. 663-3, at 23275, 23282.)  But the defendant was aware that ventilation plans were relevant to this case because the Superseding Indictment indicated as much.  (*See* R. 169, at 2274 ¶ 12 (description in Superseding Indictment of laws related to mine ventilation plans, including mining-sequence schematics required as part of ventilation plans).)  This information was also available elsewhere, such as in the mine's own ventilation plan. *See* 30 C.F.R. §§ 75.370, 75.371.  This ventilation plan was generated by the mine, and it was posted on the MSHA website immediately following the accident in 2010.  *See, e.g.*, https://www.msha.gov/PerformanceCoal/UBBVentilationPlans.asp.  As a practical matter, in comparison to the actual plans, Ross's handwritten drawing had little-to-no value.

Moreover, the drawing is not material.  In denying re-cross-examination of Ross, based in part on the defense's desire to be able to ask about a document referred to on redirect-examination, the Court explained that materiality hinges on the substance of a document rather than the formality of whether a particular document was turned over.  (*See* R. 620, at 20368.)  Here, the substance of the sketch is dwarfed by the volume of material to which the defendant has had and continues to have access regarding Ross and Blanchard.  This is particularly true given that both worked for Massey and at UBB during the relevant time period.

*SA Lafferty.*  A breakdown of the MOIs authored by SA Lafferty demonstrates that any failure to disclose them did not result in prejudice.  By way of example, of the 61 undisclosed MOIs, 28 are for persons the prosecution chose not to present as trial witnesses; their value is therefore necessarily limited.  As another example, 34 of the subjects of the undisclosed 40 MOI subjects worked for the defendant at Massey.  Because they were employed by the defendant's own company, the defense was or should have been aware of these people.

In addition, some MOIs document interviews of UBB miners.  (*See, e.g.*, R. 663-2, at 23167–70, 23177–80, 23182–84; R. 663-3, at 23240–41, 23186–88, 23205–06, 23243–44, 23249, 23246–47, 23237–38, 23213–15, 23208–11; R. 633-4, at 23352–54, 23303–04.)  The information the miners conveyed in their interviews was already publically available.  The defendant received over 290 sworn witness interview transcripts from miners who participated in MSHA's accident investigation, and included in that group were interview transcripts related to all 11 miners with MOIs in this case.  (*See* R. 600, at 16107–08 (defense counsel referencing the transcripts to support an objection); *id.* at 16164 (defense counsel using accident-investigation transcript to impeach Bobbie Pauley).)  Those accident transcripts touch on the same topics noted in the MOIs—only in more depth.    The transcripts have been publically available since early 2012.    *See* https://www.msha.gov/PerformanceCoal/Transcripts/December2011/UBBInterviews122011.asp.

As to the other MOIs, any information that could even remotely be described as material came out at trial.  For example, the miners who testified all described similar adverse conditions underground, a lack of knowledge about any programs tailored to hazard elimination, and their awareness that production was prioritized over safety.  (*See, e.g.*, R. 600, at 16095, 16106–09, 16111–13, 16118–19, 16120, 16134–35, 16137–38 (Pauley Trial Tr.); R. 663-2, at 23177–80 (Pauley MOI); R. 603, at 16831, 16845 (Young Trial Tr.); R. 663-3 at 23208–11 (Young MOI);

R. 603, at 16862–63, 16866–67, 16871–74 (Smith Trial Tr.); R. 663-3, at 23213–15 (Smith MOI);

R. 603, at 16894–97, 16905–08, 16911–12 (Racer Trial Tr.); R. 663-4, at 23303–04 (Racer MOI);

R. 606, at 17262–63, 17267–70, 17274–78, 17285–87 (Hutchens Trial Tr.); R. 663-3, at 23186–88 (Hutchens MOI); R. 606, at 17384–90, 17400 (Hodge Trial Tr.); R 663-3, at 23205–06, 23243–44 (Hodge MOI); R. 606, at 17446–50, 17453, 17462–63, 17469–70, 17480, 17488 (Adams Trial Tr.); R. 663-2, at 23182–84 (Adams MOI); R. 607, at 17543–45, 17550–52, 17557 (Ellison Trial Tr.); R. 663-4, at 23352–54 (Ellison MOI); R. 607, at 17610–12, 17615, 17618–19, 17625, 17698 (Stewart Trial Tr.); R. 663-2, at 23167–70 (Stewart MOI); R. 663-3, at 23240–41 (Stewart MOI).) Further, other undisclosed MOIs contained inculpatory information, or information that was otherwise likely to harm the defendant's case.  (*See, e.g.*, R. 663-3, at 23227–28 (Hanretty MOI); R. 663-4, at 23300 (Ross MOI noting that Ray McKinney, a Massey employee, told Ross multiple times in July 2015 that "an attorney who represented Massey" wanted to hire Ross); *id.* at 23350 (MOI noting that one of the defendant's attorneys in the criminal case talked to Gary May about the ramifications of testifying at trial on behalf of the government).)

*Opportunity for Full and Effective Cross-Examination.*  Finally, any failure to disclose the MOIs at issue did not result in prejudice because the defendant was able to conduct a full and effective cross-examination as to all three witnesses.  *See Lewis*, 35 F.3d at 152.

For example, as described above, Bill Ross and Chris Blanchard were two of the government's key witnesses.  Although Ross's direct examination was only one day, the defense cross-examined him for two days.  (*See* R. 617, 618, 619.)  The Court held at trial that the defense had a full opportunity to cross-examine Ross (R. 620, at 20366–69); nothing has changed since then.  Similarly, while Blanchard's direct examination lasted only one day, the defense cross-examined him for nearly five days.  *See Blankenship*, 846 F.3d at 670; (*see generally* R. 609, 610,

611, 612, 613, 614.)  The defendant was offered the opportunity to supplement his already lengthy cross-examination of Blanchard, yet chose not do so.  (*See* R. 616.)  To this point, the United States had to impeach Blanchard—initially called as witnesses for the government—on re-direct examination.  (*See generally* R. 614, 615.)  In other words, by the time examinations were complete, both the defense and the United States viewed Blanchard as a witness in support of the defendant.  (*See* R. 614, at 19121–23 (Blanchard admitting that he had considerable contact with defense counsel in preparing for cross-examination, and that his attorney's fees were covered by Massey).)  There is no basis for the defendant to claim that he was denied the opportunity to fully and effectively cross-examine these witnesses.  The defendant's position is further undermined by the fact that the defendant—who had filed a bevy of pre-trial motions, possessed a large team of lawyers, spared no expense or opportunity to pursue every argument he could, and contested every stage of the prosecution—elected not to put on any witnesses of his own.

In addition, and in particular regarding Blanchard, this Court held at trial that the defendant had the chance for a full cross-examination.  (*See, e.g.*, R. 472 (United States's response in opposition to re-cross-examination, which provides a thorough explanation for how the defendant was provided a thorough opportunity for cross examination of Blanchard); R. 616, at 19511–21 (Court's explanation for and denial of re-cross of Blanchard); R. 620, at 20366–69 (Court's denial of re-cross of Ross).)  The Fourth Circuit agreed.  *See Blankenship*, 846 F.3d at 670 ("[A]ll of the subjects on which Defendant requested re-cross-examination [of Blanchard] were either effectively dealt with on cross-examination or cumulative of other evidence introduced at trial."); *id.* ("Furthermore, Defendant's cross-examination of Blanchard lasted nearly five days—more time than direct and redirect examination combined—and therefore Defendant had an extensive

opportunity to examine Blanchard."); *id.* ("Most significantly, Defendant could have recalled Blanchard as a witness later in the trial.").  The circumstances since then remain the same.

### 3.  The government did not commit prosecutorial misconduct.

The defendant next claims that the government committed prosecutorial misconduct because it "repeatedly misrepresented" its compliance with the Court's discovery orders.  (R. 712-5, at 25941.)  Like his other claims, this claim also fails.

In order to prove reversible prosecutorial misconduct, the defendant must demonstrate both improper conduct and resulting prejudice.  *United States v. Tzeuton*, 370 F. App'x 415, 420 (4th Cir. 2010).  In determining whether a defendant was prejudiced, the Court must consider the following factors:

> (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

*United States v. Harrison*, 716 F.2d 1050, 1052 (4th Cir. 1983).  Ultimately, "[t]he relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotations omitted).  Under this standard, it "is not enough that the prosecutors' remarks were undesirable or even universally condemned."  *Darden*, 477 U.S. at 180–81.  The Court must evaluate the challenged remarks in the context of the record as a whole.  *United States v. Young*, 470 U.S. 1, 11–12 (1985).

"Prosecutors, moreover, retain substantial latitude to present their case as they see fit."  *Bennett v. Stirling*, 842 F.3d 319, 323 (4th Cir. 2016) (explaining further that such "latitude is not to be casually abridged"); *see also Young*, 470 U.S. at 7 ("The line separating acceptable from

improper advocacy is not easily drawn.").  Accordingly, the Supreme Court has instructed, courts "should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning" or that a jury "will draw that meaning from the plethora of less damaging interpretations."  *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974).

The defendant first fails to establish improper conduct by the prosecutors.  First, the defendant contends that AUSA Ruby misled the defense and the Court by asserting that he had "turned over MOIs" for Chris Blanchard when he had, at that time, turned over one MOI.  AUSA Ruby had mistakenly believed that two MOIs for Chris Blanchard had been turned over to the defense.  OPR concluded that "the most natural understanding of [AUSA] Ruby's oral statement . . . is that the Government had disclosed all of [Chris Blanchard's] MOIs."  (R. 703-4, at 24196.) AUSA Ruby's remark was not even made before the jury, and therefore not intended to mislead the jury.  (R. 615, at 19495–19505.)  The remark did not prejudice the accused nor, as OPR concluded, did it intentionally mislead the Court.  (See, e.g., R. 703-4, at 24112, 24196.)  And given its isolated nature out of the presence of the jury, AUSA Ruby's representation could not have had a probable, cumulative effect on the jury.  OPR correctly concluded that AUSA Ruby's mistaken remarks, including those regarding to the Blanchard MOIs, were unintentional.  This allegation certainly does not rise to the level of improper conduct.

The defendant further alleges that USA Goodwin heard AUSA Ruby's representations to the Court and "did nothing to correct them or to otherwise ensure that his team had complied with its discovery obligations."  (R. 712-5, at 25942.)  In support, the defendant attempts to analogize the facts here to *United States v. Kojayan*, 8 F.3d 1315 (9th Cir. 1993), a case in which the Ninth Circuit found that the prosecutors had committed misconduct by failing to disclose a co-conspirator's cooperation agreement but had misrepresented otherwise to the court.  In support of

its holding, the *Kojayan* court relied heavily on the fact that the supervising prosecutor failed to recognize the misconduct of his subordinate, which was evident from even the most dispassionate review of the record.  8 F.3d at 1320.

The defendant's reliance on *Kojayan* is misplaced.  Unlike *Kojayan*, here, neither USA Goodwin nor AUSA Ruby intentionally made false statements to the defense or the Court that were evident from even the most dispassionate review of the record.  *See id.*  This is further supported by OPR's conclusion, which also reached the same: that the prosecutors did not mislead the Court regarding the government's MOI disclosures.  OPR further found that any nondisclosures, if strategically intentional, were not made with the intent to withhold exculpatory evidence from the defense.  (R. 703-4, at 24179–84.)

Even assuming that the defendant had established improper conduct by the prosecutors, the defendant has not established that such conduct "so infected the trial with unfairness to make the resulting conviction a denial of due process."  *Darden*, 477 U.S. at 181.  The representations and remarks the defendant claims were improper were isolated, the proof of the defendant's guilt at trial was strong, and there is no evidence that the prosecutors' representations were made in bad faith "to divert attention to extraneous matters."  *Harrison*, 716 F.2d at 1052; *see Darden*, 477 U.S. at 181.  Above all, the defendant has not shown that there is any reasonable probability that the jury would have reached a different verdict.  Again, AUSA Ruby's remark was not even made before the jury.  As such, any prosecutorial misconduct, even if assumed, does not rise to a constitutional violation.  Because the defendant cannot demonstrate improper conduct or resulting prejudice, his prosecutorial misconduct claim fails.

.

## 4.  **There is no need for a hearing.**

Finally, the defendant's motion should be denied without a hearing.  In deciding a § 2255 motion, a court need not hold a hearing if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255; *see also Raines v. United States*, 423 F.2d 526, 531 (4th Cir. 1970) (evidentiary hearing unnecessary if motion can be resolved based on record before the court).  Allegations of "a vague, conclusory, or palpably incredible nature" do not raise factual issues which require a full hearing.  *Machibroda v. United States*, 368 U.S. 487, 495 (1962).

The defendant has raised nothing that requires the development of additional evidence.[8] While the United States does not dispute that some of the materials were discoverable and should have been disclosed pursuant to Department of Justice policies (*see* R. 712-6, at 25947), these errors are not sufficient to entitle the defendant to relief on collateral review.  An examination of the files and records in this case—including, but not limited to, pleadings, exhibits, and transcripts—conclusively shows that the defendant is not entitled to any relief for one overarching reason: the defendant has not shown that he suffered the required prejudice or harm to warrant relief under 28 U.S.C. § 2255.

In sum, because the record conclusively shows that the defendant is not entitled to relief on collateral review, an evidentiary hearing is unnecessary.  In light of the overwhelming evidence

---

[8] The defendant also seems to argue that an evidentiary hearing is necessary to determine if missing records contain exculpatory or impeaching material.  (*See* 712-2, at 25906–07.)  The 28 employees at issue, however, were not subject to discipline.  (*See* R. 703-8, at 26432.)  Those records are therefore immaterial.  Any final agency decisions, and any records relating to those decisions, regarding the five employees ultimately disciplined are otherwise already known.  (*See* 663-6, at 23548–78; *see also* R. 703-8, at 26432.)  None of these records are relevant or material to the defendant's conviction.  Additionally, for all the reasons stated in this Response, overwhelming evidence supports the conviction, and the defendant's "vague, conclusory, or palpably incredible" allegations do not raise factual issues that require a hearing.  *Machibroda*, 368 U.S. at 495.

supporting the defendant's unanimous conviction, and the fact that much of the information the defendant alleges was undisclosed was available to and effectively used through alternative means, there is no reasonable probability that the jury would have reached a different verdict.  His motion should be denied without a hearing.  *Machibroda*, 368 U.S. at 495.

## CONCLUSION

For these reasons, the United States respectfully requests that the Court deny the defendant's motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255 (R. 663, 704, 712-5) without a hearing.

Respectfully submitted,

MATTHEW G. WHITAKER
Acting United States Attorney General

BENJAMIN C. GLASSMAN
United States Attorney

s/Douglas W. Squires
DOUGLAS W. SQUIRES (OH 0073524)
JESSICA H. KIM (OH 0087831)
S. COURTER SHIMEALL (OH 0090514)
Special Attorneys to U.S. Attorney General
Assistant United States Attorneys
Southern District of Ohio
303 Marconi Boulevard, Suite 200
Columbus, Ohio 43215
Office: (614) 469-5715
Fax: (614) 469-5653

## CERTIFICATE OF SERVICE

I, Douglas W. Squires, certify that on November 16, 2018, the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users, or if they are not, by serving a true and correct copy at the addresses listed below:

Mr. Howard C. Vick
Michael A. Baudinet
MCGUIREWOODS LLP
Gateway Plaza
800 E. Canal Street
Richmond, VA 23219-3916

Benjamin L. Hatch
MCGUIREWOODS LLP
World Trade Center
101 W. Main Street, Suite 9000
Norfolk, VA 23510-1655

W. Henry Jernigan, Jr.
DINSMORE & SHOHL LLP
707 Virginia Street, East, Suite 1300
P.O. Box 11887
Charleston, West Virginia 25339-1887

/s/Douglas W. Squires
DOUGLAS W. SQUIRES (OH 0073524)
Assistant United States Attorney