**Report of Interview**

**U.S. Department of Labor**
**Office of Inspector General**
**Office of Investigations**



Page ___1___ of ___2___

OIG Form 103 (OI – 1/98)

| Investigation on: | 5/21/2012 | At: | | File: | 31-0801-0025 PC |
|---|---|---|---|---|---|

By: Special Agent Jeffrey Carter *JнC*

Date Prepared: 5/25/2012

**Person Interviewed:**     Lisa Okes

On May 21, 2012, Lisa Okes was interviewed at the above listed address by Assistant Special Agent- in-Charge Richard Deer and Special Agent Jeffrey Carter, United States Department of Labor, Office of Inspector General. Credentials were displayed and the nature of the contact was stated. Okes agreed to be interviewed and voluntarily provided the following information:

Okes is currently employed by the Veteran's Administration (VA) as the secretary to the associate director for patient care services and has been in that position since August 2011. Prior to her employment at the VA Okes was employed as a field office secretary for Mine Safety Health Administration (MSHA), District 4, Mt. Hope field office. Okes was employed at the Mt. Hope field office from April 2008 until August 2011. Her immediate supervisor was                           .

Okes' duties while employed at the field office included: maintained and reviewed inspection files and reports for completeness, tracked citations to include closed and pending, reviewed citations, issued contractor identification numbers, assigned mine IDs, made sure legal IDs were up to date and correct, purged the uniform mine files and worked as a liaison between the inspectors and         . Okes reviewed inspection reports for completeness. Okes answered the phone, handled correspondence, FIOA requests and also worked with conference litigation.

Okes explained that the uniform mine file was a hard copy book that housed current plans, base plans, addendums, approvals and denial letters and unabated citations. Okes said a lot went into the file and that she couldn't remember everything.

Okes filled in for                           for the ventilation department while she was on
            and Doris Chambers also filled in for            while she was on leave.

Okes explained that the ventilation secretary would send or hand-carry an approval or denial to the office. The plan was usually received the same day it was approved or denied because the district office and the field office are in the same building. Once Okes received the plan she stamped it received and when the material was placed into the mine file it was stamped again with date and initials. A copy is placed in the mine file, one was sent to the supervisor, and to the inspector.

UBB wasn't in Okes' work group at the time of the explosion.                           was responsible for UBB.
        took over UBB's file in October 2009. Okes helped out when        was absent from work. Okes filled in for
            on multiple occasions such as when        was out for        . Okes explained that each year mines switched work groups.

EXHIBIT 1

Okes was aware that the ventilation department had a backlog of plans that needed to be reviewed, because it was visible when you visited the vent department. The plans were on a metal cabinet located near the secretary. Okes stated there was a backlog in the field office to file materials into the mine files.

Okes explained that UBB's mine file was huge, it contained three books. One book was devoted to ventilation. Okes explained that she wouldn't know if anything was waiting to be sent to the field office. Okes was at the end of the process. The mine files were reviewed quarterly by the inspectors and annually by the supervisors. Anyone going to a mine to conduct a spot inspection should review the mine file beforehand. Okes recalled that she sometimes would have to call the ventilation department for a methane dust control plan. Okes explained that the ventilation section of the mine file was difficult to maintain. Portions of plans may need to be replaced unlike roof control where the whole plan is replaced. Okes stated that she had voiced her concerns about the ventilation portion of the mine files.

Okes stated ventilation specialists were sent to the field office to review all uniform mine files.                and                conducted the review. Okes couldn't recall if this was before or after the explosion. They came up to the field office to make sure the uniform mine files were correct. They took the mine files into the conference room mine by mine.

Okes worked until midnight the day of the UBB explosion. Everyone was working on getting the most up to date information to the mine. The ventilation department took care of getting their plans together.

Okes and                reviewed the mine file to make sure it was up to date. Okes believed that the vent department sent someone to review the ventilation portion of the file. Okes didn't recall having to do a lot to bring it up to date.

Okes stated that the uniform mine file has a retention schedule. A log isn't kept when items are added or removed from the uniform mine file.

Okes recalled that Joe Mackowiak specifically said that purged itemed didn't need to be kept in the mine file. According to Okes,                kept a lot in the file. Okes explained that UBB's mine file also had an file folder that had maps that were coordinated by date.

DLB-001747
This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

**Report of Interview**

**U.S. Department of Labor**
**Office of Inspector General**
**Office of Investigations**



| Page 1 of 2 | | OIG Form 103 (OI – 1/98) |
|---|---|---|

| Investigation on: | 5/22/2012 | At: | | File: | 31-0801-0025 PC |
|---|---|---|---|---|---|

By: Special Agent Jeffrey Carter *(signature)*                    Date Prepared: 5/29/2012

---

**Person Interviewed:**        Larry Cook

On May 22, 2012, Larry Cook who resides at the above listed address was interviewed at the Mine Safety and Health Administration (MSHA) Academy located in Beaver, WV by Assistant Special Agent- in-Charge Richard Deer and Special Agent Jeffrey Carter, United States Department of Labor, Office of Inspector General. Agency credentials were displayed and the nature of the contact was stated. Cook agreed to be interviewed and voluntarily provided the following information:

Cook is currently employed by MSHA as an electrical instructor at the mine academy. He has been in that position since November 2011. Prior to the academy Cook worked for MSHA's District 4 office located in Mt. Hope, WV as a supervisory electrical engineer. He held that position from 2000 until November 2011.

Cook stated that            was the secretary in the electrical department at Mt. Hope. Cook stated that came to him and told him that someone from the ventilation department came to        to borrow her red mine file stamp. Cook believed that the stamp was borrowed because the ventilation department couldn't find their secretary's stamp because the ventilation secretary was on leave. Cook believed that it could have been        that borrowed the stamp. Cook stated that this occurred after the UBB explosion.

Cook informed            about what had taken place.            told Cook that he would look into the matter. informed Cook that the files were being updated. Cook wasn't sure which files were being updated. Cook stated that he didn't follow up with the ventilation department.            got her mine file stamp back from the ventilation department and hid it.

            was the ventilation secretary who was out on            . Cook wasn't sure when she was on leave or for how long.

After the explosion the district as a whole had a lot going on. Copies of plans were sent to MSHA headquarters. Then ventilation department was behind. Cook didn't know what was going on in the ventilation department, only that they were behind.

Cook stated that each department had its own standard operating procedure (SOP). Cook explained that when a plan was received into the electrical department it was stamped to show that it was received. The plan is then logged into the MSIS (MSHA standardized system) system for tracking. The plan is then assigned to a reviewer. Once the plan is reviewed it is sent to Cook for review. Cook explained that this process is tracked using a plan transmittal sheet. Once the plan is signed off on it is returned to the secretary. The secretary then stamps the plan with the red mine file stamp which is dated and initialed. Once the plan received the mine file

DLB-001748

stamp it was sent to the appropriate field office to be added to the uniform mine file for that particular mine. Cook stated that the electrical department assigned a number to each plan. Cook stated that in some instances the back of submittals would be stamped to designate that the submittal was an addition to a plan. The back was stamped to show that it was not part of the original. The electrical department emailed plans to the field offices.

Cook believed that MSIS was implemented in 2003. Dates are also added when a plan is approved or denied into the system. MSIS assigned each plan a number for tracking. When a plan was entered into the MSIS system a description of the plan that was submitted was also entered. The electrical department also entered which reviewer was assigned the plan. Cook explained that reports were generated from the MSIS system. One such report was called the pending plans report. This report tracked how many pending plans there were. Cook stated that this report was sent to            secretary            weekly on Thursday. Brooks compiled the information from the various departments into one report for Kline. According to Cook, Kline forwarded the report to headquarters.

Cook stated that inspectors relied on the uniform mine file to conduct inspections. Cook stated that the MSIS system could be compared to the uniform mine file to see if it was up to date. Cook didn't think inspectors would check the MSIS system against the uniform mine file. Cook stated when a plan was approved the plan that it replaced was usually removed from the uniform mine file and thrown out. Cook stated that the field office secretaries were not comfortable with removing plans from the uniform mine file and left that to the inspectors.

Cook explained that a base plan is submitted to MSHA by the mine and that addendums and revisions follow the base plan. Annual maps are submitted to MSHA by the operators to show projections.

DLB-001749

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

**Report of Interview**

**U.S. Department of Labor**
**Office of Inspector General**
**Office of Investigations**

Page   1   of   2

OIG Form 103 (OI – 1/98)

| Investigation on: | 5/22/2012 | At: | | File: | 31-0801-0025 PC |
|---|---|---|---|---|---|

By: Special Agent Jeffrey Carter *Jac*

Date Prepared: 5/29/2012

**Person Interviewed:**      Natasha Cordle

On May 22, 2012, Natasha Cordle was interviewed at the above listed address by Assistant Special Agent- in-Charge Richard Deer and Special Agent Jeffrey Carter, United States Department of Labor, Office of Inspector General.  Agency Credentials were displayed and the nature of the contact was stated.  It was explained to Cordle that her participation in the interview was voluntary.  Cordle agreed to be interviewed and voluntarily provided the following information:

Cordle is currently employed by the Mine Safety and Health Administration (MSHA) at the National Academy as a housing specialist.  Cordle's duties include classroom scheduling, contract management and managing the residence hall.  Cordle has held this position since September 12, 2010.  Prior to her employment at the academy Cordle worked as a secretary in the ventilation department for MSHA District 4 at the Mt. Hope office.  Cordle was secretary for ventilation supervisor Joe Mackowiak and the ventilation specialist.  Cordle held this position from July 7, 2008 until September 12, 2010.  Cordle's duties included plan processing, filing, typing memos, clerical work, and also assigning plans to the reviewers.  Cordle explained the only time a plan would be assigned was if the plan needed to be rushed, for example if a plan had a citation attached to it. Mackowiak would assign the plans in those instances.

The ventilation department had a large metal storage bin divided into shelves where the plans were stored. Reviewers picked plans off of the top, which would be the oldest plans received.  Plans were only assigned under special circumstances.

Cordle stamped plans as they were received.  She stamped the cover letter and the corners of the maps.  The stamp shows the date the information was received and has the words received.  Ventilation specialist would have stamped received plans if Cordle was not there.  Cordle entered plan submittals into the MSIS (MSHA standardized information system) system when they were received.

The process was to stamp the plan received, enter the plan into MSIS and put it in the bin for review.  Once a plan was approved it was routed from the ventilation department to the assistant district manager for technical support, the assistant district manager for the district and then to the district manager.  Once this process was complete the plan approval was then returned to the ventilation department.  The plan approval was returned with a date stamp from the district manager's secretary and the district manager's signature.  The original was sent to the operator, a copy of the approval letter and plan went to the field office.  The ventilation department also kept a copy of the letter and plan for their records.  If a plan was denied only the operator and the field office received a copy.

Cordle explained when the approval was sent to the field office it was stamped with a red stamp, initialed and dated.  Cordle stated that she wrote the date, but may have used a date stamp also.

Cordle stated that the ventilation department had a backlog of plans to be reviewed. The bins were overflowing at times. Cordle believed the backlog to be at least a couple hundred. The majority of the backlog was annual maps to be reviewed. District 4 had approximately 600 active and inactive mines that fell within the district. Cordle believed that the ventilation department was three months behind on annual maps and five months behind on plans.

Cordle recalled that personnel from UBB would bring in a plan last minute and want it reviewed for approval right then. Mackowiak would have to stop what he was doing and assign to a reviewer. If it wasn't an emergency Mackowiak would tell them they would have to wait like everyone else. Cordle recalled that Heath Lilly, Eric Lilly, Bill Ross and Chris Blanchard would come in for UBB to the district office.

Cordle was on maternity leave form the end of March 2010 for approximately nine weeks. Cordle believed that there were four to five plans waiting to be reviewed for UBB when she went out on leave. Cordle had processed everything that was reviewed prior to her taking maternity leave. Her desk was empty. Pete Stone and Michael Haynes were trained to distribute the plans while Cordle was on leave. Lisa Okes and Pat Brooks helped out while Cordle was on leave putting plans into MSIS and distributing the plans.

Cordle stated that six or seven months after she started working as the secretary that she created spreadsheet for the plans. The spreadsheet contained the MSIS #, mine ID, company name, whether it was a revision, annual plan, or map and the date of the approval/denial letter.

Cordle reviewed submittals from UBB from February 2009 until March 2010 to identify her initials on the underground mine file date stamp. Cordle stated that the stamps contained her initials except for submittal dated July 27, 2009, which had the initials NEC.

Cordle explained that once they received a plan and put it into MSIS there is a tracking sheet that was attached to the plan when it is put into the bin for review.

Cordle explained that the district manager's secretary dated the approval or denial letter with a date stamp. The letter then is returned to the ventilation department. One letter contains the original signature of the district manager and one with the district manager's stamp.

Cordle prepared a weekly report for pending plans that was submitted to Mackowiak and then eventually onto the district manager.

When Cordle returned from maternity leave she was tasked with making copies of maps and plans for the accident Investigation team.

The following individuals worked in the ventilation department in April 2010:

Cordle explained that everyone had access to the red underground mine file stamp. She left it in her desk and when she went out on maternity leave it was left on her desk. Cordle never borrowed a stamp, she always had hers

Cordle believed that when she was hired has secretary that she replaced Doris Chambers.

DLB-001751
This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

**Report of Interview**

**U.S. Department of Labor**
**Office of Inspector General**
**Office of Investigations**



Page   1   of   2

OIG Form 103 (OI – 1/98)

| Investigation on: | 5/22/2012 | At: | | File: | 31-0801-0025 PC |
|---|---|---|---|---|---|

By: Special Agent Jeffrey Carter

Date Prepared: 5/30/2012

**Person Interviewed:**   Doris Chambers

On May 22, 2012, Doris Chambers was interviewed at the above listed address by Assistant Special Agent- in-Charge Richard Deer and Special Agent Jeffrey Carter, United States Department of Labor, Office of Inspector General. Agency Credentials were displayed and the nature of the contact was stated. It was explained to Chambers that her participation in the interview was voluntary. Chambers agreed to be interviewed and voluntarily provided the following information:

Chambers is currently employed by the Mine Health and Safety Administration (MSHA) as a secretary for
, Assistant District Manager (ADM) for District 4 in Mt. Hope, WV. Chambers has held that position since October 2008. Chambers stated that prior to working for Selfe she worked as                secretary and was also the secretary in the ventilation department at Mt. Hope.

Chambers explained when                was out on leave Chambers helped out in the ventilation department along with                and others that she couldn't recall. Chambers stated after the explosion at UBB she was sent to assist in the ventilation department.                , information specialist asked Chambers to assist. Chambers explained that she reviewed the MSIS (MSHA standardized system) system related to UBB and pulled files to be scanned. At first Chambers was directed to go back two years and then MSHA headquarters requested the past five years. Chambers went through old files to pull all the information that was requested by headquarters.

After the explosion Chambers and                went through old files and made copies. They used the MSIS system and compared it to what was in the ventilation department to make sure they had everything. Chambers stated that she felt things weren't in the vent files that should have been. Chambers stated that she was used to keeping things longer. Chambers was the secretary for Bill Ross when he was the ventilation supervisor at Mt. Hope. Chambers stated that Ross kept everything for the most hazardous mines like UBB, Aracoma and the Justice mine. Chambers explained that the ventilation department purges the ventilation files. The ventilation department keeps the final maps. Chambers stated that while reviewing records located in a drawer labeled "hold" that Bill Ross maintained when he was supervisor, she discovered a memo about an inundation at UBB. Chambers also recalled that the memo contained the name of                Chambers stated that she took the memo and gave in the                . Chambers felt that the memo should have been maintained in UBB's ventilation file. Chambers recalled struggling to find things that she felt should have been maintained in the file.

Chambers stated that while she was reviewing the MSIS system and comparing it to the plans in the ventilation department she discovered instances where the specialist review was not completed or filed out in MSIS. The screen required the date to be entered twice once on the main screen and another time on a pop up box at the bottom. Chambers found instances where the specialist review date was not carried down to the bottom box.

Case 5:14-cr-00244 Document 728-1 Filed 11/16/18 Page 8 of 22 PageID #: 26985

Interview Doris Chambers
May 22, 2012
Page 2 of 2

Chambers discussed this with _____. Chambers added the review date to the pop up box. Chambers used the date that was entered on the main screen of MSIS.

Chambers believed that _____ and _____ would have been the first to look at anything that was outstanding for UBB, because Joe Mackowiak was at the mine after the explosion. Chambers believed that anything outstanding or pending for UBB was pulled and held. Chambers believed that UBB had pending plans.

Chambers stated that Mackowiak was not at the office for a couple days following the explosion because he was at the mine. According to Chambers when Mackowiak returned he wasn't happy to see everyone working in the ventilation department and stated that employees from his department would take care of the scanning.

Chambers stated that she didn't feel that Joe Mackowiak would do anything in his heart that wasn't right.

At the conclusion of the interview Chambers wanted to make a clarification regarding a conversation that she had with Bill Ross. Chambers wanted to clarify that when she spoke to Ross she didn't tell him that Mackowiak removed anything out of the office. Chambers stated that she told Ross that Mackowiak could have removed things from the office because of the way he kept the doors locked when he returned to the office after the explosion.

DLB-001753

**This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.**

**Report of Interview**

**U.S. Department of Labor**
**Office of Inspector General**
**Office of Investigations**



Page  1  of  3

OIG Form 103 (OI – 1/98)

| Investigation on: | 5/23/2012 | At: | | 31-0801-0025 PC | File: |
|---|---|---|---|---|---|

By: Special Agent Jeffrey Carter

Date Prepared: 5/30/2012

**Person Interviewed:**     Carolyn Gail Vaynes (Gail)

On May 23, 2012, Gail Vaynes was interviewed at the Mine Health and Safety Administration (MSHA), District 4 office located in Mt. Hope, WV by Assistant Special Agent- in-Charge Richard Deer and Special Agent Jeffrey Carter, United States Department of Labor, Office of Inspector General. Agency Credentials were displayed and the nature of the contact was stated.

Vaynes was read the advice of rights for federal employee during interview (OIG -116A). Vaynes acknowledged that she understood her rights and signed the advisement form (attached). Vaynes agreed to be interviewed and provided the following information:

Also present during the interview was                                    and            supervisor.

Vaynes is currently employed by MSHA as a coal mine health and safety assistant for the District 4 Field Office located in Mt. Hope, WV. She has held that position since November 2007. Prior to her employment at Mt. Hope Vaynes worked in MSHA's Summerville, WV office from February 2005 until November 2007. Vaynes also had previous employment with MSHA from 1971 to 1974 and 1977 to 1982. Vaynes also worked for the National Park Service from June 1991 until February 2005.

Vaynes explained that her current duties include: compiling reports after inspections are complete and making sure inspection files are in order, to include inspection notes and making sure citations were terminated. Vaynes explained that an inspection is placed in a hold status if citations are pending and have not been terminated. Vaynes is also the time keeper and arranges travel. She receives incoming mail and maintains the uniform mine files. Vaynes compiles monthly reports in regards to mine assignments, inspectors and any changes to the mechanized mining units (MMU).

Vaynes explained when plans are received from other departments: roof control, impoundment, electrical and various other departments the uniform mine file is updated. Citations are put into the uniform mine file until they are abated and then they are removed. Vaynes stated when plans arrive they are sent to the appropriate department. She receives plans for filing after they have been reviewed. Vaynes stated the she updates the uniform mine files by removing and replacing with the updated plans. However, Vaynes stated that she didn't remove ventilation plans because she wasn't certain what should be removed. The ventilation department has come to the office and purged the ventilation portion of the uniform mine files in the past. Vaynes stated that each uniform mine file should have the retention policy located in the front. Vaynes stated when things are removed from the mine file they are thrown away.

Vaynes stated that the ventilation section of the UBB uniform mine file was purged after the explosion. Vaynes stated that Pete Stone and someone else she couldn't remember purged the UBB file after the explosion. Vaynes didn't see what was removed from the file or if a record was kept of items removed. Vaynes was not aware if UBB's uniform mine file was copied or scanned prior to the purge. Vaynes didn't know if anything was added to the file when it was purged. Vaynes believed the purge took at least a day to complete. The only issue Vaynes could recall with UBB's mine file was gas well permits were missing from the file or the file contained the permits and they couldn't be located in the department.

According to Vaynes no other mine files were purged after the UBB explosion. After the explosion Vaynes was asked to make copies and scan records from the UBB uniform mine file.                    and           also helped with scanning. The scanned copies were placed on the W drive or shared drive. Vaynes stated that archived records were also requested. When the archived records were received the accident investigation team took possession of them. Vaynes stated that the original UBB records are still located at District 4 locked up. The archived records that Vaynes was referring to were inspection records for UBB.

The ventilation department kept everything in their file and the field office replaced and updated the uniform mine files. Vaynes explained if a new base plan was submitted it was put into the file and the plan it replaced would be removed. Submittals may only replace the pages that were affected. Vaynes stated that some things are kept forever, such as well plans.

Vaynes explained that every October the mines are changed or switched among the work groups. Vaynes recalled that in 2008 or 2009                    purged the UBB file when it was assigned to his group.

Vaynes explained when a plan is approved or denied she received a copy of the letter, a copy of the request and a copy of the map, which she stamped to show when it was received by the field office. A copy of the letter was given to the supervisor and another full set of copies was given to the inspector. Before a copy is filed into the uniform mine file it is stamped, dated and initialed to show when it was added to the mine file. Vaynes stated that from 2008 until July 2011 that Okes and Vaynes alternated weeks adding things to the uniform mine files.

Vaynes believed that UBB's uniform mine file was up to date. She didn't know if documents were added and stated that she didn't add any after the explosion. Vaynes stated that she wouldn't have any way of knowing if anything was added. The uniform mine file for UBB was contained in three separate books with dividers. Book two of the uniform mine file usually contained ventilation plans. Ventilation was the biggest section in the uniform mine files.

Every quarter the uniform mine file is reviewed by the inspectors. Inspectors remove items to copy. Vaynes stated thing get left out, misplaced and not put back into the book.

Vaynes stated that she updated MSIS when a complete inspection report was turned in and she also entered plan reviews.

Vaynes stated that there haven't been any instances where she backdated any records.

Vaynes reviewed UBB plan submittals and verified that her initials were located in the field mine file stamp.

DLB-001755
This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Interview Date:
May 23, 2012
Page 3 of 3

OFFICE OF INSPECTOR GENERAL
DEPARTMENT OF LABOR

ADVICE OF RIGHTS FOR FEDERAL
EMPLOYEE DURING INTERVIEW

You are being contacted to solicit your cooperation in an inquiry regarding the performance of official Government duties. In conjunction with the Privacy Act, you are advised that the authority to conduct this interview is contained in 5 U.S.C. App. 3.

The matter under investigation could result in the criminal prosecution of the responsible individuals.

This inquiry concerns

your employment with MSHA, duties and assignments

(State the general nature of the matter)

You have a right to remain silent if your answers may tend to incriminate you;

Anything you say may be used as evidence both in an administrative proceeding or any future criminal proceeding involving you;

If you refuse to answer the questions posed to you on the ground that the answers may tend to incriminate you, you cannot be discharged solely for remaining silent; however, your silence can be considered in an administrative proceeding for its evidentiary value that is warranted by the facts surrounding your case.

I have read this statement of my rights; it has been read to me and I understand my rights with regard to this interview.

Date: 5/23/12    Time: 10.45

Employee's Signature

Witnessed by: _____    Witnessed by: _____

Title: Special Agent    Title: ASAC

Place: District 4 office    Case Number: 31-0801 - 0025 PC
      nr Hope

OIG - 116A (OI 3/01)

DLB-001756

to your agency; it and its contents are not to be distributed outside your agency.

**Report of Interview**

**U.S. Department of Labor**
**Office of Inspector General**
**Office of Investigations**

Page  1  of  3

OIG Form 103 (OI – 1/98)

| Investigation on: | 5/21/2012 | At: | | File: | 31-0801-0025 PC |

By: Special Agent Jeffrey Carter *Ax*

Date Prepared: 5/25/2012

**Person Interviewed:**     Denyse Flint

On May 21, 2012, Denyse Flint was interviewed at the above listed address by Assistant Special Agent-in-Charge Richard Deer and Special Agent Jeffrey Carter, United States Department of Labor, Office of Inspector General. Credentials were displayed and the nature of the contact was stated. It was explained to Flint that her participation in the interview was voluntary. Flint agreed to be interviewed and voluntarily provided the following information:

Flint is currently employed by the Mine Safety Health Administration (MSHA) at the Mine Academy located in Beaver, WV. She has been working as an administrative assistant in the maintenance department at the Mine Academy since October 2011. Flint's current supervisor is              . Prior to her assignment at the academy Flint worked as an mine health and safety assistant in the electrical department for MSHA at District 4 located in Mt. Hope, WV. Her immediate supervisor was              . Flint's duties included plan tracking in the MSIS (MSHA standardized system) system, typed denial and approval letters and entered electrical plans into a spreadsheet for tracking.

Flint explained when a plan was received in the electrical department it was date stamped to show when it was received and then entered into the MSIS system for tracking. After the plan is entered into MSIS it is assigned to a reviewer. The reviewer will make notes into the MSIS system. The plan is returned to Flint for the approval or denial letter that are routed through the electrical supervisor, assistant district manager (ADM) and the district manager. Once the letter is signed off on and the check sheet is initialed it comes back to Flint who scans the letter, a copy is sent to the field office responsible for the mine for their files and the original was sent to the operator. Flint stated that the letter would be stamped after it was signed and then filed in the underground uniform mine file for the appropriate mine. When Flint received the approval or denial it was stamped for the uniform mine file. The mine file stamp is initialed and dated using the date that the letter was sent. Flint maintained the checklist that followed the submittal through the process.

Flint explained that              and              were responsible for maintaining the uniform mine files.              working as a secretary for District 4 and Okes is employed at the VA medical center in Beckley, WV.

Flint stated that the electrical department didn't have problems with backlogs. The ventilation had trouble with backlogs and the electrical department would help out. The electrical department would help make copies and mail approval and denials letters to the operators.

Flint explained that Bill Ross was the ventilation supervisor when she started and Joe Mackowiak took over as supervisor around August 2009. Mackowiak has since become the ADM. Flint recalled the following individuals worked in the ventilation department:                                                                          , and
                          was the secretary.            is currently working at the academy.            worked in the ventilation department for a while and then went on                  . When she returned from
went back to the ventilation department and then transferred to the academy.

Flint believed that the ventilation department was caught up shortly after the explosion occurred at UBB. The backlog of plans were tracked through a report submitted weekly. Flint recalled that she heard Mackowiak say that the ventilation department had 400 plans. The ADM received the weekly backlog report. The ventilation department was behind on reviewing, copying, mailing and submitting for the uniform mine file. Flint assisted the ventilation department after the explosion with scanning files.

Flint recalled a backlog for UBB and other mines as well. When Flint stopped assisting the ventilation department they were still dealing with a backlog, however UBB was up to date. UBB was caught up as far as approvals, denials and getting copies into the mine file. UBB was caught up shortly after the explosion. The MSIS system would show what happened with UBB's pending plans.

Mackowiak was at UBB after the explosion and was giving orders to the office and reviewers from the phone and through emails.

Flint stated that inspectors worked from the uniform mine file in order to conduct inspections. Field office supervisors were also required to review the mine file.

Flint stated that shortly after the explosion            or                          came and got Flint's mine file stamp. Flint stated the            was on            at the time. Flint reported that her stamp had been taken to her supervisor            According to Flint,            reported this to            ADM.
told      the ventilation department was cleaning up the files. Approvals and denials were being stamped that needed to be sent to the mine file. Flint stated that the ventilation department had plans that had already been approved or denied, but haven't been sent to the field office. Flint stated that if they were catching plans up that the mine file would have to be updated. Flint wasn't sure if approvals or denials were emailed or hand carried to the field office since they were housed in the same building.

Flint stated that            was on            when the explosion at UBB occurred.            was on            for more than six weeks. Flint believed that Doris Chambers may have filled in during            absence.

Flint stated that if you would want to give the appearance that the mine file was updated you would have to back date the plans. According to Flint there were pending plans for UBB at the time of the explosion. MSIS may show if the plans were updated or terminated. All secretaries have access to MSIS. Electrical specialist had access to the system and Flint believed that some in the ventilation department had access also. Flint believed that UBB's mine file was updated because she saw            and            working on the files.

Okes helped out the most with the UBB file after the explosion. Flint believed that            helped update the backlog. According to Flint in order to update plans you would need to put them into the mine files. Flint stated that everything was taken to the field office to update the mine file. Flints believed this was unusual because it was not the normal. Flint didn't go to the field office. Flint stated that            was aware of what was going on. Flint stated that she believed that the mine file was changed using her stamp.

DLB-001758
This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Mackowiak returned from UBB to the office to get UBB files together so they could be scanned.  Mackowiak left individuals in an acting supervisor role while he was offsite at UBB.

Flint explained that a pending plans report was compiled weekly from each department.  The report included what was approved and what plans were pending.  The report was sent by email.  Typically the report was generated by the secretaries and sent to              , ADM secretary to compile.

DLB-001759
This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG).  It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

**Report of Interview**

**U.S. Department of Labor**
**Office of Inspector General**
**Office of Investigations**

Page ___1___ of ___2___

OIG Form 103 (OI – 1/98)

| Investigation on: | 5/23/2012 | At: | | File: | 31-0801-0025 PC |
|---|---|---|---|---|---|

By: Special Agent Jeffrey Carter

Date Prepared: 5/30/2012

On May 23, 2012, Patricia Brooks was interviewed at the Mine Health and Safety Administration, District 4 office located at 100 Blue Stone Road, Mount Hope, WV by Assistant Special Agent- in-Charge Richard Deer and Special Agent Jeffrey Carter, United States Department of Labor, Office of Inspector General. Agency Credentials were displayed and the nature of the contact was stated. Brooks voluntarily provided the following information:

Brooks is currently employed by the Mine Safety and Health Administration as an office assistant for assistant district manager (ADM) Joe Mackowiak. She has held this position since 2006. Brooks has also worked for MSHA as a field office clerk, switchboard operator, worked in education, training and roof control.

Brooks stated that she didn't work with the MSIS system. Brook explained that she compiled received pending plan reports weekly from each specialty group. Brooks took that information and compiled it into one report. The report is currently provided to Mackowiak and prior to Mackowiak becoming ADM Brooks gave the report to _____ Brooks stated that the pending plans report that was compiled contains two weeks of data. Brooks printed one page from the pending plans reports to provide an understanding of the report. (Attached)

Bob Hardman implemented the pending plans report December 5, 2008.

# TECHNICAL PROGRAMS - PLAN APPROVAL PROCESS
## DISTRICT 4

**May 17, 2012**

| | | 05/10/12 | | | | | 05/17/12 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Received | Approved | Denied | Pending | Overdue Reviews | Received | Approved | Denied | Pending | Overdue Reviews |
| ELECTRICAL | Slope/Shaft | 0 | 0 | 0 | 1 | | | | | | |
| | Petition for Modification | 0 | 0 | 0 | 1 | | NOT AVAILABLE | | | | |
| | ERP | 0 | 0 | 0 | 1 | | | | | | |
| | ERP Revisions | 0 | 0 | 0 | 1 | | | | | | |
| | Field Modifications | 0 | 0 | 0 | 0 | | | | | | |
| | | | | | 4 | 0 | | | | 0 | 0 |
| HEALTH | Base Plans | 0 | 1 | 0 | 5 | | 0 | 0 | 0 | 7 | |
| | Revisions | 3 | 4 | 0 | 15 | | 1 | 0 | 0 | 14 | |
| | DA Plans | 0 | 2 | 0 | 1 | | 0 | 0 | 0 | 0 | |
| | | | | | 21 | 0 | | | | 21 | 0 |
| TRAINING PLANS | Base Plans | 0 | 6 | 0 | 30 | | 7 | 12 | 2 | 23 | |
| | Instructors | 2 | 0 | 0 | 4 | | 3 | 3 | 2 | 2 | |
| | | | | | 34 | 69 | | | | 25 | 69 |
| VENTILATION | Oil & Gas Wells (75.1700) | | | | | | 3 | 2 | 0 | 9 | |
| | Base Plans and Revisions | | | | | | 6 | 3 | 0 | 13 | |
| | Seal Related Plans (new, certifications, etc.) | NOT AVAILABLE | | | | | 4 | 4 | 0 | 5 | |
| | Annual Vent. Maps & Revisions | | | | | | 6 | 10 | 2 | 43 | |
| | 75.388 - Boreholes in Advance | | | | | | 0 | 1 | 0 | 1 | |
| | 75.389 - Mng. into inaccessible areas | | | | | | 0 | 0 | 0 | 0 | |
| | | | | | 0 | 84 | | | | 71 | 85 |
| IMPOUNDMENTS | Mng. under bodies of water | 0 | 0 | 0 | 5 | | 0 | 0 | 1 | 4 | |
| | Refuse Pile Plans | 0 | 0 | 0 | 5 | | 0 | 0 | 0 | 5 | |
| | Impoundment Construction | 0 | 0 | 1 | 20 | | 3 | 0 | 1 | 21 | |
| | Annual Reports | 3 | 1 | 0 | 6 | | 0 | 0 | 1 | 5 | |
| | Impoundment Abandonment | 0 | 0 | 0 | 1 | | 0 | 0 | 0 | 1 | |
| | Slurry Injections | 0 | 0 | 0 | 6 | | 0 | 0 | 0 | 6 | |
| | Non-permissible Blasting Units > 20 shots | 0 | 1 | 0 | 0 | | 0 | 0 | 0 | 0 | |
| | Blasting Within 500 feet | 0 | 1 | 0 | 0 | | 0 | 0 | 0 | 0 | |
| | | | | | 43 | 0 | | | | 42 | 0 |
| ROOF CONTROL | Base Plans | 0 | 2 | 1 | 7 | | 2 | 1 | 0 | 7 | |
| | Revisions | 4 | 4 | 1 | 10 | | 1 | 2 | 2 | 9 | |
| | Ground Control Plans | 0 | 3 | 0 | 8 | | 1 | 4 | 1 | 5 | |
| | | | | | 25 | 0 | | | | 21 | 0 |
| | TOTALS: | | | | 127 | 153 | | | | 180 | 154 |

DLB-001761

to your agency; it and its contents are not to be distributed outside your agency.

**Report of Interview**

**U.S. Department of Labor**
**Office of Inspector General**
**Office of Investigations**



| Page | 1 | of | 4 | | OIG Form 103 (OI – 1/98) |
|------|---|----|----|---|---|

| Investigation on: | 5/24/2012 | At: | | File: | 31-0801-0025 PC |
|---|---|---|---|---|---|

By: Special Agent Jeffrey Carter *Jdc*                                    Date Prepared: 5/31/2012

**Person Interviewed:**     Jerome F. Stone Jr. (Pete)

On May 24, 2012, Pete Stone was interviewed at the Mine Health and Safety Administration, District 4 office located in Mount. Hope, WV by Assistant Special Agent- in-Charge Richard Deer and Special Agent Jeffrey Carter, United States Department of Labor, Office of Inspector General. Agency Credentials were displayed and the nature of the contact was stated.

Stone was read the advice of rights for federal employee during interview (OIG -116A). Stone acknowledged that he understood his rights and signed the advisement form (attached). Stone agreed to be interviewed and provided the following information:

Stone has been employed by the Mine Safety and Health Administration (MSHA) for 12 years effective April 7, 2012. Stone had 29 years in the coal industry prior to his employment with MSHA. Stone stated the he held numerous certifications while working in the industry, but they are no longer current.

Stone is currently a plan reviewer for MSHA at the District 4 office located in Mt. Hope, WV. From 2006 until 2008 Stone worked as a ventilation specialist for District 4. Stone was a coal mine inspector from 2000 until 2006. Stone stated that he is a plan reviewer and not a ventilation specialist because he hurt his back and can no longer travel underground.                         is the current ventilation supervisor.

As a plan reviewer Stone takes the oldest plan that has been submitted, reviews it and processes the plan. Some plans may take priority under certain circumstances. The supervisor assigns priority cases. Stone explained that tracking sheets are attached to the plans. The plans are also tracked in the MSIS (MSHA standardized system) system. MSIS can be reviewed to see what plans are pending. Stone explained that he pulls the last ventilation map that was approved and makes sure it coincides with the changes.

Stone stated currently that the ventilation department was holding its own when it came to backlogs. posts how many pending plans the department has.

Stone stated that he worked with plans for the UBB mine. Mines weren't assigned to reviewers. Oldest plans were reviewed first. When plans are reviewed the operator is notified of the outcome by certified mail.

Stone stated that the ventilation department was backlogged at the time of the UBB explosion, but didn't know how many plans total were backlogged. Stone believed that UBB had six plans revisions pending at the time of the explosion. UBB's pending plans were placed on hold after the explosion. According to Stone UBB's pending plans were pulled and placed into a folder labeled pending. A letter was sent to the operator notifying them the plans were on hold. Stone doesn't believe the plans were ever reviewed.

Stone seldom worked with the uniform mine file. Stone referred to the mine file if he didn't have a plan to see if it was contained in the mine file. Stone stated that he has never purged a mine file, but has helped straighten them out. The mine file contains multiple books and maps that are separate from the books. Stone helped straighten out UBB's mine file at the time of the explosion. Stone didn't remove anything from the file. He didn't see anything removed from UBB's file. Stone believed that this occurred within a week of the explosion. Stone stated that he used a MSIS spreadsheet from the vent department and compared it the mine file to match up everything. Once again Stone stated that nothing was added to UBB's mine file at the time of the explosion. Stone and          reviewed UBB's mine file. Stone recalled that the review took a couple of hours and was conducted in the conference room. Stone believed that the point of the review was to make sure the vent department files were the same as the mine file. Stone stated that he made sure everything matched with the maps. Stone removed entries from the file to match up with the maps and then put the entries back in the file in date order. Stone had a hard time locating some of the revisions because of the volume of material. Stone hasn't done this for any other mine file. Stone would have reported that everything matched to Joe Mackowiak who was the ventilation supervisor at that time.

Stone stated that he doesn't know who would have purged the UBB file. It may have been one of the secretaries, but Stone believed the secretaries would be uncomfortable because they wouldn't know what was still active in the file.

After the explosion the ventilation department worked on making copies, scanning and comparing the UBB maps getting everything ready to send to Arlington. Maps were compared in order to answer questions about the mine and were the accident site was.

Stone stated that he used a date stamp every day. Stone used the red underground mine file stamp and put his initials and          would initial also if they were both working on it. Stone wasn't aware that someone took a date stamp from the electrical department and wouldn't know who would have done that. Stone stated that he didn't remove a date stamp from the electrical department. Stone stated that          , ventilation secretary was out of the office at this time.

Stone stated that          and          helped the ventilation department catch the files up while          was on leave.          made entries into the MSIS system. After the information was entered into MSIS it was passed onto          and Stone who would line up the plans and stamp them. Stone filled out the top part of the tracking sheet and one of the secretaries entered the information into MSIS. The ventilation specialist to include Stone couldn't enter plans the MSIS system. Stone only had access to the system at certain levels.

Stone stated that each secretary plays a different part. When a plan is received a secretary would stamp it in showing that it was received. Another secretary would deliver the plan to the ventilation department and enter it into MSIS. After processing and approval the information was gathered, stamped, copies were made and sent certified mail.

Stone stated that when          first went on leave the ventilation department needed assistance with the backlog getting plans through the approval or denial process. Later Stone and          were taught how to get the plans into the approval process. Stone explained after he learned to get the plans through the approval process the plans would come back to him and he would stamp them for the underground mine file and get necessary copies together. Stone recalled that the roof control secretary helped out in the ventilation department and would have stamped some of the approvals. Stone also believed          from the electrical department helped out some.

DLB-001763
This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Stone recalled that the plans were laid out in stacks when they were working on the backlog. Stone and used the red stamp and initialed the plans that were stamped. Stone stated that he didn't recall doing any for UBB. Stone stated that nothing was backdated and the he initialed everything that he stamped.

**Attachment OIG-116A**

DLB-001764

This document contains neither recommendations nor conclusions of the Office of Inspector General (OIG). It is the property of the OIG and is loaned to your agency; it and its contents are not to be distributed outside your agency.

OFFICE OF INSPECTOR GENERAL
DEPARTMENT OF LABOR

ADVICE OF RIGHTS FOR FEDERAL
EMPLOYEE DURING INTERVIEW

You are being contacted to solicit your cooperation in an inquiry regarding the performance of official Government duties. In conjunction with the Privacy Act, you are advised that the authority to conduct this interview is contained in 5 U.S.C. App. 3.

The matter under investigation could result in the criminal prosecution of the responsible individuals.

This inquiry concerns

your employment with MSHA, duties and assignments

(State the general nature of the matter)

You have a right to remain silent if your answers may tend to incriminate you;

Anything you say may be used as evidence both in an administrative proceeding or any future criminal proceeding involving you;

If you refuse to answer the questions posed to you on the ground that the answers may tend to incriminate you, you cannot be discharged solely for remaining silent; however, your silence can be considered in an administrative proceeding for its evidentiary value that is warranted by the facts surrounding your case.

I have read this statement of my rights; it has been read to me and I understand my rights with regard to this interview.

Date: 5/24/12    Time: 8:58    _____
                                        Employee's Signature

Witnessed by: _____    Witnessed by: _____

Title: Special Agent    Title: ASA C

Place: District 4    Case Number: 31-0801-0025 PL
       100 Bluestone Rd
       Mt Hope    OIG - 116A (OI 3/01)

DLB-001765

to your agency; it and its contents are not to be distributed outside your agency.

**Report of Interview**

**U.S. Department of Labor**
**Office of Inspector General**
**Office of Investigations**



Page ___1___ of ___2___

OIG Form 103 (OI – 1/98)

| Investigation on: | 5/24/2012 | At: | | File: | 31-0801-0025 PC |
|---|---|---|---|---|---|

By: Special Agent Jeffrey Carter

Date Prepared: 5/31/2012

**Person Interviewed:**        Raymond Browning

On May 24, 2012, Raymond Browning was interviewed at the Mine Health and Safety Administration (MSHA), District 4 office located in Mt. Hope, WV by Assistant Special Agent- in-Charge Richard Deer and Special Agent Jeffrey Carter, United States Department of Labor, Office of Inspector General. Agency Credentials were displayed and the nature of the contact was stated.

Browning was read the advice of rights for federal employee during interview (OIG -116A). Browning acknowledged that he understood his rights and signed the advisement form (attached). Browning agreed to be interviewed and provided the following information:

Browning stated that he had been employed by MSHA for approximately 15 years and had been working as a ventilation specialist since 2003. Prior to his employment with MSHA Browning spent 24 years employed in the coal industry.

Browning stated that he didn't recall borrowing a stamp from the electrical department. Browning was familiar with the underground mine file stamp. He stated that it was used before distribution.

Browning recalled that after the UBB explosion seeing                 and              in the ventilation department with distribution laid out preparing it to be sent to the various field offices.

**Attachment OIG-116A**

OFFICE OF INSPECTOR GENERAL
DEPARTMENT OF LABOR

ADVICE OF RIGHTS FOR FEDERAL
EMPLOYEE DURING INTERVIEW

You are being contacted to solicit your cooperation in an inquiry regarding the performance of official Government duties. In conjunction with the Privacy Act, you are advised that the authority to conduct this interview is contained in 5 U.S.C. App. 3.

The matter under investigation could result in the criminal prosecution of the responsible individuals.

This inquiry concerns

Your employment with MSHA, duties and assignments

(State the general nature of the matter)

You have a right to remain silent if your answers may tend to incriminate you;

Anything you say may be used as evidence both in an administrative proceeding or any future criminal proceeding involving you;

If you refuse to answer the questions posed to you on the ground that the answers may tend to incriminate you, you cannot be discharged solely for remaining silent; however, your silence can be considered in an administrative proceeding for its evidentiary value that is warranted by the facts surrounding your case.

I have read this statement of my rights; it has been read to me and I understand my rights with regard to this interview.

Date: 5/24/12    Time: 10:36    _____
                                    Employee's Signature

Witnessed by: _____    Witnessed by: _____

Title: Special Agent    Title: ASAC

Place: District 4 MSHA    Case Number: 31- 0801 - 0025 PC

OIG - 116A (OI 3/01)

DLB-001767

to your agency; it and its contents are not to be distributed outside your agency.