UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
Beckley Division

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff/Respondent, | ) | |
| | ) | |
| v. | ) | **Criminal No. 5:14-CR-00244** |
| | ) | **Civil No. 5:18-CV-00591** |
| | ) | |
| DONALD L. BLANKENSHIP | ) | |
| | ) | |
| Defendant/Movant. | ) | |

**CONSOLIDATED REPLY TO GOVERNMENT'S CONSOLIDATED
RESPONSE IN OPPOSITION TO MOTION TO VACATE UNDER
28 U.S.C. § 2255 AND REQUEST FOR EVIDENTIARY HEARING**

Donald L. Blankenship, by and through counsel, respectfully submits this Consolidated Reply to the Government's Consolidated Response in Opposition to his Motion to Vacate Conviction and Sentence Pursuant to 28 U.S.C. § 2255 and Motion for Evidentiary Hearing.

## INTRODUCTION

At its core, justice is doing right. This fundamental truth is carved in stone on the United States Department of Justice's headquarters in Washington, D.C. There, it states, "The United States wins its case whenever justice is done one of its citizens in the courts." Here, justice was not done Mr. Blankenship because former U.S. Attorney Booth Goodwin and Assistant U.S. Attorney Steve Ruby did not do right. As the Department of Justice itself is forced to admit, Goodwin and Ruby, during the course of their prosecution of Mr. Blankenship, wrongfully withheld favorable information to which Mr. Blankenship's defense team had an absolute right.

1

While conceding this point, the government gives short shrift to the nature and scope of the misconduct of Goodwin and Ruby. Their failure to provide the information in question was not a simple oversight with reference to one, or even a few, isolated documents. Their failure was the unreasonable and intentional disregard of obligations owed Mr. Blankenship and his defense and encompassed exculpatory and impeachment information from no less than sixty-one memoranda of witness interviews ("MOIs") and thousands of pages of Mine Safety and Health Administration ("MSHA") emails and documents.

These are not merely hyperbolic characterizations of Goodwin and Ruby's misconduct offered by counsel for the defense. After an investigation into the facts surrounding the non-disclosure of the evidence in question, including written submissions from both Goodwin and Ruby, the Department of Justice's Office of Professional Responsibility ("OPR") concluded that information withheld by Goodwin and Ruby should have been provided to the defense. Moreover, the failure of Goodwin and Ruby to disclose that information was not merely an oversight on their part, but instead rose to the level of "reckless professional misconduct." And yet, for these wrongs, the government *offers absolutely no remedy*. Rather, like a miser who clutches at even an ill-gotten coin, the government defends the verdict secured against Mr. Blankenship, ignoring the ignominious manner in which it obtained it. Mr. Blankenship petitions this Court for the justice denied him as a consequence of Goodwin and Ruby's misconduct.

The obvious prejudice following from this decision not to provide these MOIs to the defense could, as noted by OPR, have been mitigated if the discoverable information been adequately provided in subsequent summary letters. OPR, however, found that the "brief" disclosure letters provided to the defense at the direction of the Court and following extensive

motions practice were wholly deficient, providing "only minimal information for only a handful of the pertinent interviews." (OPR – 000369). In the words of the report, "No reasonable Department attorney would believe that s/he could withhold that many MOIs . . ., *and without carefully reviewing them,* believe that two brief letters addressing only minimal information" met the disclosure requirements owed the defense. (*Id.*) Accordingly, their conduct in failing to provide Mr. Blankenship with what even the government now acknowledges was improperly withheld was deemed objectively unreasonable and in reckless disregard of obligations clearly owed the defense.

The effects of that misconduct must be considered as a whole, not in a piece-meal manner as the government attempts to do in its response. At the core of the government's case was the allegation that Mr. Blankenship purposely ignored and otherwise circumvented mine health and safety regulations promulgated and enforced by MSHA and that he did so because he put the profits of his employer over the safety of the company's workers. These violations included so-called advance notice of MSHA mine inspections and the failure to properly ventilate the mines.

And yet, the information withheld went directly to those allegations. It showed, for example, that there was substantial disagreement within MSHA itself as to whether the actions alleged to constitute illegal "advance notice" were actually violations of the applicable regulations. If MSHA itself was uncertain, then how were Mr. Blankenship and other mine operators to know what was required of them with the requisite certainty to allow them to be held criminally liable for actions in violation of that regulation.

Similarly, MSHA, despite its protestations to the contrary, required the implementation of a mine ventilation plan that Massey repeatedly argued was inadequate for the mine in question. Evidence supporting this fact was withheld from the defense including evidence that

3

MSHA personnel responsible for that ventilation plan were disciplined by the agency for their actions associated with that plan. That evidence, if it had been made available, would have clearly supported the defense's contentions that the ventilation plan was imposed on Massey by MSHA and that the consequence of that plan could not be attributable to any conspiracy by Mr. Blankenship to violate MSHA regulations. There could have been no more powerful evidence on this issue than evidence from the agency itself. That evidence, however, was wrongfully withheld from the defense.

The principal thrust of the government's response is to argue that the mountain of favorable evidence it admits Ruby and Goodwin suppressed would not have changed the verdict because there was overwhelming evidence of Mr. Blankenship's guilt. It also argues that the favorable, suppressed information should not be believed. The Court should take these claims well-salted. First, the government attorneys making these claims had absolutely no role in the investigation and trial of this matter. Their self-serving observations about the strength of the evidence and the incentives of witnesses are simply their post-hoc evaluations of a cold record.[1] Second, *Brady* does not turn on whether *the prosecutor* assesses the exculpatory evidence as believable or not. Rather, *Brady* requires the government to produce such information to the defense who can gauge how to present that evidence for a jury to perform its role as the arbiter of truth. Ruby and Goodwin denied that opportunity to the defense in this case by suppressing the evidence, and the fact that the government now tries to claim that helpful defense evidence is not believable only proves the importance and relevance of that suppressed evidence. Finally,

---

[1] On the very first page of its response, the government states: "This case arises from the tragic accident on April 5, 2010, at the UBB mine, which caused the death of 29 miners." The fatalities caused by that explosion are not relevant to this proceeding, which focuses on the government's misconduct. In any event, Mr. Blankenship was not charged with causing the mine explosion, and this introduction attempts to unfairly link him to those fatalities.

*Brady*'s materiality standard does not turn on whether the defense can prove that the suppressed evidence would have changed the verdict. Rather, *Brady's* materiality standard asks whether the suppressed evidence, considered *collectively*, denied the defendant a fair trial and undermines confidence in the verdict. Judged against that standard, the government makes no argument, and indeed it is obvious here that the collective weight of the suppressed evidence denied Mr. Blankenship a fair trial and defeats any confidence in the verdict that resulted.

Whatever the post-trial assessment of the government may be, the fact is that this high-profile case against a well-known coal executive was investigated and tried by an ambitious U.S. Attorney looking to leverage a conviction of Mr. Blankenship into a launching pad for his ambitions to become Governor of West Virginia and a young, and largely inexperienced (by his own account) AUSA hoping to burnish his professional reputation and legal career through the same conviction. Both had every incentive to try to limit the defense's ability to mount a successful defense in order to achieve their goals. American prosecutors who seek to be held in high esteem and who hold enormous power over the lives of American citizens cannot be permitted to engage in such egregious behavior. But whether their ambitions led them to intentionally withhold discoverable information or simply blinded them to the recklessness of the manner in which they conducted themselves ultimately matters little from Mr. Blankenship's perspective. His defense was denied information that was clearly discoverable. That withheld information adversely impacted the defense's ability to cross-examine certain prosecution witnesses and to make an informed decision as to whether certain witnesses should be called by the defense. It also impaired Mr. Blankenship's ability to, with the benefit of all information that should have been at his disposal, make a fully informed decision as to whether he should have testified on his own behalf. It also denied his defense the opportunity to pursue a more thorough

5

investigation into events such as MSHA's "shredding party," where pertinent agency document were destroyed.  None of that is speculative or hypothetical.  And none of those decisions can be said to have had no impact on the jurors in this exceedingly close case.  What that impact would have been can never be determined with certainty.  That, however, is not the fault of Mr. Blankenship and his defense team.  Rather, it is as a direct result of the reckless misconduct of Goodwin and Ruby.

## ARGUMENT

The government's response misses the forest for the trees.  It attempts to rebut each example of the adverse consequences of Goodwin and Ruby's misconduct cited in Mr. Blankenship's memorandum "item by item" to refute the idea that Mr. Blankenship suffered prejudice.  But that is not the standard in this proceeding.[2]  The standard is "not whether the defendant would more likely than not have received a different verdict with the benefit of the withheld evidence, but whether, in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  *Monroe v. Angelone*, 323 F.3d 286, 316 (4th Cir. 2003) (internal quotations omitted).  Indeed, the Fourth Circuit has rejected the "item by item" analysis the government performs here.  *Id.* at 298; *see also Smith v. Sec'y of New Mexico Dep't of Corr.*, 50 F. 3d 801, 834 (10th Cir. 1995) (cumulative weight of multiple non-disclosures prejudicial even though each piece of evidence only marginal in isolation).  *Brady* violations are assessed cumulatively, and the cumulative impact in this case is undeniable – Don Blankenship did not receive a fair trial.  The volume of undisclosed information would have changed the defense's entire approach to trial – from what leads to investigate, how to conduct cross-examinations, which witnesses to call, and whether to present a defense.

_____

[2] The government concedes that this Court has jurisdiction and that the case is not moot.  (Resp. at 5 n.2).

I.  **The examples cited in Mr. Blankenship's Memorandum in Support illustrate the prejudice, but are not a comprehensive list of all the favorable, material, undisclosed evidence.**

The flaw in the government's item by item response is best illustrated by the fact that the number of relevant, materials provided post-trial is simply too voluminous to describe in any single pleading.[3]  The examples in Mr. Blankenship's Motion and Memo provide only an illustration of how certain categories of documents would have proven helpful at trial.  For each such example, however, there are several other undisclosed documents that could have been used similarly.

To illustrate, the government argues that Mr. Blankenship could not have effectively used the undisclosed materials to impeach two key government witnesses at trial, Chris Blanchard and Bill Ross.  (Resp. at 18).  It attempts to argue that each example cited in Mr. Blankenship's Motion and Memo, viewed in isolation, is immaterial.  Not only is that argument is incorrect on the merits, it misses the key issues.  While Blanchard and Ross were the most prominent government witnesses, the government failed to disclose favorable MOIs for *twelve other* testifying witnesses.

For example, Thomas "Gary" Young – a former UBB miner – was a relatively minor witness in terms of the length of his testimony.  During his testimony, Mr. Young indicated that he often did not have anyone to help him rock dust at UBB.  (Trial Tr. Vol. V at 1031, 1041-42).  This testimony was offered to establish the prosecution's contention that Mr. Blankenship failed

---

[3] At several points, the government suggests that Mr. Blankenship's failure to discuss a specific document in his Memo may be a waiver on that point.  Mr. Blankenship waives nothing – his Memo simply highlights certain pieces of evidence.  Mr. Blankenship attached all the materials to his pleadings to provide a complete record.  What is more, the government continued to provide additional documents to the defense after it filed both its Motion and its Memo.  It would be extraordinary for them to blame Mr. Blankenship for the sheer volume of new material, which precludes an item by item response.

to hire sufficient staff at UBB to address mine safety.  Without this MOI, the defense could not challenge this assertion, only eliciting on cross-examination that UBB may have had people other than Young rock dusting.  (*Id.* at 1055-56).   In an undisclosed MOI, however, Young told investigators that there was a person named "Dustin" assigned to assist him.  (MOI-001445) (ECF No. 663-3).  However, Dustin "wanted to work somewhere else" and as a result, Young would often not be able to find him.  (*Id.*).  With the benefit of the undisclosed MOI, it would have been apparent to the jury that the reason Young did not have adequate assistance often had to do with the decision of his co-worker and not inadequate staffing by Massey.

Similarly, former miner Michael Smith testified regarding conditions at UBB and the attempts to correct certain violations before inspectors arrived. (Trial Tr. Vol. V at 1075).  In an undisclosed MOI, he told investigators that "it was a joke at UBB that the inspectors had the air violations written before they went underground."  (MOI-001443) (ECF No. 663-3).  This information could have been used by the defense to explore with Mr. Smith whether inspectors were issuing accurate citations or were predisposed to issue violations even before entering the mine.  This kind of cross-examination material is especially important because Ruby and Goodwin not only emphasized the overall number of citations, but also sought to link MSHA-issued citations to actual violations through the testimony of UBB miners rather than the MSHA inspectors themselves.

In the same vein, the government's Response addresses an email in which MSHA acknowledges weaknesses in proving citations at UBB.  (Resp. at 9) (citing USAO000030).  The government argues that these "isolated internal discussions do not call into doubt the remaining evidence."  (*Id.*).  But the undisclosed materials included other evidence from which the jury could have concluded that these issues were not "isolated" as the government now claims.  In a

8

January 10, 2010 email, an MSHA official offered to simply settle a citation when Massey challenged its validity and argued that the inspector conflated "two separate areas." (USAO0000045) (ECF No. 663-5).  This further highlights Mr. Blankenship's argument that the number of citations did not accurately reflect the number of actual violations.

In short, the undisclosed evidence is too voluminous to cite concisely in any one pleading.  It is hardly the fault of Mr. Blankenship that the government failed to disclose so much exculpatory evidence until after trial such that it is hard to address each one in a single pleading.  Should the court believe that more than the specific examples highlighted in the Motion and Memo are required to merit relief, Mr. Blankenship could present a comprehensive recital at an evidentiary hearing.

## II. The evidence of Mr. Blankenship's guilt was demonstrably not "overwhelming."

Throughout its Response, the government baldly asserts that Mr. Blankenship suffered no prejudice because the evidence against him at trial was "strong" or "overwhelming."  (Resp. at 10, 21, 37, 38).  This is utter nonsense.  Without the ability to poll jurors about the impact of undisclosed evidence, courts must look to other factors to evaluate prejudice.  "Given the difficulty of objectively evaluating this factor, appellate courts often look to the length of jury deliberations and the necessity of a modified *Allen* charge as useful proxies."  *United States v. Stewart*, 907 F. 3d 677, 689 (2d Cir. 2018) (concluding that 5 day deliberation and single *Allen* charge indicated that jury considered the verdict a close call).

In this case, the jury spent two weeks deliberating and twice told the judge they could not agree on a verdict.  When, after receiving an *Allen* charge, the jury finally reached a verdict, it returned an almost down-the-line acquittal.  The length and contentiousness of deliberations alone establishes that this was a close case – clearly not an "overwhelming" one.  Contrast this

with the case the government cites repeatedly in its response, *United States v. Bartko*, 728 F.3d 327 (4th Cir. 2013).  (*E.g.,* Resp. at 22).  There, the Fourth Circuit found that the *Brady* violations did not impact the trial in large part because after a three week trial, the jury deliberated for only four hours before convicting the defendant on all counts.  *Bartko*, 728 F.3d at 340-41.  Notably, the government in its response never so much as mentions the length of jury deliberations and the *Allen* charge.  That is the *primary* evidence of the closeness of the case for the jury, and the government simply ignores it, choosing to rely instead on its self-serving assessment of the strength of its own case.

Moreover, an impartial observer would recognize that the evidence of guilt was weak.  In particular, the government argues that "evidence and testimony that allowed the jury to determine that the defendant prioritized coal production at the expense of safety compliance" is sufficient to sustain the conviction.  (Resp. at 22).  This glosses over the fact that there was also evidence that allowed the jury to conclude the opposite.  The evidence on this point was especially contentious at trial.  More to the point, many of the undisclosed, exculpatory statements contradict the claim that Mr. Blankenship prioritized production over safety.  In fact, while arguing on the one hand that the evidence against him was overwhelming, the government then argues on the other that Mr. Blankenship was not prejudiced because he was able to introduce lots of evidence and testimony that he prioritized safety.  (E.g., Resp. at 18, 19).  The government cannot have it both ways.  Mr. Blankenship's attitude towards safety was hotly contested and the evidence contradictory.  The added weight of the undisclosed evidence could have tipped the balance for the jury in Mr. Blankenship's favor.

Finally, the government observes that the jury was instructed that it could convict Mr. Blankenship for conduct that amounted to "reckless disregard" of mine safety violations.  (Resp.

10

at 10, 23).  It therefore suggests that because there was sufficient evidence that a jury *could* have found reckless disregard based on the evidence at trial, contradictory evidence would not have been helpful.  But this Court also instructed the jury that if the evidence "reasonably permit[s] either of two conclusions – one of innocence, the other of guilt – the jury should of course adopt the conclusion of innocence."  (R. at 21588).  Thus, even assuming for the sake of argument that the evidence permitted a finding of guilt, the jury should have acquitted if it concluded that the evidence could also reasonably support a finding of innocence.  The standard on collateral review is whether "the likelihood of a different result is great enough to undermine confidence in the outcome of the trial."  *Bartko*, 728 F.3d at 340 (internal quotations omitted).  Simply put, the jury would have been entitled to conclude, based on all the evidence, including the undisclosed exculpatory evidence, that Mr. Blankenship was neither reckless nor intentional in his conduct.

### III.    Undisclosed MSHA evidence supported Mr. Blankenship's defense theory.

Again, based upon a piecemeal analysis, the government argues that undisclosed MSHA materials would not have supported Mr. Blankenship's defense.  While Mr. Blankenship disputes the government's item by item analysis for the reasons set forth above, he likewise rejects DOJ's characterization of that evidence.  For the reasons described in his original filings, this evidence does indeed undermine confidence in the jury's verdict.  In contending otherwise, the government advances several misguided arguments.

#### A.  The MSHA emails are relevant to issues at UBB during the indictment period.

The government argues that several withheld MSHA emails (USAO000024, -028, -030 & -032) that discuss issues at UBB before the 2010 explosion are not relevant because the emails themselves are dated after the period of time at issue in the indictment.  (Resp. at 9-11).  Utter nonsense.  A record or communication is assuredly relevant if it discusses relevant information

even if that discussion takes place after the fact. Surely, the government would consider it relevant if a defendant sent an email in 2012 confessing to a crime committed in 2010. In fact, the prosecutors called two witnesses at trial to discuss their after-the-fact impressions regarding UBB. Tyler Childress – who did not even join MSHA until late 2012 – nevertheless testified regarding records of citations issued to UBB between 2008 and April 2010. (R. at. 16228, 16237). Similarly, James McElroy testified about his observations at UBB as part of the accident investigation in July 2010, after the indictment period. (R. at 17710). Just as clearly, email discussions among MSHA investigators that clearly relate to events at UBB during the indictment period would have been relevant and discoverable.

In its other primary argument regarding the MSHA emails, the government tries to have its cake and eat it too. It argues that the number of citations reflects "overwhelming" evidence of wrongdoing, but then says that evidence that would undercut that very number does not matter. The government repeatedly cites the "egregious pattern of 836 violations" at UBB, placing special emphasis on the *number*. (Resp. at 11; *see also id.* at 9, 12). But it then argues that evidence showing that number was inflated by citations that lacked sufficient proof "do not call into doubt the remaining evidence." (Resp. at 10). Actually, it does. This was concrete, unimpeachable evidence that undermined the prosecutors' narrative that the number of violations actually reflected an "egregious pattern." Even worse, the government dismisses an internal MSHA email where an investigator identifies what he concedes is only a "potential" violation. The government argues that this email reflects a "documented" or actual violation and, as a consequence, does not support the defense position that the number of violations at UBB was far less than claimed. (Resp. at 10). That is not what the email says, however. It is clear that the investigator harbored doubts as to whether the violation at question could be proven but was told

to issue the citation.  At the very least, this would have enabled the defense to question the validity of evidence MSHA relied on in issuing citations.

### B.  Exculpatory evidence regarding advance notice is material.

The government argues that because the jury acquitted Mr. Blankenship of the second object of the conspiracy count, exculpatory evidence regarding advance notice is irrelevant and therefore, not prejudicial.  (Resp. at 9, 29).  While Mr. Blankenship was acquitted of that object of the count, the evidence on that point is still relevant.  First, evidence expressly rebutting a key aspect of the prosecution's theory undermines the theory as a whole.  Mr. Blankenship was charged in a single conspiracy count with multiple objects.  Information that proved the government was wrong about an aspect the conspiracy offense could have undermined the prosecution's evidence on that count generally.  For example, if the government alleges that an individual conspired with others to rob banks and launder money, and it can be demonstrated that the individual *did not* conspire to rob banks, that tends to cast doubt on whether the government is correct that said person also conspired to launder money.  Second, prosecutors at trial explicitly tied advance notice to the conspiracy to violate mine safety regulations.  (*See, e.g.,* Trial Tr. Vol. XXVIII at 5847-51).  They advanced the theory that Mr. Blankenship's alleged emphasis on production over safety led miners to provide illegal advance notice in an effort to cover up violations at UBB.  Thus, although the jury may not have found the evidence sufficient to convict Mr. Blankenship on that object, it could have considered the evidence relevant to the conspiracy to violate mine regulations. But evidence *from MSHA itself* that inspectors did not consider this to be an illegal or improper practice would have undermined the entire tenor of this theory.

Again, because this evidence was wrongfully withheld from Mr. Blankenship's defense team by Goodwin and Ruby, we will never know what impact it would have had on the jury's consideration of the conspiracy claim. Given the closeness of the verdict, however, based upon the acquittal of the felony charges, the length of the jury's deliberations, and the fact that an *Allen* charge was required to be given, the fact that the defense was denied the opportunity to present this evidence reasonably calls into question the validity of the verdict.

### C. MSHA was intimately involved in this prosecution.

The government argues that MSHA bias reflected in suppressed emails is not relevant because "none of the individuals on the emails was employed by the Department of Justice" and that "[Mr. Blankenship] ignores that this matter was not brought by MSHA." (Resp. at 11). This argument itself ignores that the prosecution team itself consisted of a Department of Labor Office of the Inspector General Special Agent and "DOL attorneys, several of whom were appointed as Special AUSAs for the *Blankenship* trial." (OPR – 000012); (*see also* ECF No. 397, 398) (appointment of MSHA attorneys as Special Assistant U.S. Attorneys). Indeed, a DOL special agent participated in a number of the undisclosed MOI interviews. Moreover, according to Ruby, the prosecutors relied on DOL and MSHA to determine what documents were exculpatory and should be disclosed to the defense. (OPR – 000121-22). MSHA was clearly part of the prosecution team in this case, as that term is used in *Brady* cases, and their biases were relevant and discoverable. The jury could determine whether those biases not only affected how inspectors and their supervisors treated citations to UBB, but also the investigation or charges brought; the government may claim the biases did not enter into its judgment in the case, but the defense is entitled to evidence needed to discover and challenge the point in court.

### D. MSHA disciplinary records provide independent evidence of a faulty ventilation plan.

MSHA disciplinary records demonstrate that MSHA personnel failed to review the ventilation and dust control plans for UBB as a consolidated plan. (*See* USAO0000132) (ECF No. 663-6). This, in conjunction with another undisclosed email (USAO0000024) (ECF No. 663-5), provide additional evidence that the MSHA-approved ventilation plan inherently led to violations. The government argues that this evidence was inadmissible, cumulative, and unfavorable. (Resp. at 11-12). Not so. First, this evidence was admissible because it supported the defense that MSHA, not Mr. Blankenship, bore responsible for ventilation violations. This Court's ruling on the motion *in limine* would not preclude such evidence because it did not relate to a disagreement between MSHA and UBB. Rather, it was evidence that MSHA itself identified problems with the plan it imposed on UBB. Even apart from its value as admissible evidence, however, this could have opened additional avenues of inquiry for the defense, including the decision of whether or not to call MSHA officials as witnesses. Second, the evidence was not cumulative. Prosecutors repeatedly emphasized the ventilation violations during trial. In his closing, Booth Goodwin opened with this as evidence of the conspiracy to violate mine safety laws: "You've heard that proper ventilation is perhaps the most important thing for safe operation of coal mines . . . The defense seems to want you to believe that MSHA was part of this problem on ventilation." (Trial Tr. XXVIII at 5834). This evidence directly undermines this critical argument and does so with MSHA's own documents rather than Massey witnesses. *See Boss v. Pierce*, 263 F.3d 734, 745 (7th Cir. 2001) (evidence not cumulative if provides independent corroboration). Third, this evidence was favorable, notwithstanding that other portions were unfavorable. In fact, given the documented evidence of MSHA's bias against Mr. Blankenship and Massey, it makes favorable evidence such as this all the more powerful.

### E.  Evidence regarding document destruction is relevant and favorable.

The government dismisses the relevance of allegations of document destruction out of hand.  This dismissal fails for at least two reasons.  First, to be clear, contrary to the government's assertion that Mr. Blankenship "claims that MSHA destroyed and altered documents", it is *MSHA employees* who make these claims.  Furthermore, the government concedes that DOL was aware of these allegations, "fully investigated" them, and that the U.S. Attorney's Office declined to prosecute.  (Resp. at 8-9).  Significantly, as another document shows, it was *Steve Ruby* who declined to prosecute at the same time as he and Goodwin were investigating Massey and, presumably, Mr. Blankenship.  (DLB-001541) (ECF No. 712-4).  That fact alone raises red flags about his review of the allegations.  What is more, Ruby brought none of this to the Court's attention and indeed, the Court based its ruling exclusively on the limited information provided by Bill Ross.  Ruby himself told OPR that he knew nothing about these allegations until Mr. Blankenship raised them at trial.  At minimum, this evidence calls into question the veracity of Ruby's testimony to OPR and casts serious doubt on his credibility.  The government simply ignores this in its response.

Second, the government argues that this Court's ruling at trial on the issue supports its position that Mr. Blankenship did not suffer prejudice from suppression of these documents.  But this ignores the fact that the Court did not have all the relevant evidence before it, including the existence of other allegations against Mackowiak or the admissions by MSHA employees about a "shredding party" that destroyed key UBB records.

### IV.  The undisclosed MOI would have led to the identification of potential defense witnesses.

The government argues that MOI that revealed exculpatory evidence from potential defense witnesses would not have helped the defense both because Mr. Blankenship should have

known the information from these witnesses and because, in any event, their testimony would not have been helpful.  (Resp. at 12-18).  Its argument misses the mark on both counts.

### A.  Mr. Blankenship did not have "influence" over or "access" to these witnesses.

The government argues, in part, that Mr. Blankenship was not prejudiced by its misconduct because he could have interviewed his own employees.  (Resp. at 13).  But Mr. Blankenship retired from Massey on December 31, 2010 – *almost four full years before his indictment*.[4]  Not to mention the fact that Massey was defunct by 2011.  Thus, by the time of his indictment years later, Mr. Blankenship would not have had "full access" to former Massey employees.

Moreover, the government argues that Mr. Blankenship was not prejudiced because some witnesses would not have been credible in the eyes of the jury due to Mr. Blankenship's "influence" over them.  (Resp. at 14-15).  For example, the government argues that "admittedly favorable" statements by Steve Sears should be discounted because Sears made them while employed by Mr. Blankenship and was therefore self-interested.  (*Id.*).  It is not for the government to make after the fact, self-serving credibility assessments – Mr. Blankenship was entitled to have a jury decide that issue.  Moreover, the government's self-serving credibility determination is simply wrong.  As is obvious from the MOI itself, Sears had retired from Massey and was working as a consultant for its successor, Alpha.  Moreover, Mr. Blankenship had been retired for almost a full year by the time Sears provided this information.  Thus, Sears was *not* subject to Blankenship's influence at the time of his interview, and in fact, Sears was a consultant for Alpha at the time.  The government relied heavily on cooperation *from Alpha* in its investigation of Mr. Blankenship.  Thus, it was not evident that Sears would provide favorable

---

[4] Massey Energy Co. SEC Filing 8-K (filed 12/7/2010).

testimony to Mr. Blankenship.  Having prior statements with which (1) to impeach harmful testimony, and (2) to determine to sponsor helpful testimony in a defense case was essential to the defense and those statements were suppressed by the government here.  *See United States v. Gil*, 297 F. 3d 93, 104 (2d Cir. 2002) (explaining that a conclusion that evidence could be "an effective tool in disciplining witnesses during cross-examination" would support a finding of materiality).

### B. The government argues that Mr. Blankenship should have done what it would not do itself.

Despite investigating this case for more than four years with a prosecution team consisting of the United States Attorney, three AUSAs, at least two SAUSAs, and two case agents – not to mention assistants and paralegals – Steve Ruby attributed his failure to disclose all evidence required to be made available to the defense to lack of time and resources.  He admitted that "I didn't keep track of [the pre-indictment MOIs].  I just didn't…"  (OPR – 000033).  Ruby apparently had time to devote to prosecuting Mr. Blankenship for charges that could have resulted in imprisonment for the rest of his life, but not enough time to protect his constitutionally-mandated right to a fair trial.  The law requires prosecutors to satisfy their discovery obligations if the verdict is to stand.

Nonetheless, the government now asserts that Mr. Blankenship cannot claim prejudice because he should have known these witnesses would have provided favorable information. (Resp. at 13).  In other words, according to the government, Mr. Blankenship should have been able to keep track of which of Massey's 7,359 employees[5] would have provided him with exculpatory evidence, and it is his own fault that he did not.  The government's reliance on

---

[5] Massey Energy Co. SEC Filing 10-K Annual Report for Fiscal Year ending December 31, 2010 (filed 4/19/2011).

*United States v. Wilson*, 901 F.2d 378 (4th Cir. 1990), to support this argument fails.[6]  (Resp. at 13).  In *Wilson*, the court faulted the defendant for not identifying one witness who would have very specific knowledge.   901 F.2d at 381.  That is simply nothing like the former CEO of a multi-billion dollar publicly traded company with thousands of employees trying to identify everyone who, years later, could possibly provide relevant, much less favorable, evidence.  Moreover, in *Wilson*, there was a factual dispute regarding whether the government ever even possessed the exculpatory information.  *Id.* at 380-81.  Here, Ruby and Goodwin *did* possess the information, were ordered by the Court to disclose it, and represented to the Court that they had done so.  "When the prosecution represents that all such material has been disclosed, it is reasonable for defense counsel to rely on the prosecution's representation."  *United States v. Nelson*, 979 F. Supp. 2d 123, 133 (D.D.C. 2013) (internal quotations and alterations omitted).

### C.  The government spins the evidence to minimize its impact.

Finally, the government attempts to argue that certain withheld evidence would not have been favorable to Mr. Blankenship or was contradicted elsewhere.  For example, it argues that Mark Clemens had "minimal involvement in mine safety" and so failure to disclose his exculpatory evidence was not prejudicial.  (Resp. at 14).  First, this assertion undermines the government's claim that Mr. Blankenship should have known Mr. Clemens would provide favorable information.  More importantly, however, the government again "confuses the weight of the evidence with its favorable tendency." *Kyles v. Whitley*, 514 U.S. 419, 451 (1995).   Mr. Clemens clearly had insight into the degree of pressure Mr. Blankenship put on production.  The

---

[6] Although not entirely clear from the opinion¸ it appears that the defendant proactively sought and brought forward exculpatory evidence only after his conviction.  That is not the case here where Mr. Blankenship pressed his discovery rights throughout the judicial process and only learned of this evidence after OPR began an investigation.

government would have been free to cross-examine him regarding his knowledge of mine safety, but the jury would have been entitled to hear that evidence.

The government similarly attempts to minimize the import of Sabrina Duba's testimony by disputing whether a jury would find her favorable statements to be credible based on her role at Massey. (Resp. at 15-16). For Charlie Bearse, the government argues that the exculpatory information is not favorable in the context of his other statements. (Resp. at 16-17). Again, while that would have been an appropriate topic for cross-examination, Mr. Blankenship would have been entitled to put the favorable evidence before the jury.

In this regard, it is important to remember that Mr. Blankenship ultimately did not put on a defense at trial. So, the helpful statements from these witnesses were not simply cumulative of other helpful testimony Mr. Blankenship presented in his defense because he presented none. If Mr. Blankenship had possessed this exculpatory information, he could have made a fully informed decision about whether to present a defense – as opposed to one artificially limited by the government's suppression of evidence – and any presentation of helpful information in his defense could well have swayed the verdict.

The government does not appear to dispute that evidence is not cumulative if it comes from a more credible source. *See Boss v. Pierce*, 263 F.3d at 745. Instead, it presents reasons that each of these witnesses' statements – Clemens, Sears, Duba, Bearse, Ojeda – should not be considered more credible than other testimony presented at trial. In so doing, it points largely to testimony provided by Chris Blanchard. (Resp. at 14-16, 18). At trial, the government argued that Mr. Blanchard was a co-conspirator with Mr. Blankenship. Therefore, corroboration of key evidence from witnesses who were not also co-conspirators – as well as who had different

perspectives and insight into Massey's operations – would have been more credible and therefore not cumulative.

This is particularly important because Mr. Blankenship's priorities were a hotly contested issue at trial. There was evidence that Mr. Blankenship prioritized safety, and the testimony of these other witnesses could have pushed it over the edge for the jury. For example, when the government argues that the evidence against Mr. Blankenship was strong, it cites a memo Mr. Blankenship wrote telling supervisors to "run coal" and not "build overcasts." (Resp. at 22). In closing, Goodwin emphasized this very direction to "run coal" and claimed it proved Mr. Blankenship emphasized production over safety. (*See, e.g.,* Trial Tr. XXVIII at 5825, 5862). But the defense introduced a second memo that Mr. Blankenship wrote one week later: "Last week I sent each of you a memo on running coal. Some of you may have interpreted that memo to imply that safety and S-1 are secondary. I would question the membership of anyone who thought that I consider safety to be a secondary responsibility." (Trial Tr. Vol. VI at 1308). Testimony from another mine president like Bearse that Blankenship wanted people to "stop, fix the problem and then move on", (MOI-001393) (ECF No. 663-2), would have undermined the government's interpretation of the original memo. It also would have enabled the jury to conclude that the second memo that Mr. Blankenship sent accurately reflected his priorities. This fact undermines confidence in a key piece of the prosecution's evidence and thus the verdict itself.

## V.  Undisclosed MOI would have led to impeachment of key witnesses.

The government cites to the length of cross-examination for both Chris Blanchard and Bill Ross to argue against prejudice to Mr. Blankenship from the non-disclosure of their MOI. (Resp. at 18-20). In fact, they argue that, by the end of trial, prosecutors and defense alike

thought of Mr. Blanchard as a defense witness. (Resp. at 19 n.5). This is nothing more than a self-serving, post-hoc reconstruction of the trial. It certainly runs contrary to Goodwin's closing argument, which began: "The defendant, Don Blankenship, ran a massive, massive criminal conspiracy. The plan and understanding that Blankenship dictated to all and which all knew had to be agreed to or face the consequences was designed to operate the UBB mine and Massey as a lawless enterprise. The defendant and his group of 'yes' men like Chris Blanchard sought to obstruct, hide, and distract others from this truth." (Tr. Trans. Vol. at 5822); *see also id. at* 5826, 5841, 5845, 5849, 5957 (references to Blanchard's testimony in prosecution's closing argument). What the government also ignores is that the defense could have conducted an even more powerful, focused cross-examination had it been in possession of all the MOI. *See United States v. Aguilar Noriega*, 831 F. Supp. 2d 1180, 1204 & n.19 (C.D. Cal. 2011) (explaining that defense suffered prejudice from non-disclosures by inability to conduct efficient, targeted cross-examinations). Ruby and Goodwin denied the defense that opportunity.

The government also argues that the undisclosed evidence was irrelevant because it came out at trial in another form. This argument presupposes that the government can, by wrongfully withholding discoverable information, shape the manner in which evidence favorable to the defense is presented. It cannot. Its duty is to disclose all such evidence. The defense's responsibility is to determine how it wishes to have that evidence presented.

The government's argument also fails to appreciate key nuances in the statements from the MOI and the witnesses' testimony at trial. As this Court well knows, cross-examination and impeachment of any witness is greatly aided by having a witness's prior statements which enables the defense to pin down a witness and to conduct targeted questioning. *See Gil*, 297 F. 3d at 104; *Aguilar Noriega*, 831 F. Supp. 2d at 1204 & n.19. For example, the government

22

argues that Mr. Blanchard's exculpatory statements about "respirable dust fraud" were addressed at trial.  (Resp. at 19-20).  On cross-examination Mr. Blanchard did acknowledge that he had not told Mr. Blankenship about the dust fraud.  (Trial Tr. XV at 3068-69).  This testimony, however, does not preclude the inference that Mr. Blankenship still knew about it from some other means. But the MOI contains statements that are more powerful as to this point.  Specifically, Mr. Blanchard indicated that he himself did not know about such alleged fraud.  (MOI-001581) (ECF No. 663-4).   If Mr. Blankenship's supposed co-conspirator was unaware of any such fraud, a jury could more confidently conclude that Mr. Blankenship would not have been aware given his respective position within the company as compared to Mr. Blanchard.  Because Mr. Blanchard's MOI was wrongfully withheld, the defense was left to fly blind in terms of how far to push this point.

## VI.    The facts in this case demonstrate bad faith sufficient to support reversal for Jencks Act violations.

The government argues that Mr. Blankenship has failed to demonstrate both a Jencks Act violation as well as bad faith or prejudice even if one did exist.  First, the government argues that Special Agent Lafferty's MOIs are not Jencks material because they did not relate to his testimony. (Resp. at 24-26).  In doing so, the government defines the subject of his testimony too narrowly.  In fact, the government concedes that SA Lafferty was asked about UBB's fireboss files but replied that he would need to review additional information to respond.  (Resp. at 26). The defense could have used statements in the Larry Adams MOI to refresh his recollection. Second, the government claims that MOIs containing direct quotations do not "appear to be attributable to the interview subjects."  (Resp. at 27).  This assertion makes little sense as the agent was directly recording statements of the interview subjects.

Most importantly, the government argues that Mr. Blankenship fails to make the requisite showing of bad faith necessary to reverse a conviction.  (Resp. at 24 n.6) (citing *United States v. Stalvey*, No. 92-5006, 1992 WL 122288 at *2 (4th Cir. June 8, 1992) ("In the absence of bad faith or prejudice, the failure to disclose Jencks Act material will not result in reversal.")).  The Jencks Act itself requires no showing of bad faith to merit relief at trial.  Nonetheless, there is, in fact, ample evidence of bad faith here.  According to Ruby, Booth Goodwin, the U.S. Attorney and chief law enforcement official for this district, intentionally disregarded his office's written discovery policies to retaliate against the defense's zealous representation of Mr. Blankenship's interests.  He directed Ruby to only provide the minimum disclosures required by law.  Despite the U.S Attorney's extraordinary decision to jettison standard policy in retaliation against a vigorous defense team, OPR concluded that the discovery violations were not intentional.  This Court is not bound by that conclusion, and indeed the facts are sufficient to support a finding of bad faith.

Moreover, Ruby professed to be concerned from the beginning that Mr. Blankenship's defense team would seek to force a discovery mistake by the prosecution in an effort to generate an investigation by OPR.  (OPR-000133-135, 339).  He nonetheless also claims that, despite that concern and an order from this Court to provide *Brady* disclosures, he was so cavalier as to prepare a summary disclosure from memory without ever reviewing the relevant MOIs.  While an evidentiary hearing would give this Court the ability to explore the question of bad faith further, the record currently before it more than supports such a conclusion here.

## VII.    The Court should make its own factual determinations at an evidentiary hearing.

There is sufficient evidence in the record already to vacate Mr. Blankenship's conviction. Contrary to the government's argument (Resp. at 38-39), Mr. Blankenship's motion cannot be

denied on the papers because, in fact, the evidence supports relief. Even were the Court to conclude that the current state of the record does not support relief by itself, there are issues of disputed facts that would require an evidentiary hearing.

As a threshold matter, many of the conclusions regarding the prosecutors' conduct in this case derive from the OPR report. This Court is not bound by OPR's conclusions, though the government appears to concede the basic facts found by OPR. As an example of a matter that would further support Mr. Blankenship, OPR considers the conduct of Ruby and Goodwin to be reckless misconduct. But Mr. Blankenship maintains, and the evidence supports, that this was actually intentional and bad faith misconduct. The government concedes that findings of intentionality and bad faith would be relevant to Mr. Blankenship's claims, including under the Jencks Act and for prosecutorial misconduct. (*See* Resp. at 24 n.6, 36). The Court should reach its own conclusions on these questions. As discussed earlier, some of Ruby's statements to OPR are contradicted by documents and other witnesses, while others appear less than credible under scrutiny. Moreover, some of OPR's conclusions rest on limited evidence. OPR itself recognized that it had lacked critical information given Goodwin's refusal to submit to an interview or respond to many of OPR's questions. (OPR – 000008, -082). And to the extent he did respond, Goodwin's information conflicted with Ruby's. Thus, an evidentiary hearing would create a record that OPR did not have. Furthermore, OPR did not have many of the materials that have been turned over more recently.

Finally, OPR did not reach a conclusion regarding whether the Court was misled by Ruby's statements regarding disclosure. (OPR – 000094). OPR stated that it would normally interview the Court regarding this issue, but could not do so due to this litigation. (*Id.*). Thus, the Court should hold an evidentiary hearing to resolve the issues regarding Ruby's

representations. First, OPR concluded that when Ruby told the Court: "We have also turned over 302s from our interviews with this witness . . . and so to the extent that there is exculpatory information that we had from this witness, that's been turned over to the defense", he mistakenly referred to plural 302s, when only one had been turned over. In light of Ruby's credibility problems – including the number of times he is flatly contradicted by Goodwin, other members of the prosecution team, and the documentary evidence – this Court should determine whether his explanation is truthful. Second, OPR accepted Ruby's tortured defense that this statement did not suggest that all 302s had been disclosed. But OPR's report failed to address the heart of the statement – "to the extent that there is exculpatory information that we had from this witness, that's been turned over to the defense." This is patently false, as Ruby himself acknowledged exculpatory evidence was not disclosed. There is no logical explanation for this misrepresentation. Third, OPR could not reach a conclusion as to whether Ruby's statement misled the Court, which would have been a critical factor in OPR's analysis. This Court should assess for itself whether this was an intentionally false statement designed to mislead the defense and the Court.

## VIII.    This patent prosecutorial misconduct must be remedied.

Mr. Blankenship has had to fight aggressively and at great expense from the start of this legal ordeal. He fought repeatedly – and as we now know unsuccessfully – to obtain all discoverable information before trial. At trial, he fought to defend himself against felony charges – charges the jury found unsupported. Now, after trial, he continued to fight for his right to the fair trial he should have received in the first place. And despite clear – and now admitted – misconduct by prosecutors, he is still forced to expend time, money, and energy to seek justice.

If there is one critical takeaway from this trial and subsequent OPR investigation, it is that Booth Goodwin and Steve Ruby *really* do not like criminal defendants who vigorously defend themselves.  Not only did Ruby admit that Goodwin changed his discovery policy to retaliate against the defense, but both Ruby and Goodwin suggested to OPR that the defense's vigor somehow excuses their misconduct.  The government spent nearly five years investigating UBB and had roughly a year to prepare for Mr. Blankenship's trial.  Its trial team included the U.S. Attorney, three AUSAs, two SAUSAs, and two special agents.  As reflected in the MOI (both disclosed and undisclosed), dozens more attorneys and agents assisted in the UBB investigation.  Yet, over and over, Ruby and Goodwin complain about the defense's resources compared to their own.  Indeed, on the very first page of his first statement to OPR, Ruby complained "Defendant is part of the rare class of defendants who can, in effect, write a blank check for an army of high-powered defense attorneys not only to defend him on the merits but also to mount an endless series of attacks against the individual prosecutors handling his case." (OPR – 000099); s*ee also* OPR – 000339 ("Unfortunately, using OPR [as a vehicle to destroy the careers of prosecutors] is now part of the playbook for those defendants and their attorneys: Overwhelm the prosecutors with superior numbers before and during trial in hopes of forcing a mistake; then use the same outsize resources to persuade OPR to spend years on a frame-by-frame review of everything . . ."); OPR – 00345 (statement by Goodwin that OPR was "apparently being hounded by Blankenship's hired guns" and "Blankenship had a defense that I am sure cost Alpha Natural Resources tens of millions of dollars").  Remarkably, in reviewing the appeal from the OPR report, the Professional Misconduct Review Unit accepted this defense sympathetically: "You and AUSA Ruby faced enormous pressures in *Blankenship* . . . an extremely aggressive and litigious defense team who filed 75-100 pre-trial motions; and finite

USAO resources compared to seemingly limitless defense resources."[7]   (OPR – 000356).   One can only imagine what happens to defendants who lack those resources.

It is vital to correct the misconduct here lest the message be that prosecutors can violate their discovery obligations with impunity.   This issue requires the supervision of the judiciary as the failure of prosecutors to comply with *Brady* is not limited to this case.   *See generally* Vida B. Johnson*, Federal Criminal Defendants Out of the Frying Pan and Into the Fire? Brady and the United States Attorney's Office,* 67 CATH. U. L. REV. 321 (2018) (outlining myriad Brady violations in recent federal cases); *United States v. Olsen,* 737 F.3d 625, 631 (9th Cir. 2013) (Kozinski, J., dissenting from denial of rehearing en banc) ("Brady violations have reached epidemic proportions in recent years…").   Indeed, the Fourth Circuit in *Bartko* identified the key issue for repeated violations within this circuit:   "The problem is that the government appears to be betting on the probability that reams of condemning evidence will shield defendants' convictions on appeal such that at the trial stage, it can permissibly withhold discoverable materials and ignore false testimony."   *Bartko*, 728 F.3d at 342.   The Fourth Circuit concluded: "Whatever it takes, this behavior must stop."   *Id.* at 343.

The prosecutorial misconduct here was pervasive and included violations of discovery obligations and court orders, violations of due process and the right to a fair trial, and misrepresentations to the Court and defense counsel.   Fortunately, this Court has an opportunity to stop to this behavior.   This case is not *Bartko*.   Here, not only does the government concede

---

[7] The defense filed many such motions out of necessity. Ruby himself admitted that, early on, prosecutors stopped responding to emails from the defense. "Goodwin said that if Zuckerman wanted information from the government, the defense could file a motion with the court, to which the government would respond."   Stunningly, Ruby and Goodwin now blame the defense's litigiousness as justification for their decisions not to comply with discovery obligations.   What is more, a number of these motions were made in an effort to obtain discovery.   Based on what has come out since, these motions were clearly both necessary and justified.

the misconduct (albeit grudgingly and only partially), but the evidence also demonstrates prejudice to the defendant. This was a hotly contested, very close case in which any marginally helpful evidence – not least its cumulative weight – could have tipped the balance. No rational observer can have confidence in the jury's verdict given the volume and content of materials the prosecutors suppressed.

What is more, while Don Blankenship has already served his full prison sentence, the prosecutors responsible for the misconduct will never face any consequences. OPR said that had either Ruby or Goodwin "remained in the federal service, OPR would have referred this finding [regarding their representations to the court] to the Department to take whatever action it thought appropriate to ensure that such conduct was not repeated." However, both Ruby and Goodwin have long since left government service and enjoy lucrative careers in politics and private practice.[8]   Even after OPR's report, Booth Goodwin remains defiant:  "I believed at the time the prosecution team had complied with all of our discovery obligations and your report has not persuaded me otherwise."  (OPR-000345).  Despite the finding of professional misconduct, the government took no meaningful action against either Ruby or Goodwin.  In fact, the government even fought to keep the details of their misconduct from becoming public until pushed to do so by the combined efforts of Mr. Blankenship, this Court, and the Charleston Gazette-Mail.  This

---

[8] For example, Steve Ruby has worked as a personal lawyer for U.S. Senator Joe Manchin and represents West Virginia Supreme Court Justice Margaret Workman in her impeachment proceedings. *See, e.g.,* Brad McElhinny, *Manchin says he's also in the dark on $15 million hotel deal gone bad,* MetroNews (Aug. 28, 2017); Lacie Pierson, *Justice Workman seeks impeachment dismissal in Senate*, Charleston Gazette Mail (Sept. 24, 2018). As described in the 2255 Motion, Booth Goodwin used the Blankenship case as a springboard to run for governor. He is now in private practice and treasurer for three political action committees that poured over $2.5 million into 2018 federal and state elections. *See* Jake Zuckerman and Lori Kersey, *Outside money finds in-roads in Charleston mayoral race*, Charleston Gazette-Mail (Oct. 30, 2018).

Court has an opportunity to send the message loud and clear – *Brady* violations will not be tolerated in the Southern District of West Virginia.


Dated: November 30, 2018                    Respectfully submitted,

                                            /s/  Howard C. Vick
                                            Howard C. Vick
                                            Michael A. Baudinet
                                            MCGUIREWOODS LLP
                                            Gateway Plaza
                                            800 E. Canal Street
                                            Richmond, VA 23219-3916
                                            Tel: (804) 775-1000
                                            Fax: (804) 775-1061
                                            tvick@mcguirewoods.com
                                            mbaudinet@mcguirewoods.com

                                            Benjamin L. Hatch
                                            MGUIREWOODS LLP
                                            World Trade Center
                                            101 West Main Street
                                            Suite 9000
                                            Norfolk, VA 23510-1655
                                            Tel: (757) 640-3700
                                            Fax: (757) 640-3701
                                            bhatch@mcguirewoods.com

                                            /s/ W. Henry Jernigan, Jr.
                                            W. Henry Jernigan, Jr. (WVSB No. 1884)
                                            DINSMORE & SHOHL LLP
                                            707 Virginia Street, East, Suite 1300
                                            P.O. Box 11887
                                            Charleston, West Virginia 25339-1887
                                            Telephone: (304) 357-0900
                                            Facsimile: (304) 357-0919
                                            henry.jernigan@dinsmore.com

                                            *Counsel for Donald L. Blankenship*

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### Beckley Division

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **Plaintiff/Respondent,** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 5:14-CR-00244** |
| | ) | **Civil No. 5:18-CV-00591** |
| | ) | |
| **DONALD L. BLANKENSHIP** | ) | |
| | ) | |
| **Defendant/Petitioner.** | ) | |

## CERTIFICATE OF SERVICE

I, W. Henry Jernigan, do hereby certify that a foregoing Consolidated **Reply to Government's Consolidated Response in Opposition to Motion to Vacate Under 28 U.S.C. § 2255 and Request for Evidentiary Hearing** was served through the Court's electronic filing system on this the 30th day of November, 2018 upon the following counsel of record:

Douglas W. Squires, Esquire
Assistant U.S. Attorney
U.S. Attorney's Office for the Southern District of Ohio
303 Marconi Blvd., Suite 200
Columbus, OH 43215

/s/ W. Henry Jernigan, Jr.
W. Henry Jernigan, Jr. (WVSB No. 1884)