IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

DONALD L. BLANKENSHIP,            )
                                  )
            Movant,               )
                                  )
v.                                )        Civil Action No. 5:18-00591
                                  )        Criminal Action No. 5:14-00244
UNITED STATES OF AMERICA,         )
                                  )
            Respondent.           )

## PROPOSED FINDINGS AND RECOMMENDATION

Pending before the Court are the following Motions: (1) Movant's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody (Document No. 663), filed on April 18, 2018; (2) Movant's Motion for Evidentiary Hearing (Document No. 704), filed on September 5, 2018; and (3) Movant's Motion for Oral Argument (Document No. 733), filed on July 31, 2019. By Standing Order, this matter was referred to the undersigned for submission of proposed findings of fact and a recommendation for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (Document No. 665.)

## PRELUDE

Carl Calvin "Pee Wee" Acord, Jason Atkins, Christopher Bell, Gregory Steven Brock, Kenneth A. Chapman, Robert E. Clark, Cory Thomas Davis, Charles Timothy Davis, Michael Lee "Cuz" Elswick, William Ildon "Bob" Griffith, Steven "Smiley" Harrah, Edward Dean Jones, Richard K. Lane, William Roosevelt Lynch, Joe Marcum, Ronald Lee Maynor, Nicholas Darrell McCroskey, James E. "Eddie" Mooney, Adam Keith Morgan, Rex L. Mullins, Joshua Scott Napper, Howard D. "Boone" Payne, Dillard Earl "Dewey" Pesinger, Joel R. "Jody" Price, Gary Wayne Quarles, Deward Allan Scott, Grover Dale Skeens, Benny Ray Willingham, and Ricky

Workman.[1]  These are the names of the miners who lost their lives on the afternoon of April 5, 2010 when an explosion occurred at the Upper Big Branch ["UBB"] Coal Mine in Montcoal, WV. The criminal trial of the Movant, while related to the events of that day, was not in fact a trial as to the cause of the April 5, 2010 tragedy, but was instead, generally, related to criminally prosecuting the Movant for allegations of violating mine safety laws. Regardless, the undersigned finds it appropriate to remember the men who lost their lives on April 5, 2010 and the family members who have had to live with the loss of their loved ones since this tragedy occurred.

The UBB disaster was a tragedy felt most poignantly in southern West Virginia, but it was also felt around the world when it was learned of the magnitude of the tragedy and the number of lives lost that day. The significance that coal mining has played in the growth and history of the United States cannot be overstated. Furthermore, it is impossible to overstate the impact that coal mining has had to the history of the State of West Virginia, to the way of life that many West Virginians have lived from generation to generation, and to the economic well-being of the lives of families who have made coal mining their career. While mining has become much safer over the last century, due in large part to federal and State mining laws and regulations, this tragedy shows that coal mining is still a dangerous profession and that mining, while safer, is still not safe. Over the last century, in response to many other mining tragedies and the loss of life, Congress and States responded with legislation to attempt to prevent the next tragedy from happening. Over the course of the last 120 years, mining employment fell from a high of 862,536 miners in 1923 to just 82,699 in 2018.[2]  More importantly, mining deaths fell from a high of 3,242 lives in 1907 to a

---

[1]  http://www.ubbminersmemorial.com/the-miners

[2]  https://arlweb.msha.gov/stats/centurystats/coalstats.asp

2

low of 8 in 2016.[3]  Much of the lowering of mining deaths can be attributable to the improvements mandated by mine safety legislation.

With that said, the decision that follows should not be seen as a decision on what caused or did not cause the UBB disaster as the criminal trial of the Movant was not about that issue. The issue at the criminal trial of the Movant was whether the Movant criminally violated mine safety laws. A jury of his peers found that he did. The issue in this immediate matter before the undersigned is should the Movant's conviction be vacated or set aside due to admitted errors by the United States during the discovery phase and trial of the Movant's criminal prosecution.

The decision that follows is based upon the laws and the facts that the undersigned has before him. While the Movant attempts to ascribe ill motives to the United States and the attorneys that tried the case, the undersigned has found no ill motive in the actions taken during the prosecution of this case. While the United States has admitted that errors were made and further argues reasons as to why those areas don't necessitate the relief sought by the Movant, the undersigned has found that those errors were simply that: errors. An analysis of the laws and the facts and the conclusions reached by the undersigned follow this preamble.

## **PROCEDURAL BACKGROUND**

**1.     Criminal Action No. 5:14-00244:**

By Superseding Indictment filed on March 10, 2015, Movant was charged with one count of conspiracy to willfully violate mandatory mine safety and health standards in violation of 30 U.S.C. § 820(d) and 19 U.S.C. § 371 and to defraud the United States by impeding the Mine Health Safety Administration ["MSHA"] in the administration and enforcement of mine safety and health

---

[3] *Id.*

laws in violation of 18 U.S.C. § 371 (Count One); one count of making false statements to the Securities and Exchange Commission in violation of 18 U.S.C. § 1001 (Count Two); and (3) one count of making false statements in connection with the sale or purchase of securities in violation of 18 U.S.C. § 78ff (Count Three). (Criminal Action No. 5:14-002244, Document No. 170.) Following a 36-day jury trial beginning on October 7, 2015, Movant was convicted as to Count One and acquitted as to Counts Two and Three. (Id., Document No. 529.) The District Court sentenced Movant on April 6, 2016, to a 12-month term of imprisonment. (Id., Document Nos. 585 and 589.) The District Court further imposed a one-year term of supervised release, a $250,000 fine, and a $25.00 special assessment. (Id.)

Movant filed a Notice of Appeal on April 7, 2016. (Id., Document No. 591.) In his appeal, Movant argued that the District Court erred by: (1) "erroneously conclude[ing] that the Superseding Indictment sufficiently alleged a violation of Section 820(d);" (2) "improperly deny[ing] [Movant] the opportunity to engage in re-cross examination of an alleged co-conspirator;" (3) "incorrectly instruct[ing] the jury regarding the meaning of 'willfully' in 30 U.S.C. § 820(d), which makes it a misdemeanor for a mine 'operator' to 'willfully' violate federal mine safety laws and regulations;" and (4) "incorrectly instruct[ing] the jury as to the government's burden of proof." Id., Document No. 647; United States v. Blankenship, 846 F.3d 663, 667 (4th Cir. 2017). On January 19, 2017, the Fourth Circuit Court of Appeals affirmed the District Court's judgment. Id. Movant filed a petition for certiorari, which was denied by the United States Supreme Court on October 10, 2017. Blankenship v. United States, ___ U.S. ___, 138 S.Ct. 315, 199 L.Ed.2d. 207 (2017).

**2.      Section 2255 Motion:**

4

On April 18, 2018, Movant, by counsel, Howard C. Vick, Benjamin L. Hatch, and W. Henry Jernigan, Jr., filed his instant Motion to Vacate and Set Aside Conviction and Sentence Pursuant to 28 U.S.C. § 2255. (Civil No. 5:18-00591, Document No. 663.) As grounds for *habeas* relief, Movant argues as follows: (1) The United States suppressed material exculpatory and/or impeaching evidence in violation of <u>Brady v. Maryland</u> and <u>Giglio v. United States</u> (<u>Id.</u>, pp. 10 – 13.); (2) The United States suppressed evidence in violated of the Jencks Act and Rule 26.2 of the Federal Rules of Criminal Procedure (<u>Id.</u>, pp. 13 – 14.); (3) The United States violated the District Court's Orders regarding discovery thereby depriving Movant of his constitutional right to a fair trial (<u>Id.</u>, pp. 14 – 17.); and (4) Prosecutorial misconducted denied Movant due process and a fair trial (<u>Id.</u>, pp. 18 – 19.). As relief, Movant requests that his sentence and conviction be vacated and set aside. (<u>Id.</u>, p. 19.) As Exhibits, Movant attaches a copy of pertinent documents that were allegedly improperly withheld (<u>Id.</u>, Document Nos. 663-1, 663-2, 663-3, 663-4, 663-5, 663-6.).

On the same day, Movant filed a "Motion for Extension of Time to Submit a Memorandum in Support of Motion to Vacate Pursuant to 28 U.S.C. § 2255." (<u>Id.</u>, Document No. 664.) In support of his Motion, Movant explained that "the Department of Justice's Office of Professional Responsibility ["OPR"] is conducting an investigation into the conduct of the prosecutors in [Movant's] case" and "the findings of the OPR report are likely to add material information to the subject matter of the Section 2255 Motion." (<u>Id.</u>) Movant stated that he expects that the OPR will issue its reports in the near future and "the interest of justice will be best served if [Movant] has the opportunity to address that information in his briefing." (<u>Id.</u>) Movant further noted that he had "learned of relevant new material as recently as April 6, 2018, and it is likely that more may come to light in the coming weeks." (<u>Id.</u>) Accordingly, Movant requested an extension of time to file his Memorandum in Support "until an appropriate date after the OPR report has been issued." (<u>Id.</u>)

By Order entered on April 23, 2018, the undersigned granted Movant's Motion for Extension of Time, directed Movant to file his Memorandum in Support of his Section 2255 Motion by June 4, 2018, and directed the United States to file its Answer no later than 45 days after the filing of Movant's Memorandum in Support. (Id., Document No. 667.) On May 21, 2018, Movant filed a "Motion for *In Camera Review*" of documents being withheld on privilege grounds by the United States Attorney for the Southern District of Virginia. (Id., Document No. 669.) The United States Attorney's Office for the Southern District of West Virginia was recused from defending the Section 2255 Motion. Subsequently, the undersigned granted an extension of time to the United States for the filing of a response to Movant's "Motion for *In Camera* Review," Movant for the filing of his Memorandum in Support of his Section 2255 Motion, and the United States for the filing of its Answer to Movant's Section 2255 Motion. (Id., Document No. 674.)

On June 21, 2018, Movant filed a "Motion to Conduct Discovery." (Id., Document No. 681.) The United States filed its Response in Opposition on July 3, 2018, and Movant filed his Reply on July 13, 2018. (Id., Document Nos. 685 and 686.) The undersigned conducted an in-chambers informal conference concerning Movant's pending "Motion to Conduct Discovery" on July 16, 2018. (Id., Document No. 689.) Movant appeared via telephone, by counsel, Benjamin L. Hatch, Howard C. Vick, Jr., Michael A. Baudinet, and W. Henry Jernigan, Jr. The United States appeared via telephone, by counsel, AUSA Douglas W. Squires, AUSA Jessica H. Kim, and AUSA S. Courter Shimeall. During the discussions, the parties reached the following agreement to resolve the issues raised in Movant's above Motion:

1. The United States will provide to Movant the Department of Justice's Office of Professional Responsibility ("DOJ") full Report of Investigation, and documents related to the DOJ's review, by **August 15, 2018**.

2. If the United States is unable to produce the foregoing by August 15, 2018, the

6

United States **must** notify the Court of its inability to comply by **August 8, 2018**. The United States **must** further notify the Court of the specific reasons for its inability to comply with the August 15, 2018 deadline, and provide the Court with a date certain for the production of the foregoing documents.

3.    If Movant concludes his discovery request is not satisfied after receipt and review of the above documents, Movant may file a new Motion for Discovery.

(Id., Document No. 688.) The undersigned, therefore, denied Movant's "Motion to Conduct Discovery" (Document No. 681) is as moot. (Id.)

The United States filed its Response to Movant's "Motion for *In Camera* Review" on July 30, 2018. (Id., Document No. 693.) Movant filed his Reply on August 7, 2018. (Id., Document No. 696.) By Order entered on August 8, 2018, the undersigned granted in part and denied in part as moot Movant's "Motion for *In Camera* Review" (Document No. 669). (Id., Document No. 697.) Specifically, the undersigned granted Movant's Motion as to Document Nos. DLB-001463, DLB-001464-77, DLB-001496-001501, and DLB-001532, and denied as moot Movant's Motion as to all remaining documents. (Id.) Thus, the Court directed the United States to produce the foregoing documents for *in camera review*. (Id.) Subsequently, the United States represented that it agreed to release Document Nos. DLB-001463 and DLB-001464-77 to Movant pursuant to the Court's Protective Order entered on July 27, 2018. (Id., Document No. 698.) The United States further stated that Document Nos. DLB-001463 and DLB-001464-77 were sent via overnight mail to Movant's counsel. (Id.) Concerning DLB-001496-001501, the United States states that it is amenable to disclosing the above document with redactions to account for the privileged communications. (Id.) The undersigned reviewed the above document and determined that such contained privileged attorney-client communications. (Id.) Accordingly, the United States was ordered to produce Document No. DLB-001496-001501, with redactions of the privileged attorney-client communications, to Movant. (Id.) Concerning DLB-001532, the undersigned

7

determined that such did not contain privileged attorney-client communicates and the United States was ordered to produce Document No. DLB-001532, without redaction, to Movant. (Id.)

On September 5, 2018, Movant filed Memorandum in Support of his Section 2255 Motion. (Id., Document Nos. 703 and 712-5.) As Exhibit, Movant's attaches copies of the pertinent evidence that was withheld by the United States. (Id., Document Nos. 703-1 – 703-17.) On September 6, 2018, Movant filed his Amended Memorandum in Support of his Section 2255 Motion. (Id., Document Nos. 705 and 712-5.) First, Movant argues that the United States suppressed material, exculpatory, and impeachment evidence in violation of Brady and Giglo. (Id., pp. 12 – 26.) Second, Movant claims that the United States suppressed evidence in violation of the Jencks Act and deprived Movant of due process. (Id., pp. 26 – 28.) Finally, Movant asserts that the United States violated the District Court's discovery Orders and committed prosecutorial misconduct. (Id., pp. 28 – 30.)

Movant also filed a "Motion for Evidentiary Hearing." (Id., Document No. 704-1.) Movant argued that the existing record demonstrates that he is entitled to relief under Section 2255. (Id.) Movant, however, states that he requests an evidentiary hearing if the Court is not inclined to grant him Section 2255 relief based on the record. (Id.)

On November 16, 2018, the United States filed its Consolidate Response in Opposition to Movant's Section 2255 Motion and Request for Evidentiary Hearing. (Id., Document No. 728.) First, the United States argues that Movant's Brady and Giglio claims are meritless because the undisclosed favorable evidence was not material. (Id., pp. 6 – 23.) Second, the United States claims that the Jencks Act claim is without merit because the statements were not relevant to the witnesses' testimony on direct examination. (Id., pp. 23 – 35.) Third, the United States disputes it committed prosecutorial misconduct by failing to comply with the Court's discovery orders. (Id.,

8

pp. 35 – 37.) Finally, the United States asserts there is no need for an evidentiary hearing because the record conclusively shows Movant is entitled to no relief. (Id., pp. 38 – 40.)

On November 30, 2018, Movant filed his Consolidate Response in Opposition. (Id., Document No. 731.) First, Movant states that "examples cited in [Movant's] Memorandum in Support illustrates prejudice, but are not a comprehensive list of all the favorable, material, undisclosed evidence." (Id., pp. 7 – 9.) Second, Movant disputes that he suffered no prejudice because the evidence against him at trial was "strong" or "overwhelming." (Id., pp. 9 – 11.) Third, Movant argues that the "undisclosed MSHA evidence supported [his] defense theory." (Id., pp. 11 – 16.) Fourth, Movant claims that the "undisclosed MOI would have led to the identification of potential defense witnesses." (Id., pp. 16 – 21.) Fifth, Movant argues that "undisclosed MOI would have led to impeachment of key witnesses." (Id., pp. 21 – 23.) Sixth, Movant asserts that "the facts in this case demonstrate bad faith sufficient to support reversal for Jencks Act violations." (Id., pp. 23 – 24.) Seventh, Movant contends that this Court "should make its own factual determinations at an evidentiary hearing." (Id., pp. 24 – 26.) Finally, Movant claims "[t]his patent prosecutorial misconduct must be remedied." (Id., pp. 26 – 30.)

On July 31, 2019, Movant filed a "Motion for Oral Argument." (Id., Document No. 733.) Movant states that he "seeks oral argument to support the resolution of his 2255 Motion." (Id.) Although Movant acknowledges that he is not incarcerated, Movant states that his conviction continues to cast "an ongoing cloud over [Movant's] professional and personal life." (Id.) Movant, therefore, requests "oral argument on the 2255 Motion so that the parties may present their arguments to the Court and respond to any issues the Court may raise." (Id.) On August 1, 2019, the United States filed its Response in Opposition. (Id., Document No. 734.) The United States notes that oral argument is not a matter of right in a *habeas* case, materials needed to review the

motion are before the Court, and oral argument would not aid in the decisional process. (Id.) On August 8, 2019, Movant filed his Reply arguing that "oral argument may assist the Court in evaluating the facts and legal issues of the matter." (Id., Document No. 735.)

## **FACTUAL BACKGROUND**

A coal mine explosion occurred at the UBB mine on April 5, 2010, resulting in the tragic death of 29 miners. The UBB mine was owned and operated by Massey Energy Company ["Massey"]. Movant was the former chairman and chief executive officer of Massey. In 2009 and 2010, Massey was repeatedly cited by MSHA for violating requirements of the Mine Safety and Health Act of 1977, 30 U.S.C. § 801, *et seq*. During the jury trial, testimony was presented that MSHA issued UBB 466 violations in 2009, 480 violations in 2010, and UBB had the third most serious safety violations in any mines in the United State for the indictment period. Testimony was also presented that Massey had the most violations in the United States for 2009 and 2010. The United States argued that Movant conspired with other Massey officials to violate the mine safety laws in order to produce more coal. The United States presented testimony that there was an unspoken understanding at UBB that safety violations were acceptable so long as the mine was producing coal. The conspiracy involved the advance warnings of mine inspectors, cheating on dust samples, and the concealing of Mr. Ross's safety warnings by designing such as confidential. Coal miners testified that they were required to work in conditions known to be unsafe and without proper ventilation. Following a six-week jury trial, Movant was convicted of conspiring to violate mine safety laws and acquitted of the remaining offenses. Prior to returning a verdict, the jury deliberated for approximately two weeks, twice informed the District Judge that they could not agree on a verdict, and received an Allen charge from the Court.

Following Movant's conviction, Movant continued his quest for evidence allegedly

suppressed by the United States. In 2017, the United States Attorney's Office began sending Movant letters enclosing materials previously suppressed. Movant contends that the United States Attorney's Office has now produced more than 1,000 additional pages of documents that should have been provided to Movant prior to his criminal trial.

## DISCUSSION

The relevant portion of Section 2255 provides as follows:

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

A motion made pursuant to Section 2255 is a collateral attack on a conviction or sentence. To succeed on a Section 2255 motion, the movant must prove that "his sentence or conviction was imposed in violation of the Constitution or law of the United States, that the court was without jurisdiction to impose such a sentence, that the sentence exceeded the maximum authorized by law, or that the sentence otherwise is subject to collateral attack." 28 U.S.C. § 2255. "A motion collaterally attacking a petitioner's sentence brought pursuant to § 2255 requires the petitioner to establish his grounds by a preponderance of the evidence." Sutton v. United States, 2006 WL 36859, * 2 (E.D.Va. Jan. 4, 2006).

Movant argues that the United States failed to disclose numerous pieces of materially favorable exculpatory evidence under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963), and material impeachment evidence under Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). It is well established that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the

evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963). In United States v. Agurs, 427 U.S. 97, 111, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976), the Supreme Court clarified the prosecutor's duty to require disclosure of favorable evidence to the defense, even if not requested. This duty encompasses impeachment evidence (often referred to as "*Giglio* material"), exculpatory evidence, and evidence "known only to police investigators and not to the prosecutor." Kyles v. Whitley, 514 U.S. 419, 438, 115 S.Ct. 1555, 1567-68, 131 L.Ed.2d 490 (1995). A prosecutor, however, does not have a "constitutional duty routinely to deliver his entire file to defense counsel." United States v. Agurs, 427 U.S. 97, 111, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976); also see Kyles, 514 U.S. 419, 437, 115 S.Ct. at 1567("[T]he rule in *Bagley* (and, hence, in *Brady*) requires less of the prosecution than the ABA Standards for Criminal Justice.) If the prosecution suppresses Brady material, the disclosure of which would have in all reasonable probability resulted in a different outcome, then the mandates of due process are violated. See United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); Brady v. Maryland, 373 U.S. at 87, 83 S.Ct. at 1196-97.

To state a valid Brady claim, the evidence "must be favorable to the accused, either because it is exculpatory, or because it is impeaching, [the] evidence must have been suppressed by the State, either willfully or inadvertently," and the evidence must have been material to the verdict such that its suppression prejudiced the defense. Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999); Monroe v. Angelone, 323 F.3d 286, 299-300 (4th Cir. 2003). Suppressed evidence is "information which had been known to the prosecution but unknown to the defense." Agurs, 427 U.S. at 103, 96 S.Ct. 2392. "Evidence is 'exculpatory' and 'favorable' if it 'may make the difference between conviction and acquittal' had it been 'disclosed

12

and used effectively.'" <u>United States v. Wilson</u>, 624 F.3d 640, 661 (4th Cir. 2010(citing <u>Bagley</u>,

473 U.S. at 676, 105 S.Ct. at 3375)). Concerning materiality, the Supreme Court emphasized three

aspects. <u>Kyles</u>, 514 U.S. at 434, 115 S.Ct. at 1565. First, the Supreme Court stressed that "a

showing of materially does not require demonstration by a preponderance that disclosure of the

suppressed evidence would have resulted ultimately in the defendant's acquittal." <u>Id.</u>, 514 U.S. at

434, 115 S.Ct. at 1566(*Bagley's* touchstone of materiality is a 'reasonable probability' of a

different result, and the adjective is important.") Stated another way, "[t]he question is not whether

the defendant would more likely than not have received a different verdict with the evidence, but

whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of

confidence." <u>Id.</u> Therefore, a "reasonable probability" is shown when the suppression of evidence

"undermines confidence in the outcome of the trial." <u>Id.</u> Second, the Supreme Court emphasizes

that when considering materiality, there is not a sufficiency of the evidence test. <u>Id.</u> The Supreme

Court explained that "[a] defendant need not demonstrate that after discounting the inculpatory

evidence in light of the undisclosed evidence, there would not have been enough left to convict."

<u>Id.</u>, 514 U.S. at 434-35, 115 S.Ct. at 1566. Again, a defendant must only show that the favorable

evidence "could reasonably be taken to put the whole case in such a different light as to undermine

confidence in the verdict." <u>Id.</u> Finally, the Supreme Court stressed that the question of materiality

must be considered "collectively, not item by item." <u>Id.</u> at 436, 115 S.Ct. at 1567(noting that it

was debatable whether lower court assessed the "cumulative effect of the evidence" because the

court's decision contained repeated references dismissing particular items of evidence as

immaterial, thereby suggesting that cumulative materiality was not the touchstone).

It is undisputed that the United States failed to produce to Movant, prior to trial, 61

Memoranda of Interviews ("MOIs") written by law enforcement agents. (Criminal Action No.

5:14-cr-00244, Document No. 728, p. 5 and Document No. 712-6, p. 2.) Eleven of the MOIs pertained to pre-indictment interviews and 50 pertained to post-indictment interviews. (Id.) Movant further argues that the United States failed to produce MSHA material including emails and disciplinary records. (Id., Document No. 712-5, pp. 7 - 8, 13 – 17.) In Response, the United States states that for purpose of the Motion, it does not dispute that the Government suppressed documents. (Id., Document No. 728, p. 6.) Therefore, the undersigned, must consider whether the suppressed documents were (1) favorable to Movant either because the documents were exculpatory or impeaching, and (2) material to the verdict such that the suppression prejudiced Movant's defense. The cumulative effective of all suppressed evidence favorable to a defendant must be considered, rather than considering each item of evidence individually. As discussed in Kyles, a court must consider the cumulative effective of all suppressed evidence favorable to a defendant rather than considering each item of evidence individually. Kyles, 514 U.S. at 436, 115 S.Ct. at 1567. Thus, the cumulative effective requirement applies to the materiality element - - not the favorability element. The undersigned, therefore, will first determine whether the suppressed evidence individually was favorable to Movant. Once making this determination, the undersigned will consider the cumulative effective of all suppressed evidence favorable to Movant.

1.    **Issue of Favorability of Suppressed Evidence:**

      A.    **MSHA Evidence:**

      First, Movant argues that suppressed MSHA material included emails and disciplinary records that were "incredibly favorable to [Movant] and would have provided significant support for his defense at trial on multiple issues." (Criminal Action No. 5:14-00244, Document 712-5, p. 13.) Movant states that "[t]hese materials could have caused the defense to change its decision and present a case, including by presenting the compelling point that [Movant] was subject to criminal

14

prosecution when MSHA officials were given a slap on the wrist for their own conduct." (Id.) Movant further alleges that evidence obtained since trial supports Movant's claim that a MSHA official altered and destroyed documents that "likely contained additional exculpatory and impeachment information." (Id., pp. 13 – 14.) Although Movant stresses that his examples are not inclusive of all favorable, material, undisclosed evidence, Movant contends that he has provided examples sufficient to prove a Brady violation. (Id.) As stated above, the undersigned will consider each example of suppressed evidence to determine if such was favorable to Movant:

> **i.**     ***Advance Notice:***

As his first example, Movant argues that the suppressed MSHA material would have supported Movant's defense that Massey's practice of informing miners when inspectors arrived at the mine did not constitute illegal advance notice. (Id., Document No. 712-5, p. 14.) Movant contends that suppressed internal emails reveal that MSHA officials were conflicted as to whether Massey's practice constituted an improper advanced notice. (Id., citing Document No. 663-5, pp. 44 -45, Page ID No. 23408, USAO0000030.) Movant further notes that the emails exhibited the "tremendous discretion and uncertainty inherent in the decision to issue a citation." (Id., p. 14.) Movant acknowledges that he made some of the points during trial through former Massey employees, but Movant argues that MSHA evidence would have provided independent corroboration. (Id.) Movant notes that independent corroboration of a defense theory is not cumulative testimony or evidence and can undermine the confidence in a verdict. (Id., pp. 14 – 15.)

In Response, the United States argues that the "MSHA materials neither relate to the [Movant's] criminal charges, nor would they have led to evidence that would have supported this defense." (Id., Document No. 728, p. 8.) First, the United States contends that the email chain

between MSHA officials discussing advance notice is irrelevant because Movant was acquitted of this aspect of Count One. (Id., p. 9.) The United States further notes that the email is irrelevant because it occurred on January 24, 2012, which was after the period of time in issue in the Superseding Indictment ("Beginning no later than January 1, 2008 and continuing through April 9, 2010 . . ."). (Id.)

In Reply, Movant disputes the United States' argument that the MSHA email (USAO0000030) was irrelevant because such was dated after the indictment period. (Id., Document No. 731, p. 11.) Movant argues that it is immaterial that the email discussion took place after the indictment period so long as the email discusses relevant information. (Id., pp. 11 – 12.) Movant maintains that the emails involved discussions among MSHA investigators as to events occurring at UBB during the indictment period, which were relevant and discoverable. (Id., p. 12.) Movant further argues that suppressed evidence regarding advanced notice was relevant and prejudicial despite his acquittal on the second object of the conspiracy count. (Id., p. 13.) Movant explains that "evidence expressly rebutting a key aspect of the prosecution's theory undermines the theory as a whole." (Id.) Specifically, Movant explains that the United States proceeded on the theory that Movant's emphasis on "production over safety" led miners to provide illegal advanced notice to cover up violations at UBB. (Id.) Movant contends that even though the jury did not convict him on this object of the conspiracy, the jury could have considered the evidence relevant to the conspiracy to violate mine regulations. (Id.) Movant notes that "evidence from MSHA itself that inspectors did not consider this to be an illegal or improper practice would have undermined the entire tenor of this theory." (Id.)

The undersigned first finds that the suppressed emails regarding advance notice are not rendered irrelevant merely because the emails were composed on January 24, 2012, which was

16

outside the indictment period (January 1, 2008 through April 9, 2010). Movant maintains that the emails involved discussions among MSHA investigators as to events occurring at UBB during the indictment period, which was relevant and discoverable. The Court agrees. Next, the undersigned will consider whether the advance notice emails were favorable despite Movant's acquittal on this object of the conspiracy as to Count One. In Count One, Movant was charged with a conspiracy involving two objects: (1) willfully violating mandatory mine health and safety standards; and (2) defrauding an agency of the United States (MSHA). Movant was acquitted of the conspiracy object of defrauding MSHA. (Criminal Action No. 5:14-00244, Document No. 529.) Movant, however, was convicted of conspiring to violate the mandatory mine health and safety standards. (Id.) At trial, the United States proceeded on the theory that Movant's knowledge and participation in advance notice was both (1) fraud on the Department of Labor and MSHA and (2) evidence of Movant's knowledge and participation in a conspiracy to violate the mine safety regulations. (Criminal Action No. 5:14-00244, Document No. 626, pp. 75 – 79, Page ID Nos. 21641-45.) The United States argued that "[t]he goal of defendant's conspiracy was to violate the mine health and safety laws in order to run more coal. And to do this, he engaged in a relentless campaign of obstruction. The Defendant's conspiracy engaged in a system of advance warnings to tip off the members underground to hide surely thousands more violations that were not ever able to be caught by inspectors." (Id., Document No. 626, p. 50, Page ID No. 21616.) The United States further argued that "providing advance warning of an inspector's presence is illegal in and of itself." (Id., p. 77.) The United States presented testimony from numerous witnesses (Smith, Racer, Justice, Hughart, Hutchen, Ellison, Stewart, and Blanchard) that Movant encouraged the practice of providing notice of an inspector's presence at the mine so that mine safety violations could be hide or avoided. (Id.) The suppressed MSHA email chain revealing that MSHA officials were

17

conflicted as to whether Massey's practice constituted an improper advanced notice is favorable to Movant. Although the jury acquitted Movant of the conspiracy charge where the object involved defrauding MSHA, it is certainly reasonable that the jury could have at least partially relied upon the alleged advance notice in concluding that Movant conspired to violate mandatory mine health and safety standards. Accordingly, the undersigned finds that MSHA email involving advance notice (Criminal Action No 5:14-00244, Document No. 663-5, pp. 44 - 45, Page ID No. 23408, USAO0000030) is favorable to Movant.

ii.      *MSHA Bias:*

(a)      *Movant's Arguments:*

Movant argues that the suppressed MSHA material would have supported Movant's defense that a MSHA citation does not necessarily reflect an actual violation of a mine safety law. (Criminal Action No. 5:14-00244, Document No. 712-5, p. 15.) Movant again claims that because the decision to issue a MSHA citation involves significant discretion, such could not form a basis for a conviction of violating mine safety law. (Id.) Movant concludes that the suppressed MSHA documents would have supported his defense by showing the following: (1) MSHA issued citations, and resisted challenges to citations, even in cases where there was insufficient proof of a violation; (2) MSHA employees were biased against Massey and Movant; and (3) MSHA inspectors often disagreed concerning what constituted a violation. (Id.) In support, Movant first references an email from a MSHA attorney discussing several citations issued to UBB. (Id., citing Document No. 663-6, p. 55, Page ID No. 23527, USAO0000114.) Movant contends that the MSHA attorney noted that one citation could not be sustained and must be vacated. (Id.) Movant claims that the MSHA attorney "writes further that more information would be needed to sustain two other citations if Massey pressed its challenge, but notes that MSHA still would not vacate

18

those citations." (Id.) Movant states that this email "provided crucial evidence explaining why [he] often considered MSHA citations the 'cost of doing business' and chose not to challenge them on the merits." (Id.)

Second, Movant references an email from a MSHA employee pointing out a "potential violation" at UBB, stating that one section "seem[ed] to be mining" but written notice was not provided for two weeks. (Id., citing Document No. 663-5, p. 40, Page ID No. 23404, USAO0000028.) The responding email stated as follows: "Sounds like a violation is in order. Let Norman know about it and I am sure he will be more than happy to give them one more piece of paper." (Id.) Movant contends that the foregoing emails demonstrate "MSHA's willingness to issue citations without sufficient proof that the underlying violation occurred, as well as its bias against Massey and [Movant]." (Id., p. 16.)

Finally, Movant references several other emails that he claims "paint[s] an even more compelling picture of this bias." (Id.) In response to a draft press release, MSHA Mine Administrator Kevin Stricklin stated as follows: "My only comment is to put a dagger into [M]assey." (Id., citing Document No. 663-5, p. 663-5, Page ID No. 49, USAO0000033.) Movant states that Mine Administrator Stricklin was "one of the MSHA employees later disciplined in connection with UBB. (Id.) In another email, a MSHA employee stated as follows: "I hope that [Movant] and Glenn Beck get raped by a rhinoceros. Horn end." (Id., citing Document No. 663-6, p. 49, Page ID No. 23521, USAO0000109.) In a final email, Movant states that a DOL official reported Movant's indictment to the Secretary of Labor stating "And sometimes bad things happen to bad people." (Id., citing Document No. 696-2, p. 1, Page ID No. 23797, DLB-001532.) Therefore, Movant alleges that the foregoing undermines MSHA's credibility and the citation process. (Id.)

19

(b)     *United States' Arguments:*

In Response, the United States disputes that the MSHA attorney-client communication regarding a settlement in an administrative matter shows that Movant was not acting willfully. (Id., Document No. 728, p. 9, citing Document No. 663-6, p. 55, Page ID No. 23527, USAO0000114.) The United States explains that his communication does not undermine the evidence and testimony presented exhibiting that there were 836 violations issued to UBB from January 2008 to April 2010, and that Movant had knowledge regarding the violations. (Id.) Specifically, the United States notes that during trial Blanchard, Ross, and Davis testified that Movant received daily violation reports. (Id., citing Document No. 614, p. (19210), Document No. 618, p. 19848, 19854-55, 19855, 19935-37, Document No. 602, p. 16509, 16513-17.) Furthermore, the United States asserts that mere reckless disregard was sufficient *mens rea* to support Movant's conviction. (Id., pp. 9 – 10.)

Furthermore, the United States disputes that the additional emails exhibit agency bias. (Id., p. 10.) The United States explains that the email referenced by Movant involving a "potential violation" and giving UBB "one more piece of paper" was regarding a single citation and the email was sent during the MSHA accident investigation in 2011. (Id., citing Document No. 663-5, p. 40, Page ID No. 23404, USAO0000028.) The United States claims that email is irrelevant because it was composed in 2011, outside the indictment period. (Id.) The United States further argues the email is not favorable because it involves a citation to UBB and the email cites specific records documenting the actual violation. (Id.) The United States asserts that MSHA employees' willingness to cite UBB for documented violations does not demonstrate bias." (Id.) Regarding the other four emails, the United States argues that none support Movant's theory of agency bias. (Id.) The United States claims that the email from Mine Administrator Stricklin ("….put a dagger into [M]assey") was "a single intemperate comment from a MSHA employee shortly after the

20

tragedy at UBB that does not show wide-spread bias." (Id., p. 10, citing Document No. 663-5, p. 49, Page ID No. 23413, USAO0000033.) The United States further noted that "the response from the DOL assistance secretary redirected the focus to "presenting the facts [about the tragedy] in a responsibly way." (Id.) The United States claims that another email was not favorable to Movant's defense because it involved a profane statement ("raped by a rhinoceros") from a "MSHA employee with no apparent enforcement connection to UBB" and an employee from a private sector. (Id., citing Document No. 663-6, p. 49, Page ID No. 23521, USAO0000109.) The United States explains that the email involving the Secretary of Labor was not favorable to Movant's defense because the email was composed after Movant's indictment, "and therefore has no relation to any possible pre-indictment MSHA enforcement bias." (Id., pp. 10 – 11, citing Document No. 696-2, p. 1, Page ID No. 23797, DLB-001532.)

Finally, the United States stresses that none of the individuals on the above emails were employed by the Department of Justice or involved in the criminal investigation. (Id.) The United States argues that "[a]lthough [Movant] claims that these emails could have undermined MSHA's credibility, he ignores that this matter was not brought by MSHA, and did not rely solely on testimony from MSHA employees." (Id.) The United States contends that given the "egregious pattern of 836 violations during the charged period[,] . . . [f]our isolated emails from people not involved in the criminal case do not refute a large volume of evidence of properly issued citations against UBB." (Id.)

(c)   <em>Movant's Reply Arguments:</em>

In Reply, Movant disputes the United States' argument that the MSHA emails (USAO0000028 and 32) were irrelevant because such were dated after the indictment period. (Id., Document No. 731, p. 11.) Movant argues that it is immaterial that the email discussion took place

after the indictment period so long as the email discusses relevant information. (<u>Id.</u>, pp. 11 – 12.) Movant maintains that the emails involved discussions among MSHA investigators as to events occurring at UBB during the indictment period, which were relevant and discoverable. (<u>Id.</u>, p. 12.) Second, Movant disputes the United States' argument that evidence that would "undercut" the number of violations issued by MSHA is irrelevant. (<u>Id.</u>) Movant notes that the United States proceeded on the theory that Movant had an "egregious pattern of 836 violations" at UBB. (<u>Id.</u>) Movant argues that his "unimpeachable evidence . . . undermined the prosecutors' narrative that the number of violations actually reflected an 'egregious pattern.'" (<u>Id.</u>) Third, Movant argues that the internal MSHA email reveals that the investigator was instructed to issue a citation even though he identified only a "potential" violation. (<u>Id.</u>) Movant argues that this email was favorable and relevant to allow Movant to question the investigator as to the reasoning for issuing the citation. (<u>Id.</u>, p. 13.)

Finally, Movant argues that "MSHA was intimately involved in this prosecution." (<u>Id.</u>, p. 14.) Movant, therefore, contends that the emails exhibiting bias by MSHA is relevant. (<u>Id.</u>) Movant notes that "the prosecution team itself consisted of a Department of Labor Office of the Inspector General Special Agent and 'DOL attorneys, several of whom were appointed as Special AUSAs for the Blankenship trial.'" (<u>Id.</u>, p. 14 citing OPR 00012 and Document Nos. 397 and 398.) Movant states that a DOL special agent participated in a number of the MOI interviews. (<u>Id.</u>) Movant also states that "according to [former AUSA] Ruby, the prosecutors relied on DOL and MSHA to determine what documents were exculpatory and should be disclosed to the defense. (<u>Id.</u>, citing OPR 000121-22). Movant concludes that MSHA "was clearly part of the prosecution team in this case" and evidence of bias by MSHA was relevant. (<u>Id.</u>) Specifically, Movant argues that evidence exhibiting bias by MSHA was relevant to the jury's determinate as to whether such bias affected

how inspectors and their supervisors treated citations to UBB, and to any effect on the subsequent investigation and charges brought by the United States against Movant. (Id.)

(d)     Court's Findings:

Concerning Movant's reference to an email from a MSHA attorney discussing several citations issued to UBB, the undersigned finds such is favorable to Movant. (Criminal Action No. 5:14-cr-00224, Document No. 663-6, p. 55, Page ID No. 23527, USAO0000114.) As Movant notes, the email indicates that MSHA counsel was aware that one citation (Citation 7261300/air quality) could not be sustained if challenged by Movant. (Id.) MSHA counsel noted that Movant had challenged citation, and thus, counsel recommended that the citation be vacated. The foregoing indicates that although MSHA was aware the citation could not be sustained, such would not have been vacated unless challenged by Movant. (Id.) As to citation 7278775 (protection from roof and rib falls), MSHA counsel indicates that the seriousness of the citation might need to be reconsidered due to the lack of information provided by the mine inspector. (Id.) MSHA counsel, however, recommended Movant's challenge to the citation be denied. (Id.) Concerning the foregoing email, Movant states that this email "provided crucial evidence explaining why [Movant] often considered MSHA citations the 'cost of doing business' and chose not to challenge them on the merits." (Id.) The undersigned finds that the foregoing email is favorable to Movant. (Criminal Action No. 5:14-cr-00224, Document No. 663-6, p. 55, Page ID No. 23527, USAO0000114.) The United States clearly relied upon reference to MSHA citations in support of its argument that Movant conspired to violate mine safety standards. The United States presented testimony that Massey was issued more safety violations than any other mines in the United States for 2009 and 2010. The forgoing email indicates that MSHA inspectors issued citations to Massey without providing sufficient evidence to support the citation, or that could not be sustained if

23

challenged.

Concerning the email from the MSHA employee pointing out a violation at UBB, and the responding email that Norman "will be more than happy to give them one more piece of paper" is not favorable to Movant. (Criminal Action No. 5:14-00244, Document No. 663-5, p. 40, Page ID No. 23404, USAO0000028.) In the foregoing email, a MSHA employee notes a potential violation and states evidence supporting such. (Id.) In response, another MSHA employee states that a violation is in order and "Let Norman know about it and I am sure he will be more than happy to give them one more piece of paper." (Id.) Despite Movant's allegations to the contrary, the foregoing does not provide favorable evidence. The email contains evidence supporting the basis for the violation. Although the email indicates that a certain MSHA employee would be "happy to give [Movant and Massey] one more piece of paper," such does not reveal agency bias because the email clearly provides evidence supporting the issuance of a violation. Accordingly, the foregoing email is not favorable to Movant. (Criminal Action No. 5:14-00244, Document No. 663-5, p. 40, Page ID No. 23404, USAO0000028.)

Concerning the email from Mine Administrator Stricklin ("....put a dagger into [M]assey"), the undersigned finds that such is favorable to Movant. (Criminal Action No. 514-00244, p. 10, citing Document No. 663-5, p. 49, Page ID No. 23413, USAO0000033.) Although the response from the DOL assistant secretary redirected the focus to "presenting the facts to the public in a responsible way," such does indicate a bias towards Massey or Movant. Concerning the email from the MSHA employee to an employee of a private sector (stating he hoped Movant was "raped by a rhinoceros"), the undersigned finds that such is favorable to Movant to show bias by a MSHA employee. (Criminal Action No. 5:14-00244, Document No. 663-6, p. 49, Page ID No. 23521; USAO0000109.) Although the United States argues that this MSHA employee had

24

"no apparent enforcement connection to UBB," Movant contends that certain MSHA employees were involved in his prosecution and bias by a MSHA employees is relevant. The undersigned agrees. Concerning the email from a DOL official reporting Movant's indictment to the Secretary of Labor stating "And sometimes bad things happen to bad people," the undersigned find such is favorable to Movant. (Id., Document No. 696-2, p. 1, Page ID No. 23797; DLB-001532.) Again, the undersigned finds that the forgoing indicates bias toward Movant and such was favorable to his defense.

According, the undersigned finds that the following emails were favorable to Movant: (1) USAO0000114 (Criminal Action No. 5:14-cr-00224, Document No. 663-6, p. 55, Page ID No. 23527.); (2) USAO0000033 (Criminal Action No. 5:14-00244, p. 10, citing Document No. 663-5, p. 49, Page ID No. 23413.); (3) USAO0000109 (Criminal Action No. 5:14-00244, Document No. 663-6, p. 49, Page ID No. 23521.); and (4) DLB-001532 (Criminal Action No. 5:14-00244, Document No. 696-2, p. 1, Page ID No. 23797.) The undersigned finds that USAO0000028 is not favorable to Movant. (Criminal Action No. 5:14-00244, Document No. 663-5, p. 40, Page ID No. 23404; USAO0000028.)

### iii.    MSHA Disciplinary Documents:

Finally, Movant argues that disciplinary records concerning MSHA employees were suppressed. (Criminal Action No. 5:14-00244, Document No. 712-5, pp. 16 – 17.) Movant claims that the MSHA employment records show that "MSHA employees responsible for oversight of the UBB mine during the period the indictment were subject to disciplinary action including for their failure to consider the interaction between the mine dust and the ventilation plans MSHA required at the UBB mine." (Id., p. 16, citing Document Nos. 663-6, pp. 78 – 83, 91 - 96, 101 - 106 and Document No. 669-1.) Thus, Movant argues "[t]his evidence would have supported a key

25

defense argument: the MSHA-required and approved ventilation plan – not some criminal conspiracy – actually caused many of the violations for which the government sought to hold [Movant] responsible." (Id.) Movant further states that in an undisclosed email one MSHA employee "chastises another [stating] 'you told Lynn that the Internal Review report still made it appear that MSHA was responsible for a defective ventilation plan at UBB. (It would have been really good if you had told me that, since I am the one who can fix it.)'" (Id., p. 17, citing Document No. 663-5, p. 34, Page ID No. 23398, USAO0000024.) Movant argue that the foregoing is "independent evidence" supporting his defense that "could have opened a number of avenues for further inquiry." (Id.)

In Response, the United States disputes that the disciplinary actions taken by MSHA against MSHA employees was favorable to Movant. (Id., Document No. 728, pp. 11 – 12.) The United States disagrees that the disciplinary letters demonstrate that MSHA caused many of the violations Movant was held accountable. (Id., p. 11.) The United States explains that disciplinary decisions were made following MSHA's post-UBB Internal Review and it was determined that MSHA's failure on several occasions to follow internal agency policies in enforcement at UBB actually resulted in less stringent enforcement at the mine. (Id., p. 12, citing Document No. 663-6, pp. 78 - 106, ID No. 23550-78.); (also citing https://www.msha.gov/PerformanceCoal/UBBInternalReview/UBBInternalReview.asp.) Thus, the United States asserts that the disciplinary documents show that "MSHA should have been harder on [Movant] for his repeated violations of mine-safety regulations." (Id.) Next, the United States disputes that MSHA's required ventilation plan was withheld. (Id.) The United States explains that testimony concerning the issue of whether the type of ventilation plan required by MSHA was responsible for the safety issues at UBB came out at trial (Id., citing Document No.

26

618, pp. 231-36, Page ID No. 19998-20003 and Document No. 601, pp. 34 – 35, Page ID No. 16238-39.) The United States further notes that the jury was not allowed to consider evidence or arguments related to any disagreements between MSHA and UBB as to the interpretation or application of ventilation standards. (Id.) Finally, the United States asserts that Movant relies upon a February 2012, email exchange occurring between MSHA counsel and MSHA team members that drafted the UBB Internal Review Report, which was outside the indictment period and is irrelevant to bias. (Id., p. 11, citing Document No. 663-5, p. 34, Page ID No. 23398; USAO0000024.) The United States further contends that the email "reflects internal discussion in the Report drafting process regarding phrasing related to ventilation," which would not have supported Movant's defense. (Id.)

In Reply, Movant argues the MSHA disciplinary records are favorable and material because they provide independent evidence of a faulty ventilation plan. (Id., Document No. 731, p. 15.) Although Movant acknowledges that portions of the disciplinary records were unfavorable to Movant, Movant contends that the disciplinary records also contained favorable information. (Id.) Movant explains that the disciplinary records "demonstrate that MSHA personnel failed to review the ventilation and dust control plans for UBB as a consolidated plan." (Id., citing and Document No. 663-6, p. 80, Page ID No. 23552, USAO 000132.) Movant claims that this finding in conjunction with another undisclosed email (USAO 00024), provides evidence that the MSHA-approved ventilation plan led to violations. (Id.) Movant disputes that this evidence would have been inadmissible or cumulative. (Id.) Movant argues that this evidence would not have been precluded by the District Court's ruling on the motion *in limine* because it did not relate to a disagreement between MSHA and UBB. (Id.) Movant explains that the disciplinary records and the undisclosed email reveal that MSHA identified problems with the plan it imposed on UBB.

27

(Id.) Movant further argues that the foregoing documents "could have opened additional avenues of inquiry for the defense, including the decision of whether or not to call MSHA officials as witnesses." (Id.) Movant argues that the suppressed evidence was not cumulative. (Id.) Movant acknowledges that he presented the defense that MSHA bore responsibility for the ventilation violations. (Id.) Movant, however, contends that suppressed evidence provides independent corroboration with MSHA's own documents, rather than Massey witnesses, that supported Movant's defense. (Id.)

The undersigned finds that both the MSHA disciplinary records and internal email are favorable to Movant. The Internal Review Report by MSHA recognized that there were inadequacies in MSHA's safety and health standards and District 4 personnel failed to follow established policies and procedures. Specifically, the Internal Review Report indicates that MSHA personnel failed to properly apply and enforce safety standards upon Movant and UBB. The Internal Review, however, ultimately concluded that neither the actions of District 4 personnel or inadequacies in MSHA safety and health standards *caused* the explosion. As part of the MSHA disciplinary records, a "Letter of Reprimand" issued to Deputy Administrator Charles J. Thomas states that "District 4 management failed to follow CMS&H policies and procedures applicable to the plan approval process." (Criminal Action No. 5:14-cr-00244, Document No. 663-6, p. 80, Page ID No. 23552, USAO 000132.) Specifically, it was determined that "District 4 management did not follow national guidance outlined in Procedure Instruction Letter No. 109-V-03, which specified that separate ventilation and dust control plans were to be consolidated into a single mine ventilation plan subject to a single review date." (Id.) Although the United States is correct that testimony came out at trial concerning the issue of whether the type of ventilation plan required by MSHA was responsible for the safety issues at UBB, such testimony focused on MSHA's

28

rejection of Massey's proposed use of belt air ventilation and the number of ventilation related citations issued to Massey. (Id., citing Document No. 618, pp. 231-36, Page ID No. 19998-20003 and Document No. 601, pp. 34 – 35, Page ID No. 16238-39.) There is no indication that Movant had independent evidence indicating that MSHA determined that District 4 personnel failed to follow proper policies and procedures when reviewing and approving the ventilation plan for UBB. Although the District Court's ruling on the motion *in limine* precluded any evidence concerning a disagreement between MSHA and UBB as to the interpretation or application of ventilation standards, the above referenced MSHA disciplinary records did not concern such a disagreement. The above MSHA disciplinary records relate to the failure MSHA employees to consolidate separate ventilation and dust control plans into a single mine ventilation plan. Although the Internal Review Report and disciplinary records certainly contain unfavorable evidence to Movant, the undersigned finds that the disciplinary records also contain some favorable evidence. The disciplinary records provide support for Movant's argument that the ventilation plan approved or imposed by MSHA contributed to safety violations. Additionally, the undersigned finds that the undisclosed MSHA email acknowledging that the Internal Review Report "made it appear that MSHA was responsible for a defective ventilation plan at UBB," is favorable to Movant. (Criminal Action No. 5:14-00244, Document No. 663-5, p. 34, Page ID No. 23398, USAO0000024.) As stated above, the MSHA email provides independent evidence supporting Movant's defense that MSHA's approved ventilation plan contributed to Movant's and UBB's safety violations.

### iv.   Conclusion as to "favorability" as to MSHA documents:

Based upon the foregoing, the undersigned has concluded that the following MSHA documents are favorable to Movant: (1) USAO0000030 (Criminal Action No 5:14-00244, Document No. 663-5, pp. 44 - 45, Page ID No. 23408.); (2) USAO0000114 (Criminal Action No.

29

5:14-cr-00224, Document No. 663-6, p. 55, Page ID No. 23527.); (3) USAO0000033 (Criminal Action No. 5:14-00244, p. 10, citing Document No. 663-5, p. 49, Page ID No. 23413.); (4) USAO0000109 (Criminal Action No. 5:14-00244, Document No. 663-6, p. 49, Page ID No. 23521.); (5) DLB-001532 (Criminal Action No. 5:14-00244, Document No. 696-2, p. 1, Page ID No. 23797.); (6) USAO 000132 (Criminal Action No. 5:14-00244, Document No. 663-6, p. 80, Page ID No. 23552.); and (7) USAO0000024 (Criminal Action No. 5:14-00244, Document No. 663-5, p. 34, Page ID No. 23398.). The undersigned finds that USAO0000028 is not favorable to Movant. (Criminal Action No. 5:14-00244, Document No. 663-5, p. 40, Page ID No. 23404; USAO0000028.)

> **B.    Memoranda of Interviews (MOIs):**

As stated above, it is undisputed that the United States failed to produce to Movant, prior to trial, 61 MOIs written by law enforcement agents. (Criminal Action No. 5:14-cr-00244, Document No. 728, p. 5 and Document No. 712-6, p. 2.) Eleven of the MOIs pertained to pre-indictment interviews and 50 pertained to post-indictment interviews. (Id.) Movant first contends that the information provided in the MOIs could have provided useful information for cross examination. (Id., Document No. 712-5, pp. 17 – 18.) Movant further argues that production of the MOIs would have allowed Movant to make a determination on whether to advance an argument that could be corroborated by witnesses. (Id.) Although Movant stresses that his examples are not inclusive of all favorable and material MOIs, Movant contends that his examples are sufficient to prove a Brady violation. (Id.)

> ### *i.    MOI of Potential Defense Witnesses:*

> #### *(a)    Movant's Argument:*

Movant identifies five potential defense witnesses that he claims could have provided

30

exculpatory testimony: Mark Clemens, Steve Sears, Sabrina Duba, Charlie Bearse, and Stephanie Ojeda. (Id.) Movant contends that the statements provided by the above witnesses in their MOIs "contradicted the government's theory that [Movant] pushed production over safety and failed to budget sufficient funds to hire more safety personnel, which was perhaps the single most important issue at trial." (Id., p. 18.) Movant stress that "these witnesses were all [Massey] employees whose roles gave them more insight than many of the witnesses who ultimately testified." (Id.) Concerning Mark Clemens, Movant contends that Mr. Clemens was in charge of Massey's production, sales, and budgeting. (Id., Document No. 712-5, p. 18.) Movant argues that "[d]ue to Clemens' role at Massey, he was uniquely qualified to address the government's theory that [Movant] pressured subordinates to run coal and ignore safety." (Id.) Movant contends that the MOI for Mr. Clemens reveals that Mr. Clemens "would have rejected this theory, as he told the government that 'there was pressure at Massey to run coal, but not enough to overlook safety.'" (Id., citing Document No. 663-2, p. 3, Page ID No. 23095, MOI-001506).

As to Steve Sears, Movant states that Mr. Sears "oversaw Massey Coal Sales." (Id., p. 18.) Similar to Mr. Clemens, Movant asserts that Mr. Sears' role at Massey make him "qualified to address the government's theory that [Movant] pressured subordinates to run coal and ignore safety." (Id.) Movant claims that the Mr. Sears stated as follows in his MOI: "Massey's primary focus was safety. [Movant] started a safety program for individuals and pushed safety more than any other CEO in the industry. People have been fired because of safety." (Id., pp. 18 - 19, citing Document No. 663-2, p. 7, Page ID No. 23099, MOI-001509). The MOI further reveals that Mr. Sears stated "he had a positive opinion about safety at all of Massey's operations." (Id., p. 19.)

Concerning Sabrina Duba, Movant contends that Ms. Duba was a Massey senior accountant, who ran the budgeting process for the mines. (Id.) Movant asserts that the MOI reveals

Ms. Duba told the government that Movant "would tell them to go back and make sure the [production] figures used were not too aggressive." (Id., p. 19, citing Document No. 663-3, p. 16, Page ID No. 23200, MOI-001412). Movant argues that this statement "would have contradicted the government's theory that Mr. Blankenship relentlessly pushed production." (Id., p. 19.) Movant further argues that MOI reveals that Ms. Duba could have testified to the following: (1) Movant "did not participate in budget meetings or have involvement in the final business plan reviews;" (2) Ms. Duba was instructed by Chris Adkins to focus on eliminating the most serious violations; and (3) Movant directed Ms. Duba to identify the people responsible for violations to learn who were the 'repeat offender.'" (Id., citing Document No. 663-3, pp. 17 - 18, Page ID No. 23201-02, MOI-001413-14).

As to Charlie Bearse, Movant asserts that Mr. Bearse was a president of a Massey resource group. (Id., p. 19.) The MOI reveals that Mr. Bearse stated that Massey's section staffing was the "industry standard." (Id., citing Document No. 663-2, p. 20, Page ID No. 23112; MOI-001392). Movant argues that this statement contradicted testimony of two other resource groups presidents that testified for the government. (Id.) Movant further states that this statement "directly contradicts the government's overarching theory that 'the [Movant] never came up with the money for that one more coal miner,' and supports [Movant's] contention that the mine was properly staffed." (Id., citing Document No. 599, p. 55, Page ID No. 15846). Second, the MOI revealed that Mr. Bearse explained that "if there was something wrong at the mine, you were expected to stop, fix the problem and then move on." (Id., citing Document No. 663-2, p. 21, Page ID No. 23113, MOI-001393.) Mr. Bearse stated "[t]here were not discussions that violations were OK, but there were discussions about trying to get better." (Id.) Mr. Bearse further stated that "You can go to any mine and find safety violations." (Id., pp. 19 – 20, citing Document No. 663-2, p. 22, Page ID

No. 23114, MOI-00134.) Finally, Movant states that Mr. Bearse acknowledged he had been reprimanded for a violation for operating without air in a section and, at times, he feared discipline over compliances issues. (Id.)

Concerning Stephanie Ojeda, Movant states she was an in-house lawyer at Massey that provided favorable evidence in her MOI. (Id.) Specifically, Movant argues that Ms. Ojeda's MOI stated the following favorable information: (1) "Ojeda knew that [Movant] wanted a report [on her meeting with Ross] but was not sure how she learned that" (Id., citing Document No. 663-4, p. 3, Page ID No. 23285, MOI-01519.); (2) "[Movant] and Adkins seemed to think Ross was legitimate," and "Ojeda thought they were looking for solutions from Ross" (Id., citing Document No. 663-4, p. 6, Page ID No. 23288, MOI-01522.); (3) "[Movant] did not like learning of inadequacies at Massey . . . . Ojeda [] advised that Adkins was going to take heat for what Ross had stated" (Id., citing Document No. 663-4, p. 7, Page ID No. 23289, MOI-01523.); (4) "The Hazard Elimination Committee started around the same time as Ross's recommendations were made" " (Id., citing Document No. 663-4, p. 10, Page ID No. 23292; MOI-01526.); and (5) "Ojeda was certain issues raised by Ross were discussed by the Hazard Elimination Committee" (Id.). Furthermore, Movant argues that Ms. Ojeda made exculpatory statements concerning the confidentiality designations placed on the memorandum memorializing Ross's thoughts and recommendations. (Id.) Specifically, Movant explains that the United States argued at trial that Ms. Ojeda's instructions to keep certain material related to Ross confidential, was evidence of a conspiracy with Movant. (Id.) Movant argues that Ms. Ojeda's MOI establishes that neither Ms. Ojeda nor Movant engaged in such a conspiracy. (Id.) Movant notes that MOI reveals that Ms. Ojeda informed the government that she "was not specifically told to attend the Ross meeting so that the meeting between Ross and [Stan] Suboleski would remain privileged" and "it was typical

to include a warning on privileged documents." (Id., pp. 20 – 21, citing Document No. 663-4, pp. 5 - 6, Page ID No. 23287-88, MOI-01521-22.) Finally, Movant states that Ms. Ojeda's MOI contradicted the United States' "suggestion that the privilege warning was intended to hide the material from Elizabeth Chamberlin, who oversaw safety at Massey." (Id., citing Document No. 663-4, p. 5, Page ID No. 23287, MOI-01521 and Document No. 618, pp. 24 – 25, Page ID Nos. 19791-92.) Specifically, Ms. Ojeda stated that she did "not remember adding the language that the report should not be shared with non-practicing attorneys to warn Ross not to share the report with Chamberlin." (Id.)

(b)   United States' Response:

In Response, the United States disputes that the suppressed evidence would have led to the identification of defense witnesses. (Criminal Action No. 5:14-00244, Document No. 728, pp. 12 - 18.) Citing United States v. Wilson, 901 F.2d 378 (4th Cir. 1990), the United States argues that Movant is not entitled to the benefit of Brady based upon the five potential witnesses now identified by Movant. (Id., p. 13.) The United States contends that all five potential witnesses were both available to Movant and a source where a reasonable defendant would have looked. (Id.) The United States points out that all five of the potential witnesses were Movant's own employees and "all of them except Sears were actually listed on the defendant's initial witness list, which was provided, by the Court Order." (Id., citing Document No. 280, p. 3, Page ID No. 4985.) The United States contends that "it 'would have been natural' for the defendant to interview his own employees 'to determine if [they] could have supplied [him] with exculpatory evidence." (Id.) Thus, the United States concludes that "[i]n light of Wilson, [Movant] cannot predicate any Brady claim on these materials." (Id.)

The United States further argues that Movant's Brady claim fails because "the witnesses

34

would not have provided favorable, material evidence." (Id., pp. 14 – 18.) As to Mr. Clemens, the United States claims Mr. Clemens statement that "there was pressure to run coal, but not enough to overlook safety" was not favorable to Movant because "Clemens was not involved with mine safety or MSHA compliance." (Id., p. 14.) The United States concludes that since Mr. Clemens "had such minimal involvement in mine safety, the omission of his MOI did not prejudice [Movant]." (Id.)

Concerning Mr. Sears, the United States acknowledges that his statements regarding Massey and Movant's focus on safety was favorable to the defense. (Id.) The United States, however, argues that Movant was not prejudiced by the nondisclosure because (1) Mr. Sears made the statement while he was employed by Movant as a "sales arm," and (2) Mr. Sears "did not have any legitimate knowledge of MSHA requirements or compliance." (Id., pp. 14 – 15.) The United States explains that Ms. Sears' statements "should be treated with a degree of suspicion" because he "certainly possessed an aspect of self-interest in protecting both himself and Massey." (Id.) The United States further argues that the MOI for Mr. Sears indicates he "was most concerned about production and least concerned with health risks arising from poor ventilation." (Id., p. 15.) The United States concludes that the MOI for Mr. Sears is immaterial because Mr. Sears' statements are "significantly undermined by not only the influence that Massey and [Movant] exercised over Sears, but also by Sears' own interest in production over safety." (Id.)

As to Ms. Duba, the United States argues that her MOI statement only related to production figures and was irrelevant to safety compliance. (Id.) Specifically, the United States explains that "[w]hen read in the context of the full MOI . . . it is clear that the statement is about [Movant's] receipt of final production, including detailed worksheets, his review of those worksheets, and his concern with the numbers." (Id.) The United States asserts that Ms. Duba's "statement had nothing

35

to do with reducing production figures to allocate more funds to safety or MSHA compliance." (Id.) The United States further disputes that Ms. Duba could have provided exculpatory testimony. (Id., p. 16.) The United States claims that Ms. Duba's "position at Massey was unrelated to the charges in the Superseding Indictment." (Id.) As to Ms. Duba's statement that Movant wanted violations tracked, the United States notes that Ms. Duba stated Movant's motive for requesting such was unclear. (Id.) Finally, the United States argues that Ms. Duba's "MOI was cumulative of testimony adduced at trial of other witnesses, including Chris Blanchard and Bill Ross, regarding [Movant's] micro-management governing style and his focus on costs and profits." (Id.)

Concerning Mr. Bearse, the United States argues "Bearse held the same position as Chris Blanchard who was cross examined for five days [and] [t]his information was equally available for him." (Id.) The United States also argues that the MOI statement referenced by Movant "are general statements taken out of context." (Id., p. 17.) The United States contends that when considering the full context of Mr. Bearse's statement that "if there was something wrong at the mine, you were expected to stop [and] fix the problem," Mr. Bearse acknowledged that "people did not stand up and do what was needed to be done." (Id.) When considering the statement Mr. Bearse feared discipline over compliance issues, the United States notes that if the full context of the statement is reviewed, such reveals that Mr. Bearse never received more than a verbal reprimand. (Id.) The United States stresses the MOI reveals that Mr. Bearse "could not recall a specific instance in which he actually feared discipline." (Id.)

As to Ms. Ojeda, the United States asserts that none of the statements helps Movant. (Id., pp. 17 – 18.) The United States first notes that "[t]he fact that [Movant] would want a report on Ojeda's meeting with Ross came out at trial through Ross's testimony." (Id., citing, Document No. 618, pp. 149-50, 11, 16; Page ID Nos. 19916-17, 19778, 19783.) The United States further claims

36

that Movant extensively cross-examined Witnesses Ross and Blanchard concerning the Hazard Elimination Program, the Hazard Elimination Committee, and Movant's attitude towards violations. (Id.) The United States, therefore, concludes that the availability of the information contained in the MOI for Ms. Ojeda was available from other witnesses and Movant did not suffer any prejudice. (Id.)

(c)      Movant's Reply:

In Reply, Movant first argues that Movant did not have "influence" over or "access" to the above potential witnesses. (Id., Document No. 731, pp. 17 – 18.) Movant disputes that he had "full access" to former Massey employees at the time of his prosecution. (Id.) Movant explains that he retired from Massey on December 31, 2010, which was nearly four years before his indictment. (Id.) Movant further states that "Massey was defunct by 2011." (Id.) Furthermore, Movant argues that United States' claim that Movant suffered no prejudice from his failure to call the potential witness is without merit. (Id.) Movant notes that the United States contends Movant suffered no prejudice because the witnesses would not have been credible in the eyes of the jury. (Id.) Movant argues that "[i]t is not for the government to make after the fact, self-serving credibility assessments – [Movant] was entitled to have a jury decide that issue." (Id.) As to Mr. Sears, Movant notes that the MOI reveals that Mr. Sears had retired from Massey and was working as a consultant for its successor, Alpha. (Id.) Movant notes that he had been retired from Massey for nearly a year at the time Ms. Sears provided his information. (Id.) Movant further states that "[t]he government relied heavily on cooperation from Alpha in its investigation of [Movant]," so "it was not evident that Sears would provide favorable testimony to [Movant]." (Id., pp. 17 – 18.)

Next, Movant disputes that he "should have been able to keep track of which of Massey's 7,359 employees would have provided him with exculpatory evidence, and it is his own fault that

37

he did not." (Id., p. 18.) Movant argues that the United States reliance upon Wilson fails. (Id., p. 19.) First, Movant notes that the Court in Wilson faulted the defendant for not identifying one witness who would have had very specific knowledge. (Id.) Movant states that unlike Wilson, Movant was "the former CEO of a multi-billion dollar publicly traded company with thousands of employees trying to identify everyone who, years later, could possibly provide relevant, much less favorable, evidence." (Id.) Second, Movant contends that there was a factual dispute in Wilson as to whether the government ever possessed the exculpatory information, unlike the circumstances in Movant's case where it is undisputed that the United States possessed the information. (Id.) Movant stresses that the United States "did possess the information, were ordered by the Court to disclose it, and represented to the Court that they had done so." (Id.) Finally, Movant argues that it was reasonable for defense counsel to rely on the United States' representation that all such material had been disclosed. (Id.)

Finally, Movant argues that the United States "spins the evidence to minimize its impact." (Id.) Movant argues that the United States "confuses the weight of the evidence with its favorable tendency" in its arguments concerning the five potential defense witnesses. (Id.) As to Mr. Clemens, Movant argues that Mr. Clemens "clearly had insight into the degree of pressure [Movant] put on production." (Id.) Movant acknowledges that the United States could have cross examined Mr. Clemens as to his knowledge of mine safety, but Movant asserts that the jury was entitled to hear the evidence. (Id.) Concerning Ms. Duba's statements, Movant argues that the United States again improperly argues there was no prejudice because the jury would not have found Ms. Duba credible due to her role at Massey. (Id., p. 20.) As to Mr. Bearse, Movant disputes that Mr. Bearse's MOI statements were not favorable because of other statements. (Id.) Movant again acknowledges that the United States could have cross examined Mr. Bearse, but Movant was

38

entitled to put the favorable evidence before the jury. (Id.) Movant contends that the United States improperly reasons that the five potential witnesses' statements were not more credible than other testimony presented at trial by Mr. Blanchard and Mr. Ross. (Id.) Movant explains that the United States argued that Mr. Blanchard was a co-conspirator with Movant and "corroboration of key evidence from witnesses who were not also co-conspirators – as well as who had different perspectives and insight into Massey's operations – would have been more credible and therefore not cumulative." (Id., pp. 20 – 21.) Movant notes that his priorities were "hotly contested" at trial. (Id., p. 21.) Movant, therefore, contends that testimony by the potential witnesses that Movant prioritized safety "could have pushed it over the edge for the jury." (Id., p. 21.)

(d)     Court's Findings:

Movant argues that the United States' suppression of MOIs prevented Movant from identifying five potential defense witnesses that he claims could have provided exculpatory testimony: Mark Clemens, Steve Sears, Sabrina Duba, Charlie Bearse, and Stephanie Ojeda. Citing Wilson, the United States first argues that Movant is not entitled to benefit of the Brady doctrine concerning the above potential witnesses because each were available to Movant in a source where a reasonable defendant would have looked. (Criminal Action No. 5:14-00244, Document No. 728, p. 13.) In Wilson, the Fourth Circuit stated that "the *Brady* rule does not apply if the evidence in question is available to the defendant from other sources." Wilson, 901 F.2d at 380(citing United States v. Davis, 878 F.2d 1501, 1505 (11th Cir. 1986)); also see United States v. Caro, 733 Fed.Appx. 651, 676 (4th Cir. 2018)(stating that the "other source" doctrine, holds that "the *Brady* rule does not apply if the evidence in question is available to the defendant from other sources.")(citing Wilson, 901 F.2d at 380)); United States v. Bros. Const. Co. of Ohio, 219 F.3d 300, 316 (4th Cir. 2000)("[T]he *Brady* rule does not apply if the evidence in question is available

39

to the defendant from other sources, either directly or via investigation by a reasonable defendant."). The undersigned finds that the facts in the instant case are distinguishable from Wilson. Unlike Wilson, the United States in the above case clearly had possession of the MOIs for the five potential witnesses and the United States represented to the Court and defense counsel that all material had been produced pursuant to the Court's discovery order. The Fourth Circuit in Wilson noted that the witness acknowledged she was questioned by government officials prior to the defendant's trial, but the witness asserted "vague statements" concerning whether she communicated favorable evidence to the government. Wilson, 901 F.2d at 381. Thus, it was unclear whether the government actually possessed Brady material. Further, there was no indication in Wilson that defense counsel sought the material and the government misrepresented that all such material had been disclosed pursuant to a discovery order. In the instant case, the MOIs were clearly under the control of the United States and there is no indication that the MOIs were available to defense counsel through other sources. Movant further disputes that he had access to the five potential witnesses that provided statements in the MOIs, and that defense counsel failed to exercise reasonable diligence in obtaining the exculpatory information. (Criminal Action No. 5:14-00244, Document No. 731, pp. 18 - 19.) Although the United States contends that Movant should have been aware of the five potential witnesses because each were under his employment at Massey, Movant stresses that he had been retired from Massey for approximately four years at the time of his indictment and there were more than 7,000 persons under his former employment. See United States v. Parker, 790 F.3d 550, 562 (4th Cir. 2015)(finding that the defendant's knowledge that a witness was involved in a scam did not relieve the government of its obligations under *Brady* to disclose that the witness was subject of an ongoing fraud investigation by the SEC). Furthermore, the MOIs of the five potential witnesses were in control of the United

40

States and it is undisputed that defense counsel sought such information from the United States. If the United States asserts that it has complied with Brady, defense counsel may reasonably rely upon the United States' representation that all materials required under Brady have been disclosed. See Strickler v. Greene, 527 U.S. 263, 283, n. 23, 119 S.Ct. 1936, 1949, 144 L.Ed.2d 286 (1999). Thus, the undersigned cannot conclude that defense counsel failed to act with due diligence in obtaining the MOIs for the five potential witnesses. Based upon the foregoing, the undersigned concludes that the "other source" exception to Brady does not apply to the circumstances of this case because the United States acknowledges that it had control of the MOIs for the five potential witnesses prior to trial, failed to produce such, and represented to the Court and defense counsel that all material had been produced.

Next, the United States contends that Movant's Brady claim fails because "the witnesses would not have provided favorable, material evidence." (Criminal Action No. 5:14-00244, Document No. 728, p. 14.) Thus, the undersigned will consider whether the MOIs for the five witnesses provided favorable evidence. First, the United States does not appear to dispute that Mr. Clemens and Mr. Sears provided favorable information in their MOIs.[4] (Id., Document No. 14.) The undersigned has also reviewed Mr. Clemens and Mr. Sears' MOIs and finds such to be favorable to Movant. As to Ms. Duba, the undersigned also finds that her MOI is favorable to Movant. Ms. Duba's MOI reveals that Movant instructed Ms. Duba to make sure Massey's production figures used were not too aggressive. (Id., Document No. 663-3, p. 16, Page ID No. 23200; MOI-001412). Additionally, Ms. Duba's MOI reveals that Movant wanted to eliminate serious MSHA violations and he instructed Ms. Duba to determine which people were responsible

---

[4] The United States does dispute that Movant was prejudiced by the suppression of Mr. Clemens and Mr. Sears's MOIs.

for violations and for failing to eliminate violations. (Id., Document No. 663-3, pp. 18, Page ID No. 23202; MOI-001414). Although Duba's MOI reveals she could not say why Movant wanted the violations tracked, the above statements were still favorable to Movant. (Id., Document No. 663-3, pp. 17 - 18, Page ID No. 23201-02; MOI-001413-14). The United States presented testimony at trial that there was an unspoken understanding at UBB that safety violations were acceptable so long as the mine was producing coal. The foregoing is favorable to Movant as it indicates that Movant did not relentlessly push production over safety.

Concerning Mr. Bearse, the MOI reveals that he stated that Massey's section staff was the "industry standard" and that Massey employees were expected to stop and fix problems. (Criminal Action No. 5:14-00244, Document No. 663-2, pp. 20 - 21, Page ID No. 23112-13, MOI-001392-93.) Although Mr. Bearse acknowledged that employees sometimes would not "stand up and do what was needed to be done" concerning problems, the foregoing statement still constitutes favorable evidence because it supports Movant's claim that known safety violations were expected to be fixed. Additionally, Mr. Bearse's statement that Massey's section staff was the "industry standard" was favorable to Movant because the United States presented evidence at trial that Movant failed to properly staff UBB. Specifically, the United States presented testimony from miners that additional staff was necessary to comply with safety requirement. In closing arguments, the United States stated that "the evidence in the case is that Massey staffed its mines with a lot fewer miners than the rest of the industry." (Criminal Action No. 5:14-0244, Document No. 626, p. 186, Page ID No. 21752.)

Concerning the MOI for Ms. Ojeda, the undersigned finds that such contains evidence both

42

favorable and unfavorable[5] to Movant. First, Ms. Ojeda stated that "[Movant] and Adkins seemed to think Ross was legitimate" and Ms. Ojeda thought "they were looking for solutions from Ross" concerning safety concerns. (Criminal Action No. 5:14-00244, Document No. 663-4, p. 6, Page ID No. 23288, MOI-01522.) The foregoing statement is favorable to Movant as the United States presented evidence that Movant disregarded Mr. Ross's safety concerns. Although the MOI for Ms. Ojeda reveals that Ms. Ojeda stated that "the Hazard Elimination Committee started around the same time as Ross' recommendations were made," Ms. Ojeda stated she did "not remember Ross' recommendations being discussed at the Hazard Elimination Committee meeting." (Id., Document No. 663-4, p. 10, Page ID No. 23292; MOI-01526.) Ms. Ojeda, however, acknowledged that "some issues addressed by the committee paralleled what Ross had discussed." (Id.) Ms. Ojeda further acknowledged that she "never asked why Ross' recommendations were not being specifically addressed," but she "was certain issues raised by Ross were discussed by the Hazard Elimination Committee." (Id.) Thus, the foregoing is favorable to Movant. Finally, Ms. Ojeda's MOI contains a statement contradicting the United States' argument that Movant conspired to conceal Mr. Ross's safety concerns from Elizabeth Chamberlin, who oversaw safety for Massey, by including a privilege warning on the memorandum memorializing Mr. Ross's concerns and recommendations. Specifically, Ms. Ojeda stated that she did "not remember adding the language

---

[5] Although Ms. Ojeda stated she "was not specifically told to attend the Ross meeting so that the meeting between Ross and [Stan] Suboleski would remain privileged," Ms. Ojeda stated she believed "Massey probably thought that having Ojeda at the meeting allowed for the meeting and the memorandum prepared after the meeting to remain privileged." (Criminal Action No. 5:14-00244, Document No. 663-4, p. 5, Page ID No. 23287; MOI-01521.) Ms. Ojeda "based her opinion as to why she was told the attend the meeting on her familiarity with the common practices at Massey." (Id.) Ms. Ojeda explained that "Massey had received direction from their outside counsel to have an attorney present if the company wanted something to remain privileged." (Id.)

that the report should not be shared with non-practicing attorneys to warn Ross not to share the report with Chamberlin." (Id., Document No. 663-4, p. 5, Page ID No. 23287; MOI-01521.) At trial, the United States argued that Movant's conspiracy to violate mine safety law involved keeping Mr. Ross's safety warnings secret or confidential. (Id., Document No. 626, p. 50, Page ID No. 21616.)

Based upon the foregoing, the undersigned finds that the MOIs for Mr. Clemens, Mr. Sears, Ms. Duba, Mr. Bearse, and Ms. Ojeda were favorable to Movant.

### ii. *MOI of Testifying Government Witnesses:*

#### (a) *Movant's Argument:*

Movant argues that the United States suppressed "five MOIs each for central witnesses Chris Blanchard and Bill Ross." (Criminal Action No. 5:14-00244, Document No. 712-5, pp. 21 – 24.) Movant claims that the "MOIs were rife with impeachment information that [Movant] could have used on cross-examination of these witnesses to further undermine the government's case." (Id., p. 21.) Movant first asserts that Mr. Blanchard was the United States' main witness, "whose testimony was intended to connect [Movant] to the alleged conspiracy." (Id.) Movant explains that at trial the United States asked Mr. Blanchard "whether there was an understanding at Massey and UBB that it was often cheaper simply to pay the fines that came along with violations than it was to spend the money that would have been necessary to follow the law," and Mr. Blanchard stated "That was the implicit understanding." (Id., p. 22, citing Document No. 614, p. 84, Page ID No. 19112.) Movant argues that in the MOI, Mr. Blanchard explained his "understanding" as follows: Movant "viewed violations as the cost of doing business and felt violations were going to be written by MSHA. There are always going to be violations that MSHA could cite . . . [Movant] felt MSHA made things up." (Id., citing Document No. 663-2, p. 56, Page ID No. 23148, MOI-

44

1402.) Movant contends that the foregoing would have supported his defense that there was no criminal conspiracy to violate safety laws, but that "MSHA would always find some reason to issue citations, especially given the degree of judgment (not to mention bias) involved on the part of the inspectors, and some citations, although incorrect, would not be worth the cost of disputing." (Id.) As additional impeachment evidence contained in Mr. Blanchard's MOI, Movant cites the following statements: (1) Mr. Blanchard "was surprised to read the testimony from UBB miners that respirable dust fraud was occurring at the mine," because "the company did not want people cheating on their respirable dust sampling" (Id., citing Document No. 663-4, p. 76, Page ID No. 23358, MOI-1581.); and (2) Mr. Blanchard stated that "decisions MSHA made ended up endangering the health and safety of miners" (Id., citing Document No. 663-4, p. 75, Page ID No. 23357, MOI-1580.).

Second, Movant states that Bill Ross was a "key witness at trial for whom multiple MOIs were undisclosed." (Id., p. 23.) Movant acknowledges that during discovery, the United States produce a 302 of a May 12, 2010 interview with Mr. Ross, and a September 12, 2001 grand jury transcript. (Id.) Movant notes, however, that the United States failed to disclose five MOIs memorializing five interviews with Mr. Ross. (Id.) Movant acknowledges that just before trial, the United States disclosed that during an interview Mr. Ross "said he did not agree with [MSHA's] general policy of denying proposed ventilation plans that proposed to use of belt aircourses for ventilation." (Id., citing USAO0000170.) Prior to trial, Movant contested the sufficiency under Brady and requested disclosure of the full notes of the interview, but the United States never provided such. (Id.) Movant contends that the undisclosed MOI now reveals that Mr. Ross stated that "Joe Mackowiak did not want belt air used to ventilate the mines in his district. Ross told Mackowiak that he should reconsider what he was saying with mines that liberated a lot of

methane." (Id., citing Document No. 663-4, p. 18, Page ID No. 23300, MOI-1532.) Additionally, "Ross advised that the UBB mine was set up to fail based on the ventilation system MSHA forced the UBB mine to use." (Id.) Movant argues that the above statements are "substantially different in both tone and content from the feeble disclosure provided by the government and simply did not arm [Movant] with sufficient information to adequately address this topic on cross-examination." (Id., p. 23.) Movant claims that the other MOIs for Mr. Ross contained information that would have been "an effective tool in disciplining Ross during cross-examination." (Id., p. 24.) Movant notes that Mr. Ross made statements that Movant told Mr. Ross that Massey needed to reduce violations and Movant was going to address the violations it was receiving. (Id., citing Document No. 663-3, p. 69, Page ID No. 23253, MOI-1476 and Document No. 663-3, p. 75, Page ID No. 23259, MOI-1487.) Movant further notes that Mr. Ross stated that during a meeting on August 5, 2009, "[Mr.] Akins stated that they should comply with all regulations at the mine site and that they did not have to worry anymore." (Id., citing Document No. 663-3, p. 70, Page ID No. 23254; MOI-1477.) Finally, Movant argues that Mr. Ross's MOIs "undermined the government's portrayal of Ross as a 'whistle-blower,' who had courage to confront Massey Management about issues he observed." (Id., citing Document No. 599, p. 49, Page ID No. 15840 and Document No. 626, p. 173, Page ID No. 21739.) Movant argues that the MOIs reveal "multiple occasions where senior officials at Massey sought out Ross's input on conditions at the mine." (Id.) Specifically, Movant references the following MOI statements: (1) Mr. Ross stated that, at Mr. Adkin's direction, Mr. Ross had an all-day meeting with Ms. Ojeda and Mr. Suboleski "to discuss some of the issues he had observed while visiting Massey Energy mines" (Id., citing Document No. 663-3, p. 68, Page ID No. 23252, MOI-1475.); (2) Mr. Ross stated that after the all-day meeting, Mr. Adkins "instructed Ross to go tell [Movant] what he thought about Massey

46

and MSHA's view of Massey" (Id., citing Document No. 663-3, p. 69, Page ID No. 23253, MOI-1476.); (3) Mr. Ross stated that Movant "wanted Ross to talk to him about the issues" (Id., citing Document No. 663-4, p. 16, Page ID No. 23298, MOI-1530.); (4) Mr. Ross stated that Mr. Adkins directed Mr. Ross to visit mines in need of additional expertise on safety, and Mr. Ross was able to travel to whichever mines he chose to teach foremen about ventilation, respirable dusty, and other safety measure (Id., citing Document No. 663-3, p. 67, Page ID No. 23251, MOI-1474 and Document Nos. 663-4, p. 17, Page ID No. 23299, MOI-1531.)

(b)   <em>United States' Argument:</em>

The United States argues that the suppressed MOIs "would not have led to impeachment of key witnesses." (Id., Document No. 728, pp. 18 – 21.) The United States does not dispute that the MOIs contained favorable statements, but that "[a]ny alleged impeachment evidence contained in the MOIs . . . was made available at trial." (Id., p. 18.) Concerning Mr. Blanchard, the United States claims that "[b]y the time examinations were complete, both the defense and the United States viewed Blanchard as a witness in support of the defendant." (Id., p. 19, fn. 5.) The United States further disputes that Mr. Blanchard's MOI statement was favorable to Movant concerning MSHA endangering miners because such was excluded by the District Court's ruling on a motion <em>in limine</em>. (Id., p. 20.) Concerning Mr. Ross, the United States again does not dispute that his MOI statements were favorable. (Id., pp. 20 – 21.) The United States, however, argues that the MOI statements for Mr. Blanchard and Mr. Ross were not material because the same favorable evidence was brought out at trial through defense counsel's cross examination. (Id.)

(c)   <em>Court's Findings:</em>

Based upon the foregoing, the undersigned finds that the MOIs for Mr. Blanchard and Mr. Ross were favorable to Movant. With the exception of Mr. Blanchard's statement that MSHA

47

endangered miners, the United States does not dispute that the MOIs were favorable. The United States disputes that Mr. Blanchard's MOI statement concerning MSHA endangering miners was favorable Movant because such was excluded by the District Court's ruling on a motion *in limine*. (Id., p. 20.) A review of the full context of the MOI for Mr. Blanchard reveals that in discussing Massey's inability to use belt air ventilation, Mr. Blanchard stated as follows: "Blanchard does not believe that MSHA or anyone from MSHA was trying to do something to endanger the health and safety of miners. Blanchard does think decisions MSHA made ended up endangering the health and safety of miners. Blanchard does not think Joe Mackowiak was willing to sit down with Performance Coal Company and work out their differences."[6] (Criminal Action No. 5:14-0244, Document No. 663-4, pp. 74 - 75, Page ID No. 23356-57; MOI-1579-80.). The District Court clearly excluded any evidence and arguments that mine safety standards were incorrect and that Massey disagreed with MSHA's interpretation or application of belt air mine regulations at UBB. (Criminal Action No. 5:14-00244, Document No. 463.) The District Court further noted that this included any evidence or arguments that MSHA "forced" UBB to adopt a ventilation plan that did not use belt air. (Id.) The statements contained in Mr. Blanchard's MOI does not state mine safety regulations were incorrect, that Massey disagreed with MSHA's interpretation or application of the regulations, or MSHA "forced" Massey to adopt a non-belt air ventilation plan. Thus, the MOI statement regarding MSHA endangering miners was favorable to Movant. The issue of whether the remainder of the suppressed MOI statements by Mr. Blanchard and Mr. Ross were material

---

[6] The United States acknowledges that Mr. Ross testified that belt air was necessary for proper ventilation, but the positioning of fans made it impossible for UBB to present proper evidence to MSHA to justify the use of belt air. Additionally, the United States acknowledges that Mr. Ross testified as to his disagreement with the ventilation supervisor at MSHA about the ventilation system MSHA required at UBB. (*Id.*, Document No. 728, p. 21, citing Document No. 618, pp. 231 - 240, Page ID Nos. 19998 – 20007.)

48

will be addressed in Section C below.

2.    <u>**Issue of Materiality of the Favorable Suppressed Evidence**</u>:

Favorable evidence is not material where the suppressed evidence is consistent with that witness's testimony at trial. <u>See</u> <u>United States v. Ellis</u>, 121 F.3 908, 916 (4th Cir. 1997). Undisclosed evidence may be material under <u>Brady</u> if the evidence "would be an effective tool in disciplining witnesses during cross-examination by refreshment of recollection or otherwise." <u>United States v. Gil</u>, 297 F.3d 93, 104 (2nd Cir. 2002). Additionally, inadmissible evidence is material if the evidence could have led to admissible evidence. <u>Id.</u>; <u>also see</u> <u>Wright v. Hopper</u>, 169 F.3d 695, 703 (11th Cir. 1999). When concerning materiality, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." <u>Kyles</u>, 514 U.S. at 434, 115 S.Ct. at 1566. The evaluation of materiality is not a sufficiency of the evidence test. <u>Id.</u> A movant is not required to "demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." <u>Id.</u> A movant need only show that the favorable evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." <u>Id.</u> Finally, the question of materiality is considered "collectively, not item by item." <u>Id.</u> at 436, 115 S.Ct. at 1567.

The undersigned has determined that the United States suppressed MSHA documents and MOIs that were favorable to Movant. As to MSHA documents, the undersigned determined that the following were favorable to Movant: (1) USAO0000030 (Criminal Action No 5:14-00244, Document No. 663-5, pp. 44 - 45, Page ID No. 23408.); (2) USAO0000114 (Criminal Action No. 5:14-cr-00224, Document No. 663-6, p. 55, Page ID No. 23527.); (3) USAO0000033 (Criminal

Action No. 5:14-00244, p. 10, citing Document No. 663-5, p. 49, Page ID No. 23413.); (4) USAO0000109 (Criminal Action No. 5:14-00244, Document No. 663-6, p. 49, Page ID No. 23521.); (5) DLB-001532 (Criminal Action No. 5:14-00244, Document No. 696-2, p. 1, Page ID No. 23797.); (6) USAO 000132 (Criminal Action No. 5:14-00244, Document No. 663-6, p. 80, Page ID No. 23552.); (7) USAO0000024 (Criminal Action No. 5:14-00244, Document No. 663-5, p. 34, Page ID No. 23398.). As to MOIs, the undersigned determined that the following were favorable to Movant: (1) Mr. Clemens' MOI; (2) Mr. Sears' MOI; (3) Ms. Duba's MOI; (4) Mr. Bearse's MOI; (5) Ms. Ojeda's MOI; (6) Mr. Blanchard's MOIs; and (7) Mr. Ross's MOIs.

The undersigned finds that the suppressed MSHA emails indicated that MSHA inspectors issued citations to Massey without providing sufficient evidence to support the citation and that could not be sustained if challenged. Additionally, there were MSHA emails indicating bias towards Movant. (See Criminal Action No. 5:14-cr-00224, Document No. 663-6, pp. 49, 55, Page ID Nos. 23521, 23527, USAO0000109; USAO0000114; Document No. 663-5, p. 49, Page ID No. 23413, USAO0000033; and Document No. 696-2, p. 1, Page ID No. 23797, DLB-001532). The United States clearly relied upon reference to MSHA citations in support of its argument that Movant conspired to violate mine safety standards. Next, there were suppressed MSHA disciplinary records and an email relating to the failure MSHA employees to consolidate separate ventilation and dust control plans into a single mine ventilation plan. The disciplinary records and emails provide support for Movant's argument that the ventilation plan approved or imposed by MSHA contributed to safety violations. (Criminal Action No. 5:14-cr-00244, Document No. 663-6, p. 80, Page ID No. 23552, USAO 000132, and Document No. 663-5, p. 34, Page ID No. 23398, USAO0000024.)

Mr. Clemens, Mr. Sears, Ms. Duba, Mr. Bearse, and Ms. Ojeda are potential defense

50

witnesses, whose MOIs were suppressed. The MOI for Mr. Clemens reveals that Mr. Clemens stated that even though there was pressure at Massey to run coal, the pressure was not enough to overlook safety. (Id., Document No. 663-2, p. 3, Page ID No. 23095, MOI-001506). The MOI for Mr. Sears reveals that Mr. Sears stated that "Massey's primary focus was safety" and Movant "started a safety program for individuals and pushed safety more than any other CEO in the industry." (Id., Document No. 663-2, p. 7, Page ID No. 23099, MOI-001509). The MOI for Ms. Duba reveals that Movant instructed Ms. Duba to make sure their production figures were not too aggressive. (Id., Document No. 663-3, p. 16, Page ID No. 23200, MOI-001412). Additionally, Ms. Duba's MOI reveals that Movant wanted to eliminate serious MSHA violations and Movant instructed Ms. Duba to determine which people were responsible for violations and for failing to eliminate violations. (Id., Document No. 663-3, pp. 18, Page ID No. 23202, MOI-001414). The MOI, however, for Ms. Duba reveals she could not say why Movant wanted the violations tracked. (Id., Document No. 663-3, pp. 17 - 18, Page ID No. 23201-02, MOI-001413-14). The MOI for Mr. Bearse reveals that he stated that Massey's section staff was the "industry standard," which contradicts the United States' argument that Movant failed to properly staff UBB. (Criminal Action No. 5:14-00244, Document No. 663-2, pp. 20 - 21, Page ID No. 23112-13, MOI-001392-93.) The MOI for Mr. Bearse further revealed that although employees sometimes would not "stand up and do what was needed to be done," Movant expected Massey employees to stop and fix problems. (Id.) The MOI for Ms. Ojeda revealed that Movant and Mr. Adkins thought Mr. Ross was "legitimate" and Ms. Ojeda thought "they were looking for solutions from Ross" concerning safety concerns. (Criminal Action No. 5:14-00244, Document No. 663-4, p. 6, Page ID No. 23288, MOI-01522.) The MOI for Ms. Ojeda further contained a statement that she did "not remember adding the language that the report should not be shared with non-practicing attorneys to warn

Ross not to share the report with Chamberlin." (Id., Document No. 663-4, p. 5, Page ID No. 23287, MOI-01521.) This contradicts the United States' argument that Movant conspired to conceal Mr. Ross's safety concerns from Elizabeth Chamberlin, who oversaw safety for Massey, by including a privilege warning on the memorandum memorializing Mr. Ross's concerns and recommendations.

Mr. Blanchard and Mr. Ross were witnesses presented by the United States, whose MOIs contained impeachment information that was suppressed by the United States. It is undisputed that Mr. Blanchard was an important witness at Movant's trial. Movant argues that the MOIs for Mr. Blanchard contained impeachment evidence concerning Mr. Blanchard's testimony that it was the "implicit understanding" at "Massey and UBB that it was often cheaper simply to pay the fines that came along with violations than it was the spend the money that would have been necessary to follow the law." (Criminal Action No. 5:14-0244, Document No. 614, p. 84, Page ID No. 19112). In Mr. Blanchard's MOI, Mr. Blanchard more fully explained his "understanding" as follows: Movant "viewed violations as the cost of doing business and felt violations were going to be written by MSHA. There are always going to be violations that MSHA could cite . . . [Movant] felt MSHA made things up." (Id., Document No. 663-2, p. 56, Page ID No. 23148, MOI-1402.) As additional impeachment evidence contained in Mr. Blanchard's MOI, Movant cites the statement that Mr. Blanchard "was surprised to read the testimony from UBB miners that respirable dust fraud was occurring at the mine," because "the company did not want people cheating on their respirable dust sampling." (Id., Document No. 663-4, p. 76, Page ID No. 23358, MOI-1581.) Finally, Mr. Blanchard's MOI reveals that Mr. Blanchard stated that "decisions MSHA made ended up endangering the health and safety of miners." (Id., Document No. 663-4, pp. 74 - 75, Page ID No. 23356-57, MOI-1579-80.)

On cross-examination at trial, Mr. Blanchard testified that he and Movant did not have "an agreement or an understanding" that there would be violations of the mine safety regulations, but "we both realized that violations would be written" because "violations are inevitable." (Id., Document No. 611, pp. 113 and 6, Page ID No. 18485 and 18378.) Mr. Blanchard testified on re-direct that UBB had 466 violations in 2009 and 480 violations in 2010. (Id., Document No. 614, pp. 106-07, Page ID No. 19134-35.) Mr. Blanchard clarified on re-direct that even though he believed it was inevitable for a mine to have zero violations, that he did not think it was "fine" for a mine to have the number of violations that UBB received. (Id., Document No. 614, pp. 106-07, Page ID No. 19134-35.) Additionally, on cross-examination Mr. Blanchard testified that Massey did not want people cheating on their respirable dust samples because it could trigger investigations by MSHA. (Id., Document No. 613, pp. 42 – 43, Page ID No. 18859-60.) Unlike the MOI, the cross-examination testimony did not reveal that Mr. Blanchard and Movant were unaware of the misconduct regarding the respirable dust samples. Further, the United States presented testimony from Ms. Pauley, Mr. Smith, Mr. Ellison, Mr. Stewart, and Mr. Halstead that there was widespread cheating on dust pumps samples and Movant was aware of such conduct.

Movant argues that Mr. Ross was another key witness for the United States, who was portrayed as a "whistle-blower." (Id., Document No. 712-5, pp. 23 – 24.) Movant acknowledges that "just before trial . . . prosecutors disclosed to defense that during an interview, Ross had 'said he did not agree with [MSHA's] general policy of denying proposed ventilation plans that proposed to use belt aircourses for ventilation.'" (Id., p. 23.) Movant states that he challenged this disclosure as insufficient and requested the full notes of the interview, but such was never provided. (Id.) Movant explains that the suppressed MOI reveals that Mr. Ross stated that "Joe Mackowiak did not want belt air to be used to ventilate the mines in his district. Ross told

Mackowiak that he should reconsider what he was saying with mines that liberated a lot of methane." (Id., citing Document No. 663-4, p. 18, Page ID No. 23300, MOI-1532.) The MOI further noted that Mr. Ross advised that "UBB mine was set up to fail based on the ventilation system MSHA forced the UBB mine to use." (Id.) Movant notes that Mr. Ross made statements that Movant told Mr. Ross that Massey needed to reduce violations and Movant was going to address the violations it was receiving. (Id., citing Document No. 663-3, p. 69, Page ID No. 23253, MOI-1476 and Document No. 663-3, p. 75, Page ID No. 23259, MOI-1487.) Although the United States portrayed Mr. Ross as a "whistle-blower," the MOIs reveal several occasions where senior officials at Massey sought out Mr. Ross's input on conditions at the mine. (Id.) The MOIs reveal that Mr. Ross stated that following: (1) At Mr. Adkin's direction, Mr. Ross had an all-day meeting with Ms. Ojeda and Mr. Suboleski "to discuss some of the issues he had observed while visiting Massey Energy mines" (Id., citing Document No. 663-3, p. 68, Page ID No. 23252, MOI-1475.); (2) After the all-day meeting, Mr. Adkins "instructed Ross to go tell [Movant] what he thought about Massey and MSHA's view of Massey" (Id., citing Document No. 663-3, p. 69, Page ID No. 23253, MOI-1476.); (3) Movant "wanted Ross to talk to him about the issues" (Id., citing Document No. 663-4, p. 16, Page ID No. 23298, MOI-1530.); and (4) Mr. Adkins directed Mr. Ross to visit mines in need of additional expertise on safety, and Mr. Ross was able to travel to whichever mines he chose to teach foremen about ventilation, respirable dusty, and other safety measure (Id., citing Document No. 663-3, p. 67, Page ID No. 23251, MOI-1474 and Document Nos. 663-4, p. 17, Page ID No. 23299, MOI-1531.)

The United States contends that the foregoing is not material because such came out in Mr. Ross's testimony at trial. At trial, Mr. Ross testified that belt air was necessary for proper ventilation, but the positioning of fans made it impossible for UBB to present proper evidence to

54

MSHA to justify the use of belt air. (<u>Id.</u>, Document No. 618, pp. 231 - 240, Page ID Nos. 19998 –
20007.) Mr. Ross explained at trial that there had to be justification to use belt air, and he made
UBB's justifications for use of belt air based on the mine liberating methane and it would help
with respirable dust. (<u>Id.</u>, pp. 231-32, Page ID Nos. 19998-99.) Mr. Ross explained with the new
MSHA requirements, he knew "it would be difficult to get all the data that they requested in order
to utilize belt air." (<u>Id.</u>) Mr. Ross, however, testified that he believed the better ventilation plan for
UBB was use of belt air. (<u>Id.</u>, p. 235, Page ID No. 20002.) Additionally, Mr. Ross testified as to
his disagreement with the ventilation supervisor at MSHA (Mr. Machoviak) about the ventilation
system MSHA required at UBB. (<u>Id.</u>, pp. 236-37, Page ID Nos. 20003-04.) Mr. Ross explained
that Mr. Machoviak told him and Movant that "they were going to make sure that UBB did not
have a plan that took belt air off the longwall." (<u>Id.</u>) Mr. Ross further testified that Mr. Machoviak
had made "boasts about the fact that no mines in this district was going to be allowed to use belt
air" and Mr. Ross challenged Mr. Machoviak stating the "we've got to have belt air at UBB." (<u>Id.</u>,
p. 239, Page ID No. 20006.) Mr. Ross states that he informed Mr. Machoviak that "UBB liberates
a lot of methane, too. . . we need that belt air as much as anybody else in this industry needs belt
air that has longwalls." (<u>Id.</u>, p. 240, Page ID No. 20007.) Mr. Ross, however, testified that Mr.
Machoviak "was adamant about not using belt air at UBB." (<u>Id.</u>) Although Mr. Ross testified
concerning his opinion on the use of belt air at UBB, Mr. Ross did not testify that he believed
"UBB mine was set up to fail" based on the ventilation system approved by MSHA. (<u>Id.</u>, Document
No. 663-4, p. 18, Page ID No. 23300; MOI-1532.) Furthermore, the impeachment evidence
contained in Mr. Ross's MOIs is material. Although the United States presented Mr. Ross as a
"whistle-blower," the MOIs reveal that Mr. Ross acknowledged that Massey officials sought out
Mr. Ross's opinion on safety conditions at UBB. (<u>Id.</u>, Document No. 663-3, pp. 67-69, Page ID

55

No. 23251-53, MOI-1474-76, and Document No. 663-4, pp. 16 - 17, Page ID No. 23298-99, MOI-1530-31.) At trial, the United States argued that Movant wanted to conceal Mr. Ross's safety warnings and Movant's main concern was with the production of coal - - not addressing safety issues.

Although the United States argues that the above suppressed evidence was not material because the evidence supporting Movant's conviction was overwhelming, the undersigned disagrees. The Supreme Court has emphasized that when considering materiality, there is not a sufficiency of the evidence test. Kyles, 514 U.S. at 434, 115 S.Ct. at 1566. "A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." Id., 514 U.S. at 434-35, 115 S.Ct. at 1566. A defendant must only show that the favorable evidence, considered collectively, "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id. The undersigned finds in the instant case that disclosure of the suppressed evidence could have made a different result reasonably probable. The United States' case focused extensively upon numerous citations issued by MSHA, testimony concerning inadequate mine staffing, and testimony that Movant pushed coal production over safety. The United States argued that Movant's conspiracy involved advance warning of mine inspectors, cheating on dust samples, and keeping Mr. Ross's safety warnings secret or confidential. At trial, the United States presented testimony that miners were forced to "operate with skeleton crews" and were expected to produce "big footage" of coal. Testimony was presented that Movant was informed that UBB needed more miners to comply with the safety laws, but Movant refused to hire additional staff. Ms. Pauley, Mr. Smith, Mr. Racer, Mr. Hutchens, Mr. Adams, Mr. Ellison, Mr. Young, and Mr. Stewart testified that they were required to work in conditions known to be unsafe and without proper

56

ventilation. Ms. Pauley, Mr. Smith, Mr. Ellison, Mr. Stewart, and Mr. Halstead further testified that there were widespread cheating on dust pumps samples, and Movant was aware of such conduct. The United States argued that Movant knew that serious safety violations (roof support, combustible materials, and lack of ventilation) were continually occurring at UBB, but there was an unspoken understanding at UBB that safety violations were acceptable so long as the mine was producing coal. The United States argued that Movant did not want to comply with safety laws because such would have costed money and reduced Movant's overall profit. Disclosure of the suppressed MSHA materials and the MOIs for Mr. Clemens, Mr. Sears, Ms. Duba, Mr. Bearse, Ms. Ojeda, Mr. Blanchard, and Mr. Ross could have resulted in a weaker case for the United States, and a stronger one for the defense. Disclosure of the suppressed MOIs could have reduced the value of Mr. Blanchard and Mr. Ross as witnesses for the United States. Considering the suppressed evidence collectively, the suppressed evidence could have had some weight and its tendency could have been favorable to Movant. The undersigned acknowledges that the suppressed evidence does not undisputedly prove Movant's innocence, but the question is whether the Court is confident that the jury's verdict would have been the same. Based upon the undersigned's summary of the suppressed evidence, and the evidence presented by the United States to secure Movant's conviction, the undersigned does not have confidence in the verdict. Accordingly, the undersigned respectfully recommends that Movant's Section 2255 Motion be granted. The undersigned finds it unnecessary to address the merits of Movant's claim based upon the Jencks Act and prosecutorial misconduct.

## **POSTLUDE**

The undersigned believes it is important to contextualize this case in light of the vitriolic rhetoric that the Movant attempts to place on the actions of the United States. A detailed and

thorough review of the evidence in this case clearly shows that, while errors were made and that those errors, when collectively reviewed, **could** have resulted in a different verdict, the undersigned did not find that the actions taken by the United States were malicious or done in bad faith. The record does not establish a scintilla of evidence that then-United States Attorney Booth Goodwin and then-AUSA Steven Ruby acted in bad faith or with malice towards the Movant. While the benefit of collateral review establishes that the verdict COULD have been different had the favorable evidence been made available to Movant, it is equally as likely that had the evidence been disclosed that Movant COULD have still been convicted. Movant, however, has established his burden under Brady that requires him to show that the suppressed, favorable evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." See Kyles, 514 U.S. at 434, 115 S.Ct. at 1567. With that said, the undersigned believes that there is no question that Movant has satisfied his burden of proof establishing by a preponderance of the evidence that the United States violated his constitutional rights by committing a Brady violation justifying Section 2255 relief.

The Movant may attempt to paint the undersigned's recommendation in this matter as proof of something more sinister than errors, but from the undersigned's review of the entire record produced in this matter, there is no evidence that Mr. Goodwin and Mr. Ruby acted with any ulterior motive other than to attempt to hold the Movant responsible for criminal violations of the laws of the United States. As this recommendation clearly states, while errors were made in the pursuant of justice in this matter, which requires that the undersigned recommend relief for the Movant, it is equally important to make clear that the undersigned does not find a scintilla of evidence that Mr. Goodwin and/or Mr. Ruby acted with improper motive or malice towards the Movant.

## PROPOSAL AND RECOMMENDATION

Based upon the foregoing, it is therefore respectfully **PROPOSED** that the District Court confirm and accept the foregoing factual findings and legal conclusions and **RECOMMENDED** that the District Court **GRANT** Movant's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody (Document No. 663), **DENY as moot** Movant's Motion for Evidentiary Hearing (Document No. 704), **DENY as moot** Movant's Motion for Oral Argument (Document No. 733), and **REMOVE** this matter from the Court's docket.

Movant is notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable United States District Judge Irene C. Berger. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), Rule 8(b) of the Rules Governing Proceedings in the United States District Courts Under Section 2255 of Title 28, United States Code, and Rule 45(c) of the Federal Rules of Criminal Procedure, Movant shall have seventeen days (fourteen days, filing of objections and three days, mailing/service) from the date of filing of these Findings and Recommendation within which to file with the Clerk of this Court, written objections, identifying the portions of the Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208, 104 S. Ct. 2395, 81 L. Ed. 2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Berger,

and this Magistrate Judge.

The Clerk is requested to send a copy of this Proposed Findings and Recommendation to counsel of record.

Date: August 26, 2019.

Omar J. Aboulhosn
United States Magistrate Judge

60